

Joseph E. Caceres, Esq. (SBN 169164)
Charles Shamash, Esq. (SBN 178110)
CACERES & SHAMASH, LLP
9701 Wilshire Boulevard, Suite 1000
Beverly Hills, California 90212
Tel: (310) 205-3400
Fax: (310) 878-8308
Email: jec@locs.com

Attorneys for Claimant Jeff Ratner & Associates, Inc.

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| In re | Case No.: 2:25-bk-11235-NB |
|---|---|
| ITKIN & SABADASH, | Chapter 7 (Involuntary) |
| | **OPPOSITION OF JEFF RATNER & ASSOCIATES, INC. TO OBJECTION TO CLAIM NO.'s 2-3 FILED BY PUTATIVE PARTNER ALEXANDER SABADASH; DECLARATIONS OF ELENA GOFMAN, JEFF RATNER, AND GARRY Y. ITKIN IN SUPPORT THEREOF** [Re: Dkt. # 26] |
| | ***DECLARATION OF ELENA GOFMAN FILED SEPARATELY HEREWITH*** |
| Debtor. | Date:    June 3, 2025<br>Time:    2:00 p.m.<br>Ctrm:    1545<br>        255 E. Temple Street<br>        Los Angeles, CA 90012 |

//

//

//

//

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF FACTS ......................................................................................... 2

III.    ARGUMENT ............................................................................................................. 2

    A.      General Standards Regarding Objections to Claims................................................ 2

    B.      Sabadash Admits that the Claim Objection is Premature ....................................... 3

    C.      The Ratner Claim is a Legitimate Claim Against Itkin & Sabadash ..................... 4

        1.    The Itkin & Sabadash Partnership Exists .......................................................... 4

        2.    Ratner's Claim is Not "False" .......................................................................... 6

        3.    Ratner's Claim is Not Barred by Any Statute of Limitations .......................... 7

        4.    Garry Itkin's Trial Testimony Did Not Magically Dissolve the
            Partnership ....................................................................................................... 8

IV.     CONCLUSION ......................................................................................................... 9

DECLARATION OF ELENA GOFMAN with EXHIBITS…………................. (separately filed)

DECLARATION OF JEFF RATNER .......................................................................... . 10

DECLARATION OF GARRY Y. ITKIN ..................................................................... . 12

LIST OF EXHIBITS ...................................................................................................... .15

1  **TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE,**

2  **THE UNITED STATES TRUSTEE, AND OBJECTING PARTY:**

3        Claimant JEFF RATNER & ASSOCIATES, INC. ("Ratner") hereby submits its

4  *Opposition of Jeff Ratner & Associates, Inc. to Objection to Claim No.'s 2-3 Filed by Putative*

5  *Partner Alexander Sabadash; Declarations of Elena Gofman, Jeff Ratner, and Garry Y. Itkin in*

6  *Support Thereof*, as follows.

7  **I.    <u>INTRODUCTION</u>**

8        The objection to Ratner's claim (the "Claim Objection") filed by self-described

9  "putative partner" Alexander Sabadash ("Sabadash") is largely based on his contention that the

10  "Itkin & Sabadash" partnership does not exist, such that there can be no claims against it.  As

11  Sabadash knows, however, a finding on that issue has not yet been made by this Court, although

12  he placed it squarely before the Court by virtue of his pending motion to dismiss the involuntary

13  petition.  Hence, the Claim Objection is premature, and should await a finding on the issue of the

14  existence of the partnership by this Court, as that decision could make the objection to claim moot

15  regardless of which way the Court rules (if it rules there is a partnership, the Claim Objection has

16  no merit; if it rules there is not, the case would presumably be dismissed).  Moreover, the Court

17  indicated at the initial hearing on the motion to dismiss that it was considering abstaining from

18  the involuntary, which might also moot the Claim Objection.

19        In apparent recognition of the foregoing, Sabadash admits that the Claim Objection is

20  premature, while also arguing that the Ratner Claim itself is premature.  Ratner agrees

21  wholeheartedly that the Claim Objection is premature for the reasons set forth above; but

22  disagrees with the contention that the claim itself is premature, as that latter contention stands

23  solely on Sabadash's spurious assertion that the claim was somehow filed "too early."  This is

24  nonsensical.  Moreover, after admitting that his Objection is premature, Sabadash goes on to

25  argue that the claim should be disallowed.  This is also nonsensical – since both parties agree that

26  the Objection is premature, it should be summarily overruled.

27        Should the Court, however, decide that a ruling on the merits of Ratner's claim is

28  appropriate despite the foregoing, the claim is valid for the reasons set forth below, including that

1  Mr. Itkin affirmed and acknowledged the debt as a partner of Itkin & Sabadash.  Moreover,

2  Sabadash's assertion that Ratner's claim is barred by the statute of limitations has no merit.

3  Finally, Sabadash's apparent conclusion that Garry Itkin's trial testimony that he thought the

4  partnership "ended" in 2016 somehow established that the partnership was magically dissolved at

5  that time is plainly incorrect; not to mention that it flies in the face of his mantra that the

6  partnership never existed in the first place.

7  **II.    STATEMENT OF FACTS**

8      The background of this case is described in detail in Petitioning General Partner

9  Garry Y. Itkin's *Opposition to Putative Partner Alexander Sabadash's Motion to Dismiss*

10  *Involuntary Petition Under FRCP 12(b)(l) and 12(b)(6) or, in the Alternative, Motion for*

11  *Summary Judgment*, filed <u>April 8, 2025</u> as <u>Dkt. # 16</u> ("Opposition to Motion to Dismiss"), and

12  currently before the Court on the same date and time as the Claim Objection.  Hence, rather than

13  repeat that background, Ratner incorporates the factual recitation in the Opposition to Motion to

14  Dismiss herein by reference.

15  **III.    ARGUMENT**

16      **A.    General Standards Regarding Objections to Claims**

17      Pursuant to 11 U.S.C. § 502(a), a proof of claim is deemed allowed unless a party in

18  interest objects.  Under Fed.R.Bankr.Proc. 3001(f), a proof of claim "filed in accordance with

19  these rules shall constitute *prima facie* evidence of the validity and amount of the claim."  *See*

20  *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).

21      When a creditor has filed a proof of claim that complies with the rules (thereby giving

22  rise to the presumption of validity), the burden shifts to the objecting party who must "present

23  evidence to overcome the prima facie case." *In re Medina*, 205 B.R. 216, 222 (9th Cir. B.A.P.

