1 | HILL, FARRER & BURRILL LLP
Daniel J. McCarthy (SBN 101081)

2 | dmccarthy@hillfarrer.com
515 South Flower Street, 7th Fl.

3 | Los Angeles, CA  90071
Telephone: (213) 621-0802

4 | Fax: (213) 624-4840

5 | Attorneys for Petitioning General Partner
Garry Y. Itkin

6

7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

10

11 | In re

12 | ITKIN & SABADASH,

13 | Involuntary Debtor.

Case No. 2:25-bk-11235-NB

Chapter 7

**NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF ORDER DISMISSING INVOLUNTARY CASE [DOCKET NO. 76] AND MEMORANDUM OF DECISION [DOCKET NO. 75]; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF GARRY Y. ITKIN, ELENA GOFMAN, DANIEL J. McCARTHY AND RON CHILDRESS**

Date:   to be set
Time:   to be set.
Place:  Courtroom 1545

**TO:     THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY**

**JUDGE, AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

On such date and time that the Court may set, which will be the subject of further notice, petitioning general partner Garry Y. Itkin ("Mr. Itkin") will bring on for hearing his Motion for Reconsideration of the Court's Order Dismissing Involuntary Petition that was entered on June 17, 2025 (the "Order," docket no. 76, Exh. H hereto) and its June 16, 2025 Memorandum Decision Dismissing Involuntary Petition (the "Memorandum," docket no. 75, Exh. I hereto), by which he requests that the Court vacate that Order and Memorandum.  The Order and

-1-

Memorandum were issued by the Honorably Neil W. Bason after hearings on April 22, 2025, and June 3, 2025.  The Motion will be brought pursuant to Federal Rule of Civil Procedure 59(e), as made applicable by Federal Rule of Bankruptcy Procedure 9023, which authorizes a motion to alter or amend a judgment, and Federal Rule of Civil Procedure 60, as made applicable by Federal Rule of Bankruptcy Procedure 9024.

Pursuant to Local Bankruptcy Rule 9013-1(4), there are different facts and circumstances that were not shown in opposition to the Alexandar Sabadash's "Motion to Dismiss Involuntary Petition Under FCRP 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment" (docket no. 8, the "Motion to Dismiss") because (1) Mr. Sabadash raised multiple new arguments and alleged facts in his Reply in support of his Motion to Dismiss to which Mr. Itkin had no opportunity to respond in writing and with evidence, (2) in its Memorandum, the Court also raised new analysis and inferences that were not asserted by Mr. Sabadash to which Mr. Itkin also had no opportunity to respond in writing and with evidence.

Moreover, reconsideration also is required to prevent manifest injustice in that the Court's Memorandum relied upon inadmissible evidence and also did not consider the evidence a light favorable to Mr. Itkin, which was contrary to well-settled case law.

As more fully set forth on the attached Memorandum, the Motion is made on grounds that (1) Mr. Sabadash violated multiple requirements applicable to summary judgment motions, which the Court improperly permitted, including by voluntarily waiving the requirements of the Local Bankruptcy Rules without any request by Mr. Sabadash that the Court do so (thereby denying Mr. Itkin due process) and by submitting inadmissible evidence that the Court based its decision upon without ruling on most of Mr. Itkin's objections to Mr. Sabadash's evidence despite repeated requests from Mr. Itkin's that the Court rule on those objections; (2) perhaps most significantly, the Court applied an incorrect standard in considering Mr. Itkin's evidence by failing to consider that evidence in the light most favorable to Mr. Itkin, by failing to make all reasonable inferences in favor Mr. Itkin and instead improperly weighing and interpreting evidence against Mr. Itkin; (3) the Court minimized the evidence of the Russian Courts' rulings, including the August 6, 2020 Information Summary of the Ninth Arbitration Court of Appeal, which were contrary to Mr.

Sabadash's contention that Itkin & Sabadash is not a partnership; (4) having discounted those decisions, the Court also misapplied the doctrine of collateral estoppel; (5) the Court also misapplied the doctrine of collateral estoppel to the Los Angeles Superior Court's November 7, 2019 judgment in favor of Elena Gofman; and (6) dismissal was an inappropriate remedy under 11 U.S.C. § 305(a).

This Motion will be based upon this Notice of Motion and Motion, the attached Memorandum and declarations, the Court's files in this Chapter 7 case, the Court's files in the Chapter 15 case of Golden Sphinx Limited, the transcripts of the April 22, 2025, and June 3, 2025 hearings in this case, and such further evidence and arguments of counsel as may be presented in connection with the Motion.

In the event the Court schedules the Motion for hearing, Local Bankruptcy Rule 9013-1(f) requires that any response to the Motion must be filed and served upon counsel for Mr. Itkin and the United States Trustee at least 14 days prior to the scheduled hearing.

DATED: July 1, 2025                           HILL, FARRER & BURRILL LLP

                                              By:   /s/ Daniel J. McCarthy
                                                   Daniel J. McCarthy
                                                   Attorneys for Petitioning General Partner
                                                   GARRY Y. ITKIN

- 3 -

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

I.    INTRODUCTION ............................................................................................................. 1

    A.    Procedural History .................................................................................................. 1

        1.    The State Court Action ............................................................................... 1

        2.    The Motion to Dismiss ............................................................................... 1

        3.    The April 22 and June 3, 2025 Hearings ................................................... 2

        4.    The Creditors' Joinders, Proofs of Claim and Mr. Sabadash's Objections .................................................................................................. 4

        5.    The Court's June 16, 2025 Memorandum of Decision and Its June 17, 2025 Dismissal Order ........................................................................... 5

    B.    Summary of Argument ............................................................................................ 7

II.    ARGUMENT ..................................................................................................................... 8

    A.    Applicable Standard ................................................................................................ 8

    B.    The Court Allowed Mr. Sabadash to Violate Applicable Rules, and It Misapplied the Standards Governing Summary Judgment Motions ....................... 9

        1.    Mr. Sabadash Impermissibly Violated Applicable Rules ........................... 9

        2.    Mr. Sabadash Violated the Requirement of Admissible Evidence ........... 12

        3.    The Standard Applicable to Review of Evidence in Opposition to a Summary Judgment Motion .................................................................... 13

    C.    Mr. Itkin's Evidentiary Objections to Mr. Zorkin's Declaration and His Objection to the Sabadash RJN Should be Ruled Upon and Granted ................... 14

    D.    The Court Relied Upon Inadmissible Evidence .................................................... 14

    E.    Because It Was Based Upon Inadmissible Evidence, Mr. Sabadash's Motion for Summary Judgment Should Have Been Denied ................................. 16

    F.    The Court Did Not Consider Mr. Itkin's Evidence in a Light Most Favorable to Him, but Instead Construed It Against Him ..................................... 17

    G.    Mr. Sabadash's Reply Made Other Unfounded Accusations ................................ 25

    H.    The *Leong Partnership* Case Does Not Compel the Court's Decision .................. 26

    I.    The Decisions of the Russian Courts and the Superior Court Are Binding on Mr. Sabadash on the Issue of the Existence of the Partnership ........................ 27

        1.    The Scope of the Russian Courts' Rulings ............................................... 27

        2.    The Russian Courts' Decisions and the Superior Court's Judgment Were Binding Upon Mr. Sabadash as to the Existence of the Partnership ............................................................................................... 33

    J.    Abstention is Improper .......................................................................................... 34

III.    CONCLUSION ............................................................................................................... 35

SUPPLEMENTAL DECLARATION OF GARRY Y. ITKIN ................................................... 36

DECLARATION OF ELENA GOFMAN .................................................................................. 41

DECLARATION OF DANIEL J. McCARTHY ...........................................................................48

DECLARATION OF RON CHILDRESS .................................................................................49

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*389 Orange St. Partners v. Arnold,*
  179 F.3d 656 (9th Circ. 1999) ............................................................ 8

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................... 17

*Drew v. Equifax Information Services, LLC,*
  690 F3d 1100 (9th Cir. 2012) ............................................................. 15

*Furnace v. Sullivan,*
  705 F.3d 1021 (9th Cir. 2013) ............................................................ 17

*Headwaters Inc. v. U.S. Forest Serv.,*
  399 F.3d 1047 (9th Cir. 2005) ............................................................ 34

*In re Aquaslide 'N' Dive Corp.,*
  85 B.R. 545 (B.A.P. 9th Cir. 1987) ................................................. 12, 13

*In re Leong P'ship,*
  2018 WL 1463852 (B.A.P. 9th Cir. Mar. 23, 2018),
  aff'd, 788 F. App'x 539 (9th Cir. 2019) .................................... 11, 26, 27

*In re QDOS, Inc.,*
  607 B.R. 338 (B.A.P. 9th Cir. 2019) .............................................. 11, 12

*In re RHTC Liquidating Co.,*
  424 B.R. 714 (Bankr. W.D. Pa. 2010) ................................................. 35

*In re Taub,*
  439 B.R. 261 (Bankr. E.D.N.Y. 2010) ................................................. 10

*Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.,*
  933 F.2d 724 (9th Cir. 1991) ............................................................. 34

*McGee v. Estelle,*
  722 F.2d 1206 (5th Cir.1984) ............................................................ 35

*Navajo Nation v. Confederated Tribes & Bands of the Yakima Indian Nation,*
  331 F.3d 1041 (9th Cir. 2003) ............................................................. 8

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,*
  210 F.3d 1099 (9th Cir. 2000) ........................................................... 17

*Orloff v. Cleland*,
    708 F.2d 372 (9th Cir. 1983) ............................................................................. 17

*PNY Techs., Inc. v. Miller, Kaplan, Arase & Co., LLP*,
    2017 WL 2876736 (N.D. Cal. July 6, 2017) ...................................................... 34

*S.E.C. v. Koracorp Indus., Inc.*,
    575 F.2d 692 (9th Cir. 1978) ............................................................................. 24

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ................................................................................. 8

*Thompson v. Wainwright*,
    714 F.2d 1495 (11th Cir.1983) .......................................................................... 35

*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) ........................................................................... 17

*United States v. Hangar One, Inc.*,
    563 F.2d 1155 (5th Cir. 1977) ........................................................................... 14

**State Cases**

*Patel v. Crown Diamonds, Inc.*,
    247 Cal. App. 4th 29 (Cal. Ct. App. 2016), *as modified* (Apr. 29, 2016) ............... 34

**Federal Statutes**

11 U.S.C. § 305 ....................................................................................................... 35

11 U.S.C. § 305(a) ..................................................................................................... 8

11 U.S.C. § 502(a) ..................................................................................................... 5

**State Statutes**

California Corporations Code § 15901.02 ............................................................... 19

California Corporations Code § 16101 ................................................................... 19

**Rules**

F.R.B.P. 1001 ......................................................................................................... 10

F.R.B.P. 1013(a) ............................................................................................... 9, 11, 12

F.R.B.P. 1018 ......................................................................................................... 12

F.R.B.P. 3007 ........................................................................................................... 5

F.R.B.P. 9023 ........................................................................................................ 8

F.R.B.P. 9024 ........................................................................................................ 8

F.R.C.P. 56(c) ...................................................................................................... 15

F.R.C.P. 56(c)(2) .................................................................................................. 16

F.R.C.P. 56(c)(4) ............................................................................................ 12, 16

F.R.C.P. 59(e) ........................................................................................................ 8

F.R.C.P. 60(b) ........................................................................................................ 8

Federal Rule of Evidence 201(a) ........................................................................ 13

Federal Rule of Evidence 613(b) ........................................................................ 24

Local Bankruptcy Rule 3007-1 ............................................................................. 5

Local Bankruptcy Rule 7056-1(b)(2).....................................................................

Local Bankruptcy Rule 9013-1(l) .......................................................................... 8

**Other Authorities**

*9 Collier on Bankruptcy* (16th ed.), ¶ 1013.02........................................................ 10

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.      INTRODUCTION**

3    **A.      Procedural History**

4    **1.      The State Court Action**

5    Garry Y. Itkin ("Mr. Itkin"), Alexander Sabadash ("Mr. Sabadash") and other entities are

6    parties to an action pending in the Los Angeles Superior Court, case no. BC647351 (the "State

7    Court Action"). The first cause of action in Mr. Itkin's second amended cross-complaint sought

8    dissolution of that partnership.

9    Prior to the trial in the State Court Action, Mr. Sabadash brought a motion for summary

10   judgment. Mr. Itkin presented considerable evidence in showing the existence of that partnership.

11   The supporting documents were marked as trial exhibits. Mr. Sabadash's motion was denied.

12   The State Court Action was stayed by this Court's order (docket no. 42) on September 9,

13   2022, in case no. 2:20-bk-14320-NB that recognized the foreign liquidation proceeding of Golden

14   Sphinx Limited ("GSL"). Mr Itkin filed a motion for relief from automatic stay. The Court

15   subsequently ruled by Order on March 16, 2023, that the State Court Action was stayed, except as

16   to affirmative causes of action by certain plaintiffs. (Docket no. 70.) The State Court has stayed

17   the State Court Action given that limited relief.

18   **2.      The Motion to Dismiss**

19   Mr. Itkin filed the involuntary Chapter 7 petition against Itkin & Sabadash, a California

20   partnership (the "Partnership") on February 19, 2025.

21   Mr. Sabadash is the subject of a Chapter 15 proceeding before this Court in case no. 2:23-

22   bk-15574-NB. On March 20, 2025, he filed a "Motion to Dismiss Involuntary Petition Under

23   FRCP 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment" (docket no. 8,

24   the "Motion to Dismiss") in this case, which was noticed for hearing on April 22, 2025. It was

25   supported by attached declarations from Michael Zorkin and Andrew Wood and a request for

26   judicial notice (the "Sabadash RJN").

27   The Motion to Dismiss violated Local Bankruptcy Rules ("LBRs"). LBR 7056-1(b)(2)

28   requires that a motion for summary judgment be accompanied by a statement of uncontroverted

-1-

1   facts and conclusions of law and a proposed summary judgment.  Mr. Sabadash failed to file

2   those required documents.  The Motion to Dismiss also was not filed at least 42 days before the

3   April 22, 2025 hearing as required by LBR 7056-1(b)(1).

4       LBR 9013-1(c) requires that a motion include: "A written statement of all reasons in

5   support thereof, together with a memorandum of the points and authorities upon which the

6   moving party will rely."  That requirement is reinforced by LBR 9013-1(g)(4), which states:

7   "New arguments or matters raised for the first time in reply documents will not be considered."

8       The Motion to Dismiss failed to address any of the evidence presented by Mr. Itkin in the

9   State Court Action on the existence of the Partnership.

10      On April 8, 2025, Mr. Itkin filed (1) an Opposition to the Motion to Dismiss (docket no.

11  16); (2) a supporting Request for Judicial Notice ("Mr. Itkin's RJN," docket no. 17); (3)

12  Evidentiary Objections to Mr. Zorkin's declaration, which had attached multiple inadmissible

13  exhibits attached (docket no. 18); and (4) an Objection to the Sabadash RJN (docket no. 19).

14      Mr. Itkin's Opposition presented evidence to this Court that Mr. Itkin had presented in the

15  State Court Action, but which Mr. Sabadash's Motion had ignored.  Importantly, Mr. Itkin's

16  Opposition noted the need for the Court to rule on the Evidentiary Objections to Mr. Zorkin's

17  declaration and the Sabadash RJN, stating:

18  > Concurrent with the filing of this Opposition, Mr. Sabadash is filing an Objection
19  > to Mr. Sabadash's RJN and Evidentiary Objections to Mr. Zorkin's declaration,
>    which should be ruled upon before reaching the merits of the Motion to Dismiss.
>    In part, that is because the Motion is based upon inadmissible documents and
20  > statements.

21  (Docket no.16,  at 2:25-28, emphasis added.)

22  At the April 22, 2025 hearing, Mr. Itkin's counsel similarly stated:
>    Your Honor, I won't go through all the evidentiary objections. I think there needs
23  > to be a ruling on them before Your Honor goes any further.

24  (Exh. J, Transcript 4/22/2025, at 12:21-23.)

25  Mr. Sabadash filed a reply on April 15, 2025.  (Docket no. 21.)

26              **3.      The April 22 and June 3, 2025 Hearings**

27      The Motion to Dismiss came on for hearing on April 22, 2025, at 11:00 a.m.  Mr. Zorkin

28  requested and was granted for priority, although the Partnership's Chapter 7 case was the subject

- 2 -

of calendar numbers 7 and 8 of a very busy 23-item 11:00 a.m. calendar.  The Court provided its

tentative ruling and then stated: "I'm just going to give you a relatively short period of time in

which to argue on those issues or persuade me if I'm missing some issues and I should focus on

something else." (Exh. J, Transcript 4/22/2025, at 7:13-16.)  The Court then stated: "So Mr.

Zorkin, why don't you take five minutes and address what you think I need to focus on?"  (*Id.* at

7:17-18.)

Mr. Zorkin briefly argued at pages 7-10 of the Transcript.  Mr. Itkin's counsel then argued

at pages 11-17 of the Transcript.  Mr. Zorkin briefly replied at pages 20-21.  After discussing

scheduling and other issues, the Court clarified: "no further briefing unless I ask for it… For now,

no further briefing and no further papers. No evidentiary issues, no legal briefs." (*Id.* at 28:6-13.)

The hearing was continued to June 3, 2025, at which the Court read and/or paraphrased its

21-page tentative ruling, which the Court acknowledged it was still working on.  (Exh. K,

Transcript 06/03/2025, at 6-23.)  Mr. Itkin's counsel then addressed several procedural issues.

(*Id.* at 24- 32.)  One issue concerned the lack of any opportunity to respond to the evidence and

arguments raised for the first time in Mr. Sabadash's reply.  Mr. McCarthy explained:

> So regarding the evidence, Your Honor, one of the things that I expressed at the
> last hearing was my frustration that all the evidence that we had presented in our
> opposition, which Mr. Sabadash and Mr. Zorkin were familiar with because they
> were trial exhibits in the state court action and presented with cross-motions for
> summary judgment weren't addressed until the reply brief. And I felt that that was
> unfair to my client. My client had no chance to respond in writing and I made that
> point to you in my request for permission to file a supplemental brief in which I
> stated there are a lot of issues that were argued for the first time in the reply brief,
> but there was one in particular that I thought was very important to bring to your
> attention, which was the reason for the information summary, which Mr. Zorkin
> discounted and disparaged.
>
>                   *         *         *         *
>
> So anyway, I was frustrated with the lack of opportunity to respond in writing to
> what Mr. Zorkin had argued for the first time in his reply brief. And I had a lot to
> say about some of that evidence and his responses, which we actually didn't get
> into at the last hearing. We had a very short hearing.
>
> (*Id.* at 25:2-17, 26:5-10.)

Mr. McCarthy also expressed concern over the Court's tentative ruling, which criticized

Mr. Itkin's evidence in ways that even Mr. Sabadash had not argued and on which Mr. Itkin also

- 3 -

had no opportunity to respond:

> But I want to note something, Your Honor. You were critical of a lot of Mr. Itkin's evidence in what you just stated, questioning, for example, the -- why would the partnership agreement be worded the way it was, that Mr. Itkin's statement that partnership had terminated. These are things that he explained in his declaration.

> But here's what's important about that, Your Honor. Your criticisms of that evidence -- and I understand them -- but they're different than what was argued in the motion or in the reply. So now it's a situation where I didn't have a chance to respond to what Mr. Zorkin said for the first time in the reply and I'm being presented with your questioning of Mr. Itkin's evidence and also some reliance on inadmissible evidence submitted by -- by Mr. Zorkin, again without a chance to respond in writing.

> (*Id.* at 26:11-27:1.)

Further, Mr. McCarthy again asked that the Court ruling on the evidentiary objections and additionally asked that the Court grant the request to file the supplemental brief. (*Id.* at 28:4-8.)

The Court continued the hearing to June 17, 2025.

### 4.    The Creditors' Joinders, Proofs of Claim and Mr. Sabadash's Objections

Ten creditors filed joinders in the Involuntary Petition. Five joinders were filed on March 28, 2025. (Docket nos. 10-14.) They were the subject of Mr. Itkin's RJN. (Docket no. 17.)

The other five creditors filed joinders. Progressive Management, Inc., filed a joinder on May 18, 2025. (Docket no. 49.) Jeff Ratner & Associates filed a joinder on May 18, 2025. (Docket no. 50.) Alexey Kurochkin filed a joinder on May 19, 2025. (Docket no. 51.) Atabek & Co. filed a joinder on May 20, 2025. (Docket no. 60.) Aleksandr Grant filed a joinder on June 2, 225. (Docket no. 64.) Thus, every creditor who filed a claim filed a joinder in the petition.

The same ten creditors filed proof of claims nos. 1 to 11. Claim nos. 2 and 3 (filed by Jeff Ratner and Associates, Inc.) were duplicative. Claims nos. 1 to 10 also were the subject of Mr. Itkin's RJN. (Docket no. 17.) Mr. Sabadash did not object to the Court taking judicial notice of the claims for the truth of the matters stated in those claims, which included that they held claims against the Partnership. Alexsandr Grant filed proof of claim no. 11 on June 2, 2025. The ten verified claims were independent evidence of the fact that there was a partnership

- 4 -

1    between Mr. Itkin and Mr. Sabadash.

2        For the obvious purpose of being able to assert that proof of claim nos. 1 to 10 should not

3    be deemed allowed under 11 U.S.C. § 502(a), Mr. Sabadash filed a single objection to those

4    claims shortly before the April 22, 2025 hearing on April 16, 2025.  (Docket no. 23.)  The

5    objection violated Local Bankruptcy Rule 3007-1 and Federal Rule of Bankruptcy Procedure

6    3007 in numerous respects.  It was not noticed for a hearing.  It did not list the claim numbers.  It

7    did not have copies of the claims attached.  The claims were not similarly situated, so a single

8    objection was improper.  No supporting evidence was attached.  No notice of claims objection

9    was served.

10        At the April 22, 2025 hearing, the Court provided Mr. Sabadash an opportunity to correct

11    these errors.  It required proper claims objections to be filed by April 30, 2025, and it scheduled

12    the objections for hearing on June 3, 2025.

13        Mr. Sabadash filed objections to claims nos. 1 to 10 on April 30, 2025.  (Docket nos. 25 to

14    33.)  They each were supported by a declarations from Mr. Zorkin.

15        Each of the nine creditors filed oppositions to the objections on May 20, 2025 (docket nos.

16    52-59.)  All of the oppositions were supported by attached declarations.  A declaration of Elena

17    Gofman was separately filed in support of all the oppositions.  (Docket no. 61.)  The claim of

18    Alexsandr Grant was not objected to.

19        At the June 3, 2025 hearing, the Court did not rule on the claims objections.  Instead, it

20    continued the hearing to June 17, 2025.

21              **5.        The Court's June 16, 2025 Memorandum of Decision and Its**

22                     **June 17, 2025 Dismissal Order**

23        On June 16, 2025, the Court entered a 23-page Memorandum of Decision Dismissing

24    Involuntary Petition.  ("Memorandum," docket no. 75, Exh. I.)  On June 17, 2025, it also entered

25    an Order Dismissing Involuntary Petition (the "Dismissal Order, docket no. 76, Exh. H.)  A

26    notice of dismissal was entered on the same day.  (Docket no. 77.)  The Court did not close the

27    case.  Instead, it retained jurisdiction under LBR 1017-1(f).

28        The Memorandum will be discussed in greater detail below.  At this point, this Motion

- 5 -

1  will note what the Memorandum did not do.

2  The Court stated that it had reviewed ten of the eleven proofs of claim (not no. 11), the

3  claims objections, the oppositions to those objections, the omnibus reply, and the creditors'

4  joinders in the petition.  (Docket 75, at 4:23-5:5.)   The Court did not rule upon those objections.

