MICHAEL ZORKIN (Bar No. CA 313308)
Email: mz@thezorkinfirm.com
THE ZORKIN FIRM
6320 Canoga Ave., 15th Floor
Woodland Hills, California 91367
Telephone:   323.493.8075

Attorneys for Putative Partner of Alleged Debtor
Alexander Sabadash

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | No. 2:25-bk-11235-NB |
| Itkin & Sabadash, | Hon. Neil W. Bason |
| Debtor, | **PUTATIVE PARTNER ALEXANDER SABADASH'S MOTION FOR FEES AND DAMAGES, UNDER 11 U.S.C. § 303(I)** |
| | Hearing Date: August 5, 2025 <br> Hearing Time: 11:00 a.m. |
| | Filed concurrently with: <br> 1. Declaration of Michael Zorkin; <br> 2. Declaration of Alexander Sabadash; <br> 3. Declaration of Andy Wood; <br> 4. Request for Judicial Notice. |

1

THE ZORKIN FIRM

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 5, 2025 at 11:00 a.m. in Courtroom 1545 of the above captioned court, located at 255 E. Temple Street, Los Angeles, CA 90012, Putative Partner of Alleged Debtor Alexander Sabadash will move for fees and punitive damages under 11 U.S.C. 303(i).

This motion is made because the involuntary petition was dismissed without the consent of all petitioners and the alleged debtor.

This motion is also made because the involuntary petition was filed in bad faith.

Putative Partner seeks attorneys' fees and damages from Mr. Itkin, Mr. McCarthy, and Mr. Caseres jointly and severally.

Mr. Sabadash seeks $78,485 in fees and asks the Court to treble the fee award in punitive damages.

LBR 9013-1(f) requires a written response to be filed and served at least 14 days before the hearing.

The motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities and declarations, the request for judicial notice, any evidence or argument presented at the hearing, and any papers on file with the Court.

Dated:        July 1, 2025                    THE ZORKIN FIRM


By: /s/ Michael Zorkin
   Michael Zorkin
   Attorneys for Putative Partner
   Alexander Sabadash

MOTION FOR FEES

<u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 1

ARGUMENT .................................................................................................................. 5

I.      ALEXANDER SABADASH IS ENTITLED TO RECOVER HIS
ATTORNEYS' FEES AND DAMAGES UNDER 11 U.S.C. § 303(i) BECAUSE THE
PETITION WAS DISMISSED WITHOUT CONSENT OF THE PARTIES. ................. 5

    A.    The totality of the circumstances test favors imposition of fees. ................. 5

    B.    The petition was filed in bad faith. ................................................................ 6

        1.    The petition was filed for an improper purpose—stalling of the Jersey
proceeding and forum-shopping. ............................................................... 7

        2.    Mr. Itkin knew the debts were in bona fide dispute. ................................ 10

        3.    Mr. Itkin failed to inform this court that he paid Gofman $21,000 to sue
the alleged debtor ..................................................................................... 13

        4.    Mr. Itkin relied on forged documents to establish a partnership. .......... 14

        5.    Mr. Itkin failed to tell the court that he represented to the Russian
court that the Gofman judgment has been satisfied. ................................ 15

II.      MR. ITKIN, MR. MCCARTHY, AND MR. CASERES SHOULD BE
JOINTLY AND SEVERALLY LIABLE FOR ANY AWARD. ....................................... 16

III.      THE COURT SHOULD AWARD ATTORNEYS' FEES AND PUNITIVE
DAMAGES ................................................................................................................... 17

    A.    Fees for obtaining dismissal of the involuntary petition. ........................... 17

    B.    Fees for work incurred on this motion. ...................................................... 18

    C.    Punitive damages ......................................................................................... 18

CONCLUSION ............................................................................................................. 19

THE ZORKIN FIRM

**INTRODUCTION**

Alexander Sabadash seeks fees and damages because this involuntary bankruptcy petition was a misuse of the court system—filed not for a proper bankruptcy purpose, but to dodge unfavorable rulings from the Jersey Court.  Mr. Itkin and his attorneys knew that no partnership existed and that the alleged debts were hotly contested.  Yet, they filed anyway, banking on deception to halt ongoing litigation abroad.

Mr. Sabadash is entitled to attorneys' fees because the petition was dismissed without consent of the parties.  The totality of the circumstances overwhelmingly supports fees: the involuntary petition had no merit, there was no improper conduct by Mr. Sabadash, and the creditors acted unreasonably.

Mr. Sabadash is entitled to damages because the petition was undeniably filed in bad faith, intended to stall Jersey court proceedings, evade payment of court-ordered fines, and engage in blatant forum-shopping.

The severity of their conduct merits punitive damages to adequately punish and deter future abuses.  An award of treble damages will reflect the seriousness of Mr. Itkin's team's misconduct.

Mr. Sabadash asks the Court to hold Mr. Itkin, Mr. McCarthy, and Mr. Caseres jointly and severally liable for all attorneys' fees and damages incurred by Mr. Sabadash.