24  1996). To defeat the claim, the objecting party must provide sufficient evidence and "show facts

25  tending to defeat the claim by probative force equal to that of the allegations of the proofs of

26  claim themselves." *Lundell*, 223 F.3d at 1039 (quoting *In re Holm*, 931 F.2d 620, 623 (9th Cir.

27  1991)).  "The objector must produce evidence, which, if believed, would refute at least one of the

28  allegations that is essential to the claim's legal sufficiency." *Lundell*, 223 F.3d at 1040 (quoting

2

1    *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3rd Cir. 1992)).  If the objecting party produces

2    sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden

3    reverts back to the claimant to prove the validity of the claim by a preponderance of the evidence.

4    *See In re Consol. Pioneer Mort*, 178 B.R. 222, 226 (9th Cir. BAP 1995), *aff'd*, 91 F.3rd 151 (9th

5    Cir. 1996) (quoting *Allegheny Int'l*, 954 F.2d at 173-74).

6    **B.    Sabadash Admits that the Claim Objection is Premature**

7              In apparent recognition of the realities of this case, Sabadash admits that the Claim

8    Objection is premature, and Ratner agrees.  The Claim Objection is largely based on Sabadash's

9    contention that the "Itkin & Sabadash" partnership does not exist, such that there can be no claims

10    against it.  As Sabadash knows, however, a finding on that issue has not yet been made by this

11    Court, although he placed it squarely before the Court by virtue of his pending *Motion to Dismiss*

12    *Involuntary Petition*, filed <u>March 20, 2025</u> as <u>Dkt. # 8</u> (the "Motion to Dismiss"), initially heard

13    before this Court at the first hearing on the matter on April 22, 2025 at 11:00 a.m., and continued

14    to the above date and time.  Hence, the Claim Objection should await a finding on the issue of the

15    existence of the partnership by this Court on that motion, as that decision could make the

16    objection to claim moot regardless of which way the Court rules (if there is a partnership, the

17    Claim Objection has no merit; if there is not, the case would presumably be dismissed).

18    Moreover, the Court indicated at the initial hearing on the Motion to Dismiss that it was

19    considering abstaining from the involuntary, which might also moot the Claim Objection.

20              Sabadash's contention, on the other hand, that the claim itself is also premature is

21    nonsensical, as that contention stands solely on his spurious assertion that the claim was somehow

22    filed "too early."  This makes no sense whatsoever.  FRBP 3002(c) sets an outside date for claims

23    to be filed, but it does not preclude an earlier filing, even in the involuntary period.  Moreover, it

24    stands to reason that creditors who filed joinders should be entitled to file claims to substantiate

25    their joinders; indeed, if the claims were not filed, Sabadash would surely be kicking and

26    screaming that those who filed joinders had not even filed claims.

27              In any event, after admitting that the Claim Objection is premature, Sabadash goes on to

28    argue that the claim should be disallowed.  This is nonsensical – since both parties agree that the

1    Objection is premature, the inquiry should end there, pending a decision on the issue of whether a

2    partnership exists, and on the Motion to Dismiss in general, given the possibility of abstention

3    raised by the Court.

4         For the foregoing reasons, Ratner agrees that the Claim Objection is premature, such that

5    the Claim Objection should be overruled on this basis alone.

6    **C.       The Ratner Claim is a Legitimate Claim Against Itkin & Sabadash**

7         **1.   The Itkin & Sabadash Partnership Exists**

8         As more fully set forth in the Declaration of Elena Gofman ("Gofman Decl.") filed

9    separately herewith, she (Gofman) is a Russian tax attorney that sued the Itkin/Sabadash

10   Partnership in Moscow and Los Angeles for unpaid legal fees, and received a monetary

11   judgement against Itkin & Sabadash in both jurisdictions.  Moreover, Gofman's judgment

12   specifically confirms the existence of the Itkin & Sabadash Partnership.

13        Not surprisingly, Sabadash completely ignores these facts, instead engaging in wild

14   speculation and opinion regarding alleged fraud on the part of Gofman and Mr. Itkin in obtaining

15   the judgment, trying to goad them into an unnecessary exercise of trying to prove a negative.  It is

16   noteworthy that Sabadash never made any allegations that the Moscow judgement was fake,

17   fraudulent, or based on counterfeit or forged documents in any of the 5 trial or appellate courts,

18   including the Los Angeles Superior Court, that considered the issues, yet now speculates wildly

19   that Gofman "appears" to be one of Mr. Itkin's personal lawyers, hired specifically to fake a

20   partnership through court judgments.  If true, why did Sabadash wait until now to make this

21   argument?  Not even Mr. Zorkin, who of course filed the instant Claim Objection, raised such

22   issues in the L.A. Superior Court.  The judgment referred to in the attached Gofman Decl. speaks

23   for itself; it cannot now be wished away by collateral attack in a different forum.  *See* Gofman

24   Decl., and **Exhibits A-H** thereto.

25        Regardless, if Sabadash believed the judgments were obtained fraudulently, his remedy

26   was to go back to the courts that issued them, not to seek to collaterally attack them in the context

27   of a claim objection, which is prohibited under the doctrines of res judicata and/or collateral

28   estoppel, as well as the *Rooker-Feldman* doctrine.  The United States Supreme Court explained as

follows in *Montana v. United States*, 440 U.S. 147 (1979):

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies .... " *Southern Pacific R. Co. v. United States*, 168 U.S. 1. 48-49 (1897). Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Cromwell v. County of Sac*, 94 U.S. 351. 352 (1877); *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326 (1955); 1BJ. Moore, Federal Practice if 0.405 [1], pp. 621-624 (2d ed. 1974) (hereinafter 1B Moore); Restatement (Second) of Judgments § 47 (Tent. Draft No.1 Mar. 28, 1973) (merger); id., § 48 (bar). Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5 (1979); Scott, Collateral Estoppel by Judgment, 56 Harv. L. Rev.1, 2-3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra, at 49*; *Hart Steel Co. v. Railroad Supply Co.*, 244 U. S. 294. 299 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, 154*154 and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

In addition to the foregoing, the *Rooker-Feldman* doctrine applies to bar the action Sabadash is trying to take here.  This doctrine takes its name from *Rooker v. Fidelity Trust Co.*, 263 US. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 US. 462 (1983). In *Rooker*, the court held that federal statutory jurisdiction over direct appeals from state courts lies exclusively in the United States Supreme Court and is beyond the original jurisdiction of federal district courts.  *See* 263 U.S. at 415-16.  In *Feldman*, the court held that this jurisdictional bar extends to particular claims that are "inextricably intertwined" with those claims that a state court has already decided.  *See* 460 U.S. at 486-87.  This is just such a case, as the exact same judgment is being attacked as fraudulent.