5  Notwithstanding Mr. Itkin's requests, the Court's Memorandum also did not rule upon (1)

6  most of Mr. Itkin's Evidentiary Objections to Mr. Zorkin's declaration and its attached exhibits;

7  and (2) Mr. Itkin's Objection to the Sabadash RJN.  To the contrary, as explained below, the

8  Court's Memorandum actually relied upon plainly inadmissible evidence in concluding that the

9  existence of the Partnership was in bona fide dispute.

10  The Court, however, granted Mr. Itkin's request to file a supplemental brief on the limited

11  issue of the meaning of the Information Summary, which Mr. Sabadash's reply in support of his

12  Motion to Dismiss had improperly disparaged as "some sort of a summary of the case" and which

13  incorrectly asserted "the Russian appellate court made no findings as to the existence of the

14  partnership."  (Docket no. 21, at 7:20-8:5.)   The Court, however, did not rule upon Mr. Itkin's

15  request for a further opportunity to respond to the new evidence and argument submitted by Mr.

16  Sabadash for the first time in his reply in support of his Motion to Dismiss, which Mr. Itkin stated

17  as follows in the supplemental brief that the Court permitted:

18
19
20
21
22
> In his Reply in support of the Motion to Dismiss, Mr. Sabadash addressed the documentary evidence for the first time although he was well aware of it from the State Court action, thereby intentionally denying Mr. Itkin an opportunity to reply in writing to many false statements and arguments by Mr. Sabadash. (Docket no. 21.) At the April 22, 2025 hearing on the Motion to Dismiss at which Mr. Sabadash's counsel requested priority, the Court instructed the parties each to argue no longer than five minutes, which also provided Mr. Itkin little opportunity to respond to all of those false statements and arguments.

23
24
> While Mr. Itkin would like an adequate opportunity to fully respond in writing to all of those false statements and arguments that were made for the first time in Mr. Sabadash's Reply in violation of Local Rule 9013-1(c)(3)(A), there is one very crucial issue that Mr. Itkin believes this Court must consider. (Footnote)

25
26
27
> That issue concerned the ruling by the Ninth Arbitration Court of Appeal in Russia that Itkin and Sabadash was a partnership, which was a judicial proceeding in which Mr. Sabadash very actively and directly participated and argued the issue before four courts in Russia—losing at every turn.

> (Docket no. 45, Exh. A (Supplement Brief), at 2:20-3:6, emphasis added.)

28

Instead, the Court viewed Mr. Itkin's request for leave to file a supplemental brief on the

limited issue of the nature of the Ninth Arbitration Court of Appeal's August 6, 2020 Information

Summary as conduct that somehow "sanitized" Mr. Sabadash's violations of the Local

Bankruptcy Rules regarding motions for summary judgment.  In that regard, the Court stated:

> But analyzing the motion under Rule 56 does not prejudice Mr. Itkin, because as
> set forth above this Court has considered Mr. Itkin's supplemental brief. That brief
> was filed on May 1, 2025 – 42 days after the filing of Mr. Sabadash's motion on
> March 20, 2025. Under the Local Bankruptcy Rules, Mr. Itkin is entitled to a
> period of only 21 days to respond to a Rule 56 motion. LBR 7056-1(c)(1).
> Therefore, Mr. Itkin's response time has not been shortened.

(Docket  no. 75, at 5:12-17.)

The Court, however, further absolved Mr. Sabadash of those violations in going on to hold

that "this Court has the authority to 'waive the application of any Local Bankruptcy Rule in any

case or proceeding … in the interest of justice,"  citing the need for a prompt decision on an

involuntary petition ((Docket  no. 75, at 5:17-23)

**B.    Summary of Argument**

The Court should reconsider and vacate its June 17 Dismissal Order and its June 16

Memorandum for at least six reasons.  First, Mr. Sabadash violated multiple requirements

applicable to summary judgment motions, which the Court improperly permitted, including by

voluntarily waiving the requirements of the Local Bankruptcy Rules without any request by Mr.

Sabadash that the Court do so (thereby denying Mr. Itkin due process) and by submitting

inadmissible evidence that the Court based its decision upon without ruling on Mr. Itkin's

objections to Mr. Sabadash's evidence.

Second, the Court applied an incorrect standard in considering Mr. Itkin's evidence by

failing to consider that evidence in the light most favorable to Mr. Itkin, by failing to make all

reasonable inferences in favor Mr. Itkin and instead improperly weighing and interpreting

evidence against Mr. Itkin.

Third, the Court minimized the evidence of the August 6, 2020 Information Summary of

the Ninth Arbitration Court of Appeal and the other Russian Court decisions that were contrary to

Mr. Sabadash's contention that Itkin & Sabadash is not a partnership.

- 7 -

1    Fourth, having discounted the Ninth Arbitration Court of Appeal's August 6, 2020

2    Information Summary and the other Russian Court decisions, the Court misapplied the doctrine of

3    collateral estoppel to those rulings.  Mr. Sabadash is in privity with the Partnership and, therefore,

4    is bound under California law to the Russian Court's ruling that the Partnership existed.  The

5    Court's Memorandum ignored law in that regard that Mr. Itkin cited in his Opposition to the

6    Motion to Dismiss.

7    Fifth, after incorrectly minimizing Mr. Sabadash's participation in Ms. Gofman's Los

8    Angeles Superior Court Action in which he asserted by way of ex parte application that the

9    Partnership did not exist, the Court also misapplied the doctrine of collateral estoppel to the

10    judgment in that action.

11    Sixth, dismissal was an inappropriate remedy under 11 U.S.C. § 305(a).

12    **II.    ARGUMENT**

13    **A.    Applicable Standard**

14    The requirements for reconsidering a final order or judgment are similar.  See Fed. R. Civ.

15    P. Rules 59(e) and 60(b), made applicable to bankruptcy courts pursuant to Federal Rules of

16    Bankruptcy Procedure 9023 and 9024.  So too are the requirements for reconsidering the denial of

17    a motion in bankruptcy court.  See Local Bankruptcy Rule 9013-1(l).

18    Federal Rule of Civil Procedure 59(e) states: "A motion to alter or amend a judgment

19    must be filed no later than 28 days after the entry of the judgment."  By this Motion, Mr. Itkin

20    seeks to alter the Order and Memorandum.

21    "A motion for reconsideration should not be granted, absent highly unusual

22    circumstances, unless the district court is presented with newly discovered evidence, committed

23    clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v.*

24    *Arnold,* 179 F.3d 656, 665 (9th Circ. 1999).  Reconsideration may also be granted "as necessary

25    to prevent manifest injustice." *Navajo Nation v. Confederated Tribes & Bands of the Yakima*

26    *Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).  "There may also be other, highly unusual,

27    circumstances warranting reconsideration. *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS,*

28    *Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993),

- 8 -

**B.      The Court Allowed Mr. Sabadash to Violate Applicable Rules, and It**

**Misapplied the Standards Governing Summary Judgment Motions**

The Court chose to treat the Motion to Dismiss as a motion for summary judgment, which meant that the rules and standards applicable to summary judgment motions were required to be followed.  Mr. Sabadash did comply with those rules and standards.  Mr. Itkin respectfully submits that the Court overlooked or ignored those violations.

**1.      Mr. Sabadash Impermissibly Violated Applicable Rules**

As already noted, Mr. Sabadash's Motion to Dismiss violated LBR 7056-1(b)(2), which require that a motion for summary judgment be accompanied by a statement of uncontroverted facts and conclusions of law and a proposed summary judgment.  He also violated LBR 7056-1, which requires the motion to be filed at least 42 days before the April 22, 2025 hearing.

As also already noted, the Court sanitized this violation by noting that Mr. Itkin had filed a request for leave to file a supplemental brief on the narrow issue of the nature of the "Information Summary" that Mr. Sabadash had disparaged.  The fact that this request was filed 42 days after the Motion clearly did not provide Mr. Itkin the period he was entitle to have in opposing the Motion.

As quoted above, the Court's Memorandum noted that it could "waive the application of any Local Bankruptcy Rule in any case or proceeding … in the interest of justice," which was relief that Mr. Sabadash <u>had</u> <u>not</u> even requested.  The Court did not <u>expressly</u> waive the application of the LBRs, although its Memorandum perhaps impliedly did so:

> Finally, under Rule 1001, "[w]hen a petition in an involuntary case is contested, the court must: (1) rule on the issues presented *at the earliest practicable time*; and (2) *promptly* issue an order for relief, dismiss the petition, or issue any other appropriate order" (emphasis added).

(Docket no. 75, at 5:20-23.)

The issue of whether it was appropriate to waive the requirements of the LBRs, however, was not even briefed by any party because it was not requested by Mr. Sabadash.  Instead, the Court volunteered this waiver.  The salient issue is whether the provisions of applicable rules justified that waiver.  The quote in the Court's Memorandum is from Federal Rule of Bankruptcy

1    Procedure 1013(a), not Rule 1001.  This is Mr. Itkin's first opportunity to brief that issue.  He

2    respectfully submits that the waiver was unjustified for at least four reasons.

3        First, neither the Court nor Mr. Sabadash explained why a denial of summary judgment

4    and permission for Mr. Sabadash to properly file the motion in compliance with the LBRs would

5    have prejudiced Mr. Sabadash, Mr.. Itkin or the ten creditors who had filed claims and had joined

6    the Involuntary Petition.  In fact, the Court had provided Mr. Sabadash time to comply with the

7    rules applicable to his objections to claim.  And the Court clearly was cognizant of the

8    requirement of prejudice relating to rules violations when it held that Mr. Itkin supposedly was

9    not prejudiced by the violations.

10       Second, there are no facts that suggest that any such prejudice would have occurred from

11   delay.  Mr. Sabadash (who is in prison in Russia) clearly would not be prejudiced if the process to

12   decide a properly-filed and noticed summary judgment motion was delayed for two or three

13   months.  Mr. Itkin was stayed from pursuing his dissolution cause of action in the State Court

14   Action, so he could not affect the Partnership in that Action.  The Partnership is not an operating

15   business.  It was not incurring debt during an involuntary gap period in which creditors of an

16   operating company might be discouraged to extend credit.  "Creditors who extend credit during

17   the 'gap' period between the filing and the order for relief receive some, but not full, protection

18   for their claims."  9 *Collier on Bankruptcy* (16th ed.), ¶ 1013.02.  The Partnership had no need

19   for a quick resolution, as in many cases.  "In general, it is in the debtor's interest to resolve

20   promptly the issues and either have the case dismissed or an order for relief entered so that the

21   uncertainty about the debtor's future is reduced." 9 *Collier on Bankruptcy* (16th ed.), ¶ 1013.02.

22       The purpose of F.R.B.P. 1013(a) was explained in *In re Taub*, 439 B.R. 261, 270 (Bankr.

23   E.D.N.Y. 2010), as follows:

24       The purpose of this rule is "the avoidance, to the extent possible, of the
         consequences of the involuntary petition in the absence of the entry of an order for
25       relief [,]" which may include "loss of credit standing, a chilling effect on the
         willingness of creditors and third parties to transact business in the ordinary
26       course, and possible public embarrassment." *In re Immudyne, Inc.*, 218 B.R. 860,
         862 (Bankr.S.D.Tex.1998) (citing In re Reid, 773 F.2d 945 (7th Cir.1985)). The
27       rule "recognizes that the interests of both the debtor and the creditors are best
         served by prompt resolution of the issues raised by an involuntary bankruptcy

28
                                          - 10 -

petition." 9 COLLIER ON BANKRUPTCY ¶ 1013[02] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).

None of these factors are present in this case. Indeed, here 10 creditors filed claims and joined the petition, which clearly suggests that they also had no expedient need for the Involuntary Petition to be quickly ruled upon and dismissed.

Third, there is the notion that it is more important to get it right. The supposed need for expediency does not warrant a "rush to justice."

Fourth, and perhaps most importantly, case law contradicts the Court's conclusion. In *In re Leong P'ship*, 2018 WL 1463852, at *3 (B.A.P. 9th Cir. Mar. 23, 2018), aff'd, 788 F. App'x 539 (9th Cir. 2019), which Mr. Sabadash and the Court relied upon, Mr. Leong filed a summary motion "[a]fter an unsuccessful attempt to obtain dismissal of the involuntary petition," which certainly supports the notion that Mr. Sabadash's Motion to Dismiss should have been denied and Mr. Sabadash should have required to file a proper summary judgment motion, as the objecting general partner was required to do in the *Leong Partnership* case. As discussed below, that decision is not controlling in this case, but it actually does provide guidance on the proper procedure for seeking dismissal of an involuntary petition.

Evidentiary hearings sometimes are required in involuntary cases, which contradicts the notion of unnecessary expediency. "Federal Rule of Bankruptcy Procedure 1013(a) requires prompt action on an involuntary petition, but also recognizes that if the debtor or non-joining partner contests the petition, a trial and perhaps pre-trial discovery may be necessary before the issues can be resolved." 9 *Collier on Bankruptcy* (16th ed.), ¶ 1013.02. The Court in *In re QDOS, Inc.,* 607 B.R. 338, 346 (B.A.P. 9th Cir. 2019), similarly observed:

> The "earliest practicable time" is when the bankruptcy court has "sufficient information to resolve the conflict" before it. *Hayes v. Rewald (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*), 779 F.2d 471, 475 (9th Cir. 1985). Often the bankruptcy court will acquire this information at trial.
>
> Where trial is required to adjudicate an involuntary petition, Rule 1018 incorporates many procedural Rules and expressly provides that references to adversary proceeding therein include a reference to a proceeding to contest an involuntary petition. Fed. R. Bankr. P. 1018.

The *QDOS* Court reversed the bankruptcy court's dismissal of an involuntary petition. It

- 11 -

1   further noted: "In short, Rule 1018 makes clear that resolution of a contested involuntary petition

2   should proceed with the discovery and disclosures typical in an adversary proceeding, but Rule

3   1013(a) mandates that the process move speedily."  *In re QDOS, Inc.*, 607 B.R. at 346.

4        In other words, the *QDOS* Court recognized that rules should be followed rather than cast

5   aside in the name of expediency.

6                **2.    Mr. Sabadash Violated the Requirement of Admissible**

7                     **Evidence**

8        Under LBR 9013-1(c), the motion was required to provide "all reasons in support thereof,

9   together with a memorandum of the points and authorities upon which the moving party will

10  rely."  FRCP 56(c)(4) states: "An affidavit or declaration used to support or oppose a motion must

11  be made on personal knowledge, set out facts that would be admissible in evidence, and show that

12  the affiant or declarant is competent to testify on the matters stated."   See *In re Aquaslide 'N'*

13  *Dive Corp.*, 85 B.R. 545, 548 (B.A.P. 9th Cir. 1987) ('If the trial court is to consider these

14  [affidavits] as raising an issue of fact so as to preclude summary judgment, the affidavits must

15  conform with the admissibility rules for summary judgment. They must be based on personal

16  knowledge and set forth facts admissible in evidence.")

17       The Motion was supported by Mr. Zorkin's declaration, which itself was inadmissible in

18  certain respects, but more importantly it had attached multiple exhibits that also were

19  inadmissible.  In *In re Aquaslide 'N' Dive Corp.*, 85 B.R. at 548, an opposition to a summary

20  judgment motion was supported by an attorney, who lacked personal knowledge of the veracity of

21  deposition testimony that he attached as an exhibit.  The Court held:

22       The affidavit by the Grzybowskis' attorney, William Cannon, is not based on
         personal knowledge, nor does Mr. Cannon make any statement to that effect.
23       Rather, he incorporates Mr. Grzybowski's deposition by reference. In that
         deposition Mr. Grzybowski stated he thought the slide was manufactured by "Slide
24       'N' Dive" according to the box in which the slide came. Since Mr. Cannon did not
         see the box, he has no personal knowledge as to what was printed on the box.
25       Affidavits by attorneys which do not comply with the personal knowledge
         requirement cannot be used in opposition to a summary judgment motion.
26       (Citations.)  An affidavit not based on personal knowledge is to be disregarded
         when considering a summary judgment motion. (Citation.) The affidavit of Mr.
27       Cannon is not based on personal knowledge and cannot be considered by a court
         evaluating a summary judgment motion. Since it is not admissible, the affidavit
28       cannot be used to raise an issue of fact. (Citation.)

                                    - 12 -

1       *Id.* at 548, emphasis added.

2              Mr. Itkin filed Evidentiary Objections to Mr. Zorkin's declaration and most of the

3       attached exhibits.  (Docket no. 18.)  The Motion also was supported by a Request for Judicial

4       Notice that improperly requested judicial of four documents (three declarations and an answer

5       that were filed in the State Court Action).  Mr. Itkin also filed an objection to the Sabadash RJN.

6       (Docket no. 19.)  The objection explained that the Sabadash RJN merely asked that judicial notice

7       be taken of documents, rather than of any "adjudicative facts" under Federal Rule of Evidence

8       201(a).  The objection to the Sabadash RJN further explained that the documents were

9       inadmissible hearsay and that judicial notice of documents filed in another court are improper for

10      the truth of the matters stated.

11             Like the lawyer's declaration in *In re Aquaslide 'N' Dive Corp,* the inadmissible portions

12      of the Zorkin declaration, the documents attached thereto and all four documents attached to the

13      Sabadash RJN should not have been considered by this Court in evaluating Mr. Sabadash's

14      summary judgment motion.  Since they were not admissible, they could not be invoked to "raise

15      an issue of fact" in opposition to the Involuntary Petition.

16             Mr. Sabadash violated the requirement that the Motion be supported by admissible

17      evidence.  Notwithstanding Mr. Itkin's objections to the Zorkin Declaration and the Sabadash

18      RJN, Mr. Itkin's request in his Opposition to the Motion to Dismiss that the Court rules on those

19      objections first before considering the Motion, and his counsel's request at the April 22 and June

20      3, 2025 hearing that the Court rule on the objections, the Court did not do so at either hearing or

21      in its June 16, 2025 Memorandum, except in a few respects noted below.

22             As explained below, the lack of admissible evidence had at least three consequences.

23      First, without such evidence, Mr. Itkin did not have a burden to oppose the inadmissible evidence.

24      Second, the Motion could not be granted  based upon such inadmissible evidence.  Third, and

25      perhaps most importantly, the Court improperly relied upon that inadmissible evidence.

26                     **3.      The Standard Applicable to Review of Evidence in Opposition**

27                             **to a Summary Judgment Motion**

28             As noted above, Mr. Itkin's counsel complained at the June 3, 2025 hearing that the Court

1  was interpreting Mr. Itkin's evidence in a manner not argued by Mr. Sabadash and in a manner

2  that afforded Mr. Itkin no opportunity to respond.  The standard for interpreting and applying

3  evidence in opposition to a summary judgment motion is well-settled.  Citing Supreme Court

4  authority, the Court's Memorandum explained: "The evidence and inferences therefrom must be

5  viewed in the light most favorable to the non-moving party."  (Docket no. 75, at 6:21-23.)

6        Mr. Sabadash's reply in support of his Motion to Dismiss, however, ignored this

7  standard.  Instead, it argued that he had contrary (albeit inadmissible) evidence and (without any

8  evidence) he speculated that Mr. Itkin's evidence must be the product of forgery and even a

9  conspiracy with a Russian attorney named Elena Goffman.

10       As explained below, the Court similarly chose not view Mr. Itkin's evidence "in the light

11  most favorable" to him.

12        **C.    Mr. Itkin's Evidentiary Objections to Mr. Zorkin's Declaration and**

13             **His Objection to the Sabadash RJN Should be Ruled Upon and**

14             **Granted**

15       "[T]he threshold issue of admissibility must be resolved before determining whether or

16  not unresolved questions of fact exist."  *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1157

17  (5th Cir. 1977).  Mr. Itkin filed timely Evidentiary Objections to Mr. Zorkin's Declaration and a

18  timely Objection to the Sabadash RJN.  The merely filing of those Objections necessitated a

19  ruling.  As explained above, Mr. Itkin's Opposition to the Motion to Dismiss requested that the

20  Court first rule on those Objections for an obvious reason.  Without admissible evidence, the

21  Motion could not be granted.  Mr. Itkin's counsel repeated that request at the April 22 and June 3,

22  2025 hearings.  By this Motion, Mr. Itkin renews his request that the Court rule upon all of those

23  Objections.  In determining this Motion, the Court's reconsideration of its Dismissal Order and

24  Memorandum must start with the admissible evidence that formed the foundation of its ruling.

25        **D.    The Court Relied Upon Inadmissible Evidence**

26       Mr. Itkin submitted the "Minutes of the Meeting of Partners of Simple Partnership 'Itkin

27  & Sabadash'" (the "Partnership Minutes") dated February 12, 2004, as written confirmation of

28  the Partnership.  As explained in the Court's Memorandum, Mr. Itkin described the circumstances

- 14 -

1   under which the Partnership was formed and the reason for needing written confirmation in 2004,

2   and the Court quotes the Partnership Minutes. (Docket no. 75, at 17:8-18:10.)

3         The Court then quotes Mr. Sabadash's declaration from the State Court Action in which

4   he disagreed that there was a partnership and asserted that his signature on the document is a

5   forgery.  (Docket no. 75, at 18:11-26.)  The Court noted that the declaration was in the record at

6   (dkt. 8-1, Ex. 3, PDF pp. 39–40 of 86).  (*Id.* at 18:26-27.)  Based upon that, the Court concluded

7   that Mr. Sabadash had shown the existence of a bona fide dispute:

8           Mr. Sabadash is required only to show that a bona fide dispute exists either as to
            the existence of the Itkin & Sabadash partnership or as to the validity of the claims
9           asserted against the partnership. Mr. Sabadash has met that standard. He has
            shown that there is no genuine dispute that there does in fact exist a bona fide
10          dispute as to both the existence of the partnership and the validity of the claims
            asserted against the alleged partnership.
11
12        (Docket no. 75, at 19:2-7.)

13        In footnote 4 on pages 18-19 of the Memorandum, the Court ruled on Mr. Itkin's

14  evidentiary objection to Mr. Sabadash's declaration as follows:

15          Mr. Itkin objects to this testimony as inadmissible hearsay. That objection is
            overruled. The testimony is offered not to establish the truth of the matters set
16          forth therein, but instead to demonstrate the existence of a bona fide dispute as to
            the existence of the Itkin & Sabadash partnership (as distinguished from a
17          frivolous dispute, concocted at the last minute).

18        Mr. Sabadash's declaration <u>only</u> can demonstrate "the existence of a bona fide dispute as

19  to the existence of the Itkin & Sabadash partnership" if it is accepted for "the truth of the matters

20  stated" in the declaration.[1]  There is no known exception to the hearsay rule or to the

21  requirements of admissible evidence under Rule 56(c) that allows for the admissibility of hearsay

22  to place a fact in dispute.  Inadmissible testimony may not be considered to create an issue of fact.

23  A statement is not hearsay if offered for some purpose <u>other</u> than to prove the truth of the matter

24  asserted (e.g., to show only that the statement was made or to show a certain effect on the hearer

25  or reader).  *Drew v. Equifax Information Services, LLC*, 690 F3d 1100, 1108 (9th Cir. 2012) (out

26  _____
    [1] Mr. Itkin objected to this declaration, which is Exhibit 3 to Mr. Zorkin's declaration, on grounds
27  of hearsay.  (Docket no. 18, at 2:12-18.)  For the reasons explained above, Mr. Itkin also objected
    to Mr. Sabadash's request that the Court take judicial notice of Exhibits 2, 3, 4 and 5 to Mr.
28  Zorkin's declaration, one of which was Mr. Sabadash's declaration that the Court relied upon in
    its Memorandum.  (Docket 19.)