Any lesser sanction risks emboldening similar misuse, degrading public confidence in the judicial system, and transforming legitimate legal remedies into tools for gamesmanship and delay.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.  Meeting and hiring Mr. Itkin.**

The Sabadash family met Mr. Itkin, a Los Angeles tax preparer, in the 1990's.  Mr. Itkin began doing taxes for the Sabadashes and the families became friends.  Around 2000, Mr. Sabadash asked Mr. Itkin to move to Russia and work for his

1    companies performing various tasks centered on accounting and tax services.

2    (Sabadash Decl., ¶ 2.)  Mr. Sabadash offered Mr. Itkin a generous salary and Mr.

3    Itkin began receiving $50,000 per month as soon as he began working for Mr.

4    Sabadash.  (Sabadash Decl., ¶ 3; Zorkin Decl., Ex. 1, Itkin Dep. Tr., 148:15-149:1.)

5        When Mr. Itkin was hired in May 2000, Mr. and Mrs. Sabadash issued Mr.

6    Itkin a power of attorney.  (Zorkin Decl., Ex. 6; Sabadash Decl. ¶ 1.)  This document

7    specified that Mr. Itkin was to "manage [the Sabadash's] property arising out of [the

8    Sabadash's] interests in said companies" in exchange for "fees to [Mr. Itkin]."

9        From 2000 to 2016, Mr. Itkin worked for Mr. Sabadash as an accountant and

10    financial manager.  To enable Mr. Itkin to perform his duties, Mr. Sabadash

11    appointed Mr. Itkin as a director of various corporations which required Mr. Itkin's

12    services.  (Sabadash Decl. ¶ 1-3.)

13    **B. Mr. Itkin's removal from his corporate positions.**

14        In around 2014, Mr. Itkin hatched a scheme to take over nearly all of the

15    Sabadash family assets by exploiting his positions of trust as director of various

16    Sabadash companies.  For instance, between 2014 and 2016, he stole money from

17    bank accounts, transferred corporate shares to himself, mortgaged Mr. Sabadash's

18    assets, and created various contracts and promissory notes that effectively locked

19    down all of Mr. Sabadash's assets.  (Sabadash Decl. ¶ 8-10.)  Mr. Itkin believed that

20    in Mr. Sabadash's absence he could do this in secret and that Mrs. Sabadash would

21    be unable to defend the family.  And he almost got away with it.

22        Mr. Itkin's plan is striking because he did much more than just lay claim to

23    Mr. Sabadash's business assets.  He took control (on paper) of the Sabadash family

24    home where Mrs. Sabadash lives with her two children.  This has caused

25    unimaginable strain on Mrs. Sabadash whose life has been put on hold by Mr.

26    Itkin's betrayal and who continues to pay the substantial mortgage, property taxes,

27    and all expenses for this home.

28

1    After Mr. Itkin's abuses of trust and misappropriation of assets surfaced, he

2    was officially voted out from his positions as director of all companies by Mr.

3    Sabadash.  (Sabadash Decl. ¶ 8-10.)  Mr. Itkin disputed the shareholder vote was

4    legitimate but never mentioned a partnership.  (*Id.* ¶ 11.)

5    **C. Mr. Itkin invents a partnership as a defense.**

6    The first time anyone heard about a partnership, was Mr. Itkin's 2017 cross-

7    complaint against Mr. Sabadash.  (Sabadash Decl. ¶ 12.)  Mr. Itkin came up with a

8    defense—that back in 1998 he and Mr. Sabadash formed an oral partnership.  Mr.

9    Itkin, a tax preparer at the time, claims he was promised a one-third interest in the

10    Sabadash business empire worth hundreds of millions of dollars.  Per Mr. Itkin, this

11    alleged 20-year-old promise allowed him to take whatever Sabadash assets he

12    wanted, including money and corporate shares, purportedly as payment for his

13    services, all without consequence.  And Mr. Itkin did not document this deal of a

14    lifetime in any way.

15    After extensive discovery and a three-day deposition, Mr. Itkin's partnership

16    theory fell apart.  For example, Mr. Itkin never agreed to share in the losses of the

17    partnership. (Zorkin Decl., Ex. 1, Itkin Dep. Tr., 629:10-17; 156:22-157:11; 160:3-

18    11.)  To the contrary, his draw was supposedly guaranteed, meaning that even if the

19    partnership lost money, Mr. Itkin would get his share, and Mr. Sabadash, a two-

20    thirds partner, would get nothing.  Unsurprisingly, Mr. Itkin admitted that he never

21    received this promised "partnership" share.  (*Id.*, 159:3-8; 527:22-25.)

22    And though Mr. Itkin will claim that he took part in managing the Sabadash

23    businesses, his sworn testimony tells a different story.  Mr. Itkin admitted that he

24    only worked with Mr. Sabadash's non-Russian entities.  Mr. Itkin testified that he

25    didn't manage any business in Russia, was not a signatory to any Russian bank

26    accounts, and "had no clue" how money in Russia was made.  (*Id.*, 93:20-95:9;

27    180:12-15; 485:19-486:1.)