In short, five courts, including a California state court, have already considered and ruled in Gofman's favor on the issue of the existence of a partnership and Gofman's entitlement to a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

judgment against it.  Sabadash would have this court throw out all of these rulings and declare Gofman's judgment to be fraudulent, notwithstanding the principles of res judicata and collateral estoppel (issue preclusion), as well as the *Rooker-Feldman* doctrine.  Making matters worse, he asks that this Court do so based on nothing but his opinion and speculation.  This attempt should be rejected.

## 2.  Ratner's Claim is Not "False"

In line with Sabadash's modus operandi in this case, he claims that Ratner's claim and Garry Itkin's letter affirming and acknowledging it are essentially "false" and "convenient," based on the existence of a partnership which Sabadash asserts does not exist (as stated in the objection, "The letter makes clear that the claim is based solely on the existence of a partnership and fails if the partnership fails").  Sabadash also claims that Ratner "admitted at deposition that Mr. Itkin never told him there was a partnership."  All of these assertions are without merit.

First, as set forth above, a partnership does exist; and no amount of wishing it away on Sabadash's part, or repeating his tired opinion that the Russian and Los Angeles rulings were obtained by fraud, will change that.  Again, if Sabadash wanted to challenge the rulings of the various Russian courts and the L.A. Superior Court, his remedy was to go back to the courts that issued them, not to seek to collaterally attack them in the context of a claim objection before this Court.

Second, any assertion that the claim is otherwise "false" is vague and unsupported, based wholly on Sabadash's opinion and speculation.  As more fully described in the attached Ratner and Itkin declarations, the debts Ratner seeks payment for were legitimate and actually incurred, when he was sucked into a partnership dispute and deposed in a state trial that involved entities belonging to the partnership, and incurred costs for both preparation and conduct of the deposition.  At that time, in his capacity as general partner of the partnership, Itkin promised to reimburse Ratner for those expenses, and issued his letter affirming the debt on behalf of the

1  partnership.  *See* Ratner and Itkin Declarations.

2      Finally, as set forth in more detail in the attached Ratner Decl., Sabadash's contention that

3  Ratner "admitted at deposition that Mr. Itkin never told him there was a partnership" is a gross

4  distortion of Ratner's testimony, as it omits various excerpts where Ratner testified that he was

5  told by Itkin of Sabadash's offer to Itkin specifically to go into a partnership, his acceptance

6  thereof, and his part ownership as a partner of all entities owned (of record) by Sabadash,

7  including New Albion (owner of the Beverly Park Property).

8

9              **3.  Ratner's Claim is Not Barred by Any Statute of Limitations**

10      Next, Sabadash asserts that Ratner's claim is barred by the "2 or 4" year statute of

11  limitations, without any analysis whatsoever, or even citation to any such statute, whether from

12  California (presumably he is referring to the 2 and 4 year statutes of limitation of *Calif. Code of

13  Civ. Proc.* ("CCP") §§ 339 and 337, respectively)[1]; or from Russia.[2]  Regardless, as more fully set

14  forth in the attached Declaration of I&S partner Garry Y. Itkin ("Itkin Dec."), this contention has

15  no merit, regardless of whether the California statute of limitations or the Russian statute of

16  limitations applies, for the simple reason that Mr. Itkin continuously (at least once a year), spoke

17  with Ratner (and others) and promised to pay them so as to avert further lawsuits such as

18  Gofman's, hoping for the Los Angeles court to dissolve the Itkin & Sabadash Partnership so that

19

20  its assets could be sold and debts paid.  He also issued these promises in writing.  *See* Itkin Decl.

21

22  _____

23  [1] *Calif. CCP § 337* provides, in pertinent part, that an action shall be commenced within 4 years if based on
"(a) An action upon any contract, obligation or liability founded upon an instrument in writing…" or "(b) An action
to recover (1) upon a book account whether consisting of one or more entries; (2) upon an account stated based upon
24  an account in writing, but the acknowledgment of the account stated need not be in writing; (3) a balance due upon a
mutual, open and current account, the items of which are in writing…."

25  *Calif. CCP § 339* provides, in pertinent part, that an action shall be commenced within 2 years if based on
26  "1. An action upon a contract, obligation or liability not founded upon an instrument of writing…."

27  [2] In Russia, the statute of limitations is either 3 years if the debtor does not admit the debt, and 10 years if debtor does
admit it, pursuant to its *Civil Code Section 196,* titled "General Statutes of Limitation Periods."  With regard to the
28  10-year period, the statute states, in pertinent part, that "The limitation period may not exceed ten years from the date
of violation of the right for the protection of which this period is established…."

For the foregoing reasons, both statutes of limitations, California's and Russia's, were restarted and/or waived by acknowledgment of the debt, as allowed under *Calif. CCP § 360* (providing that written acknowledgment or promise regarding debt takes such debt out of the operation of statute of limitations), and Russian *Civil Code Section 196* (extending statute of limitations to 10 years where debtor admits the debt, as here).

### 4.  Garry Itkin's Trial Testimony Did Not Magically Dissolve the Partnership

Finally, Sabadash's apparent conclusion that Garry Itkin's testimony during trial that he thought the partnership "ended" in 2016 somehow established that the partnership was magically dissolved at that time is plainly incorrect.  Moreover, this contention flies in the face of Sabadash's mantra that the partnership never existed in the first place.

As set forth in more detail in the attached Itkin Decl., what Itkin meant in this testimony was that when he was removed from his offices and was refused to have monies owed to him paid, the partnership ended in its functionality; i.e., it stopped operating.  That is precisely why he sued in State Court in the first place to dissolve the partnership, liquidate its assets, pay any debts due, and determine the financial relationship between the partners.  If Sabadash was correct that the partnership magically "dissolved" in 2016 just because of Itkin's use of the word "ended" in trial testimony, Itkin would not have needed to file the lawsuit.  Moreover, it goes without saying that a partnership cannot magically dissolve itself, but has to follow proper legal procedures, either by a voluntary process between the partners or court order, to do so.  Unfortunately, the lawsuit ended in a mistrial and stay due to the Covid-19 pandemic.