                                        - 15 -

of court statement used to show a statement was made, nor truth of statement).  Mr. Sabadash did

not offer the declaration for any such purpose.  He offered it to prove alleged forgery.

The Court actually highlights this in going on to explain:

> [Mr. Sabadash] must show only that there is no genuine dispute that the existence
> of the partnership, or the claims against the partnership, are in fact subject to a
> bona fide dispute. <u>Put another way, he must show that there *is* a genuine issue of
> material fact as to either the existence of the Itkin & Sabadash partnership or its
> liability for damages</u>.

(Docket 75, at 19:13-17, emphasis added.)

Mr. Sabadash cannot show "there is a genuine issue of material fact as to either the

existence of the Itkin & Sabadash partnership or its liability for damages" with an inadmissible

declaration that is not accepted for the truth of the matters stated in it.

**E.    Because It Was Based Upon Inadmissible Evidence, Mr. Sabadash's
Motion for Summary Judgment Should Have Been Denied**

F.R.C.P. 56(c)(2) states: "A party may object that the material cited to support or dispute a

fact cannot be presented in a form that would be admissible in evidence."  Mr. Itkin objected to

the inadmissible evidence in Mr. Zorkin's declaration and the Sabadash RJN.

When the Court considers and rules on Mr. Itkin's Evidentiary Objections to Mr. Zorkin's

Declaration and his Objection to the Sabadash RJN, it will be apparent that Mr. Sabadash lacked

admissible evidence to support the Motion to Dismiss.  That has two implications.

First, without admissible evidence required under Rule 56(c)(4), the Motion should have

been denied.  There are limited circumstances in which a moving party need only establish that

the opposing party (with the burden of proof) lacks evidence to support a material element of its

claim.  Here, Mr. Itkin admittedly had the burden of showing that the existence of the Partnership

(as stated under oath in the Involuntary Petition) was not in bona fide dispute.  Mr. Sabadash's

Motion could have been based upon a showing that Mr. Itkin completely lacked evidence to show

that.  "[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

- 16 -

1    any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

2    *Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

3        In *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1105 (9th Cir.

4    2000), the Court explained:

5        In a typical case, in order to carry its initial burden of production by pointing to the
         absence of evidence to support the nonmoving party's claim or defense, the
6        moving party will have made reasonable efforts, using the normal tools of
         discovery, to discover whether the nonmoving party has enough evidence to carry
7        its burden of persuasion at trial…."Even after *Celotex* it is never enough simply to
         state that the non-moving party cannot meet its burden at trial." (Citation.)

8
     Mr. Sabadash's Motion, however, did <u>not</u> present any admissible evidence that
9
    demonstrated that Mr. Itkin was <u>unable</u> to show the lack of a bona fide dispute as to the existence
10
    of the Partnership.
11
        Second, the  burden never shifted to Mr. Itkin to present any evidence in opposition to the
12
    Motion, although he did so.  "If a moving party fails to carry its initial burden of production, the
13
    nonmoving party has no obligation to produce anything, even if the nonmoving party would have
14
    the ultimate burden of persuasion at trial. (Citations.)  In such a case, the nonmoving party may
15
    defeat the motion for summary judgment without producing anything." *Nissan Fire & Marine*
16
    *Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d at 1102–03.
17
        In short, the Motion should have been denied.
18
                    **F.    The Court Did Not Consider Mr. Itkin's Evidence in a Light Most**
19
                            **Favorable to Him, but Instead Construed It Against Him**
20
        The Court's Memorandum is critical of Mr. Itkin's evidence, without considering it in a
21
    light most favorable to him.  Again, the Court acknowledged that: "The evidence and inferences
22
    therefrom must be viewed in the light most favorable to the non-moving party."  (Docket no. 75,
23
    at 6:21-23.)  "Summary judgment is appropriate only if, taking the evidence and all reasonable
24
    inferences drawn therefrom in the light most favorable to the non-moving party, there are no
25
    genuine issues of material fact and the moving party is entitled to judgment as a matter of law."
26
    *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (quoting *Torres v. City of Madera*, 648
27
    F.3d 1119, 1123 (9th Cir. 2011)); see *Orloff v. Cleland*, 708 F.2d 372, 375 (9th Cir. 1983).
28
                                            - 17 -

*First*, the Court questions the existence of the Partnership based upon the lack of a written agreement when the Partnership was formed, given the promise of $4 million per year and Mr. Itkin's reluctance to move to Russia, especially given that Mr. Itkin is an accountant.  (Docket no. 75, at 19:22-20:15.)  In not considering the evidence in a light most favorable to Mr. Itkin, the Court overlooks the facts that:

- Between 1990 and 1998, Mr. Sabadash and Mr. Itkin and their spouses) "became good friends."  (Docket 16, at 34:12-17).

- Contrary to the Court's statement, Mr. Sabadash did not "guarantee[] Mr. Itkin a *minimum income of $4 million per year*" (docket no. 75, at 2:6-7, emphasis in original), but instead Mr. Itkin stated: "A. Sabadash stated he was so confident we would succeed that he promised me a minimum income of $4,000,000 per year, which I could either draw upon, or reinvest into the partnership as I saw fit."  (*Id.* at 35:11-13.)   A "promise" is not a "guarantee."

- That income did not materialize at first; instead "[a]t its earliest stages, the Partnership generated barely any revenue, and little in the way of comfort" and "when I first moved to St. Petersburg, A. Sabadash and I lived together in a run-down, one-bedroom apartment that A. Sabadash informed me was owned by his mother-in-law" and "when I did rent my own apartment, that apartment was even more squalid.  (*Id.* at 35:26-36:6);

- Mr. Itkin and Mr. Sabadash acted like partners in the manner agreed to by them, with Mr. Itkin forming the companies, Mr. Itkin being appointed as a director and officer, and the Partnership assets being held in this manner.  (*Id.* at 36:11-16);

- In late 1999, Mr. Sabadash and Mr. Itkin joined the International Union of Economists ("IUE"), as partners and splitting the $15,000 registration fee with Mr. Sabadash paying $10,000 and Mr. Itkin paying $5,000 per their agreed upon partnership share shares of 2/3 and 1/3.  (*Id.* at 36:19-28.)

- Both of them drew on Partnership accounts.  (*Id.* at 37:1-4.)

- Both of them held "ourselves out as partners to employees, business associates, governmental officials, and others."  (*Id.* at 37:5-7.)

In other words, this Partnership between friends was entered into without an agreement

- 18 -

1   and worked well from approximately 1999 to 2003 without a written agreement.  Only when they

2   met Russian attorney Elena Gofman, f/k/a Elena Nikolayevna Vasilieva, in early 2004 did they

3   act on her recommendation in conducting a meeting on February 12, 2024, that resulted in the

4   Partnership Minutes, which Mr. Itkin saw Mr. Sabadash sign.  (Docket no. 16 at 37:21-38:6;

5   Gofman Decl., ¶ 10; Suppl. Itkin Decl., ¶ 6.)

6       Interpreting this evidence in the "light most favorable" to Mr. Itkin, it is credible that the

7   Partnership between friends was entered into without a written agreement.[2]  (Suppl. Itkin Decl., ¶

8   12.)  They trusted each other at the time.  (*Id.*)  Significantly, neither Mr. Sabadash nor the Court

9   dispute that a partnership agreements may be verbal and need not be in writing.  In light of no

10  contrary admissible evidence, Mr. Itkin established that there is not a bona fide dispute as to the

11  existence of the Partnership.

12      *Second*, in further questioning Mr. Itkin's declaration, the Court doubts that Mr. Itkin's

13  "academic background" and his "professional experience, business reputation and connection"

14  justified "obtain[ing] this $4 million per year, and a 30% or so interest in assets that turned out to

15  be worth hundreds of millions of dollars."  (Docket no. 75, at 20:16-27.)[3]  The Court was

16  referring to the language in the Partnership Minutes.  However, the Court ignores the evidence

17  that Mr. Itkin's contributions went far beyond his background.  He presented evidence that:

18      • Paragraph 1 of the Partnership Minutes also stated that Mr. Itkin and Mr. Sabadash

19  agreed in 1998 to "combine their assets, monetary funds, other financial resources, as well as the

20  value of their education, professional experience, business reputation and business connections to

21  jointly conduct business activities without forming a legal entity."  (Docket no. 16, Ex. A,

22  emphasis added, also Exh. A hereto.)  They agreed to contribute the same types of consideration.

23      • Paragraph 2 of the Partnership Minutes stated: "Each Partner shall be personally liable

24  to the second Partner for non-performance or partial performance of his obligations hereunder.

25

26  ---
    [2]  California Corporations Code § 16101 explicitly defines a "partnership agreement" as an
    agreement "whether written, oral, or implied" among the partners concerning the partnership.
27  Similarly,  California Corporations Code § 15901.02 also recognizes that a partnership agreement
    may be "oral, implied, in a record, or in any combination."
28  [3] Mr. Sabadash did not make this argument in his Motion or Reply.

1    Moreover, Partners shall serve as each other's fiduciaries. Each Party shall act in good faith

2    towards his Partner and abstain from engaging in acts of gross negligence or recklessness,

3    intentional unlawful acts or deliberate violations of the law." (Docket no. 16, Ex. A.)  Thus, Mr.

4    Itkin and Mr. Sabadash agreed to be liable to the other one; they each promised to act as

5    fiduciaries; and they each agreed to abstain from improper conduct.

6        • Paragraph 5 of the Partnership Minutes stated: "In consideration of the obligations of

7    each Party to keep all the information received by the Partners hereunder confidential, Partners

8    agree not to disclose the existence of the Simple Partnership to third parties (Silent Partnership)."

9    (Docket no. 16, Ex. A.)  Thus, Mr. Itkin and Mr. Sabadash each promised confidentiality.

10        But the evidence of Mr. Itkin's consideration for his 33% Partnership interest goes well

11    beyond the recitations in the Partnership Minutes, which the Court only references regarding Mr.

12    Itkin's background, experience and connections.  Mr. Itkin's declaration further explains:

13        • He moved to Russia and for a time lived in squalid conditions to pursue the Partnership,

14    as stated above.

15        • In 2004, Mr. Itkin and Mr. Sabadash hired Elena Nikolayevna Vasilieva "on behalf of

16    the Partnership to provide tax-related legal services to Itkin & Sabadash and the companies

17    owned by it that were held in the name of Mr. Sabadash."  (Docket 16, at 37:21-23; 38:7-10.)

18        • Mr. Itkin did not receive the $4 million per year.  Instead, he "drew my share as a fairly

19    steady draw, opting to leave most of my interests invested in the Partnership. I drew between

20    approximately $300,000 and $800,000 per year, as needed, for a total of approximately

21    $8,000,000 over the course of approximately sixteen years." (*Id.* at 40:23-25.)  He significantly

22    reinvested in the Partnership, thereby meeting his promise that was stated in paragraph 1of the

23    Partnership Minutes to "combine [his] assets, monetary funds, other financial resources."

24        • Mr. Itkin also kept track of Partnership income and expenses.  He explained: "I kept

25    track of the Partnership's revenues and expenses and provided monthly expense statements to A.

26    Sabadash so each of us could keep track of Partnership revenues and expenses and how much

27    each of us had withdrawn from the Partnership. Attached hereto as **Exhibit H** are true and correct

28    copies of examples those cash flow statements in chronological order from the period February

- 20 -

1    2005 to August 2010." (*Id.* at 54:22-26.)

2        Thus, interpreting the evidence the "light most favorable" to Mr. Itkin, he clearly

3    contributed significant time and money to the Partnership as consideration that went well beyond

4    his background, experience and connections, which themselves constituted consideration. It must

5    be kept in mind that while the Partnership eventually had assets worth hundreds of millions of

6    dollars, that future success could not have been predicted. It is unfair to Mr. Itkin to discount his

7    multiple contributions to the Partnership in light of future developments and then apply the

8    benefit of hindsight. Thus, when considering the evidence of Mr. Itkin's contributions to the

9    Partnership in the light most favorable to him, it supports the existence of the Partnership and

10   establishes an absence of bona fide dispute in that regard, especially when considering that Mr.

11   Sabadash failed to present any admissible evidence to the contrary.

12       *Third*, the Court sees contradictions in Mr. Itkin's statements in his declaration that he

13   moved to Russia to take over Mr. Sabadash's existing ventures and to pursue new ventures and

14   looked into marketing our products abroad for export from Russia, on the one hand, and his

15   deposition testimony that he did not manage cash flow generated by Russian operations and "I

16   have no clue where" the "Russian flow of funds" originated. (Docket 75, at 21:1-13.)

17       As an initial matter, footnote 5 in the Memorandum asserts that this testimony is

18   admissible because "[i]t is offered not to establish the truth of the matters to which he testifies,

19   but instead to demonstrate the existence of a bona fide dispute as to the existence of the Itkin &

20   Sabadash partnership. *See* n. 3." That presumably was a reference to footnote 4. As stated above

21   regarding footnote 4, there is no exception to the hearsay rule that hearsay is admissible to

22   demonstrate a dispute without it being accepted for the truth of the matters stated.

23       More importantly, while the Court acknowledges that it "can conceive of possible ways to

24   try to reconcile these statements," it concludes "at the very least they would only establish that

25   Mr. Sabadash's dispute is bona fide." (Docket 75, at 21:11-13.) There is a very simple way to

26   reconcile these statements, especially if Mr. Itkin's declaration and deposition testimony are read

27   in a "light most favorable" to him.

28       Mr. Itkin's declaration does <u>not</u> state that he agreed to take over Russian business

- 21 -

1    operations.  Instead, he states that Mr. Sabadash initially proposed the venture as follows:  "In

2    1998, <u>A. Sabadash asked me</u> to move to Russia with A. Sabadash, to become 'business partners'

3    with him and to take over the operation and growth of all of A. Sabadash's existing business

4    ventures, as well as pursuing new business ventures."  (Docket 16, at 34:15-17, emphasis added.)

5    Mr. Itkin's declaration does <u>not</u> state that he took over "the operation and growth of all of A.

6    Sabadash's existing business ventures" in Russia, but he does state that he assisted Mr. Sabadash

7    in "pursuing new business ventures," including (as noted by the Court) looking into marketing the

8    Partnership's products abroad for export from Russia (*id.* at 36:17-18); he "was appointed as a

9    director and officer of the majority of the corporate entities falling under the Partnership or of the

10   parent company for each such business, controlling the boards of directors of the subsidiary

11   companies" (*id.* at 36:11-16); he also "took steps to modernize/westernize the Partnership's

12   business interests" (*id.*); and after Mr. Sabadash was elected to the Russian Senate in 2003, Mr.

13   Itkin took "on the role of sole director and officer for the bulk of the corporate entities falling

14   within the Partnership" (*id.* at 37:16-17).  He was very active in the Partnership's business.

15       So, how can Mr. Itkin reconcile his deposition testimony in which he stated that he did not

16   "manage cash flow" generated by Russian operations and "I have no clue where" the "Russian

17   flow of funds" originated?  (Zorkin Decl. (dkt. 8-1), Ex. 1, at 93:25-94:4.)  In Mr. Itkin's

18   deposition testimony that Mr. Sabadash submitted with his Motion, Mr. Itkin explained a very

19   sensible reason why, which is that those details were handled by someone else:

20       Q And you were managing the entire partnership; is that correct?

21       No.  I was not managing Russian flow. I mentioned that before, number one.
22       Number two, I -- the monies that were coming in, to me, they were monies that
         were coming from profits and -- from the profits of the partnership. I have no clue
23       where they're coming from. <u>It was a completely separate person that was dealing
         with that, with the Russian flow of funds.</u>

24       Q <u>And who was that</u>?

25       A <u>Kirill Arsentiev</u>.

26       (*Id.* at 93:93:22-94:4, emphasis added.)

27       In follow up questions from Mr. Zorkin, Mr. Itkin explained what he meant:

28       Q What do you mean by "money flows in Russia"?  I'm sorry.

- 22 -

A Well, there were a number of partnership entities in Russia, and there were -- there were incoming funds and there were expenditures and et cetera's. <u>All that was done by Kirill Arsentiev.  What I saw is the end, the monies on Golden Sphinx, Golden Spirits; in other words, accounts that were over the border.</u>

Q Okay.

A How they were generated and received there, I didn't know.

(*Id.* at 93:24-94:9, emphasis added.)

Mr. Itkin further testified that he was "notified when the money came in" and that Mr. Arsentiev "would always tell me this amount of money is being sent….(*Id.* at 182:3-15.)

Thus, while Mr. Itkin held a position as officer and director of multiple companies with assets worth hundreds of millions of dollars, he cannot be expected to know the details of "money flows."  After Kirill Arsentiev was hired in 2007-2008, he handled the cash flow of net profits from the Partnership's Russian operations.  He was the equivalent of a Chief Financial Officer for the Partnership's Russian operations.  (Suppl. Itkin Decl., ¶ 13.)

In short, reading Mr. Itkin's declaration and his actual deposition testimony in a light most favorable to him leads to the conclusion that they are consistent and that they do not  show that there was a bona fide dispute as to the existence of the Partnership.  In fact, even if the testimony could be viewed as inconsistent, whether or  not Mr. Itkin managed funds or personally followed cash flows does not contradict the conclusion that the Partnership existed.

*Fourth*, the Court sees a contradiction between Mr. Itkin's declaration regarding living in a run-down apartment belonging to Mr. Sabadash's mother-in-law and later living in a squalid apartment, on the one hand, and his deposition testimony that he began receiving $50,000 per month from the Partnership "practically right away" after moving to Russia.  The Court states that Mr. Itkin does not explain this apparent inconsistency.  (Docket no. 75, at 21:14-25.)  Again, as stated above, that deposition testimony is inadmissible.  Further, there is no evidence that Mr. Itkin was even asked to explain this apparent inconsistency that the Court identified, so it is unclear why the Court criticizes Mr. Itkin for not explaining it, unless the Court is seeking to impeach Mr. Itkin's credibility without him even being asked to explain the supposed

1   inconsistency.[4]  It is well-settled that the credibility of a testimony of a witness in opposition to a

2   summary judgment motion cannot be determined  by the Court in choosing to disbelieve his or

3   her testimony.  *S.E.C. v. Koracorp Indus., Inc.,* 575 F.2d 692, 698 (9th Cir. 1978) ("It is not the

4   function of the trial court at the summary judgment hearing to resolve any genuine factual issue,

5   including credibility; and for the purpose of ruling on the motion all factual inferences are to be

6   taken against the moving party and in favor of the opposing party, and the appellate court will do

7   likewise in reviewing the trial court's grant of summary judgment.")  However, there is a very

8   simple explanation.  When Mr. Itkin moved to Russian, his family stayed in California.  The bulk

9   of the $50,000 each month was sent to Mr. Itkin's wife so his family would have funds to pay for

10  their expenses.  Mr. Itkin kept a small amount for himself to pay his expenses in Russia, while he

11  often worked more than 15 hours per day on Partnership business.  {Suppl. Itkin Decl., ¶ 14.}

12  Again, Mr. Itkin's evidence was supposed to be interpreted in the light most favorable to him

13      *Fifth*, the Court also suggests that Ms. Gofman's judgment against the Partnership for

14  $13,130.83 was a "ploy to preclude Mr. Sabadash from contesting the existence against the

15  Partnership" because she has not chosen to enforce it, which the Court concludes "casts doubt

16  about both the existence of the partnership and the validity of Ms. Gofman's claim against it."

17  (Docket no. 75, at 22:1-7.)  Of course, there is no evidence regarding Ms. Gofman's reasons for

18  not seeking enforcement.  The Court speculated in that regard.  Ms. Gofman's attached

19  supplemental declaration explains why she has not pursued collecting on her $13,130.83

20  Recognition Judgment.  First, the fees and costs that would be incurred by her in seeking to

21  enforce the Recognition Judgment would be disproportionate to the $13,130.83 judgment amount.

22  Second, she has been unaware of any assets directly owned by the Partnership in California that

23  could be the subject of an inexpensive effort to enforce the Recognition Judgment.  (Suppl.

24  Gofman Decl., ¶ 3.)  These reasons are obvious.  Rather than viewing Ms. Gofman's lack of

25  _____

26  [4] Federal Rule of Evidence 613(b) states that a witness must be given an opportunity to explain
    prior inconsistent statements: "Unless the court orders otherwise, extrinsic evidence of a witness's
27  prior inconsistent statement may not be admitted until after the witness is given an opportunity to
    explain or deny the statement and an adverse party is given an opportunity to examine the witness
28  about it."  The Court's questioning of Mr. Itkin's credibility on this issue in its Memorandum did
    not afford Mr. Itkin that opportunity.

- 24 -

1   collection efforts in the light <u>most</u> favorable to Mr. Itkin, the Court questions it in a light <u>least</u>

2   favorable to Mr. Itkin.  More importantly, even if the Court chooses to discount the impact of Ms.

3   Gofman's lack of collection efforts on her small judgment, it still does not contradict Mr. Itkin's

4   testimony, the Partnership Minutes, the contract between Ms. Gofman and the Partnership, and

5   the rulings of the Russian Courts.

6       In short, not only did the Court question Mr. Itkin's evidence in certain respect that were

7   not questioned by Mr. Sabadash, but the Court also interpreted that evidence in a manner <u>least</u>

8   favorable to Mr. Itkin rather than in a light <u>most</u> favorable to him.  Had the Court only considered

9   admissible evidence and had the Court viewed that evidence in the light most favorable to Mr.

10  Itkin, it should have concluded that there is no evidence of a bona fide dispute regarding the

11  existence of the Partnership.

12              **G.    Mr. Sabadash's Reply Made Other Unfounded Accusations**

13      Mr. Itkin had no opportunity to address in writing and with evidence additional

14  accusations made for the first time in Mr. Sabadash's Reply.  This Motion will address them.

15      First, without <u>any</u> <u>admissible</u> supporting evidence, Mr. Sabadash's Reply argued that Mr.

16  Sabadash's signatures on the Partnership Minutes and the Information Services Agreement were

17  forged.  In authenticating those documents, Mr. Itkin already stated in his declaration attached to

18  the Opposition to the Motion to Dismiss that he saw Mr. Sabadash sign those documents.

19  (Docket no. 16, at 38:3-4; 38:11-12.)  Ms. Gofman's attached declaration also confirms that she

20  prepared those documents and saw Mr. Sabadash sign those documents.  (Gofman Decl., ¶ 10,

21  Exhs. A and B.)  There was not a forgery.  Notably, Mr. Sabadash's signature on the inadmissible

22  declarations that are attached as Exhibit 2 and 3 to Mr. Sabadash's Motion to Dismiss are

23  remarkably similar to his signatures on the Partnership Minutes and the Information Services

24  Agreement.  (Docket no. 8-1, at 37 and 40 of 86; Gofman Decl., Exhs. A and B.)

25      Second, without <u>any</u> supporting evidence, Mr. Sabadash's Reply argued that Mr. Itkin

26  tried to give the Information Services Agreement with Ms. Gofman "an aura of legitimacy by

27  stamping it with a seal of the 'Itkin & Sabadash Partnership," but he botched the partnership seal

28  misspelling Mr. Sabadash's name proving that it is a fraud."  In truth, Ms. Gofman ordered that

1    stamp because according to Russian custom at that time every organization needed an official

2    stamp.  Since the Partnership did not have a stamp, she ordered it on an urgent basis and

3    apparently a misspelling of Mr. Sabadash's name occurred.  Mr. Itkin and Ms. Gofman did not

4    realize that at the time.  (Gofman Decl., ¶ 17; Suppl. Itkin Decl., ¶ 11.)  The simple explanation

5    was that a mistake was made, not that the incorrect spelling was evidence of an imagined fraud.