28

1    In fact, all Mr. Itkin knew about Mr. Sabadash's businesses is how much

2    money was deposited into the European bank accounts, which Mr. Itkin used mainly

3    to pay Mr. Sabadash's bills.  (*Id.*)

4    Mr. Itkin also admitted that the partnership did not formally exist.  The

5    partnership never owned a single asset.  The partnership never filed a tax return (as

6    all partnerships are required to do).  (*Id.*, 50:9-21; 505:15-19.)  The partnership

7    never had a bank account and Mr. Sabadash was always listed as the owner of

8    corporate accounts, even on accounts opened by Mr. Itkin.  And Mr. Itkin, without

9    fail, referred to Mr. Sabadash as the beneficial owner of each company.  (*Id.*, 78:13-

10   79:9; 171:9-19; 505:5-14.)

11   Every corporate document Mr. Itkin ever created confirmed that he had no

12   ownership interest.  Whether they were employment agreements or various

13   guarantees and corporate resolutions, Mr. Itkin always listed Mr. Sabadash as the

14   owner.  Indeed, when Mrs. Sabadash asked Mr. Itkin to meet with her lawyer and

15   accountant and disclose the extent of Mr. Sabadash's holdings, he identified Mr.

16   Sabadash – not himself or any alleged partnership – as the 100% owner.  (Zorkin

17   Decl., Ex. 7.)

18   **D. The Golden Sphinx bankruptcy**.

19   The facts surrounding Golden Sphinx's bankruptcy are known to the parties

20   and this court.  As a quick refresher, Golden Sphinx, and in turn New Albion, were

21   both assets of the Amber Trust—a trust formed by Mrs. Sabadash in 1996 to protect

22   the family's assets (years before Mr. Itkin began working for Mr. Sabadash).  Mr.

23   Sabadash has never been a shareholder; the trustees of the trust hold the shares of

24   Golden Sphinx.  (Itkin Dep. Tr., 322:16-25.)

25   Mr. Itkin was removed from the board of Golden Sphinx by the trustees of the

26   Amber Trust (and shareholders of Golden Sphinx) in 2017.

27

28

THE ZORKIN FIRM ⑦

4

1   This Court has recognized the Golden Sphinx Jersey liquidation as the foreign

2   main proceeding and the liquidation is proceeding in the Jersey Court.  Mr. Itkin's

3   repeated attempts to stall the Jersey proceeding have been rejected by the Jersey

4   Court.  Mr. Itkin was ordered to pay £78,432 in costs by February 24, 2025 and also

5   provide evidence for his baseless defenses.  (Wood Declaration, Ex. AW2.)  In a

6   transparent attempt to flout the court's order, Mr. Itkin filed this petition instead.

7   **E.  Involuntary Chapter 7 Bankruptcy.**

8   Dissatisfied with this Court's orders recognizing the Golden Sphinx

9   bankruptcy and with the Jersey Court's multiple orders against him including

10  sanctions, Mr. Itkin tried to reverse those orders by filing an involuntary petition

11  against the non-existent partnership.  This Court dismissed the involuntary petition

12  in a memorandum decision and order.  (Dkts. 75 and 76.)

13  **ARGUMENT**

14  I.  **ALEXANDER SABADASH IS ENTITLED TO RECOVER HIS ATTORNEYS' FEES AND DAMAGES UNDER 11 U.S.C. § 303(i)**

15  **BECAUSE THE PETITION WAS DISMISSED WITHOUT CONSENT OF THE PARTIES.**

16  A.  **The totality of the circumstances test favors imposition of fees.**

17  "The filing of an involuntary petition should not be lightly undertaken [and]

18  should be a measure of last resort."  *Higgins v. Vortex Fishing Sys., Inc.*, 379 F.3d

19  701, 707 (9th Cir. 2004) (cleaned up).  To "discourage inappropriate and frivolous

20  filings," 11 U.S.C. § 303(i) creates a presumption that the debtor in a dismissed

21  involuntary bankruptcy is entitled to recover reasonable attorneys' fees.  *Id.*  The

22  only statutory prerequisite for fees is dismissal without consent of the creditors and

23  debtors.  11 U.S.C. § 303(i).  "Congress drafted the statute to make an award of costs

24  and fees the norm."  *In re Kidwell*, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993).

25  To assist the bankruptcy court in exercising its discretion to award fees and

26  costs, the Ninth Circuit adopted the totality of the circumstances test.  The factors to

27  be considered are: "1) the merits of the involuntary petition, 2) the role of any

28

THE ZORKIN FIRM

5

improper conduct on the part of the alleged debtor, 3) the reasonableness of the

actions taken by the petitioning creditors, and 4) the motivation and objectives

behind filing the petition." *Vortex Fishing Sys., Inc.*, 379 F.3d at 707–08. "It is the

petitioner's burden to demonstrate that the totality of the circumstances supported

the disallowance of fees." *Id.*

However, in adopting the totality of the circumstances test, the Ninth Circuit

did not "abandon the premise that any petitioning creditor in an involuntary case

should expect to pay the debtor's attorney's fees and costs if the petition is

dismissed." *Id.*; *In re S. California Sunbelt Devs., Inc.*, 608 F.3d 456, 462 (9th Cir.

2010) ("When an involuntary bankruptcy petition is dismissed, the debtor is

presumed to be entitled to reasonable fees and costs.")

The factors in the totality of the circumstances test heavily favor imposing

fees.

**Merits and motivation behind the petition.** As described in the bad faith

section below, the petition lacked all merit and was filed to derail the Jersey

litigation and escape fines ordered by the Jersey Court.