//

//

//

//

//

8

IV.    **CONCLUSION**

For all of the above reasons, the Claim Objection must be (1) overruled as premature pending this court's decision on whether a partnership exists, whether to dismiss the case, or whether to abstain from it; or (2) should the Court decide that a ruling on the merits of the claim is appropriate at this time despite the foregoing, overrule the Claim Objection on the basis that the claim is valid for the reasons set forth above.[3]

Dated: May 19, 2025                    CACERES & SHAMASH, LLP

                                      /s/ Joseph E. Caceres
                                      _____
                                      Joseph E. Caceres, Esq.
                                      Charles Shamash, Esq.
                                      Attorneys for Claimant Jeff Ratner &
                                      Associates, Inc

---

[3] Ratner recognizes that Claims 2 and 3 are duplicates.  Claim 3 was re-filed to attach further documentation, but was not designated as an "amended claim."  Hence, Ratner has no issue with Claim 2 being disallowed as a duplicate claim, with Claim 3 being allowed.

## DECLARATION OF JEFF RATNER

I, Jeff Ratner, declare as follows:

1.      I am the principal of claimant Jeff Ratner & Associates, Inc. ("JRA").  I am over the age of 18.  The facts contained within this declaration are of my personal knowledge except where stated on information and belief, and if called upon to testify to them I would do so.  As to matters set forth on information and belief, I believe them to be true.

2.      Sabadash's assertion that my company's claim is "false" is vague and unsupported, based wholly on his opinion and speculation.  As more fully described in the attached Declaration of Garry Itkin, for years Jeff Ratner & Associates provided accounting and tax services to 58 Beverly Park property, New Albion Limited, AFB Trading One, Inc., and VLK Air, Inc.  From various unassailable court judgements, both Russian and U.S., it was clear to me that the Beverly Park property, New Albion Limited, AFB Trading One, Inc., and VLK Air, Inc. and all property vested therein, in reality belonged to the Itkin & Sabadash Partnership, such that Ratner's services were provided to the Partnership.  The debts I now seek payment for were legitimate and actually incurred, when I was sucked into a partnership dispute and deposed in a state trial that involved the above entities belonging to the partnership, and I incurred costs for both preparation and conduct of the deposition.  By mutual agreement, and in his capacity as general partner of the partnership, Mr. Itkin promised to reimburse me for those expenses, and issued his letter affirming the debt on behalf of the partnership, which is attached to the claim.

3.      Sabadash also contends that I "admitted at deposition that Mr. Itkin never told him [i.e., me] there was a partnership."  This is a gross distortion of my testimony, as it omits various excerpts where I testified that I was told by Mr. Itkin of Sabadash's offer to Mr. Itkin <u>specifically to go into a partnership</u>, his acceptance thereof, and his part ownership as a partner of all entities owned (of record) by Sabadash, including New Albion (owner of the Beverly Park Property).

Attached hereto as **Exhibits I-J** are true and correct copies of relevant pages of my deposition testimony (morning and afternoon sessions, respectively), reflecting the following statements made by me, among others:

FROM EXHIBIT I

- that Itkin told me Sabadash made him an offer "that he cannot refuse." *See Lines designated 11:39-06 – 11:39-12;*

- that Itkin "said to me Sabadash offered him a partnership…" *See Lines designated 11:40-00 – 11:40-05;* and

- that Itkin told me Sabadash "offered him to become a partner." *See Line designated 11:40-30.*

FROM EXHIBIT J

- that "The only thing I know that he said that he's a partner, but – …." *See Lines designated 02:46-42 – 02:46-45;*

- that Itkin was a partner "In every entity which is owned by Sabadash." *See Lines designated 02:46-46 – 02:46-48;*

- that Itkin "…in our conversation, he always referred that he's a partner of Sabadash." *See Lines designated 02:47-15 – 02:47-33;* and

- that Itkin referred to himself in conversations with me as a partner in "…any business he's communicating with me because he's the only source of communication," and that this was with regard to businesses named AFB, Maxim Distribution, VLK Air, and New Albion. *See Lines designated 02:48-24 – 02:49-03.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May ___19___, 2025 at Beverly Hills, California.

Jeff Ratner

## <u>DECLARATION OF GARRY Y. ITKIN</u>

I, Garry Y. Itkin, declare as follows:

1.      I am a partner of Itkin & Sabadash, the Involuntary Debtor in this case.  I am over the age of 18.  The facts contained within this declaration are of my personal knowledge except where stated on information and belief, and if called upon to testify to them I would do so.  As to matters set forth on information and belief, I believe them to be true.

2.      Sabadash's assertion that Ratner's claim is "false" is vague and unsupported, based wholly on his opinion and speculation.  For years Jeff Ratner & Associates provided services to Beverly Park property, New Albion Limited, AFB Trading One, Inc., and VLK Air, Inc.  From various unassailable court judgements, both Russian and U.S., it was clear that the Beverly Park property, New Albion Limited, AFB Trading One, Inc., and VLK Air, Inc. and all property vested therein, in reality belonged to the Itkin & Sabadash Partnership, such that Ratner's services were provided to the Partnership.  In its claim, Jeff Ratner & Associates are claiming debt for reimbursement of legal expenses they incurred for Jeff Ratner's deposition in State trial that involved entities belonging to Partnership, both in preparation for and conduct of the deposition.  By mutual agreement, and in my capacity as General Partner of the Partnership, I promised to reimburse him for this expense as well as his time, on behalf of the Partnership from the proceeds of liquidation of Partnership's assets that I hoped would be realized from the Court's termination of the Partnership.  This promise I confirmed in writing.  A true and correct copy of my letter affirming and acknowledging the Ratner debt is attached to Ratner's Claim 3.

3.      Sabadash also asserts that the "claims are barred by both the 2 or 4-year statute of limitations for either oral or written obligations."  In this regard I note that I have continuously (at least once a year), spoken with Ratner (and others) and promised to pay them so as to avert further lawsuits such as Gofman's lawsuit that resulted in a judgment against Itkin & Sabadash.  I

also issued these promises in writing, as set forth above.  My hope was that the Los Angeles court would dissolve the Itkin & Sabadash Partnership so that its assets could be sold and debts paid. The sale of assets and resulting payment of creditors is also my goal for this involuntary case, and the reason I commenced the case as a general partner.