6         Third, without <u>any</u> supporting evidence, Mr. Sabadash's Reply speculated that Mr. Itkin

7    paid Ms. Gofman $21,000 between July 2018 and March 2019 to "bribe" her pursuant to a

8    conspiracy between them to file the lawsuits against the Partnership in Russia and the Los

9    Angeles Superior Court so that Mr. Itkin could "weaponize" those judgments against Mr.

10   Sabadash.  Ms. Gofman and Mr. Itkin's attached declarations address those defamatory

11   statements.  Ms. Gofman pursued those lawsuits to collect on the amounts owed to her by the

12   Partnership pursuant to her Information Services Agreement.  (Gofman Decl., ¶ 15; Suppl. Itkin

13   Decl., ¶ 9.)  A payment of $2,000 in July 2018 is expressly accounted for in her Russian

14   Judgment against the Partnership.  (Gofman Decl., ¶ 5, Exh. C; Suppl. Itkin Decl., ¶3.)  Further

15   payments of $10,000 between July 2018 and March 2019 were credited against the Russian

16   Judgment when she sought and as awarded $13,130.83 by the Superior Court.  (Gofman Decl., ¶

17   6, Exh. E; Suppl. Itkin Decl., ¶ 4.)  The balance of $9,000 was applied to fees incurred by her in

18   obtaining the Russian Judgment and also obtaining recognition of the Russian Judgment in the

19   United Kingdom.  (Gofman Decl., ¶ 6, Exh. E; Suppl. Itkin Decl., ¶ 4.)

20        **H.    The *Leong Partnership* Case Does Not Compel the Court's Decision**

21        In *In re Leong Partnership*, 2018 WL 1463852 (9th Cir. BAP Mar. 23, 2018), *aff'd,* 788 F.

22   App'x 539 (9th Cir. 2019), the issue was whether the claims of petitioning creditors were in bona

23   fide dispute.  After the opposing alleged partner's motion to dismiss was denied, he brought a

24   motion for summary judgment.  The Bankruptcy Appellate Panel noted that in granting summary

25   judgment "the bankruptcy court gave a detailed recitation of the <u>uncontroverted</u> <u>facts</u> in the

26   record and carefully analyzed why, in light of those facts, Leong was entitled to summary

27   judgment." *Id.* at *4, emphasis added.  In contrast, Mr. Sabadash lacks admissible evidence and

28   Mr. Itkin offers plenty of evidence not only to demonstrate the existence of the Partnership, but

1 also to demonstrate that it is not in bona fide dispute.  In *dicta,* the Court went on to address the

2 statements that the partner/creditor relied upon to prove the existence of the partnership, which

3 the Court held were "equivocal at best."  *Id.* at *8.  Mr. Itkin's evidence is not "equivocal at best,"

4 especially when viewed in the light most favorable to him.

5      The *Leong Partnership* Court explained when a bona fide dispute exists:

6     Whether a bona fide dispute exists is a question of fact, and "[t]he burden is on the
petitioning creditors to show that no bona fide dispute exists." *In re Vortex Fishing
7 *Sys., Inc.*, 277 F.3d at 1064 (citing *Rubin V. Belo Broad. Corp. (In re Rubin)*, 769
F.2d 611, 615 (9th Cir. 1985) ). A claim is subject to "bona fide dispute" if "there
8 is an objective basis for either a factual or a legal dispute as to the validity of the
debt." *Id.* (citation omitted). Put another way, "if there is either a genuine issue of
9 material fact that bears upon the debtor's liability, or a meritorious contention as to
the application of law to undisputed facts, then the petition must be dismissed." Id.
10 (citation omitted).

11 *Id.* at *7.

12     As noted above, the burden of persuasion only shifts to the party opposing summary

13 judgment when a moving party provides admissible evidence to demonstrate a question of fact.

14 Here, Mr. Sabadash failed to do so.  However, in response, Mr. Itkin presented considerable

15 evidence that there is no genuine issue of material fact as to the existence of the Partnership.  The

16 only way around that was to consider inadmissible evidence and to criticize Mr. Itkin's evidence

17 rather than construing it in a light most favorable to him—both in violation of applicable

18 summary judgment standards.

19     **I.**    **The Decisions of the Russian Courts and the Superior Court Are**

20     **Binding on Mr. Sabadash on the Issue of the Existence of the**

21     **Partnership**

22     **1.**    **The Scope of the Russian Courts' Rulings**

23     Even without evidence of the rulings of the Russian Courts, Mr. Itkin submitted

24 considerable evidence of the existence of the Partnership.  The Russian Courts' rulings

25 corroborate that evidence.  As an initial matter, neither Mr. Sabadash nor the Court dispute that

26 the Russian Courts determined that the Itkin & Sabadash partnership existed and that they even

27 identified assets owned by the Partnership.

28     Before the Ninth Arbitration Court of Appeals and Russian Supreme Court, Mr. Sabadash

1    had argued that Itkin & Sabadash was not a partnership, so those Courts and the Arbitration Court

2    of the Court of the City of Moscow could not have ruled that Itkin and Sabadash was a

3    partnership that owed Ms. Gofman monies, as determined by the September 14, 2018 Judgment

4    of the Arbitration Court of the Court of the City of Moscow.  On or about December 9, 2019, Ms.

5    Gofman wrote the Moscow District Arbitration Court and asked for clarification regarding how

6    the Arbitration Court of the Court of the City of Moscow could have ruled (contrary to Mr.

7    Sabadash's contentions) that Itkin and Sabadash was a partnership that owed her monies for

8    services she had rendered to the Partnership.  In response, she received a letter dated December

9    12, 2019, from the Moscow District Arbitration Court.  In that letter, the Court confirmed as

10   follows: "In accordance with the Federal law… The Court is the guarantor of the enforceability of

11   the lawful decision. Consequently, during the trial, the court verifies a priori the actions of each of

12   the parties, as well as the existence of each of the parties, provided that non-existence of the

13   parties (death, liquidation etc.) invalidates legal proceedings, the decision and the enforceability

14   of such decision."  (Emphasis added.)  (Gofman Decl., ¶ 19, Exh. F.)

15        For the same reasons, on approximately December 9, 2019, Ms. Gofman also wrote the

16   Operations Office of the Arbitration and Specialized Courts of the Judicial Department of the

17   Supreme Court of the Russian Federation.  She received a response from that Office on December

18   13, 2019.  In that letter, that Office confirmed as follows: "Upon review and adjudication of the

19   claim, the Arbitration court establishes the existence of each of the parties to each claim, which is

20   a prerequisite to issuance of legally binding decision. The said procedure of establishment of the

21   parties is undertaken at the preparation stage of the case review."  (Emphasis added.)  (Gofman

22   Decl., ¶ 20, Exh. G.)

23        Thus, both letters confirmed under Russian law that the existence of the Partnership was

24   required to have been determined by the Russian Courts notwithstanding Mr. Sabadash's

25   arguments to the contrary.  (Gofman Decl., ¶ 21.)

26        Rather than disputing that the Russian Courts held that the Partnership existed and that it

27   owed Ms. Gofman for services rendered by her to the Partnership, the Court's Memorandum

28   alternatively makes multiple points regarding the Russian Courts' rulings: (1) the September 12,

1   2019 order of the Ninth Arbitration Court of Appeal ruled that the Moscow Arbitration Court

2   "had not in fact made any decision as to the rights and obligations of Mr. Sabadash, including

3   whether he was deemed to be a member of the Alleged Partnership" (docket no. 75, at 11:18-20);

4   (2) that means that the previously-quoted language from the September 14, 2018 judgment

5   Moscow Arbitration Court is *dicta* (*id.* at 11:27-12:1);[5] (3) that means "there was no 'decision' in

6   the 'resolutive or the declarative parts' of the Judgment about either the existence of the

7   partnership or Mr. Sabadash's personal rights and obligations" (*id.* at 12:1-3); (4) the September

8   12, 2019 order of the Ninth Arbitration Court of Appeal held that because "Mr. Sabadash is not

9   party to the lawsuit…[t]he mere existence of a simple partnership agreement does not form

10  sufficient basis for allowing Applicant to appeal the ruling"; (5) according the September 12,

11  2019 order of the Ninth Arbitration Court of Appeal, it  is "factually incorrect" "that an actual

12  decision had been made about the existence of the alleged partnership Itkin & Sabadash" (*id.* at

13  12:24-28); (6) the August 6, 2020 Information Summary of the Ninth Arbitration Court of Appeal

14  is not shown to be a "judgment or decision that would be entitled to preclusive effect" (*id.* at

15  13:3-5); (7) the Information Summary "does not address the apparently plain statement of the

16  Russian Appellate Court that it is 'factually incorrect' to assert that any decision was made about

17  the existence of the alleged partnership" (*id.* at 13:5-7); (8) alternatively, the existence of the

18  Partnership at the time of the September 14, 2018 judgment Moscow Arbitration Court does not

19  mean it existed at other times, given Mr. Itkin's (inadmissible) trial testimony that the

20  "partnership ended" in 2016, so it could have ended at any time; and (9) alternatively, Ms.

21  Gofman could have filed an opposition to the Motion to Dismiss, but did not do so.

22          That is a lot to address.  Briefly stated, in order:

23          (1) As quoted on page 11 of the Memorandum, the September 12, 2019 order of the Ninth

24  Arbitration Court of Appeal admittedly held that "the decision of the trial court does not address

25  Mr. Sabadash's personal rights and obligations" and "[t]here is no reference to Mr. Sabadash's

26  personal rights or obligations in either the resolutive or the declarative parts of the court

27  _____

28  [5] The Court similarly should ignore the *dicta* in the *Leong Partnership* case described above.

decision." That is very different from a determination that the Partnership did not exist. The

Moscow Arbitration Court plainly held that it did exist, and it awarded Ms. Gofman a judgment

against the Partnership.

(2) That means that the finding of the Moscow Arbitration Court was not *dicta*. Indeed, it

could not have been *dicta*. Awarding Ms. Gofman a judgment against the Partnership

necessitated a determination that the Partnership existed. Whether that determination bound Mr.

Sabadash is a different issue, which is addressed below.

(3) While there may not have been "a 'decision' in the 'resolutive or the declarative parts'

of the Judgment about … Mr. Sabadash's personal rights and obligations," there clearly <u>was</u> a

decision by the Moscow Arbitration Court "in the 'resolutive or the declarative parts' of the

Judgment about … the existence of the partnership." Again, whether that determination bound

Mr. Sabadash is a different issue, which is addressed below.

(4) Here, the Court is correct. The September 12, 2019 order of the Ninth Arbitration

Court of Appeal held that because "Mr. Sabadash is not party to the lawsuit…[t]he mere

existence of a simple partnership agreement does not form sufficient basis for allowing Applicant

to appeal the ruling."

(5) The September 12, 2019 order of the Ninth Arbitration Court of Appeal did <u>not</u> hold

as this Court stated that is was "factually incorrect" "that an actual decision had been made <u>about

the existence of the alleged partnership Itkin & Sabadash</u>." (Docket no. 75, at 12:24-27.) The

order actually stated (as quoted on page 11 of the Memorandum) regarding the appellant (Mr.

Sabadash): "<u>The Appellant's position</u> is that the Court made its decision as to Appellant's rights

and obligations, deeming A. V. Sabadash to be a member of the Simple Partnership 'Itkin and

Sabadash' which is factually incorrect." (Docket no. 21-1 (Zorkin Reply Decl.), Exh. 17, at 51 of

68.) The quoted language on page 12 of the Memorandum merely shows that Ninth Arbitration

Court of Appeal held that Mr. Sabadash was not a party to the lawsuit before the Moscow

Arbitration Court so he lacked standing to appeal. That is point of the preceding paragraph.

(6) As explained in Mr. Itkin's Supplemental Brief, the Information Summary from the

Ninth Arbitration Court of Appeals was the result of a request for clarification in an Information

Request by the Partnership. A true and correct copy is attached as Exhibit A to the Supplemental

Brief. The Partnership asked the Court to clarify its September 12, 2019 order on several issues,

including the existence of the Partnership. The Supplemental Brief quotes the Information

Request in that regard. (Docket no. 45 (Exh. 1 thereto), Exh. A thereto, at 4.) In response to this

request, the Court issued the Information Summary on August 8, 2020, in which it held (1) Mr.

Sabadash had participated in the proceedings; (2) all participants (including Mr. Sabadash) had a

full and fair opportunity to be heard; (3) the plaintiff (Ms. Gofman) had rendered services to the

Partnership; (4) it further confirmed the ownership of the Partnership by Mr. Itkin and Mr.

Sabadash; (5) it explained that Mr. Sabadash's involvement included filing the appeal from the

September 12, 2018 decision of the lower court in which Mr. Sabadash challenged whether Itkin

and Sabadash was a partnership; (6) it explained that the Court had considered and rejected Mr.

Sabadash's contentions regarding the non-existence of the Partnership; and (7) the Information

Summary was ordered to be published. It is inconceivable that the published Information

Summary, which clarified the September 12, 2019 ruling, would not be considered a final order.

(7) the Information Summary did not need to address the "apparently plain statement of

the Russian Appellate Court that it is 'factually incorrect' to assert that any decision was made

about the existence of the alleged partnership" because the September 12, 2019 order of the Ninth

Arbitration Court of Appeals did not make such a statement, as noted in point 5 above. As quoted

extensively in Mr. Itkin's Supplemental Brief, the Information Summary repeatedly stated that

the Court actually had held that the Partnership existed.

(8) It is a red herring to argue that the existence of the Partnership at the time of the

September 14, 2018 judgment of the Moscow Arbitration Court does not mean it existed at other

times, given Mr. Itkin's (inadmissible) trial testimony that the "partnership ended" in 2016, so it

could have ended at any time. The issue is whether the Partnership still exists to this day, so it

can qualify as a "person" that can be subject to an involuntary petition. Evidence that the Russian

Courts held that the Partnership existed in 2018, 2019 and 2020 clearly is relevant to that showing

in the absence of a subsequent dissolution of the Partnership, which Mr. Itkin requested in the

stayed State Court Action but on which no ruling has been made. The statement that the

- 31 -

1    Partnership ended in 2016 was not a legal conclusion but a layperson's statement about the

2    practical (not the legal) "end of the Partnership" when Mr. Itkin testified: "I believe the

3    partnership ended when I was removed from the offices and refused to be paid monies that I'm

4    owed" and that it occurred in 2016.  (Docket 8-1, Exh. 9, at 25:25-26:3.)  California Corporations

5    Code states: "A partnership is dissolved, and its business shall be wound up, only upon the

6    occurrence of any of the following events:…(5) On application by a partner…."  (emphasis

7    added.)  Mr. Itkin sought dissolution of the Partnership by his first cause of action in his second

8    amended cross complaint in the State Court Action.  That cause of action has not yet been ruled

9    upon because this Court determined in the Golden Sphinx Limited ("GSL") case that it is stayed.

10    The Partnership has not yet been dissolved.  It still exists.

11        (9)  The fact that Ms. Gofman did not file an opposition to the Motion to Dismiss does not

12    prove she agreed with it.  The Motion was brough against Mr. Itkin, not Ms. Gofman.

13        If the foregoing is not sufficient for the Court to conclude that under Russian law that the

14    existence of the Partnership was determined by the Russian Courts and that Mr. Sabadash is

15    bound by those decisions, Mr. Itkin asks that the Court consider the attached declaration of Rob

16    Childress.  Professor Childress is an attorney and an adjunct professor of Russian law at the

17    University of South Carolina School of Law.  (Childress Decl., ¶ 1.)  He was retained by Mr.

18    Itkin's attorney "as an expert in Russian law." (Id., ¶ 2.)  His curriculum vitae supported that

19    expertise.  (Id., Exh. 1.)  His declaration is helpful to an understanding of the rulings of the

20    Russian Courts in favor of Ms. Gofman that determined the existence of the Partnership over Mr.

21    Sabadash's objections.  In his Summary of Findings, he states as follows regarding the rulings of

22    the Ninth Arbitration Court of Appeals, an intermediate appellate court, and the Russian Supreme

23    Court that rejected Mr. Sabadash's evidence and arguments that the Partnership did not exist:

24        10.    …the Ninth Arbitrazh Appellate Court, in a court trial, accepted and
            adjudicated upon the new evidence and arguments submitted by Mr. Sabadash in
25        his appeal, as well as his motion to reinstate the deadline for filing an appeal,
            including his contention that a general partnership between "Itkin and Sabadash"
26        did not exist, and rejected all of the arguments made by Mr. Sabadash, thereby
            confirming the existence of a partnership between Mr. Sabadash and Mr. Itkin.

27        11.    Upon further appeal to the Arbitrazh Court of the Moscow Circuit (Okrug)
28        and the RF Supreme Court Collegium on Economic Disputes, both courts rejected

- 32 -

1    all Mr. Sabadash's arguments against the existence of the Simple Partnership,
     upholding Ninth Arbitrazh Appellate Court's decision determining and confirming
2    the existence of partnership as between Mr. Sabadash and Mr. Itkin. The
     Determination entered by the RF Supreme Court was final and all appeals have
3    been exhausted.

4        His declaration goes on to explain in detail the Russian legal system (*id.*, ¶¶ 12-44) and

5    the historical background of the four Russian Courts that were involved with Ms. Gofman's

6    matters. (*Id.*, ¶¶ 45-82.) After explaining the factual background of the Gofman lawsuit (*id.*, ¶¶

7    83-94), he explains in considerable detail the trial and appellate court proceedings in the Gofman

8    lawsuit, including the August 6, 2020 Information Summary (*id.*, ¶¶ 95-116), which he stated

9    "provides a complete and accurate account of the Gofman case. (*Id.*, ¶ 107.)

10       There can be no doubt that Mr. Sabadash's arguments and evidence were heard by

11   multiple Russian Courts and rejected.

12                    **2.    The Russian Courts' Decisions and the Superior Court's**

13                           **Judgment Were Binding Upon Mr. Sabadash as to the**

14                           **Existence of the Partnership**

15       The Court relied upon the standards for issue preclusion under California law.

16   (Memorandum, at 10:1-21.) The standards are met: (1) The issue of the existence of the

17   Partnership identical. That is the issue before this Court, and it was an issue before the Russian

18   Courts, as confirmed by Professor Childress. (2) The issue was actually litigated, which is why

19   the September 14, 2018 judgment of the Moscow Arbitration Court determined that the

20   Partnership existed and the September 12, 2019 Ruling and the August 6, 2020 Information

21   Summary from the Ninth Arbitration Court of Appeals later confirmed that. (3) The issue was

22   necessarily decided in four decisions of the Russian courts. Ms. Gofman could not obtain a

23   judgment against the Partnership and have that judgment affirmed in appeals filed by Mr.

24   Sabadash unless the Partnership existed. (4) The decisions of the Moscow Arbitration Court and

25   the Ninth Arbitration Court of Appeals were appealed up the Russian Supreme Court. Mr.

26   Sabadash presented his arguments and evidence, which were rejected. The judgment is final. (5)

27   The party against whom preclusion is sought (Mr. Sabadash) was in privity with the Partnership,

28   which was a party to the proceedings in the Russian Courts.

1    The Court cites law that <u>partners</u> are not in privity with other <u>partners</u>: "'a judgment

2    against one partner in an action brought against him personally on a tort arising out of the

3    partnership business is res judicata when the same issues are raised in subsequent litigation

4    against another partner.' *Patel v. Crown Diamonds, Inc.*, 247 Cal. App. 4th 29, 39, (Cal. Ct. App.

5    2016), *as modified* (Apr. 29, 2016) (citation omitted)." (Docket no. 75, at 14:2-6.)  That law is

6    inapplicable because (1) it does not concern privity between <u>partnerships</u> and their <u>partners</u>, and

7    (2) it concerns privity for purposes of joint liability, not issue preclusion as the Mr. Itkin's

8    Opposition already explained. (Docket 16, at 15:23-16:2.)  Mr. Itkin cited *Headwaters Inc. v.*

9    *U.S. Forest Serv.*, 399 F.3d 1047, 1052–53 (9th Cir. 2005); *Lake at Las Vegas Investors Group,*

10   *Inc. v. Pacific Malibu Dev. Corp.,* 933 F.2d 724, 728 (9th Cir. 1991); *PNY Techs., Inc. v. Miller,*

11   *Kaplan, Arase & Co., LLP,* 2017 WL 2876736, at *4 (N.D. Cal. July 6, 2017), for the proposition

12   that <u>partners</u> are in privity with their <u>partnerships</u> for purposes of issue preclusion. (*Id.* at 15.)

13   The Court's Memorandum does not mention these decisions, but instead relies upon the *Patel*

14   decision, which Mr. Itkin had already distinguished.  As noted at page 16 of the Opposition:

15   
16   > "[T]he general rule denying privity solely by virtue of partnership status does not
       preclude applicability of res judicata rules to partners who are otherwise subject
       thereto." *Krofcheck v. Ensign Co.*, 112 Cal. App. 3d 558, 566 (1980).

17   (Docket no. 16, at 16:3-5.)

18   Similarly, under the authorities cited above, Mr. Sabadash is in privity with the

19   <u>Partnership</u> by virtue of the fact that he is a partner, regardless of whether he disputes that fact

20   (without any admissible evidence).  He also is bound by the Superior Court's Recognition

21   Judgment in favor of Ms. Gofman against the Partnership.  The Court's Memorandum explains

22   that Mr. Itkin brough an ex parte application to intervene in that lawsuit in grounds that the

23   Partnership did not exist, but that application was denied. (Docket no. 75, at 14:7-15:16:2.)  That

24   application was actually considered and denied, so Mr. Sabadash actually did participate in that

25   lawsuit through the application.  Notably, he did not seek any relief from that ruling from the

26   Court of Appeal. (Supp. Gofman Decl., ¶ 18.)

27       **J.    Abstention is Improper**

28   Mr. Sabadash's Motion to Dismiss and his Reply briefly argued that the Court should

- 34 -

1    abstain in this involuntary Chapter 7 case pursuant to 11 U.S.C. § 305.  The Court's

2    Memorandum similarly provides little analysis on this further alternative ruling in the last

3    paragraph of its June 16, 2025 Memorandum.  This Court recognized GSL's foreign liquidation

4    proceeding where the ownership of the Beverly Hills property is at issue.  (Docket no. 75, at

5    22:21-23:2.)  Given the involuntary Chapter 7 case, the issue now is whether the Jersey Court

6    should reciprocate in deferring to this Court deciding whether Itkin & Sabadash is a <u>California</u>

7    Partnership that owns, among other assets, the Property in Beverly Hills, <u>California</u>, under

8    <u>California</u> partnership and real estate law.  "[C]omity is not just a one-way street. Just as this

9    Court will defer to a foreign court if the circumstances require it, so too should a foreign court

10    defer to this Court when appropriate." *In re RHTC Liquidating Co.,* 424 B.R. 714, 725 (Bankr.

11    W.D. Pa. 2010).  Accord, *McGee v. Estelle,* 722 F.2d 1206, 1214 (5th Cir.1984) (en banc)

12    (quoting *Thompson v. Wainwright,* 714 F.2d 1495, 1509 (11th Cir.1983)).

13        Mr. Itkin's Opposition to the Motion to Dismiss explained in great detail why abstention

14    is not consistent with the five goals of Chapter 15 case.  (Docket no. 16, at 28:7-32:8.)  Neither

15    Mr. Sabadash's Reply nor the Court's "alternative" ruling in its Memorandum addressed any of

16    these factors, so Mr. Itkin is unable to respond to the Court's reasons in this Motion beyond there

17    mere facts that it has recognized the GSL proceeding where ownership of the Beverly Hills

18    property is at issue, even though (as explained in the Opposition) it is not close to trial—unlike

19    here where the parties' lawyers were trial ready and actually commenced trial in March 2020 until

20    a mistrial was declared due to Covid-19

21        **III.    CONCLUSION**

22        Based upon the foregoing, Mr. Itkin respectfully request that the Court vacate its June 16,

23    2025 Memorandum (docket no. 75) and its June 17, 2025 order of dismissal.