**The role of any improper conduct on the part of the alleged debtor.**

Mr. Sabadash has not engaged in improper conduct and has steadfastly maintained

that no partnership has ever been formed between him and Mr. Itkin.

**Reasonableness of the actions taken by the petitioning creditors.** As

described in the bad faith section below, the petitioning creditors have not acted

reasonably. The creditors are Mr. Itkin's lawyers and friends, acting on his behalf

with legally questionable claims to help him in his campaign of fraud against Mr.

Sabadash.

**B. <u>The petition was filed in bad faith.</u>**

"Any petitioner who files in bad faith may be required to pay any damages

proximately caused by such filing, together with punitive damages." *In re Kidwell,*

THE ZORKIN FIRM

MOTION FOR FEES

1   158 B.R. at 217; 11 U.S.C. § 303(i)(2)(A), (B).  "Punitive damages may be awarded

2   under § 303(i)(2)(B) even absent an award of actual damages under § 303(i)(2)(A)."

3   *In re S. California Sunbelt Devs., Inc.*, 608 F.3d at 465.

4       "Bad faith is measured by an 'objective test' that asks what a reasonable

5   person would have believed.  There is no statutory requirement that the bad faith

6   must be directed toward anyone in particular.  Courts have employed a more

7   expansive definition of bad faith to include ill will or malice toward the debtor or its

8   owners."  *In re Cadena*, 634 B.R. 1038, 1052 (Bankr. C.D. Cal. 2022) (cleaned up).  In

9   short, "if it smells like bad faith, it's got to be bad faith."  *In re Mi La Sul*, 380 B.R.

10  546, 554 (Bankr. C.D. Cal. 2007).

11      **1.**  <u>The petition was filed for an improper purpose—stalling of the

12      Jersey proceeding and forum-shopping.</u>

13      "A petitioner has no valid bankruptcy purpose—and acts in bad faith—when

14  his goal is to stall or disrupt litigation in another court."  *In re Meltzer*, 516 B.R. 504,

15  515–16 (Bankr. N.D. Ill. 2014) (awarding damages for an involuntary petition filed

16  in bad faith).

17      Mr. Itkin filed this petition to escape the jurisdiction of the Jersey court after

18  the Jersey court ordered Mr. Itkin to substantiate his defenses and to pay Golden

19  Sphinx £78,432.  (Wood Decl., ¶ 3-9.)  Mr. Itkin delayed responding to basic requests

20  for information since October 2024 forcing Golden Sphinx to move to compel

21  compliance.  (Wood Decl., ¶ 10-14.)  In response, the Jersey court ordered Mr. Itkin

22  to respond and pay sanctions.  (*Id.*, Ex. AW2.)  Mr. Itkin again asked for another

23  continuance claiming that he had no opportunity to speak with or take advice from

24  his Jersey and U.S. counsel on account of the Palisades fires.  (*Id.*)  The Jersey court

25  granted another continuance ordering Mr. Itkin to respond and pay by February 24,

26  2025.

27

28

1  But as is now apparent, contrary to Mr. Itkin's representations that he was

2  unable to confer with his counsel, he was scheming behind the scenes with his

3  Russian cronies to stall the Jersey case with this petition, which he filed two days

4  after the Jersey Court's order.  Mr. Itkin's counsel concurrently represented to the

5  Jersey Court that there is a bankruptcy stay preventing the Jersey Court from

6  moving forward.  (Wood Decl., ¶ 18.)  *See In re Anmuth Holdings LLC*, 600 B.R. 168,

7  193 (Bankr. E.D.N.Y. 2019) ("Where, as in this case, a petition is filed as a litigation

8  tactic, solely to avoid the consequences of an adverse state court decision, bad faith

9  is manifest.")

10  Subsequently, the Jersey Court realized it was misled stating,

11  "Notwithstanding Mr Itkin's apparent inability to consult with his US lawyers,

12  within 2 days of my orders, he managed to engage with US lawyers and to file a

13  bankruptcy petition in relation to the alleged partnership."  (Wood Decl., Ex. AW3.)

14  The forum-shopping is readily apparent from Mr. Itkin's counsel's arguments

15  at the hearing.  Mr. McCarthy argued that the Golden Sphinx Chapter 15

16  proceeding was wrongly being considered in Jersey and that Mr. Itkin's defense of

17  trying to create a partnership should be heard in in California:[1]

> This proceeding concerning a California general partnership that's on California property involves issues that should be determined here. The idea that you should defer to the Jersey court to determine whether a partnership existed under California law really is backwards. That's an issue that you should take on and that Jersey court should defer to you.

(April 22, 2025, Hr. Tr. 15:6-12.)

24  Mr. McCarthy all but admitted this involuntary was filed for an improper

25  purpose:

---

[1] Mr. Atabek, one of four of Mr. Itkin's lawyers who acted as a creditor in this matter, also argued that the proper forum is here, claiming it would not be a "heavy lift" to hold a trial in this court.  (April 22, 2025, Hr. Tr. 19:13-23.)

THE ZORKIN FIRM

> [W]hat this involuntary really is about is putting the issues
> before the proper court to be determined; again, whether
> there's a partnership under California law and whether
> that partnership owns California real property. Your
> Honor, you're the one to make that determination or relief
> from stay should be granted for it to be determined in state
> court.