4.      In an attempt to show that no partnership exists, Sabadash asserts that because I testified at trial in L.A. Sup.Ct. Case No. BC647351 that the partnership "ended" in 2016, that meant in and of itself that the partnership was magically dissolved at that time.  Attached hereto as **<u>Exhibit K</u>** is a true and correct copy of the relevant two pages of my trial testimony from where he drew these conclusions (*see* p.25:18 – 26:3).  This is the exact testimony appearing on those pages:

> *Q. Are you still a member or in the partnership?*
>
> *A. I don't think so. We're in a courtroom trying to enter [sic; end] this partnership and figure out who owes what to whom.*
>
> *Q. When did the partnership end?*
>
> *MR. KABATECK: Calls for a legal conclusion.*
>
> *THE COURT: Sustained.*
>
> *Q. BY MR. PLATT: When did you believe the partnership ended?*
>
> *A. I believe the partnership ended when I was removed from the offices and refused to be paid monies that I'm owed.*
>
> *Q. Would that be in 2016?*
>
> *A. I believe so.*

What I meant in this testimony was that when I was removed from my offices and was refused to have monies owed to me paid, the partnership ended in its functionality; i.e., it stopped operating.  That is precisely why I sued in State Court to dissolve the partnership, liquidate its assets, pay any debts due, and determine the financial relationship between the partners.  If

Sabadash was correct that the partnership magically "dissolved" in 2016, I would not have needed to file the lawsuit; but it was obvious to me even as a lay person that a partnership could not magically dissolve itself, but had to follow proper legal procedures, either by a voluntary process between the partners or court order, to do so.  Unfortunately, the lawsuit ended in a mistrial and stay due to the Covid-19 pandemic.

5.    In short, Sabadash's apparent conclusion that the foregoing established that the partnership was in essence "dissolved" in 2016 is incorrect; not to mention that it flies in the face of his mantra that the partnership never existed.

6.    Finally, as a partner of Itkin & Sabadash, I have reviewed all nine claims that have been filed to date in the involuntary case, including the one discussed in this opposition, and acknowledge that they are all valid claims against the partnership.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May ___19___, 2025 at Beverly Hills, California.


_____
Garry V. Itkin

# <u>LIST OF EXHIBITS</u>

<u>Exhibit No</u>.                                                                            <u>Pages</u>

EXHIBIT I -   Copy of Relevant Pages of Jeff Ratner Trial Testimony (Morning)…..…….. 16-22

EXHIBIT J -   Copy of Relevant Pages of Jeff Ratner Trial Testimony (Afternoon)……….. 23-30

EXHIBIT K -  Copy of Relevant Pages of Garry Itkin Trial Testimony…………………….. 31-33

# EXHIBIT I

1    Q    So at the time that Mr. Sabadash hired        11:36:36

2    your office to begin performing work, you were      11:36:38

3    interacting directly with Mr. Sabadash; is that     11:36:41

4    true?                                                11:36:41

5        A    Yes.                                        11:36:45

6    Q    There was no person who was interacting        11:36:45

7    with your office on Mr. Sabadash's behalf at that    11:36:52

8    time; is that true?                                  11:36:55

9        A    Yes.                                        11:36:56

10       Q    Now, when Mr. Itkin left your office in     11:37:07

11   approximately April of 2000 --                       11:37:11

12           That's correct; right?                        11:37:16

13       A    Yeah.                                       11:37:17

14       Q    When Mr. Itkin left your office in         11:37:18

15   approximately April of 2000, did he tell you the    11:37:20

16   reason why he was leaving?                           11:37:22

17       A    Well, he started, I believe, at that      11:37:30

18   time -- yes.                                         11:37:33

19       Q    What did he tell you?                       11:37:34

20       A    Well, I believe -- if I can recall it --   11:37:37

21   my memory -- him and Alexander, they are almost the  11:37:43

22   same age and they became quite friends, close       11:37:50

23   friends.  I mean, they were family.  They were       11:37:55

24   going to dinners together, et cetera, et cetera.     11:38:01

25           At some point, Garry came to me and said    11:38:03

Page 61

|    |    |    |
|----|----|----|
| 1  | that Alexander made him an offer he can't refuse, | 11:38:08 |
| 2  | but he was scared.  He was young.  He didn't have | 11:38:15 |
| 3  | much experience working in a foreign country. | 11:38:19 |
| 4  | He asked me to join him, to go together, | 11:38:24 |
| 5  | and I said, "No, I will not go.  I have my family | 11:38:33 |
| 6  | here.  I have my mother." | 11:38:41 |
| 7  | She was old, and I don't need it, and I | 11:38:42 |
| 8  | said, "You're young.  You're ambitious.  You want | 11:38:46 |
| 9  | to make a lot of money.  Go for it." | 11:38:50 |
| 10 | He said, "But I am kind of -- here I have | 11:38:54 |
| 11 | my income my family." | 11:38:58 |
| 12 | And I said, "You cannot do that.  Either | 11:39:00 |
| 13 | you are in or you are not." | 11:39:03 |
| 14 | Q    So Itkin told you that Mr. Sabadash made | 11:39:06 |
| 15 | him an offer that Itkin couldn't refuse; right? | 11:39:09 |
| 16 | A    That he cannot refuse. | 11:39:12 |
| 17 | Q    What was the offer that Mr. Itkin | 11:39:13 |
| 18 | described to you? | 11:39:16 |
| 19 | A    He didn't describe it to me, and I wasn't | 11:39:16 |
| 20 | even interested in that. | 11:39:19 |
| 21 | Q    So Mr. Itkin never told you the terms of | 11:39:21 |
| 22 | what Mr. Sabadash offered him? | 11:39:24 |
| 23 | A    Correct. | 11:39:25 |
| 24 | Q    But Mr. Itkin did ask you to join him in | 11:39:26 |
| 25 | going to Russia to work with Mr. Sabadash; correct? | 11:39:30 |

Page 62

1    A    Yeah, to go on 50/50 basis to work with          11:39:33
Alexander.                                                   11:39:37

3    Q    Well, can you explain.                           11:39:39

     I hear you say Itkin asked you to go on a             11:39:42
50/50 basis, but what were the terms of the offer          11:39:45
made to you by Mr. Itkin?                                   11:39:48

7    A    No.  It wasn't discussed, and I said no          11:39:49
the first -- in the first words.                            11:39:53

9    Q    So you just said "to go on a 50/50 basis."       11:39:56
What did you mean when you said that?                       11:39:59

11    A    Well, he said to me Sabadash offered him a      11:40:00
partnership.  His share -- if I can go on his share        11:40:05
on a 50/50 basis.                                           11:40:09

14    Q    Okay.                                            11:40:10

15    A    That's what it is.                               11:40:12

16    Q    So let's step back.                              11:40:12

17         Mr. Itkin did describe to you at least          11:40:14
something about what Mr. Sabadash purportedly              11:40:16
offered to him; correct?                                    11:40:21