24    DATED: July 1, 2025                    HILL, FARRER & BURRILL LLP

25

26                            By:  */s/ Daniel J. McCarthy*
                                Daniel J. McCarthy
27                                Attorneys for Petitioning General Partner
                                GARRY Y. ITKIN
28

- 35 -

## SUPPLEMENTAL DECLARATION OF GARRY Y. ITKIN

I, Garry Y. Itkin, declare:

1.      This declaration supplements my declaration that was attached to my Opposition that was filed on my behalf on April 8, 2025, to Alexander Sabadash's "Motion to Dismiss Involuntary Petition Under FRCP 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment."

2.      In his reply brief that was filed on April 15, 2025 (the "Reply") with the Bankruptcy Court in the Partnership's involuntary Chapter 7 case, Mr. Sabadash made multiple defamatory accusations against Elena Gofman and me.  I am informed that the Reply stated:

> Mr. Itkin had no written evidence of a partnership so he found Ms. Gofman
> and paid her to forge documents and file a lawsuit on Mr. Itkin's behalf. This part of
> Mr. Itkin's scheme began in July 2018 when he made the first payment to Gofman
> from his personal bank account. Between July 2018 and March 2019, Mr. Itkin made
> six payments to Ms. Gofman totaling $21,000. (Supp. Zorkin Decl., Ex. 18.) The
> series of bribes culminated in a $10,000 payment on March 25, 2019 which
> corresponds with the filing of the Gofman California action to enforce the Russian
> judgment on April 19, 2019.

3.      I acknowledge wiring Ms. Gofman $21,000 between July 2018 and March 2019. The payments were not "bribes."  A payment of $2,000 was wired to me by me to her on July 6, 2018.  That was the equivalent of 124,000 Russian rubles ("RUB").  Page 3 of the English translation of the Russian Judgment that is attached hereto as Exhibit C states: "Defendant, represented by Managing Partner G. U. Itkin, has voluntarily partially satisfied [Plaintiff's] Demand for Payment by remitting 2,000 (two thousand) US dollars (an amount equal to 124,000 (one hundred twenty four thousand) RUB)."  That payment was accounted for in reaching the amount awarded in the Russian Judgment, which was the equivalent to $23,130.83.  Thus, Itkin & Sabadash (the "Partnership") was credited for the first payment of $2,000 when Ms. Gofman obtained the Recognition Judgment for the balance owing to her by the Partnership.

4.      Attached hereto as **Exhibit E** is a true and correct copy of the motion for judgment

1    on the pleadings that was filed on Ms. Gofman's behalf in her Superior Court Action against the

2    Partnership on August 7, 2019.  As set forth in that motion, the Partnership was further credited

3    with an additional $10,000 in payments that I had wired her between July 2018 and March 2019,

4    which is why I believe the motion requested and Ms. Gofman was awarded the balance of

5    $13,130.83 in the Recognition Judgment.  The sums of $2,000 and $10,000 account for $12,000

6    of the total amount of $21,000 that I wired to Ms. Gofman between July 2018 and March 2019.  It

7    is my understanding that the balance of $9,000 was applied to the equivalent of $5,000 in legal

8    fees incurred by Ms. Gofman in obtaining the Russian Judgment and the equivalent of $4,126.72

9    in legal fees incurred by Ms. Gofman in obtaining recognition of the Russian Judgment in the

10    United Kingdom.

11        5.    I am informed that the Reply further stated:

12        In exchange for $21,000, Ms. Gofman agreed to sign a contract supposedly for

13        services to the "partnership" and file a lawsuit against the "partnership." After

14        discovery closed in the state court action, Mr. Itkin "found" a contract between the

15        "partnership" and used it to support his motion for summary adjudication.

16        6.    I did not pay Ms. Gofman $21,000 between July 2018 and March 2019 in order to

17    induce her to sign a contract for services to the "partnership" and file a lawsuit against the

18    "partnership." Mr. Sabadash and I both hired Ms. Gofman on behalf of the Partnership many

19    years earlier in 2004.  When we met her, we informed her about our partnership.  On her

20    recommendation, we confirmed the terms of our partnership at an in-person meeting on February

21    12, 2004, at which Ms. Gofman was present.  Ms. Gofman then promptly prepared the minutes of

22    that meeting, which are dated February 12, 2024.  She was present when Mr. Sabadash and I

23    signed that document (the "Partnership Minutes").  A true and correct copy of those Minutes that

24    are in Russian and an English translation of those Minutes is attached hereto as **Exhibit A**.  Mr.

25    Sabadash's signature on those Minutes was not forged.  I saw Mr. Sabadash sign the Partnership

26    Minutes.  At the same time, I also saw Mr. Sabadash sign the Information Services Agreement

27    that Ms. Gofman had prepared under which we hired her to perform services for the Partnership.

28    A true and correct copy of that Agreement, which also is dated February 12, 2024, and was

- 37 -

executed on or about that date, and an English translation of that Agreement is attached hereto as

**Exhibit B**.  Mr. Sabadash's signature on the Information Services Agreement also was not

forged.

7.    I understand that Mr. Sabadash complained in his Reply that the February 12, 2024

Partnership Minutes are illegible.  A more legible copy of the Partnership Minutes in Russian is

attached as **Exhibit D**.

8.    The Reply further stated:

> To the contrary, Mr. Itkin, purporting to act on behalf of the partnership,
>
> strategically and promptly admitted allegations, revived the time-barred suit in
>
> Russia, admitted allegations once more in California, and conceded a judgment
>
> against the purported partnership by failing to oppose Gofman's motion for
>
> judgment on the pleadings. All the while, Mr. Itkin was in a conspiracy with Ms.
>
> Gofman to whom he paid $21,000. Mr. Itkin did all this so that he can use the
>
> judgments *against* Mr. Sabadash.

9.    I did not engage in a conspiracy with Ms. Gofman to cause her to file a lawsuit

against the Partnership in Russia and then obtain recognition of the Russian Judgment by the Los

Angeles Superior Court so that I could use those judgments against Mr. Sabadash.  Ms. Gofman

decided to file those lawsuits on her own so she could try to collect on the balance of monies

owed to her by the Partnership. The Partnership was credited by her with the $21,000 that I had

paid her on behalf of the Partnership.

10.    I am informed that the Reply further states regarding the February 12, 2024

Partnership Minutes that:

> Mr. Itkin tried to give this contract an aura of legitimacy by stamping it with a seal of the
>
> "Itkin & Sabadash Partnership." But he botched the partnership seal misspelling
>
> Mr. Sabadash's name proving that it is a fraud.

11.    That statement is false.  I did not order that stamp.  I am informed that Ms.

Gofman ordered the Partnership stamp because according to Russian custom at that time every

organization needed an official stamp.  Since the Partnership did not have a stamp, she ordered it

on an urgent basis and apparently a misspelling of Mr. Sabadash's name occurred.  I did not realize that at the time.

12.     I understand that the Court questions the existence of the Partnership based upon the lack of a written agreement when the Partnership was formed, given the promise to me of $4 million per year and my reluctance to move to Russia, especially given that I am an accountant. There is a simple explanation.  Between 1990 and 1998, Mr. Sabadash and our spouses became good friends.  I trusted Mr. Sabadash, and I believe he trusted me.  Neither one of us suggested that a written agreement was necessary and in fact we engaged in business together without a written agreement until Ms. Gofman recommended in early 2014 that we confirm the Partnership in writing, as explained above.

13.     In connection with my position with the Partnership, I was not the person who managed cash flow generated by the Partnership's Russian operations.  As I testified in my deposition in the State Court Action between Mr. Sabadash, Golden Sphinx Limited, other entities and me, that was done by Kirill Arsentiev.  In approximately 2007-2008, Mr. Arsentiev was hired by Mr. Sabadash and me (on behalf of the Partnership) to manage cash flow generated by the Partnership's Russian operations.  Before we hired Mr. Arsentiev, I managed all finances, including "rubles, after I arrived in Russia.  Mr. Arsentiev was the equivalent of Chief Financial Officer for Russian operations, with strict instructions from Mr. Sabadash and I that net Russian ruble profits from Russian operations were to be transferred to Golden Spirits Limited or Golden Sphinx Limited, both Jersey limited liability companies, for the purpose of paying dividends to Mr. Sabadash and me.  After we hired Mr. Arsentiev, both of those companies became "wallets' for those profits. Prior to working for the Partnership, Mr. Arsentiev was a senior Vice President of MDM-Bank, a large bank in Moscow.

14.     The Court's June 16, 2025 Memorandum perceived an inconsistency between the $50,000 per month that I was paid by the Partnership when I moved to Russia and my living conditions at the time, first in an apartment that I was told by Mr. Sabadash was owned by his mother-in-law and then in my own apartment.  That is easily explained.  When I moved to Russia, my family stayed in California.  The bulk of the $50,000 each month was sent to my wife so my

1   family would have funds to pay for their expenses.  I kept a small amount to pay my expenses in

2   Russia, while I often worked more than 15 hours per day on Partnership business.

3        15.    I am informed that Mr. Sabadash's Reply argued that I failed to produce the

4   Partnership Minutes in the State Court Action.  Those Minutes and the Information Services

5   Agreement with Ms. Gofman were trial exhibits in the State Court Action, which I am informed

6   were provided to Mr. Zorkin, who was trial counsel for Mr. Sabadash.

7        16.    If Jeff Ratner's deposition testimony in the State Court Action (attached as Exhibit

8   15 to Mr. Sabadash's Reply) is to be considered by the Court, Mr. Ratner testified at pages 89 and

9   90 that I informed him of the Partnership and that it would own corporations.  Mr. Ratner's

10  deposition testimony that is attached to his opposition to the objection to his proof of claim

11  (docket no. 53) also provides further excerpts from his deposition transcript regarding my

12  statements to him about my partnership with Mr. Sabadash.

13       The foregoing is within my personal knowledge.  I declare under penalty of perjury of the

14  laws of the United Sates of America that the foregoing is within my personal knowledge, that this

15  declaration is true and correct and that this declaration was executed on July 1, 2025.

16

17  _____

18  Garry Y. Itkin

19

20

21

22

23

24

25

26

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

- 40 -

1    **DECLARATION OF ELENA GOFMAN**

2    I, Elena Gofman, declare:

3    1.    I am  now and since July 2001 have been a tax lawyer in Russia.  I formerly was

4    known as Elena Nikolayevna Vasilieva.

5    2.    I understand that in the involuntary Chapter 7 case of Itkin & Sabadash (the

6    "Partnership"), case no. 2:25-bk-11235-NB, the Court questioned the fact that I had not taken any

7    action to enforce the judgment (the "Recognition Judgment") that I obtained in November 2019

8    in the Los Angeles Superior Court (the "Superior Court") in case no. 19STCP01412 (the

9    "Superior Court Action") against the Partnership, which recognized the judgment I obtained

10    against the Partnership in Russia in September 2018 (the "Russian Judgment").  I am informed

11    that in its June 16, 2025 Memorandum Decision Dismissing Involuntary Petition, the Court

12    stated:

13    (5) Ms. Gofman has not attempted to enforce the Recognition Judgment, which

14    awards her $13,130.83, since it was entered approximately six years ago.

15    Her failure to enforce the Recognition Judgment lends credence to Mr.

16    Sabadash's assertion that the Recognition Judgment was obtained solely as

17    a ploy to preclude Mr. Sabadash from contesting the existence of the

18    partnership. That, in turn, casts doubt about both the existence of the

19    partnership and the validity of Ms. Gofman's claim against it.

20    3.    I have not yet taken any action to seek to enforce the Recognition Judgment

21    against the Partnership for two reasons.  First, the fees and costs that would be incurred by me in

22    seeking to enforce the Recognition Judgment would be disproportionate to the $13,130.83

23    judgment amount.  Second, I have been unaware of any assets directly owned by the Partnership

24    in California that could be the subject of an inexpensive effort to enforce the Recognition

25    Judgment.

26    4.    I understand that Alexander Sabadash filed a reply brief filed on April 15, 2025

27    (the "Reply") with the Bankruptcy Court in the Partnership's involuntary Chapter 7 case and that

28    Mr. Sabadash has made multiple defamatory accusations against me and Garry Itkin in that

1    Reply.  I am informed that the Reply stated:

2           Mr. Itkin had no written evidence of a partnership so he found Ms. Gofman

3           and paid her to forge documents and file a lawsuit on Mr. Itkin's behalf. This part of

4           Mr. Itkin's scheme began in July 2018 when he made the first payment to Gofman

5           from his personal bank account. Between July 2018 and March 2019, Mr. Itkin made

6           six payments to Ms. Gofman totaling $21,000. (Supp. Zorkin Decl., Ex. 18.) The

7           series of bribes culminated in a $10,000 payment on March 25, 2019 which

8           corresponds with the filing of the Gofman California action to enforce the Russian

9           judgment on April 19, 2019.

10          5.       I acknowledge receipt of $21,000 from Mr. Itkin by wire transfers between July

11   2018 and March 2019.  The payments were not "bribes."  A payment of $2,000 was wired to me

12   by Mr. Itkin on July 6, 2018.  That was the equivalent to 124,000 Russian rubles ("RUB").  Page

13   3 of the English translation of the Russian Judgment that is attached hereto as Exhibit C states:

14   "Defendant, represented by Managing Partner G. U. Itkin, has voluntarily partially satisfied

15   [Plaintiff's] Demand for Payment by remitting 2,000 (two thousand) US dollars (an amount equal

16   to 124,000 (one hundred twenty four thousand) RUB)."  Thus, that payment was accounted for in

17   reaching the amount awarded in the Russian Judgment, which was the equivalent to $23,130.83.

18   Thus, the Partnership was credited for the first payment of $2,000 when I obtained the

19   Recognition Judgment for the balance owing to me by the Partnership.

20          6.       Attached hereto as **Exhibit E** is a true and correct copy of the motion for judgment

21   on the pleadings that was filed on my behalf in the Superior Court Action on August 7, 2019.  As

22   set forth in that motion, the Partnership was further credited an additional $10,000 in payments

23   that Mr. Itkin had wired me between July 2018 and March 2019, which is why the motion

24   requested and I was awarded the balance of $13,130.83 in the Recognition Judgment.  The sums

25   of $2,000 and $10,000 account for $12,000 of the total amount of $21,000 that Mr. Itkin wired to

26   me between July 2018 and March 2019.  The balance of $9,000 was applied to the equivalent of

27   $5,000 in legal fees incurred by me in obtaining the Russian Judgment and the equivalent of

28   $4,126.72 in legal fees incurred by me in obtaining recognition of the Russian Judgment in the

1  United Kingdom.

2        7.      I am informed that the Reply further stated:

3        The Opposition does not mention that Gofman has not tried to enforce her

4        California Judgment for almost six years. (Itkin Decl. Ex. F, Judgment entered on

5        Nov. 7, 2019 for $13,130.83.)  She doesn't need to because Mr. Itkin already paid her

6        almost double to play along. And the payments were not made to pay off the alleged

7        debt. Even after receiving $21,000, Ms. Gofman still claimed in court that she was

8        owed the full amount for her alleged services and Mr. Itkin agreed with her claim.

9        8.      I have explained above why I have not yet taken any action to enforce the

10  Recognition Judgment.  As I also have explained, the Partnership has been credited with the

11  payments made to me by Mr. Itkin on behalf of the Partnership, which is why I still was owed the

12  balance that I sought by the Russian Judgment, as recognized by the Recognition Judgment.  Mr.

13  Itkin did not pay me to "play along."

14        9.      I am informed that the Reply further stated:

15        In exchange for $21,000, Ms. Gofman agreed to sign a contract supposedly for

16        services to the "partnership" and file a lawsuit against the "partnership." After

17        discovery closed in the state court action, Mr. Itkin "found" a contract between the

18        "partnership" and used it to support his motion for summary adjudication.

19        10.      Mr. Itkin did not pay me $21,000 between July 2018 and March 2019 in order to

20  induce me to sign a contract for services to the "partnership" and file a lawsuit against the

21  "partnership." Mr. Itkin and Mr. Sabadash both hired me on behalf of the Partnership many years

22  earlier in 2004.  When they came to me, they informed me about their partnership.  On my

23  recommendation, they confirmed the terms of their partnership at an in-person meeting on

24  February 12, 2004, at which I was present.  At that time, I prepared the minutes of that meeting,

25  which are dated February 12, 2024, and I saw Mr. Itkin and Mr. Sabadash sign that document (the

26  "Partnership Minutes").  A true and correct copy of those Minutes that are in Russian and an

27  English translation of those Minutes is attached hereto as **<u>Exhibit A</u>**.  Mr. Sabadash's signature

28  on those Minutes was not forged.  I saw Mr. Itkin and Mr. Sabadash sign the Partnership Minutes.

At the same time, I also saw Mr. Itkin and Mr. Sabadash sign the Information Services

Agreement that I had prepared under which they hired me to perform services for the Partnership.

A true and correct copy of that Agreement, which also is dated February 12, 2024, and was

executed on or about that date, and an English translation of that Agreement is attached hereto as

**Exhibit B**.  Mr. Sabadash's signature on the Information Services Agreement also was not

forged.

11.    Attached hereto as **Exhibit C** is a true and correct copy of the Service Delivery

Reports that I prepared for the Partnership dated December 31, 2004, December 31, 2005, and

December 31, 2006, with an English translation of the three reports.  I prepared those reports for

the Partnership pursuant to my February 12, 2004 Information Services Agreement with the

Partnership (Exhibit B hereto).  I prepared those reports shortly after the end of each year covered

by the Reports.  Those Reports accurately state that I duly executed and discharged my

obligations under the Agreement, namely provided consulting, information and legal services, as

well as advice on tax matters, tax optimization and selection of optimal taxation structure, on-site

and field tax audits, taxpayers rights and protection, accounting, tax planning, tax strategy risk

assessment and monitoring of applicable law pertaining to the Partnership's assets and property

and that I provided the Partnership with monthly written reports on work performed during the

relevant service period.

12.    I understand that Mr. Sabadash complained in his Reply that the February 12, 2024

Partnership Minutes are illegible.  The original of those Minutes were submitted to the Moscow

Arbitration Court in my action to obtain the Russian Judgment, and it was not returned to me.  A

more legible copy of the Partnership Minutes in Russian is attached as **Exhibit D**.

13.    I filed the lawsuit against the Partnership in Russia in July 2018.  Mr. Itkin did not

pay me $21,000 or any other monies to file that lawsuit.  I filed it for the purpose of collecting on

the balance of the Partnership's debt to me, which is set forth in the Russian Judgment.

14.    The Reply further stated:

To the contrary, Mr. Itkin, purporting to act on behalf of the partnership,

strategically and promptly admitted allegations, revived the time-barred suit in

1    Russia, admitted allegations once more in California, and conceded a judgment

2    against the purported partnership by failing to oppose Gofman's motion for

3    judgment on the pleadings. All the while, Mr. Itkin was in a conspiracy with Ms.

4    Gofman to whom he paid $21,000. Mr. Itkin did all this so that he can use the

5    judgments *against* Mr. Sabadash.

6    15.    I did not engage in a conspiracy with Mr. Itkin to file a lawsuit against the

7    Partnership in Russia and then obtain recognition of the Russian Judgment by the Superior Court

8    so that Mr. Itkin could use the judgments against Mr. Sabadash.  Again, those lawsuits were filed

9    so I could try to collect on the monies owed to me by the Partnership, and the Partnership was

10    credited for the $21,000 that Mr. Itkin had paid me.

11    16.    I am informed that the Reply further states regarding the February 12, 2024

12    Partnership Minutes that:

13    Mr. Itkin tried to give this contract an aura of legitimacy by stamping it with a seal of the

14    "Itkin & Sabadash Partnership." But he botched the partnership seal misspelling

15    Mr. Sabadash's name proving that it is a fraud.

16    17.    That statement is false.  Mr. Itkin did not order that stamp.  I ordered the

17    Partnership stamp because according to Russian custom at that time every organization needed an

18    official stamp.  Since the Partnership did not have a stamp, I ordered it on an urgent basis and

19    apparently a misspelling of Mr. Sabadash's name occurred.  I did not realize that at the time.

20    18.    In the Superior Court Action, Mr. Sabadash brought an ex parte application to

21    intervene in that Action, which the Superior Court denied.  Mr. Sabadash did not seek any relief

22    from that ruling before the Court of Appeal in California.

23    19.    Before the Ninth Arbitration Court of Appeals and Russian Supreme Court, Mr.

24    Sabadash had argued that Itkin and Sabadash was not a partnership, so those Courts and the

25    Arbitration Court of the Court of the City of Moscow could not have ruled that Itkin and

26    Sabadash was a partnership that owed me monies, as determined by the September 14, 2018

27    Judgment of the Arbitration Court of the Court of the City of Moscow.  On or about December 9,

28    2019, I wrote the Moscow District Arbitration Court and asked for clarification regarding how the

1  Arbitration Court of the Court of the City of Moscow could have ruled (contrary to Mr.

2  Sabadash's contentions) that Itkin and Sabadash was a partnership that owed me monies for

3  services I had rendered to the Partnership.  In response, I received a letter dated December 12,

4  2019, from the Moscow District Arbitration Court, a true and correct copy of which is attached

5  hereto as **Exhibit F**, along with an English translation of that letter.  In that letter, the Court

6  confirmed as follows: "In accordance with the Federal law… The Court is the guarantor of the

7  enforceability of the lawful decision. Consequently, during the trial, the court verifies a priori the

8  actions of each of the parties, <u>as well as the existence of each of the parties</u>, provided that non-

9  existence of the parties (death, liquidation etc.) invalidates legal proceedings, the decision and the

10  enforceability of such decision." (Emphasis added.)

11          20.      For the same reasons, on approximately December 9, 2019, I also wrote the

12  Operations Office of the Arbitration and Specialized Courts of the Judicial Department of the

13  Supreme Court of the Russian Federation.  I received a response from that Office on December

14  13, 2019, a true and correct copy of which is attached hereto as **Exhibit G**, along with an English

15  translation of that letter.  In that letter, the Office confirmed as follows: "Upon review and

16  adjudication of the claim, <u>the Arbitration court establishes the existence of each of the parties to</u>

17  <u>each claim</u>, which is a prerequisite to issuance of legally binding decision. The said procedure of

18  establishment of the parties is undertaken at the preparation stage of the case review."  (Emphasis

19  added.)

20          21.      Thus, both letters confirmed that the existence of the Partnership was required to

21  have been determined by the Russian Courts notwithstanding Mr. Sabadash's arguments to the

22  contrary.

23          22.      I am licensed to practice law in Russia.  I would never jeopardize my license by

24  engaging in the bribery and conspiracy that Mr. Sabadash has falsely accused me of engaging in.

25          23.      I am fluent in Russian.  I am not completely fluent in English, but I understand

26  English well enough to read this declaration and to understand it.  To make sure that I understood

27  this declaration before signing it, I had the assistance of a person (not Garry Itkin) who is fluent

28  in Russian and English.

- 46 -

1      The foregoing is within my personal knowledge.  I declare under penalty of perjury of the

2    laws of the United Sates of America that the foregoing is within my personal knowledge, that this

3    declaration is true and correct and that this declaration was executed on July 1, 2025.