(April 22, 2025, Hr. Tr. 16:12-19.)

Thus, according to Mr. McCarthy, Mr. Itkin was unhappy with this Court's order recognizing the Golden Sphinx Chapter 15 bankruptcy and this Court's order denying Mr. Itkin relief from stay in the Golden Sphinx bankruptcy. Rather than appeal the Golden Sphinx orders, he filed an involuntary proceeding for a made-up entity specifically to get out of Jersey.

Courts routinely find bad faith when the timing of the petition reveals an intent to interfere with pending litigation. *See In re Fox Island Square P'ship*, 106 B.R. 962, 968 (Bankr. N.D. Ill. 1989) (finding bad faith when the involuntary petition was filed after a motion to change venue in another court was denied); *In re Meltzer*, 516 B.R. at 516 ("The filing of an involuntary case shortly before a hearing in related litigation strongly suggests the case was filed only to stall the hearing.") (collecting cases); *In re Anmuth Holdings LLC*, 600 B.R. at 192–93 ("The timing of the filing of the Involuntary Petitions demonstrates egregious bad faith and an improper use of the bankruptcy system."); In *re Homesite Holdings LLC*, No. BAP SC-22-1112-BSG, 2023 WL 3918405, at *8 (B.A.P. 9th Cir. 2023) ("Filing a bankruptcy case to defeat or delay state court litigation, even if that is not the only purpose for the filing, can constitute bad faith."); *In re WLB-RSK Venture*, 296 B.R. 509, 515 (Bankr. C.D. Cal. 2003), *aff'd,* 320 B.R. 221 (B.A.P. 9th Cir. 2004), *aff'd,* 223 F. App'x 555 (9th Cir. 2007) (finding bad faith for involuntary petition filed "in a forum shopping effort to avoid the latest, still pending litigation in the state court.")[2]

---

[2] Although most bankruptcy courts address forum shopping as it relates to state courts, the reasoning applies in full force to litigation pending in other countries.

THE ZORKIN FIRM

1    This Court should find the petition was filed for an improper purpose to

2  disrupt the Jersey proceeding and to escape unfavorable rulings against Mr. Itkin.

3    **2.** Mr. Itkin knew the debts were in bona fide dispute.

4    "Creditors act in bad faith when they file an involuntary petition knowing

5  their claims are in bona fide dispute." *In re Anmuth Holdings LLC*, 600 B.R. at 197–

6  98.

7    Here, Mr. Itkin knew that the very existence of a partnership and thus any

8  debts of the partnership were in dispute.  (Sabadash Decl., ¶2.)  Mr. Itkin was

9  removed from his director and officer positions in Mr. Sabadash's corporations in

10  2016.  (Sabadash Decl., ¶ 8-9.)  Mr. Sabadash then sued Mr. Itkin for fraud and

11  breaches of fiduciary duties and Mr. Itkin countersued for breach of duty and

12  judicial dissolution of partnership.  (*Id.*, 12.)  The litigation was hotly contested: Mr.

13  Itkin's motion for summary adjudication to establish a partnership was denied and

14  the case went to a jury trial that was interrupted by the Covid pandemic.  (*Id.*, 12.)

15  There is thus no credible argument that the existence of the partnership was not in

16  bona fide dispute.

17    Mr. Itkin's main argument for the existence of the partnership was claim

18  preclusion based on lawsuits filed in Russia and California by Elena Gofman.  Mr.

19  Itkin argued Mr. Sabadash is precluded from arguing that no partnership exists.

20  But Mr. Itkin already made an identical argument in state court in his motion for

21  summary adjudication.  (Zorkin Decl., Ex. 25, RJN.).  The court denied Mr. Itkin's

22  motion because "collateral estoppel issues are in dispute regarding the prior actions

23  filed by Elena Gofman."  (*Id.*, Ex. 26, RJN.)  This shows that Mr. Sabadash always

24  disputed the import of the Gofman cases and the Superior Court judge agreed with

25  Mr. Sabadash.  Yet Mr. Itkin stubbornly insists that the Gofman lawsuits are

26  dispositive even though he cannot meet any elements of claim preclusion.

27  ─────────────────────────────────────────────────
    This is especially true given that Mr. Itkin has represented to the Jersey Court that
28  the involuntary petition had the effect of staying the Jersey case. (Wood Decl., ¶ 18.)

THE ZORKIN FIRM ⑦

MOTION FOR FEES

1  And Mr. Itkin's efforts to establish the elements of the doctrine were half-

2  hearted at best.  The only element of res judicata Mr. Itkin addressed in his

3  opposition was privity.  (Dkt. 16, Itkin Opp., at 14-16.)  Mr. Itkin did not address

4  either the requirement that there be an identical cause of action (for claim

5  preclusion) or that an identical issue was litigated and necessarily decided (for issue

6  preclusion).  (*Id.*)  Nor did Mr. Itkin mention the public policy behind claim

7  preclusion as articulated by the California Supreme Court.  This shows that Mr.

8  Itkin (and his counsel) did not sincerely believe in the application of claim

9  preclusion.

10  What is more, Mr. Itkin argued in the Russian court that "Sabadash, as an

11  individual, is neither a party to the said agreement nor a party to the present case,"

12  making his privity argument to this Court frivolous.  (Zorkin Decl., Ex. 19.)