20         MR. SARGOY:  Objection.  Misstates.             11:40:22

21    BY MR. DAVIS:                                         11:40:25

22    Q    You can answer the question.                    11:40:25

23         MR. SARGOY:  Go ahead.                           11:40:26

24         THE WITNESS:  Not on a money-wise.  It's        11:40:27
just a -- he offered him to become a partner.              11:40:30

                                                           Page 63

0019

BY MR. DAVIS:                                          11:40:34

 1    Q    Okay.  And did Mr. Itkin tell you the       11:40:35

 2 terms of this purported partnership share that was  11:40:39

 3 offered to him by Mr. Sabadash?                      11:40:43

 4    A    No.                                          11:40:45

 5    Q    Did Mr. Itkin tell you the percentage of    11:40:46

 6 the partnership that was purportedly offered by     11:40:49

 7 Mr. Sabadash?                                        11:40:52

 8    A    No.                                          11:40:52

 9    Q    Did Mr. Itkin tell you that there was any   11:40:53

10 guaranteed payment to be made pursuant to this      11:40:56

11 partnership purportedly offered by Mr. Sabadash?    11:41:00

12    A    No.                                          11:41:04

13    Q    Did Mr. Itkin tell you what businesses      11:41:05

14 would be part of this partnership purportedly       11:41:09

15 offered by Mr. Sabadash?                             11:41:12

16    A    No.                                          11:41:14

17    Q    But Mr. Itkin did ask you to join him and   11:41:14

18 take half of whatever partnership interest he was   11:41:21

19 going to get; correct?                               11:41:24

20    A    Yes.                                          11:41:24

21    Q    Did Mr. Itkin tell you how much money that  11:41:27

22 partnership interest would be worth?                 11:41:31

23    A    No.                                          11:41:33

24    Q    Did Mr. Itkin tell you the terms of what    11:41:34

Page 64

0020

```
 1    that portion of the partnership interest would be?    11:41:39

 2         A    No.                                          11:41:42

 3         Q    And you never asked any questions to get    11:41:43

 4    more information?                                      11:41:46

 5         A    I was not interested, no.                    11:41:47

 6         Q    So if you knew hypothetically that this      11:41:50

 7    opportunity Mr. Itkin was presenting to you would      11:41:55

 8    pay you $100 million a year, you wouldn't have been    11:41:57

 9    interested?                                            11:42:01

10         A    No.                                          11:42:01

11         Q    Under no circumstances?                      11:42:03

12         A    Absolutely not.  My mom was 88 years old.    11:42:04

13    She was alone.  I couldn't leave her.                  11:42:08

14         Q    Did Mr. Sabadash ever talk to you at any     11:42:15

15    point in time about the purported partnership          11:42:17

16    interest that was offered to Mr. Itkin?                11:42:22

17         A    No.                                          11:42:23

18         Q    He never mentioned it?                       11:42:24

19         A    Never.                                       11:42:25

20         Q    After Mr. Itkin left in 2000, did            11:42:25

21    Mr. Sabadash ever, at any point in time, mention a     11:42:29

22    purported partnership with Mr. Itkin?                  11:42:33

23         A    No.                                          11:42:35

24         Q    You never had any conversation with          11:42:39

25    Mr. Sabadash ever in which a partnership between       11:42:42

                                                     Page 65
```

0021

```
 1    accounting and he knows finance.                      11:44:04

 2         Q    So when you say -- I'm just trying to        11:44:06

 3    understand what you mean when you say he would take    11:44:09

 4    over the financials.                                   11:44:11

 5         A    Uh-huh.                                      11:44:12

 6         Q    Do you mean that Mr. Itkin told you he       11:44:12

 7    would be doing the bookkeeping for Mr. Sabadash's      11:44:15

 8    companies?                                             11:44:17

 9         A    No.                                          11:44:17

10         Q    What does it mean when you say that          11:44:18

11    Mr. Itkin told you he would be taking over the         11:44:19

12    financials?                                            11:44:22

13         A    It's like a -- in my understanding, like he  11:44:22

14    will be a Chief Financial Officer of the company.      11:44:26

15         Q    And did Mr. Itkin tell you whether that      11:44:30

16    role would pertain to the Russian business             11:44:33

17    operations?                                            11:44:36

18         A    Well, I believe the purpose of the           11:44:37

19    partnership was to oversee all the business            11:44:41

20    entities in Russia, not here.                          11:44:43

21         Q    So your understanding is that this           11:44:45

22    purported partnership between Mr. Itkin and -- and     11:44:49

23    Mr. Sabadash was entered for the purpose of having     11:44:53

24    Mr. Itkin oversee the finances of the Russian          11:44:57

25    business enterprises; correct?                         11:45:01
```

Page 67

0022

# EXHIBIT J

CONFIDENTIAL

```
1    of the services rendered to New Albion.            02:45:35

2         A    I cannot recall it.  I don't remember.  My   02:45:37

     invoices were to New Albion.  If I provide --    02:45:45

3         Q    Your invoices were to New Albion?       02:45:48

4         A    Yeah.  Whatever I did for Progressive, the   02:45:51

5    invoice was to Progressive.  Whatever the invoice   02:45:55

6    was for New Albion, it was for New Albion.         02:45:55

7    Whatever the invoice was to Sabadash, it was to    02:45:58

8    Sabadash.                                          02:46:00

9         Q    Do you remember the account for which the   02:46:01

10   New Albion invoices were paid?                     02:46:03

11        A    The account?  The bank account?          02:46:05

12        Q    The signatory on the bank account, the   02:46:09

13   name on the bank account.                          02:46:11

14        A    Oh, I have no idea --                    02:46:13

15        Q    You don't remember?                      02:46:15

16        A    -- I don't know.                         02:46:15

17             I'm not involved in that.                02:46:16

18        Q    So you don't --                          02:46:17

19        A    It's not my business, yes.               02:46:18

20        Q    Are you aware that Itkin claims that he is   02:46:31

21   the shareholder of New Albion today?               02:46:35

22        A    The only thing I know that he said that   02:46:42

23   he's a partner, but --                             02:46:45

24        Q    He's a partner in what?                  02:46:46
```

Page 172

0024

A    In every entity which is owned by Sabadash.    02:46:48

Q    Well, I thought we discussed earlier that    02:46:53
Mr. Itkin told you that Mr. Sabadash made an offer    02:46:56
to become a partner.    02:47:01