4

5                                                   _____

6                                                 Elena Gofman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HILL, FARRER & BURRILL LLP**
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
ONE CALIFORNIA PLAZA, 37TH FLOOR
300 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3147

1       ### DECLARATION OF DANIEL J. McCARTHY

2       I, Daniel J. McCarthy, declare:

3       1.      Attached hereto as **Exhibit H** is a true and correct copy of the Court's Order

4    Dismissing Involuntary Petition that was entered on June 17, 2025.  (Docket no. 76.)

5       2.      Attached hereto as **Exhibit I** is a true and correct copy of the Court's

6    Memorandum Decision Dismissing Involuntary Petition that was entered on June 17, 2025.

7    (Docket no. 75.)

8       3.      Attached hereto as **Exhibit J** is a true and correct copy of the transcript of the

9    April 22, 2025 hearing in this action.

10      4.      Attached hereto as **Exhibit K** is a true and correct copy of the transcript of the

11   June 3, 2025 hearing in this action.

12      The foregoing is within my personal knowledge.  I declare under penalty of perjury of the

13   laws of the United Sates of America that the foregoing is within my personal knowledge, that this

14   declaration is true and correct and that this declaration was executed on July 1, 2025.

15

16                                              /s/ Daniel J. McCarthy

17                                              Daniel J. McCarthy

18

19

20

21

22

23

24

25

26

27

28

- 48 -

## DECLARATION OF RON CHILDRESS

I, RON CHILDRESS, hereby declare:

1.      I am an attorney at law duly licensed to practice in the state of South Carolina, and an adjunct professor of Russian law at the University of South Carolina School of Law. A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

2.      I have been retained as an expert in Russian Law by Atabek & Associates, P.C., to review materials provided to me, conduct my own investigation, and ultimately render opinions on certain questions asked of me relating to certain legal proceedings that took place in the Russian Federation. A true and correct index, and copy of the materials I reviewed for this assignment is attached hereto as Exhibit 2.

3.      The matters stated herein are based on my personal knowledge and opinions, based upon review of the materials listed in the attached Log and the Analysis set forth below.

4.      If called upon to testify as witness I could and would competently testify to the accuracy and truth of such matters.

## SUMMARY OF FINDINGS

5.      Alexander Sabadash ("Mr. Sabadash") was a party to the *Arbitrazh* lawsuit brought by Elena Gofman against the Simple Partnership of "Itkin and Sabadash" (hereinafter, the "Gofman lawsuit").

6.      In the Gofman Lawsuit, Mr. Sabadash failed to comply with the RF *Arbitrazh* Procedural Code (*APK*) in raising the issue of whether a partnership between himself and Garry Itkin ("Mr. Itkin") existed before the *Arbitrazh* Court for the City of Moscow, and his arguments against the existence of the Simple Partnership were presented and rejected in turn by the Ninth *Arbitrazh* Appellate Court, the *Arbitrazh* Court of the Moscow Circuit (*Okrug*), and the Russian Federation ("RF") Supreme Court Collegium on Economic Disputes.

7.      The Determination entered by the RF Supreme Court was final, and Mr. Sabadash has no further rights of appeal on the issue.

8.      In a 2017 criminal prosecution of Mr. Sabadash, the *Smol'ninskii* Court of General Jurisdiction, the trial court incorporated testimony of witnesses that Messrs. Itkin and Sabadash had shared a business relationship as part of its guilty judgment, which judgment and findings were cited with approval by the *Arbitrazh* Court of the Moscow Circuit (*Okrug*).

9.      While Russian procedural jurisprudence does not recognize American

1  "fundamental fairness" or "due process," which usually precludes an American assessment of

2  a given result reached by a Russian trial or appellate court, there are no indications in the

3  records I have reviewed that would suggest that the findings against Mr. Sabadash were

4  formalistic, or otherwise denied Mr. Sabadash due process he would have received in the

5  United States. In fact, based on my review of the proceedings, it appears Mr. Sabadash was

6  duly served with the pleadings in those proceedings, and given every opportunity to (and in

7  fact, did!) present evidence and arguments to support his position, and the Russian courts

8  simply disagreed with him, time and again, at every level.

9       10.    More specifically, the Ninth Arbitrazh Appellate Court, in a court trial,

10 accepted and adjudicated upon the new evidence and arguments submitted by Mr. Sabadash

11 in his appeal, as well as his motion to reinstate the deadline for filing an appeal, including his

12 contention that a general partnership between "Itkin and Sabadash" did not exist, and rejected

13 all of the arguments made by Mr. Sabadash, thereby confirming the existence of a partnership

14 between Mr. Sabadash and Mr. Itkin.

15      11.    Upon further appeal to the Arbitrazh Court of the Moscow Circuit (Okrug) and

16 the RF Supreme Court Collegium on Economic Disputes, both courts rejected all Mr.

17 Sabadash's arguments against the existence of the Simple Partnership, upholding Ninth

18 Arbitrazh Appellate Court's decision determining and confirming the existence of partnership

19 as between Mr. Sabadash and Mr. Itkin.  The Determination entered by the RF Supreme

20 Court was final and all appeals have been exhausted.

21                                **ANALYSIS**

22 **I.  Paradigms in Russian Versus American Legal Discourse**

23      12.    There are four important differences between Russian and American

24 jurisprudence that American attorneys must keep in mind. Our "paradigms" of legal discourse

25 are very different on their face, though in practice it is not so hard to follow once you become

26 aware of certain fundamental concepts in Russian law.  (This idea of jurisprudential

27 "paradigms" comes from Ronald Dworkin's 1986 book, Law's Empire.) We can easily go

28 astray without keeping these differences in mind.

29 **A.  Common Law Versus Civil Law.**

30      13.    American common law rests upon court precedents under our tradition of ***stare***

31 ***decisis***.

32 ATABEK & ASSOCIATES, P.C.                    2                    DECLARATION OF
   Attorneys at Law                                                PROF. RON CHILDRESS
33 10171.3                                                         LASC Case No. BC647351

14.     American legal history, in fact, reveals an almost grudging attitude toward statutes. In South Carolina, for example, many legislative acts incorporate existing common law. Therefore, construction in derogation of common law rights is to be avoided. Statutes actually in derogation of common law are to be construed strictly to preserve vested rights. One might say that our common law co-exists with, but precedes and preempts, statutes.

15.     By contrast, the Soviet Union and the Russian Federation inherited the traditions of civil law, like most European countries – namely, the general concept of law (***pravo***) rests upon statutory enactment (***zakon***). This is why Russian lawyers use the word ***zakon*** far more frequently than ***pravo*** in everyday conversation.

16.     More importantly, the interpretation and application of Russian statutes is not governed by court precedent. Rather, Russian litigators invoke "Explanations" issued by "Apex" Courts. The concept of an Apex Court is discussed below in describing the Russian Federation court structure.

17.     Through an "Explanation" (***Razyasnenie***), an Apex Court conveys to lower courts the correct interpretation of a statutory provision. The formal name for an "Explanation" is "Resolution" (***Postanovlenie***). These Resolutions are issued by the ***Plenum*** of the Apex Court which is basically the entire corps of its judges. For example, the current authorized membership for the RF Supreme Court is 170 judges (but the actual membership is below that number).

18.     From 2000 until August 2014, the Apex Court for the ***Arbitrazh*** Court system was the highest ***Arbitrazh*** Court (abbreviated ***VAS*** in Russian). During that period, ***VAS*** issued eight such Resolutions: **2009 VAS Resolution No. 36 (28 May)**; **2009 VAS Resolution No. 61 (23July)**; **2011 VAS Resolution No. 12 (17 February); 2011 VAS Resolution No. 30 (24 March);2012 VAS Resolution No. 43 (12 July); 2013 VAS Resolution No. 100 (25 December)**; **2014VAS Resolution No. 48 (11 July); 2014 VAS Resolution No. 49 (11 July**).

19.     In 2014 ***VAS*** was absorbed by the RF Supreme Court (abbreviated ***VS*** in Russian). Since that time the RF Supreme Court has issued two such Resolutions: **2020 Supreme Court (VS) Resolution No. 12 (30 June);2020 Supreme Court (VS) Resolution No. 13 (30 June).**

20.     Several of these Resolutions are discussed below as they interpret relevant

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

3

DECLARATION OF
PROF. RON CHILDRESS
LASC Case No. BC647351

051

1  portions of the **Arbitrazh** Procedural Code (***Arbitrazhnyi Protsessual'nyi Kodeks – APK***).

2  **B. Law and Duty Arise Only from Statute**

3      21.     Everyday life does not require an American citizen to know about the "duty of
4  due care." Outside driver training schools, the duty of due care comes into focus only when
5  an accident gives rise to litigation. Approaching a stop sign, the average American motorist
6  may think about the rules of the road, but such legal doctrines as negligence, contributory
7  negligence, and last clear chance will make their appearance (if at all) only after a wreck
8  results in a lawsuit.

9      22.     In the Russian paradigm, by contrast, rights and duties (***prava i obyazannosti***)
10  have no justiciable reality outside a law-relationship (***pravootnoshenie***), which must be
11  established by substantive statute (***zakon***). When a substantive law-relationship becomes a
12  legal dispute, then the parties enter into a procedural law-relationship which will consist of
13  procedural rights and duties.

14      23.     Of course, Russian disputes involve things (called ***ob"yekty***) and people as
15  bearers of rights and duties (called ***sub"yekty***). In order for a factual dispute to acquire a
16  justiciable nature, some substantive Code (***Kodeks***) must explicitly describe their rights and
17  duties.

18      24.     The doctrine of "case and controversy" is second nature to American attorneys.
19  Without some concrete thing in dispute between persons, a cause of action cannot arise.
20  American attorneys historically have assumed that rights and duties exist as natural law.

21      25.     All the foregoing vocabulary seems baffling and unnecessary to American
22  attorneys, butthey make up the language of Russian litigation. The present case is an example.
23  But, again, bearing these concepts in mind, one can easily understand the Russian
24  proceedings and explain them in terms that are familiar to American courts.

25  **C. Due Process in the Russian Court System**

26      26.     Unlike our American court systems, the 1993 Constitution of the Russian
27  Federation does not mention "due process" or the concept of "fundamental fairness" anywhere
28  within its text or interpretation of those texts. Yet, in some respects in civil litigation, their
29  procedures can offer more opportunities to make an argument than even our own system.

30      27.     American procedural rules are construed in light of both plain language and
31  case law, which often includes a federal or state constitutional "test." Post Conviction Relief

32  | ATABEK & ASSOCIATES, P.C. | 4 | DECLARATION OF |
    | Attorneys at Law | | PROF. RON CHILDRESS |
33  | 10171.3 | | LASC Case No. BC647351 |

1  (PCR in South Carolina) frequently goes beyond a court record, even though all procedural

2  rules may appear to have been followed. For example, "ineffective assistance of counsel"

3  might involve failure of counsel to contact or summon an alibi witness. This claim is often

4  used as a textbook example of the manner in which the American constitutional law may

5  override procedural correctness.

6       28.    Courts of the Russian Federation follow three procedural codes (discussed

7  below), the instant case primarily involves the *Arbitrazh* Procedural Code (*Arbitrazhnyi*

8  *Protsessual'nyi Kodeks* – *APK*) from which examples are drawn. All three procedural codes

9  are governed not by American "due process" standards but by "correct application of statutes"

10  (*pravilnoe primenenie zakonov*) – i.e., statutory procedural provisions. As noted above, the

11  interpretation of such provisions is not drawn from case law but from *Plenum* Resolutions

12  (aka, "Explanations").

13       29.    *APK* Article 6 declares that: "Legality (*zakonnost'*) in consideration of cases

14  by an *Arbitrazh* court is achieved (*obespechivaetsya*) through **correct application of statutes**

15  **and other normative legal acts**, and likewise through observance by all *Arbitrazh* court

16  judges of rules established by legislation for *Arbitrazh* court proceedings." There is no

17  mention of an American-style "due process" doctrine.

18       30.    In describing conduct of an *Arbitrazh* court in consideration of a case, *APK*

19  Article 9(3) once again recites the "correct application" standard:

20      An *Arbitrazh* court, maintaining independence, objectivity and impartiality,
    shall conduct direction of the trial (*protsess*), explain their rights and duties to
21      persons participating in the case, warn of the consequences for performing or
    not performing procedural actions, provide cooperation in exercise of their
22      rights, establish conditions for comprehensive and complete investigation of
    evidence, establishing factual circumstances and correct application of statutes
23      and other normative legal acts in considering the case.
24

25       31.    *APK* Article 9(3) also declares that *Arbitrazh* courts shall also ensure

26  "comprehensive and complete investigation of evidence". The duty of "comprehensive and

27  complete investigation" is also found in both the Criminal Procedural Code (*UPK*) and the

28  Civil Procedural Code (*GPK*). It is actually a legacy of Soviet legality. Even in the post-

29  Soviet Russian Federation, reviewing courts have reversed trial court judgments because the

30  lower court failed to consider possible issues that may or may not have been raised by a party.

31  In this sense, the Russian system can actually provide *more* protection of a litigant's rights,

32

33

ATABEK & ASSOCIATES, P.C.          5          DECLARATION OF
Attorneys at Law                        PROF. RON CHILDRESS
10171.3                         LASC Case No. BC647351

1    rather than less.

2        32.    All *APK* provisions governing review of trial court decisions follow the same

3    "correct application" standard: (1) appellate review (*apellyatsionnaya instantsiya*) is

4    governed by *APK* Article 270; (2) cassational review (*kassatsionaya instanstyia*) – by *APK*

5    Articles 286 through288; and (3) supervisory review (*nadzor*) – by *APK* Artice 308.11.

6        33.    Thus, an American inquiry into the "fundamental fairness" of a given Russian

7    legal proceeding or result is simply a projection of an American paradigm upon Russian legal

8    discourse.  A Russian legal analysis would simply seek to assure "correct application" of

9    relevant statutory provisions. Yet, in any given case, one can review the *opportunities* given

10    to litigants, and the *outcome* to nonetheless determine whether a proceeding was "fair" by

11    American standards.

12    **D. Specialization**

13        34.    American judges tend to be generalists. A South Carolina Circuit Court or

14    Federal District Circuit Judge can hear civil and criminal cases. I understand that in California,

15    the same is true for federal judges, yet state judges are broadly divided by matters such as

16    probate, family law, and civil litigation (encompassing everything from personal injury, to

17    commercial disputes, to intellectual property disputes). This overall identity as a generalist is

18    found at all levels from trial courts to the United States Supreme Court which today consists

19    of nine justices. By contrast, the Russian Federation Supreme Court is authorized to have 170

20    judges divided into specialized collegia and panels.

21    **II.   A Brief History of the Soviet Judiciary**

22        35.    Chapter 20 of the 1977 USSR Constitution described the Soviet Judiciary.

23    Article 153 declared the USSR Supreme Court to be the highest court in the Soviet Union.

24    Below the Supreme Court, each of the 15 Republics had a Republic Supreme Court below

25    which the courts were arrayed in a hierarchical system. At the lowest level were the District

26    (*Rayonnyi*) and City(*Gorodskii*) Peoples Courts functioning as trial courts which are

27    described in Russian as courts "of first instance."

28        36.    Article 163 established a system of "state agencies" tasked to resolve disputes

29    between enterprises, institutions, and organizations. These agencies constituted the Soviet

30    *Arbitrazh* system. The original French word *arbitrage* can mean "arbitration" while in

31    English the term has special commercial meaning.

32    ATABEK & ASSOCIATES, P.C.              6              DECLARATION OF
      Attorneys at Law                                      PROF. RON CHILDRESS
33    10171.3                                                LASC Case No. BC647351

37.     The above-mentioned provisions of the 1977 USSR Constitution were replicated in Chapter 21 (Articles 163 and 175) of the 1978 Constitution for the Russian Soviet Federal Socialist Republic (RSFSR) which was one of the 15 Soviet Republics of the USSR.

38.     The Soviet *Arbitrazh* corresponded to neither the French nor English versions, since commercial enterprise was unknown in the USSR. Instead, the Soviet *Arbitrazh* was a special government institution charged with resolving disputes in implementing the Five Year Plans.

**III.    Modern Day Court Structure of the Russian Federation**

39.     The Soviet Union was dissolved on December 25, 1991. In July 1991, while still part of the USSR, the RSFSR adopted a statute (1991 No. 1543-1) which converted the Soviet *Arbitrazh* into a system of *Arbitrazh* Courts specializing in commercial cases. The original 1991 statute was replaced in July 1995 by R.F. Federal Constitutional Statute (*Federal'nyi Konstitutsionnyi zakon – FKZ*) No. 1.

40.     Between 1991 and December 1993, the RSFSR Constitution remained in effect the fundamental law of the new, independent Russian Federation. Chapter 21 of that Constitution was revised significantly. The new *Arbitrazh* Court system (just described) became one of two Apex court systems in the Russian Federation, with the Highest *Arbitrazh* Court at the top of the *Arbitrazh* pyramid. The Soviet-era court system became known as the Courts of General jurisdiction (CGJ) with the RF Supreme Court at the Apex. CGJ tribunals tried all criminal and civil cases, except for the commercial cases that were under *Arbitrazh* court competence.

41.     The *Arbitrazh* courts conducted trials and appeals under an *Arbitrazh* Procedural Code (*Arbitrazhnyi Protsessual'nyi Kodeks – APK*). CGJ tribunals followed two Codes – the criminal Procedural Code (*Ugolovnyi Protsessual'nyi Kodeks – UPK*) and the Civil Procedural Code (*Grazhdanskii Protsessual'nyi Kodeks – GPK*).

42.     In August 2014, the Highest *Arbitrazh* Court was absorbed by the RF Supreme Court andall references to it were deleted from Chapter 7 of the 1993 Constitution. However, the three procedural codes – *APK, UPK* and *GPK* – remained in effect with amendments as necessary to reflect absorption of the *Arbitrazh* first and second instance (trial and reviewing) courts into the RF Supreme Court pyramid.

43.     A final feature of the evolving judicial Russian system between 1991 and 1993 deserves brief mention. The new Chapter 21 of the RSFSR Constitution established a Constitutional Court which is not an apex court. It does not review appeals from trial or intermediate appeals courts.

44.     Essentially, the Constitutional Court renders rulings that, for Americans, are the equivalents of "advisory opinions." "First instance" (meaning "trial") courts, whether CGJ or *Arbitrazh* tribunals should not decide constitutional questions but refer them to the Constitutional Court, often suspending trial court proceedings.

**IV.     Historical Background on *Arbitrazh* Courts Relevant to the Instant Action**

45.     Four levels of courts were involved in the Gofman case, three of which were part of the *Arbitrazh* system: (1) the *Arbitrazh* Court for the City of Moscow; (2) the Ninth *Arbitrazh* Appellate Court; (3) the *Arbitrazh* Court of the Moscow Circuit (*Okrug*); and (4) the RF Supreme Court Collegium on Economic Disputes.

46.     The three levels of *Arbitrazh* courts were established in 1995 by Federal Constitutional statute (*FKZ*) No. 1. The trial courts were established by Article 34 of this Statute. Each subdivision (*Subyekt*) of the Russian Federation has an *Arbitrazh* trial court. Under Article 65 of the RF Constitution, the City of Moscow is deemed a "City of Federal Significance" for which the *Arbitrazh* Court for the City of Moscow serves as trial ("First Instance") court.

47.     Article 33.1 of Federal Constitutional Statute (*FKZ*) No. 1 established twenty Appellate courts. Each Appellate Court encompassed several RF Subdivisions, ranging from three to eight. In 2014, the Twenty-First Appellate Court was established with the annexation of Crimea. The Ninth *Arbitrazh* Appellate Court contains only the City of Moscow.

48.     Article 24 of Federal Constitutional Statute (*FKZ*) No. 1 established ten Circuit (*Okrug*) Courts each of which encompassed several RF Subdivision. The *Arbitrazh* Court of the Moscow Circuit contains only the City of Moscow and the Moscow *Oblast* (these were the basic administrative districts created by the Soviets as subdivisions of the fifteen USSR Republics).

49.     In 2014, when the Highest *Arbitrazh* Court (*VAS*) was absorbed by the Supreme Court (*VS*), a Supreme Court Collegium or Chamber (*Kollegia*) on Economic Disputes was established by 2014 Federal Constitutional Statute (*Federal'nyi*

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

8

DECLARATION OF
PROF. RON CHILDRESS
LASC Case No. BC647351

056

*Konstitutsionnyi Zakon – FKZ*) No. 3. It consists of three judicial panels. A total of 26 judges are currently members of this Collegium. The final stage of the Gofman case was a cassational appeal to the 2nd panel (Contract Disputes), rejected by a Determination (*Opredelenie*) signed by Judge Chuchunova.

## V. Authority and Function of the Relevant Courts—the *Arbitrazh* Procedural Code (*APK*) and Controlling Plenum Resolutions.

### A. The *Arbitrazh* Court for the City of Moscow

50.     *APK* Division Two governs proceedings in *Arbitrazh* trial courts ("courts of first instance"). Rules that govern the filing and service of a Summons and Complaint can vary among American jurisdictions, but generally these actions are ministerial in character. American litigators can challenge jurisdiction of the court, adequacy of service and the complaint itself through defendant motions.

51.     By contrast, the Russian *Arbitrazh* court of first instance *sua sponte* accepts, rejects, defers or returns the complaint under *APK* Articles 127, 127.1, 128 or 129. As noted above, "Explanations" issued as "Resolutions" by the Highest *Arbitrazh* Court Plenum – rather than case law in American practice – interpret provisions of the *APK*. At the conclusion of proceedings on the merits, an *Arbitrazh* court issues a Decision (*Reshenie*) under Articles 167 through 183 of APK Chapter 20.

### B. The Ninth *Arbitrazh* Appellate Court

52.     Proceedings in *Arbitrazh* Appellate Courts are governed by *APK* Chapter 34. As in trial courts, the appellate court may accept or defer the petition for consideration under *APK* Articles 261 and 263. It may also return the petition under *APK* Article 264 or terminate consideration of the petition at a later time under *APK* 265. (Incidentally, *APK* Article 268(1) states that appellate review shall consist of *de novo* consideration of evidence presented in the court of first instance.)

53.     Under *APK* Article 257(1) appellate review is described as follows: "Persons participating in a case, and likewise other persons in cases contemplated by this Code, may appeal the decision (*Reshenie*) of an *Arbitrazh* court of first instance, not yet having entered into legal force, in an appellate proceeding." The general rule governing such persons is found in *APK* Article 42: "Persons not participating in a case, about whose rights and duties a court order (*akt*) has been adopted, may appeal that decision or dispute it in a supervisory

procedure under rules established by this Code. Such persons possess the rights and bear the duties of Persons participating in the case."

54.      *APK* Article 42 was interpreted by 2009 *VAS* Plenum Resolution No. 36. Paragraph One of the Resolution declared that *APK* Articles 16(3) and 42 establish that persons not participating in a case may still challenge a court order (*akt*) that violates their rights and legal interests or affects their rights and duties.

55.      Paragraph One took up *APK* Articles 257 (The Right of Appellate Review) and 272 (Appellate Petitions from Determinations of a First Instance *Arbitrazh* Court). The Court then explained that: "Persons not participating in a case, whether named or not named in the rationale (*motivirochnaya* [*chast'*]) and/or dispositive part (*rezolyutivnaya chast'*) of the court order (*akt*) may appeal through an appellate review proceeding if it was adopted regarding their rights and duties – that is, the given court order (*akt*) directly "touches" their rights and duties, to include creating "obstacles to exercise of a subjective[1] right or proper discharge of a duty with regard to one of the parties to the dispute."

56.      This passage creates what American lawyers would call a "test."  In the American"paradigm" such "tests" are found in case law decisions.