13  And Mr. Itkin's reliance on the Information Summary in lieu of the actual

14  opinion of the Russian court provides more evidence of bad faith.  Mr. Itkin tried to

15  steer the Court away from the actual court of appeal ruling by citing the Information

16  Summary as if it were the Court's ruling.  Indeed, the Opposition did not even

17  submit the Court's ruling as an exhibit.  Asking this Court to rely on a summary of a

18  legal opinion – that inexplicably includes facts and legal analysis not found in the

19  actual opinion – is frivolous on its face.

20  And this is the likely reason Mr. Itkin tried to hoodwink this Court into ruling

21  based on a summary—to avoid harmful language from the actual opinion.  As this

22  Court recognized:

> You've got statement by one - or the information summary
> that seems to say one thing and yet, what it's purporting to
> summarize seems to me to say the opposite.

25  (Zorkin Decl., Ex. 21, June 3, 2025 Hr. Tr., 43:13-16.)

26  Mr. Itkin continued to misrepresent the facts in his supplemental brief,

27  repeatedly referring to the Information Summary's recitation of the facts as holdings

28

THE ZORKIN FIRM

of a court.  (Dkt. 45, Supp. Brief, 5:2-6:9.)  The Information Summary cannot "hold" anything and the "holdings" identified by Mr. Itkin were simply general facts of the case as alleged by Gofman.  No reasonable lawyer could mistake these background facts for a holding.

Not to mention that even if this Summary were real, and Mr. Sabadash has no basis to believe that it is, Mr. Itkin gave no notice that he asked for the Summary and did not allow Mr. Sabadash to participate in the process.[3]  He then tried to use the summary for preclusive effect.  This is frivolous.

Courts routinely find bad faith when the petitioning creditors knew or should have known the claims are disputed.  *In re Fox Island Square P'ship*, 106 B.R. at 968–69 ("At the time the Petitioners filed the Involuntary Petition, they knew the Oak Park debt was highly disputed, and they knew *or reasonably should have known* that the Oak Park debt was not a Partnership debt.") (emphasis added); *In re Johnston Hawks Ltd.*, 72 B.R. 361, 367 (Bankr. D. Haw. 1987), *aff'd,* 885 F.2d 875 (9th Cir. 1989) (finding bad faith when the claim was subject to a bona fide dispute); *In re Meltzer*, 516 B.R. at 517 ("Creditors act in bad faith when they file an involuntary petition knowing their claims are in bona fide dispute."); *In re Anmuth Holdings LLC*, 600 B.R. at 197–98 ("It is obvious that the Petitioning Creditors were aware, at all relevant times, that their claims were disputed. The claims had been the subject of over four years of litigation between the parties in state court."); *In re Oakley Custom Homes, Inc.*, 168 B.R. 232, 239 (Bankr. D. Colo. 1994) (bad faith found where "Involuntary Petition is the product of a business war and personal vendetta carried on primarily by [creditor] against this Alleged Debtor and its principal.")

Finally, "[a] materially false statement in support of an involuntary petition constitutes bad faith for purposes of section 303(i)(2)."  *In re Kidwell*, 158 B.R. at

---

[3] The Information Summary does not appear on the docket of the Gofman case casting doubt on its authenticity.  (*See* Zorkin Decl. ¶ 18-19.)

217; *Johnston Hawks,* 72 B.R. at 361 (falsely asserting claim not subject to bona fide dispute is bad faith). Here, Mr. Itkin's answer to question 11 (whether there was a bona fide dispute) on the petition was false.

        3. <u>Mr. Itkin failed to inform this court that he paid Gofman $21,000 to sue the alleged debtor</u>

      Mr. Itkin had no written evidence of a partnership so he found Ms. Gofman and paid her to forge documents and file a lawsuit on Mr. Itkin's behalf. This part of Mr. Itkin's scheme began in July 2018 when he made the first payment to Gofman from his personal bank account. Between July 2018 and March 2019, Mr. Itkin made six payments to Ms. Gofman totaling $21,000. (Zorkin Decl. Ex. 18.) The series of bribes culminated in a $10,000 payment on March 25, 2019 which corresponds with the filing of the Gofman California action to enforce the Russian judgment on April 19, 2019.

      Itkin's first payment to Gofman was made in July 2018, the same month she filed the lawsuit in Russia. Mr. Itkin knew about the lawsuit, hired a lawyer, but never told Sabadash or his counsel.

      Mr. Itkin did everything he could to ensure a judgment was entered. According to the court, he "voluntarily satisfied [Plaintiff's] demand for payment." He even revived the time-barred suit because he "agreed to the total amount of debt, interest, and fine arising out of the breach of this agreement." (Dkt. 16-1, Itkin Decl., Ex. C.).

      Gofman then used her fraudulent Russian judgment to sue the "partnership" in California. She did this even though she represented to the Russian court that the judgment has been fully satisfied. (Zorkin Decl., Ex. 19.) Mr. Itkin also admitted liability and did not oppose entry of judgment recognizing the Russian judgment in California. Gofman has not tried to enforce the judgment since 2019.