A    Right.    02:47:03

Q    But Mr. Itkin had never thereafter    02:47:03
communicated to you that he and Mr. Sabadash    02:47:05
actually entered into any partnership.    02:47:08

A    As a partnership, no, but in our    02:47:10
conversation, he always referred that he's a    02:47:15
partner of Sabadash.    02:47:18

Q    Who -- who always referred that he's a    02:47:20
partner?    02:47:22

A    When we discussed it, he acted on behalf    02:47:22
of any company that he's a partner there.    02:47:25

Q    Okay.  So you are talking about    02:47:28
conversations you had with Mr. Itkin; correct?    02:47:31

A    Yes, correct.    02:47:33

Q    You've never had any conversation with    02:47:33
Mr. Sabadash or any written communication with    02:47:35
Mr. Sabadash in which he referred to Mr. Itkin as a    02:47:38
partner; correct?    02:47:40

A    Correct.    02:47:41

Q    And it's your testimony that Mr. Itkin    02:47:41
would routinely refer to himself as a partner in    02:47:46

Page 173

0025

represented; correct?

2      MR. SARGOY:  Objection.  Misstates --    02:47:55

3  misstates testimony.    02:47:58

4      That Jeff Ratner & Associates represented?  02:48:01

5      MR. DAVIS:  Correct, for purposes of    02:48:04

6  filing income tax returns, bookkeeping, et cetera.  02:48:06

7      THE WITNESS:  Okay.    02:48:09

8      MR. SARGOY:  Do you understand the    02:48:10

9  question?    02:48:11

10      THE WITNESS:  Not really.  It's kind of    02:48:12

11  vague.    02:48:13

12      MR. SARGOY:  It's kind of backward way of    02:48:15

13  saying it, Counsel.    02:48:17

14  BY MR. DAVIS:    02:48:18

15      Q    If you don't understand, I'm happy to    02:48:18

16  rephrase.    02:48:20

17      A    Okay.    02:48:21

18      Q    If you do understand, answer it.    02:48:21

19      A    Please rephrase.    02:48:23

20      Q    Okay.  You testified that Mr. Itkin    02:48:24

21  referred to himself in conversations with you as a    02:48:27

22  partner; correct?    02:48:29

23      A    Yes.    02:48:29

24      Q    And he made that reference in connection    02:48:31

Page 174

0026

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | with dealing -- dealing with businesses in which he | 02:48:33 |
| 2 | purported to be a partner; correct? | 02:48:39 |
| 3 | A    Correct. | 02:48:41 |
| 4 | Q    Which businesses was he referring to? | 02:48:41 |
| 5 | A    Any -- any business he's communicating | 02:48:44 |
| 6 | with me because he's the only one source of | 02:48:47 |
| 7 | communication. | 02:48:50 |
| 8 | Q    So we know he communicated with you | 02:48:51 |
| 9 | regarding AFB; correct? | 02:48:52 |
| 10 | A    Not only AFB. | 02:48:54 |
| 11 | Q    I'm not saying exclusively. | 02:48:55 |
| 12 | A    AFB, yes. | 02:48:57 |
| 13 | Q    Regarding Maxxim Distribution; correct? | 02:48:58 |
| 14 | A    Yes. | 02:48:58 |
| 15 | Q    Regarding VLK Air; correct? | 02:49:01 |
| 16 | A    Yes. | 02:49:03 |
| 17 | Q    Regarding New Albion; correct? | 02:49:03 |
| 18 | A    Yes. | 02:49:03 |
| 19 | Q    And so is it your understanding that | 02:49:04 |
| 20 | Mr. Itkin referred to himself as a partner in | 02:49:06 |
| 21 | connection with at least each of those four | 02:49:09 |
| 22 | businesses? | 02:49:12 |
| 23 | A    Correct. | 02:49:12 |
| 24 | Q    But you never filed any sort of partnership | 02:49:12 |
| 25 | return on behalf of Itkin and Mr. Sabadash; correct? | 02:49:22 |

Page 175

0027

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. SARGOY:  How about we take a | 02:57:52 |
| 2 | five-minute break? | 02:57:54 |
| 3 | MR. DAVIS:  Let's take five minutes. | 02:57:54 |
| 4 | VIDEO OPERATOR:  We are going off the | 02:57:56 |
| 5 | record.  The time is 2:57 P.M. | 02:57:58 |
| 6 | (Off the record.) | 02:58:03 |
| 7 | VIDEO OPERATOR:  We're going back on the | 03:12:53 |
| 8 | record.  The time is 3:12 P.M. | 03:12:58 |
| 9 | Please continue. | 03:13:01 |
| 10 | MR. SARGOY:  Counsel, before we continue, | 03:13:03 |
| 11 | Mr. Ratner would like to make a clarification of | 03:13:06 |
| 12 | testimony within the last period that we were in | 03:13:11 |
| 13 | deposition. | 03:13:15 |
| 14 | THE WITNESS:  I just want to clarify. | 03:13:17 |
| 15 | Because before that, I told on the record that I | 03:13:19 |
| 16 | never heard about that Garry was a partner, and | 03:13:23 |
| 17 | then I testified that Garry, on our conversation, | 03:13:27 |
| 18 | he did say he is a partner.  So I did hear it, that | 03:13:30 |
| 19 | he's a partner. | 03:13:35 |
| 20 | BY MR. DAVIS: | 03:13:36 |
| 21 | Q    I want to make sure I understand. | 03:13:37 |
| 22 | You heard Garry Itkin reference himself as | 03:13:39 |
| 23 | a partner; correct? | 03:13:42 |
| 24 | A    Correct. | 03:13:43 |
| 25 | Q    You never heard or came to learn that | 03:13:43 |

Page 185

0028

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | exactly correct. | 03:17:49 |
| 2 | BY MR. DAVIS: | 03:17:50 |
| 3 | Q    Let me, for purposes of making the | 03:17:50 |
| 4 | record -- | 03:17:52 |
| 5 | MR. SARGOY:  Let him clarify.  Let him | 03:17:52 |
| 6 | clarify it, please. | 03:17:55 |
| 7 | MR. DAVIS:  There's no question pending. | 03:17:57 |
| 8 | It's not -- | 03:17:58 |
| 9 | MR. SARGOY:  He wants to clarify it and | 03:17:58 |
| 10 | then you can ask him. | 03:18:01 |
| 11 | Please -- please go ahead. | 03:18:03 |
| 12 | THE WITNESS:  The last answer, please, can | 03:18:04 |
| 13 | you repeat it? | 03:18:07 |
| 14 | MR. DAVIS:  Do you want me to just ask the | 03:18:12 |
| 15 | question again, and he will have the opportunity to | 03:18:14 |
| 16 | give whatever response he now wants to give? | 03:18:16 |
| 17 | MR. SARGOY:  No.  I want to make sure I | 03:18:18 |
| 18 | hear his answer.  I want to make sure I hear his | 03:18:20 |
| 19 | answer. | 03:18:25 |
| 20 | MR. DAVIS:  Okay.  You can read it back. | 03:18:25 |
| 21 | (The following record | 03:17:46 |
| 22 | was read by the reporter: | 03:17:46 |
| 23 | "QUESTION:  It was your | 03:13:56 |
| 24 | understanding, but you never heard | 03:13:56 |
| 25 | from Garry Itkin or from any other | 03:13:58 |