57.      The "test" found in Paragraph One of 2009 *VAS* Plenum Resolution No. 36 (28 May2009) has subsequently been confirmed by 2009 *VAS* Resolution No. 61 (23 July 2009). Since 2014, the RF Supreme Court (*VS*) has issued all Plenum Resolutions governing *Arbitrazh* courts. Paragraphs One and Two of 2020 *VS* Plenum Resolution No. 12 (30 June) restated with approval the original "test" adopted in the 2009 *VAS* Plenum Resolution No.36.

58.      Paragraph Two of 2009 *VAS* Plenum Resolution No. 36 further stated: "If a petition is filed by a person not participating in the case, the court should determine if the petition contains a basis for the manner in which the disputed court order (**akt**) directly

---

[1] A another brief linguistic digression is required to explain "subjective" as cited from Paragraph One above. In Russian jurisprudence, the word "person" (*litso*) has legal significance only in phrases like "natural person" (*fizicheskoe litso*), "legal person" (*yuridicheskoe litso*), an "official"(*dolzhnostnoe litso*) or "third person" (*tret'yo litso*). The word "subject" (*sub'yekt*), however, means a "bearer of rights and duties." Usually, the word is employed when a "person" has entered into a law-relationship (*pravootnoshenie*) established under astatute. For example, Messrs. Itkin and Sabadash were in the law-relationship described by Civil Code(GK) Chapter 55 - i.e., a contract of "Simple Partnership" which establishes rights and duties. Thus, the adjective "subjective" in the passage above has the specific legal meaning just described, as opposed to our English understanding which connotes feelings or attitudes.

10                                DECLARATION OF
PROF. RON CHILDRESS
LASC Case No. BC647351

1 | touches the rights and duties of the applicant. In the absence of the appropriate basis the

2 | appellate petition shall be returned on the grounds of *APK* Article 264(1)[1]." Thus, under

3 | 2009 VAS Plenum Resolution No. 36, an appellate petition shall be returned to the applicant

4 | and proceedings on the petition shall terminate even after acceptance of the petition in the

5 | circumstances described above.

6 | 59.    *APK* Article 264(1) calls for return of an appellate petition to the moving

7 | party, if it comes to light that: "the appellate petition was filed by a person not having the right

8 | to appeal the court order (*akt*) in an appellate procedure." The termination of appellate review

9 | in the circumstances just described is accomplished by a Determination (*Opredelenie*) with

10 | further review available under APK Article 265(3) & (4).

11 | **C. The *Arbitrazh* Court for the Moscow Circuit**

12 | 60.    In Russian jurisprudence, the next level of review is described as cassational

13 | instance.

14 | 61.    Such proceedings are not limited to certain courts. Cassational proceedings are

15 | governed by *APK* Chapter 35. Like the trial and appellate courts, a court of cassational

16 | instance may accept or defer the petition for consideration under APK Articles 278 and 280.

17 | It may also return the petition under *APK* Article 281 or terminate consideration of the

18 | petition at a later time under *APK* 282.

19 | 62.    A court of cassational instance may issue a Ruling (*Postanovlenie*) that leaves

20 | the lower court order unchanged and denies the petition for cassational review under *APK*

21 | Article 287.

22 | **D. The Supreme Court Collegium (*Kollegia*) on Economic Disputes**

23 | 63.    As described above, 2014 Federal Constitutional Statute (*Federal'nyi*

24 | *Konstitutsionnyi zakon – FKZ*) No. 3 created the Collegium (*Kollegia*) on Economic

25 | Disputes. *APK* Chapter 35 regulates all cassational reviews in the *Arbitrazh* courts. Under

26 | *APK* Article 291.1, cassational petitions can be taken from such courts as the *Arbitrazh* Court

27 | for the Moscow Circuit to the RF Supreme Court and specifically to one of its Judicial

28 | Collegia. In other words, such a cassational petition takes the case out of the *Arbitrazh*

29 | system.

30 | 64.    Nevertheless, these cassational reviews are governed by *APK* Articles 291.2

31 | through 291.15. APK Article 291.3 prescribes the form and content of a cassational petition to

---

| ATABEK & ASSOCIATES, P.C. | 11 | DECLARATION OF |
| Attorneys at Law | | PROF. RON CHILDRESS |
| 10171.3 | | LASC Case No. BC647351 |

a Supreme Court Collegium (*Kollegia*). *APK* Article 291.5 sets forth criteria for returning a
petition to the petitioner without consideration on the merits (*po sushchestvu*). *APK* Article
291.6 governs transmittal of a cassational petition for review by a Collegium. However,
Section (2) of *APK* Article 291.5 calls for return to the petitioner if the petitioner lacks the
right to seek appellate review. Finally, *APK* Article 291.8 calls for a Determination
(*Opredelenie*) in such case, if upon review of the petition by a single judge of a Collegium the
conditions for return exist. The petition shall not be passed to the full Collegium for
consideration on the merits.

### E. Relevant Plenum Resolutions

65.    On 25 December 2013 the Higher *Arbitrazh* Court Plenum issued Resolution
No. 100, which confirmed "Instructions on Record Management in the R.F. *Arbitrazh* Courts
(of first, appellate and cassational instance)." The "Instructions"[2] themselves were attached as
a document consisting of 384 pages. The text filled 299 pages with 66 forms as attachments
which are referenced in the text.

66.    The "Instructions" addressed three topics: (1) General Provisions on Record
Management; (2) the Record (*Protokol*) for a Court Session; and (3) Conducting Reference-
Informational (*Spravochnaya-Informatsionnaya*) Work. The General Provisions regulate
activities of the docketing staff in trial, appellate and cassational courts.

#### a. Applicable General Provisions

67.    Section Four (4) of these "Instructions" governs actions to be taken by the
docketing staff at the trial court level upon filing of a lawsuit. Section Four.One (4.1)
describes documents to be filed with the lawsuit establishing the identity and location of the
Plaintiff and Defendant as juridical persons or as registered individual entrepreneurs. This
passage in the "Instructions" cites and applies APK Article 126(9).

68.    Section Four.Two (4.2) states that the documentation requirements of *APK*
Article 126(9) shall not apply if the Plaintiff or Defendant is a foreign person. In such case,
APK Article 254(3) shall apply. That provision requires a foreign person which is a juridical
person or a registered individual entrepreneur in that country to present evidence of juridical

---

[2] A Translation Note is required: The Russian word *Deloproizvodstvo* can mean "Record
Management" or "Case Proceeding" because *Delo* can mean "File" or "Case" (among other
things). Since these "Instructions" describe clerical functions, the former translation is used.

1   status and the right to engage in entrepreneurial activity. If the Defendant is simply a physical
2   (natural) person, the requirement does not apply.

3        69.     Section Five (5) interprets provisions for court notifications, in particular
4   notification to participants that a lawsuit has been accepted and that a court case has been
5   opened. There are thirteen detailed subsections to this portion of the "Instructions" which
6   describe procedures for serving all participants with timely notifications and court orders. The
7   same attention to detail is found much later in Sections 20 (on cases with foreign persons) and
8   Sections 21 through 22 (on initial reception of lawsuits).

9        70.     Section Forty is entitled "Organizing Control of Record Management
10   Conduct." It clearly demonstrates that the Russian docketing staff bears responsibility for the
11   accuracy of information on the names, locations, and status of participants in a case. By
12   contrast, in American practice disputed questions concerning the existence and capacity of
13   parties or service of process are brought to the court by the parties themselves for resolution
14   by the court, rather than determined administratively by court staff.

15          **b.    Reference-Informational (*Spravochnaya-Informatsionnaya*) Work**

16        71.     The "Instructions" describe Reference-Informational Work, meaning the
17   development by docketing staff of documentary reports and certificates of an official nature.
18   The Russian *word **spravka*** has several meanings, but in official jargon the English word
19   "certificate" is the most appropriate rendering. Thus, when the "Instructions" use ***spravka*** or
20   its adjectival *version **spravochnyi*** (feminine ending – ***aya***; neuter ending – ***oe***), the process
21   contemplates reference and certifying of findings. (In translating the title to these sections,
22   "Reference-Informational" is used since English "Certifying" does not necessarily convey the
23   reference work that must precede this kind of certification.)

24        72.     Section Thirteen (13) is entitled "Production and Processing a Certificate of
25   Returning the State Fee and Other Certificates of an Informational Character." This Section is
26   quite brief. The only "informational" certificates discussed in it are responses to requests for
27   information about a refund of the State fee or about a bankruptcy proceeding.

28        73.     Section Forty-Five (45) is entitled "Reference-Informational Work." Several
29   subsections are translated below. They illustrate the tenor and objective of Section Forty-Five
30   (45) and introductory Sections as they direct and describe responsibilities of docketing staff in
31   the RF ***Arbitrazh*** court system.

32
33

ATABEK & ASSOCIATES, P.C.              13              DECLARATION OF
Attorneys at Law                                PROF. RON CHILDRESS
10171.3                                   LASC Case No. BC647351

061

74.    Section Forty-Five.One (45.1): "The basis for reliability and efficiency of the *Arbitrazh* courts Reference-Informational Service is scrupulous discharge by specialists, and law clerks of the judicial panels, and by *Arbitrazh* court division specialists of requirements for timely entry into the systems of automated court proceedings and record management of information on the progress of lawsuits (pleadings), appellate, and cassational petitions, court cases, motions and petitions and other documents and court orders (*akty*) adopted on them."

75.    Section Forty-Five.Two (45.2): "Interested persons may receive information on the progress of court cases and documents in an *Arbitrazh* court at the official [web]site of the corresponding court and also on the official [web]site of the RF *VAS* on the "internet" network using the services "Card File (*Kartoteka*) of *Arbitrazh* Cases" or "Database of *Arbitrazh* Court decisions (*Resheniya* – plural)."

76.    "Work of an *Arbitrazh* Court [web]site shall be organized through the Office of Court informational Support in cooperation with judicial panels and divisions of the court."

77.    Section Forty-Five.Three (45.3): "Information and Certification(s) (*Spravki*) by telephone are given out with information about the registration number of a received document, its sender number and date, name of the *Arbitrazh* court and number of the court case, considered in the "first instance," information about the Plaintiff and Defendant and Third Persons. Search shall be conducted on every mandatory requisite or their entirety."

78.    Section Forty-Five.Four (45.4): "The immediate conduct of certification work shall be conducted by a specialist ([or] specialists) of the Reference-Informational Service of record management or other division of the court at the discretion of the court chairperson, working in cooperation with the judicial panels and divisions using the systems of automated case management and record management permitting receipt of necessary information for providing certificates on cases and petitions."[3]

79.    Section Forty-Five.Five (45.5): "Employees of the Reference (*Spravochnaya*) Service, the judicial panels and divisions shall communicate to persons participating in a case, to other interested persons, to their representatives, and likewise to representatives of mass information media the following information: [1] the receipt number of a lawsuit (pleading)

---

[3] Translation note: this passage contains two Russian *words sudoproizvodstva* (literally, "court management") and *deloprovodstva* ("record management") in this Declaration. Clearly, the terms refer to two different aspects of an automated judicial system.

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3                                   14                      DECLARATION OF
                                                                 PROF. RON CHILDRESS
                                                                 LASC Case No. BC647351

062

1  and corresponding number of the court case being considered or considered by a court; [2] the

2  substance of an order (*akt*) adopted in a case; [3] the receipt and consideration of appellate

3  and cassational petitions; [4] the substance of rulings adopted on a petition; [5] the receipt of

4  comments (*zayavleniy* – plural) on a decision (*reshenie*), actions (inactions) of the court

5  bailiff/enforcement officer and results of considering a comment (*zayavlenie*); [6] the name of

6  the judicial panel or division in which a complaint, court case or petition is under

7  consideration...[10] the issuance or dispatch of the execution order; dispatch of a written

8  answer."

9      80.    Section Forty-Five.Six (45.6): "The Reference-Informational Service shall

10  provide information on progress of court cases, pleadings and petitions at any stage in passage

11  (consideration) to the parties or their representatives on oral (telephonic) requests the entire

12  working day."

13      81.    In summary, the "Instructions" describe several activities performed by

14  docketing personnel which Americans find hard to comprehend. In fairness, it must be

15  recognized that the rules on creation of a Record (*Protokol*) represent a great improvement

16  from practices of the 1990s. In those years, the Record essentially was a hand-written

17  (sometimes typed) summary of highlights in the trial without a written transcript to which

18  American litigators are accustomed. The current *APK* requirement for more complete

19  Records are quite familiar to American trial attorneys.

20      82.    On the other hand, Reference-Informational Work takes most American

21  lawyers by surprise. Section Forty-Five describes research by staff using all available

22  pleadings, motions, decisions, and records to extrapolate and certify pronouncements that may

23  not literally appear in a court decision (*reshenie*), determination (*opredelenie*) or ruling

24  (*postanovlenie*).

25  VI.    **Factual Background of the Gofman Lawsuit**

26      83.    From the documents presented, Messrs. Itkin and Sabadash memorialized

27  and/or established a Simple Partnership by an agreement on 12 February 2004. I have

28  reviewed this agreement both in Russian and in an English translation. The document is not

29  titled "Agreement" but "Minutes of the Meeting of Partners of Simple Partnership 'Itkin &

30  Sabadash'" in both Russian and English.

31      84.    Paragraph Four of this instrument declares that disputes and disagreements

1  should be resolved through negotiation, if possible. If not, then: "Parties agree to resolve their

2  disputes inthe United States court system, under California law."

3      85.    As it happens, Chapter 55 of the RF Civil Code (*Grazhdanskii Kodeks – GK*)

4  governs Russian Simple Partnerships. At one point in the Russian *Arbitrazh* appellate courts,

5  Mr. Sabadash invoked *GK* Articles 1041 through 1047 in support of his contention that the

6  trial court judgment did effectively affect his rights and duties to give him procedural

7  authority to appeal the lower court judgment. This matter is discussed below, but an important

8  contrast with the American "paradigm" is highlighted by Mr. Sabadash's argument. The

9  Russian appellate courts rejected Mr. Sabadash's contention on the basis of prior Plenum

10  Resolutions by the High *Arbitrazh* Court.

11      86.    Moreover, Paragraph Four of the agreement at issue states the intention of the

12  parties to be governed by California law. It appears that both parties signed the document,

13  Sabadash using the Latin alphabet while the signature of Itkin may be English or Cyrillic.

14      87.    On 12 February 2004 Messrs. Itkin and Sabadash, partners in the Simple

15  Partnership, executed an "Information Services Agreement (hereinafter – the Agreement)" as

16  "Client" with Elena Nikolayevna Gofman (neé Vasilyeva), a registered individual

17  entrepreneur, as "Contractor." The Agreement is signed by all parties. The Simple Partnership

18  seal is impressed on each of the three pages, with initials of the partners on the first two pages

19  and signatures onthe final page. The signature of Ms. Gofman appears on all three pages.

20      88.    The Agreement contemplated provision of legal and tax advice by Ms.

21  Gofman (as "Contractor") to the Simple Partnership (as "Client") during calendar years 2004,

22  2005 and 2006. Monthly during those years, the Contractor was to provide written reports of

23  services performed. At the conclusion of each year, the parties would jointly issue and sign a

24  "Service Delivery Report [hereinafter – Report(s)"] declaring that all services were duly

25  performed and that the Client owed the agreed annual price of 200,000 rubles. Under

26  Paragraph Six of the Simple partnership Agreement, Itkin was authorized to conduct day-to-

27  day operations of the Simple partnership. The three annual reports were duly accomplished

28  and bore the signature of Ms. Gofman and the Simple Partnership seal with Mr. Itkin's

29  signature executed over it. I have reviewed the Agreement and the annual Reports in both

30  Russian and English.

31      89.    Apparently, the Simple Partnership defaulted in its payments. Ms. Gofman

ATABEK & ASSOCIATES, P.C.    16    DECLARATION OF
Attorneys at Law    PROF. RON CHILDRESS
10171.3    LASC Case No. BC647351

064

1  brought action in the *Arbitrazh* Court for the City of Moscow to recover the defaulted

2  payments together with penalties contemplated by Paragraph 4.6 of the Agreement. Russians

3  do not caption their cases in the same manner as Americans. Thus, the Russian case – Gofman

4  versus Itkin and Sabadash Simple Partnership – is simply entitled the "Gofman case" in this

5  Declaration.

6     90.    The RF Civil Code (GK) contemplates 26 so-called "nominate" contracts for

7  which the Code prescribes certain required terms and allows others at the discretion of the

8  parties. The agreement between the Simple Partnership and Ms. Gofman is governed by *GK*

9  Chapter 39 (Compensated Provision of Services). Paragraph 2.3 of the Agreement reflects *GK*

10  Articles 779(1) and 781. Upon a failure of the Simple Partnership as "Client" to pay for

11  services rendered and accepted under the annual Reports, Ms. Gofman would have a right to

12  bring an action for recovery.

13     91.    The *APK* delineates the competence of *Arbitrazh* courts in several provisions.

14  Section (2) of *APK* Article 27 declares that *Arbitrazh* courts shall resolve economic disputes

15  with "citizens who are conducting entrepreneurial activities without forming a juridical person

16  and having the status of individual entrepreneur acquired in the procedure established by

17  statute." GK Article 23 governs entrepreneurial activity of citizens. Section (1) declares that

18  the status of "individual entrepreneur" is acquired by State registration.

19     92.    *APK* Article 248 declares that exclusive competence vests in the *Arbitrazh*

20  courts in cases involving foreign persons. As indicated in the Simple Partnership Agreement,

21  Mr. Itkin was an American citizen possessing a United States Passport, issued in August

22  1997. The status of the parties clearly justified commencing the Gofman case in the Arbitrazh

23  court. Moreover, *APK* Article 247 included several additional reasons for competence to vest

24  in *Arbitrazh* courts: location of defendant's property in the Russian Federation under

25  Section(1)[1]; and performance taking place in the Russian Federation under Section (1)[3].

26     93.    Finally, Paragraph 5.2 of the Agreement states that disputes between the parties

27  shall be considered by a court in Moscow. While Paragraph 5.2 does not specifically refer to

28  Arbitrazh courts, the *APK* provisions cited above would indicate that the proper forum, under

29  *APK* Article 249, would be the *Arbitrazh* Court for the City of Moscow. Thus, the stage was

30  set for filing the Gofman lawsuit in that court.

31  VII.    **Proceedings in the Gofman Lawsuit**

32  ATABEK & ASSOCIATES, P.C.                    17                    DECLARATION OF
     Attorneys at Law                                                 PROF. RON CHILDRESS
33  10171.3                                                           LASC Case No. BC647351

94.      The following description of the Gofman case has been assembled using the actual court judgment whether a Decision (*Reshenie*), Determination (*Opredelenie*) or Ruling(*Postanovlenie*). Together with these judgments, this description also draws upon the Certificates (*Spravki*) prepared by the court staff in accordance with *VAS* Plenum Resolution No. 100 (25 December 2013). These documents have been reviewed in Russian and in English translation. (As appropriate, corrections to and notes on a translation are added to the discussion.)

**A.  The *Arbitrazh* Court for the City of Moscow**

95.      On 12 September 2018, the *Arbitrazh* Court for the City of Moscow conducted a hearing on the lawsuit of Elena Gofman for recovery under the Information Services Agreement (hereinafter – the Agreement) executed by the Simple Partnership "Itkin & Sabadash"on 12 February 2004. The text of the court Decision (*Reshenie*) was issued on 14 September 2018.

96.      In construing the Agreement, the Decision invoked RF Civil Code (*GK*) Articles 779 and 781 governing contracts for compensated provision of services and *GK* Articles 309 and 330 governing "Obligations." At the conclusion of the "explanatory" (*motivirovochnaya*) part of the Decision, the court cited provisions from *GK* Chapter 51 ("Contract of Commission") for reasons that are unclear but may be included in the Record of the court session.

97.      On 18 October 2018, Plaintiff Gofman requested information from the Court. On 24 October 2018, the Department (*Otdel*) of Record Management prepared an untitled response signed by its Deputy Director, N.A. Sotnich.[4]

98.      This document commenced with a description of *VAS* Plenum Resolution No. 100 (25 December 2013) and its "Instructions." The text of the document does not, however, containany specific information on the case or the court's Decision. Instead, it recites the requirements of *APK* Chapter 12 on court notifications.[5]

---

[4] The English translation refers to the Department of Case Management, which is one of the possible choices for rendering *deloproizvodstvo* as noted above (p. 9) in discussion of VAS Plenum Resolution No. 100 (25 December 2013). As explained above, this Declaration uses the translation "Record Management."

[5] In discussing APK Articles 121 and 123, the translation describes the "first legal action" in a case is "relevant party's decision" on accepting the complaint and opening a case. Actually,

1    99.    That Court found in favor of Ms. Gofman and issued the equivalent of what we

2    here would consider a "judgment" in her favor.

3    **B. The *Arbitrazh* Court for the City of Moscow**

4    100.    On 3 July 2019, A.V. Sabadash submitted a Motion to Extend the Time for

5    Appeal andan Appeal to the Ninth *Arbitrazh* Appellate Court. Under *APK* Article 259(1), the

6    deadline forfiling an appeal from judgment of a first instance court is one month. Thus

7    Sabadash was required to seek an extension of the deadline.

8    101.    In both the Motion to Extend and the Appeal,[6] Sabadash denied the existence

9    of a partnership between himself and Itkin. The translation of these documents requires a

10   slight, butimportant, correction which is set forth below.[7]

11   102.    The Ninth *Arbitrazh* Appellate Court conducted a hearing on 10 September

12   2019 and issued a text of its Determination on 12 September. The Court considered and

13   rejected Sabadash's argument on appeal that the trial court Decision effected his rights and

14   duties therebyqualifying him to challenge the Decision. Sabadash's appeal invoked *GK*

15   Articles 1041 and1047,from Chapter 55 on Simple Partnerships to support his contention that

16   the court Decision "touched" his rights and duties. Sabadash's argument relied upon a "test"

17   which was atodds with the "test" articulated by 2009 *VAS* Plenum Resolution No. 36 (28

18   May 2009) discussed below.

19

20

---

21   the Russian text describes the **court's** determination (*opredelenie*), not a decision by a party.
22   Court review and court options are described in *APK* Chapter13, as noted above.

23   [6] The English translation of Sabadash's Motion for Extension and Appellate Petition
     refers to "Itkin and Sabadash" as a "General Partnership" when actually the Russian text
24   describes "Itkin and Sabadash" as a "Simple Partnership" (*Prostoe Tovarishchestvo*). Likewise,
     the translation also renders the phrase "the conclusion of a Simple Partnership Agreement" as
25   "the existence of a Simple Partnership Agreement."

26   [7] The second page of Sabadash's Motion for Extension in English translation complained
     that the Determination "imputes a part" of the partnership to Sabadash. The actual Russian
27   *pripisyvaetsya uchastie* would be more accurately rendered as "imputes participation [to
     Sabadash]" which could be an allusion to his signing the Simple Partnership and Agreement with
28   Gofman. Sabadash denied any such "participation." Similarly, in numbered paragraph (3) on the
     fourth page of the English translation of Sabadash's Appeal, the same Russian clause
29   *pripisyvaetsya uchastie* is translated "is said to be a part" of thepartnership. However, the clause
     *pripisyvaetsya uchastie* is more accurately rendered as "imputes participation [to Sabadash]"
30   which could be an allusion to his signing the Simple Partnership and Agreement with Gofman.
     Sabadash denied any such "participation."