1          4.  <u>Mr. Itkin relied on forged documents to establish a partnership.</u>

2          Mr. Itkin's chief evidence of the partnership were a contract hiring Gofman

3   and minutes of meeting of partnership drafted by Gofman.  The alleged partnership

4   seal in the lower left corner of the contract misspells Mr. Sabadash's last name (the

5   seal says Sadabash).  (Zorkin Decl., Ex. 16.)  This is not a mark of a successful

6   business but of a back-alley counterfeiter.  Mr. Itkin knows about the misspelling,

7   yet he gave this Court a false translation which correctly spells Mr. Sabadash's

8   name.  (*Cf.* Dkt. 16-1, Itkin Decl., Ex. B.).

9          What is more, Mr. Sabadash's signature is forged.  Both Mr. Itkin and Ms.

10  Gofman signed using the same pen in the same style.  But Mr. Sabadash's signature

11  appears to be electronically affixed, which would have been very difficult given the

12  state of technology in Russia in 2004.  And of course, Mr. Sabadash never signed the

13  contract and never met Gofman.  (Sabadash Decl., ¶ 5-7.)

14         Realizing that he blundered by so sloppily forging the "partnership" seal and

15  Mr. Sabadash's signature, Mr. Itkin created another document, solemnly titled

16  "Minutes of the meeting of partners of simple partnership Itkin & Sabadash."

17         The English translation of the Minutes purports to memorialize in writing the

18  partnership agreement between Mr. Sabadash and Itkin.  According to Itkin, these

19  Minutes were drafted by Gofman on the same day she was hired to perform

20  consulting work for Itkin and Sabadash.  Mr. Sabadash has never seen or signed this

21  document.  (Sabadash Decl., ¶ 5-7.)

22         The Minutes are missing the "partnership" seal that misspelled Sabadash in

23  the underlying Gofman contract.  This glaring omission proves that both the Gofman

24  contract and the Minutes are forgeries.  Mr. Itkin did not want to be caught forging

25  yet another document in such an amateur manner.  When Mr. Itkin created the

26  Minutes – after he created the contract – he did not use the seal to make the

27  Minutes appear less obviously fake.

28

1    But the Court need only take a look at the document itself to be able to

2    disregard it.  The "Minutes" are an unreadable page and a half in landscape that

3    purportedly described the business relationship of an entity that generates hundreds

4    of millions from several factories and hundreds of employees.  There is not a single

5    legible word in the document Mr. Itkin rests his entire case on.  (Dkt. 16-1, Itkin

6    Decl., Ex. A.).

7    A much more likely explanation is that Mr. Itkin forged these documents to

8    support his partnership theory and paid Ms. Gofman $21,000 to go along with the

9    fraud.

10    5.    <u>Mr. Itkin failed to tell the court that he represented to the</u>

11    <u>Russian court that the Gofman judgment has been satisfied.</u>

12    After the Ninth Arbitration Court of Appeal denied Mr. Sabadash appeal, he

13    appealed to the next level, the Moscow District Arbitration Court, also called the

14    Cassation Court.  (Zorkin Decl., Ex. 19.)[4]  The Cassation Court listed the parties to

15    the appeal as Claimant (Gofman), Appellant (Sabadash), and Respondent

16    (Partnership, represented by Itkin).[5]  *Id.*

17    While the Cassation Court upheld the appellate court's ruling that Mr.

18    Sabadash lacked standing to appeal, the court found another important ground for

19    dismissing the appeal – *Mr. Itkin represented to the court that the judgment has been*

20    *fully paid making Gofman and Itkin's sworn declarations, proofs of claim, and*

21    *arguments demonstrably false.*

22    In reciting the "partnership's" contentions on appeal, the Cassation Court

23    stated:

24    "In the response to the cassation appeal, the respondent,
represented by managing partner G.Yu. Itkin, stated that

25    _____

26    [4] In her opposition to objection to proof of claim, Ms. Gofman submitted the decision
of the cassation court (Dkt. 62, Gofman Decl., Ex. D) but she did not submit the full
opinion of that Court.

27    [5] The fact that Mr. Itkin opposed the appeal which would reverse a judgment against
28    the "partnership" speaks volumes about his intent.

THE ZORKIN FIRM

> . . . the court decision in this case *has been fully satisfied*
> by the respondent."

Later, in the holding, the Cassation Court explained:

> "Furthermore, as stated by the claimant [Gofman] and
> the respondent's representative [Itkin] at the cassation
> court hearing, the court decision in this case, which has
> entered into legal force, *has been fully satisfied*."

In other words, Mr. Itkin affirmatively represented to the Russian court that the judgment has been paid. Yet here both Mr. Itkin and Gofman submitted sworn declarations contending Gofman is a creditor of the "partnership." Mr. Itkin has transcended bad faith and is blatantly committing perjury.[6]

## II.  **MR. ITKIN, MR. MCCARTHY, AND MR. CASERES SHOULD BE JOINTLY AND SEVERALLY LIABLE FOR ANY AWARD.**

Under § 303(i), fees and damages may be awarded against the petitioning creditors. Mr. Sabadash asks the Court to award fees and damages against Mr. Itkin *only* for several reasons.