Page 188

0029

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | person that Mr. Itkin had accepted | 03:14:00 |
| 2 | Mr. Sabadash's offer to enter into | 03:14:02 |
| 3 | a partnership? | 03:14:05 |
| 4 | "ANSWER:  Correct.") | 03:18:51 |
| 5 | THE WITNESS:  It was not exactly correct | 03:18:51 |
| 6 | because he did mention, as I said, that he got an | 03:18:54 |
| 7 | offer to become a partner in a partnership. | 03:19:00 |
| 8 | BY MR. DAVIS: | 03:19:04 |
| 9 | Q    So Mr. Itkin told you that Mr. Sabadash | 03:19:07 |
| 10 | had made him an offer to join him in Russia as a | 03:19:10 |
| 11 | partner in his business; correct? | 03:19:13 |
| 12 | A    Yes. | 03:19:13 |
| 13 | Q    After that conversation, at any point, did | 03:19:19 |
| 14 | Mr. Itkin tell you that he had affirmatively | 03:19:23 |
| 15 | accepted the offer to join Mr. Sabadash as a | 03:19:27 |
| 16 | partner? | 03:19:30 |
| 17 | A    No. | 03:19:31 |
| 18 | Q    Did Mr. Itkin ever tell you at any point | 03:19:32 |
| 19 | that he had any ownership interest in AFB? | 03:19:43 |
| 20 | MR. SARGOY:  Asked and answered. | 03:19:48 |
| 21 | THE WITNESS:  No. | 03:19:50 |
| 22 | BY MR DAVIS: | 03:19:50 |
| 23 | Q    Did he ever tell you at any point that he | 03:19:50 |
| 24 | had any ownership interest in Maxxim? | 03:19:52 |
| 25 | MR. SARGOY:  Asked and answered. | 03:19:55 |

Page 189

0030

# EXHIBIT K

1    my family maybe once a month, once every couple months.

2          Q.      And part of your compensation package was

3    Mr. Sabadash paid for you to fly business class a certain

4    number of times a year back and forwards between Russia and

5    Los Angeles?

6          A.      I did not have a compensation package, sir.

7          Q.      Mr. Sabadash paid for you to fly back and forth,

8    correct?

9          A.      The payments for my travel, just as much as

10   payments for Mr. Sabadash's travels.  Were coming out of our

11   partnership accounts.

12         Q.      Now, when you -- let me ask another question

13   before I jump into that.

14         Is the partnership still alive?  Is it operating?

15         MR. KABATECK:  Calls for a legal conclusion.

16         THE COURT:  Sustained as worded.

17         MR. PLATT:  Okay.

18         Q.      Are you still a member or in the partnership?

19         A.      I don't think so.  We're in a courtroom trying

20   to enter this partnership and figure out who owes what to

21   whom.

22         Q.      When did the partnership end?

23         MR. KABATECK:  Calls for a legal conclusion.

24         THE COURT:  Sustained.

25         Q.      BY MR. PLATT:  When did you believe the

26   partnership ended?

27         A.      I believe the partnership ended when I was

28   removed from the offices and refused to be paid monies that

0032

1      I'm owed.

2              Q.      Would that be in 2016?

3              A.      I believe so.

4              Q.      I didn't hear you.

5              A.      I believe so.  I'm sorry.

6              Q.      And when you claim this partnership was formed,

7      you didn't put any of the purported terms in writing, right?

8              A.      That is correct.

9              Q.      And the partnership was never documented in any

10     writings?

11             A.      That's incorrect, sir.

12             Q.      Let's take a look at page 529, lines 8 to 12.

13             MR. KABATECK:  There is an objection interposed there,

14     your Honor.

15             THE COURT:  Otherwise?

16             MR. KABATECK:  Otherwise I have no objection.

17             THE COURT:  Just take that part out, please.  That's at

18     line 11.

19                     (Videotaped deposition of Garry Itkin

20                          played as transcribed.)

21                     "Q.  From '98 to 2014 there's not a

22                     single writing that reflects that a

23                     partnership existed between you and

24                     Alexander Sabadash; is that correct?

25                     "A.  I don't know."

26             Q.      BY MR. PLATT:  So between 1998 and 2014 you're

27     not aware.

28             Now, did you make any efforts after 2014 to document

0033

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9701 Wilshire Blvd., Suite 1000, Beverly Hills, CA 90212

The foregoing documents described as __Opposition of Jeff Ratner & Associates, Inc. to Objection to Claim No.'s 2-3 Filed by Putative Partner Alexander Sabadash; Declarations of Elena Gofman, Jeff Ratner, and Garry Y. Itkin in Support Thereof [Re: Dkt. # 26]__ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On __05/20/2025__ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

II. **SERVED BY UNITED STATES MAIL**: On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be completed no later than 24 hours after the document is filed.</u>*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| 05/20/2025 | Joseph E. Caceres | /s/ Joseph E. Caceres |
| *Date* | *Type Name* | *Signature* |

# Mailing Information for Case 2:25-bk-11235-NB

### Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Daniel J McCarthy**    dmccarthy@hillfarrer.com, spadilla@hillfarrer.com;dflowers@hfbllp.com
- **Charles Shamash**    cs@locs.com, generalbox@locs.com
- **Oleg Stolyar**    astolyar@loeb.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Michael Zorkin**    mz@thezorkinfirm.com

### Manual Notice List

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Itkin & Sabadash**
8501 Wilshire Blvd., Suite 330
Beverly Hills, CA 90211

**Aleksandr Vitalievich Sabadash**
,

## Creditor List

Click the link above to produce a complete list of **creditors** only.

## List of Creditors

Click on the link above to produce a list of **all** creditors and **all** parties in the case. User may sort in columns or raw data format.