31

103.    In its Determination,[8] the Court found that neither the "dispositive" (***rezolyutivnaya***) nor the "explanatory" (***motivirochnaya***) parts of the trial Court Decision contained any reference (***ukazanie***) to the rights and duties of Sabadash. Invocation of ***GK*** Chapter 55 in Sabadash's appellate petition failed to establish any nexus between the Decision and his rights and duties. In this portion of the Determination, the Court held that neither concluding (***zaklyuchenie***) a Simple partnership Agreement nor having an interest in the outcome of the case supplied the necessary nexus.[9]

104.    Based on the foregoing, the Court cited Paragraph Two of 2009 ***VAS*** Plenum Resolution No. 36 (28 May 2009) as mandating termination of an appeal proceeding and return of an appellate petition to the party filing it, even after acceptance of the petition by an ***Arbitrazh*** court,when it is found that an appellant did not have the right to appeal.

105.    On 6 August 2020, the Ninth ***Arbitrazh*** Appellate Court issued an "Informational Certificate" (***Informatsionnaya Spravka***) in response to a request. This Informational Certificate begain by citing 2013 ***VAS*** Plenum Resolution No. 100 (25 December 2013) with its voluminous "Instructions" which are discussed in some detail above. Those "Instructions" govern the generation of such Certificates by the Reference-Informational (***Spravochnaya- Informatsionnaya***) staff. The Certificate was signed by Oleg Grigor'evich Mishakov, the Deputy Presiding Judge of the Ninth ***Arbitrazh*** Appellate Court .

106.    This Certificate recounted the entire history of the Gofman case as it moved

---

[8] The title of the Russian document is a Determination (***Opredelenie***) not a Ruling (***Postanovlenie***). Sabadash was seeking standard appellate review which would be subject to a Ruling (***Postanovlenie***). ***APK*** Article 265(3), however, states that termination of an appellate review shall be accomplished by a Determination (***Opredelenie***). At the conclusion of the determination, the statement "Rules as Follows" should read "Has Determined". Additionally, the English translation of this Determination provides introductory information listing the panel of judges: B.S. Veklich (Presiding Judge); B. P. Garmayeva and T.Yu. Levina. The Record (***Protokol***) of the court session was assembled by E.N. Kozin, whose title is translated "Court Clerk." The actual Russian phrase in ***APK*** Article 155(3) describing this person is "Secretary of the Court Session." "Court Clerk" is an acceptable rendering, but misses the precision that characterizes Russian legal writing.

[9] In the first paragraph of its findings, the Court described the Decision of the ***Arbitrazh*** Court for the City of Moscow as "a legally enforceable decision (***vstupivshii v zakonnuyu silu***). This adjectival phrase has juridical significance. In a normal appeal under ***APK*** Article 257(1) appellate review (which is a ***de novo*** review of evidence) applies only to decisions that have not taken effect or "entered into legal force." Cassational review under ***APK*** Chapter Article 273(1) and Supervisory review under ***APK*** Chapter Article 308.1(1) both pertain to decisions that have entered into legal force.

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

20

DECLARATION OF
PROF. RON CHILDRESS
LASC Case No. BC647351

068

through the *Arbitrazh* Court for the City of Moscow, the Ninth *Arbitrazh* Appellate Court,
the *Arbitrazh* Court for the Moscow Circuit, and the Judicial Collegium on Economic
Disputes of the RF Supreme Court. The document reflects substantial work by the staff of the
Ninth *Arbitrazh* Appellate Court.

107.    I have reviewed the Certificate in Russian and in English translation. In light
of all documents that I have reviewed, the Russian version of the Certificate provides a
complete and accurate account of the Gofman case.

108.    Unfortunately, the English translation contains some errors that require
correction. Throughout the translation, the Simple Partnership "Itkin and Sabadash" is called
a "General Partnership" which is contrary to all the Russian documents. In a paragraph
commencing with "On September 10, 2019...," the Certificate translation states that the
"appellate complaint [sic]"was dated September 14, 2018. In the Russian version of this
paragraph, no date is shown for filing of Sabadash's appeal. It should be added that the
Russian phrase *apellyatsionnaya zhaloba* can be translated "appellate complaint" but
"appellate petition" is more frequently used, even though *zhaloba* literally means
"complaint."

**C. The *Arbitrazh* Court for the Moscow Circuit**

109.    On 14 October 2019, Sabadash filed a cassational petition in the *Arbitrazh*
Court for theMoscow Circuit seeking revocation of the Determination and remand to the
Ninth *Arbitrazh* Appellate Court for new consideration. The petition was accepted, and a
court session was conducted on 7 November 2019. At the conclusion of the court session, the
Court issued only the dispositive part of the Ruling (*Postanovlenie*) which left the
Determination of the Ninth *Arbitrazh* Appellate Court without change (*bez izmeneniya*). I
have reviewed the Ruling in Russian and in English translation. The English translation,
unfortunately incorrectly renders the phrase "without change" as "stayed."

110.    On 13 November 2019 the Court issued the full text of its Ruling, which I have
reviewed in Russian only. The petition of Sabadash restated the argument that under the RF
Civil Code (*GK*) provisions on a Simple Partnership, his rights and duties were directly
"touched" by the Determination. Sabadash also argued that a Simple Partnership was not a
juridical person and therefore could not have been a party to a lawsuit in the *Arbitrazh* Court
for the City of Moscow.

111.    The Ruling also noted that the response filed for the Simple Partnership (and Defendant Itkin) had cited a criminal case judgment (*prigovor*) involving Sabadash which was entered on 24 October 2017 by the ***Smol'ninskii*** District Court in Saint Petersburg which confirmed the existence of "Itkin and Sabadash" Simple Partnership.

112.    The fact that the ***Arbitrazh*** Court for the Moscow Circuit favorably noted the criminal judgment is sufficient grounds to conclude that at least one Russian Court of General Jurisdiction confirmed the existence of the Simple Partnership. The ***Smol'ninskii*** case is discussed below.

113.    The Circuit Court concluded – in accordance with ***APK*** Articles 284, 286 and 287 (regulating cassational review) – that the Determination by the Ninth ***Arbitrazh*** Appellate Court correctly applied all relevant material and procedural rules. Moreover, interpreting ***APK*** Article 42 on appellate rights of persons not participating in a case, the Circuit Court concluded that Sabadash was not entitled to appeal for lack of any basis to conclude that his rights and duties were "touched" or that his claims of a legal interest in the outcome sufficed as bestowing upon him the appellate right. The Circuit Court Ruling essentially followed the "test" established by 2009 ***VAS*** Plenum Resolution No. 36 (28 May 2009) – described above – without specific citation.

114.    On 13 December 2019, in response to an inquiry by Gofman, the Secretariat for the Presiding Judge of the ***Arbitrazh*** Court for the Moscow Circuit, issued a brief summary of procedures followed in that Court. Basically, the response summarized procedures in the same way as certificates (*spravki*) issued by other ***Arbitrazh*** courts, including the customary citation of 2013 VAS Plenum Resolution No. 100 (25 December 2013). In particular, the response cited Section 41.2.2 of the "Instructions" which governs reception of inquiries from citizens and organization representatives regarding operations of a court.

115.    Interestingly, this response included the following passage: "Upon consideration of the claim and establishing a decision (*reshenie*) the [***Arbitrazh***] court verifies the fact of the existence of each of the parties to every claim, which is a prerequisite to [a] legally binding decision (*reshenie*). The indicated establishment of the parties is conducted at the preparation stage of case consideration." The response did not cite ***APK*** on this "preparation stage." It is governed by ***APK*** Chapter 14, Articles 133 through 137.

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

22

DECLARATION OF
PROF. RON CHILDRESS
LASC Case No. BC647351

070

1    116.    As described above (p. 18), the Ninth *Arbitrazh* Appellate Court issued its own

2  certificateon 6 August 2020 which also contains a detailed account of this stage in the

3  Gofman litigation. This certificate accurately captured the essential facts and need not be

4  further discussed here.

5    **D. The 2017 judgment of the Smol'ninskii Court of General Jurisdiction**

6    117.    A digression is required to discuss the RF Criminal Procedural Code (*UPK*) in

7  order to explain the court judgment (*Prigovor* – "Sentence") in the *Smol'ninsky* case. Article

8  47(2) of the RF Constitution declares that jury trials of criminal cases are limited to crimes

9  specified by statute. *UPK* Articles 30 and 31 identify the criminal cases in which a defendant

10  may apply for trial byjury.  Most criminal cases are tried to a single judge, although a number

11  of crimes may be tried by three-judge panels.

12    118.    In a Russian criminal case, the Record (*Protokol*) of the court session plays the

13  same role asthe Record created under the *APK*. The text of a court decision may fill hundreds

14  of pages, because the trial court summarizes all the evidence – live testimony, testimony

15  found in investigative records, identification and description of tangible and documentary

16  evidence –and sets forth the court findings on each item.

17    119.    These lengthy texts constitute the court findings of fact and law. By contrast,

18  the typical American criminal case concludes with a general jury verdict on the basis of which

19  the court either deems the defendant "not guilty" or imposes a sentence according to the

20  offense charged and with respect to which the jury has found the defendant "guilty."

21    120.    In Criminal Case No. 1-153/2017, Judge Yuliya Vladimirovna Kotenova of the

22  *Smol'ninskii* District Court of General Jurisdiction issued a judgment (*Prigovor*) on 24

23  October 2017 which found Defendant Sabadash guilty of Swindling under Article 159 of the

24  RF Penal Code (*UK*) along with two co-defendants, Somov and Garkusha who were both

25  senior officers of the *Tavricheskii* Bank, an Open Stock Company (*OAO*).  The gravamen of

26  the prosecution was a series of fraudulent transactions by which the Bank extended credits

27  and transferred money to entities controlled by Sabadash and others. Several of the properties

28  described in the testimony are also included in the February 2004 "Information Services

29  Agreement" between the Simple Partnership "Itkin and Sabadash and Gofman.  They are:

30  Open Joint Stock Company [*OAO*], "Vyborgskaya Celluloza"[sic], Closed Joint Stock

31  Company [*ZAO*] "LIVIZ," and Open Joint Stock Company [*OAO*] "LIVIZ."

32 ATABEK & ASSOCIATES, P.C.                    23                    DECLARATION OF
   Attorneys at Law                                                 PROF. RON CHILDRESS
33 10171.3                                                          LASC Case No. BC647351

121.   The judgment is 110 pages long. In it, the judge summarized the testimony of 23 individual witnesses (pp. 16-39).  A number of witnesses mentioned Garry Yu. Itkin by name: A.N. Filip'eva (p. 16); E.A. Voyt (pp. 29-31); M.Yu. Glazova (pp. 31-32); N.V. Aleksandrov (p. 32); A.Yu. Vorob'ev (p.32); P.L. Basistyi (p. 33); Yu.A. Sneshko (pp. 33-34); K.V. Arsent'ev (pp. 34-37); T.S. Lobanova (p. 37-39); and S.V. Grekova (p. 39-40).

122.   Most of the references to Garry Yu. Itkin pertained to his leadership role in the companies discussed.  However, several witnesses characterized the relationship between Itkin and Sabadash as long-standing and business-related. Witness Basistyi considered Itkin to be a "partner (*kompan'on*)" of Sabadash (p. 33). [The Russian word *kompan'on* can mean a "partner"in a business sense but it can also mean "companion," "associate," "affiliate" even "consort." Witness Sneshko described Itkin as a "business partner (*partnyor*) of Sabadash (p. 33). Witness Lobanova characterized Itkin as a "long-time acquaintance and partner (*kompan'on*) (p. 38). Witness Grekova described Itkin as both a "business partner (*partnyor*) and companion (*kompan'on)*" (p. 39).

123.   The court explicitly rejected the defendants' attacks upon the above-listed witnesses, finding that all the defendants had been warned against the Russian equivalent of "perjury" or evasion under Penal Code (*UK*) Articles 307 and 308 (p. 84). Moreover, the court detected no animosity on the part of the witnesses with regard to the defendants nor any personal interest inthe outcome of the case (p. 84).

124.   The existence of "Itkin and Sabadash" as a Simple Partnership was not an issue that was essential to the *Smol'ninskii* judgment of "guilt" with regard to Defendant Sabadash and his co-defendants. Nevertheless, under the standards of "correct application" and "comprehensive and complete investigation," the court judgment included the testimony discussed above and in effect confirmed a long-standing business relationship (and friendship) between Messrs. Itkin and Sabadash.

**E. <u>Judicial Collegium on Economic Disputes of the RF Supreme Court</u>**

125.   The final step in pursuit of remand by Sabadash was a cassational petition to the Judicial Collegium on Economic Disputes of the RF Supreme Court filed the same day as the full text of the Ruling by *Arbitrazh* Court for the Moscow Circuit (13 November 2019). On 13 March 2020,Judge Natalia C. Chuchunova, member of the Panel on Contract Disputes in the Judicial Collegium on Economic Disputes of the RF Supreme Court issued a

1  Determination (*Opredelenie*) denying and returning the petition by Sabadash. I have reviewed

2  the Determination in Russian. It contains a full recital of the grounds for returning the petition

3  (which are described above on page 12).

4        126.    On 9 December 2019, Elena Gofman filed an application to the Judicial

5  Department ofthe RF Supreme Court. On 13 December 2019, a response was sent by the

6  Directorate for Support of *Arbitrazh* an Specialized Courts signed by O.V. Yakubvoskii,

7  Acting Head of the Directorate which recited the statutory provisions governing cassational

8  review of lower courtdecisions found in the Civil Procedural Code (*GPK*).

9

10      I declare under penalty of perjury under the laws of the State of California that the

11  foregoing is true and correct.

12        Executed on June ___, 2021 in Columbia, South Carolina.

13

14                                  RONALD CHILDRESS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32  ATABEK & ASSOCIATES, P.C.                    26                   DECLARATION OF
    Attorneys at Law                                            PROF. RON CHILDRESS
33  10171.3                                                     LASC Case No. BC647351

# EXHIBIT 1

## Ronald M. Childress - Curriculum Vitae

U.S. District Court of South Carolina.  (October 2000 through July 2006)

>As staff attorney, reviewed cases and drafted Magistrate Judge
>Reports & Recommendations on petitions for habeas corpus relief,
>prisoner civil rights actions, appeals from Social Security
>administrative rulings and actions for employment discrimination.
>Also wrote and presented materials for Continuing Legal Education
>(CLE) seminars sponsored by the Court.

Defense Intelligence Agency (DIA), Washington, D.C. (January 1997 – October 2000)

>April 1999 – October 2000 - Analyst of Russian Defense Production
>December 1998 – April 1999 - Office of Inspector General, DIA, lead
>inspection of Foreign Materiel Program
>January – August 1998 –  Assistant Air Attache, U.S. Embassy, Moscow,
>filling vacancy for seven months
>June – December 1997 – Deputy for Operations, Foreign Liaison
>Division,  responsible for liaison with all foreign military attaches in
>Washington, D.C., and other high level military contacts

Director, Rule of Law Consortium, Moscow, Russia (January 1995 – December 1996)

>Managed and directed six million dollar program of technical and
>material assistance to Russian Federation commercial courts, courts
>of general jurisdiction, prosecutor training institutions, law schools,
>and non-governmental organizations in support of legal reform.
>American-Russian staff of approximately ten individuals used the
>Russian language in  daily office operations.

Director of Research, Project ROSCON, Moscow, Russia (March 1993 – December 1994)

>Introduced Russian sociologists to social marketing and audience
>research; tested and evaluated media products with Russian
>audiences; established wide academic, media and governmental
>network of professional contacts in Russia; used Russian and
>German language skills to extend networks to Western and Eastern
>Europe.  Supervised Russian research staff using Russian as
>operational language.

County Attorney, Richland County, South Carolina (June 1991 – January 1993)

>Appointed upon demobilization following OPERATION DESERT
>STORM, assisted County Administrator and Council to eliminate six
>million dollar deficit by reducing legal department budget by fifty
>percent, while increasing efficiency, and identifying new, non-tax

revenues; corrected major deviations from constitutional and statutory law in Richland County government, drafted opinions and ordinances, and represented County Council in wide variety of litigation.

Mobilized as Major, US Air Force Reserve (January 1991 to May 1991)

Led a USAF interrogation contingent during OPERATION DESERT STORM; maintained morale under tense and stressful conditions at a field camp near the Iraqi border; motivated subordinates and peers to focus energies on the mission; nearly 400 reports were written in a few weeks.  Returning to Washington, DC, wrote after-action reports prior to demobilization in May 1991.

Attorney in private practice, Columbia, S.C. (March 1984 to January 1991)

Law Clerk – Chief Justice J. Woodrow Lewis, S.C. Supreme Court (March 1981 to March 1984)

Associate – Rogers, McDonald, McKenzie, Fuller and Rubin, Columbia, SC (1979-1981)

Law School & Teaching USC GINT, Lifelong Learning Division (1976-1987)

Graduate School (Resident) & Teaching Fellow, Harvard University (1971-1975)

Active Duty, U.S. Air Force (1967-1971) Republic of Vietnam, Washington, DC, other locations

## Education

Ph.D., Government, Harvard University, 1978
J.D., University of South Carolina, 1978
M.A., Government, Harvard University, 1975
B.A., Government, Cornell University, 1967, Magna cum Laude

## Military Experience

Commissioned Second Lieutenant in U.S. Air Force, June, 1967.  Active Duty from 1967-1971.   U.S. Air Force Intelligence Reserve (AFIR): various assignments within HUMINT specialty, including Attache assignments (US Embassy, Bonn, Germany, and US Embassy, Moscow, RF).  Retired in June, 1999, with rank of Colonel.

## Language Experience

Since 1989, served as interpreter for high level US-USSR/Russian governmental, commercial and military exchanges; trained other Air Force reservists for interpreter duties supporting arms control treaty verifications.

Employed knowledge of German language in Air Force reserve activities and also in writing a doctoral dissertation on Friedrich Nietzsche, researching his works in the original German, pointing out shortcomings in previous translations.

## Teaching Experience

Currently teach Law 691 (Law and Legal System of the Russian Federation) at the University of South Carolina Law School as Adjunct Professor.

For twelve years (1976-1987), taught evening courses in political science for University of South Carolina; distilled and communicated complicated concepts of political philosophy and international relations, in a practical way to inform and hold the interest of mature students.

## Personal

DOB: 13 September 1945
POB: Tallahassee, Florida
Married to Susan A. Childress
Two sons: Andrew and David

Contact:    7033 Glengarry Drive, Columbia, S.C. 29209    Phone: (803) 776-8567
email:<ronmcesquire@gmail.com>

# EXHIBIT 2

**Log of Materials Reviewed**

(A) Judgments entered in the Gofman lawsuit:
    (1) Full text of the Decision (***Reshenie***) of the ***Arbitrazh*** Court for the City of Moscow (14 September 2018) in Case No. A40-165165/18 140/4254 (Russian text and English translation).
    (2) Enforcement Order of the ***Arbitrazh*** Court for the City of Moscow (15 October 2018) in Case No. A40-165165/18 140/4254 (Russian text only).
    (3) Motion (***Khodataystvo***) to Extend the Time for Appeal filed on behalf of A.V. Sabadash in the Ninth ***Arbitrazh*** Appellate Court on 3 July 2019 in Case No. A40-165165/18 (Russian text and English translation).
    (4) Appeal (***Apellyatsionnaya Zhaloba***) filed on behalf of A.V. Sabadash in the Ninth ***Arbitrazh*** Appellate Court on 3 July 2019 in Case No. A40-165165/18 (Russian text and English translation).
    (5) Full text of the Determination (***Opredelenie***) of the Ninth ***Arbitrazh*** Appellate Court (12 September 2019) in Case No. 09AP-43744/2019–GK (trial court Case No. A40-165165/18) (Russian text and English translation).
    (6) Cassational Appeal (***Kassatsionnaya Zhaloba***) filed on behalf of A.V. in the ***Arbitrazh*** Court of the Moscow Circuit (***Okrug***) on 11 October 2019 in Case No. A40-165165/18 (Russian text and English translation).
    (6) Full text of the Ruling (***Postanovlenie***) of the ***Arbitrazh*** Court of the Moscow Circuit (***Okrug***) (13 November 2019)
    (5) Full Text of the Determination (***Opredelenie***) of the RF Supreme Court Collegium on Economic Disputes in Case No. 305-ES20-464 (trial court Case No. A40-165165/2018 (Russian text and English translation).

(B) Criminal Case No. 1-153/2017 – Guilty Judgment (***Prigovor***) of the Smol'ninskiy District Court entered by Presiding Judge Yu. V. Koteneva on 24 October 2017 against Defendants A.V. Sabadash, S.A. Somov and D.V. Garkusha charged with violation of the RF Penal Code (***Ugolovnyi Kodeks***) Article 159(4).  (Russian text with limited excerpts in English translation).

(C) Plenum Resolutions of the RF Highest ***Arbitrazh*** Court  (abbreviated ***VAS*** in Russian) (Reviewed in Russian text only.)
    (1) 2009 ***VAS*** Resolution No. 36 (28 May).
    (2) 2009  ***VAS***  Resolution No. 61 (23July).
    (3) 2011  ***VAS***  Resolution No. 12 (17 February).
    (4) 2011  ***VAS***  Resolution No. 30 (24 March).
    (5) 2012  ***VAS***  Resolution No. 43 (12 July).
    (6) 2013  ***VAS***  Resolution No. 100 (25 December).
    (7) 2014 ***VAS***  Resolution No. 48 (11 July).
    (8) 2014  ***VAS***  Resolution No. 49 (11 July).

(D) Plenum Resolutions of the RF Supreme Court (abbreviated ***VS*** in Russian). (Reviewed in Russian text only.)

(1) 2020 Supreme Court ( *VS* ) Resolution No. 12;(30 June).

(2) 2020 Supreme Court ( *VS* ) Resolution No. 13 (30 June).

(E) Informational Certificates.

(1) Certificate of the Record Management Department of the *Arbitrazh* Court for the City of Moscow  issued on 24 October 2018 signed by N.A. Sotnich.  (Russian text and English translation)

(2) Informational Certificate issued  on 6 August 2020 and signed by O.G. Mishakov, Deputy Presiding Judge of the Ninth *Arbitrazh* Appellate Court.  on 6 August 2020. (Russian text and English translation.)

(3) Untitled Certificate issued on 13 December 2019 by the Secretariat for the Presiding Judge of the *Arbitrazh* Court for the Moscow Circuit.  (Russian text and English translation.)

(4) Untitled Certificate issued on 12 December 2019 by the Judicial Department of the RF Supreme Court and signed by O.V. Yakubovskii, Acting Head of the Directorate for Support of *Arbitrazh* and Specialized Courts

(F) Documents of the Parties

(1) Agreement of partners to establish "Itkin and Sabadash" Simple Partnership (12 February 2004).  (Russian text and English translation.)

(2) "Information Services Agreement" between "Itkin and Sabadash" Simple Partnership and E.N. Vasilieva (12 February 2004).  (Russian text and English translation.)

(G) The RF *Arbitrazh* Procedural Code (*APK*).  (Russian text only.)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 515 South Flower Street, 7th Floor, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF ORDER DISMISSING INVOLUNTARY CASE [DOCKET NO. 76] AND MEMORANDUM OF DECISION [DOCKET NO. 75]; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF GARRY Y. ITKIN, ELENA GOFMAN, DANIEL J. McCARTHY AND RON CHILDRESS**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) July 1, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Joseph E Caceres jec@locs.com,  generalbox@locs.com
Daniel J McCarthy  dmccarthy@hillfarrer.com,  spadilla@hillfarrer.com;dflowers@hfbllp.com
Kurt  Ramlo Adam RamloLegal@gmail.com,  kr@ecf.courtdrive.com,ramlo@recap.email
Charles  Shamash cs@locs.com,  generalbox@locs.com
Oleg  Stolyar  astolyar@loeb.com
United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov
Michael  Zorkin on behalf of Partner Alexander  Sabadash mz@thezorkinfirm.com

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) July 1, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

United States Trustee
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 1, 2025 | Sonia Padilla | /s/ Sonia Padilla |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

- 49 -