*First*, Mr. Itkin was the catalyst behind this petition. The creditors' claims exist solely because Mr. Itkin promised to pay them for legally dubious obligations. Mr. Itkin should be solely responsible for fees incurred in opposing this petition. *In re Maple-Whitworth*, 556 F.3d 742, 746 (9th Cir.) ("[A] bankruptcy court has discretion to hold all or some petitioners jointly or severally liable for costs and fees [and] to apportion liability according to petitioners' relative responsibility or culpability.")[7]

*Second*, six creditors are Russian nationals against whom an award would be worthless. There is little chance a Russian court would enforce a judgment of an American court given the reciprocal sanctions and general deterioration of the

---

[6] The cassation court opinion is in both Mr. Itkin's and Gofman's possession as they were both parties to the case and appeared at the hearing. They chose not to present it to this Court.

[7] No other creditor opposed the motion to dismiss, although Mr. Caseres appeared and argued against dismissal.

relationship between the two nations.  There is also little chance Mr. Sabadash would be able to locate the creditors to collect.

Mr. McCarthy and Mr. Caseres should be jointly and severally liable with Mr. Itkin for their role in the bad faith conduct as described above.  *See In re Cadena*, 634 B.R. at 1056–57 (ordering counsel jointly and severally liable with petitioner for fees, damages, and sanctions.); *In re Fox Island Square P'ship*, 106 B.R. at 971 (same).

Without repeating the above, a reasonable lawyer would have, on proper inquiry, advised her client that the debt is subject to dispute and there are no grounds for an involuntary petition.  Not to mention, as discussed, the creditors' claims were highly questionable.  Finally, counsel admitted in court that the purpose behind this petition was forum-shopping.

It is also highly likely that Mr. Caseres was acting on Mr. Itkin's behalf in this case.  Mr. Caseres should explain how ten creditors, six of whom live in Russia, and are connected only through Mr. Itkin, retained his services.  Mr. Sabadash believes that Mr. Itkin, and not the creditors, provided all information to Mr. Caceres.

In short, Mr. McCarthy and Mr. Caseres shirked their duties and should be held jointly and severally liable with Mr. Itkin.

## III.    THE COURT SHOULD AWARD ATTORNEYS' FEES AND PUNITIVE DAMAGES

### A. Fees for obtaining dismissal of the involuntary petition.

Mr. Sabadash incurred $51,645 in fees for legal work to obtain a dismissal of the petition.  (Zorkin Decl., ¶ 31-37.)  This included research and analysis, factual investigation, drafting the motion to dismiss, reply, and declarations, addressing proofs of claim, hearing attendance, and client communications.  This is calculated as $550 hourly for 93.9 hours of work.  (*Id.*)  The rates and hours are reasonable for this task and the Los Angeles market. *See Zurich Am. Ins. Co. of Illinois*, 2020 WL

1    8610839, at *6 (finding $550 per hour reasonable for the Los Angeles legal market);

2    *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484, at

3    *15 (C.D. Cal. Mar. 24, 2015), *aff'd,* 847 F.3d 657 (9th Cir. 2017) (approving up to

4    $690 per hour for associates and $930 per hour for partners in 2014.)

5    **B. <u>Fees for work incurred on this motion.</u>**

6    Mr. Sabadash incurred $26,840 in fees for work to pursue this motion for fees

7    and sanctions.  (Zorkin Decl., ¶ 31-37.)  This included research and analysis, factual

8    investigation, drafting the motion to dismiss, reviewing Itkin's opposition, drafting

9    reply, and declarations, addressing proofs of claim, hearing attendance, and exhibit

10   review.  This is calculated as $550 hourly for 48.8 hours of work.

11   Mr. Sabadash will also incur fees for analyzing the opposition, drafting the

12   reply, and attending the hearing.  He will submit a declaration for those future fees

13   at the appropriate time.  Mr. Sabadash will also request fees and damages for

14   opposing Mr. Itkin's motion for reconsideration which was filed July 1, 2025.

15   Fees for pursuing fees are recoverable because section 303(i) is a fee shifting

16   provision that encompasses all phases of proceedings.  *In re S. California Sunbelt*

17   *Devs., Inc.*, 608 F.3d 456, 463–64 (9th Cir. 2010).

18   **C. <u>Punitive damages</u>**

19   Because of the egregious conduct by Mr. Itkin and his counsel, an award of

20   punitive damages is appropriate.

21   "Under § 303(i)(2), a court may award actual *or* punitive damages, without

22   limitation; the sole precondition is a showing of bad faith."  *In re S. California*

23   *Sunbelt Devs., Inc.*, 608 F.3d at 465 (emphasis original).  The Ninth Circuit has held

24   that punitive damages may be awarded even in absence of actual damages.  *Id.*

25   That said, the "cost of defense" incurred is a "tangible harm" and the Court may base

26   its punitive damages award on the cost of defense.  *Id.*   Mr. Sabadash asks the court

27   to treble the fees award to calculate punitive damages.

28

## <u>CONCLUSION</u>

This involuntary petition was an egregious attempt at manipulating the court for an improper purpose.  Fees, damages, and sanctions are warranted.


Dated:      July 1, 2025                    THE ZORKIN FIRM


By: /s/ Michael Zorkin
    _____
    Michael Zorkin
    Attorneys for Putative Partner
    Alexander Sabadash