MICHAEL ZORKIN (Bar No. CA 313308)
Email: mz@thezorkinfirm.com
THE ZORKIN FIRM
6320 Canoga Ave., 15th Floor
Woodland Hills, California 91367
Telephone: 323.493.8075

Attorneys for Putative Partner of Alleged Debtor
Alexander Sabadash

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | No. 2:25-bk-11235-NB |
| Itkin & Sabadash, | Hon. Neil W. Bason |
| Debtor, | **DECLARATION OF MICHAEL ZORKIN IN SUPPORT OF PUTATIVE PARTNER ALEXANDER SABADASH'S MOTION FOR FEES AND DAMAGES UNDER 11 U.S.C. § 303(I) AND MOTION FOR SANCTIONS UNDER FRBP 9011** |
| | Hearing Date: August 5, 2025<br>Hearing Time: 11:00 am. |

THE ZORKIN FIRM

DECLARATION OF MICHAEL ZORKIN

# DECLARATION OF MICHAEL ZORKIN

I, Michael Zorkin, declare as follows:

I am an attorney and counsel of record for Alexander Sabadash in this Action as well as the *Itkin v. Sabadash* (Case No. BC647351) action pending in the Los Angeles County Superior Court. If called as a witness, I could and would competently testify to all facts within my personal knowledge.

1.     I was present during the deposition of Garry Y. Itkin taken on March 27-29, 2019, in Case No. BC647351. After the deposition, I received the transcript from the court reporter. The transcript accurately reflects the deposition testimony. Attached as **Exhibit 1** is a true and correct copy of the relevant excerpts from the transcript of the Deposition of Garry Y. Itkin.

2.     In 2018, I obtained the declaration of Alexander Sabadash to oppose Mr. Itkin's Special Motion to Strike. This declaration was filed in Case No. BC647351. A true and correct copy of the Declaration of Alexander Sabadash dated April 19, 2018 is attached as **Exhibit 2.**

**3.**     In 2019, I obtained the declaration of Alexander Sabadash to oppose Mr. Itkin's Motion for Summary Adjudication. This declaration was filed in Case No. BC647351. A true and correct copy of the Declaration of Alexander Sabadash dated December 19, 2019 is attached as **Exhibit 3.**

4.     In 2020, I obtained the declaration of Larisa Sabadash to Oppose Mr. Itkin's Motion for Summary Adjudication. This declaration was filed in Case No. BC647351. A true and correct copy of the Declaration of Larisa Sabadash dated January 9, 2020 is attached as **Exhibit 4.**

5.     A true and correct copy of Mr. Sabadash's Answer to Garry Itkin's Cross-Complaint generally denying all allegations of the Cross-Complaint filed in Case No. BC647351 is attached as **Exhibit 5.**

**6.**     A true and correct copy of the Power of Attorney issued to Garry Itkin

THE ZORKIN FIRM

1  by Mr. and Mrs. Sabadash on May 1, 2000 is attached as **Exhibit 6.**

2      7.      On August 18, 2016, Garry Itkin sent an email to Joseph Corozzo

3  discussing Mr. Sabadash's 100% ownership of all assets and beneficial ownership of

4  the Beverly Hills residence.  The email from Mr. Itkin included as an attachment a

5  chart of assets titled "AS Structure."  A true and correct copy of the August 18, 2016

6  email from Garry Itkin and the AS Structure attachment is attached as **Exhibit 7.**

7      8.      True and correct copies of the Demand and Order to Act documents

8  authenticated by Garry Itkin at his deposition are attached as **Exhibit 8.**

9      9.      I was present during the 2020 trial in Case No. BC647351.  I received

10  the trial transcripts from the court reporter.  A true and correct copy of the relevant

11  excerpt from the March 11, 2020 Trial Transcript is attached as **Exhibit 9.**

12      10.      A true and correct copy of the redacted W-2 issued to Garry Itkin by

13  AFB Trading One, Inc. for years 2008 and 2009 is attached as **Exhibit 10.**  This

14  document was received in discovery in the BC647351 action.

15      11.      A true and correct copy of a "Guaranty" dated October 9, 2012 signed by

16  Garry Itkin for Golden Sphinx Limited is attached as **Exhibit 11**.

17      12.      A true and correct copy of an "Employment Agreement" dated August

18  21, 2025 between Garry Itkin and Golden Sphinx Limited is attached as **Exhibit 12**.

19      13.      Attached as **Exhibits 13 and 14** are true and correct copies of Mr.

20  Iktin's discovery responses in the BC647351 action.

21      14.      Deposition of Jeffrey Ratner was taken on June 11, 2019 in Case No.

22  BC647351.  After the deposition, I received the transcript from the court reporter.

23  The transcript accurately reflects the deposition testimony.  Attached as **Exhibit 15**

24  is a true and correct copy of the relevant excerpts from the transcript of the

25  Deposition of Jeffrey Ratner.

26      15.      In preparation for trial in the BC647351 action, I caused the Gofman

27  Information Services Contract to be translated from Russian to English.  Attached

28

THE ZORKIN FIRM

3

as **Exhibit 16** is a true and correct copy of Gofman Information Services Contract along with a certified translation.  I speak fluent Russian and confirmed that the translation is correct.

16.    Attached as **Exhibit 17** is a true and correct copy of the ruling of the Russian Appeal Court on Mr. Sabadash's appeal in the Gofman lawsuit along with a certified translation.  I speak fluent Russian and confirmed that the translation is correct.

**17.**    In the BC647351 Action, I obtained via subpoena bank records for Mr. Itkin's personal bank account at East West Bank.  These bank records show Mr. Itkin's payments to Ms. Gofman.  A true and correct copy of the relevant excerpts of bank records, including the custodian of record's declaration, is attached as **Exhibit 18.**

18.    I am fluent in Russian.  From my professional experience, I am aware that Russian courts maintain an official database of judicial decisions at kad.arbitr.ru.  This database is similar a docket search on PACER.  It is publicly available.  I accessed the database and searched for case No. A40-165165/2018 (Gofman v. Itkin & Sabadash).  The direct link to the docket for this case is https://kad.arbitr.ru/Card/93e50ff5-fb53-49ee-9f54-daadbd093a3a.

19.    The docket included each judicial opinion and judgment from the trial court through the appellate courts culminating with the Russian Supreme Court's refusal to hear the case.  The Information Summary does not appear on the docket.

20.    I accessed the Nov. 13, 2019 opinion of the Arbitration Court of the Moscow District (cassation court) from the docket.  I caused the opinion to be translated into English.  A true and correct copy of the Nov. 13, 2019 opinion and certified translation is attached as **Exhibit 19.**

21.    I attended hearings on Mr. Sabadash's motion to dismiss on April 22, 2025 and June 3, 2025.  I thereafter purchased transcripts of both hearings.  I

1    reviewed the transcripts and they accurately reflect the arguments made at the

2    hearing.  True and correct copies of transcripts of the April 22, 2025 and June 3,

3    2025 hearings in this court are attached as **Exhibits 20 and 21**.

4        22.    I provided U.S. support in representation of defendants in the Russian

5    arbitration titled *Davilla Investing Limited v. Golden Spirits Limited, AFB Trading*

6    *One, Inc., and Golden Sphinx Limited* ("Davilla Arbitration").  I received a letter

7    from the arbitrator, Mr. Knyazev, informing me that a private arbitration hearing

8    was set for August 25, 2021.  I, in conjunction with Russian counsel, sent Mr.

9    Knyazev three formal objections.  The first contested the jurisdiction of the

10    arbitrator to hear the dispute because defendants were not parties to any arbitration

11    agreement.  The second objected on the ground that defendants have not received

12    any documents substantiating Plaintiff's claims and questioned the validity of any

13    such documents.  The third raised a defense based on the statute of limitations as

14    the alleged debts arose in 2010.

15        23.    On August 25, 2021, I was on the phone with Russian attorneys at 2

16    a.m. (noon Moscow time) ready to log on to Skype to attend this supposed

17    arbitration.  The Russian attorneys went to the address listed by the arbitrator

18    while in contact with me by phone.  The attorneys knocked on the door of the office

19    designated by the arbitrator, but no one answered the door.

20        24.    Then, about ten minutes after the hearing was scheduled to start, the

21    arbitrator emailed me attaching a decision dismissing the case based on Defendants'

22    objections.  The arbitrator found that he lacks jurisdiction to hear the case based on

23    objections submitted by defendants. The email used by the arbitrator was

24    ag99@list.ru.

25        25.    The arbitrator copied Mr. Itkin and plaintiff's counsel on this email.  A

26    true and correct copy of the decision sent to me by the arbitrator and a certified

27    translation is attached as **Exhibit 22**.  A true and correct copy of the email is

28

attached as **Exhibit 23**.

26.    A true and correct copy of Claim 11 filed by Mr. Caceres is attached as **Exhibit 24**.

27.    I am counsel of record in the BC647351 action between Itkin and Sabadash in the Superior Court of California.  In 2019, Mr. Itkin filed a motion for summary adjudication arguing that Mr. Sabadash is precluded from arguing that the partnership does not exist based on the Gofman judgments.  Mr. Sabadash opposed the motion.  A true and correct copy of Itkin's motion is attached as **Exhibit 25**.

28.    The Court denied the motion finding that "collateral estoppel issues are in dispute regarding the prior actions filed by Elena Gofman."  A true and correct copy of the order denying Itkin's motion is attached as **Exhibit 26**.

29.    I caused subpoenas to be served on Jeffrey Ratner and Progressive Management, Inc. in the California state law case BC647351.  The subpoenaing party was plaintiff AFB Trading One, Inc.  a corporation wholly owned by Mr. Sabadash.  No plaintiff in that case agreed to pay Jeffrey Ratner or Progressive Management any money or attorneys' fees for appearance at the deposition outside of the statutory witness fees.

30.    In the course of discovery in the BC647351 action, Mr. Ratner and Progressive Management produced all documents in their possession related to Mr. Sabadash.  In that production, there was not a single invoice addressed to a partnership, showing that the invoice attached to the proof of claim was created specifically for this proceeding and is not proof of genuine debt.

31.    I have practiced law for nine years.  I earned my J.D. from UCLA School of Law and I have practiced extensively in the areas of civil litigation with an emphasis on business disputes and healthcare litigation.  I am a former associate at Manatt, Phelps & Phillips, LLP, which is a national firm.

THE ZORKIN FIRM

32.     I have handled numerous cases before the federal district courts of California, including the U.S. Bankruptcy Court, and other courts throughout the state

33.     My current hourly billing rate is $550 per hour.  This rate is consistent with or below market rates for attorneys with comparable experience in the Los Angeles area.  Based on my education, years of experience, and the nature and complexity of this case, I believe this rate is reasonable and customary.

34.     In connection with defending against this involuntary petition, I spent a total of 93.9 hours on research and analysis, factual investigation, drafting the motion to dismiss, reviewing Itkin's opposition, drafting reply, and declarations, addressing proofs of claim, hearing attendance, and exhibit review.  The total attorney's fees sought for obtaining dismissal of the petition is $51,645.

35.     In connection with this motion for sanctions, I spent a total of 48.8 hours on research and analysis, factual investigation, drafting the motion, and declarations.  I anticipate spending additional time on reply and hearing attendance. The total attorney's fees sought for this motion for sanctions is $26,840.

36.     I also spent $220 on document translation and $114.61 on hearing transcripts order.

37.     A detailed billing summary is attached as **Exhibit 27**.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and accurate.  Executed: July 1, 2025.


By: /s/ Michael Zorkin
Michael Zorkin

DECLARATION OF MICHAEL ZORKIN

THE ZORKIN FIRM

# Exhibit 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
2               FOR THE COUNTY OF LOS ANGELES
3
4    AFB TRADING ONE, INC., A
     CALIFORNIA CORPORATION;
5    M-BJEP LIMITED, AN ISLE OF
     MAN CORPORATION; M-NICE
6    LIMITED, AN ISLE OF MAN      No. BC647351
     CORPORATION; GOLDEN SPHINX
7    LIMITED, A JERSEY
     CORPORATION; NEW ALBION
8    PROPERTY LIMITED, AN ENGLAND
     CORPORATION,
9              Plaintiffs,
10
         vs.
11
     GARRY Y. ITKIN, AN
12   INDIVIDUAL; THE LIGHTHOUSE
     PARTNERSHIP LIMITED, AN
13   ENGLAND CORPORATION; AND DOES
     1 THROUGH 100, INCLUSIVE,
14             Defendants.
15   _____
16
                    ** CONFIDENTIAL **
17
18       VIDEOTAPED DEPOSITION OF GARRY ITKIN
19              Los Angeles, California
20             Wednesday, March 27, 2019
21                     Volume I
22
23   Reported by:
     MARIA ELLERSICK
24   CSR No. 10531
     Job No. 3260077
25   PAGES 1 - 277

                                          Page 1

1 Ratner why a 1065 and a K-1 wasn't filed?

2    A   For what entity?

3    Q   For Alexander Sabadash personally.

4    A   A 1065 is filed for partnership, not for

5 individual.  For individual, you file Form 1040.    11:11:25

6    Q   So has --

7    A   I'm not understanding your question,

8 Michael.

9    Q   The question is -- you just testified that

10 a partnership has to report flow-through taxes?    11:11:36

11    A   Correct.

12    Q   And then the partners pay the taxes;

13 correct?

14    A   Correct.

15    Q   All right.  So has a 1065 or a K-1 or any    11:11:42

16 other tax form indicating a partnership ever been

17 filed on behalf of Alexander Sabadash?

18    A   On behalf of partnership?  Are you asking

19 on behalf of my partnership with Alexander Sabadash?

20    Q   Yes.    11:12:05

21    A   The answer is no.

22    Q   You being an accountant and Mr. Ratner

23 being an accountant, have you ever discussed that

24 maybe that's something that should be done?

25    A   My agreement with Alexander from the very    11:12:12

Page 50

1 beginning is that I'm coming in as partner to an

2 existing structure that he has, and I'm becoming a

3 partner in that existing structure.  So I was

4 reporting an income that I was receiving, and I was

5 a silent part of an existing structure.  Does that    11:12:36

6 answer the question?

7    Q   So you were a silent partner?  Is that what

8 you said?

9    A   I was a silent partner.  I was minority

10 partner.  Minority partners are always silent.    11:12:45

11    Q   Did you have any concerns that you're not

12 accurately reporting income tax to the IRS?

13    A   No.  I always accurately report income.

14    Q   Did you have any concerns that you are not

15 accurately reporting Alexander's income taxes to the    11:13:04

16 IRS?

17    A   I was reporting to Mr. Ratner exact numbers

18 that Alexander wanted me to report to him.

19 Therefore, taxes were filed properly.  And if

20 anybody did not report correctly, it was Alexander.    11:13:24

21    Q   Now, how many -- have you ever -- you've

22 communicated with Mr. Ratner by E-mail, I imagine?

23    A   And by phone.

24    Q   Okay.  And have you ever communicated with

25 Victoria Lerman via E-mail?    11:13:48

Page 51

1    A   Yes.

2    Q   Can you tell me what Bids.com is?

3    A   Internet sales.

4    Q   What is your role with Bids.com?

5    A   What period of time are you referring to?    11:14:22

6    Q   From the founding of Bids.com.

7    A   I was an investor, and I was member of

8 board of directors.  At one point in time, I was the

9 CFO.

10    Q   Okay.    11:14:34

11    A   It was a publically traded company.

12    Q   Okay.  When you say you were an investor,

13 can you elaborate on that?  Did you have an

14 ownership interest?

15    A   Yes.    11:14:48

16    Q   What kind of ownership interest did you

17 have in Bids.com?

18        MR. ATABEK:  Are you asking for the

19 specific number of shares that he held in Bids.com?

20 BY MR. ZORKIN:    11:14:57

21    Q   What kind of ownership interest did you

22 have in Bids.com?

23    A   I was a shareholder.

24    Q   What was your percentage of the shares?

25        MR. ATABEK:  I'm going to object on the    11:15:05

Page 52

1 grounds of undue invasion of privacy under the

2 California Constitution.  You guys are not entitled

3 to do discovery into his overall assets.  It's not

4 relevant to this action.  I will instruct him not to

5 answer.    11:15:18

6        MR. ZORKIN:  Could you repeat the question,

7 please.

8        (Record read.)

9        THE WITNESS:  I will adhere to Counsel's

10 advice.    11:15:27

11        MR. ATABEK:  But I'd be happy to meet and

12 confer if you have an explanation for why it's not

13 an inappropriate question.

14 BY MR. ZORKIN:

15    Q   Was Bids.com part of your purported oral    11:15:34

16 partnership with Alexander?

17    A   No.

18    Q   Has Alexander invested any money in

19 Bids.com at any time?

20    A   No.    11:15:46

21    Q   Did Alexander ever provide any type of

22 financial support for Bids.com?

23    A   No.

24    Q   Since '98, '99 when you moved to Russia,

25 have you held an ownership interest in any other    11:16:09

Page 53

14 (Pages 50 - 53)

1  Q  So any money that would come --
2  A  I'm -- I'm sorry.  Repeat the question.  I
3  want to make sure I understand.
4      (Record read.)
5      MR. ATABEK:  I'll object on grounds of    11:41:36
6  vagueness as to the term "invest," but go ahead.
7      THE WITNESS:  I've -- the monies that I've
8  received in these companies were my draws.  And if I
9  chose to invest them, I have.
10  BY MR. ZORKIN:                              11:41:49
11  Q  Okay.
12  A  They were my money.
13  Q  Okay.  Okay.  So besides Alexander
14  Sabadash, LLC, Itkin Financial Corporation, Itkin
15  Financial Partnership, Famous Brands Distribution,   11:42:14
16  Garry Itkin, J.D., Altina Marketing, and Tax
17  Network, Inc., are there any other California
18  corporations or LLCs that you have had an ownership
19  interest in at any time?
20      MR. ATABEK:  Rifkind objection.          11:42:31
21  Inappropriate list.
22  Go ahead.
23      THE WITNESS:  Besides the ones that we
24  talked about, I don't recall.  I don't think so, but
25  I don't recall for sure.                     11:42:46

Page 74

1  BY MR. ZORKIN:
2  Q  So you -- it's possible that you had a
3  corporation and you forgot about it?
4  A  It's possible.  You asked me in the
5  beginning to name the corporations.  I wasn't able   11:42:55
6  to name half of them that you did.  So you know them
7  better.
8  Q  Well, I think you know them better.
9  A  No, I don't.  I'm telling you what I
10  remember and what I know.                     11:43:07
11  Q  That's fine.
12  A  I'm under oath.
13  Q  That's true.  Okay.  Have you ever opened
14  bank accounts for any company related to Alexander?
15      MR. ATABEK:  Objection to the term        11:43:24
16  "related."  Vague and ambiguous.
17  Go ahead.
18      THE WITNESS:  Company related to Alexander?
19  What do you mean?
20  BY MR. ZORKIN:                               11:43:34
21  Q  Companies that Alexander was involved in as
22  opposed to, say, Garry Itkin, J.D.
23  A  We -- Alexander and I had tons of bank
24  accounts.  We've had --
25      MR. ATABEK:  He's asking did you          11:43:48

Page 75

1  specifically open it.
2      THE WITNESS:  I was -- I was part of
3  opening a lot of them, yes.
4  BY MR. ZORKIN:
5  Q  Okay.  So you've opened a lot of bank       11:43:55
6  accounts for companies that are related to
7  Alexander?
8  A  Companies that are part of our partnership,
9  yes.
10  Q  Can you estimate how many bank accounts did  11:44:03
11  you open?
12  A  I can't.
13  Q  Was it more than 100?
14  A  No, no.  Less than 100.
15  Q  More than 50?                              11:44:19
16  A  I think less than 50.  You're asking me to
17  guess.  I'm guessing at this point in time.
18  Mr. Stampfli would know better.
19  Q  Just so we're clear, I'm asking about what
20  you personally did, you know, the accounts you      11:44:31
21  personally opened.  So you don't recall how many
22  accounts you personally opened?
23  A  I don't recall how many accounts I
24  personally opened.
25  Q  Okay.  So you mentioned that your alleged   11:44:48

Page 76

1  partnership with Alexander had many bank accounts?
2  A  Yes.
3  Q  Were you an authorized signatory on every
4  bank account?
5  A  Except for Russian bank accounts, yes.      11:44:59
6  Q  Okay.  When you opened bank accounts on
7  behalf of the alleged partnership or any company
8  related to Alexander, the banks asked you to provide
9  certain information; is that correct?
10  A  Correct.                                    11:45:36
11  Q  Okay.  And is it important to be truthful
12  and honest when providing information to the banks?
13  A  Yes.
14  Q  Were you always honest when you provided
15  information to the banks when opening bank accounts  11:45:47
16  on behalf of the alleged partnership?
17  A  If you're asking me why on all the bank
18  accounts Alexander is listed as beneficiary -- is
19  that the question you're asking me?
20  Q  I'm asking you if you ever provided false   11:46:03
21  information to the banks when you opened bank
22  accounts?
23  A  As it relates to our partnership -- look,
24  again, it's important to emphasize that Alex and I
25  agreed that I'm becoming a partner in existing       11:46:28

Page 77

1 structure and that I'm not to change what's in a
2 structure. Therefore, the bank accounts that were
3 opened by a structure were always opened with
4 Alexander's name as beneficiary on the account.
5 That was agreed.                              11:46:47
6      Q  So you were a secret partner?  No one knew
7 about the fact that you were a partner?
8      A  No.
9         MR. ATABEK:  Objection.  Misstates, and
10 argumentative.                               11:46:55
11        THE WITNESS:  The answer is no.
12 BY MR. ZORKIN:
13      Q  But the banks where you opened bank
14 accounts on behalf of the alleged partnership, they
15 weren't aware that you were a partner?       11:47:03
16      A  Correct.
17      Q  So is it your testimony that you listed
18 Alexander as the beneficial owner, but it wasn't
19 true that he was the beneficial owner?
20      A  He was a beneficial owner of record.  11:47:19
21      Q  Are you familiar with "know your customer"
22 laws?
23      A  No.
24      Q  Okay.  Have you ever responded to due
25 diligence from a bank related to companies related  11:47:39

Page 78

1 to Alexander?
2      A  Possibly.
3      Q  Okay.  And you always answered honestly?
4      A  Within the realm of my agreement with
5 Alexander.                                    11:47:54
6      Q  So you agree that every bank account you
7 opened involving Alexander, you listed Alexander
8 Sabadash as the beneficial owner?
9      A  Yes.
10      Q  Are you familiar with an entity called  11:48:29
11 "Liviz"?
12      A  Yes.
13      Q  Can you tell me what Liviz is?
14      A  There are a number of entities called
15 Liviz.  I don't know which one you are referring to.  11:49:04
16      Q  There is a -- there are -- how many -- how
17 many -- Liviz is a Russian company?
18      A  Yes.
19      Q  How many companies called "Liviz" are
20 there?                                        11:49:14
21      A  Three that I recall.
22      Q  Okay.  Are there any one of those that you
23 would consider to be the main company?
24      A  No.  Each company owned a production plant.
25      Q  Okay.  What was your role with all three of  11:49:32

Page 79

1 these companies?
2      A  At a different point in time, I was
3 managing the company, as I was managing most of
4 them, and securing the companies through the legal
5 efforts, making sure that it's not taken over or you  11:49:57
6 know, defended lawsuits, et cetera.
7      Q  This is all in Russia?
8      A  Yes.
9      Q  Okay.
10      A  There was another company called "Liviz."  11:50:11
11 It was a Swiss company, I believe.
12      Q  Okay.  Did any of the Russian Liviz
13 entities own a company called Milan Limited?
14      A  No.
15      Q  You were involved in a lawsuit that     11:50:25
16 Milan Limited filed against Odilo Real Estate in
17 California in 2011; right?
18      A  Yes.
19      Q  Okay.  Odilo Real Estate, are you familiar
20 with this company?                            11:50:49
21      A  Yes.
22      Q  Is Odilo Real Estate and AFB Trading One
23 the same company?
24      A  Yes.
25         MR. ZORKIN:  Would you like to take a    11:51:17

Page 80

1 break?
2         MR. ATABEK:  No.  Just for the record, I
3 was hand signaling to Mr. Zorkin that I'm getting
4 somewhat hungry, and we've been going for almost two
5 hours.  At some point, we should probably consider  11:51:27
6 taking lunch.  I'm not saying we do it yet, but --
7         MR. ZORKIN:  It's fine.
8         MR. ATABEK:  It's a long drive from
9 Orange county.
10         MR. ZORKIN:  It's fine if you want to take  11:51:38
11 lunch.
12         MR. ATABEK:  This will actually tie me
13 over.  This will probably give me another
14 30 minutes.
15         MR. ZORKIN:  Did you want to go off the  11:51:46
16 record for a second?
17         MR. ATABEK:  No, no, no.  I'm actually
18 fine.  I was just putting in your mind in case, you
19 know, at some point you guys were going to find a
20 natural break.  It seems like you were starting on a  11:51:55
21 new subject.
22         MR. ZORKIN:  Let's take a break now.
23         MR. ATABEK:  Okay.
24         MR. ZORKIN:  Off the record.
25         MR. ATABEK:  Off the record.      11:52:04

Page 81

21 (Pages 78 - 81)

Page 90

1 Milan prior to 2011?
2    A  I was -- I participated in the transaction
3 where Milan was owed money from AFB, and Milan was
4 trying to collect, and there were a lot of
5 correspondence in that regards.        12:44:11
6    Q  Is that it?
7    A  Yeah.  You asked me what my involvement
8 with --
9    Q  Yeah, just besides -- so I understand.
10 We'll talk about the debt from AFB to Milan and the   12:44:27
11 lawsuit in a minute.  I'm asking outside of that,
12 did you have any business dealings with Milan as an
13 entity?
14    A  No, no, no, no.  Outside of this, not at
15 all.                    12:44:37
16    Q  What about after the lawsuit, how were
17 you -- what was your interaction with Milan?
18    A  I did not have any interaction with Milan
19 after the lawsuit.  However, Milan has -- or
20 Mr. Chernoval or you know, Milan, they have become   12:44:54
21 one of the companies that Mr. Sabadash was
22 affiliated with or directed.
23    Q  Can you explain what you mean by that?
24    A  Well, the second sentence that Mr. Sabadash
25 has received was involved funneling money through   12:45:13

Page 91

1 Milan, and that was the monies that Mr. Sabadash was
2 borrowing from bank.
3    Q  Okay.
4    A  So it was -- the entire conviction that he
5 received, to my knowledge, was based upon him   12:45:31
6 channeling loans from Bank Tavrichesky to Milan --
7 from Bank Tavrichesky, T-a-v-r-i-c-h- --
8 something -- e-v.  Tavrichesky to Milan, and then
9 further on.
10    Q  Okay.  So at some point, Alexander became   12:45:53
11 involved with Milan.  Did you have any knowledge of
12 Alexander becoming involved with Milan?
13    A  I don't recall right now.
14    Q  Could you do anything to refresh your
15 memory on that point?        12:46:11
16    A  Right now, I can't, but -- well, again, I
17 believe that I recall that Mr. Sabadash was involved
18 with Milan.
19    Q  This was independent of the alleged
20 partnership with you?        12:46:30
21    A  It was independent of me, yes.
22    Q  Was it independent of the alleged
23 partnership with you?
24    A  Yes.
25    Q  So --            12:46:42

Page 92

1    A  Well, I'm not really understanding the
2 question.  What do you mean by "independent"?
3    Q  Sure.  So were any of the alleged
4 partnership entities involved with this -- what you
5 call funneling of money through Milan?        12:46:55
6       MR. ATABEK:  I'm going to -- I know we've
7 been all over a lot of stuff relating to some pretty
8 sensitive matters regarding some of the companies.
9 How would you feel about just generally designating
10 this volume of the transcript "confidential" under   12:47:11
11 the protective?
12       MR. ZORKIN:  Which volume?
13       MR. ATABEK:  I mean, so far today's volume.
14       MR. ZORKIN:  I don't think there's any need
15 for that.  If you want to look at the transcript and   12:47:20
16 identify some specific confidential part.  I don't
17 see how any of this is confidential.
18       MR. ATABEK:  Well, to the extant that
19 you're talking about, you know, something that's
20 resulted in the conviction of your client and   12:47:33
21 transfer of money as it potentially relates to the
22 partnership, I think it's pretty obvious where, I
23 mean, I'm going with this in terms of why it's
24 potentially sensitive and confidential.  So I'm
25 going to go ahead and designate this portion of the   12:47:50

Page 93

1 transcript confidential from here, and then I'll go
2 ahead and de-designate once you get done asking this
3 line of questioning.
4       MR. ZORKIN:  Okay.  Well, it's -- we object
5 to the designation.  We don't agree to designate   12:48:00
6 confidential any portion of the transcript so far.
7       Could you read back the last question,
8 please.
9       (Record read.)
10       THE WITNESS:  My understanding, again, from   12:48:26
11 seeing documents from trial is that monies were
12 coming from the Bank Tavrichesky to Milan, then to
13 some other entity completely unrelated to
14 partnership, and then they ended up in
15 Golden Sphinx' account.        12:48:53
16 BY MR. ZORKIN:
17    Q  And Golden Sphinx is part of the alleged
18 partnership?
19    A  Correct.
20    Q  And you were managing the entire        12:48:58
21 partnership; is that correct?
22    A  No.  I was not managing Russian flow.  I
23 mentioned that before, number one.  Number two, I --
24 the monies that were coming in, to me, they were
25 monies that were coming from profits and -- from the   12:49:18

1 profits of the partnership. I have no clue where
2 they're coming from. It was a completely separate
3 person that was dealing with that, with the Russian
4 flow of funds.
5    Q    And who was that?          12:49:40
6    A    Kirill Arsentiev.
7         MR. ATABEK: Do you need a spelling?
8         THE REPORTER: I'm just going to ask for
9 all of them at the end. I have a list. Thank you,
10 though.                          12:49:45
11        MR. ATABEK: I figured it's probably going
12 to happen often in this case. That makes sense.
13 BY MR. ZORKIN:
14    Q    Is it fair to say that -- strike that.
15        You mentioned that you weren't involved    12:50:10
16 with money coming from Russia?
17    A    I was not involved with --
18        MR. ATABEK: Objection. Misstates, but go
19 ahead.
20        THE WITNESS: What I said is I said I was    12:50:21
21 not involved with money flows in Russia.
22 BY MR. ZORKIN:
23    Q    What do you mean by "money flows in
24 Russia"? I'm sorry.
25    A    Well, there were a number of partnership    12:50:33

1 entities in Russia, and there were -- there were
2 incoming funds and there were expenditures and
3 et cetera's. All that was done by Kirill Arsentiev.
4 What I saw is the end, the monies on Golden Sphinx,
5 Golden Spirits; in other words, accounts that were    12:50:55
6 over the border.
7    Q    Okay.
8    A    How they were generated and received there,
9 I didn't know.
10    Q    Okay. So at some point, Vadim Chernoval    12:51:07
11 became head of security at Liviz?
12    A    Yes.
13    Q    While at the same time being a director of
14 Milan?
15    A    Yes.                     12:51:23
16    Q    Did you find it odd that a person who just
17 sued AFB started working for you and Mr. Sabadash?
18    A    Not at all.
19    Q    No. Why not?
20    A    We had number of employees that -- who were    12:51:37
21 one way or the other burned before.
22    Q    I don't understand what that means.
23    A    We had a top manager at -- not top manager.
24 Sorry. A guy who was doing a lot of construction
25 and building work at Vyborg was -- lost a lot of    12:52:06

1 time -- a lot of money with Vyborg before,
2 tremendous amount, and basically, lost and came to
3 Vyborg and said can I provide some services. I need
4 some money to live. So it's not a unique situation,
5 and he's not the only one. That's a guy that came    12:52:29
6 to mind, but there were others.
7    Q    So there were other employees of
8 Mr. Sabadash that have sued his companies, and then
9 went on to work at his companies?
10    A    I'm not sure if this gentleman sued, but he    12:52:44
11 did lose a tremendous amount of money working with
12 our entities.
13    Q    Okay. In your discovery responses, you
14 identified Mr. Chernoval as a potential witness. Do
15 you recall that?                  12:53:07
16    A    Yes.
17    Q    What would Mr. Chernoval be a witness to,
18 in your opinion?
19    A    There are a number of documents --
20        MR. ATABEK: First -- go ahead. Never    12:53:23
21 mind.
22        THE WITNESS: There are a number of
23 documents that went into criminal investigation of
24 Mr. Sabadash on the second trial. Mr. Chernoval,
25 along with a number of others, were interrogated.    12:53:54

1 During their interrogation, Mr. Chernoval,
2 Mrs. Grekova, Mrs. Voit, Mr. Arsentiev gave
3 testimonies that knew me as Alex's partner. So
4 that was the reason why I thought that his testimony
5 would be important.               12:54:24
6 BY MR. ZORKIN:
7    Q    Okay. Is that -- what you just mentioned,
8 is that all that Mr. Chernoval you think would know
9 about this lawsuit?
10    A    What lawsuit? Are you talking about --    12:54:32
11    Q    This current lawsuit.
12    A    Current lawsuit, yes, yes.
13    Q    Okay. All right. Just to be clear, you
14 said that you read the trial testimony of
15 Mr. Sabadash's trial?            12:54:48
16    A    I have.
17    Q    And that's the extent of your knowledge
18 about what happened at the trial, by reading it?
19    A    I've read it when the testimony was given.
20 At the time, it was provided to me by one of the    12:54:56
21 lawyers of Alex because I was actively involved in
22 his defense. After I've left Russia, I was cut off
23 from most of the information, and I stopped
24 receiving it.
25    Q    How did Milan find Mr. Baranov?    12:55:16

1 and legal departments of his vodka factories in

2 exchange --

3      A   No.  You've --

4      Q   I thought that those were your exact words,

5 to manage the legal department.          01:53:45

6      A   No, no.

7      Q   Tell me.  Explain, please.

8      A   Again, I've just said it.  The agreement

9 was that I come to Russia, and my understanding was

10 that I'll be managing businesses with forte in legal  01:53:55

11 and accounting -- accounting and legal, I guess.

12      Q   Okay.  So the agreement was that you come

13 to Russia.  You manage various businesses.

14      A   Yes.

15      Q   In exchange, you receive $300,000 a month?   01:54:13

16      A   In exchange, I become a partner with a

17 guaranteed draw of $300,000 a month anywhere from

18 six months to a year after I move.

19      Q   Okay.  Can you tell me what your

20 understanding of the word "partner" is?         01:54:27

21      A   Partner?

22      Q   Yes.

23      A   It's like marriage.

24      Q   Well, Alexander asked you to marry him?

25      A   Partnership is marriage.  That's my         01:54:39

Page 142

1 understanding.

2      Q   Well, listen, all jokes aside, I'm asking

3 you a serious question.

4      A   I don't know how to answer this question.

5      Q   In your mind -- you know, you speak fluent  01:54:48

6 English.  You're educated.  What does the word

7 "partner" mean to you in your mind?

8      MR. ATABEK:  Object to the form of the

9 question.

10      Go ahead.                      01:54:59

11      THE WITNESS:  I have difficulties answering

12 this question.  I don't -- you know, "partner" means

13 that we're working together with one goal in mind.

14 We're sharing in profits.  We're sharing in equity

15 in businesses.  We take care of each other as much  01:55:13

16 as we can.  We're -- you know, we're -- as I said,

17 it's like marriage.

18 BY MR. ZORKIN:

19      Q   Well, that's a completely different answer

20 from I don't know what that means.  Thank you for  01:55:28

21 that answer.  Okay.

22      MR. ATABEK:  If this is a natural break,

23 we've been going for --

24      THE WITNESS:  Yeah, I was going to ask

25 for --                              01:55:39

Page 143

1      MR. ZORKIN:  Sure.  5 minutes?

2      THE WITNESS:  -- restroom break.

3      MR. ZORKIN:  5 minutes?

4      THE WITNESS:  Yeah.

5      MR. ZORKIN:  Off the record.          01:55:42

6      THE VIDEOGRAPHER:  Off the record at 1:55.

7      (Recess.)

8      THE VIDEOGRAPHER:  Okay.  On the record at

9 2:21.

10 BY MR. ZORKIN:                      02:21:20

11      Q   So what I'm trying to do right now is to

12 understand the specific terms of the agreement you

13 had -- you made with Alexander when you moved to

14 Russia.  And so what I understand it to be is he

15 offered you to become his partner, and the terms of   02:21:42

16 that was that you would manage different businesses

17 in return for $300,000 a month; is that accurate?

18      MR. ATABEK:  Objection.  Misstates.

19      THE WITNESS:  Partial.

20 BY MR. ZORKIN:                      02:21:56

21      Q   Okay.  Which part is not accurate?

22      A   Equity.

23      Q   Okay.  So --

24      A   That I would become one-third partner with

25 him, manage the businesses.  My guaranteed draw     02:22:01

Page 144

1 would be third of a million, about 300,000 a month.

2 I don't think that number was ever specific, like it

3 was 333-.  It was about $300,000 a month, about a

4 third of a million, so.

5      Q   I'm sorry.  So he -- so Alexander said that   02:22:24

6 you will -- you will be paid a third of a million

7 per month?  Were those the exact terms?

8      MR. ATABEK:  Objection to the extent it

9 calls for legal conclusion, but go ahead.

10      THE WITNESS:  He said that I will be his     02:22:39

11 one-third partner.  And since he at that point in

12 time is making about a million, I will be making

13 about a third of a million a month.  And I've --

14 again, we've talked about it numerously because this

15 was one of my biggest concerns, that I will go to     02:22:59

16 Russia and I will lose my practice because as you

17 understand, any kind of professional business is

18 what you do with your own hands or your own head, I

19 mean.  And if you're not there, you know, you lose

20 your practice.  So I was very much concerned and     02:23:18

21 very much afraid to lose what I have and gain

22 nothing.  So this is something that we discussed

23 numerously over the -- over the period of like

24 couple years.

25 BY MR. ZORKIN:                      02:23:33

Page 145

37 (Pages 142 - 145)

| | |
|---|---|
| 1   Q  So 300,000 a month is what you were | 1   from six months to a year, he said, you know, you'll |
| 2   comfortable with at the end -- | 2   start making this money. |
| 3   A  Yes. | 3   Q  Okay.  And what was the agreement before |
| 4   Q  -- to say yes? | 4   the third of half -- third of a million dollars? |
| 5   A  Yes.                     02:23:43 | 5   What was the budget that you're talking about that   02:26:11 |
| 6   Q  So what were the discussions prior to that | 6   you told him? |
| 7   $300,000 offer?  Did he -- did Alex offer you less | 7   A  I think it was around 50 grand a month, |
| 8   money initially? | 8   approximately, 40- to 50-, something of that sort. |
| 9   A  No, no, no.  It was -- he wasn't -- he | 9   And again, it was -- the agreement was take what you |
| 10   wasn't guaranteeing the money.  That was the issue.   02:23:55 | 10   need.  Take what you need.  Don't take more, but   02:26:24 |
| 11   He was -- he was willing to take me as partner.  He | 11   take what you need. |
| 12   offered one third.  It wasn't my offer.  He offered | 12   Q  And in response to that, you said I need |
| 13   one third.  He basically said that you'll have to -- | 13   about 50,000 a month? |
| 14   you know, that your contribution being to work | 14   A  Yeah, I said approximately 50-. |
| 15   and to manage and to work in businesses, and you   02:24:13 | 15   Q  Okay.  And at some point, you started   02:26:37 |
| 16   will be one-third partner. | 16   receiving the $50,000 a month? |
| 17      My concern was one-third partner of nothing | 17   A  Yes. |
| 18   is nothing.  So how do I know that I am not going to | 18   Q  And when was that? |
| 19   be losing my business here and leaving my family | 19   A  I think practically right away. |
| 20   with nothing while being in Russia.  I need to be   02:24:31 | 20   Q  As soon as you moved to Russia, you started  02:26:45 |
| 21   guaranteed some amount so that I'm safe and I | 21   receiving -- |
| 22   understand that my family is going to be okay.  And | 22   A  Yeah, I think -- yeah, I think practically, |
| 23   in the end, that was his offer, that I will | 23   anyway. |
| 24   guarantee you that you will -- you know, you'll make | 24   Q  I'm sorry.  As soon as you moved to Russia, |
| 25   at least that.                02:24:49 | 25   you started receiving $50,000 a month?   02:26:49 |
| Page 146 | Page 148 |

| | |
|---|---|
| 1   Q  At least what? | 1   A  Yes. |
| 2   A  At least one-third of a million a month, so | 2   Q  Okay.  So your understanding is that you |
| 3   300-and-something, 333-. | 3   obtained an ownership interest in Alexander's |
| 4   Q  Alexander also said you wouldn't make that | 4   companies? |
| 5   300,000 -- a third of one million a month right   02:25:02 | 5   A  Sweat equity.                02:27:03 |
| 6   away? | 6   Q  Okay.  And it was a third? |
| 7   A  That's correct. | 7   A  Yes. |
| 8   Q  And what would have to happen for you to | 8   Q  So your understanding is that your |
| 9   start earning a -- | 9   ownership interest in Alex's companies was a third? |
| 10   A  He --                   02:25:08 | 10   A  Yes.                     02:27:18 |
| 11   Q  I'm sorry. | 11   Q  Okay.  So did you and Alex discuss what |
| 12   A  Go ahead.  Go ahead.  I'm sorry. | 12   happens going forward once the value of the |
| 13   Q  What would have to happen for you to start | 13   businesses change? |
| 14   earning a third of a million a month in Alexander's | 14   A  No.  We started being partners.  So from |
| 15   words?                     02:25:17 | 15   thereon, whatever we do was together.       02:27:36 |
| 16   A  He did not state specifically what had to | 16   Q  Okay.  So going forward, your agreement was |
| 17   happen.  He was talking about a period of time.  So | 17   that you and Alexander will split the equity or the |
| 18   his words was don't expect to start earning this | 18   profits? |
| 19   from the day one.  It will take you a little time, | 19   A  No.  We agreed that whatever -- you know, |
| 20   and my question was how much time.  I think I   02:25:33 | 20   whatever we do in the future, we do as partners.    02:27:54 |
| 21   already said it, but I'll say it again.  How much | 21   Q  On what terms, though? |
| 22   time and what do I do meanwhile?  So for meanwhile, | 22   A  Same terms. |
| 23   he said take whatever you need, and we talked about | 23   Q  Same terms. |
| 24   approximately, you know, what I'm spending, you   02:25:51 | 24   A  That I'm a third partner. |
| 25   know, what my budget is.  And then he said anywhere | 25      MR. ATABEK:  I just realized I forgot to   02:28:03 |
| Page 147 | Page 149 |

1  Q  Okay.  Is that what you and Alexander
2  agreed on?
3  A  That was my presumption.  I don't think we
4  ever discussed it, but that's, you know, natural.
5  Q  Okay.                          02:34:44
6  A  A partner cannot own assets without having
7  considered liabilities.
8  Q  So you own 33 percent of the assets and of
9  the income?  Are you supposed to be paid 33 percent
10  of all their income every year?           02:35:02
11  A  Yes.
12  Q  So are you supposed to be paid 33 percent
13  of the value of every asset?
14  A  No, no, no.  The assets were never meant to
15  be sold.  The point that I was making is I became an  02:35:18
16  equity partner and -- I became a full partner.  I
17  did not become a partner that shares in profits only
18  or a partner that shares in equity only.  We became
19  partners, meaning that the assets and -- that the
20  net assets are part of the partnership, and the       02:35:45
21  income is also part of the partnership of which
22  one third is mine and two thirds are his.
23  Q  So what does it mean when Alexander
24  Sabadash offered to pay you the greater of 4 million
25  a year or 33 percent of the total value of the       02:36:03

Page 154

1  partnership's assets?
2  A  That's exactly what I just said.
3  Q  How can he pay you the 33 percent of the
4  value of the assets?
5  A  He didn't pay me.  He gave it to me at the    02:36:14
6  onset of partnership.
7  Q  And when you talk about income, how do you
8  define "partnership income"?
9  A  Whatever partnership nets.
10  Q  So the -- so the profit of the partnership,   02:36:35
11  is that how you define "income"?
12  A  That's what my presumption.
13  Q  And is that -- so no matter what the
14  partnership earned every year, you were supposed to
15  under this agreement get a third of that; is that    02:36:55
16  correct?
17  A  Minimally 4 million a year, a third of --
18  or a third, whichever is larger because according to
19  Alexander, he was making -- at that point in time,
20  he was making a million dollars a month.       02:37:10
21  Therefore -- I'm repeating myself.  I think I've
22  said it again.
23  Q  So why is it the greater?  What does --
24  A  Because if we start working together and we
25  all of a sudden start making $10 million a month,    02:37:20

Page 155

1  then I'm entitled to a third.
2  Q  So you're only entitled to a third if the
3  income exceeds a million dollars a month?
4  A  No.  You're misstating.  You're putting
5  words in my mouth.                  02:37:33
6  Q  No.  I'm asking you.  You can explain.
7  A  Okay.  I think I've explained numerously.
8  Let me say it again.  You know what guaranteed draw
9  is?
10  Q  Sure.                          02:37:42
11  A  Okay.  My guaranteed draw was $4 million a
12  year.
13  Q  Okay.
14  A  If the income of the partnership
15  exceeded -- let's put it -- if 33 percent of the     02:37:54
16  income of the partnership exceeded $4 million a
17  year, I would be paid more.
18  Q  Okay.  So it was only 33 percent if the
19  income of the partnership reached a certain point?
20  A  No.  It was guaranteed draw.  That's why I   02:38:09
21  asked you if you know what guaranteed draw is.
22  Q  Well, you said your guaranteed draw was
23  $4 million a year?
24  A  Correct.
25  Q  Okay.                          02:38:17

Page 156

1  A  Irrespective of what the partnership makes
2  or doesn't make.  But if the partnership makes more,
3  then it's natural that my third would be more than
4  4 million.
5  Q  Hold on.  So your guaranteed draw is      02:38:28
6  $4 million a year whether or not the partnership
7  makes any money?
8  A  Correct.
9  Q  So where would you get $4 million a year
10  from if the partnership made no money?       02:38:40
11  A  I didn't ask Alex that.
12  Q  You don't think that's an important thing
13  to ask?
14  A  If the guy who you're very close friends
15  with telling you that I'm making a million dollars a  02:38:49
16  month, which is $12 million a year, and I'm
17  guaranteeing you that he would have at least a third
18  of that, at least, to me that's sufficient.  Again,
19  we were very, very close friends, and Alex and
20  Larisa always lived well.  So I had no doubts that   02:39:10
21  Alex did not make that kind of money.  And in fact,
22  when I joined, I understood that the company is
23  making, you know, this kind of money.
24  Q  So explain to me again.  He offered you a
25  third or he offered you a certain amount?      02:39:30

Page 157

40 (Pages 154 - 157)

**Page 158**

1    MR. ATABEK: Objection. Asked and
2 answered. Vague.
3    THE WITNESS: We've -- Michael, we've
4 been --
5    MR. ATABEK: You just used the words "tell    02:39:36
6 me again." I mean, you can't just ask him to tell
7 you the same thing over and over again. Objection.
8 Asked and answered.
9 BY MR. ZORKIN:
10    Q Do I understand you right when you say that    02:39:44
11 Alexander offered to pay you $4 million a year
12 unless 33 percent of the partnership income exceeds
13 $4 million a year, and then you get 33 percent?
14    A Correct.
15    Q Okay. And it wasn't important enough for    02:39:58
16 you to ask what happens if the partnership makes no
17 money?
18    MR. ATABEK: Objection. Argumentative.
19 Assumes facts.
20    THE WITNESS: My -- I can only tell you    02:40:11
21 what I was thinking about at that point in time. If
22 he's making this kind of money and he has good
23 steady business and I'm aboard, so I'm not going to
24 make it worse. I'll make it better. We'll make
25 more money. So my thinking was that we can make a    02:40:30

**Page 159**

1 lot more money than $12 million a year.
2 BY MR. ZORKIN:
3    Q Okay. So did you ever receive $4 million a
4 year?
5    A No, never.    02:40:42
6    Q Did you ever receive a third of the
7 profits?
8    A No.
9    Q And your understanding is that you're also
10 sharing in the losses as well; correct?    02:40:57
11    A Yes, but not below guaranteed 4 million --
12 not below guaranteed 4 million.
13    Q Can you explain what you mean by that?
14    MR. ATABEK: I think he's explained it
15 several times. Objection. Asked and answered.    02:41:12
16 BY MR. ZORKIN:
17    Q Go ahead.
18    A I was guaranteed $4 million a year
19 irrespective of the income of the partnership. So
20 if the partnership was in losses or it made    02:41:24
21 $10 million, I wouldn't care.
22    Q So Alexander, who's a 60 percent owner,
23 if --
24    A 67.
25    Q So Alexander owned 60 percent -- 67 percent    02:41:40

**Page 160**

1 of the partnership.
2    A Two-thirds.
3    Q Alexander owns two-thirds of the
4 partnership. But in the event the partnership makes
5 less money than $4 million a year, he doesn't get    02:41:48
6 anything. You get all of it; is that correct?
7    A In the event that the partnership makes
8 less than $4 million a year, yes. Frankly, I never
9 thought of that, to be honest with you. I always
10 thought the partnership is going to make more and a    02:42:11
11 lot more.
12    Q When you and Alexander agreed to this
13 arrangement, did you do anything to memorialize
14 these terms in writing?
15    A No.    02:42:30
16    Q You didn't --
17    A It was -- it was a handshake and to me it
18 was sufficient, again, knowing Alexander and being
19 close friends with him.
20    Q Did you send anybody an E-mail saying hey,    02:42:42
21 I was -- I'm offered this great opportunity?
22    A No. I've talked to Jeff Ratner, as I
23 mentioned to you, and I've offered him to go
24 together with me without asking Alexander. But
25 again, if he would have said yes, then I would ask.    02:42:59

**Page 161**

1 And my thinking at that point in time -- again, I
2 had a young family. I had a child -- young child,
3 and I wasn't sure that I wanted to be away from home
4 so much. My wife wasn't either. She wasn't
5 thrilled.    02:43:17
6    Q As a professional accountant, did it occur
7 to you that you should write down the terms of a
8 multi-million dollar agreement?
9    MR. ATABEK: Objection. Argumentative.
10 Assumes facts.    02:43:28
11    THE WITNESS: Again, my thinking was that a
12 handshake with a gentleman of the statute of
13 Alexander is sufficient. Mistake.
14 BY MR. ZORKIN:
15    Q Have you -- have you now -- have you told    02:43:47
16 me everything that you were supposed to do in return
17 for becoming a partner?
18    MR. ATABEK: Objection. Rifkind.
19    THE WITNESS: We've -- I've told you the
20 main points of our agreement. If you wanted to ask    02:44:08
21 something specific, go ahead.
22 BY MR. ZORKIN:
23    Q I just want to close the topic. So I just
24 want to make sure that you told me everything. So
25 you said you were supposed to manage the businesses,    02:44:17

**Page 170**

1 never did the same tasks?

2   A  No.

3   Q  Okay. Who are the four people that you had

4 doing Joseph Koro's duties?

5   A  I don't remember the names.    02:54:50

6   Q  Do you remember any one of their names?

7   A  I don't remember their names.

8   Q  These are people in Russia?

9   A  Uh-huh. They were clerical employees.

10     MR. ATABEK: Use a verbal response. When  02:54:57

11 you say "uh-huh," she's not going to be able --

12     THE WITNESS: Yes.

13     THE REPORTER: And please, you're stepping

14 on each other's toes again. So I will not get what

15 you're saying.

16     THE WITNESS: Okay. Sorry. Sorry. Sorry.

17 Sorry. Sorry. Getting tired a bit.

18     MR. ATABEK: Yeah, I know it's starting to

19 get late in the day. I'll give you a tip. Take a

20 breath after each question. That way you know that  02:55:13

21 you've given him enough time and me enough time to

22 object.

23     THE WITNESS: I have so many questions.

24 I'll be hyperventilating.

25     Sorry. Go on, Michael. I'm sorry.  02:55:23

**Page 171**

1     MR. ATABEK: Actually, do you mind -- do

2 you mind if we take 5 minutes just so I can grab

3 some water? Not even 5, like 30 seconds.

4     MR. ZORKIN: Sure. Off the record.

5     THE VIDEOGRAPHER: Off the record at 2:55.  02:55:37

6     (Recess.)

7     THE VIDEOGRAPHER: On the record at 2:59.

8 BY MR. ZORKIN:

9   Q  Did your alleged partnership with Alexander

10 ever have a bank account?    02:59:47

11   A  No. We had a lot of bank accounts.

12   Q  But not in the name of a partnership;

13 right?

14   A  Not in the name of the partnership.

15   Q  Did you have a partner's capital account?  02:59:58

16   A  I'm not understanding what that is.

17   Q  A bank account specifically for a partner.

18   A  I never had any joint bank account with

19 Alexander.

20   Q  Okay. Did your alleged partnership file a  03:00:08

21 Statement of Information with the California

22 Secretary of State?

23   A  No.

24   Q  Did the partnership file a Statement of

25 Authority with the California Secretary of State?  03:00:22

**Page 172**

1   A  I don't believe so.

2   Q  Did this alleged partnership ever have any

3 financial statements generated?

4   A  No.

5   Q  Any profit and loss statements?    03:00:37

6   A  No, no. Except for expense statements, no.

7   Q  So the partnership between you and

8 Alexander Sabadash generated expense statements?

9   A  We've had expense statements, the amount

10 of monies that we're spending. We talked about it  03:00:49

11 every month.

12   Q  Are you in possession of these expense

13 statements?

14   A  I don't know.

15   Q  Can you check your records and produce  03:00:58

16 those expense statements, if you have any?

17   A  I will check, but before then, check with

18 Mr. Sabadash if he wants me to produce that.

19   Q  Mr. Sabadash wants you to produce all

20 evidence of the partnership between you and him.  03:01:12

21   A  I will check.

22   Q  Thank you. Did the partnership ever have a

23 balance sheet?

24   A  No.

25   Q  Any -- were there ever any financial  03:01:25

**Page 173**

1 records prepared for the alleged partnership between

2 you and Alexander?

3   A  Nothing expense -- nothing except for

4 expense statements. That's it.

5   Q  Have you ever provided an accounting to  03:01:36

6 Alexander to show how much cash you received from

7 the partnership?

8   A  That was expense statements, basically. It

9 was his expenses and my expenses.

10   Q  Who created these documents, the expense  03:01:56

11 statements?

12   A  Usually me.

13   Q  Okay.

14   A  Usually me.

15   Q  So can you explain exactly what would go  03:02:04

16 into the expense statements?

17   A  Expenses that the partnership incurred,

18 monies that the partnership spent.

19   Q  So just -- I would just like you to be more

20 specific because if I understand you correctly, the  03:02:20

21 partnership had many different businesses under its

22 control.

23   A  My concern was the monies, again, that were

24 out of Russia, not in Russia. So the expenses that

25 we've discussed are those that were spent from  03:02:34

**Page 178**

1    A  Correct.

2    Q  Okay.  And how do you calculate that

3  figure, $55 million?

4    A  The calculations at that point in time was

5  a proximity of what Alex was spending versus what I    03:07:37

6  was taking and calculating a third.

7    Q  Sorry.  Can you explain the calculation?  A

8  third of what?

9    A  If you take the total amount of money that

10  was spent, you deduct what I was taking -- take it    03:07:51

11  back.  If you take the total amount of money that

12  was spent, take one third of that, and that was

13  supposed to be mine.  If you deduct what I was

14  actually getting, I ended up with calculation of

15  approximately $55 million, to which Alex did not --    03:08:11

16  at our last conversation, he did not argue.

17    Q  I thought you said you were supposed to

18  receive a third of the income of the partnership.

19  Just now you said a third of how much was spent.

20    A  Well, he -- to me, the monies that were    03:08:27

21  received by partnership entities are income of

22  partnership.  Where else would they come from?

23    Q  I thought -- you just said that you

24  calculated how much money was spent by the

25  partnership, and then you wanted a third of that?    03:08:41

**Page 179**

1    A  Partnership spent every penny that it

2  received.

3    Q  I don't understand what you mean by that.

4    A  Partnership spent every penny that it

5  received.  Partnership had no extra income.  So    03:08:54

6  whatever monies were received by our entities were

7  spent every month.  In fact, there was a shortage

8  every month.

9    Q  So there was no money in any bank account

10  at any point?    03:09:11

11    A  Not in the last few years, not at all.

12    Q  What do you mean by "last few years"?

13    A  You're asking me to guess.  I'm not sure.

14    Q  I'm asking you to clarify what you said.

15    A  No.  My recollection is that there was in    03:09:25

16  the last, I would say, three years of partnership,

17  for sure, there was no extra money at all.

18    Q  I just want to pinpoint what you mean by

19  the last three years of partnership.  What years are

20  you referring to?    03:09:45

21    A  Well, Alex was arrested in May of 2014.  So

22  last three years before then.

23    Q  Okay.  So 2011 through 2014?

24    A  I would say.

25    Q  So from 2011 to 2014 --    03:09:56

**Page 180**

1    A  Partnership was spending every cent that it

2  had.  There was no overage.  There was no extra

3  money.

4    Q  So during that time, no entity related to

5  Alexander had money in any bank account?    03:10:12

6    A  No.

7    Q  Okay.

8    A  Not significant money.  I mean, again,

9  monies that would come in, they would be spent.  So

10  I mean, there would be some, you know, 10-, 20,000,    03:10:21

11  50,000, but not nothing serious.

12    Q  And you mentioned before that you really

13  weren't aware of the money that was generated in

14  Russia?

15    A  Correct.    03:10:36

16    Q  Okay.  So you were -- you dealt with

17  European and American entities?

18    A  Yes.

19    Q  So what you really -- what you're saying

20  right now is that in the bank accounts of the    03:10:48

21  European and American and non-Russian entities,

22  there was no money from 2011 to 2014?

23    A  Correct.  Yeah.

24    Q  But you don't know what was going on in

25  Russia?    03:11:00

**Page 181**

1    A  I don't.  But again, my presumption that --

2  was that whatever -- whatever we were earning is

3  what's being deposited into our non-Russian

4  entities.

5    Q  Okay.  So when you took -- you did take    03:11:17

6  partnership draws?

7    A  Yes.

8    Q  How often did you take partnership draws?

9    A  I don't know.  Every month.

10    Q  Okay.  And when you took your partnership    03:11:43

11  draws, which bank accounts would you take them from?

12    A  From partnership bank accounts.  I'm not

13  sure.  Could be Golden Sphinx.  Could be

14  Golden Spirits.  Could be something else.  There

15  were a number of partnership bank accounts.    03:11:55

16    Q  So you just randomly went into a bank

17  account and took money?

18    A  What do you mean "randomly"?

19    Q  Well, you said it could have been any

20  number of accounts.    03:12:07

21    A  Wherever we had money.  I mean, my draws

22  were basically a necessity for me just as much as

23  payment for airplane or payment for house or payment

24  for something else.

25    Q  Okay.  So money would come in from Russia    03:12:22

1 into an account in Europe or in America?

2   A  Yes, in Europe.

3   Q  In Europe.  Okay.  Was there a specific

4 account that money from Russia was deposited in?

5   A  No.  It varied.        03:12:35

6   Q  And you were notified when the money came

7 in?

8   A  Of course.

9   Q  Okay.  By the bank?

10   A  Yeah.        03:12:43

11   Q  Okay.

12   A  I would check.  Plus Kirill would always

13 tell me this amount of money is being sent to you,

14 so.

15   Q  Okay.  So Kirill Arsentiev knew of your    03:12:55

16 partnership draw?

17   A  He -- I think so, yeah.  He knew that I'm

18 taking -- that I'm taking money, of course, but I

19 don't know if he had full accounting of, you know,

20 what I'm taking, what Alex is taking.  Alex -- I    03:13:15

21 don't think Alex wanted him to know as much.

22   Q  Kirill would tell you money's in this

23 account for you?

24   A  Yeah, there's so much money being deposited

25 in this account.        03:13:28

Page 182

1 of partnership.

2   Q  I'm asking because you said the last three

3 years of the partnership were 2011 through 2014.

4   A  Active partnership.  Active partnership.

5   Q  So just to put an end to this topic, you    03:15:11

6 were taking your partnership draw from what you

7 call spending of the partnership?  I'm still trying

8 to figure out what you mean when you said the

9 partnership spent all its money, and I wanted to

10 calculate a third of what was spent.    03:15:40

11   A  The partnership would receive certain

12 amount of income.  The income would be sent from

13 Russian entities from -- by Kirill.  The partnership

14 had a certain amount of expenses that it needed to

15 pay, and those were so large that amount left for me    03:15:59

16 was very small.

17   Q  Well --

18   A  For instance, Alex was paying for the G550,

19 right.  The G550 was -- it would -- the cost of G550

20 to us would be 330-something-thousand in financing    03:16:24

21 costs, about 200,000 to Jet Aviation every month.

22 Every month, approximately 40,000 to pilots, plus

23 expenses of the pilots.  So the one plane -- one

24 plane alone cost, what, $600,000 every single month.

25   Q  And you used the G550?    03:16:56

Page 184

1   Q  Okay.  Could you estimate your monthly

2 partnership draw on average?

3   A  I would say about 100- a month,

4 approximately.  Just approximating.

5   Q  So let me ask you.  When you take your    03:13:51

6 partnership draw, does that become your money or --

7   A  Of course.

8   Q  I'm sorry.  When you take a partnership

9 draw, does that become your personal money or is

10 that still the partnership's money?    03:14:04

11   A  No.  It's my personal money.

12   Q  Okay.  So when Alexander takes a

13 partnership draw, that's his personal money as well;

14 correct?

15   A  Yes, all with the exception that he took    03:14:14

16 more money than he was supposed to.

17   Q  I don't -- I'm not sure what you mean by

18 that.

19   A  He took more than 67 percent of the money,

20 and I took significantly less than my 33 percent.    03:14:32

21   Q  During the entire time of the partnership?

22   A  Yeah.

23   Q  Okay.  So is it -- is it your position that

24 the partnership ended in 2014?

25   A  I think we're still working through the end    03:14:53

Page 183

1   A  No.

2   Q  Did you use the G200?

3   A  Never flown in it.  G550, I've flown

4 several times with Alexander.

5   Q  Ever fly on these planes by yourself    03:17:16

6 without Alexander?

7   A  I'm sorry?

8   Q  Have you ever flow on these planes by

9 yourself without Alexander?

10   A  No.  On G200, I never flew at all, ever.    03:17:24

11   Q  And so you're not really sure how much

12 money was being generated in Russia?  You just knew

13 how much was deposited into the --

14   A  That is correct.

15   Q  -- foreign accounts?    03:17:38

16   A  That is correct, and that was -- my

17 presumption was that that's the income of the

18 Russian operation.

19   Q  In your discovery responses, as I mentioned

20 earlier, you identified some people who may be    03:18:18

21 witnesses in this case.  I just want to ask you a

22 couple of questions about these people.

23       So you mentioned Kirill Arsentiev already.

24 Is it correct to say that he was the person in

25 charge of transferring money from Russia into    03:18:33

Page 185

1  of Golden Sphinx at that point in time resigned and

2  was not communicating with us.

3     Q  Well, are you saying -- how can a

4  shareholder resign?

5     A  The shareholder of Golden Sphinx was        05:47:29

6  Minerva.  Minerva has ceased to do business with us

7  approximately at the time of Alexander's arrest.

8     Q  When you say "us," who do you mean?

9     A  "Us" meaning me and Alexander.

10  Approximately at the time of Alexander's arrest, and   05:47:47

11  all the business has stopped.

12     Q  So you -- so did you attempt to disclose

13  the assignment of the promissory note to Minerva as

14  the shareholder of Golden Sphinx?

15     A  No.                                 05:48:06

16     Q  You didn't send them a letter or anything

17  like that?

18     A  No.

19        MR. ZORKIN:  Can we go off the record for a

20  minute?                                     05:48:28

21        THE VIDEOGRAPHER:  Off the record.  5.48.

22        (Recess.)

23        THE VIDEOGRAPHER:  All right.  We are on

24  the record at 5:50.

25        MR. ZORKIN:  So it's almost 6:00 p.m.        05:51:01

                                                    Page 274

1  We'll adjourn this session, and we will reconvene

2  this deposition at 10:00 a.m. tomorrow morning, same

3  place.

4        Going off the record for today.

5        THE VIDEOGRAPHER:  All right.  This        05:51:17

6  concludes today's testimony given by Garry Itkin,

7  Volume I.  The total number of media units used was

8  seven and will be retained by Veritext Legal

9  Solutions.  We are off the record at 5:51.  Thank

10  you.                                         05:51:30

11        (TIME NOTED: 5:51 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 275

1

2

3

4        I, GARRY ITKIN, do hereby declare under

5  penalty of perjury that I have read the foregoing

6  transcript; that I have made any corrections as

7  appear noted, in ink, initialed by me, or attached

8  hereto; that my testimony as contained herein, as

9  corrected, is true and correct.

10        EXECUTED this _____ day of _____,

11  2019, at _____, _____.

                    (City)            (State)

12

13

14

15     _____

          GARRY ITKIN

16

17

18

19

20

21

22

23

24

25

                                                    Page 276

1        I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4        That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were placed under oath; that a

8  verbatim record of the proceedings was made by me

9  using machine shorthand which was thereafter

10  transcribed under my direction; further, that the

11  foregoing is an accurate transcription thereof.

12        I further certify that I am neither

13  financially interested in the action nor a relative

14  or employee of any attorney of any of the parties.

15        IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17

18  Dated: April 1, 2019

19

20

21

22

23

24     *Maria Ellersick*

          MARIA ELLERSICK

25        CSR No. 10531

                                                    Page 277

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                  FOR COUNTY OF LOS ANGELES
 3
        _____
 4      AFB TRADING ONE, INC., a      )
        California corporation;       )
 5      M-BJEP LIMITED, an Isle of    )
        Man corporation; M-NICE       )
 6      LIMITED, an Isle of Man       )
        corporation; GOLDEN SPHINX    )   No. BC647351
 7      LIMITED, a Jersey             )
        corporation; NEW ALBION       )
 8      PROPERTY LIMITED, an England  )
        corporation,                  )
 9                                    )
                  Plaintiff Companies,)
10                                    )
              vs.                     )
11                                    )
        GARRY Y. ITKIN, an            )
12      individual; THE LIGHTHOUSE    )
        PARTNERSHIP LIMITED, an       )
13      England corporation; and DOES )
        1 through 100, inclusive,     )
14                                    )
                  Defendants.         )
15      _____)
16
17                  ** CONFIDENTIAL **
18        VIDEOTAPED DEPOSITION OF GARRY Y. ITKIN
19               Los Angeles, California
20               Thursday, March 28, 2019
21                     Volume II
22
23      Reported by:
        NADIA NEWHART
24      CSR No. 8714
        Job No. 3277298
25      PAGES 278 - 532


                                            Page  278
```

1    Q   Okay.  When Golden Sphinx was formed, were
2  any shares distributed to you?
3    A   No.
4    Q   Do you recall who appointed you a director
5  of Golden Sphinx?                      11:14:55
6    A   People at Minerva, because I believe that
7  they've incorporated Golden Sphinx upon our request.
8    Q   Are you aware of any documents that identify
9  Golden Sphinx as an entity controlled by the
10  partnership?                         11:15:10
11    A   No.
12    Q   Could you tell me what assets does Golden
13  Sphinx own.
14    A   Currently, I don't believe it owns any
15  assets.                              11:15:22
16    Q   Could you tell me what assets Golden Sphinx
17  owned in 2015.
18    A   Golden Sphinx owned a note or a loan to
19  M-BJEP, a loan to M-NICE, a loan to La Desirad.  I
20  think there was something else.  I just don't    11:15:55
21  recall.
22    Q   Did Golden Sphinx own the shares of
23  New Albion property?
24    A   Yes.  I forgot the most important one.
25    Q   Did Golden Sphinx have a bank account?    11:16:08

Page 323

1    A   When as to the time?
2    Q   So at the time you were a director of Golden
3  Sphinx.
4    A   Yes.
5    Q   How many bank accounts, could you estimate?    11:16:20
6    A   Golden Sphinx had number of bank accounts.
7  Minimally, three that I know.
8    Q   Do you recall what banks these three bank
9  accounts were in?
10    A   UBS -- I think even four.  I think Golden    11:16:41
11  Sphinx had a Credit Suisse bank account, I'm not
12  sure.  Credit Suisse.  I'm not sure.  VP Bank and
13  First Curacao.
14    Q   Okay.  Did you open any of these accounts?
15    A   I believe we participated in opening -- I    11:16:59
16  know I opened a Curacao bank account.  I
17  participated in opening VP Bank account, and I
18  believe I've participated in opening UBS bank
19  account.
20    Q   Were you the -- were you an authorized    11:17:16
21  signatory on these three bank accounts?
22    A   Yes.
23    Q   Was anyone else a signatory on the three bank
24  accounts you just mentioned?
25    A   I don't believe so.    11:17:38

Page 324

1    Q   And on all three of the bank accounts of
2  Golden Sphinx, was Alexander listed as the
3  beneficial owner?
4    A   Very likely.
5    Q   And if you were the one that opened the bank    11:17:47
6  account, that means that you were the one that
7  listed Alexander as the beneficial owner?
8    A   As I said, I participated in opening
9  accounts.  I'm not sure who actually filled out the
10  documents and et cetera.    11:18:03
11    Q   So if I understand your testimony correctly,
12  Golden Sphinx was funded through profit-producing
13  entities in Russia?
14    A   That was my belief.
15    Q   Okay.  You didn't know for sure?    11:18:21
16    A   That was my belief.  This was what I was
17  represented by Alexander.
18    Q   Okay.  At some point, did you enter into an
19  employment agreement with Golden Sphinx?
20    A   Yes.    11:18:39
21    Q   Do you have a copy of that agreement?
22    A   Not with me.
23    Q   I understand.  But do you have a copy of that
24  agreement in your possession somewhere?
25    A   I very likely do.    11:18:49

Page 325

1    Q   If you don't mind producing it to us, because
2  I don't believe we have one.
3    A   Certainly.
4    Q   Thank you.
5        Were you ever paid pursuant to the employment    11:18:56
6  agreement you created with Golden Sphinx?
7    A   No.
8    Q   And why not?
9    A   Again, as I've mentioned before, all of the
10  agreements were to be a part of my partnership draw;    11:19:13
11  therefore, I did not regard the payment upon this
12  agreements as necessary.
13        I was taking a draw that was left for me
14  after the expenditures, as I said yesterday.
15        MR. ATABEK:  Hang on before you go further.    11:19:39
16  You're asking us to produce a Golden Sphinx
17  employment agreement, but wasn't that part of the
18  pleadings in the Jersey case?
19        MR. ZORKIN:  I don't know.  I'm asking you to
20  produce it in this litigation, because I don't have    11:19:50
21  one.
22        MR. ATABEK:  Okay.
23  BY MR. ZORKIN:
24    Q   And when you entered into the employment
25  agreement with Golden Sphinx, you were a director of    11:20:09

Page 326

13 (Pages 323 - 326)

1    MR. ATABEK:  No, no.  I'm like 90 percent
2    certain I've seen it in your document production.  I
3    was just hoping, for purposes of cleanliness of the
4    deposition record, we'd have a Bates-stamped copy
5    but okay.                                    03:50:56
6        THE WITNESS:  I remember this document;
7    apologies received by me for not being there.
8    BY MR. ZORKIN:
9    Q  So does this document accurately reflect that
10   you became the sole director of Golden Spirits on    03:51:06
11   November 23rd, 2009?
12   A  Yes.
13   Q  Okay.  Can you tell me who the shareholder of
14   Golden Spirits was?
15   A  I believe it was Amber Trust.             03:51:30
16   Q  So Golden Spirits was an entity that was part
17   of the Amber Trust?
18   A  Golden Spirits was entity that was part of a
19   partnership, but the shareholder of it was, I
20   believe, Amber Trust.                         03:51:39
21   Q  Okay.  Do you recall, did Golden Spirits have
22   a bank account?
23   A  Yes.
24   Q  Do you recall what bank the bank account was
25   with?                                         03:51:52

Page 483

1    A  I believe it was UBS.
2    Q  Okay.  Did you open that bank account with
3    UBS?
4    A  I'm not sure.  I think it was opened previous
5    to me becoming a director.                    03:52:03
6    Q  Were you the authorized signatory on the UBS
7    bank account for Golden Spirits?
8        MR. ATABEK:  Objection; vague as to time.
9    BY MR. ZORKIN:
10   Q  At any time.                              03:52:14
11   A  Yes.
12   Q  Was there a time where you were not an
13   authorized signatory on the Golden Spirits bank
14   account?
15   A  Yes.                                      03:52:21
16   Q  Was it prior to you becoming a director?
17   A  Yes.
18   Q  And after the time you became a director, was
19   there a time when you were not an authorized
20   signatory on the Golden Spirits UBS bank account?    03:52:28
21   A  No.
22   Q  During the time -- well, let's just say from
23   2009 when you were the sole director, was -- did
24   anybody else have access to the Golden Spirits bank
25   account?                                      03:52:43

Page 484

1    A  What do you mean by the word "access"?  Was
2    there other signatories?
3    Q  Correct.
4    A  No, I believe I was the sole signatory.
5        MR. ZORKIN:  I have Exhibit 37.          03:53:09
6        MR. ATABEK:  Do you mind if we go off the
7    record for just one sec, like very, very quick?
8        MR. ZORKIN:  Okay.
9        THE VIDEOGRAPHER:  Off the record at 3:53.
10   (Discussion off the record.)               03:53:18
11       THE VIDEOGRAPHER:  Okay.  The time is 3:16.
12       THE REPORTER:  4:16.
13       THE VIDEOGRAPHER:  I'm sorry.  4:16.  We are
14   back on the record.  Thank you.
15   BY MR. ZORKIN:                               04:16:11
16   Q  Mr. Itkin, you mentioned that Golden Spirits
17   had a bank account with UBS; is that correct?
18   A  Yes.
19   Q  And where did the funds come from in the UBS
20   bank account of Golden Spirits?              04:16:24
21   A  My understanding was that they originated
22   from Russia, from our Russian business.
23   Q  Okay.  You don't know for sure where the
24   money originated from?
25   A  As I mentioned before, I was not involved in    04:16:36

Page 485

1    Russian money transfers and et cetera.
2        THE REPORTER:  "I was not involved in
3    Russian" what?
4        THE WITNESS:  Russian money transfers.  The
5    rubles were not my -- were not done by me.    04:16:49
6        MR. ZORKIN:  Okay.  So I have Exhibit 37,
7    which is a bank statement.
8        (Exhibit 37 was marked for identification
9    by the court reporter and is attached hereto.)
10   BY MR. ZORKIN:                               04:17:19
11   Q  So this is a bank statement of Golden
12   Spirits, correct, from UBS bank?
13   A  Yes.
14   Q  Now, this statement is from 2010 and 2011 and
15   one 2012 transaction.  And this Golden Spirits bank    04:17:40
16   statement shows that you made multiple payments to
17   Michael Baranov in 2010 and 2011 and 2012.
18   A  Yes.
19   Q  And so if I could take you back to the last
20   page --                                       04:18:00
21   A  The last page?
22   Q  Yes.
23   A  Yes.
24   Q  There is a payment to the law firm of Baranov
25   & Wittenberg.  Is that Mr. Baranov's law firm?    04:18:09

Page 486

1   Q   How many corporations would you estimate are
2   related to Alexander or the Russian businesses?
3   A   I cannot estimate.
4   MR. ATABEK:  Objection; Rifkind.  It's more
5   appropriate for a special interrogatory.        04:36:30
6   But go ahead.
7   BY MR. ZORKIN:
8   Q   You said you cannot estimate?
9   A   I can't estimate.
10  Q   So we discussed multiple companies during      04:36:36
11  this deposition.  Besides the ones we've already
12  discussed, can you think of any other companies that
13  were -- corporations that were associated with
14  Alexander or his businesses?
15  A   There were numerous corporations besides       04:36:52
16  those that I spoke with.
17  Q   Are there any documents in the files of any
18  of the corporations that we've discussed that
19  reference a partnership in any way?
20  A   I don't believe so.              04:37:09
21  Q   The fact of the partnership was never listed
22  in articles of incorporation or the bylaws of any
23  other corporations that we've discussed so far?
24  A   That is correct.
25  MR. ATABEK:  I'm sorry.  What was the       04:37:29

Page 503

1   question?
2   MR. ZORKIN:  Can you repeat the question,
3   please.
4   (Record read as follows:
5   "Q:  The fact that the partnership was       04:37:19
6   never listed in articles of incorporation
7   or the bylaws of any other corporations
8   that we've discussed so far?")
9   MR. ZORKIN:  The fact of the partnership.
10  THE REPORTER:  Thank you.              04:37:46
11  MR. ATABEK:  Right.  That was my question
12  too.  I wasn't sure if there was an actual question
13  there.
14  MR. ZORKIN:  Was there an answer to the
15  question?              04:38:00
16  THE REPORTER:  There was.  "That is correct."
17  Sorry.
18  MR. ZORKIN:  I forgot.
19  Q   And the fact of the partnership was never
20  disclosed to any of the other directors of any of      04:38:07
21  the companies that you contend were owned by the
22  partnership; is that correct?
23  A   That is correct.
24  Q   So no -- no person that was at any time a
25  director besides you of any of the alleged       04:38:22

Page 504

1   partnership-related entities can testify that you
2   and Alexander were partners?
3   A   I don't know what they can -- what other
4   people could testify to.
5   Q   And the fact that you and Alexander were      04:38:39
6   partners were never disclosed to any bank or
7   financial institution that held accounts in the name
8   of the alleged partnership entities; is that
9   correct?
10  A   I -- it doesn't seem that way.      04:38:59
11  Q   Have you ever personally disclosed that you
12  were Alexander's partner when you opened any bank
13  account in the name of the partnership's entities?
14  A   I don't think so.
15  Q   And the fact that you and Alexander were      04:39:09
16  alleged partners was never disclosed to the IRS,
17  correct?
18  A   That is correct.  There was no reason for
19  that.
20  Q   Are you aware of any document that shows that  04:39:30
21  the alleged oral partnership continued after all of
22  the corporations were formed?
23  A   I'm sorry.  Say it again.
24  MR. ZORKIN:  Can you repeat the question,
25  please.              04:39:43

Page 505

1   (Record read as follows:
2   "Q:  Are you aware of any document that
3   shows that the alleged oral partnership
4   continued after all of the corporations
5   were formed?")              04:39:30
6   THE WITNESS:  No, there were no documents.
7   We've conducted ourselves as -- as a partnership
8   always.
9   BY MR. ZORKIN:
10  Q   I believe you testified that the businesses    04:40:01
11  in Russia -- well, why don't you just tell me so I'm
12  clear what the businesses in Russia actually were.
13  A   We had three vodka production plants.  We had
14  a Vyborg plant, whatever it was called; the names
15  changed.              04:40:31
16  Q   And the -- can you describe the nature of the
17  plant.
18  A   It -- it produced pulp, paper and by-products
19  at one time.  Then we have -- as I said, we built a
20  pellet plant and a port.              04:40:49
21  Q   Are there any other Russian businesses that
22  you haven't mentioned yet?
23  A   There is a Rosca dizzle (phonetic), which is
24  a rental premises that we rented most of the time.
25  Towards the end of the partnership, we built a very  04:41:11

Page 506

58 (Pages 503 - 506)

1  Larisa Isakova and Michael Szysynzki (phonetic) that
2  can testify that they were aware that you and
3  Alexander were partners?
4      A  I believe Mr. Beletsky could, if he would.  I
5  can't think of anybody else right now, but        05:22:21
6  perhaps -- as I mentioned before, our employees have
7  testified to that during the criminal interrogation
8  that they've undergone in relationship to
9  Alexander's trial.
10     Q  Prior to the meeting with Larisa Isakova, you   05:22:40
11  never thought to put any of the conversations you
12  had with Alexander regarding your partnership draws
13  in writing?
14     A  We have not.  Again, I did have records of
15  what was drawn by me, of what was drawn by him, and   05:23:00
16  we've looked at them together practically on a
17  monthly basis together with a budget for expenses.
18     Q  Why haven't you thought to put any of these
19  conversations with Alexander in writing?
20     A  We worked for 17 years together, and we never   05:23:17
21  put anything in writing to start with.
22     Q  In 17 years working with Alexander, you never
23  once received what Alexander promised that you would
24  receive in 1998, correct?
25     A  That is true.                        05:23:34

Page 527

1      Q  Do you have any record of the partnership's
2  profits or losses over the years?
3      A  I have the records -- I had the records of
4  monies that were received in non-ruble accounts, in
5  UBS and et cetera, and those were partnership       05:23:55
6  profits.  That is my -- that was my understanding.
7      Q  As an accountant and someone as a -- someone
8  with a legal degree, did you keep actual financial
9  records of the partnership's profits and losses?
10     MR. ATABEK:  Objection; argumentative.       05:24:16
11     THE WITNESS:  We have kept records of what
12  was received by these entities, the non-Russian
13  ruble entities -- non-Russian entities -- let's term
14  them this way -- and what was spent by them.
15     It was always my understanding -- and this   05:24:35
16  understanding was coming from Alex -- that these
17  monies were earned by partnership; therefore, they
18  were partnership profits.
19  BY MR. ZORKIN:
20     Q  So the only records you have is monies       05:24:46
21  received and spent by corporations, correct?
22     A  Correct.
23     Q  Excuse me.
24     So with all your accounting training, your
25  legal training, your business acumen, you never   05:25:31

Page 528

1  thought to memorialize anything that has to do with
2  the partnership in writing over the period of
3  14 years; is that correct?
4      MR. ATABEK:  Objection; argumentative.
5      THE WITNESS:  We did memorialize on May 5th,   05:25:44
6  2014.
7  BY MR. ZORKIN:
8      Q  From '98 to 2014, there's not a single
9  writing that reflects that a partnership existed
10  between you and Alexander Sabadash; is that correct?   05:25:55
11     MR. ATABEK:  Objection; assumes facts.
12     THE WITNESS:  I don't know.
13     MR. ZORKIN:  So we -- let's -- do we want to
14  go off the record now?  It's 5:30.
15     MR. ATABEK:  Sure.                       05:26:09
16     MR. ZORKIN:  Let's go off the record.
17     THE VIDEOGRAPHER:  All right.  This will
18  conclude today's testimony given by Garry Itkin,
19  Volume II.  The total number of media units used was
20  six and will be retained by Veritext Legal        05:26:22
21  Solutions.
22     We are off the record at 5:26.
23     (Discussion off the record.)
24     MR. DAVIS:  Let's have the original of the
25  transcript sent to my office, Manatt Phelps &        05:28:03

Page 529

1  Phillips.  We will share the -- oh, no, I'm getting
2  this backwards.  Scratch that.
3      The original of the transcript sent to Jon
4  Atabek.  Jon will share the transcript with Garry
5  Itkin.  He will return any changes he has to the      05:28:18
6  transcript.
7      Can we do it in three weeks?
8      THE WITNESS:  I think so.
9      MR. ATABEK:  Are you able to read two volumes
10  in three weeks?                            05:28:28
11     THE WITNESS:  It should be fine.
12     MR. DAVIS:  Mr. Itkin will review the
13  transcript and return any changes verified within
14  three weeks of receipt of the original.
15     Jon will keep custody of the original.  If      05:28:40
16  the original is lost or misplaced for any reason,
17  we'll agree to use a certified copy in lieu of the
18  original.
19     MR. ATABEK:  So stipulated.
20     (TIME NOTED:  5:28 p.m.)
21
22
23
24
25

Page 530

64 (Pages 527 - 530)

```
1
2
3
4        I, GARRY Y. ITKIN, do hereby declare under
5   penalty of perjury that I have read the foregoing
6   transcript; that I have made any corrections as
7   appear noted, in ink, initialed by me, or attached
8   hereto; that my testimony as contained herein, as
9   corrected, is true and correct.
10       EXECUTED this _____ day of _____,
11   20_____, at _____, _____.
              (City)           (State)
12
13
14
15       _____
              GARRY Y. ITKIN
16              Volume II
17
18
19
20
21
22
23
24
25
```

Page 531

```
1        I, the undersigned, a Certified Shorthand
2   Reporter of the State of California, do hereby
3   certify:
4       That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that any witnesses in the foregoing proceedings,
7   prior to testifying, were administered an oath; that
8   a record of the proceedings was made by me using
9   machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12      Further, that if the foregoing pertains to the
13  original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [ ] was [ ] was not requested.
16      I further certify that I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19     IN WITNESS WHEREOF, I have this date subscribed
20  my name.
21  Dated: April 2, 2019
22
23
24       Nadia Newhart
            NADIA NEWHART
25       CSR NO. 8714
```

Page 532

65 (Pages 531 - 532)

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
2               FOR THE COUNTY OF LOS ANGELES
3
4    AFB TRADING ONE, INC., A
     CALIFORNIA CORPORATION;
5    M-BJEP LIMITED, AN ISLE OF
     MAN CORPORATION; M-NICE
6    LIMITED, AN ISLE OF MAN      No. BC647351
     CORPORATION; GOLDEN SPHINX
7    LIMITED, A JERSEY
     CORPORATION; NEW ALBION
8    PROPERTY LIMITED, AN ENGLAND
     CORPORATION,
9
              Plaintiffs,
10
         vs.
11
     GARRY Y. ITKIN, AN
12   INDIVIDUAL; THE LIGHTHOUSE
     PARTNERSHIP LIMITED, AN
13   ENGLAND CORPORATION; AND DOES
     1 THROUGH 100, INCLUSIVE,
14
              Defendants.
15
16   _____
17                 ** CONFIDENTIAL **
18
19        VIDEOTAPED DEPOSITION OF GARRY ITKIN
20              Los Angeles, California
21              Friday, March 29, 2019
22                   Volume III
23   Reported by:
     MARIA ELLERSICK
24   CSR No. 10531
     Job No. 3277312
25   PAGES 533 - 665

                                      Page 533

1 EXHIBITS (Continued):
2 EXHIBIT                    PAGE
3 Exhibit 50  Demand and Order to Act
         from Alexander Sabadash to
4        Garry Y. Itkin re
         VLK Air, LLC            616
5
   Exhibit 51  Demand and Order to Act
6        from Alexander Sabadash to
         Garry Y. Itkin re
7        Golden Sphinx Limited      616
8 Exhibit 52  Demand and Order to Act
         from Alexander Sabadash to
9        Garry Y. Itkin re
         M-NICE Limited         616
10
   Exhibit 53  Chart of ownership structure  617
11
   Exhibit 54  Printout of text message
12       between Larisa Sabadash
         and Garry Itkin         618
13
   Exhibit 55  Printout from website of
14       Union of Economists       636
15
16
17
18
19
20
21
22
23
24
25
                                 Page 538

1 videographer.  The court reporter is Maria
2 Ellersick.  We are from Veritext Legal Solutions.  I
3 am not authorized to administer an oath.  I am not
4 related to any party in this action, nor am I
5 financially interested in the outcome.      10:15:39
6        Counsel all and present in the room will
7 now state their appearances and affiliations for the
8 record.  If there are any objections to proceeding,
9 please state them at the time of your appearance.
10       MR. ZORKIN:  Michael Zorkin on behalf of  10:15:52
11 the Plaintiffs and Cross-Defendants.
12       MR. ATABEK:  Jon Atabek on behalf of
13 Defendant and Cross-Complainants.
14       MR. REYNOLDS:  Thomas Reynolds.
15       MS. SABADASH:  Larisa Sabadash.      10:16:05
16       MR. STAMPFLI:  Conrad Stampfli.
17       THE VIDEOGRAPHER:  Thank you.  The
18 court reporter may now re-swear the witness in, and
19 we will continue.
20
21              GARRY ITKIN,
22 having been administered an oath, was examined and
23 testified as follows:
24
25
                                 Page 540

1 Los Angeles, California, Friday, March 29, 2019
2        10:14 a.m.
3
4        THE VIDEOGRAPHER:  Okay.  Good morning.  We
5 are on the record.  The time is 10:14 a.m. the date  10:14:30
6 today is March 29, 2019.
7        Please note that the microphones are
8 sensitive and may pick up whispering, private
9 conversations, and cellular interference.
10       Please turn off all cell phones or place  10:14:45
11 them away from the microphones as they can interfere
12 with the deposition audio.
13       Audio and video recording will continue
14 take to place unless all parties agree to go off the
15 record.                           10:14:56
16       This is Media Unit 1 of the video recorded
17 deposition of Garry Itkin, Volume III, taken by
18 counsel for Plaintiff in the matter AFB Trading One,
19 Inc., et al., versus Garry Y. Itkin, et al., filed
20 in Superior Court in the State California for the  10:15:12
21 County of Los Angeles, Case No. BC 647351.
22       The deposition is being held at 11355 West
23 Olympic Boulevard, Suite 425, Los Angeles,
24 California.
25       My name is David West.  I am the      10:15:27
                                 Page 539

1              EXAMINATION
2 BY MR. ZORKIN:
3  Q  Mr. Itkin, good morning again.
4  A  Good morning.
5  Q  I would like to remind you that you are  10:16:25
6 still under oath as if you were in court just like
7 you were the last two days.
8  A  Yes.
9  Q  Okay.  Mr. Itkin, yesterday you mentioned
10 that you haven't been in Russia since February of  10:16:35
11 2015; is that correct?
12  A  That is correct.
13  Q  Do you know who's operating the Russian
14 factories right now?
15  A  I do not.                    10:16:43
16  Q  Do you know who has been operating the
17 Russian factories at any point since you left in
18 2015?
19  A  It is my understanding that the operation
20 of all our businesses was done by Tatiana Lobonova,  10:16:55
21 the management of operations.  I really don't know
22 much insight.
23  Q  And when you mean the management operations
24 were done by Tatiana Lobonova, are you including the
25 vodka businesses and the --              10:17:19
                                 Page 541

3 (Pages 538 - 541)

1    A   No.  I believe mostly we spoke.

2    Q   Do you recall ever sending Kirill E-mails

3   saying these X number of things need to be paid, and

4   this is how much money I need.  Please send the

5   money?                                12:10:39

6    A   It's possible, but we usually spoke, as I

7   said.

8    Q   Okay.  Are you currently -- not currently

9   as you sit here, but are you generally in possession

10   of E-mail communications between you and Kirill    12:10:52

11   Arsentiev?

12    A   I haven't looked.  I could search.

13   However, at that point in time, we used E-mail

14   that I don't have access to any further.

15    Q   Okay.  What was that E-mail account?    12:11:11

16    A   There were -- there were several.  There

17   was a Liviz E-mail.  There was an account at Liviz.

18   There was an E-mail that Alex and I created.  It was

19   like a separate server.  The server was stored at

20   the French house.  It was stationed there.  So --    12:11:34

21   and I don't have access to those E-mails at all.

22    Q   Okay.

23    A   Neither one.

24    Q   Okay.  On the E-mail accounts that you

25   still do have access to, on those servers, are there    12:11:49

Page 614

1   any communications between you and Kirill Arsentiev?

2    A   I do not know that right now.

3    Q   How have you checked?

4    A   I have not.

5    Q   Do you recall ever raising to Kirill    12:12:01

6   concerns about your partnership draw and that, you

7   know, you needed to be paid and money should be

8   sent?

9    A   I don't think I discussed with Kirill my

10   partnership draws.  I didn't think it's any of his    12:12:19

11   business.  I would tell Kirill how much money we

12   need, and he would -- my understanding was that he

13   would do his best to provide.  Then, again, as I

14   said before, the expenses were paid in certain

15   priorities.                                12:12:39

16    Q   So when you would tell Kirill the amount

17   that you would need, you would include in that

18   amount your partnership draw?

19    A   I would include a certain amount that I

20   needed that -- something that I was planning to    12:12:48

21   draw.  Having said that, not always did I have

22   enough money to pay that.

23    MR. ZORKIN:  46 -- 45.

24    (Exhibit 45 was marked for

25   identification by the court reporter.)    12:13:38

Page 615

1    MR. ATABEK:  How much longer do you think

2   you have?

3    MR. ZORKIN:  I'm not sure, man.  I'm trying

4   to hurry up.

5    I'm going to have -- let's do these    12:13:53

6   separately.  So --

7    THE WITNESS:  They're all the same.  You

8   can put them together.

9    MR. ZORKIN:  Well, they're a little

10   different.

11    THE WITNESS:  Okay.

12    (Exhibit 46, Exhibit 47, Exhibit 48,

13   Exhibit 49, Exhibit 50, Exhibit 51, and

14   Exhibit 52 were marked for identification

15   by the court reporter.)

16   BY MR. ZORKIN:

17    Q   Mr. Itkin, did you draft the exhibits that

18   I just handed you?

19    A   Yes.

20    MR. ATABEK:  Do we -- which ones are which    12:15:34

21   exhibits?

22    MR. ZORKIN:  All of them.

23    THE WITNESS:  They're all the same.

24   They're all exactly the same.

25    MR. ATABEK:  They're all one exhibit?    12:15:41

Page 616

1    MR. ZORKIN:  They're separate exhibits.

2   They're slightly different.

3    Q   But I think the question can be as broadly,

4   did you draft all of these exhibits I just handed

5   you?                                12:15:51

6    A   Yes.

7    Q   And did you send them to Alex's attorney,

8   Mr. Shpilevoy-Shatskiy?

9    A   Yes.

10    Q   Did you also send these exhibits to Larisa?    12:15:58

11    A   Later.

12    Q   And did you also send these exhibits to

13   Mr. Joe Corozzo?

14    A   Yes.

15    MR. ZORKIN:  Which number am I on?  53.    12:17:15

16    (Exhibit 53 was marked for

17   identification by the court reporter.)

18   BY MR. ZORKIN:

19    Q   Mr. Itkin, did you draft this chart on

20   Exhibit 53?                                12:17:23

21    A   I'm not sure.  I may.  I'm not sure.

22    Q   Do you recall around June 2016 Larisa

23   asking you to provide a chart of the ownership

24   structure of Alexander's companies?

25    A   I remember we talked about it.    12:17:47

Page 617

22 (Pages 614 - 617)

**Page 618**

1  Q  Do you remember drafting a chart and
2  providing it to Larisa?
3    A  I don't remember.
4    MR. ZORKIN:  Exhibit 54.
5    (Exhibit 54 was marked for      12:17:53
6    identification by the court reporter.)
7    MR. ATABEK:  I just want to make sure.
8  It's kind of illegible, but the Bates number on 53,
9  is that AFB 1743?
10    MR. ZORKIN:  Yes.      12:18:20
11    THE WITNESS:  Yes.
12  BY MR. ZORKIN:
13    Q  The exhibit you're looking at now, is that
14  a message from Larisa to you asking you to prepare a
15  structure of the assets?      12:18:38
16    A  This is -- yeah.
17    Q  And is there a response from you saying
18  that "I will prepare the chart by Thursday, as I
19  promised"?
20    A  That's what it said.      12:18:48
21    Q  Okay.  Does that refresh your recollection
22  as to whether you prepared that chart and gave it to
23  Larisa?
24    A  I'm not certain I have.  I -- I see this,
25  but I'm not sure that this chart was prepared and

**Page 619**

1  given to Larisa.
2    Q  Do you recall preparing a chart of the
3  structure of assets and giving it to Larisa?
4    A  I don't remember.
5    Q  Would you have responded to Larisa's      12:19:15
6  message saying "I will prepare a chart by Thursday,
7  as I promised," and then not prepare a chart?
8    A  It's possible.  And then maybe I prepared
9  the chart, but I'm not sure this is the chart.  This
10  does not look very familiar.      12:19:29
11    Q  Okay.  Do you recall --
12    A  Although the information is more or less
13  there.  The chart looks correct with an exception of
14  the top, Alexander Sabadash, 100 percent owner,
15  but -- I don't know if I would put it there that      12:19:56
16  way.  But other than that, the chart looks more or
17  less correct.
18    Q  In June 2016, do you recall meeting with
19  Larisa, Thomas, Mr. Joe Corozzo, and Mr. Joe
20  DiPietto at Larisa's home?      12:20:14
21    A  Absolutely.  That I couldn't forget.
22    Q  And at that meeting, did you provide the
23  chart I just showed you to all four of the people I
24  just mentioned?
25    A  I'm not sure.  Well, again, I may have, but      12:20:23

**Page 620**

1  I'm not sure that this is the chart.  I'm not ready
2  to identify this chart as that particular chart.
3    Q  So you recall the meeting very well, you
4  said?
5    A  I recall the meeting.      12:20:34
6    Q  Do you recall providing documents to
7  Larisa, Thomas, Mr. Corozzo, and Mr. DiPietto?
8    A  I don't remember what I provided at the
9  meeting.  I just remember that when I looked up
10  Mr. Corozzo's name, it took me a while to gather      12:20:49
11  myself back.  I don't think I've ever dealt with
12  members of Gambino Family.  It was quite scary.
13    Q  Do you have any reason to believe that the
14  chart I just handed you is not the same chart that
15  you gave to Larisa, Thomas, Mr. Corozzo, and      12:21:11
16  Mr. DiPietto?
17    MR. ATABEK:  Objection.  Assumes facts.
18    THE WITNESS:  I'm -- as I said, I'm not
19  ready to identify this chart -- that this chart was
20  prepared by me.  The information looks basically      12:21:22
21  correct.
22  BY MR. ZORKIN:
23    Q  Do you recall preparing a chart of the
24  structure of the businesses and bringing it to the
25  meeting we just referred to with Joe Corozzo and      12:21:34

**Page 621**

1  Mr. DiPietto?
2    A  I do not recall whether I gave any
3  documents at the meeting or not.  I remember that I
4  was at the meeting.  I remember we were meeting in
5  Larisa's -- you know, in Larisa's home and that I      12:21:48
6  was very scarily impressed by Mr. Corozzo.  That I
7  remember.  I was rather intimidated.
8    Q  Do you recall the messages I just showed
9  you where Larisa asks you to provide all entities'
10  structure diagram?      12:22:23
11    A  You showed me the message.  I'm reading it.
12  It looks correct.  I don't know.
13    Q  Okay.  Does it seem accurate to you that in
14  response to this text message and your response,
15  that you would have prepared a diagram of the      12:22:37
16  entities' structure?
17    A  Michael --
18    MR. ATABEK:  Objection.  Argumentative.
19    THE WITNESS:  You keep on asking more or
20  less the same question.  I read the messages.  I      12:22:47
21  read that I promised Larisa a chart.  I'm not
22  certain that I gave Larisa a chart, and I'm not
23  certain that this is the chart.  I don't think I
24  could identify -- and I said it again, and I'll say
25  it again.  I don't think I could identify this chart  12:23:04

23 (Pages 618 - 621)

Page 626:

1 outcome is going to be.
2  Q  So you testified that because you learned
3 of the divorce petition, you took a number of
4 actions. You entered into -- I believe you removed
5 Piotr Szymanski from some positions, right. You        12:28:28
6 entered into some promissory notes. You took a
7 significant amount of actions in order to, as you
8 say, lock down the assets?
9      MR. ATABEK: Objection. Misstates, and
10 assumes facts.                                         12:28:44
11      Go ahead.
12 BY MR. ZORKIN:
13  Q  And you did all this because you learned of
14 the divorce, but yet a month earlier when you --
15 Larisa said take me to a divorce attorney and you      12:28:53
16 took her to a divorce attorney, you didn't think you
17 needed to take any action at that point to lock down
18 the assets?
19  A  No.
20      MR. ATABEK: Objection. Misstates.             12:29:03
21 Assumes facts, and argumentative.
22      THE WITNESS: No. I just explained to you
23 why.
24 BY MR. ZORKIN:
25  Q  You were hoping there was not going to be a      12:29:10

Page 627:

1 divorce?
2  A  I was -- I was not hoping. I've made an
3 introduction so that Larisa could receive the best
4 advice. I was not thinking whether she will get
5 divorced or not. I know many people who speak to       12:29:25
6 lawyers, whether they're divorce lawyers or
7 otherwise, and no actions are coming out of it.
8 People talk. A lot of times, divorce lawyers would
9 suggest family counseling or something else. So I
10 didn't know that this meeting would result in a        12:29:45
11 divorce. All I was doing is I was arranging a
12 meeting between a lawyer and friend.
13  Q  Did you think there was a possibility that
14 the meeting would result in a divorce?
15  A  I didn't know.                                   12:29:58
16  Q  But you didn't take any steps to, as you
17 say, protect your assets once you found out Larisa
18 was meeting with a divorce attorney; right?
19  A  No.
20      MR. ZORKIN: Can we take 5 minutes?          12:30:20
21      MR. ATABEK: Sure.
22      MR. ZORKIN: Off the record.
23      THE VIDEOGRAPHER: Off the record. 12:30.
24      (Recess.)
25      THE VIDEOGRAPHER: Okay. The time is          12:45:42

Page 628:

1 12:46. We are back on the record.
2 BY MR. ZORKIN:
3  Q  Okay. Just a couple questions about your
4 original agreement with Alexander to enter into the
5 alleged partnership. At the time you entered into      12:46:14
6 the partnership agreement, did you agree to be
7 responsible for the debts of the partnership?
8  A  I think you already asked this question,
9 and we haven't discussed the particulars. We've
10 discussed that we're partners, and we'll go in as      12:46:33
11 partners. We haven't discussed that issue or asset
12 issue, et cetera's.
13  Q  Did you assume that as -- when you received
14 33 percent of the partnership, that you would be not
15 only receiving 33 percent of the income, but you       12:46:51
16 would also be responsible for the losses of the
17 partnership and the debts of the partnership?
18      MR. ATABEK: I'm going to designate this
19 portion of the transcript confidential because I
20 think I know what you're trying to do, but go ahead.   12:47:02
21 Also object that it calls for legal conclusion.
22      THE WITNESS: I didn't even -- didn't think
23 about it, but I would -- I would agree that a
24 partnership would entail splitting both profits and
25 losses. However, as I numerously explained           12:47:23

Page 629:

1 previously, I was going into Russia after living
2 here for many years and having a family here and
3 et cetera. My concern was exactly what you're
4 talking about, that the partnership would not create
5 income, and I had to be sure that the money are        12:47:39
6 coming to the family. Therefore, that was -- that
7 was why the guaranteed payment was discussed and
8 agreed upon.
9 BY MR. ZORKIN:
10  Q  Okay. Just to be clear, it was your        12:47:54
11 understanding that you and Alexander would share or
12 split the income, the losses, and you both would be
13 responsible for the debts of the partnership;
14 correct?
15  A  I think I just answered this question.      12:48:09
16  Q  Well, is that a "yes"?
17  A  We haven't -- we haven't discussed it.
18  Q  I understand you did say that. I
19 appreciate it. I'm asking what your understanding
20 was at the time.                                      12:48:21
21  A  Again, I didn't think about it, but I think
22 it's natural for a partnership to split not only
23 assets, but liabilities as well.
24  Q  Okay. So at the time you entered into the
25 partnership via this oral partnership agreement, did  12:48:38

25 (Pages 626 - 629)

1 you become a third owner of the real estate that the
2 partnership holds?
3        MR. ATABEK: Objection. Calls for legal
4 conclusion.
5        THE WITNESS: I presume so, yes.        12:48:52
6 BY MR. ZORKIN:
7    Q  At the time you entered into the
8 partnership agreement, you intended that the
9 partnership business would not be concluded within
10 one year; right?        12:49:05
11        MR. ATABEK: Objection. Calls for --
12        THE WITNESS: Correct. In fact, I was
13 thinking of staying in Russia for maybe, you know,
14 five years or something. I remember my conversation
15 with my wife about it, and she said how long are you        12:49:16
16 going to be gone for, and I said well, give me five
17 years. And then if I make the money that Alex is
18 promising me, I think it will be, you know, a very
19 nice amount, and I could move back.
20 BY MR. ZORKIN:        12:49:28
21    Q  Okay. I refer you back to Exhibit 3.
22       Do you have a copy or --
23        MR. ATABEK: I got it.
24 BY MR. ZORKIN:
25    Q  I refer you to paragraph 31. This        12:50:12

Page 630

1 paragraph, paragraph 31, is not true, is it?
2        MR. ATABEK: Hang on. I need to see it.
3        THE WITNESS: Why is it not true?
4 BY MR. ZORKIN:
5    Q  Because you testified yesterday that the        12:50:31
6 partnership was making $1 million per month.
7    A  This is what I was told by Alex. I haven't
8 seen that, but this what I've been told by Alex.
9    Q  So your testimony is not that the
10 partnership was making $1 million a month, but        12:50:45
11 that's only what you were told?
12    A  I was told by Alex at the time we were
13 making agreement that he's making a million dollars
14 a month, and therefore, my portion will be a third
15 of that and that's -- that's it.        12:50:58
16        MR. ATABEK: I'm going to interpose a bit
17 of a late objection. Object to the extent that
18 you're trying to cross-examine with use of the
19 complaint. As you know, complaints are not
20 admissible at trial, particularly if they're not        12:51:11
21 verified.
22 BY MR. ZORKIN:
23    Q  So when you moved to Russia to work with
24 Alexander, did you discover that the vodka factory
25 generated barely any revenue?        12:51:31

Page 631

1    A  I have not seen a million dollars a month.
2 But as I said before, Alex has forewarned me that
3 for some period of time, I'm not going to be
4 receiving this -- you know, what he promised,
5 300,000, whatever, and I was not.        12:51:52
6        So we lived rather modestly. We lived in a
7 small apartment that belongs to Larisa's mom in
8 Pushkin. We lived together in the same apartment.
9 I slept in one room. He slept in the other room.
10 So to me, I mean, if you're making a million dollars        12:52:20
11 a month, I think, you know, you should live better,
12 but whatever.
13    Q  So in addition to their house in
14 Beverly Hills on Laurel Way, Alexander lived in a --
15 what is it, a one-bedroom apartment, you say, in        12:52:39
16 Russia?
17    A  In Russia, yeah --
18        MR. ATABEK: Wait, wait. Objection.
19 Misstates. Assumes facts. We're talking about
20 1998?        12:52:45
21        THE WITNESS: We're talking about '98, '99,
22 and I think beginning of 2000. I'm not sure when
23 Larisa's mom sold the apartment. That's when we
24 moved out. It was, I think, probably 2001. I'm
25 guessing -- I'm guessing. I'm not sure.        12:53:01

Page 632

1 BY MR. ZORKIN:
2    Q  So is it your testimony that in 2000 and
3 2001 with operating a vodka producing factory,
4 Alexander lived in a one-bedroom apartment?
5    A  That is correct. That is my testimony. I        12:53:19
6 have to tell you, Alexander was -- he -- in Russia,
7 he lived rather modestly, always. The last two,
8 three years before arrest, he lived in a small
9 apartment that was part of our office. One of the
10 wings of the office was remodeled, and it was made        12:53:46
11 into an apartment.
12        Furthermore, the apartment had one bedroom
13 and a living room. The living room was a little bit
14 larger than this office, and it was used as a
15 conference room. So whenever I had to meet with        12:54:04
16 somebody that -- because my office was not big. If
17 I had a lot of people, I would use his living room
18 as a conference room. So he's -- he was always
19 modest, you know, as far as living in Russia.
20    Q  And so there's a difference between being        12:54:26
21 modest and not having any funds. Do you agree?
22    A  I think -- yeah, I agree. Completely
23 different things.
24    Q  Is it your testimony that Alexander's
25 businesses as of 2000, 2001, as you say, were not        12:54:40

Page 633

26 (Pages 630 - 633)

1 generating revenue?

2    MR. ATABEK: Objection. Misstates.

3    THE WITNESS: I don't know whether it was

4 generating revenue or not.

5 BY MR. ZORKIN:    12:54:52

6  Q. Okay.

7  A. I haven't seen a lot of revenues from

8 business.

9  Q. So you recall attending the deposition of

10 Mr. Sosinsky?    12:55:15

11  A. Yes.

12  Q. Mr. Sosinsky testified -- and you also

13 allege this in your complaint -- that you and

14 Alexander joined the organization called the Union

15 of Economists; is that true?    12:55:27

16  A. Yes.

17  Q. You and Alexander joined the Union of

18 Economists in '99?

19  A. Yes.

20  Q. Okay. And Mr. Sosinsky was your contact to  12:55:34

21 be able to join this organization?

22  A. Yes.

23  Q. Can you tell me a little bit about what the

24 Union of Economists is?

25  A. It is one of the oldest Russian    12:55:46

Page 634

1 organization of economists. It is Russian

2 equivalent of Davos. It organizes --

3  Q. Of what? I'm sorry.

4  A. Davos, Davos meeting in Switzerland.

5  Q. Oh, I'm not familiar with Switzerland.    12:56:03

6 Sorry.

7  A. No, no. You know, the Davos meeting, it's

8 a world famous meeting of the economists -- people

9 that have to do with economy. The presidents

10 attend, heads of the biggest companies attend.    12:56:13

11 Union of Economists is, of course, smaller, but

12 it's -- I think it's an organization that has a lot

13 of very important members, and it's a club where you

14 could meet people, and you could talk to them.

15    To give you an example, Shell was --    12:56:40

16 Shell Corporation, the oil producing company, was a

17 member of this organization. De Beers was member of

18 this organization. McDonald's was member of this

19 organization. I mean, huge, huge big companies.

20  Q. Are you aware that Union of Economists has    12:56:53

21 a website where they list all their members?

22  A. I am aware they have a website. I don't

23 know if they list all the members.

24  Q. Now, is it correct that you and Alexander

25 paid $15,000 to join the Union of Economists?    12:57:08

Page 635

1  A. That is correct.

2  Q. Okay. And you gave $15,000 to Mr. Sosinsky

3 directly?

4  A. Yes.

5  Q. And Mr. Sosinsky then told you okay, I'm    12:57:17

6 going to pay the fee with this money?

7  A. It was -- it was dues. I'm not exactly

8 remember how, but I understood -- I understood it

9 was dues, and Alexander was first one that -- it

10 was -- it was not my idea, obviously. I mean, I    12:57:34

11 came to Russia. I had no clue what -- you know, and

12 Alex felt that it's -- it would be good for us to

13 join, that we could further our business, especially

14 because we're talking about export and we're talking

15 about -- so he felt it would be -- it would be good    12:57:52

16 for us.

17    MR. ZORKIN: Okay. I have Exhibit 55.

18    (Exhibit 55 was marked for

19    identification by the court reporter.)

20 BY MR. ZORKIN:    12:58:25

21  Q. So this is a printout from the website of

22 the Union of Economists.

23    MR. ATABEK: Are you representing that to

24 him?

25    MR. ZORKIN: Yes.    12:58:30

Page 636

1  Q. And maybe Mr. Itkin can confirm that it

2 says --

3  A. Yeah.

4  Q. -- International Union of Economists in

5 Russian?    12:58:37

6  A. It does. It does.

7  Q. And I'll represent that I accessed this

8 website personally approximately a month ago.

9    MR. ATABEK: What's the exhibit number on

10 this?    12:58:47

11    THE WITNESS: 55.

12 BY MR. ZORKIN:

13  Q. So this section -- the section of the

14 website exhibit -- in this exhibit is information on

15 how to join the Union of Economists. Do you see    12:58:57

16 that?

17  A. Yes. I'm sorry. Yes.

18  Q. So this says that -- this website --

19 according to this website, as of April 2nd, 2018,

20 the fee to join this union is 1,000 rubles for a    12:59:16

21 person and 100,000 rubles for a legal entity. Do

22 you see that?

23  A. Yes.

24  Q. Can you tell me what you paid $15,000 for

25 in '99?    12:59:30

Page 637

27 (Pages 634 - 637)

| | | | |
|---|---|---|---|
| 1 Mr. Szymanski will go forward via video conference. | | 1 | |
| 2     That the deposition of Mr. Stampfli and | | 2 | |
| 3 Ms. Sabadash may exceed seven hours. | | 3 | |
| 4     That you will get back to me regarding the | | 4     I, GARRY ITKIN, do hereby declare under | |
| 5 manner in which Mr. Sabadash's deposition can go    01:29:15 | | 5 penalty of perjury that I have read the foregoing | |
| 6 forward. | | 6 transcript; that I have made any corrections as | |
| 7     And basically, just asking you to confirm | | 7 appear noted, in ink, initialed by me, or attached | |
| 8 it, and then I also just mentioned the other piece | | 8 hereto; that my testimony as contained herein, as | |
| 9 about admitting -- that's not necessary for this | | 9 corrected, is true and correct. | |
| 10 part.  We can meet and confer on the last piece    01:29:27 | | 10     EXECUTED this _____ day of _____, | |
| 11 separately. | | 11 2019, at _____, _____. | |
| 12     MR. ZORKIN:  Let's see.  Agree on point 1 | | |     (City)          (State) |
| 13 except Mr. Szymanski hasn't 100 percent confirmed | | 12 | |
| 14 the date yet, but I don't have a reason why -- he | | 13 | |
| 15 hasn't told me a reason why he wouldn't be    01:29:42 | | 14 | |
| 16 available. | | 15 | |
| 17     MR. ATABEK:  Okay. | | | _____ |
| 18     MR. ZORKIN:  So 2 is fine.  3 is fine.  4 | | 16 |     GARRY ITKIN |
| 19 is fine.  5 is fine.  All of this, of course, | | 17 | |
| 20 barring family emergencies, unforeseen    01:29:55 | | 18 | |
| 21 circumstances. | | 19 | |
| 22     MR. ATABEK:  Acts of God. | | 20 | |
| 23     MR. ZORKIN:  Acts of God. | | 21 | |
| 24     MR. ATABEK:  Sure.  Okay.  Perfect. | | 22 | |
| 25 Thanks.  We're off the record.    01:30:02 | | 23 | |
| | Page 662 | 24 | |
| | | 25 | Page 664 |
| 1     THE VIDEOGRAPHER:  All right.  This | | 1     I, the undersigned, a Certified Shorthand | |
| 2 concludes today's testimony given by Garry Itkin, | | 2 Reporter of the State of California, do hereby | |
| 3 Volume III.  The total number of media units used | | 3 certify: | |
| 4 was three and will be retained by Veritext Legal | | 4     That the foregoing proceedings were taken | |
| 5 Solutions.  We are off the record at 1:30.  Thank    01:30:13 | | 5 before me at the time and place herein set forth; | |
| 6 you. | | 6 that any witnesses in the foregoing proceedings, | |
| 7     (TIME NOTED: 1:30 p.m.) | | 7 prior to testifying, were placed under oath; that a | |
| 8 | | 8 verbatim record of the proceedings was made by me | |
| 9 | | 9 using machine shorthand which was thereafter | |
| 10 | | 10 transcribed under my direction; further, that the | |
| 11 | | 11 foregoing is an accurate transcription thereof. | |
| 12 | | 12     I further certify that I am neither | |
| 13 | | 13 financially interested in the action nor a relative | |
| 14 | | 14 or employee of any attorney of any of the parties. | |
| 15 | | 15     IN WITNESS WHEREOF, I have this date | |
| 16 | | 16 subscribed my name. | |
| 17 | | 17 Dated: April 2, 2019 | |
| 18 | | 18 | |
| 19 | | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 *Maria Elleksick* | |
| 25 | | |     MARIA ELLEKSICK |
| | Page 663 | 25 |     CSR No. 10531    Page 665 |

Veritext Legal Solutions
866 299-5127

# Exhibit 2

## DECLARATION OF ALEXANDER SABADASH

I, Alexander Sabadash, declare:

1.    I am a cross-defendant in the litigation entitled *AFB Trading One, Inc., et al v. Garry Y. Itkin, et al*, Los Angeles County Superior Court Case No. BC647351. I make this declaration in Support of Plaintiffs' Opposition to Defendant Garry Y. Itkin's ("Itkin") Special Motion to Strike Portions of the Second Amended Complaint. I make this declaration based on personal knowledge and, if needed, would testify competently thereto.

2.    In or around the year 2000, I hired Itkin as an accountant and financial manager for AFB Trading One, Inc. To enable Itkin to perform his assigned duties, I appointed him as officer of AFB Trading One, Inc., a company of which I am, and always have been, the sole shareholder. Itkin has never held any ownership or partnership interest in any company that I own directly or beneficially.

3.    I have never offered, consented, or otherwise agreed to enter into a partnership with Itkin. He and I have never been business partners in any enterprise.

4.    The only roles Itkin has held with respect to each company that I own, was as an officer or director. In these positions, Itkin always worked as an employee at-will. For his services Itkin was paid a regular salary.

5.    I have never entered into a written employment agreement with Itkin.

6.    The agreements attached to the Second Amended Complaint as Exhibits 1 through 12 were never authorized or consented to by me or by any disinterested director (*i.e.* any director other than Itkin), and each attached agreement is directly against the interests of the companies.

7.    I have never met or spoken with Michael Sosinsky. I am not and have never been a member of the International Union of Economists, nor have any of my businesses. I am aware of the deposition testimony Mr. Sosinsky has given in this case, and it is categorically untrue.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF ALEXANDER SABADASH

**112**

1   Among other falsities, I have never held myself out to be a partner of Garry Itkin in Russia or

2   anywhere else, and I have never paid dues to the International Union of Economists.

3         8.     I have never met or spoken with Larisa Isakova.  I am aware of the deposition

4

5   testimony Ms. Isakova has given in this case, and it is categorically untrue.  Among other

6   falsities, I never attended a meeting with Ms. Isakova and Garry Itkin on May 5, 2014 (or at any

7   other time), I have never confirmed the existence of any partnership agreement with Itkin in Ms.

8   Isakova's presence (or at any other time), I never confirmed or discussed with Itkin any debt

9   he claims is owed to him in Ms. Isakova's presence (or at any other time), and I have never

10   reviewed or confirmed any minutes (or, for that matter, any other document) recorded by Ms.

11   Isakova.

12

13         9.     In 2016, I was made aware that Itkin is attempting to take over the assets of my

14   companies.  In an effort to protect my business interests, I granted a proxy and power of attorney

15   to Conrad Stampfli, and voted by proxy to remove Itkin from the board of directors of AFB.  I

16   also voted by proxy to appoint new directors in Itkin's place.

17         10.    Itkin never informed me: (i) that a lawsuit was filed on behalf of Milan against

18

19   AFB Trading One, Inc.; (ii) that Itkin purported to appear on AFB's behalf in that litigation, and

20   to waive service; (iii) that Itkin stipulated to a judgment against AFB for the entire amount of

21   damages sought in the Milan complaint; or (iv) that Itkin sold the judgment to himself for a

22   nominal sum.

23         11.    AFB Trading One, Inc. incurred well in excess of $100,000 in legal fees in

24   vacating the fraudulent judgment resulting from the Milan action.

25     ///

26     ///

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF ALEXANDER SABADASH

**113**

1        I declare under the penalty of perjury under the laws of the state of California that the

2    foregoing is true and correct. Executed on _____19_____, _____april_____, 2018 at St. Petersburg,

3    Russia.

4

5                                                    _Sabedash_

6                                                    Alexander Sabadash

7    320092781.3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF ALEXANDER SABADASH

**114**

# Exhibit 3

DECLARATION OF ALEXANDER SABADASH

I, Alexander Sabadash, declare:

1.      I am a cross-defendant in the litigation entitled *AFB Trading One, Inc., et al v. Garry Y. Itkin, et al*, Los Angeles County Superior Court Case No. BC647351. I make this declaration in Support of Cross-Defendant's Opposition to Cross-Complainant Garry Y. Itkin's ("Itkin")Motion for Summary Judgment. I make this declaration based on personal knowledge and, if needed, would testify competently thereto.

1.      In 2000, I hired Itkin as an accountant and financial manager for my U.S.and European business entities. To that end, I appointed Itkin an officer and/ordirector of several corporations wholly owned by me. Itkin's primary dutiesincluded accounting and tax services. Additionally, Itkin would sometimes negotiate contracts onbehalf of my businesses and on my behalf, subject to my approval. In his fiduciary function as accountant and financial manager, Itkin hadaccess to bank accounts of the corporations which he managed and ensured my business bank accountswere not overdrawn and bills were timely covered. Itkin was also charged with ensuring thatproperty taxes and maintenance bills for myU.S. residence were paid.Itkin has never held any ownership interest in any company that I own directly or beneficially.

2.      I have never offered, consented, or otherwise agreed to enter into a partnership with Itkin. He and I have never been business partners in any enterprise. Itkin has never had any equity interest in any of my assets, real estate, or businesses.

3.      The only roles Itkin has held with respect to each company that I own.was as an officer or director. In these positions, Itkin always worked as an employee at-will. For his services, Itkin was paid a regular salary. I have never entered into a written employment agreement with Itkin.

MANATT, PHELPS &
PHELPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF ALEXANDER SABADASH

325608575.1

*A. S.*

**108**

4.      I have never met or spoken with Michael Sosinsky. I am not and have never been a member of the International Union of Economists, nor have any of my businesses. I am aware of the deposition testimony Mr. Sosinsky has given in this case, and it is false. Among other falsities, I have never held myself out to be a partner of Garry Itkin in Russia or anywhere else, and I have never paid dues to the International Union of Economists.

5.      I have never met or spoken with Larisa Isakova. I am aware of the deposition testimony Ms. Isakova has given in this case, and it is false. Among other falsities, I never attended a meeting with Ms. Isakova and Garry Itkin on May 5, 2014 (or at any other time), I have never confirmed the existence of any partnership agreement with Itkin in Ms. Isakova's presence (or at any other time), I have never confirmed or discussed with Itkin any debt he claims is owed to him in Ms. Isakova's presence (or at any other time), and I have never reviewed or confirmed any minutes (or, for that matter, any other document) recorded by Ms. Isakova.

6.      I have never met or spoken with Elena Gofman (or Vasilieva). I have never hired her to perform any services. I am not aware of any services she performed for any of my businesses. I did not enter into the "Information Services Agreement" referred to by Itkin. My signature on that agreement is a forgery. The contents of that agreement are false.

7.      I have never seen or approved the "Minutes of the Meeting of Partners of Simple Partnership." My signature on that document is a forgery. The contents of that document are false.

I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed on December _10_, 2019 at _Lgov_, Russian Federation.

_Sabadash_
Alexander Sabadash

DECLARATION OF ALEXANDER SABADASH

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

123464573.1

**109**

# Exhibit 4

## **DECLARATION OF LARISA SABADASH**

I, Larisa Sabadash, declare:

1.      I make this declaration in support of Cross Defendant's Opposition to Motion for Summary Adjudication.  I have personal knowledge of the following facts and, if called upon as a witness, I could and would testify competently thereto.

2.      In June of 2014, I asked Itkin to prepare a diagram of the structure of my husband's (Alexander Sabadash) companies.  I asked Itkin to do this because Itkin was an officer and director of many of my husband's companies and I was preparing to manage the assets in Mr. Sabadash's absence.  Itkin agreed to prepare this diagram.

3.      On June 24, 2016, I met with Itkin, my attorney Joe Corrozzo, and my accountant Joe Dipietto, at my home to discuss the ownership structure of my husband's assets.  Itkin brought the chart of the ownership structure and gave it to me, my attorney, my accountant, and Thomas Reynolds.  This chart named Mr. Sabadash is the 100% owner of all companies Itkin now claims belong to the "partnership." A true and correct copy of the chart drafted by Itkin is attached hereto as Exhibit _12_

4.      Then, on August 13, 2016, my husband's attorney, Mr. Shpilevoy-Shatsky forwarded to me an email that he received from Itkin.  Attached to this email were documents requesting Mr. Sabadash to release Itkin from all liability.  These documents also identified Mr. Sabadash as the 100% beneficial owner of all companies Itkin now claims are part of the partnership.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 9, 2020 at Los Angeles, California.

Larisa Sabadash

- 1 -

DECLARATION OF LARISA SABADASH IN SUPPORT OF CROSS DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION

**115**

# Exhibit 5

1  MANATT, PHELPS & PHILLIPS, LLP
2  ROBERT H. PLATT (Bar No. CA 108533)
   REID P. DAVIS (Bar No. CA 275164)
3  MICHAEL ZORKIN (Bar No. CA 313308)
   11355 West Olympic Blvd.
4  Los Angeles, CA 90064
   Tel: (310)312-4000
5  Fax: (310)312-4224

6  *Attorneys for Plaintiffs and Cross-Defendants*
   AFB TRADING ONE, INC., M-BJEP LIMITED, M-NICE LIMITED,
7  GOLDEN SPHINX LIMITED, NEW ALBION PROPERTY
   LIMITED, ALEXANDER SABADASH, LARISA SABADASH,
8  CONRAD STAMPFLI, THOMAS REYNOLDS

9
10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  FOR THE COUNTY OF LOS ANGELES

12

| | |
|---|---|
| AFB TRADING ONE, INC., a California corporation; M-BJEP LIMITED, an Isle of Man corporation; M-NICE LIMITED, an Isle of Man corporation, GOLDEN SPHINX LIMITED, a Jersey corporation; NEW ALBION PROPERTY LIMITED, an England corporation; | Case No.: BC647351 **CROSS-DEFENDANTS' ANSWER TO SECOND AMENDED CROSS-COMPLAINT** |
| Plaintiff Companies, | |
| vs. | |
| GARRY Y. ITKIN, an individual; THE LIGHTHOUSE PARTNERSHIP LIMITED, an England corporation; and DOES 1 through 100, inclusive, | |
| Defendants. | |
| And Related Actions and Cross Actions | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

1    Cross-Defendants ALEXANDER SABADASH, LARISA SABADASH, CONRAD

2   STAMPFLI, and THOMAS REYNOLDS (collectively, **"Cross-Defendants"**), for themselves

3   and no other parties, answer the unverified Second Amended Cross-Complaint (**"Cross-**

4   **Complaint"**) of Cross-Complainants GARRY Y. ITKIN and NEW ALBION PROPERTY

5   LIMITED (collectively, **"Cross-Complainants"**) as follows:

6    Pursuant to California Code of Civil Procedure Section 431.30(d), Cross-Defendants

7   deny, generally and specifically, each and every allegation contained in Cross-Complainants'

8   Cross-Complaint, and the whole thereof.

9    Cross-Defendants further deny, generally and specifically, that Cross-Complainants have

10   been damaged in any sum, or at all, by reason of any act or omission to act on the part of Cross-

11   Defendants, or on the part of any of Cross-Defendants' agents, servants, employees or

12   representatives.

13    Cross-Defendants further deny, generally and specifically, that Cross-Complainants are

14   entitled to attorneys' fees or prejudgment interest in any sum or at all by reason of any act or

15   omission to act on the part of Cross-Defendants, or on the part of any of Cross-Defendants'

16   agents, servants, employees or representatives.

17    **AFFIRMATIVE DEFENSES**

18    **FIRST AFFIRMATIVE DEFENSE**

19    **(Failure to State a Claim)**

20    1.    The Cross-Complaint, and each purported cause of action therein, fails to state

21   facts sufficient to state or constitute a claim against Cross-Defendants and further fails to state

22   facts sufficient to entitle Cross-Complainants to the relief sought, or to any other relief

23   whatsoever, from Cross-Defendants.

24    **SECOND AFFIRMATIVE DEFENSE**

25    **(Failure of Consideration)**

26    2.    The Cross-Complaint is barred, in whole or in part, due to lack of consideration.

27   //

28   //

2

ANSWER TO SECOND AMENDED CROSS-COMPLAINT

## THIRD AFFIRMATIVE DEFENSE

### (Mistake)

3.    The Cross-Complaint is barred, in whole or in part, because any contract alleged in the Cross-Complaint fails to reflect the true intent of the parties, such failure resulting from a unilateral and/or mutual mistake of the parties.

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

4.    Some or all of Cross-Complainants' claims are time-barred, in whole or in part, by the applicable statutes of limitation.

## FIFTH AFFIRMATIVE DEFENSE

### (Waiver)

5.    Cross-Complainants' Cross-Complaint, and each purported cause of action therein, are barred to the extent that Cross-Complainants, by reason of their own conduct and actions, have waived any right to assert the claims set forth therein.

## SIXTH AFFIRMATIVE DEFENSE

### (Laches/Estoppel)

6.    Cross-Complainants' Cross-Complaint, and each purported cause of action therein, are barred by the doctrines of laches and/or estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

7.    The Cross-Complaint, and each purported cause of action therein, are barred by reason of the doctrine of unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

### (Lack of Proximate Causation)

8.    Cross-Complainants cannot prove any facts showing that the conduct of Cross-Defendants was the proximate cause of the injuries incurred, if any, and the damages sought in the Cross-Complaint, which are denied.

//

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

ANSWER TO SECOND AMENDED CROSS-COMPLAINT

## NINTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

9.      Cross-Complainants' recovery, if any, should be barred or decreased to the extent that they have failed to mitigate the alleged damages.

## TENTH AFFIRMATIVE DEFENSE

### (Third Party)

10.     Some or all of Cross-Complainants' claims are barred because the alleged conduct complained of by Cross-Complainants was done by persons or entities other than Cross-Defendants and, that at all times, said persons or entities acted without the consent, authorization, knowledge, or ratification of Cross-Defendants with regard to the acts as alleged in the Cross-Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

11.     The Cross-Complaint is barred, in whole or in part, because the relief sought by Cross-Complainants would, if granted, unjustly enrich Cross-Complainants.

## TWELFTH AFFIRMATIVE DEFENSE

### (Lack of Damages)

12.     Cross-Complainants have not suffered any damages as a result of any actions taken by Cross-Defendants or their agents, and Cross-Complainants are therefore barred from asserting any cause of action against Cross-Defendants.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Good Faith Belief and Conduct)

13.     At all relevant times, Cross-Defendants acted with a good faith belief that they had good cause to act as they did and did not directly or indirectly perform any acts which would constitute a violation of any of Cross-Complainants' rights and, as a consequence, Cross-Complainants are not entitled to any damages.

//

//

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(No Legal Duty or Obligation)**

14.    There is no legal or other relationship upon which any duty or obligation could be owed by Cross-Defendants to Cross-Complainants, and therefore, Cross-Complainants' causes of action fail as a matter of law.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(No Consent/Assent)**

15.    Cross-Complainants' claims premised on implied contract and/or oral contract fail because Cross-Defendants did not by words or conduct consent or assent to any purported contract with Cross-Complainants.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(No Agreement on Terms of Contract)**

16.    Cross-Complainants' claims premised on implied contract and/or oral contract fail because the parties reached no agreement on, and there was no mutual assent to, the terms of an implied or oral contract between the parties..

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(Statute of Frauds)**

17.    Cross-Complainants claims are barred, in whole or in part, by the statute of frauds. Cal. Civ. Code § 1624.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(No Causation)**

18.    Cross-Complainants' damages, if any, were not caused by Cross-Defendants.

**NINETEENTH AFFIRMATIVE DEFENSE**

**(No Partnership)**

19.    No partnership was formed because all businesses at issue were organized as corporations.  Cal. Corp. Code § 16202(b).

//

//

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

ANSWER TO SECOND AMENDED CROSS-COMPLAINT

## TWENTIETH AFFIRMATIVE DEFENSE

### (Supersession )

20.    In the event any partnership was formed between any of Cross-Complainants and any of Cross-Defendants, which Cross-Defendants deny, such partnership terminated automatically upon incorporation of business entities within the purported partnership.

## TWENTY FIRST AFFIRMATIVE DEFENSE

### (Mutual Rescission/Abandonment)

21.    The Cross-Complaint is barred because any agreement between any Cross-Complainant and any Cross-Defendant has been abandoned and cannot form a basis for liability. Cal. Civ. Code § 1689.

## TWENTY SECOND AFFIRMATIVE DEFENSE

### (Modification)

22.    The Cross-Complaint is barred because any oral agreement between any Cross-Complainant and any Cross-Defendant has been the subject of modification and the original oral agreement is extinguished.  Cal. Civ. Code § 1697.

## TWENTY THIRD AFFIRMATIVE DEFENSE

### (Failure to Do Equity)

23.    The Cross-Complaint is barred because Cross-Complainant failed to do equity in the matters alleged in the Cross-Complaint.

## TWENTY FOURTH AFFIRMATIVE DEFENSE

### (Adequate Remedy at Law)

24.    The Cross-Complainant's equitable claims are barred because Cross-Complainant has an adequate remedy at law.

## TWENTY FIFTH AFFIRMATIVE DEFENSE

### (Right to Assert Additional Affirmative Defenses)

25.    Cross-Defendants presently have insufficient knowledge or information on which to form a belief as to whether Cross-Defendants may have additional, as yet unstated, affirmative defenses available.  Cross-Defendants reserve the right to assert additional defenses in the event

1    that discovery indicates they would be appropriate.

2

3        **WHEREFORE**, Cross-Defendants pray that this Court enter judgment:

4    A. Dismissing Cross-Complainants' Cross-Complaint in its entirety with prejudice;

5    B. Awarding Cross-Defendants their attorneys' fees and costs in this action; and

6    C. For any other relief this Court may deem just and proper.

7

Dated:    May 30, 2018            MANATT, PHELPS & PHILLIPS, LLP

8

9

                                By: _____
10
                                    Reid P. Davis

11

12

13
320455033.1
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                7

                    ANSWER TO SECOND AMENDED CROSS-COMPLAINT

**PROOF OF SERVICE**

I, Erica L. Nash, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California 90064-1614. On **May 30, 2018,** I served the within:

**CROSS- DEFENDANTS' ANSWER TO SECOND AMENDED CROSS-COMPLAINT**

on the interested parties in this action addressed as follows:

Jon A. Atabek. Esq.                    *Attorneys for Defendant,*
**ATABEK & ASSOCIATES, P.C.**          Garry Y. Itkin
16330 Bake Parkway
Irvine, CA 92618
Phone: (213) 394-5943
Fax:    (213) 402-3413
Email: jatabek@atabeklaw.com

☒    **(BY MAIL)** By placing such document(s) in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of correspondence for mailing with the United States Postal Service, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

☐    **(BY OVERNIGHT MAIL)** By placing such document(s) in a sealed envelope, for collection and overnight mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of overnight service mailing, said practice being that in the ordinary course of business, correspondence is deposited with the overnight messenger service, **FEDEX**, for delivery as addressed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on **May 30, 2018**, at Los Angeles, California.

_____
Erica L. Nash

319445481.1

# Exhibit 6

a:\Vollmeng.doc

# POWER OF ATTORNEY

Know all men by these presents, that we

### Alexander Sabadash

address and passport number for identification

### Larissa Sabadash

address and passport number for identification

have made, constituted and appointed and by these presents do make, nominate and appoint

### Garry Itkin

address and passport number for identification

our true and lawful attorney, for us and in our name, place and stead:

1.   To make, carry out and execute any and all contracts regarding our interests

   - within AMBER TRUTS, trustee: Merlin Trust Company, 4, Britannia Place, Bath Street, St. Hélier, JE4 RE5, Isle of Jersey;

   - within GOLDEN SPIRITS LTD., a private limited company by shares, incorporated under the Laws of Jersey at 4, Britannia Place, Bath Street, St. Hélier, Jey RE5, Isle of Jersey;

   - within SPHINX CORPORATION AG, a stock company, incorporated under the Laws of Switzerland, at Mullerhof, St. Niklausstrasse 1, 4500 Solothurn, Switzerland;

   - within MAXOIL PROPERTY LTD., a private limited company by shares, incorporated under the Laws of United Kingdom, at 11, Wimpole Mews , London W1m 7TE, United Kingdom.

2.   To carry on, conduct and conclude any and all negotiations in and about our interests in the said companies and trust.

3.   To carry on, conduct and render any instruction to the Directors, Trustees, protectors, attorneys, agents, representants and staff of the said companies and trust and to our other attorneys appointed by us. Such instruction shall be executed by the said persons, in so far such instruction are not against the Law, statutory regulations, customs and/or moral.

4.   To receive, endorse and collect checks payable to our order, for whatever account, and to give full discharge for same.

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000294

**68-1**

Seite 2/2

5. To collect, receive and receipt for all interests moneys and all money or credits of any kinds or nature belonging or owing to our account or our claim against.

6. To manage our property arising of our interests in the said companies and trusts and to do any and very act of whatsoever nature concerning the same or in relation thereto which we might personally do, hereby giving and granting unto our said attorney full and to all intents and purposes as we might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that our said attorney may lawfully do or cause to be done by virtue hereof. The enumeration of special powers herein shall in no way be construed to limit the broad general powers herein given it being my intention, by this instrument, to confer unto my said attorney every power that may be conferred under the law of the land;

7. This Power of Attorney shall not be affected by disability of the Principals.

8. We engage ourselves to pay all fees to our said attorney.

9. This power of Attorney and our contractual relations to our said attorney shall be governed by Swiss Law.

In witness thereof, we have hereunto set our hand this 1st day of May, 2000.

Signed, acknowledged and

delivered by:

The Attorney                                    The Principals

......................................          ......................................

Garry Itkin                                      Alexander Sabadash

                                                 ......................................

                                                 Larissa Sabadash

*Please enclose an actual copy of the Passports of each subscribing party.*

*Please issue 7 originals of the agreement*

*destined to each of the companies.*

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

The Secretary of State
of the United States of America
hereby requests all whom it may concern to permit the citizen/
national of the United States named herein to pass
without delay or hindrance and in case of need to
give all lawful aid and protection.

Le Secrétaire d'Etat
des Etats-Unis d'Amérique
prie par les présentes toutes autorités compétentes de laisser passer
le citoyen ou ressortissant des Etats-Unis titulaire du présent passeport,
sans délai ni difficulté et, en cas de besoin, de lui accorder
toute aide et protection légitimes.

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE

**NOT VALID UNTIL SIGNED**



UNITED STATES OF AMERICA

TKIN

GARRY YURI

UNITED STATES OF AMERICA

27 MAY/MAI 60

M    UKRAINE

21 AUG/AOU 97        27 AUG/AOU

PASSPORT AGENCY

LOS ANGELES        24

P<USAITKIN<<GARRY<YURI<<<<<<<<<<<<<<<<<<<<

AFB0000296

68-3

# Exhibit 7

| | |
|---|---|
| **From:** | Garry Itkin <itkin1@icloud.com> |
| **Sent:** | Thursday, August 18, 2016 12:20 PM |
| **To:** | jcorozzo@rubcorlaw.com |
| **Subject:** | Structure (1 of 4) |
| **Attachments:** | AS Structure.xlsx; Untitled attachment 00004.txt |

Dear Joseph:

This email as well as 3 more to follow will provide you with requested information to clearly establish ownership of the Beverly Park property beneficially belonging to Alexander Sabadash. Please note that information provided in these 4 emails is shared pursuant direct order by Alexander Sabadash and is attorney-client privileged.

Attached below is a diagram of of entities. Corporate documents for each entity are to follow.

1

AFB0003668

```
                                   Alexander Sabadash
                                          |
                                   100% ownership of
                  |=========|==================|=======================|
            AFB Trading One, Inc.                          SCI La Desirade
             Callifornia Corp.                               French LLC
            Director: Garry Itkin                    Director: Alexander Sabadash
                     |                                          |
            100% ownership of                          100% ownership of
                     |                                          |
M-BJEP Limited    M-NICE Limited    Golden Sphinx Limited    House in France
Isle of Man LLC   Isle of Man LLC    Isle of Jersey LLC
Director: Piotr Szymanski   Director: Piotr Szymanski   Director: Piotr Szymanski
Director: Garry Itkin   Director: Garry Itkin   Director: Garry Itkin
        |                  |                  |
100% ownership of   100% ownership of   100% ownership of
        |                  |                  |
Gulfstream 550    Gulfstream 200    New Albion Limited
                                    UK LLC, qualified in CA
                                    Director: Piotr Szymanski
                                          |
                                    100% ownership of
                                          |
                                    House in Beverly Hills
```

1

AFB0003669

| | | | |
|---|---|---|---|
| | **Alexander Sabadash** | | |
| | | | |
| | 100% ownership of | | |
| | ==================== | | |
| | AFB Trading One, Inc. | | |
| | Callifornia Corp. | | |
| | Director: Garry Itkin | | |
| | | | |
| | 100% ownership of | | |
| | | | |
| | Golden Sphinx Limited | | |
| | Isle of Jersey LLC | | |
| | Director: Piotr Szymanski | | |
| | Director: Garry Itkin | | |
| | | | |
| | 100% ownership of | | |
| | | | |
| | New Albion Limited | | |
| | UK LLC, qualified in CA | | |
| | Director: Piotr Szymanski | | |
| | | | |
| | 100% ownership of | | |
| | | | |
| | House in Beverly Hills | | |
| | | | |
| | | | |

# Exhibit 8

**Attachments:**    Order to Act AFB.pdf
ATT00001.htm
Order to Act Maxxim.pdf
ATT00002.htm
Order to Act VLK.pdf
ATT00003.htm
Order to Act New Albion.pdf
ATT00004.htm
Order to Act Diesel.pdf
ATT00005.htm
Order to Act Golden.pdf
ATT00006.htm
Order to Act Vyborg.pdf
ATT00007.htm
Order to Act M-BJEP.pdf
ATT00008.htm
Order to Act M-NICE.pdf
ATT00009.htm
Order to Act AS.pdf
ATT00010.htm

Sent from my iPhone

Begin forwarded message:

> **From:** "advokatsp@gmail.com" <advokatsp@gmail.com>
> **Date:** August 13, 2016 at 11:58:59 PDT
> **To:** V L <l2020@hotmail.com>
> **Subject: Fwd: 10 приказов о передаче инфо**
>
>
> Пересылка от Garry. На проверку. Он хочет, чтобы Алекс подписал.
>
> *Содержимое настоящего письма и приложений к нему составляет
> адвокатскую тайну, охраняемую ст.8 Федерального Закона РФ "Об
> адвокатской деятельности и адвокатуре в РФ".*
> *Адвокат*
> *Павел Шпилевой-Шатский.*
>
> Отправлено с мобильного устройства iPhone 6 plus
>
> Начало переадресованного сообщения:
>
>> **От:** Garry Itkin <itkin1@icloud.com>
>> **Дата:** 13 августа 2016 г., 21:39:13 GMT+3
>> **Кому:** "advokatsp@gmail.com" <advokatsp@gmail.com>
>> **Тема: 10 приказов о передаче инфо**

### Demand and Order to act:

I, Alexander Sabadash, a 100% shareholder of AFB Trading One., Inc. (Company), domiciled at 8501 Wilshire Blvd., Suite 330, Beverly Hills, California 90211, hereby order its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____

Principal:
Alexander Sabadash

_____

Witness:
Pavel Shpilevoy-Shatskiy, Attorney-at-Law
Managing partners
Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000023

### Demand and Order to act:

I, Alexander Sabadash, hereby order my authorized representative Garry Y. Itkin to provide whatever personal information and documentation is available to him and in his possession, including but not limited to information related to my personal taxes, to Joseph Corozzo, Attorney at Law of the Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned. The release and waiver executed herein by the undersigned is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration.  The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.

_____              _____

Principal:                                              Witness:
Alexander Sabadash                                 Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                                            Managing partners
                                                            Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

## Demand and Order to act:

I, Alexander Sabadash, a 100% beneficial shareholder of Diesel Limited (Company), domiciled in Isle of Jersey, Channel Islands, United Kingdom, hereby order its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____          _____

Principal:                                Witness:
Alexander Sabadash                        Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                          Managing partners
                                          Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000027

**Demand and Order to act:**


I, Alexander Sabadash, a 100% beneficial shareholder of Golden Sphinx Limited (Company), domiciled in Isle of Jersey, Channel Islands, United Kingdom, hereby order its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____            _____

Principal:                                                    Witness:
Alexander Sabadash                                  Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                                                   Managing partners
                                                                   Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000026

**158-5**

## Demand and Order to act:

I, Alexander Sabadash, a 100% shareholder of Maxxim Distribution, Inc. (Company), domiciled at 8501 Wilshire Blvd., Suite 330, Beverly Hills, California 90211, hereby order its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration.  The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____

Principal:
Alexander Sabadash

_____

Witness:
Pavel Shpilevoy-Shatskiy, Attorney-at-Law
Managing partners
Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000022

## Demand and Order to act:

I, Alexander Sabadash, a 100% beneficial shareholder of M-BJEP Limited (Company), domiciled at Bridge Chambers, West Quay, P.O. Box 665, Ramsey, Isle of Man, IM81DL., hereby <u>order</u> its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____          _____

Principal:                                        Witness:
Alexander Sabadash                                Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                                  Managing partners
                                                  Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000028

**158-7**

## Demand and Order to act:

I, Alexander Sabadash, a 100% beneficial shareholder of M-NICE Limited (Company), domiciled at Bridge Chambers, West Quay, P.O. Box 665, Ramsey, Isle of Man, IM81DL., hereby order its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____          _____

Principal:                            Witness:
Alexander Sabadash                    Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                      Managing partners
                                      Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000029

**158-8**

### Demand and Order to act:

I, Alexander Sabadash, a 100% beneficial shareholder of New Albion Limited (Company), domiciled at Palladium House, ¼ Argyll Street, London, United Kingdom, W1F 7LD, hereby order my representative Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.

_____

Principal:
Alexander Sabadash

_____

Witness:
Pavel Shpilevoy-Shatskiy, Attorney-at-Law
Managing partners
Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

## Demand and Order to act:

I, Alexander Sabadash, a 100% beneficial and owner of record of VLK Air, LLC and its successor VLK Air, Inc. (Company), domiciled at 8501 Wilshire Blvd., Suite 330, Beverly Hills, California 90211, hereby order its Manager and Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.


_____                    _____

Principal:                                                                    Witness:
Alexander Sabadash                                            Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                                                                   Managing partners
                                                                                   Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

## Demand and Order to act:

I, Alexander Sabadash, a 100% beneficial shareholder of Vyborg Limited (Company), domiciled in Isle of Jersey, Channel Islands, United Kingdom, hereby order its Director Garry Y. Itkin to provide information and documents available to him and in his possession to Joseph Corozzo, Attorney at Law of Law Offices of Rubinstien & Corozzo, and hereby unconditionally release and fully discharge Garry Y. Itkin from any and all claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the undersigned and to the Company. The release and waiver executed herein by the undersigned as principal and as authorized agent for the Company, is intended to be for all claims known and unknown and therefore waives the protection of California Civil Code Section 1542:

**Counsel.**

Each of the parties to this Receipt and Release has had the opportunity to consult with its independent counsel and either has done so or waived such right to do so.

**Choice of Law and Jurisdiction.**

The parties to this Receipt and Release (on behalf of themselves and the companies) choose to resolve any disputes before JAMS in Los Angeles California by binding arbitration in accordance with the JAMS rules for expedited arbitration. The arbitration shall be before a single arbitrator who is a retired judge of the Superior Court of California or the United States District Court for the Central District of California.

_____       _____

Principal:                                                      Witness:
Alexander Sabadash                                    Pavel Shpilevoy-Shatskiy, Attorney-at-Law
                                                                     Managing partners
                                                                     Law office of "Shpilevoy-Shatskiy & partners"

CONFIDENTIAL – SUBJECT TO
PROTECTIVE ORDER

AFB0000025

# Exhibit 9

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2            FOR THE COUNTY OF LOS ANGELES
 3   DEPARTMENT 62        HON. MICHAEL L. STERN, JUDGE
 4
 5   AFB TRADING ONE, INC., a        )
     California corporation; M-BJEP  )
 6   LIMITED, an Isle of Man         )
     corporation; M-NICE LIMITED, an )
 7   Isle of Man corporation; GOLDEN )
     SPHINX LIMITED; a Jersey        )
 8   corporation; NEW ALBION PROPERTY)
     LIMITED, an England corporation,)
 9                                   )
                   Plaintiffs,       )
10                                   ) SUPERIOR COURT
          vs.                        ) CASE NO. BC647351
11                                   )
     GARRY Y. ITKIN, an individual;  )
12   THE LIGHTHOUSE PARTNERSHIP      )
     LIMITED, an England corporation;)
13   and DOES 1 through 100, inclusive, )
14                   Defendants.     )
     _____)
15   AND RELATED CROSS-ACTIONS.      )
                                     )
16
17        REPORTER'S TRANSCRIPT OF PROCEEDINGS
18      Wednesday, March 11, 2020 (A.M. Session)
19   APPEARANCES OF COUNSEL:
20   FOR PLAINTIFFS:    MANATT, PHELPS & PHILLIPS, LLP
                        BY:  ROBERT H. PLATT, ESQ.
21                           MICHAEL ZORKIN, ESQ.
                             REID P. DAVIS, ESQ.
22                      2049 Century Park East
                        Suite 1700
23                      Los Angeles, California  90067
                        rplatt@manatt.com
24                      mzorkin@manatt.com
                        rdavis@manatt.com
25
26   (Appearances continued on next page.)
27                      DAVID A. SALYER, CSR, RMR, CRR
                        Official Pro Tem Court Reporter
28                      License No. 4410
```

```
 1   INDEX FOR WEDNESDAY, MARCH 11, 2020(A.M. SESSION)
 2
 3        CHRONOLOGICAL INDEX OF WITNESSES
 4   WITNESS         DIRECT   CROSS  REDIRECT  RECROSS
 5   ITKIN, Garry(Cont'd) 776    2
 6
 7
 8            EXHIBIT INDEX
 9   EXHIBIT NO.   DESCRIPTION      FOR ID   IN EVIDENCE
10   (See Clerk's Minute Order.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

```
 1   APPEARANCES OF COUNSEL: (CONTINUED)
 2
 3   FOR DEFENDANTS:    KABATECK, LLP
                       BY:  BRIAN S. KABATECK, ESQ.
 4                          CHRISTOPHER NOYES, ESQ.
                           STEPHANIE E. CHARLIN, ESQ.
 5                          MARINA R. PACHECO, ESQ.
                       633 West Fifth Street
 6                     Suite 3200
                       Los Angeles, California  90071
 7                     (213)217-5000
                       bsk@bklawyers.com
 8                     cn@bklawyers.com
                       sc@bklawyers.com
 9                     mrp@bklawyers.com
10                     &
11                     ATABEK & ASSOCIATES, P.C.
                       BY:  JON A. ATABEK, ESQ.
12                     16330 Bake Parkway
                       Irvine, California  92618
13                     (213)394-5943
                       jatabek@atabeklaw.com
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

```
                                                      1
 1   CASE NUMBER:              BC647351
 2   CASE NAME:                AFB TRADING V. ITKIN
 3   LOS ANGELES, CALIFORNIA   WEDNESDAY, MARCH 11, 2020
 4   DEPARTMENT 62             MICHAEL L. STERN, JUDGE
 5   REPORTER:                 DAVID A. SALYER, CSR 4410
 6   TIME:                     8:30 A.M.
 7                  -o0o-
 8        (The following proceedings were held
 9        outside the jury's presence.)
10        THE COURT:  Do you want to make your appearances for
11   the record?
12        MR. ZORKIN:  Michael Zorkin on behalf of the
13   plaintiffs.
14        MR. DAVIS:  Reid Davis on behalf of plaintiffs and
15   cross-defendant.
16        MR. NOYES:  Good morning, your Honor.  Chris Noyes on
17   behalf of Mr. Itkin.
18        MS. PACHECO:  Good morning, your Honor.  Marina Pacheco
19   on behalf of the defendant, Garry Itkin.
20        MS. CHARLIN:  Good morning, your Honor.  Stephanie
21   Charlin on behalf of Garry Itkin.
22        MR. KABATECK:  And Brian Kabateck, also appearing on
23   behalf of Mr. Itkin.
24        THE COURT:  Good morning.
25        MR. ATABEK:  John Atabek on behalf of defendant.
26        THE COURT:  We'll get off the ground in a few minutes.
27        MR. KABATECK:  Should Mr. Itkin retake the stand?
28        THE COURT:  Stand by.  I'll give you a couple minutes
```

| | 22 |
|---|---|
| 1 | owner of the house. |
| 2 | Q. Who was the owner? |
| 3 | A. New Albion. |
| 4 | Q. Okay. Did you inform New Albion? |
| 5 | A. New Albion was me. |
| 6 | Q. Okay. So because New Albion was you, did you |
| 7 | send a letter to the trust and say, guess what, guys, I just |
| 8 | took a $2 million loan out on the house. I just want you to |
| 9 | know? |
| 10 | A. There was no point sending it to the trust. The |
| 11 | New Albion was already out of the trust. |
| 12 | I felt that because the house was purchased with the |
| 13 | partnership money and I'm owed $55 million by Mr. Sabadash, I |
| 14 | am free to take a loan. |
| 15 | Q. Okay. If you're really owed $55 million, why |
| 16 | would you only borrow two? Why not borrow 20 million against |
| 17 | the house? |
| 18 | A. At that point of time, this is all that I was |
| 19 | offered by Lighthouse. And I don't need $20 million. You |
| 20 | know, I don't fly airplanes. I live normal life. |
| 21 | Q. But if you were owed the money, you should take |
| 22 | it. |
| 23 | A. I was not offered the money, sir. I just said |
| 24 | that. |
| 25 | THE COURT: Counsel, this is not a conversation. It's |
| 26 | a question and answer to inform the jury of what the facts are |
| 27 | to enable the jury to ultimately reach conclusions, please. |
| 28 | Q. BY MR. PLATT: I want to go back to something |

| | 23 |
|---|---|
| 1 | you said. You said that New Albion was outside the trust. |
| 2 | A. Yes. |
| 3 | Q. And what do you base that belief on? |
| 4 | A. Based this belief on a decision of a Court in |
| 5 | Jersey, sir. |
| 6 | Q. And that decision was based on when you sued |
| 7 | Golden Sphinx, correct? |
| 8 | A. Correct. |
| 9 | Q. And in that case you sued Golden Sphinx and |
| 10 | Golden Sphinx didn't have a lawyer, correct? |
| 11 | A. It did have a lawyer, sir. We went over it |
| 12 | yesterday. |
| 13 | Q. It didn't have a lawyer at the courthouse |
| 14 | proceeding, correct? |
| 15 | A. Did not have a lawyer at the courthouse |
| 16 | proceeding. It was up to a lawyer to be there or not. |
| 17 | Q. Now, let's move on. |
| 18 | I want to turn your attention to your claim that you're |
| 19 | Mr. Sabadash's partner, okay? |
| 20 | A. Yes. |
| 21 | Q. And you're a sophisticated businessman, correct? |
| 22 | A. I don't know what it means. I'm a businessman, |
| 23 | yes. |
| 24 | Q. Okay. And you graduated from UCLA? |
| 25 | A. Graduated from Pepperdine, sir. |
| 26 | Q. Okay. You attended UCLA? |
| 27 | A. I attended UCLA. |
| 28 | Q. You got an MBA from Pepperdine? |

| | 24 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And you graduated from law school in Russia? |
| 3 | A. Yes. |
| 4 | Q. And you're a licensed accountant? |
| 5 | A. No, incorrect. |
| 6 | MR. PLATT: If you don't mind, your Honor, could we |
| 7 | play page 31, line 23, to 32, line 5? |
| 8 | MR. KABATECK: Object, your Honor. It's just |
| 9 | duplicative. |
| 10 | THE COURT: Sustained. It's what he just said. |
| 11 | Q. BY MR. PLATT: Are you an enrolled agent? |
| 12 | A. No, sir. |
| 13 | Q. You were, correct? |
| 14 | A. I was at one point of time. I gave up my |
| 15 | practice and I gave up my enrollment when I joined |
| 16 | Mr. Sabadash in Russia. I gave up my life here. |
| 17 | Q. Now, when did this partnership start? |
| 18 | A. Are you referring to my partnership with |
| 19 | Mr. Sabadash? |
| 20 | Q. Correct. |
| 21 | A. In 1998 we have agreed to be partners. |
| 22 | Q. And when did you actually start working full |
| 23 | time in this alleged partnership? |
| 24 | A. I've made couple trips to Russia in '98. I made |
| 25 | probably six or seven trips. |
| 26 | When I say trips, it's not one-day trip. I mean it's |
| 27 | two, three weeks, a month. In '99 I made five, six trips. |
| 28 | In 2000 I've moved to Russia to live there and visiting |

| | 25 |
|---|---|
| 1 | my family maybe once a month, once every couple months. |
| 2 | Q. And part of your compensation package was |
| 3 | Mr. Sabadash paid for you to fly business class a certain |
| 4 | number of times a year back and forwards between Russia and |
| 5 | Los Angeles? |
| 6 | A. I did not have a compensation package, sir. |
| 7 | Q. Mr. Sabadash paid for you to fly back and forth, |
| 8 | correct? |
| 9 | A. The payments for my travel, just as much as |
| 10 | payments for Mr. Sabadash's travels. Were coming out of our |
| 11 | partnership accounts. |
| 12 | Q. Now, when you -- let me ask another question |
| 13 | before I jump into that. |
| 14 | Is the partnership still alive? Is it operating? |
| 15 | MR. KABATECK: Calls for a legal conclusion. |
| 16 | THE COURT: Sustained as worded. |
| 17 | MR. PLATT: Okay. |
| 18 | Q. Are you still a member or in the partnership? |
| 19 | A. I don't think so. We're in a courtroom trying |
| 20 | to enter this partnership and figure out who owes what to |
| 21 | whom. |
| 22 | Q. When did the partnership end? |
| 23 | MR. KABATECK: Calls for a legal conclusion. |
| 24 | THE COURT: Sustained. |
| 25 | Q. BY MR. PLATT: When did you believe the |
| 26 | partnership ended? |
| 27 | A. I believe the partnership ended when I was |
| 28 | removed from the offices and refused to be paid monies that |

---

26

1    I'm owed.
2        Q.    Would that be in 2016?
3        A.    I believe so.
4        Q.    I didn't hear you.
5        A.    I believe so.  I'm sorry.
6        Q.    And when you claim this partnership was formed,
7    you didn't put any of the purported terms in writing, right?
8        A.    That is correct.
9        Q.    And the partnership was never documented in any
10   writings?
11       A.    That's incorrect, sir.
12       Q.    Let's take a look at page 529, lines 8 to 12.
13       MR. KABATECK:  There is an objection interposed there,
14   your Honor.
15       THE COURT:  Otherwise?
16       MR. KABATECK:  Otherwise I have no objection.
17       THE COURT:  Just take that part out, please.  That's at
18   line 11.
19            (Videotaped deposition of Garry Itkin
20                played as transcribed.)
21            "Q.  From '98 to 2014 there's not a
22            single writing that reflects that a
23            partnership existed between you and
24            Alexander Sabadash; is that correct?
25            "A.  I don't know."
26       Q.    BY MR. PLATT:  So between 1998 and 2014 you're
27   not aware.
28            Now, did you make any efforts after 2014 to document

27

1    the partnership?
2        A.    I'm trying to understand your question.
3        Q.    If you don't understand, I'm happy to repeat it.
4    After 2014 are you aware of a single document anywhere
5    in the universe referencing the partnership?
6        A.    After 2014 I'm not.
7            However, the statement that you wrote on the board
8    isn't correct.
9        Q.    Okay.  That's okay.  You'll have plenty of time.
10   This is what you testified to.
11           Now, I'm not asking you --
12       THE COURT:  Counsel, it's what you wrote.
13       MR. PLATT:  Okay.
14       THE COURT:  And it's not appropriate to have it on
15   there if the witness disagrees with it.
16       MR. PLATT:  Okay.  I'll take it down.
17       Q.    Is there a single email anywhere in the universe
18   that reflects the existence of the partnership?
19       MR. KABATECK:  Objection.  It's overbroad and calls for
20   speculation.
21       THE COURT:  No.  I'll allow it.
22       THE WITNESS:  There are emails that contain documents
23   that prove the existence of the partnership.
24       Q.    BY MR. PLATT:  Is there a single email in the
25   entire universe that mentions the partnership?
26       A.    I'm sure there are.  I don't know.
27       Q.    You don't know.  You don't know of any.  Okay.
28       A.    In the entire universe.

28

1        Q.    I'll limit it to Earth, okay?  Would that help?
2    Is there a single email anywhere in the world that
3    mentions the partnership?
4        MR. KABATECK:  Calls for speculation.
5        THE COURT:  Overruled.  You may respond to the extent
6    you're able.
7        THE WITNESS:  There are emails that mention
8    partnership.
9        Q.    BY MR. PLATT:  I didn't hear you.  I'm sorry.
10       A.    There are, yes.
11       Q.    And it actually mentions the partnership?
12       A.    Yes, sir.
13       Q.    Can you identify any of them for me?
14       A.    Of course.  There was a lawsuit in Russia --
15       Q.    I'm not asking about --
16       MR. KABATECK:  May he answer the question, your Honor?
17       Q.    BY MR. PLATT:  I'm asking an email.
18       THE COURT:  You asked for the whole Earth and I guess
19   we're going to get the whole Earth.
20       MR. PLATT:  And it's a motion in limine too, your
21   Honor.
22       MR. KABATECK:  He opened the door.
23       MR. PLATT:  I didn't ask this question.  I asked for an
24   email.
25       THE COURT:  You may respond, sir.
26       THE WITNESS:  There is a lawsuit in Russia where a
27   partnership is being sued by a contractor of the partnership
28   who was contracted to give advice to the partnership.  That

29

1    person was underpaid and that person went to court.
2            There are decisions of the Russian court to that effect
3    confirming the existence of a partnership.
4        MR. PLATT:  It's hearsay, your Honor.  I move to strike
5    it.  And it's a legal conclusion.
6        THE COURT:  I think you got the response that your
7    whole universe, Whole Earth Catalog question.
8            Next question, please.
9        Q.    BY MR. PLATT:  I'm asking about an email.
10           In an email, typed in an email -- do you understand --
11   I'm asking you typed in an email have you ever seen any
12   reference to a partnership between you and Mr. Sabadash?
13       A.    There are numerous emails concerning this
14   lawsuit that I just mentioned, and all those emails are
15   referring to the partnership.
16           Additionally, I have been notified by Russian courts --
17       MR. PLATT:  Objection, your Honor.  Hearsay.
18       THE COURT:  I think we're going to get out of the
19   Russian courts and get back to Los Angeles.
20       MR. PLATT:  Okay.
21       Q.    Now, did Mr. Sabadash pay you as an employee?
22       A.    No, sir.
23       Q.    Okay.  Let's take a look at Exhibit 415.
24           Now, these are your W-2 wage statements, sir?
25       A.    Yes.
26       Q.    Okay.  And you were an employee of AFB?
27       A.    Yes.
28       Q.    Okay.  Let's move along here.

---

# Exhibit 10

EXHIBIT

Ratner
6-4-19

PENGAD 800-631-6989

| Void ☐ | a Employee's social security number | Copy D—For Employer. |
| | ▮▮▮▮▮▮▮ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| ▮▮▮▮▮▮▮ | 100000.00 | |
| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
| AFB TRADING ONE, INC. | 100000.00 | 6200.00 |
| | 5 Medicare wages and tips | 6 Medicare tax withheld |
| 8501 WILSHIRE BLVD. # 330 | 100000.00 | 1450.00 |
| BEVERLY HILLS, CA 90211 | 7 Social security tips | 8 Allocated tips |
| d Control number | 9 Advance EIC payment | 10 Dependent care benefits |
| 3 | | |
| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 12a See instructions for box 12 |
| GARRY          ITKIN | | |
| | 13 Statutory employee | Retirement plan | Third-party sick pay | 12b |
| 8501 WILSHIRE BLVD. #330 | 14 Other | 12c |
| BEVERLY HILLS          CA 90067 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| CA | ▮▮▮▮▮▮ | 100000.00 | | 100000.00 | 997.36 | CA SDI |

Form **W-2** Wage and Tax Statement

**2009**

38-2099803   Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see the back of Copy D.

---

| Void ☐ | a Employee's social security number | Copy D—For Employer. |
| | | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
| | | |
| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
| | | |
| | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | | |
| | 7 Social security tips | 8 Allocated tips |
| d Control number | 9 Advance EIC payment | 10 Dependent care benefits |
| | | |
| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | |
| | 13 Statutory employee | Retirement plan | Third-party sick pay | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| | | | | | | |

Form **W-2** Wage and Tax Statement

**2009**

38-2099803   Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see the back of Copy D.

BW2ERD       NTF 2573245

**415-1**

DO NOT STAPLE

| 33333 | a Control number | For Official Use Only ▶ OMB No. 1545-0008 | | |
|---|---|---|---|---|

| b Kind of Payer | 941 ☑ Military 943 944 CT-1 Hshld. emp. Medicare govt. emp. Third-party sick pay | 1 Wages, tips, other compensation 100000.00 | 2 Federal income tax withheld |
|---|---|---|---|
| | | 3 Social security wages 100000.00 | 4 Social security tax withheld 6200.00 |
| c Total number of Forms W-2  1 | d Establishment number | 5 Medicare wages and tips 100000.00 | 6 Medicare tax withheld 1450.00 |
| e Employer identification number (EIN) | | 7 Social security tips | 8 Allocated tips |
| f Employer's name AFB TRADING ONE, INC. | | 9 Advance EIC payments | 10 Dependent care benefits |
| 8501 WILSHIRE BLVD. # 330 | | 11 Nonqualified plans | 12 Deferred compensation |
| BEVERLY HILLS    CA 90211 | | 13 For third-party sick pay use only | |
| | | 14 Income tax withheld by payer of third-party sick pay | |
| g Employer's address and ZIP code | | | |
| h Other EIN used this year | | | |
| 15 State CA  Employer's state ID number | | 16 State wages, tips, etc. 100000.00 | 17 State income tax |
| | | 18 Local wages, tips, etc. 100000.00 | 19 Local income tax 693.58 |
| Contact person | | Telephone number ( ) | For Official Use Only |
| Email address | | Fax number ( ) | |

Under penalties of perjury, I declare that I have examined this return and accompanying documents. and, to the best of my knowledge and belief, they are true, correct, and complete.

Signature ▶ _Winn_    Title ▶ _Bookkeeper_    Date ▶ _01/31/09_

## Form W-3 Transmittal of Wage and Tax Statements  2008
38-2099803    Department of the Treasury
Internal Revenue Service

**Send this entire page with the entire Copy A page of Form(s) W-2 to the Social Security Administration.**

**Do not** send any payment (cash, checks, money orders, etc.) with Forms W-2 and W-3.

### Reminder

**Separate instructions.** See the 2008 Instructions for Forms W-2 and W-3 for information on completing this form.

### Purpose of Form

A Form W-3 Transmittal is completed only when paper Copy A of Form(s) W-2, Wage and Tax Statement, are being filed. Do not file Form W-3 alone. Do not file Form W-3 for Form(s) W-2 that were submitted electronically to the Social Security Administration (see below). All paper forms **must** comply with IRS standards and be machine readable. Photocopies and hand-printed forms are **not** acceptable. Use a Form W-3 even if only one paper Form W-2 is being filed. Make sure both the Form W-3 and Form(s) W-2 show the correct tax year and Employer Identification Number (EIN). Make a copy of this form and keep it with Copy D (For Employer) of Form(s) W-2 for your records.

### Electronic Filing

The Social Security Administration strongly suggests employers report Form W-3 and W-2 Copy A electronically instead of on paper. SSA provides two e-file options:

● Free fill-in Forms W-2 for employers who file 20 or fewer Form(s) W-2.

● Upload a file for employers who use payroll/tax software to print Form(s) W-2, if the vendor software creates a file that can be uploaded to SSA.

For more information, go to www.socialsecurity.gov/employer and select "First Time Filers" or "Returning Filers" under "BEFORE YOU FILE."

### When To File

Mail any paper Forms W-2 under cover of this Form W-3 Transmittal by March 2, 2009. Electronic fill-in forms or uploads are filed through SSA's Business Services Online (BSO) Internet site and will be on time if submitted by March 31, 2009.

### Where To File Paper Forms

Send this entire page with the entire Copy A page of Form(s) W-2 to:

**Social Security Administration
Data Operations Center
Wilkes-Barre, PA 18769-0001**

**Note.** If you use "Certified Mail" to file, change the ZIP code to "18769-0002." If you use an IRS-approved private delivery service, add "ATTN: W-2 Process, 1150 E. Mountain Dr." to the address and change the ZIP code to "18702-7997." See Publication 15 (Circular E), Employer's Tax Guide, for a list of IRS-approved private delivery services.

For Privacy Act and Paperwork Reduction Act Notice, see the back of Copy D of Form W-2.    BW3    NTF 2572330B

**415-2**

| Void ☐ | a Employee's social security number ▓▓▓▓▓▓ | Copy D—For Employer. OMB No. 1545-0008 | | |
|---|---|---|---|---|
| b Employer identification number (EIN) ▓▓▓▓ | | 1 Wages, tips, other compensation 100000.00 | 2 Federal income tax withheld | |
| c Employer's name, address, and ZIP code AFB TRADING ONE, INC. 8501 WILSHIRE BLVD. # 330 BEVERLY HILLS, CA 90211 | | 3 Social security wages 100000.00 | 4 Social security tax withheld 6200.00 | |
| | | 5 Medicare wages and tips 100000.00 | 6 Medicare tax withheld 1450.00 | |
| | | 7 Social security tips | 8 Allocated tips | |
| d Control number 3 | | 9 Advance EIC payment | 10 Dependent care benefits | |
| e Employee's name, address, and ZIP code GARRY ITKIN 8501 WILSHIRE BLVD. #330 BEVERLY HILLS CA 90067 | | 11 Nonqualified plans | 12a See instructions for box 12 | |
| | | 13 Statutory employee  Retirement plan  Third-party sick pay | 12b | |
| | | 14 Other | 12c | |
| | | | 12d | |

| 15 State CA | Employer's state ID number ▓▓▓▓▓ | 16 State wages, tips, etc. 100000.00 | 17 State income tax | 18 Local wages, tips, etc. 100000.00 | 19 Local income tax 693.58 | 20 Locality name CA SD |
|---|---|---|---|---|---|---|

**Form W-2** Wage and Tax Statement    **2008**    38-2099803    Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see the back of Copy D.

---

| Void ☐ | a Employee's social security number | Copy D—For Employer. OMB No. 1545-0008 | | |
|---|---|---|---|---|
| b Employer identification number (EIN) | | 1 Wages, tips, other compensation | 2 Federal income tax withheld | |
| c Employer's name, address, and ZIP code | | 3 Social security wages | 4 Social security tax withheld | |
| | | 5 Medicare wages and tips | 6 Medicare tax withheld | |
| | | 7 Social security tips | 8 Allocated tips | |
| d Control number | | 9 Advance EIC payment | 10 Dependent care benefits | |
| e Employee's name, address, and ZIP code | | 11 Nonqualified plans | 12a See instructions for box 12 | |
| | | 13 Statutory employee  Retirement plan  Third-party sick pay | 12b | |
| | | 14 Other | 12c | |
| | | | 12d | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

**Form W-2** Wage and Tax Statement    **2008**    38-2099803    Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see the back of Copy D.

BW2ERD    NTF 2572391

# Exhibit 11

## GUARANTY

This Guaranty (this **"Guaranty"**) is executed and delivered as of the date set forth below by the undersigned guarantor, Golden Sphinx Limited, a Limited Liability Company duly organized and validly existing under the laws of Isle of Jersey, Channel Islands with its domicile at 43/45 La Motte Street, St Helier, Jersey JE4 8SD, Channel Islands (the **"Guarantor"**) in order to further securitize, guarantee, and provide surety for any and all promises and obligations of Mr. Alexander Sabadash, residing at Moyka River Embankment 64, St. Petersburg, the Russian Federation 190000, Russian Passport Number 63 N869249 (the **"Obligor"**), pursuant any and all documents, instruments, certificates and agreements, whether oral or in writing. The Obligor is beneficial owner of and indirectly owns 100% of the equity interests in Guarantor. Guarantor is hereby pledging, without limitations, all of its assets to secure timely payment of all of Obligor's Obligations (as hereinafter defined). Guarantor further absolutely and unconditionally guarantees the payment and performance of Obligations of Obligor. Guarantor hereby agrees as follows:

1) **Guaranty**. Guarantor hereby guarantees prompt payment and/or performance of all indebtedness, obligations and liabilities of Obligor at any time owing, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, or acquired by or otherwise created, including without limitation any and all agreements, rent, loan, purchase or other installment payments, principal balances, taxes, indemnities, liquidated damages, accelerated amounts, return deficiency charges, casualty value payments, transaction expenses and other reimbursements, administrative charges, all interest, including late charge interest, attorneys' fees or enforcement and other costs, which may at any time be payable, together with all claims for damages arising from or in connection with the failure to punctually and completely pay or perform Obligor's obligations, arising out of any and all documents, instruments, certificates and agreements, whether oral or in writing, (collectively, the **"Obligations"**). This Guaranty is a guaranty of payment and performance, and Guarantor hereby undertakes and agrees, that if Obligor is in Default (as hereinafter defined) hereunder for any reason, Guarantor shall (i) punctually pay any such Obligations requiring the payment of money, as an obligation for payment due and owing, without any abatement, reduction, setoff, defense, counterclaim or recoupment, and (ii) punctually perform any and all Obligations not requiring the payment of money, as an obligation for performance due and owing directly from Guarantor. Guarantor shall be deemed to be primarily liable for each Obligation and not merely as a surety thereof.

2) **Absolute, Unconditional, Joint and Several Nature of Guaranty**. The obligations of Guarantor hereunder are absolute, unconditional and irrevocable, may not be cancelled, terminated, repudiated or rescinded for any reason, and shall be joint and several with Obligor that may be liable, directly or indirectly, for the payment or performance of any Obligations. Guarantor shall not be released from any obligations under or in respect of this Guaranty for any reason, nor shall such obligations be reduced, diminished or discharged for any reason. It is the obligation of Guarantor to discharge the Obligations when due, notwithstanding any occurrence, circumstance, event, action or omission whatsoever, whether or not particularly described herein. Guarantor acknowledges that it may be required to pay the Obligations, in full, without the assistance or support of any other party.

3) **Waivers**. Guarantor waives Action Against Others.
    a) **Notices**. Notice of the execution, delivery or acceptance by, Obligor or any other party, of this Guaranty or any document, agreement or instrument evidencing any Obligation; notice of modifications or extensions of any Obligation; notice of defaults, or other non-performance by Obligor in connection with any Obligation; notice of the repossession, sale or other disposition of any of the Collateral; notice of the acceptance of this Guaranty; demand and presentation for payment upon Obligor or any other party liable for any Obligation; protest, notice of intention to accelerate or notice of acceleration of any Obligation, notice of protest and diligence in bringing suit against Obligor or any other party;
    b) **Subrogation**. Any right which Guarantor may at any time have against Obligor, or any other party liable for any Obligation, as a result of the performance by Guarantor of its obligations under this Guaranty, including, but not limited to contractual, statutory and common law rights of subrogation, reimbursement, indemnification, set-off or contribution arising after the occurrence of an event or circumstance which becomes an Event of Default.
    c) **Suretyship Defenses**. Any defenses which Guarantor may have or assert against the enforcement of this Guaranty or any Obligation based upon suretyship principles or any impairment of Collateral.

4) **Representations; Warranties; Covenants**. Guarantor hereby represents, warrants, covenants and agrees that this Guaranty has been duly executed and delivered by Guarantor and constitutes the legal, valid and binding obligation of Guarantor enforceable in accordance with its terms.

5) **Default; Performance of Obligations**. An Event of Default occurs under this Guarantee if:
    a) Guarantor is notified in writing that Obligor has failed to promptly pay and/or perform any of his Obligations;
    b) Guarantor is notified in writing that any representation or warranty of Obligor, in any certificate, agreement, statement or document furnished at any time on behalf Obligor, including without limitation, any financial information, is false or incorrect in any material respect and any such breach or violation of any such representation or warranty is not cured within thirty (30) days after written notice thereof;
    c) Guarantor is notified in writing that Obligor failed to perform or observe any covenant, including without limitation,

CONFIDENTIAL

Δ π EXHIBIT _18_
Deponent _ZHKИ_
Date _3 28 19_ Rptr _NN_
WWW.DEPOBOOK.COM

GI070995

**18-1**

any financial covenants, condition or agreement required to be performed or observed by him hereunder or in connection with any Obligation, and such failure shall continue for ten (10) days after written notice thereof to Guarantor;

d)  Guarantor is notified in writing that there is a liquidation, bankruptcy, assignment for the benefit of creditors or similar proceeding affecting assets or obligations of Obligor in respect of the Obligations, provided, however as to any involuntary proceeding such involuntary proceeding is not dismissed within sixty (60) days after the commencement thereof.

Each of the foregoing a – d being hereinafter referred to as a "**Default**". Should event of Default occurs, the Obligations of Obligor shall become immediately due and payable by Guarantor for all purposes of this Guaranty, and Guarantor shall (i) immediately pay all such Obligations owing by Obligor including, without limitation, any liquidated damages, principal or interest payments or balances, fees, other installments or any other accrued or unaccrued amounts with respect to such Obligations, irrespective of whether a Default exists relating to Obligor, and notwithstanding any stay, injunction or other prohibition preventing or affecting acceleration of any Obligations against Obligor, and (ii) promptly perform all other Obligations. <u>Guarantor shall be liable, as principal obligor</u> and not as a surety or guarantor only, for all actual and out of pocket attorneys' fees and other costs and expenses incurred in connection with enforcement of this Guaranty, together with interest on all amounts recoverable under this Guaranty, compounded monthly in arrears, from the time such amounts become due and payable until the date of payment.

6)  **Collateralized Guaranty**.  This is a collateralized Guaranty and is secured by, without limitations, all of Guarantor's assets

7)  **Governing Law; Jurisdiction**. THIS GUARANTY SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE ISLE OF JESEY.

a)  The Guarantor hereby irrevocably consents that any legal action or proceeding against it or any of its assets with respect to this Guaranty may be brought in any jurisdiction where the Guarantor or any of its assets may be found, or in Court of the Isle of Jersey, and by execution and delivery of this Guaranty the Guarantor hereby irrevocably submits to and accepts with regard to any such action or proceeding, for itself and in respect of its assets, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts.

b)  The Guarantor further agrees that final judgment against the Guarantor in any action or proceeding in connection with this Guaranty shall be conclusive and may be enforced in any other jurisdiction within or outside the United Kingdom by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of such party's indebtedness.

c)  The Guarantor hereby irrevocably waives, to the fullest extent permitted by law, any objection which the Guarantor may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in the Isle of Jersey, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in the Isle of Jersey has been brought in an inconvenient forum. To the extent that the Guarantor may in any jurisdiction in which proceedings may at any time be taken for the determination of any question arising under or for the enforcement of this Guaranty (including any interlocutory proceedings or the execution of any judgment or award arising therefrom) be entitled to claim or otherwise be accorded for itself or its property, assets or revenues immunity from suit or attachment (whether in aid of execution, before judgment or otherwise) or other legal process, and to the extent that in any such jurisdiction, there may be attributed to such party, or its property, assets or revenues such immunity (whether or not claimed), such party hereby irrevocably agrees not to claim and waives such immunity to the fullest extent permitted by the law of such jurisdiction.

8)  **Binding Effect**.  This Guaranty shall be binding upon Guarantor and Guarantor's successors and assigns.

9)  **Miscellaneous**.

a)  Time is of the essence in the payment and performance of all Obligations and all of Guarantor's obligations and liabilities hereunder.

b)  All communications and notices provided for herein shall be in writing and shall become effective (i) upon hand delivery, or (ii) upon delivery by a courier delivery service,

The undersigned, pursuant to due authority has or have caused this Guaranty to be executed as of the date set forth below.


Golden Sphinx Limited,


By: Garry Y Itkin, Sole Director and Officer
October 9 2012



CONFIDENTIAL                                                                GI070996


**18-2**

# Exhibit 12

EMPLOYMENT AGREEMENT
("Agreement")

THIS AGREEMENT made as of August 21st, 2015, by and between Golden Sphinx Limited, a Jersey company domiciled at Suite 3, Burlington House, St. Saviour's Road, St. Helier, Isle of Jersey, JE24LA ("Company") and Garry Y. Itkin of 8501 Wilshire Blvd., Suite 330, Beverly Hills, California, 90211 USA ("Itkin").

WHEREAS Itkin was originally appointed as Director of the Company in August 2000. Itkin has tendered his services to the Company in capacity of Director since.

WHEREAS in light of certain events that started on May 7th of this year with arrest of BO of the Company and continue to this day, Company and Itkin would like to reaffirm their agreements pertaining to Itkin's employment with the Company.

WHEREAS Company has just been returned to good standing.

WHEREAS Itkin has disclosed to the Board of Directors that he regards himself as interested pursuant Sections 81 and 82 of the Memorandum of Association of the Company because 1) as of this date Company is already indebted to him for past due unpaid Director's Fees in amount of £295,000 and will be liable to remunerate him for his future services as Director, and 2) because he is a party to the PROMISSORY NOTE SECURED BY PLEDGED COLLATERAL of today's date, securing past due debt to him in amount of £295,000 as of this date, as well as debts and advances incurred by the Company in the future, including but not limited to future Director's Fees.

WHEREAS, notwithstanding above disclosures, the Company desires to continue to benefit from the experience and ability of Itkin, and Itkin is willing to continue to commit to serve as sole Director of the Company, on the terms and condition herein.

WHEREAS, accordingly, in consideration of the premises and the respective covenants and agreements of the parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Itkin hereto agree as follows:

Section 1: Appointment/Term of Service
The Company reconfirms appointment of Itkin as sole Director of the Company effective on the date hereof, and Itkin accepts such appointment upon the terms and conditions set forth. Itkin shall serve as President, Chief Executive Officer, Secretary, Chief Financial Officer, and sole Director until his successor is appointed or elected and shall qualify.

Section 2: Duties/ Extent of Services.
During the Term, as defined in Section 1 of this Agreement, Itkin shall be available to the Company to provide such services as may reasonably be required of him. Itkin agrees to devote to the Company such time as shall be necessary for the effective conduct of his duties hereunder. Itkin shall be permitted to engage in outside business and other interests that do not conflict with such duties. Itkin shall not be required to provide services to the Company in excess of ten hours per month.

Section 3: Compensation.
From this day forward Itkin shall receive remuneration in amount of £15,000 monthly for his services

AFB0003648

Section 4: Expenses

Itkin is authorized to incur reasonable expenses for promoting the Company in performing his duties, including expenses for travel, transportation, entertainment, and similar items, which expenses shall be paid by the Company.

Section 5: Indemnification

The Company hereby releases, discharges, indemnifies, and promises to keep Itkin harmless from all actions, causes of actions, suits, debts, dues, sums of money, accounts, reckonings, attorney's fees, covenants, contracts, controversies, agreements, promises, damages, judgments, executions, claims and demands whatsoever, in law or equity, whether or not arising from fraud, fraudulent inducement or any matter unknown as of the date hereof, which against the other party such party, its successors and assigns ever had, now have or hereafter can, shall or may have for, upon or by reason of or relating to any matter, action, transaction, omission, practice, conduct, cause or thing whatsoever. The Company further acknowledges that it is familiar with Section 1542 of the California Civil Code, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him, must have materially affected his settlement with the debtor." Without limiting the generality of the foregoing, Company hereby waives and releases any right to any benefit which it may now or hereafter may have under Section 1542 of the California Civil Code to the maximum extent permitted by law. Furthermore to the releases set forth in this section and the waiver of the provisions of California Civil Code 1542, Company shall indemnify, defend and hold Itkin harmless from and against any and all claims, losses and liabilities whatsoever and hereby agrees to pay to Itkin reasonable attorneys' fees, plus all other reasonable expenses incurred by Itkin in exercising any of the right and remedies pursuant this Agreement.

Section 6: Termination of Employment

The Employment Period (Term) shall terminate with cause or without upon 90 days' written notice by the Company to Itkin. Upon termination Itkin will deliver to the Company any and all belongings of the Company (Company's property) unless Itkin's compensation pursuant terms of this Agreement is unpaid and past due. It is further agreed that Company hereby grants a continuing lien and security interest to Itkin, assigns, pledges, hypothecates, and delivers all cash, investment property, financial assets, securities, and instruments which are now or may hereafter be held, contained or deposited in, arising under, or subject to, and all additions thereto and substitutions and replacements thereof as security for payment of Itkin's compensation pursuant terms of this Agreement. If Company fails to pay all moneys that are due to Itkin within 30 days of termination of his employment, Company unconditionally and irrevocably authorizes Itkin and extends to Itkin right to (i) transfer the whole or any part of Company's property into the name of himself or his nominee for the purpose of selling the same, or to conduct a sale of the Company's property pursuant to any applicable law; (ii) vote the Company's property; (iii) dispose of the Company's property at public or private sale(s) or other proceedings. Company hereby irrevocably appoints Itkin its attorney-in-fact, subject to the terms hereof, to effectuate the transfer of Company's property on the books of the issuer thereof to the name of Itkin or Itkin's nominee, designee or assignee and waives diligence, presentment, demand, protest, and notice of any other kind whatsoever and agree to pay all costs incurred by Itkin in enforcing his rights under this Agreement, including reasonable attorney's fee

Section 7: Entire Agreement

This Agreement contains the entire agreement of the parties pertaining to the appointment of the Itkin. No change or modification of this Agreement shall be valid unless it is in writing and signed by the party against whom the change or modification is sought to be enforced.

AFB0003649

Section 8: Severability of Provisions

If any provision of this Agreement is held unenforceable, the invalidity or unenforceability of that provision or provisions shall not affect the validity or enforceability of any other provision of this Agreement.

Section 9: Governing Law and Venue

All questions regarding the validity and interpretation of this Agreement shall be governed by and construed and enforced in all respects in accordance with the laws Los Angeles County, California, USA. The sole and proper venue shall be Los Angeles County, California, USA.

IN WITNESS, the parties have executed this Agreement on the date and year first above written.

_____
Garry Y. Itkin

_____
Golden Sphinx Limited
By: Garry Y. Itkin

# Exhibit 13

1  Jon A. Atabek SBN 269497
   (jatabek@atabeklaw.com)
2  Shella Alcabes (of counsel) SBN 267551
   (salcabes@atabeklaw.com)
3  ATABEK & ASSOCIATES, P.C.
4  16330 Bake Parkway
   Irvine, CA 92618
5  Tel: (213) 394-5943
   Fax: (213) 402-3413
6
7  Attorneys for Defendants and Cross-Complainants
   GARRY Y. ITKIN and NEW ALBION PROPERTY LTD.
8
               **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
9
          **COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE**
10

11  | AFB TRADING ONE, INC., a California | Case No. BC647351 |
| corporation; M-BJEP LIMITED, an Isle of | |
| Man corporation; M-NICE LIMITED, an Isle | [Assigned: Hon. Michael L. Stern, Dept. 62] |
| of Man corporation; GOLDEN SPHINX | |
| LIMITED, a Jersey corporation; NEW | **DEFENDANT AND CROSS-** |
| ALBION PROPERTY LIMITED, an England | **COMPLAINANT ITKIN'S** |
| corporation; | **SUPPLEMENTAL RESPONSES TO** |
| | **REQUESTS FOR PRODUCTION BEFORE** |
| Plaintiffs, | **TRIAL PROPOUNDED BY PLAINTIFF** |
| | **AFB TRANDING ONE, INC.** |
| v. | |
| | |
| GARRY Y. ITKIN, an individual; THE | |
| LIGHTHOUSE PARTNERSHIP LIMITED, | |
| an England corporation, and DOES 1 through | |
| 100, inclusive, | |
| | |
| Defendants. | |
| | |
| GARRY Y. ITKIN, an individual; NEW | |
| ALBION PROPERTY LIMITED, an England | |
| corporation; | |
| | |
| Cross-Complainants, | |
| | |
| v. | |
| | |
| ALEXANDER SABADASH, an individual; | |
| LARISSA SABADASH, an individual; | |
| CONRAD STAMPFLI, an individual; PIOTR | |
| SZYMANSKI, an individual; THOMAS | |
| REYNOLDS, an individual; and ROES 1 | |
| through 30, inclusive, | Case Filed: 1/19/17 |
| | Trial Date: 7/22/19 |
| Cross-Defendants. | |

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

ITKIN'S SUPPLEMENTAL RESPONSES TO
DOCUMENT REQUESTS BEFORE TRIAL
LASC Case No. BC647351

**27**

PROPOUNDING PARTY:    Plaintiff AFB TRADING ONE, INC.

RESPONDING PARTY:    Defendant and Cross-Complainant GARRY Y. ITKIN

SET NO.:    1 THROUGH 4, SUPPLEMENTAL

Defendant and Cross-Complainant GARRY Y. ITKIN ("Responding Party") submits the following responses to Requests for Production, Set One, Set Two, Set Three, and Set Four, pursuant to a request to supplement responses to requests for production propounded by Plaintiff AFB TRADING ONE, INC. ("Plaintiff" or "Propounding Party").

## PREFATORY STATEMENT/GENERAL OBJECTIONS

These responses are made solely for the purpose of this action.

All responses contained herein are based only upon such information and documents, which are presently available to and specifically known to this Responding Party.

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that this Responding Party has answered any interrogatories should not be taken as an admission that this responding party accepts or admits any documents produced constitute admissible evidence.

The following responses are given without prejudice to this Responding Party's right to produce evidence of any subsequently discovered fact or facts, which this Responding Party may later recall. This Responding Party accordingly reserves the right to change any and all answers herein as additional facts are ascertained, analyses are made, legal research is completed, and contentions are made. The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as are presently known, but should in no way be to the prejudice of this Responding Party in relation to further discovery, research, or analysis.

These supplemental responses incorporate by reference each and every objections previously asserted in all prior responses to the same requests.

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

0

ITKIN'S SUPPLEMENTAL RESPONSES TO
DOCUMENT REQUESTS BEFORE TRIAL
LASC Case No. BC647351

28

1  **REQUEST FOR PRODUCTION NO. 17:**

2      Any partnership agreement between YOU and Alexander Sabadash.

3  **RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

4      Defendant incorporates the Prefatory Statement/General Objections herein by reference.

5  Defendant objects to the extent the document request seeks information which implicates

6  Defendant's personal financial privacy to the extent AFB and its subsidiaries fall under the umbrella

7  of his partnership with Alexander Sabadash ("A. Sabadash"), as well as sensitive business

8  information belonging to AFB and its related entities, which information requires the protection of

9  an appropriate protective order. Defendant further objects to the extent the request is vague and

10  ambiguous regarding the terms "partnership agreement," in that the request does not specify whether

11  it is seeking only a copy of any written contract setting forth the terms of the partnership (how

12  Responding Party interprets it), or also documents that tend to prove the existence of the partnership

13      Subject to and without waiving the foregoing objections, Responding Party responds as

14  follows: Interpreting this request as seeking only a copy of any written contract setting forth the

15  terms of the business partnership between Garry Itkin and Alexander Sabadash, after a diligent

16  search, Responding Party has been unable to identify any responsive documents in its possession,

17  custody, or control.

18  **SUPPLEMENTAL RESPONES TO REQUEST FOR PRODUCTION NO. 17**

19      Subject to and without waiving the foregoing objections, Responding Party responds as

20  follows: Responding Party will produce any non-privileged documents responsive to this request in

21  Responding Party's possession, custody, or control, to the extent they exist.

22  **REQUEST FOR PRODUCTION NO. 18:**

23      Any and all WRITING relating to a partnership agreement between YOU and Alexander

24  Sabadash.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

26      Defendant incorporates the Prefatory Statement/General Objections herein by reference.

27  Defendant objects to the extent the document request seeks information which implicates

28  Defendant's personal financial privacy to the extent AFB and its subsidiaries fall under the umbrella

29  of his partnership with Alexander Sabadash ("A. Sabadash"), as well as sensitive business

30  information belonging to AFB and its related entities, which information requires the protection of

31  an appropriate protective order. Defendant further objects to the extent the document request

32  implicates matters covered by the attorney-client and attorney work product privileges. The request

33  is also grossly overbroad and unduly burdensome, to the extent all documents generated during the

1   term of the partnership, which began in 1998, would arguably be responsive, including all internal

2   and third party email, financials, receipts, memoranda, notes, internal and third party agreements,

3   and all other documents one might expect to generate during the operation of a business.

4   **SUPPLEMENTAL RESPONES TO REQUEST FOR PRODUCTION NO. 18**

5           Subject to and without waiving the foregoing objections, Responding Party responds as

6   follows: Responding Party will produce any non-privileged documents responsive to this request in

7   Responding Party's possession, custody, or control, to the extent they exist.

8   **REQUEST FOR PRODUCTION NO. 19:**

9           All WRITINGS between YOU and AFB.

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

11           Defendant incorporates the Prefatory Statement/General Objections herein by reference.

12   Defendant objects to the extent the document request seeks information which implicates

13   Defendant's personal financial privacy to the extent AFB and its subsidiaries fall under the umbrella

14   of his partnership with Alexander Sabadash ("A. Sabadash"), as well as sensitive business

15   information belonging to AFB and its related entities, which information requires the protection of

16   an appropriate protective order. Defendant further objects that the document request is overbroad,

17   exceeds the scope of this lawsuit, and in that sense is not designed to lead to the discovery of

18   potentially admissible evidence. Defendant further objects to the extent the document request

19   implicates matters covered by the attorney-client and attorney work product privileges. The request

20   is also grossly overbroad and unduly burdensome since Itkin was the sole director and officer of

21   AFB since 2003, and all documents generated during the term of the partnership, which began in

22   1998, would arguably be responsive, including all internal email, financials, receipts, memoranda,

23   notes, internal agreements, and all other documents one might expect to generate during the

24   operation of a business.

25           Subject to and without waiving the foregoing objections, Responding Party responds as

26   follows: Responding Party will produce any agreements between Itkin and AFB in Responding

27   Party's possession, custody, or control, to the extent they exist.

28   **SUPPLEMENTAL RESPONES TO REQUEST FOR PRODUCTION NO. 19**

29           Subject to and without waiving the foregoing objections, Responding Party responds as

30   follows: Responding Party will produce any non-privileged documents responsive to this request in

31   Responding Party's possession, custody, or control, to the extent they exist.

32   **REQUEST FOR PRODUCTION NO. 20:**

33           All WRITINGS that relate to, pertain to, or contain any information about AFB.

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3
12
ITKIN'S SUPPLEMENTAL RESPONSES TO
DOCUMENT REQUESTS BEFORE TRIAL
LASC Case No. BC647351

40

1  Discovery is ongoing. Responding Party reserves the right, but is not obligated, to

2  supplement these responses up to and through the time of trial as appropriate.

3  **SUPPLEMENTAL RESPONES TO REQUEST FOR PRODUCTION NO. 127**

4  Subject to and without waiving the foregoing objections, Responding Party responds as

5  follows: Responding Party will produce any non-privileged documents responsive to this request in

6  Responding Party's possession, custody, or control, to the extent they exist.

7  **REQUEST FOR PRODUCTION 128:**

8  Any and all DOCUMENTS that REFER to, RELATE to, or support YOUR contention in

9  Paragraph 7 of YOUR cross-complaint that "A. Sabadash was Itkin's business partner."

10  **RESPONSE TO REQUEST NO. 128:**

11  Defendant incorporates the Prefatory Statement/General Objections herein by reference. The

12  request is grossly overbroad, and unduly burdensome to the extent it implicates production of all

13  documents relating or referring to the Partnership between Itkin and Sabadash, as any and all

14  documents generated by the Partnership, when taken as a whole, have some tendency to show that

15  the parties' business was operated as a partnership—this would involve potentially millions of pages

16  of documents. Additionally, many of the documents involved would be public records equally

17  available to Propounding Party. Responding Party further objects to the extent the relevant

18  documents have already been produced in discovery.

19  **SUPPLEMENTAL RESPONES TO REQUEST FOR PRODUCTION NO. 128**

20  Subject to and without waiving the foregoing objections, Responding Party responds as

21  follows: Responding Party will produce any non-privileged documents responsive to this request in

22  Responding Party's possession, custody, or control, to the extent they exist.

23  **REQUEST FOR PRODUCTION 129:**

24  Any and all DOCUMENTS that REFER to, RELATE to, or support YOUR contention in

25  Paragraph 8 of YOUR cross-complaint that "Stampfli was both Itkin and A. Sabadash's attorney at

26  one point in time, until their relationship was terminated."

27  **RESPONSE TO REQUEST NO. 129:**

28  Defendant incorporates the Prefatory Statement/General Objections herein by reference. The

29  request is grossly overbroad, and unduly burdensome to the extent it implicates production of all

30  documents relating or referring to the Partnership between Itkin and Sabadash, as any and all

31  documents generated by the Partnership, when taken as a whole, have some tendency to show that

32  the parties' business was operated as a partnership—this would involve potentially millions of pages

33  of documents. Additionally, many of the documents involved are emails already in the possession of

ATABEK & ASSOCIATES, P.C.                    97                    ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                                        DOCUMENT REQUESTS BEFORE TRIAL
10171.3                                                                      LASC Case No. BC647351

**125**

1

## VERIFICATION

2  I, GARRY Y. ITKIN, hereby declare as follows:

3      I am the Plaintiff in the above action described in this verification. I have read the foregoing

4  **DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES**

5  **TO REQUESTS FOR PRODUCTION BEFORE TRIAL PROPOUNDED BY PLAINTIFF**

6  **AFB TRANDING ONE, INC.,** and know its contents. I have personal knowledge of the facts

7  alleged herein, and on allegations based upon information and belief, I am informed and believe

8  that such matters are true and correct and on those grounds certify or declare under penalty of

9  perjury under the laws of the State of California that the same are true and correct.

10      Executed this ____June 17____, 2019, at Los Angeles, California.

11                          (Date)                              (City)

12

13

14

15                                            GARRY ITKIN

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

**161**

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) and not a party to the within action. My business address is 16330 Bake Parkway, Irvine, CA 92618.

On June 17, 2019, I served the foregoing document described as **DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES TO REQUESTS FOR PRODUCTION BEFORE TRIAL PROPOUNDED BY PLAINTIFF AFB TRANDING ONE, INC.** on the interested parties in this action by placing ( ) the original **(X)** true copies thereof enclosed in sealed envelopes addressed as follows:

| ( X )    BY MAIL | ( )    BY FACSIMILE TRANSMISSION |
|---|---|
| I caused such envelope to be deposited in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. | I caused said document(s) to be transmitted by facsimile transmission to the name(s) and facsimile telephone number(s) of the person(s) set forth on the attached service list. The facsimile machine telephone number of the sending facsimile machine was (213) 402-3413. A transmission report was issued by the sending facsimile machine confirming that the transmission was completed without error. A true and correct copy of said transmission report is attached hereto. |
| ( )    BY OVERNIGHT DELIVERY | ( )    BY PERSONAL DELIVERY |
| Said document was placed in an envelope designated by the express service center and placed for collection in a box regularly maintained by said carrier with whom we have a direct billing account, to be delivered to the office of the addressee listed above on the next business day. | I caused personal service of the above-referenced document by requesting that an appropriate agent deliver the above referenced documents to the office of the recipient named below, either by handing the document(s) to the recipient to by leaving the document(s) with the receptionist or other person apparently in charge of the recipient's office. |
| ( )    BY ELECTRONIC SERVICE | |
| By transmitting the document(s) listed above from my email to the e-mail address(es) of the person(s) set forth on the attached service list. The transmission was reported as complete and without error. *See* California Rules of Court, rule 2060. | |

**(X)    STATE**    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**(X)    EXECUTED** on June 17, 2019, at Irvine, California.

_____

Ugur Atabek

ATABEK & ASSOCIATES, P.C.          134          ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                         DOCUMENT REQUESTS BEFORE TRIAL
10171.3                                                       LASC Case No. BC647351

**162**

## SERVICE LIST

Robert H. Platt, Esq.
Reid P, Davis, Esq.
Michael Zorkin, Esq.
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, California 90064
rplatt@manatt.com
redavis@manatt.com
mzorkin@manatt.com

*Counsel for ALEXANDER SABADASH,
CONRAD STAMPFLI, LARISSA SABADASH,
THOMAS REYNOLDS, AFB TRADING ONE,
INC., M-BJEP LIMITED, M-NICE LIMITED,
GOLDEN SPHINX LIMITED*

Christian S. Molnar, Esq.
ARENDSEN CANE & MOLNAR, LLP
315 S. Beverly Dr., Ste. 320
Beverly Hills, CA 90212
T: 310.299.8630
F: 310.820.9926
cmolnar@arendsenlaw.com

*Counsel for THE LIGHTHOUSE
PARTNERSIP LIMITED*

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

135

ITKIN'S SUPPLEMENTAL RESPONSES TO
DOCUMENT REQUESTS BEFORE TRIAL
LASC Case No. BC647351

**163**

# Exhibit 14

Jon A. Atabek SBN 269497
(jatabek@atabeklaw.com)
Shella Alcabes (of counsel) SBN 267551
(salcabes@atabeklaw.com)
ATABEK & ASSOCIATES, P.C.
16330 Bake Parkway
Irvine, CA 92618
Tel: (213) 394-5943
Fax: (213) 402-3413

Attorneys for Defendants and Cross-Complainants
GARRY Y. ITKIN and NEW ALBION PROPERTY LTD.

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE

| | |
|---|---|
| AFB TRADING ONE, INC., a California corporation; M-BJEP LIMITED, an Isle of Man corporation; M-NICE LIMITED, an Isle of Man corporation; GOLDEN SPHINX LIMITED, a Jersey corporation; NEW ALBION PROPERTY LIMITED, an England corporation;<br><br>       Plaintiffs,<br><br>v.<br><br>GARRY Y. ITKIN, an individual; THE LIGHTHOUSE PARTNERSHIP LIMITED, an England corporation, and DOES 1 through 100, inclusive,<br><br>       Defendants. | Case No. BC647351<br><br>[Assigned: Hon. Michael L. Stern, Dept. 62]<br><br>**DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES TO SPECIAL INTERROGATORIES BEFORE TRIAL PROPOUNDED BY PLAINTIFF AFB TRANDING ONE, INC.** |
| GARRY Y. ITKIN, an individual; NEW ALBION PROPERTY LIMITED, an England corporation;<br><br>       Cross-Complainants,<br><br>v.<br><br>ALEXANDER SABADASH, an individual; LARISSA SABADASH, an individual; CONRAD STAMPFLI, an individual; PIOTR SZYMANSKI, an individual; THOMAS REYNOLDS, an individual; and ROES 1 through 30, inclusive,<br><br>       Cross-Defendants. | Case Filed: 1/19/17<br>Trial Date: 7/22/19 |

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

ITKIN'S SUPPLEMENTAL RESPONSES TO
SPECIAL INTERROGATORIES BEFORE TRIAL
LASC Case No. BC647351

165

1 PROPOUNDING PARTY:   Plaintiff AFB TRADING ONE, INC.

2 RESPONDING PARTY:   Defendant and Cross-Complainant GARRY Y. ITKIN

3 SET NO.:   1 THROUGH 3, SUPPLEMENTAL

4

5   Defendant and Cross-Complainant GARRY Y. ITKIN ("Responding Party") submits the

6 following supplemental responses to Special Interrogatories, Set One, Set Two, and Set Three,

7 pursuant to a request to supplement responses to requests for production propounded by Plaintiff

8 AFB TRADING ONE, INC. ("Plaintiff" or "Propounding Party").

9 **PREFATORY STATEMENT/GENERAL OBJECTIONS**

10   These responses are made solely for the purpose of this action.

11   All responses contained herein are based only upon such information and documents, which

12 are presently available to and specifically known to this Responding Party.

13   Except for explicit facts admitted herein, no incidental or implied admissions are intended

14 hereby. The fact that this Responding Party has answered any interrogatories should not be taken as

15 an admission that this responding party accepts or admits any documents produced constitute

16 admissible evidence.

17   The following responses are given without prejudice to this Responding Party's right to

18 produce evidence of any subsequently discovered fact or facts, which this Responding Party may

19 later recall. This Responding Party accordingly reserves the right to change any and all answers

20 herein as additional facts are ascertained, analyses are made, legal research is completed, and

21 contentions are made. The responses contained herein are made in a good faith effort to supply as

22 much factual information and as much specification of legal contentions as are presently known, but

23 should in no way be to the prejudice of this Responding Party in relation to further discovery,

24 research, or analysis.

25   These supplemental responses incorporate by reference each and every objections previously

26 asserted in all prior responses to the same requests.

27 **RESPONSES TO SPECIAL INTERROGATORIES**

28 **SPECIAL INTERROGATORY NO. 1:**

29   IDENTIFY the "corporate entities falling under the auspices of the Partnership" referred to in

30 Paragraph 44 of YOUR CROSS-COMPLAINT.

31 (As used in these interrogatories, the term "IDENTIFY" means to state with particularity the unique

32 characteristics of the thing being described. When referring to a PERSON, the term IDENTIFY

33 means to provide, to the extent known, the PERSON's full name, present or last known address, and

ATABEK & ASSOCIATES, P.C.                          0                    ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                                        SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3                                                                 LASC Case No. BC647351

**166**

1  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

2          Subject to and without waiving the foregoing objections, Responding Party responds as

3  follows: Upon further investigation, Responding Party estimates that in total, over the course of his

4  partnership with Sabadash, he has drawn approximately $16,000,000 from the partnership's

5  operations and assets.

6  **SPECIAL INTERROGATORY NO. 14:**

7          On what date was the last payment of salary or draw from profits paid to YOU pursuant to

8  the agreement(s) described in YOUR CROSS-COMPLAINT.

9  **RESPONSE TO INTERROGATORY NO.14**

10         Defendant incorporates the Prefatory Statement/General Objections herein by reference.

11         Subject to and without waiving the foregoing objections, Responding Party responds as

12  follows:

13         Approximately sometime in the first half of 2015.

14         Discovery is ongoing. Responding Party reserves the right, but is not obligated, to

15  supplement these responses up to and through the time of trial as appropriate.

16  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

17         Subject to and without waiving the foregoing objections, Responding Party responds as

18  follows: Responding Party has no further information to provide in supplementing this response.

19  **SPECIAL INTERROGATORY NO. 15:**

20         IDENTIFY all DOCUMENTS evidencing the partnership agreement between YOU and

21  Alexander Sabadash.

22  **RESPONSE TO INTERROGATORY NO.15**

23         Defendant incorporates the Prefatory Statement/General Objections herein by reference.

24  Defendant further objects to the extent this interrogatory implicates matters covered by the attorney-

25  client and attorney work product privileges. The request is also vague and ambiguous to the extent

26  the term "evidencing" could have multiple meanings, e.g. direct evidence of admissions, or all

27  documentary evidence that Itkin and Sabadash operated as a partnership, which, in that case, the

28  request is also overbroad and unduly burdensome, as it arguably implicates every document

29  generated by the partnership from its inception, and would require a compilation subject to C.C.P. §

30  2030.230.

31         Subject to and without waiving the foregoing objections, Responding Party responds as

32  follows:

33  / / /

**185**

1    The books and records of each of the entities falling under the partnership, as well as their
2    bank accounts. Due to the extensive length of time, it would be unduly burdensome to compile and
3    list every corporate activity taken or overseen by Responding Party since the company's inception,
4    and to that end, pursuant to C.C.P. § 2030.230, refers Propounding Party to Responding Party's
5    production of documents in this action.

6    Additionally, Responding Party identifies the "Minutes of Meeting" dated 5/5/2014, taken by
7    Larisa Isakova.

8    Discovery is ongoing. Responding Party reserves the right, but is not obligated, to
9    supplement these responses up to and through the time of trial as appropriate.

10   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

11   Subject to and without waiving the foregoing objections, Responding Party responds as
12   follows: Each and every document produced by Itkin related to the business dealings of Itkin and
13   Sabadash have some tendency to evidence the existence of the partnership. Taken as a whole, the
14   accounts and records of the business have a tendency show that Itkin and Sabadash did not treat the
15   companies as true corporations, but rather entities that merely existed for their personal benefit, but
16   that were also structured to protect Itkin's interest in the partnership's assets. While the companies
17   maintained many corporate formalities as to each of the underlying entities, many of the companies
18   would buy and sell assets as needed to allow the partners to generate cash and either take draws, or
19   make payments to satisfy the obligations of individual partners, or the obligations of other affiliated
20   entities within the partnership. For example, toward the end of the partnership, Itkin and Sabadash
21   would sell land entitlements in Russia belonging to the partnership to help satisfy partnership's
22   obligations and to pay themselves, which sales are reflected on the personal income tax returns of
23   both Itkin and Sabadash. To identify each and every document that could be used by an expert to
24   testify regarding the nature of the partnership would be unduly burdensome at this stage. Rather,
25   Responding Party will agree to have their expert identify all of the responsive documents upon
26   which they rely during expert discovery.

27   Additionally, the following documents all tend to expressly identify or relate to the existence
28   of the partnership in a more direct manner:

29   The identification cards of Itkin and Sabadash for the International Union of Economists,
30   which relates to the testimony of Michael Sosinsky (GI070881-GI070882).

31   Documents relating to Itkin and Sabadash's membership with the International Union of
32   Economists, dated (GI070879-GI070880).

33   Emails such as AFB000863 referring to Sabadash and Itkin's business as "our" business.

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3
20
ITKIN'S SUPPLEMENTAL RESPONSES TO
SPECIAL INTERROGATORIES BEFORE TRIAL
LASC Case No. BC647351

**186**

1   A contract with Russian attorney Elena Goffman, who's retainer agreement both identifies

2   several of the assets at issue in this action and refers to Itkin and Sabadash's business relationship as

3   a "simple partnership."

4   A judgment entered in the Arbitration Court of Moscow related to claims by Elena Goffman

5   for unpaid fees associated with the above-referenced contract, which identifies Itkin and Sabadash's

6   business relationship as a "simple partnership." Also, a judgment entered in the United Kingdom

7   related to claims by Elena Goffman for unpaid fees associated with the above-referenced contract,

8   which identifies Itkin and Sabadash's business relationship as a "simple partnership."

9   The transcripts of the depositions of Larisa Isakova and Michael Sosinsky.

10   Discovery is ongoing. Responding Party reserves the right, but does not commit to

11   supplement this response up to and through trial.

12   **FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

13   Subject to and without waiving the foregoing objections, Responding Party responds as

14   follows: Responding Party identified the following additional documents:

15   The transcripts of depositions of Garry Itkin, Jeffrey Ratner, and Victoria Lerman.

16   That document titled "Information Services Agreement" between the partnership and Elena

17   Gofman and each "Service Delivery Report" related thereto.

18   The judgment obtained by Elena Gofman in the Russian Federation against the partnership.

19   The lawsuit filed by Elena Gofman in the Superior Court for the State of California seeking

20   to domesticate the Russian judgment against the partnership, Case No. 19STCP01412.

21   Expense/accounting statements maintained by Mr. Itkin and reviewed by both Mr. Itkin and

22   Mr. Sabadash.

23   "Sentence in the Name of the Russian Federation" of Alexander Sabadash, dated October 24,

24   2017.

25   **SPECIAL INTERROGATORY NO. 16:**

26   IDENTIFY all persons with knowledge of the partnership agreement between YOU and

27   Alexander Sabadash.

28   **RESPONSE TO INTERROGATORY NO.16**

29   Defendant incorporates the Prefatory Statement/General Objections herein by reference.

30   Defendant further objects to the extent this interrogatory implicates matters covered by the attorney-

31   client and attorney work product privileges. The request is also vague and ambiguous to the extent

32   the phrase "knowledge of the partnership" does not distinguish between knowledge regarding

33

ATABEK & ASSOCIATES, P.C.          21          ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3                                         LASC Case No. BC647351

**187**

1  whether Itkin and Sabadash operated as partners or whether those persons had knowledge regarding

2  the terms of the partnership.

3         Subject to and without waiving the foregoing objections, Responding Party responds as

4  follows:

5             a.   Jeff Ratner;

6             b.   David Zinberg;

7             c.   Michael Sosinsky;

8             d.   Larisa Isakova;

9             e.   Tatiana Labanova;

10            f.   Yelena Voit;

11            g.   Sofia Grekova;

12            h.   Kiril Arsentiev.

13        Discovery is ongoing. Responding Party reserves the right, but is not obligated, to

14  supplement these responses up to and through the time of trial as appropriate.

15  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

16        Subject to and without waiving the foregoing objections, Responding Party responds as

17  follows: Responding Party further identifies Alexander Beletsky, Yury Sneshko, and P.L. Basisty.

18  **SPECIAL INTERROGATORY NO. 17:**

19        IDENTIFY all corporate actions taken by YOU as director or officer on behalf of AFB

20  Trading One, Inc. from 2003 to the present.

21  **RESPONSE TO INTERROGATORY NO.17**

22        Defendant incorporates the Prefatory Statement/General Objections herein by reference.

23  Defendant further objects to the extent this interrogatory implicates matters covered by the attorney-

24  client and attorney work product privileges. Defendant further objects to the extent the term

25  "corporate actions" is vague and ambiguous to the extent it is not defined.

26        Subject to and without waiving the foregoing objections, Responding Party responds as

27  follows:

28        Responding Party was involved in the partnership's acquisition of and re-naming/re-

29  registration of AFB Trading One. The entity was originally owned by one of Itkin's accounting

30  clients, as merely a shelf company, and acquired by Itkin and Sabadash concurrently with the

31  inception of their partnership. Since at least 1998, Itkin was a director and officer of the entity, and

32  in 2003, took over as the sole director and officer of the company. Itkin was the sole signatory on all

33  of its bank accounts, and took countless actions on a day to day basis overseeing that entity,

ATABEK & ASSOCIATES, P.C.                              22                        ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                                                SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3                                                                         LASC Case No. BC647351

**188**

1                                 **VERIFICATION**

2  I, GARRY Y. ITKIN, hereby declare as follows:

3        I am the Plaintiff in the above action described in this verification. I have read the foregoing

4  **DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES**

5  **TO SPECIAL INTERROGATORIES BEFORE TRIAL PROPOUNDED BY PLAINTIFF**

6  **AFB TRANDING ONE, INC.,** and know its contents. I have personal knowledge of the facts

7  alleged herein, and on allegations based upon information and belief, I am informed and believe

8  that such matters are true and correct and on those grounds certify or declare under penalty of

9  perjury under the laws of the State of California that the same are true and correct.

10       Executed this ___JUNE 17___, 2019, at __Los Angeles__, California.

11                 (Date)                   (City)

12

13

14

15                                        GARRY ITKIN

16

ATABEK & ASSOCIATES, P.C.                       43                  ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                            SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3                                                     LASC Case No. BC647351

**209**

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) and not a party to the within action. My business address is 16330 Bake Parkway, Irvine, CA 92618.

On June 17, 2019, I served the foregoing document described as **DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES TO SPECIAL INTERROGATORIES BEFORE TRIAL PROPOUNDED BY PLAINTIFF AFB TRANDING ONE, INC.** on the interested parties in this action by placing ( ) the original **(X)** true copies thereof enclosed in sealed envelopes addressed as follows:

| **(X)    BY MAIL** | **(  )    BY FACSIMILE TRANSMISSION** |
|---|---|
| I caused such envelope to be deposited in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. | I caused said document(s) to be transmitted by facsimile transmission to the name(s) and facsimile telephone number(s) of the person(s) set forth on the attached service list. The facsimile machine telephone number of the sending facsimile machine was (213) 402-3413. A transmission report was issued by the sending facsimile machine confirming that the transmission was completed without error. A true and correct copy of said transmission report is attached hereto. |
| **(  )    BY OVERNIGHT DELIVERY** | **(  )    BY PERSONAL DELIVERY** |
| Said document was placed in an envelope designated by the express service center and placed for collection in a box regularly maintained by said carrier with whom we have a direct billing account, to be delivered to the office of the addressee listed above on the next business day. | I caused personal service of the above-referenced document by requesting that an appropriate agent deliver the above referenced documents to the office of the recipient named below, either by handing the document(s) to the recipient to by leaving the document(s) with the receptionist or other person apparently in charge of the recipient's office. |
| **(  )    BY ELECTRONIC SERVICE** | |
| By transmitting the document(s) listed above from my email to the e-mail address(es) of the person(s) set forth on the attached service list. The transmission was reported as complete and without error. *See* California Rules of Court, rule 2060. | |

**(X)    STATE**        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**(X)    EXECUTED** on June 17, 2019, at Irvine, California.

_____
Ugur Atabek

ATABEK & ASSOCIATES, P.C.                    44                    ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                                   SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3                                                            LASC Case No. BC647351

**210**

1
2
## SERVICE LIST
3
4   Robert H. Platt, Esq.                        Christian S. Molnar, Esq.
    Reid P, Davis, Esq.                          ARENDSEN CANE & MOLNAR, LLP
5   Michael Zorkin, Esq.                         315 S. Beverly Dr., Ste. 320
    MANATT, PHELPS & PHILLIPS, LLP               Beverly Hills, CA 90212
6   11355 West Olympic Boulevard                 T: 310.299.8630
    Los Angeles, California 90064                F: 310.820.9926
7   rplatt@manatt.com                            cmolnar@arendsenlaw.com
    redavis@manatt.com
8   mzorkin@manatt.com                           *Counsel for* THE LIGHTHOUSE
                                                 *PARTNERSIP LIMITED*
9   *Counsel for ALEXANDER SABADASH,*
    *CONRAD STAMPFLI, LARISSA SABADASH,*
10  *THOMAS REYNOLDS, AFB TRADING ONE,*
    *INC., M-BJEP LIMITED, M-NICE LIMITED,*
11  *GOLDEN SPHINX LIMITED*
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33

211

# Exhibit 15

## Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

--------------------------------
AFB TRADING ONE, INC., a      )
California corporation; M-BJEP )
LIMITED, an Isle of Man       )
corporation; M-NICE LIMITED, an )
Isle of Man corporation; GOLDEN )
SPHINX LIMITED, a Jersey      )
corporation; NEW ALBION PROPERTY)
LIMITED, an England corporation;)
                              )
        Plaintiffs,           ) Case No.
                              )
    vs.                       ) BC647351
                              )
GARRY Y. ITKIN, an individual; )
THE LIGHTHOUSE PARTNERSHIP    )
LIMITED, an England corporation,)
and DOES 1 through 100,       )
inclusive,                    )
                              )
        Defendants.           )
--------------------------------
AND RELATED CROSS-ACTION.     )
                              )
--------------------------------
(Complete caption on following page.)

DEPOSITION OF JEFFREY RATNER

LOS ANGELES, CALIFORNIA

TUESDAY, JUNE 4, 2019

Job No. 3399377
Reported by:
RICKI Q. MELTON, RPR
CSR No. 9400
CONFIDENTIAL PAGES 99 - 268
PAGES 1 - 268

## Page 2

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

--------------------------------
AFB TRADING ONE, INC., a      )
California corporation; M-BJEP )
LIMITED, an Isle of Man       )
corporation; M-NICE LIMITED, an )
Isle of Man corporation; GOLDEN )
SPHINX LIMITED, a Jersey      )
corporation; NEW ALBION PROPERTY)
LIMITED, an England corporation;)
                              )
        Plaintiffs,           ) Case No.
                              )
    vs.                       ) BC647351
                              )
GARRY Y. ITKIN, an individual; )
THE LIGHTHOUSE PARTNERSHIP    )
LIMITED, an England corporation,)
and DOES 1 through 100,       )
inclusive,                    )
                              )
        Defendants.           )
--------------------------------
GARRY Y. ITKIN, an individual; )
NEW ALBION PROPERTY LIMITED, an )
England corporation,          )
                              )
        Cross-Complainants,   )
                              )
    vs.                       )
                              )
ALEXANDER SABADASH, an        )
individual; LARISSA SABADASH, an)
individual; CONRAD STAMPFLI, an )
individual; PIOTR SZYMANSKI an )
individual; THOMAS REYNOLDS, an )
individual; and ROES 1 through )
30, inclusive,                )
                              )
        Cross-Defendants.     )
--------------------------------

## Page 3

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

--------------------------------
AFB TRADING ONE, INC., a      )
California corporation; M-BJEP )
LIMITED, an Isle of Man       )
corporation; M-NICE LIMITED, an )
Isle of Man corporation; GOLDEN )
SPHINX LIMITED, a Jersey      )
corporation; NEW ALBION PROPERTY)
LIMITED, an England corporation;)
                              )
        Plaintiffs,           ) Case No.
                              )
    vs.                       ) BC647351
                              )
GARRY Y. ITKIN, an individual; )
THE LIGHTHOUSE PARTNERSHIP    )
LIMITED, an England corporation,)
and DOES 1 through 100,       )
inclusive,                    )
                              )
        Defendants.           )
--------------------------------
AND RELATED CROSS-ACTION.     )
                              )
--------------------------------

    DEPOSITION of JEFFREY RATNER, taken at 11355 West
Olympic Boulevard, Los Angeles, California, commencing
at 10:19 A.M., Tuesday, June 4, 2019, before Ricki Q.
Melton, CSR 9400, RPR 45429.

## Page 4

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFFS AND CROSS-DEFENDANTS:

    MANATT, PHELPS & PHILLIPS, LLP

    BY:  REID P. DAVIS, ESQ.

    11355 West Olympic Boulevard

    Los Angeles, California 90064

    (310) 312-4000

    redavis@manatt.com

    FOR THE DEFENDANTS AND CROSS-COMPLAINANTS:

    ATABBK & ASSOCIATES, P.C.

    BY:  JON A. ATABEK, ESQ.

    16330 Bake Parkway

    Irvine, California 92618

    (213) 394-5943

    jatabek@atabeklaw.com

Page 5

1    APPEARANCES OF COUNSEL (Continued):
2
3    FOR THE DEPONENT:
4
5        KENNETH J. SARGOY, ESQ.
6        815 Moraga Drive
7        Los Angeles, California 90049
8        (310) 208-1003
9        ken@sargoylaw.com
10
11   ALSO PRESENT:
12
13       LARISSA SABADASH
14       THOMAS REYNOLDS
15       GRANT CIHLAR, Video Operator
16
17
18
19
20
21
22
23
24
25

Page 6

1                    I N D E X
2
3    TUESDAY, JUNE 4, 2019
4
5    WITNESS:                    EXAMINATION
6
7    JEFFREY RATNER
8
9        (By Mr. Davis)          10
10
11
12
13           UNANSWERED QUESTIONS
14           PAGE    LINE
15            26      4
16            73     24
17            89      5
18
19
20           INFORMATION REQUESTED
21             (None)
22
23
24
25

Page 7

1            DEPOSITION EXHIBITS
2            JEFFREY RATNER
3
4    NUMBER      DESCRIPTION      IDENTIFIED
5    (Deposition exhibits have been
6    designated as confidential and
7    are attached to the deposition
8    transcript designated
9    Confidential pursuant to the
10   protective order.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1    LOS ANGELES, CALIFORNIA, JUNE 4, 2019
2                10:19 A.M.
3                  -o0o-
4
5        VIDEO OPERATOR:  Good morning.  We're
6    going on the record.  The time is 10:19 A.M. on
7    June 4th, 2019.
8        Please note that the microphones are
9    sensitive and may pick up whispering, private
10   conversations, and cellular interference.
11       Please turn off all cell phones or place
12   them away from the microphones as they can
13   interfere with the deposition audio.
14       Audio and video recording will continue to
15   take place unless all parties agree to go off the
16   record.
17       This is media unit 1 of the video-recorded
18   deposition of Jeffrey Ratner taken by counsel for
19   plaintiff in the matter of AFB Trading One,
20   Incorporated, et al., versus Garry Y. Itkin, et al.,
21   filed in Superior Court, State of California,
22   County of Los Angeles, Central Division.  The case
23   number is BC647351.
24       This deposition is being held at Manatt
25   Phelps & Phillips, LLP, located at 11355 West

Page 9

1  Olympic Boulevard, Suite 425, in Los Angeles,
2  California.
3          My name is Grant Cihlar from the firm
4  Veritext, and I am the videographer.  The court
5  reporter is Ricki Q. Melton from the firm Veritext.
6          I am a notary public.  I am not related to
7  any party in this action nor am I financially
8  interested in the outcome.
9          Counsel and all present in the room will
10  now state their appearances and affiliations for
11  the record.
12          If there are any objections to proceeding,
13  please state them at the time of your appearance,
14  beginning with the noticing attorney.
15          MR. DAVIS:  Reid Davis on behalf of
16  plaintiffs and cross-defendants, and with me in the
17  room are Larissa Sabadash and Thomas Reynolds.
18          MR. SARGOY:  Kenneth Sargoy on behalf of
19  nonparty witness Jeff Ratner, who is the deponent
20  today.
21          MR. ATABEK:  Jon Atabek on behalf of
22  Garry Y. Itkin and New Albion Property -- Property,
23  Limited, defendant, cross-complainant, and --
24  cross-complainant.
25          VIDEO OPERATOR:  Thank you.

Page 10

1          Will the court reporter please swear in
2  the witness.
3
4          JEFFREY RATNER,
5  the witness, having been first administered
6  an oath in accordance with CCP section 2094,
7  testified as follows:
8
9          EXAMINATION
10
11  BY MR. DAVIS:
12      Q   Good morning, Mr. Ratner.
13      A   Good morning.
14      Q   Can you please state and spell your full
15  name for the record.
16      A   I am Jeffrey Ratner, J-e-f-f-r-e-y
17  R-a-t-n-e-r.
18      Q   And, Mr. Ratner, do you understand that
19  the oath that you took just now is the same oath
20  and has the same effect as though it were given in
21  the court of law?
22      A   Yes.
23      Q   And that means that the testimony you are
24  giving here today is given under the penalty of
25  perjury.

Page 11

1          Do you understand?
2      A   Yes.
3      Q   Is there any reason you are unable to give
4  your most complete and truthful testimony here
5  today?
6      A   No.
7      Q   In preparation for today's deposition,
8  have you reviewed any documents?
9      A   Some of them.
10      Q   What documents did you look at?
11      A   I was provided some e-mails from my
12  attorney because all the documents were released
13  years ago.
14      Q   I understand that you provided documents
15  to a requesting party some years ago.
16          My question is narrowly limited to what
17  documents did you review in preparation for today's
18  deposition.
19      A   I received some e-mails provided by our --
20  my attorney, and I looked at them.
21      Q   Can you tell me how many e-mails you
22  received and reviewed in preparation for today's
23  deposition.
24      A   It's hard to tell because they are coming
25  day-by-day, like 12, 15 something.  It's my best

Page 12

1  estimate.
2          MR. SARGOY:  Counsel, we -- we have them,
3  and I can produce them to you.  I only have one
4  copy so you will need to make copies.
5          MR. DAVIS:  So I'll take a look at those
6  during the break.
7          MR. SARGOY:  Sure.
8          MR. DAVIS:  You have them in hard copy?
9  Fair enough.
10          MR. SARGOY:  I believe so, yes.
11  BY MR. DAVIS:
12      Q   To try to shortcut this a bit, can you
13  generally characterize the substance of the e-mails
14  that you reviewed in preparation for today's
15  deposition.
16      A   They were between Garry Itkin, who is my
17  client, to myself or cc to Victoria Lerman, who is
18  our office manager, and some of them in the foreign
19  language, which is Russian.  So those are e-mails.
20      Q   Okay.  And were any of the e-mails that
21  you reviewed in preparation for today's deposition
22  originally sent within the past year?
23      A   I can't answer that question.  I don't
24  recall it.
25      Q   I'll take a look at a break.

Page 89

1      MR. SARGOY:  No.  Counsel, you need -- a
2  deposition proceeds, question and answer.  There
3  was no question pending.
4      MR. DAVIS:  But now there is.
5   Q   My question is:  Please tell me what you
6  were going to say.
7      MR. SARGOY:  That's not -- that's not a
8  proper question.  It's overbroad, for one.
9      MR. DAVIS:  Are you instructing your
10  witness not to answer --
11     MR. SARGOY:  Yes.
12     MR. DAVIS:  -- on that basis?
13     MR. SARGOY:  Yes.
14     MR. DAVIS:  That's an improper
15  instruction.
16   Q   Does it make sense to you that a
17  partnership could own a corporation such as AFB?
18     MR. ATABEK:  Objection.  Calls for
19  incomplete hypothetical, calls for unqualified lay
20  witness opinion, vague and ambiguous.
21     MR. SARGOY:  Join in those and it's
22  also -- Counsel, it's getting argumentative.
23  BY MR. DAVIS:
24   Q   You can answer the question.
25   A   My understanding, a partnership can own a

Page 90

1  corporation, yes, but to be a partner with the
2  corporation, no.
3      It's my understanding it was a proposal
4  from Alexander Sabadash to Garry Itkin to become
5  partners between two persons, but not a partner
6  with AFB or a partner with anybody else.
7   Q   Right.
8      But if AFB were owned by a partnership,
9  would that need to be disclosed on AFB's tax
10  returns?
11     MR. ATABEK:  Objection.  Calls for --
12     THE WITNESS:  No.
13  BY MR DAVIS:
14   Q   And given that AFB owns foreign
15  subsidiaries, does the Foreign Account Tax
16  Compliance Act require disclosure of a partnership
17  interest if a partner owned -- partnership owned
18  AFB?
19     MR. SARGOY:  Objection.  Incomplete
20  hypothetical.
21     MR. ATABEK:  Join.
22     THE WITNESS:  No.  The answer is no.
23  BY MR. DAVIS:
24   Q   And if Mr. Itkin owned an interest through
25  a partnership in any foreign corporation, would he

Page 91

1  be required to disclose that interest on his tax
2  return?
3      MR. ATABEK:  Objection.  Calls for improper
4  lay witness opinion, incomplete hypothetical.
5      MR. SARGOY:  Join.
6      MR. DAVIS:  He can answer.
7      THE WITNESS:  If I can answer it correctly,
8  no.
9  BY MR. DAVIS:
10   Q   So basically you can avoid disclosing
11  ownership interests that are required under the
12  Foreign Account Tax Compliance Act by owning
13  something through a partnership.
14      Is that your testimony?
15     MR. ATABEK:  Whoa.  Whoa.
16      Objection.  Assumes facts, argumentative,
17  incomplete hypothetical, calls for improper lay
18  witness opinion.
19      Got anything else?
20     MR. SARGOY:  Join.
21     THE WITNESS:  If I will start answering,
22  it will be -- it will take half a day.
23  BY MR. DAVIS:
24   Q   Give me the abridged version.
25   A   I can't because your question is to me

Page 92

1  regarding the tax law.  It's not right.
2   Q   Tell me why.
3   A   Okay.  If a person is -- if it's a
4  partnership, then the partnership has to file -- I
5  don't know the law in Russia, but the partnership
6  has to file its tax return and the tax return,
7  partnership will report that the partnership owns
8  foreign entity, not the person.
9      The person will receive only a K-1 form.
10  That's the U.S. law.  On a K-1 form, it will show
11  income expenses, distributions, et cetera,
12  et cetera, et cetera, but there is nothing to report
13  on the personal income tax.
14  BY MR. DAVIS:
15   Q   So --
16   A   That's the question of yours whether a
17  person supposed to report is wrong.  It's not a
18  proper question.
19   Q   So there is a partnership that owns the
20  California corporation.  Is that partnership
21  required to file an income tax return?
22   A   If a partnership formed in California in
23  the U.S., let's say, and a partnership owns a
24  corporation, he reports only on that he owns shares.
25  Nothing else.

Page 93

1    Q   Right.
2        But the partnership, the partnership
3    entity -- is the partnership entity required to
4    file a tax return?
5    A   Yes.
6    Q   If the partnership were formed abroad in
7    Russia but owns a California corporation, is the
8    partnership entity required to file a tax return in
9    California -- in the U.S.?
10   A   Yes.
11   Q   To your knowledge, did any partnership
12   between Mr. Itkin and Mr. Sabadash ever file a
13   partnership tax return?
14   A   No.
15   Q   When you filed tax returns on behalf of
16   AFB, you had to receive the information regarding
17   AFB's income and losses from somebody; right?
18   A   That is correct.
19   Q   Who provided you that information?
20   A   Garry Itkin.
21   Q   Did anybody other than Mr. Income -- I'm
22   going to keep doing that.
23   A   You need lunch.
24   Q   Did anybody other than Mr. Itkin ever
25   provide you any information that was used in the

Page 94

1    preparation of a tax return filed on behalf of AFB?
2    A   At the beginning, it was Alexander
3    himself.  As soon as Garry Itkin joined him and
4    took over all the financial, only Garry Itkin was
5    in touch with me.
6    Q   So since the year 2000, nobody other than
7    Mr. Itkin has provided you with any information
8    that was used in preparing tax returns filed on
9    behalf of AFB; correct?
10   A   Correct.
11   Q   Since the year 2000, has anybody other
12   than Mr. Itkin provided you information that was
13   used in preparing tax returns on behalf of Maxxim?
14   A   Garry.
15   Q   Other than Garry Itkin?
16   A   Nobody else.
17   Q   Since the year 2000, has anybody other than
18   Mr. Itkin provided you information used in preparing
19   tax returns filed on behalf of VLK Air?
20   A   Garry Itkin only.
21   Q   Nobody else?
22   A   Nobody else.
23   Q   And since the year 2000, has anybody other
24   than Mr. Itkin provided you information used in
25   preparing -- preparing tax returns filed on behalf

Page 95

1    of New Albion?
2    A   No.
3    Q   Only Garry Itkin?
4    A   Only Garry Itkin.
5    Q   Before the tax returns for those -- well,
6    strike that.
7        When you prepared tax returns for the
8    Sabadash-affiliated companies, did Mr. Itkin
9    prepare -- I'm sorry.  Strike that.
10       When you prepared tax returns on behalf of
11   the --
12       MS. SABADASH:  You need a break.
13       MR. DAVIS:  I do.  We will break soon.
14   I'm going to get it right this time.
15   Q   When you prepared tax returns on behalf of
16   the Sabadash-affiliated entities -- you know what?
17   I'm just going to get away from that question all
18   together.  I'm going to start over.
19       Okay?  Just say "yes" so I can --
20       MR. SARGOY:  So the question is withdrawn?
21       MR. DAVIS:  The question is withdrawn.
22   Q   When you prepared the AFB tax returns, did
23   Mr. Itkin review the information included with the
24   tax returns before they were filed?
25   A   Somebody reviewed it.  Whether it's Itkin

Page 96

1    or Alexander himself, I don't know.
2    Q   Since the year 2000, when you prepared the
3    AFB tax returns, did Mr. Itkin review the
4    information included in the tax returns before they
5    were filed?
6    A   I believe so.
7    Q   Alexander did not; correct?
8    A   I don't know.  I don't know.  We sent the
9    review copy, and they reviewed it.  I assumed that
10   Alexander reviewed it as well.
11   Q   But you had no basis to know whether
12   Alexander ever reviewed an AFB tax return before it
13   was filed for any year after 2000 at least; correct?
14   A   Correct.
15       MR. DAVIS:  Let's look at some documents.
16       MR. ATABEK:  You want to do the documents
17   before lunch?
18       MR. DAVIS:  Yes.
19       (Pages 99 through 268 are
20       designated confidential.)
21
22
23
24
25

Page 109

1    A   Yes, it looks like.
2    Q   And did you personally participate in the
3    preparation of this document?
4    A   Yes.
5    Q   Can you, again, just briefly explain to me
6    what form 1065 is.
7    A   It's a partnership income tax return.
8    Q   If there is a company, whether an LLC or a
9    corporation, that is owned by a partnership, is it
10   always required that a Form 1065 be filed?
11   A   If it's a partnership, yes, 1065 supposed
12   to be filed.
13   Q   If the company is owned by a partnership,
14   a Form 1065 must be filed; correct?
15   A   Yes.
16   Q   Are there any exceptions to that rule that
17   you are aware of?
18   A   No.
19   Q   And as far as you know, all of the
20   information reflected on this form 1065 that we
21   have marked as Exhibit 1 is accurate; correct?
22   A   To the best of my knowledge what I
23   received from Garry Itkin.
24   Q   And the information reflected on Exhibit 1
25   was provided to you by Garry Itkin; correct?

Page 110

1    A   Correct.
2    Q   It was not provided to you by Alexander
3    Sabadash; correct?
4    A   I can't state it.  I don't remember that.
5    Q   You don't remember being provided any
6    information by Alexander Sabadash that was used in
7    the preparation of Exhibit 1; correct?
8    A   I don't remember.  Correct.
9    Q   If you go to the third page of
10   Exhibit 1 --
11   A   Okay.
12   Q   -- there's a line with Garry Itkin's name
13   on it.  It says "Name of Designated TMP."
14   A   Uh-huh, yes.
15   Q   My question is:  What is a TMP?
16   A   Tax matter partner.
17   Q   Tax matter partner?
18   A   Yes.
19   Q   What is that?
20   A   Tax matter partner is a partner who signs
21   the return.
22   Q   Okay.  So this return was made out for
23   Garry Itkin's signature; correct?
24   A   No.  It was made up to report the
25   partnership income and expenses and a tax matter

Page 111

1    partner signs under perjury of.
2    Q   Penalty of perjury?
3    A   Yes.
4    Q   Okay.  Now, if you go to Schedule B-1,
5    second-to-last page of Exhibit 1.
6    A   It's backwards.  Okay.
7    Q   Am I correct in understanding that this
8    Schedule B-1 shows that Alexander owned
9    99.5 percent of the partnership interest in VLK
10   Air, LLC?
11   A   That is correct.
12   Q   And you got that information, again, from
13   Mr. Garry Itkin?
14   A   Correct.
15   Q   Mr. Itkin never told you that he owned one
16   third of VLK Air; correct?
17   A   No, never told me that.
18       I have it backwards.
19       MR. SARGOY:  Me, too.
20   BY MR. DAVIS:
21   Q   Now, if, for example, AFB were owned by a
22   partnership, would you have prepared a Form 1065
23   for AFB?
24   A   No.  AFB is a corporation.  I cannot
25   prepare a partnership for AFB.

Page 112

1    Q   Well, VLK Air, LLC, is an LLC; correct?
2    A   It's an LLC, correct, registered in
3    Delaware, I believe.
4    Q   Right.
5        But this Exhibit 1 shows that VLK Air,
6    LLC, was owned in partnership with Alexander
7    Sabadash owning 99.5 percent --
8    A   That's correct.
9    Q   -- of the partnership; correct?
10   A   It's standing alone LLC which is formed in
11   United States and Alexander is partner there.
12   Q   Right.
13       So my question is:  If AFB were owned in a
14   partnership, would you have filed a Form 1065?
15   A   For VLK --
16       MR. ATABEK:  Wait, wait, wait.
17       Objection.  Incomplete hypothetical and
18   assumes facts.
19       MR. SARGOY:  Join.
20   BY MR. DAVIS:
21   Q   Do you understand the question?
22   A   Yes.  VLK Air -- if AFB is a partner there,
23   then it will be listed here that AFB is a partner
24   and AFB will receive a K-1 from a partnership.
25   Q   My question is actually different, and I'm

Page 121

1    right? Counsel? Per the court rules.
2        MR. DAVIS:  We will meet and confer once
3    we make the exhibit list.
4        MR. SARGOY:  I think that's a court
5    requirement, only the last four numbers.
6        MR. DAVIS:  I'm not saying no.  I'm just
7    saying it's not an issue we need to discuss right
8    now.
9        MR. SARGOY:  I'm clear with that.
10   BY MR. DAVIS:
11       Q    So it's your testimony that a partnership
12   can own a corporation; correct?
13       A    A partnership can, yeah, own the
14   corporation; correct.
15       Q    And if a partnership owned AFB --
16       A    Okay.
17       Q    -- would a Schedule K-1 allocation summary
18   be required to be filed for AFB?
19       MR. ATABEK: Objection.  Incomplete
20   hypothetical.
21       THE WITNESS:  Yeah.
22       MR. SARGOY:  Join.
23       THE WITNESS:  Yes.
24   BY MR. DAVIS:
25       Q    "Yes"; right?

Page 122

1        A    Correct.
2        Q    And to your knowledge, no Schedule K-1
3    allocation summary was ever filed for AFB during
4    the years that you did AFB's returns; correct?
5        A    I don't remember.  Probably, yes.
6        Q    In the world of tax preparation, have you
7    ever heard of the concept of a silent partner?
8        A    Yes.
9        Q    Is there a distinction by which a silent
10   partner has different tax reporting obligations
11   than somebody who is just a general partner?
12       A    A silent partner is a partner who invested
13   his time, money, or otherwise and he was never
14   reported on any -- on any books of the corporation
15   or partnership.  That's a silent partner.
16       Q    If a silent partner received income from a
17   partnership, would he still be required to report
18   that income on his tax returns?
19       A    I believe being a U.S. citizen, yes.  As a
20   foreigner, I don't know.
21       Q    And if a silent partner owned an interest
22   in a business entity, the business entity would
23   still have to file a Schedule K-1 for a silent
24   partner; correct?
25       MR. ATABEK: Objection.  Incomplete

Page 123

1    hypothetical.
2        MR. SARGOY:  Join.
3        THE WITNESS:  Again, if he's not on the
4    books and he's not a partner, so to speak,
5    officially, a silent partner is a partner who
6    just -- it's a handshake between a person or between
7    two persons.
8    BY MR. DAVIS:
9        Q    So is it your testimony that -- is it your
10   understanding of the term "silent partner" that a
11   silent partner is not truly a partner in the
12   business?
13       MR. ATABEK: Objection.  Misstates and
14   argumentative.
15       MR. SARGOY:  Join.
16       THE WITNESS:  It's hard to tell.  It
17   depends how the people among themselves agreed
18   upon, but generally, a silent partner, if you
19   invested money or in a partnership, it's in a
20   partnership books that you are an investor so you
21   are a silent partner.
22   BY MR. DAVIS:
23       Q    Right.
24       But there might be different contributions
25   of a partner.  For example, a partner could invest

Page 124

1    time and effort; correct?
2        A    That's correct.  And he was paid -- he was
3    paid for it.
4        Q    And he was paid?
5        A    Yeah, for his efforts.
6        Q    What do you mean by that?
7        A    Income to him.
8        Q    Are you talking about Garry specifically?
9        A    No, in general.  You asked me in general.
10       Q    Right.
11       So if a partner obtains a share in a
12   partnership by contributing time and efforts, he is
13   a partner; correct?
14       A    But again, you asked me if he acquires a
15   share.  There is no such thing because he's a
16   silent partner.  There is no official document
17   saying that I bought 50 percent in a partnership or
18   50 percent of stock in a corporation.
19       Q    So we've already established that
20   partnerships are require to file a Form 1065 and a
21   California Form 565; correct?
22       A    Yes, if it's a partnership.  Yes.
23       Q    Is it your testimony that a silent
24   partnership is not required to file a Form 1065 in
25   California --

Page 133

1  that he had received any income generated through
2  his purported partnership with Mr. Sabadash?
3      MR. ATABEK: Objection. Vague.
4      MR. SARGOY: Join.
5      THE WITNESS: Again, whatever income he
6  reported, it came from their joint venture or
7  partnership, as you said.
8  BY MR. DAVIS:
9      Q   I would love to ask you about income that
10  he has reported, but your counsel has instructed
11  you not to answer on that subject so my question is
12  going to be different.
13      Okay?
14      A   Okay.
15      Q   My question is:  At any time did Mr. Itkin
16  ever communicate to you, whether in writing or
17  orally, that he had received any income generated
18  from his purported partnership with Mr. Sabadash?
19      A   No.
20      Q   And at any time, did Mr. Itkin ever
21  communicate to you, whether in writing or orally,
22  that he had generated any losses from his purported
23  partnership with Mr. Sabadash?
24      A   No.
25      Q   I apologize if I asked you this, but you

Page 134

1  never filed any tax return on behalf of a
2  partnership between Mr. Itkin and Mr. Sabadash;
3  correct?
4      A   Correct.
5      Q   Isn't it true that VLK Air used to be
6  organized as a corporation?
7      A   It -- the -- at some point, the VLK Air,
8  LLC, was converted to a corporation.
9      Q   I see.
10      So VLK Air, LLC -- VLK Air used to be
11  organized as a limited liability company and then
12  it was changed to a corporation --
13      A   Correct.
14      Q   -- correct?
15      A   Correct.
16      Q   After VLK Air was reorganized as a
17  corporation, did you file a Form 1065 for VLK Air,
18  Inc.?
19      A   There is no 1065 for VLK Air, Inc.  It's a
20  corporation.  So it's 1120.
21      Q   What is an 1120?
22      A   It's a corporate tax return for regular
23  C corp, they call it.  There is two types of
24  corporation, S corp and C corp.
25      MR. SARGOY: Okay.  You answered the

Page 135

1  question.
2  BY MR. DAVIS:
3      Q   I'll get --
4      A   Like a lecture, I have to explain.
5      Q   I'm interested in every -- I appreciate
6  the explanation.
7      A   Come to my office.
8      Q   I'm a lawyer.  I'm not an accountant.  So
9  I appreciate it.
10      A   I do a lot of lawyers.
11      MR. SARGOY: We're not at -- this is a
12  deposition; although --
13      THE WITNESS: I understand.
14      MR. SARGOY: I have used the term
15  "schooling."
16      THE WITNESS: Okay.  Okay.
17      MR. DAVIS: Can you please mark Exhibit 3.
18      (Exhibit 3 was marked for
19      identification by the reporter
20      and is attached hereto.)
21      THE WITNESS: Thank you.
22  BY MR. DAVIS:
23      Q   Exhibit 3 is an e-mail from Garry Itkin to
24  you dated May 17, 2012.
25      Do you recognize Exhibit 3 as an e-mail

Page 136

1  that you received?
2      A   I believe so.
3      Q   And the subject line says: "Forward:
4  FBAR."
5      Do you see that?
6      A   FBAR, yes.
7      Q   Can you tell me what "FBAR" stands for.
8      A   FBAR -- if a person or a company owns a --
9  or have a signature in a foreign bank, they have to
10  report it onto form -- FBAR form, and it's separate
11  from income tax.  It's a separate form.
12      It goes to Philadelphia main office.
13      Q   So if a person is a signatory on a foreign
14  bank account, they are required to file an FBAR
15  form --
16      A   Yes.
17      Q   -- is that correct?
18      A   Yes.
19      Q   At any point in time, has Mr. Itkin ever
20  communicated to you, in writing or orally, that he
21  is a signatory on a foreign bank account?
22      A   If he owns or he is a shareholder there,
23  yes.
24      Q   Well, my question is -- well, strike that.
25      At any point in time, did Mr. Itkin ever

Page 189

```
 1        person that Mr. Itkin had accepted
 2        Mr. Sabadash's offer to enter into
 3        a partnership?
 4        "ANSWER:  Correct.")
 5        THE WITNESS:  It was not exactly correct
 6   because he did mention, as I said, that he got an
 7   offer to become a partner in a partnership.
 8   BY MR. DAVIS:
 9        Q   So Mr. Itkin told you that Mr. Sabadash
10   had made him an offer to join him in Russia as a
11   partner in his business; correct?
12        A   Yes.
13        Q   After that conversation, at any point, did
14   Mr. Itkin tell you that he had affirmatively
15   accepted the offer to join Mr. Sabadash as a
16   partner?
17        A   No.
18        Q   Did Mr. Itkin ever tell you at any point
19   that he had any ownership interest in AFB?
20        MR. SARGOY:  Asked and answered.
21        THE WITNESS:  No.
22   BY MR. DAVIS:
23        Q   Did he ever tell you at any point that he
24   had any ownership interest in Maxxim?
25        MR. SARGOY:  Asked and answered.
```

Page 190

```
 1        THE WITNESS:  What period of time?  He was
 2   an owner of Maxxim.
 3   BY MR DAVIS:
 4        Q   You're right.  I'm sorry.
 5        After 2013, did Mr. Itkin ever tell you he
 6   had any ownership interest in Maxxim?
 7        A   No.
 8        Q   Did Mr. Itkin ever tell you that he had
 9   any ownership interest in New Albion?
10        MR. SARGOY:  Asked and answered.
11        THE WITNESS:  No.
12   BY MR. DAVIS:
13        Q   Now, to your knowledge, was there ever any
14   federal tax ID assigned to any purported
15   partnership entity that was owned by Garry Itkin
16   and Alexander Sabadash?
17        A   No, no.
18        Q   Now, understanding that -- well, strike
19   that.
20        Mr. Itkin never communicated to you,
21   orally or in writing, that a partnership had been
22   formed between him and Mr. Sabadash; correct?
23        A   Correct.
24        Q   This might be silly in light of that
25   answer, but did you ever come to learn the name of
```

Page 191

```
 1   any purported partnership formed between Alexander
 2   Sabadash and Garry Itkin?
 3        A   No.
 4        Q   Did Mr. Itkin ever refer to himself in any
 5   written communication that you have seen as a
 6   partner of Mr. Sabadash?
 7        A   No.
 8        Q   Did Mr. Itkin ever communicate to you that
 9   he had any ownership interest in any business
10   entity that you understood to be affiliated with
11   Mr. Sabadash?
12        A   No.
13        Q   To your knowledge, is the property at
14   58 Beverly Park still owned by New Albion?
15        A   Yes.
16        Q   Do you have any understanding as to who
17   the beneficial owner of that company is?
18        MR. ATABEK:  Objection.  Calls for a legal
19   conclusion, vague and ambiguous.
20        THE WITNESS:  The property --
21        MR. SARGOY:  Join.
22        THE WITNESS:  -- is owned by New Albion.
23   The owner is New Albion.
24   BY MR DAVIS:
25        Q   Do you have any understanding as to who
```

Page 192

```
 1   the beneficial owner of New Albion is?
 2        MR. ATABEK:  Objection.  Calls for a legal
 3   conclusion, vague and ambiguous.
 4        MR. SARGOY:  Join.
 5   BY MR. DAVIS:
 6        Q   You have to speak up.
 7        A   Okay.  Well, no.
 8        Q   Okay.  Just ask the question one more time
 9   subject to counsel's objections.
10        Do you have any understanding as to who
11   the beneficial owner of New Albion is?
12        A   No.
13        Q   Do you know who lives in the house at
14   58 Beverly Park?
15        A   Yes.
16        Q   Who?
17        A   Larissa Sabadash.
18        Q   Do you know if her children live there as
19   well?
20        A   Yes.
21        Q   To your knowledge, has Mrs. Sabadash and
22   her children lived at the 58 Beverly Park property
23   continuously for at least the past decade?
24        A   I believe so, yes.
25        Q   And to your knowledge, in the past decade,
```

Page 257

1  Russia, and he stayed until April 15, for two and a
2  half months.
3      Q    And prior to February of 2000, during that
4  year 1999, how much time did Itkin spend in Russia?
5      A    I don't remember that.  I don't.
6      Q    I think you testified earlier but just to
7  confirm, he was still working full time during that
8  year 1999 in your office in Los Angeles; correct?
9      A    Yes.
10     Q    And by "full time," you mean 40-plus hours
11  a week; correct?
12     A    As necessary, as needed, yes.
13     Q    Roughly 40 hours a week; is that accurate?
14     A    Might be more than 40 hours, yes.
15     Q    Now, again, I think you testified earlier
16  that a partnership business is required to file a
17  1065; correct?
18     A    Yes.
19     Q    And counsel for Mr. Itkin asked you some
20  questions on that subject, and I believe your
21  testimony was that, if a business is structured as
22  a joint venture, then the income from a joint
23  venture can be reported on individual tax returns;
24  correct?
25     A    Correct.

Page 258

1      Q    And to your knowledge or to your
2  understanding as a tax professional, a joint venture
3  is different from a partnership; correct?
4      A    They are -- basically the idea is -- behind
5  it is the same.  Each partner or each companion, as
6  we said in Russia, reports his own income, yes.
7          Even though today we report it on --
8  sometimes we report 100 percent on Schedule E, it's
9  a rental or business income, and then it splits.
10  On the bottom, it says, I am only an owner of
11  50 percent of that and net goes to front page.
12     Q    So is it your understanding that a joint
13  venture and a partnership are one and the same?
14     A    Almost the same.  Almost the same.
15     Q    How are they different?
16     A    They are different.  Because if it's a
17  formal partnership, partnership files his own --
18  its own partnership return and then each partner
19  receives a form K-1 and it says only one line net
20  income.
21     Q    So any time there is a formal partnership,
22  it's required that the partnership file a return;
23  correct?
24     A    Correct.
25     Q    No exceptions?

Page 259

1      A    No.
2      Q    Let me ask the question again.
3      Any time there is a formal partnership, it
4  is required that the partnership entity file a
5  return; correct?
6      A    Correct.
7      Q    There are no exceptions; correct?
8      A    Correct.
9      Q    Mr. Sabadash, never for any year that you
10  prepared his individual return, reported income
11  from any joint venture with Mr. Itkin; correct?
12     A    I haven't seen it, yes.
13     Q    And for any year that you prepared a tax
14  return for Mr. Sabadash, he never reported income
15  from any partnership with Mr. Itkin; correct?
16     A    Correct.
17     Q    Now, I think we went over this, but I want
18  to clarify.
19     Itkin never affirmatively told you that he
20  had any interest in the Lelinsky Luch land
21  entitlements; correct?
22     A    Yes, correct.
23     Q    And the Lelinsky Luch land entitlements
24  were reported on Alexander Sabadash's individual
25  returns as his 100 percent ownership interest;

Page 260

1  correct?
2      A    No.  We reported only the portion which
3  was sold.  On the income tax, you only show what
4  you sell.  So whatever you own, you don't show.
5      Q    So of that portion that was sold from the
6  Lelinsky Luch land entitlements, it was shown as
7  100 percent owned by Alexander Sabadash; correct?
8          MR. ATABEK:  Objection.
9          THE WITNESS:  On income tax, it doesn't
10  show you own 100 percent.  It just show the date of
11  purchase, the date of sale, sales price, and
12  purchase price.
13  BY MR. DAVIS:
14     Q    The sale proceeds from the sale of the
15  portion of the Lelinsky Luch land entitlements were
16  reported as the 100 percent income of Alexander
17  Sabadash; correct?
18     A    Yes.
19     Q    And if Mr. Itkin had, in fact, owned any
20  interest in the sale proceeds from those land
21  entitlements, it would have been inaccurate to
22  report that as solely income of Alexander Sabadash;
23  correct?
24     A    I cannot testify to that.  He might report
25  on his own income tax what he sold.



Page 265

```
 1   the fact that it was not reflected on any tax
 2   returns would be as a result of him just not
 3   reporting the existence of that partnership to you;
 4   correct?
 5       A   My understanding, whatever my client
 6   reports, I put it to the income tax.  If he didn't
 7   report something, I have no idea.
 8       Q   All right.  So if they failed to report
 9   something to you, that's on them?
10       A   That's correct.
11           MR. ATABEK:  I have no further questions.
12           MR. DAVIS:  Okay.  Let's go off the record
13   quickly.
14           VIDEO OPERATOR:  We're going off the
15   record.  The time is 5:15 P.M.
16           (Off the record.)
17           VIDEO OPERATOR:  We're going back on the
18   record.  The time is 5:19 P.M.
19           Please continue.
20           MR. DAVIS:  So this will conclude the
21   deposition of Mr. Ratner.
22           I propose that we stipulate to relieve the
23   court reporter of her duties under the code.
24           The original of the transcript will be
25   sent to counsel for Mr. Ratner.
```

Page 266

```
 1           Mr. Kenneth Sargoy, who -- will share the
 2   transcript with Mr. Ratner and transmit to me any
 3   changes to the transcript within two weeks of
 4   receipt of the original.
 5           If the original transcript is lost or not
 6   otherwise available for trial, we can use a
 7   certified copy in place of the original.
 8           MR. SARGOY:  So stipulated.
 9           MR. ATABEK:  So stipulated.
10           THE REPORTER:  On the record, would you
11   like to order a copy?
12           MR. ATABEK:  Yes.  I think I sent you an
13   e-mail.
14           MR. SARGOY:  No.  I'm okay.
15           MR. DAVIS:  Yes, please.
16           VIDEO OPERATOR:  We are going off the
17   record.  The time is 5:20 P.M. and this concludes
18   today's testimony given by Jeffrey Ratner.  The
19   total number of media units used was ten and will
20   be retained by Veritext Legal Solutions.
21           (Whereupon, at 5:20 P.M., the
22           deposition of JEFFREY RATNER was
23           adjourned.)
24
25
```

Page 267

```
 1       I declare under penalty of perjury
 2   under the laws of the State of California
 3   that the foregoing is true and correct.
 4
 5       Executed on _____, 2019,
 6   at _____, _____.
 7
 8
 9
10   _____
11       SIGNATURE OF THE WITNESS
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 268

```
 1   STATE OF CALIFORNIA   )
 2   COUNTY OF LOS ANGELES )
 3
 4      I, RICKI Q. MELTON, CSR No. 9400, RPR No. 45429,
 5      do hereby certify:
 6
 7      That the foregoing deposition testimony of
 8   JEFFREY RATNER was taken before me at the time and
 9   place therein set forth, at which time the witness
10   was placed under oath and was sworn by me to tell
11   the truth, the whole truth, and nothing but the
12   truth;
13      That the testimony of the witness and all objections
14   made by counsel at the time of the examination were
15   recorded stenographically by me and were thereafter
16   transcribed under my direction and supervision, and
17   that the foregoing pages contain a full, true, and
18   accurate record of all proceedings and testimony to
19   the best of my skill and ability.
20      I further certify that I am neither counsel for
21   any party to said action nor am I related to any
22   party to said action, nor am I in any way
23   interested in the outcome thereof.
24
25
26      IN WITNESS WHEREOF, I have subscribed my name
27   this 11th day of June, 2019.
28
29
30
31
32
33      <%5976,Signature%>
34      RICKI Q. MELTON, C.S.R. No. 9400
35
```

# Exhibit 16

# INFORMATION SERVICES CONTRACT

Moscow                                                                                   February 12, 2004

The Itkin and Sadabash Simple Partnership, hereinafter referred to as the "Customer," represented by partner G. Yu. Itkin and partner A.V. Sadabash, acting in accordance with the Simple Partnership Contract on the one part, and E.N. Vasilieva, having qualification in accordance with the Diploma (with honors) DVS No. 1245053 dated 07/27/2001, Qualification Certificate of a Tax and Duty Consultant of the MTL [Ministry of Taxes and Levies] of the RF [Russian Federation] No. 0017 dated 12/30/2003, on the other part, have concluded this contract as follows:

## 1.       SCOPE OF CONTRACT

1.1. The Customer charges and the Contractor undertakes to render consulting, information, and legal services, as well as advice on tax matters, tax optimization, the choice of the optimal tax system, in-office and on-site tax audits, protection of the interests of taxpayers, accounting, tax planning, assessing the security of tax decisions, and monitoring of legislation.

1.2. The Customer shall pay for the services of the Contractor in the manner, time, and on the conditions determined by this Contract.

## 2.       RIGHTS AND OBLIGATIONS OF THE PARTIES

2.1. The Contractor shall:
-   render consulting and information services providing for the interests of the Customer in accordance with the provisions of the current legislation in relation to the assets and property owned by the Customer, namely
    1.   Russky Dizel OJSC (address: industrial zone, Kirpichny Zavod station, Vsevolozhsky District, Leningrad Region);
    2.   Vyborg Cellulose OJSC (address: 2, Zavodskaya St., Sovetsky, Vyborg District, Leningrad Region);
    3.   LIVIZ CJSC (address: 56-58, Sinopskaya Emb., St. Petersburg);
    4.   LIVIZ LLC (address: 5, Nagornaya St., Krasnoye Selo, St. Petersburg);
    5.   land shares in the Leninsky luch state farm (Krasnogorsky District, Moscow Region) 987 hectares, Petrovsky state farm (Krasnogorsky District, Moscow Region) 197 hectares, Ilyinsky state farm (Krasnogorsky District, Moscow Region) 430 hectares, Dmitrovsky state farm (Krasnogorsky District, Moscow Region) 360 hectares;

excluding the property of the Customer: immovable property located at the address: 17, General de Gaulle Boulevard, Cap Ferrat, France; aircraft Falcon 200, tail number HB VNG, in connection with the location of the property outside of the RF.

2.2. The Contractor has the right to:
-   on the basis of the duly issued power of attorney, represent the Customer on matters that are the subject of this contract in relations with all organizations, institutions, and citizens;
-   independently determine the forms and methods of rendering services under this Contract, based on the requirements of the current legislation of the Russian Federation;
-   study the documentation related to the financial and economic activities of the Customer for the proper fulfillment of its obligations under this Contract;
-   upon request of the Customer, provide the necessary information on the requirements of the legislation of the Russian Federation concerning issues of interest to the Customer, as well as on the regulatory acts of the Russian Federation on which the Contractor's observations and conclusions are based;
-   inform the Customer in a timely manner on possible negative consequences of tax accounting, and financial and economic activities of the customer in the form provided for consultation;
-   negotiate on behalf of the Customer, as well as sign documents, the right to sign which will be provided to the Contractor by the Customer;
-   request and receive from the Customer all the necessary documents,
-   make copies of any documents for use in order to fulfill obligations under the contract;

[signature]

[stamp:]
Itkin and
Sadabash Simple
Partnership
Russia

[hw:] A.S.
G. I.

- use the services of any individuals and legal entities for the timely and high-quality fulfillment of obligations under the contract, taking into account the confidentiality agreement.

2.3. The Customer shall:

- provide the Contractor with all the information and documents in its possession necessary for the fulfillment of this Contract

- provide the Contractor with written and oral tasks necessary for research

- provide the Contractor with the necessary powers under this Contract, issuing it with appropriate powers of attorney and Contracts;

- accept from the Contractor the minutes of negotiations, letters, certificates of the work performed, and other materials;

- accept the work of the Contractor and sign the certificates of the work performed;

- promptly, no less than five days in advance, to notify the Contractor of the time and place for conducting negotiations on issues related to the duties of the Contractor under this Contract;

- pay for the services of the Contractor in the order, in the terms and in the amount established by the supplementary agreements to this contract.

2.4. The Customer has the right to:

- request from the Contractor information on the progress of the contract, copies of documents confirming the work performed by the Contractor;

- request from the Contractor data and information about the negotiations, drawn up by the relevant minutes.

2.5. Documents confirming the fulfillment of obligations to the Customer are the service acceptance acts.

2.6. Service acceptance acts and the activity reports are transmitted and signed by the managing partner and the Customer's representative G.Yu. Itkin, which is stipulated in the Itkin and Sadabash Simple Partnership Contract.

### 3.   TERM OF VALIDITY AND SETTLEMENT PROCEDURE

3.1. This contract is valid from February 12, 2004.

3.2. Fulfillment place of this contract: Moscow, Russian Federation.

3.3. The amount of remuneration of the Contractor for services rendered under this Contract is 200,000 (two hundred thousand) rubles per year.

3.4. In the period until 02/20/2004, the Customer makes an advance payment under the contract in the amount of RUB 200,000 (Two hundred thousand).

3.5. The Customer pays the services of the Contractor on the basis of the invoice issued by the Contractor within five days from the receipt of the invoice in a manner agreed by the parties.

3.6. The Contractor has the right to demand payment for the work done by each of the partners of Itkin and Sadabash Simple Partnership, which implies the joint responsibility of each partner.

### 4.   CAUSE FOR TERMINATION OF CONTRACT AND LIABILITIES OF THE PARTIES

4.1. The Customer has the right to refuse to fulfill this Contract, subject to payment to the Contractor of the actual costs and services incurred by him.

4.2. Contractor shall have the right to refuse to fulfill the obligations under this Contract only under the condition of full compensation to the Customer of the losses.

4.3. Contract is terminated in the following cases:

- in case of the unilateral refusal of one of the parties to fulfill the contract;

- in case of the fulfillment of the parties' obligations under the contract;

- by agreement of the parties.

4.4.   Parties are entitled to compensation for damages caused by the fault of the other Party, in accordance with applicable law.

4.5.   In case of impossibility of fulfillment of this Contract due to circumstances for which neither of the parties is responsible, the Customer shall reimburse the Contractor for the expenses it actually incurred related to the fulfillment of obligations under this Contract.

4.6.   In case the Customer violates the terms of payment for the services of the Contractor, the Customer shall pay the Contractor a penalty in the amount of 10% per annum of the unpaid amount, as well as a one-time penalty for breach of the terms of the contract in the amount of RUB 50,000 (fifty thousand).

[stamp:]
Itkin and
Sadabash Simple
Partnership
Russia

[hw:] *A.S.*
*G. I.*

[signature]

4.7. Payment of penalties, fines, charges, and damages do not exempt the parties from fulfilling their obligations.

4.8. The parties are exempt from liability for partial or complete non-fulfillment of obligations under this contract if this failure was the result of force majeure circumstances arising after the conclusion of the contract as a result of extraordinary events that the parties could neither foresee nor prevent by reasonable measures.

4.9. *The circumstances of force majeure include events which the parties cannot influence and for whose occurrence they are not responsible, for example: natural disasters, extraordinary events of a social nature (war, mass riots, etc.), government regulations or orders of state bodies that make the implementation of the object impossible.*

## 5.     SETTLEMENT OF DISPUTES

5.1. All disputes and disagreements arising in the process of fulfillment of this contract will, if possible, be resolved through negotiations.

5.2. If the parties fail to reach agreement on matters of dispute, disputes will be referred to the court of Moscow in the manner prescribed by the current legislation of the RF.

5.3. When considering a dispute and determining the amount of personal liability, the percentage of shares provided for by a Simple Partnership Contract, namely, G.Yu. Itkin – 33% and A.V. Sadabash – 67% will be taken into account.

5.4. In all other matters not provided for by this Contract, the parties are guided by the current legislation of the RF.

5.5. This contract is made in two copies, one for each of the parties.

## 6.     ADDRESSES AND DETAILS OF THE PARTIES

**Customer**
Itkin and Sadabash Simple Partnership, the address of the partnership is determined by the location (residence) of the managing partner – G.Yu. Itkin: 8501 Wilshire Blvd., Suite 330 Beverly Hills, California 90211 USA

Address of the partner Alexander Vitalyevich Sadabash: 37-41 Bedford Row, London, WC1R4JH, UK

**Contractor**
Elena Nikolaevna Vasilyeva (04/30/1980).
Location: 3, Rogozhsky pos. St., apt. 42, Moscow, RF, 109051.

[signature]

[signature]

[signature]

[stamp:]
Itkin and
Sadabash Simple
Partnership
Russia

## ACT OF SERVICES RENDERED
### UNDER INFORMATION SERVICES CONTRACT DATED FEBRUARY 12, 2004

December 31, 2004

Itkin and Sadabash Simple Partnership, hereinafter referred to as the "Customer," represented by the managing partner G. Yu. Itkin, acting under the Simple Partnership Contract, on the one part, and E.N. Vasilyeva, on the other part, jointly referred to as the Parties, have concluded this act as follows:

1.     On February 12, 2004, the Customer and the Contractor concluded the information services contract (hereinafter - "Contract").

2.     In the period from 02/12/2004 to 12/31/2004, the Contractor duly fulfilled the obligations stipulated in the Contract, namely, consulting, informational, and legal services, as well as consultations on tax matters, on tax optimization, choosing the optimal tax system, in-office and on-site tax audits, protecting taxpayers, accounting, tax planning, assessing the security of tax decisions, and monitoring of legislation in relation to assets and property owned by the Customer, namely:

   1.   Russky Dizel OJSC (address: industrial zone, Kirpichny Zavod station, Vsevolozhsky District, Leningrad Region);
   2.   Vyborg Cellulose OJSC (address: 2, Zavodskaya St., Sovetsky, Vyborg District, Leningrad Region);
   3.   LIVIZ CJSC (address: 56-58, Sinopskaya Emb., St. Petersburg);
   4.   LIVIZ LLC (address: 5, Nagornaya St., Krasnoye Selo, St. Petersburg);
   5.   land shares in the Leninsky luch state farm (Krasnogorsky District, Moscow Region) 987 hectares, Petrovsky state farm (Krasnogorsky District, Moscow Region) 197 hectares, Ilyinsky state farm (Krasnogorsky District, Moscow Region) 430 hectares, Dmitrovsky state farm (Krasnogorsky District, Moscow Region) 360 hectares;
   6.   purchase of real estate located at the address: 58 Beverly Park, Beverly Hills, California, USA;
   7.   purchase of the aircraft Gulfstream G500.

3.     During the reporting period, the Customer was provided with monthly written activity reports.

4.     On the basis of the foregoing, the Parties declare that the services under the contract are rendered in full, of adequate quality, and have no claims on the fulfillment of the Contract to each other.

5.     This act of services rendered was drawn up in two copies having the same legal force, one copy for each of the Parties.

6.     Services rendered under the Contract in the amount of RUB 200,000 (Two hundred thousand).

### SIGNATURES OF THE PARTIES:

**Customer:**                                          **Contractor:**

[signature]                                            [signature]

[stamp:]
Itkin and
Sadabash Simple
Partnership
Russia

## ACT OF SERVICES RENDERED
### UNDER INFORMATION SERVICES CONTRACT DATED FEBRUARY 12, 2004

December 31, 2005

Itkin and Sadabash Simple Partnership, hereinafter referred to as the "Customer," represented by the managing partner G. Yu. Itkin, acting under the Simple Partnership Contract, on the one part, and E.N. Vasilyeva, on the other part, jointly referred to as the Parties, have concluded this act as follows:

1.      On February 12, 2004, the Customer and the Contractor concluded the information services contract (hereinafter - "Contract").

2.      In the period from 01/01/2005 to 12/31/2005, the Contractor duly fulfilled the obligations stipulated in the Contract, namely, consulting, informational, and legal services, as well as consultations on tax matters, tax optimization, choosing the optimal tax system, in-office and on-site tax audits, protecting taxpayers, accounting, tax planning, assessing the security of tax decisions, and monitoring of legislation in relation to assets and property owned by the Customer, namely:

1. Payment of the assets of Russky Dizel OJSC as share capital to Diesel Limited located on Jersey, United Kingdom;
2. Payment of the assets of Vyborg Cellulose OJSC as share capital to Vyborg Limited located on Jersey, United Kingdom
3. LIVIZ CJSC (address: 56-58, Sinopskaya Emb., St. Petersburg);
4. LIVIZ LLC (address: 5, Nagornaya St., Krasnoye Selo, St. Petersburg);

3.      During the reporting period, the Customer was provided with monthly written activity reports.

4.      On the basis of the foregoing, the Parties declare that the services under the contract are rendered in full, of adequate quality, and have no claims on the fulfillment of the Contract to each other.

5.      This act of services rendered was drawn up in two copies having the same legal force, one copy for each of the Parties.

6.      Services rendered under the Contract in the amount of RUB 200,000 (Two hundred thousand).

### SIGNATURES OF THE PARTIES:

Customer:                                      Contractor:

[signature]                                         [signature]

[stamp:]
Itkin and
Sadabash Simple
Partnership
Russia

## ACT OF SERVICES RENDERED
### UNDER INFORMATION SERVICES CONTRACT DATED FEBRUARY 12, 2004

December 31, 2006

Itkin and Sadabash Simple Partnership, hereinafter referred to as the "Customer," represented by the managing partner G. Yu. Itkin, acting under the Simple Partnership Contract, on the one part, and E.N. Vasilyeva, on the other part, jointly referred to as the Parties, have concluded this act as follows:

1.      On February 12, 2004, the Customer and the Contractor concluded the information services contract (hereinafter - "Contract").

2.      In the period from 01/01/2006 to 12/31/2006, the Contractor duly fulfilled the obligations stipulated in the Contract, namely, consulting, informational, and legal services, as well as consultations on tax matters, tax optimization, choosing the optimal tax system, in-office and on-site tax audits, protecting taxpayers, accounting, tax planning, assessing the security of tax decisions, and monitoring of legislation in relation to assets and property owned by the Customer.

3.      During the reporting period, the Customer was provided with monthly written activity reports.

4.      On the basis of the foregoing, the Parties declare that the services under the contract are rendered in full, of adequate quality, and have no claims on the fulfillment of the Contract to each other.

5.      This act of services rendered was drawn up in two copies having the same legal force, one copy for each of the Parties.

6.      Services rendered under the Contract in the amount of RUB 200,000 (Two hundred thousand).

### SIGNATURES OF THE PARTIES:

Customer:                                Contractor:

[signature]                                                    [signature]

[stamp:]
Itkin and
Sadabash Simple
Partnership
Russia

## DECLARATION AND CERTIFICATION

**I, <u>Iuliia Broshyna</u>, declare that I am a**

**(Insert Name of Person Translating)**


**(Check one)**

**( ) CERTIFIED/ REGISTERED COURT INTERPRETER as described in GC 68561**

**( x ) A CERTIFIED TRANSLATOR REGISTERED WITH THE AMERICAN TRANSLATORS ASSOCIATION**


**I am certified/registered to interpret and translate from the Russian language to the English language.  My Certification/Registration Number(s) is/are: 263947.**

**I declare to the best of my abilities and belief, that this is a true and accurate translation of the Russian language text of "2004-02-12 Simple Partnership contract".**

**I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

**This declaration signed this 21st day of May 2019 in Miami.**

**Print name of Certified/ Registered Court Interpreter or Certified Translator registered with the American Translators Association NATIVE SPEAKER TRANSLATION INC**

*NOTE: The Certified/ Registered Court Interpreter or Certified Translator registered with the American Translators Association must be acknowledged by a notary public.*

**REV. 01/01/08**



State of _Florida_
County of _Broward_
On this _21_ day of _May, 2019_
before me personally appeared
_Iuliia Broshyna_
to me known to be the person who executed the
foregoing instrument, and acknowledged that he
executed the same as his free act and deed.
SEAL (signed)_____
                    NOTARY PUBLIC

*personally known*

HALINA ZDANOVICH
MY COMMISSION # GG073539
EXPIRES March 08, 2021

ДОГОВОР НА ОКАЗАНИЕ ИНФОРМАЦИОННЫХ УСЛУГ

г. Москва                                                                  "12" февраля 2004г.

Простое товарищество "Иткин и Сабадаш", именуемое в дальнейшем "Заказчик", в лице партнера Иткина Г. Ю. и партнера Сабадаш А.В., действующий на основании Договора простого товарищества с одной стороны, и Васильева Е.Н., имеющая квалификацию в соответствии с Дипломом (с отличием) ДВС №1245053 от 27.07.2001г., Квалификационный аттестат консультанта по налогам и сборам МНС РФ №0017 от 30.12.2003г., с другой стороны, заключили настоящий договор о нижеследующем:

## 1. ПРЕДМЕТ ДОГОВОРА

1.1. Заказчик поручает, а Исполнитель обязуется оказать консультационные, информационные, правовые услуги, а также консультации по налоговым вопросам, по оптимизации налогов, по выбору оптимальной системы налогообложения, по камеральным и выездным налоговым проверкам, по защите интересов налогоплательщиков, по бухгалтерскому учету, налоговому планированию, оценке безопасности налоговых решений; мониторинг законодательства.

1.2. Заказчик обязуется оплатить услуги Исполнителя в порядке, в срок и на условиях, определенных настоящим договором.

## 2. ПРАВА И ОБЯЗАННОСТИ СТОРОН

2.1. Исполнитель обязуется:
- оказывать консультационные и информационные услуги предусматривая интересы Заказчика в соответствии с положениями действующего законодательства в отношении принадлежащего Заказчику активов, имущества, а именно:
    1. ОАО "Русский Дизель" (адрес: Ленинградская область, Всеволожский район, станция Кирпичный завод, промзона);
    2. ОАО "Выборгская целлюлоза" (адрес: Ленинградская область, Выборгский район, пос. Советский ул. Заводская д.2);
    3. ЗАО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Синопская наб.,д.56-58);
    4. ООО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Красное село, ул. Нагорная д.5);
    5. земельные паи в совхоз "Ленинский луч" (Московская область, Красногорский район) 987 га, совхоз "Петровский" (Московская область, Красногорский район) 197 га, совхоз "Ильинский" (Московская область, Красногорский район) 430 га, совхоз "Дмитровский" (Московская область, Красногорский район) 360 га;

исключая имущество Заказчика: недвижимое имущество, расположенное по адресу: Франция, Кап Феррат, бульвар имени Генерала де Голя, д. 17; самолет Фалькон 200, бортовой номер HB VNG, в связи с нахождением имущества за пределами РФ.

2.2. Исполнитель имеет право:
- на основании выданной в установленном порядке доверенности представлять Заказчика по вопросам, являющимся предметом настоящего договора, в отношениях со всеми организациями, учреждениями и гражданами;
- самостоятельно определять формы и методы оказания Услуг по настоящему Договору, исходя из требований действующего законодательства Российской Федерации;
- исследовать в документацию, связанную с финансово-хозяйственной деятельностью Заказчика для надлежащего исполнения своих обязательств по настоящему Договору;
- предоставлять по требованию Заказчика необходимую информацию о требованиях законодательства Российской Федерации, касающихся интересующего Заказчика вопроса, а также о нормативных актах Российской Федерации, на которых основываются замечания и выводы Исполнителя;
- своевременно информировать Заказчика о возможных негативных последствиях ведения налогового учета, финансово-хозяйственной деятельности Заказчика в представленном для консультации виде;
- от имени Заказчика вести переговоры, а также подписывать документы, право подписания которых будет предоставлено Исполнителю Заказчиком;
- требовать и получать от Заказчика все необходимые документы,
- снимать копии с любых документов для использования в целях исполнения обязательств по настоящему договору;



2.3. Заказчик обязан:

- предоставить Исполнителю все имеющиеся у него сведения и документы, необходимые для исполнения настоящего договора

- предоставлять Исполнителю задания в письменном и устном виде, необходимые для проведения исследований

- предоставить Исполнителю необходимые полномочия в рамках настоящего договора, оформив это соответствующими доверенностями и договорами;

- принимать от Исполнителя протоколы переговоров, письма, справки о проделанной работе и другие материалы;

- принимать работу Исполнителя и подписывать акты выполненных работ;

- своевременно, не менее чем за пять дней, предупреждать Исполнителя о времени и месте проведения переговоров по вопросам, связанным с обязанностями Исполнителя по настоящему договору;

- оплатить услуги Исполнителя в порядке, в сроки и в размере, установленные дополнительными соглашениями к настоящему договору.

2.4. Заказчик имеет право:

- требовать у Исполнителя сведений о ходе исполнения договора, копии документов, подтверждающих проведенную Исполнителем работу;

- запрашивать у Исполнителя данные и сведения о проведенных переговорах, оформленные соответствующими протоколами.

2.5. Документами, подтверждающими исполнение обязательств перед Заказчиком, являются акты выполненных работ.

2.6. Акты выполненных работ и отчеты о проделанной работе передаются и подписываются управляющим партнером и представителем Заказчика Иткиным Г.Ю., что предусмотрено договором Простого товарищества "Иткин и Сабадаш".

### 3. СРОК ДЕЙСТВИЯ И ПОРЯДОК РАСЧЕТОВ

3.1. Настоящий договор действует с "12" февраля 2004 года.

3.2. Место исполнения настоящего договора: город Москва, РФ.

3.3. Размер вознаграждения Исполнителя за оказанные услуги по настоящему договору составляет 200 000 (двести тысяч) рублей в год.

3.4. В срок до 20.02.2004 года Заказчик производит предварительную оплату по договору в размере 200 000 (Двести тысяч) рублей.

3.5. Заказчик оплачивает услуги Исполнителя на основании счета, выставленного Исполнителем, в течение пяти дней с момента получения счета согласованным сторонами способом.

3.6. Исполнитель имеет право требовать оплаты выполненной работы у каждого из партнеров простого товарищества "Иткин и Сабадаш", что предполагает солидарную ответственность каждого партнера.

### 4. ОСНОВАНИЯ ПРЕКРАЩЕНИЯ ДОГОВОРА И ОТВЕТСТВЕННОСТЬ СТОРОН

4.1. Заказчик вправе отказаться от исполнения настоящего договора при условии оплаты Исполнителю фактически понесенных им расходов и выполненных услуг.

4.2. Исполнитель вправе отказаться от исполнения обязательств по настоящему договору лишь при условии полного возмещения Заказчику убытков.

4.3. Договор прекращает действие в следующих случаях:

- при одностороннем отказе одной из сторон от исполнения договора;

- при исполнении сторонами обязательств по договору;

- по соглашению сторон.

4.4. Стороны имеют право на возмещение убытков, причиненных по вине другой стороны, в соответствии с действующим законодательством.

4.5. В случае невозможности исполнения настоящего договора по обстоятельствам, за которые ни одна из сторон не отвечает, Заказчик возмещает Исполнителю фактически понесенные им расходы, связанные с исполнением обязательств по настоящему договору.

4.6. В случае нарушения Заказчиком сроков оплаты услуг Исполнителя Заказчик уплачивает Исполнителю пеню в размере 10% годовых от неуплаченной суммы, а также единовременный штраф за нарушение условий договора в размере 50000 (пятидесяти тысяч) рублей.



4.7. Уплата неустойки, пени, штрафа и возмещение убытков не освобождают стороны от выполнения принятых на себя обязательств.

4.8. Стороны освобождаются от ответственности за частичное или полное неисполнение обязательств по настоящему договору, если это неисполнение явилось следствием обстоятельств непреодолимой силы, возникших после заключения договора в результате событий чрезвычайного характера, которые стороны не могли ни предвидеть, ни предотвратить разумными мерами.

4.9. К обстоятельствам непреодолимой силы относятся события, на которые стороны не могут оказывать влияния и за возникновение которых не несут ответственности, например: стихийные бедствия, чрезвычайные события социального характера (война, массовые беспорядки и т.п.), правительственные постановления или распоряжения государственных органов, делающие невозможным реализацию объекта.

## 5. ПОРЯДОК РАЗРЕШЕНИЯ СПОРОВ

5.1. Все споры и разногласия, возникающие в процессе исполнения настоящего договора, будут, по возможности, разрешаться путем переговоров.

5.2. В случае если стороны не придут к соглашению по спорным вопросам, споры будут переданы на рассмотрение в суд г.Москвы в порядке, предусмотренном действующим законодательством РФ.

При рассмотрении спора и определении размера персональной материальной ответственности учитывается процентное соотношение долей, предусмотренное договором простого товарищества, а именно Иткин Г.Ю. - 33% и Сабадаш А.В. - 67%.

5.3. Во всем остальном, не предусмотренном настоящим договором, стороны руководствуются действующим законодательством РФ.

5.4. Настоящий договор заключен в двух экземплярах, по одному для каждой из сторон.

## 6. АДРЕСА И РЕКВИЗИТЫ СТОРОН

**Заказчик**
Простое товарищество "Иткин и Сабадаш"
адрес товарищества определяется местом нахождения (жительства) управляющего партнера - Иткина Г.Ю.: 90211, США, штат Калифорния, город Беверли Хиллс, бульвар Вилшер, дом 8501, оф. 330. (8501 Wilshire Blvd., Suite 330 Beverly Hills, California 90211 USA)

Адрес партнера Сабадаш Александра Витальевича: WC1R4JH, Великобритания, город Лондон, улица Бедфорд роу, дом 37/41 (37-41 Bedford Row, London, WC1R4JH, UK)

**Исполнитель**
Васильева Елена Николаевна (30.04.1980г.р.)
Место нахождения: 109051, РФ, г. Москва, ул. Рогожский пос., д. 3, кв. 42

РОССИЯ ПРОСТОЕ ТОВАРИЩЕСТВО ИТКИН И САДАБАШ РОССИЯ

**АКТ ОКАЗАНИЯ УСЛУГ**
**ПО ДОГОВОРУ НА ОКАЗАНИЕ ИНФОРМАЦИОННЫХ УСЛУГ ОТ «12» ФЕВРАЛЯ 2004г.**

31 декабря 2004 год

Простое товарищество "Иткин и Сабадаш", именуемое в дальнейшем "Заказчик", в лице управляющего партнера Иткина Г. Ю., действующий на основании Договора простого товарищества, с одной стороны, и Васильева Е.Н., с другой стороны, именуемые вместе – Стороны, составили настоящий акт о следующем:

1. «12» февраля 2004 года между Заказчиком и Исполнителем был заключен договор на оказание информационных услуг (далее – Договор).

2. В период с 12.02.2004г. по 31.12.2004г. Исполнитель надлежащим образом исполнял предусмотренные Договором обязательства, а именно

консультационные, информационные, правовые услуги, а также консультации по налоговым вопросам, по оптимизации налогов, по выбору оптимальной системы налогообложения, по камеральным и выездным налоговым проверкам, по защите интересов налогоплательщиков, по бухгалтерскому учету, налоговому планированию, оценке безопасности налоговых решений; мониторинг законодательства в отношении принадлежащего Заказчику активов, имущества, а именно

1. ОАО "Русский Дизель" (адрес: Ленинградская область, Всеволожский район, станция Кирпичный завод, промзона);
2. ОАО "Выборгская целлюлоза" (адрес: Ленинградская область, Выборгский район, пос. Советский ул. Заводская д.2);
3. ЗАО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Синопская наб, д.56-58);
4. ООО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Красное село, ул. Нагорная д.5);
5. земельные паи в совхоз "Ленинский луч" (Московская область, Красногорский район) 987 га, совхоз "Петровский" (Московская область, Красногорский район) 197 га, совхоз "Ильинский" (Московская область, Красногорский район) 430 га, совхоз "Дмитровский" (Московская область, Красногорский район) 360 га;
6. покупка недвижимого имущества находящегося по адресу: США, штат Калифорния, город Беверли Хиллс, улица Беверли Парк, д.58;
7. покупка самолета Гольфстрим G500;

3. В отчетный период Заказчику предоставлялись ежемесячные письменные отчеты о проделанной работе.

4. На основании изложенного Стороны заявляют, что услуги по договору оказаны в полном объеме, надлежащего качества, претензий у Сторон по исполнению Договора друг к другу не имеют.

5. Настоящий акт оказания услуг составлен в двух экземплярах, имеющих одинаковую юридическую силу, по одному экземпляру для каждой из Сторон.

6. Выполнены услуги по Договору на сумму 200000 (Двести тысяч) рублей.

**ПОДПИСИ СТОРОН:**

Заказчик:                              Исполнитель:

31 декабря 2005 год

Простое товарищество "Иткин и Сабадаш", именуемое в дальнейшем "Заказчик", в лице управляющего партнера Иткина Г. Ю., действующий на основании Договора простого товарищества, с одной стороны, и Васильева Е.Н., с другой стороны, именуемые вместе – Стороны, составили настоящий акт о следующем:

1. «12» февраля 2004 года между Заказчиком и Исполнителем был заключен договор на оказание информационных услуг (далее – Договор).

2. В период с 01.01.2005г. по 31.12.2005г. Исполнитель надлежащим образом исполнял предусмотренные Договором обязательства, а именно консультационные, информационные, правовые услуги, а также консультации по налоговым вопросам, по оптимизации налогов, по выбору оптимальной системы налогообложения, по камеральным и выездным налоговым проверкам, по защите интересов налогоплательщиков, по бухгалтерскому учету, налоговому планированию, оценке безопасности налоговых решений; мониторинг законодательства в отношении принадлежащего Заказчику активов, имущества, а именно

1. взнос активов ОАО "Русский Дизель"в качестве уставного капитала в компанию "Дизель Лимитед" (Diesel Limited) находящуюся на острове Джерси, Великобритания;
2. взнос активов ОАО "Выборгская целлюлоза" в качестве уставного капитала в компанию "Выборг Лимитед" (Vyborg Limited) находящуюся на острове Джерси, Великобритания;
3. ЗАО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Синопская наб, д.56-58);
4. ООО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Красное село, ул. Нагорная д.5);

3. В отчетный период Заказчику предоставлялись ежемесячные письменные отчеты о проделанной работе.

4. На основании изложенного Стороны заявляют, что услуги по договору оказаны в полном объеме, надлежащего качества, претензий у Сторон по исполнению Договора друг к другу не имеют.

5. Настоящий акт оказания услуг составлен в двух экземплярах, имеющих одинаковую юридическую силу, по одному экземпляру для каждой из Сторон.

6. Выполнены услуги по Договору на сумму 200000 (Двести тысяч) рублей.

ПОДПИСИ СТОРОН:

Заказчик:                                    Исполнитель:

**АКТ ОКАЗАНИЯ УСЛУГ**
**ПО ДОГОВОРУ НА ОКАЗАНИЕ ИНФОРМАЦИОННЫХ УСЛУГ ОТ 12" ФЕВРАЛЯ 2004Г.**

31 декабря 2006 год

Простое товарищество "Иткин и Сабадаш", именуемое в дальнейшем "Заказчик", в лице управляющего партнера Иткина Г. Ю., действующий на основании Договора простого товарищества, с одной стороны, и Васильева Е.Н., с другой стороны, именуемые вместе – Стороны, составили настоящий акт о следующем:

1.      «12» февраля 2004 года между Заказчиком и Исполнителем был заключен договор на оказание информационных услуг (далее – Договор).

2.      В период с 01.01.2006г. по 31.12.2006г. Исполнитель надлежащим образом исполнял предусмотренные Договором обязательства, а именно консультационные, информационные, правовые услуги, а также консультации по налоговым вопросам, по оптимизации налогов, по выбору оптимальной системы налогообложения, по камеральным и выездным налоговым проверкам, по защите интересов налогоплательщиков, по бухгалтерскому учету, налоговому планированию, оценке безопасности налоговых решений; мониторинг законодательства в отношении принадлежащего Заказчику активов, имущества.

3.      В отчетный период Заказчику предоставлялись ежемесячные письменные отчеты о проделанной работе.

4.      На основании изложенного Стороны заявляют, что услуги по договору оказаны в полном объеме, надлежащего качества, претензий у Сторон по исполнению Договора друг к другу не имеют.

5.      Настоящий акт оказания услуг составлен в двух экземплярах, имеющих одинаковую юридическую силу, по одному экземпляру для каждой из Сторон.

6.      Выполнены услуги по Договору на сумму 200000 (Двести тысяч) рублей.

**ПОДПИСИ СТОРОН:**

Заказчик:                                              Исполнитель:

# Exhibit 17

*Zoya Spivakovsky*
*Certified Russian Interpreter & Translator*
*Tel: + 1 (323) 652-0003*

Judicial Council of California
Certification No. 301037

## CERTIFICATE OF ACCURACY

October 31, 2019

    I, the undersigned, hereby certify that I am a professional translator, registered with the United States District Court, Central District of California and Los Angeles Superior Court as an official court interpreter and translator, and that I am thoroughly familiar with the Russian and English languages, and that the translation from Russian into English of the following attached document:

    *Ruling of the Court No. 09AP-43744/2019-GK by the 9th Arbitration Court of Appeals (2 pages)*

is a true, accurate and correct rendition of the original document in the English language to the best of my knowledge and belief.

Executed under penalty of perjury this 31th day of October 2019, in Los Angeles, California.

Zoya Spivakovsky,
Certified Court Interpreter & Translator



**THE 9TH ARBITRATION COURT OF APPEALS**

12 Proyezd Solomennoy storozhki, GSP-4, Moscow, 127994

Website: http://98aas.arbitr.ru

# RULING OF THE COURT No. 09AP-43744/2019-GK

City of Moscow                                                    Case No. A40-165165/18
September 12, 2019

Resolutive part of the Decision was issued on September 10, 2019.
The complete ruling was issued on September 12, 2019.
The 9th Arbitration Court of Appeals composed of

Presiding Judge: B. S. Veklich
Judges: B. P. Garmaev  and T. U. Levina
Record of the court proceedings provided by O. O. Kozin, Court Clerk

held a hearing in open court with regard to the appeal filed by A.V. Sabadash as to the decision issued on September 14, 2018 in case No. A40-165165/18 (judicial code 140-4254) by the Moscow Arbitration Court with regard to the lawsuit filed by Plaintiff, Sole Proprietor E. N. Goffman against Respondent, Simple Partnership "Itkin and Sabadash".

 Notice to appear was duly mailed to the parties involved.

 Plaintiff:         No appearance.

 Respondent:   Represented in court by I. N. Shadaev pursuant to Power of Attorney dated 08/07/2018 (document number n/a)

 Appellant:      Represented in court by K.V. Tykhenova pursuant to Power of Attorney dated 07/03/2019 (document number n/a)

### THE COURT FINDS AS FOLLOWS:

 Pursuant to a legally enforceable decision issued by the Moscow Arbitration Court on September 14, 2018, the court ordered payment of debt and penalties in the amount of 826,000 RUB, 46 kopecks to be made by "Itkin and Sabadash", a Simple Partnership to Sole Proprietor E. N. Hoffman.
 Mr. Sabadash disagrees with the decision of the Court and filed an appeal in accordance with Article 42 of the Arbitration Procedure Code, seeking to reverse the decision and arguing violation of substantive and procedural law by the Arbitration Court.
 Respondent objects to arguments cited in the complaint and asks the Court to deny the appeal, submitting a written response.
 The complaint was reviewed by the Court in accordance with Articles 123, 156 of the Arbitration Procedure Code of the Russian Federation in the absence of Plaintiff's Representative, who was duly notified of the place and time of the hearing.
 The Appellant's position is that the Court made its decision as to Appellant's rights and obligations, deeming A. V. Sabadash to be a member of the Simple Partnership "Itkin and Sabadash" which is factually incorrect.
 The Panel of Judges believes that the decision of the trial court does not address Mr. Sabadash's personal rights and obligations.

There is no reference to Mr. Sabadash's personal rights or obligations in either the resolutive or the declarative parts of the court decision.

Mr. Sabadash is not party to the lawsuit. The mere existence of a simple partnership agreement does not form sufficient basis for allowing Applicant to appeal the ruling.

Furthermore, having an interest in the outcome of the case does not vest Mr. Sabadash who is not party to the claim with the right to appeal the judicial ruling. Individuals who are not party to a court action may appeal judicial rulings only if they are able to demonstrate that said ruling not only impacted said individual's personal rights and obligations, but that it directly addressed said rights and obligations.

According to Article 264, Part 1, Paragraph 1 of the Arbitration Procedure Code of the Russian Federation, the Arbitration Court of Appeals must deny the appeal if in the process of determining whether to accept the complaint the court will have established that appellant had no legal standing to file the appeal.

In accordance with Paragraph 2 of Resolution No. 36 issued by the Plenum of Supreme Arbitration Court of the Russian Federation on May 28, 2009 titled "*On the Application of Russia's Arbitration Procedure Code When Considering Arbitration Court of Appeals Matters*" if after the court accepts the complaint it is established that the appellant was not entitled to file such an appeal, then appellate proceedings as to the complaint shall be terminated pursuant to Article 150, Part 1, Paragraph 1 of the Arbitration Procedure Code of the Russian Federation.

In view of the above and pursuant to Articles 104, 150, 184, 185 and 265 of the Arbitration Procedural Code of the Russian Federation, the Court

## RULES AS FOLLOWS:

**To terminate its review of the complaint filed by A. V. Sabadash appealing the decision of the Moscow Arbitration Court issued on September 14, 2018 in case No. A40-165165/18.**

The Decision of the Ninth Arbitration Court of Appeal is in effect as of the day of its issuance and may be appealed through the Moscow District Arbitration Court within one month from the date of issuance of the full decision.

| | |
|---|---|
| Presiding Judge: | B. S. Veklich |
| Judges: | B. P. Garmaev, T.Y. Levina |

For court-related information, please dial 8 (495) 987-2800

097/2019-218951(1)



# ДЕВЯТЫЙ АРБИТРАЖНЫЙ АПЕЛЛЯЦИОННЫЙ СУД

127994, Москва, ГСП -4, проезд Соломенной Сторожки, 12
адрес веб-сайта: http://9aas.arbitr.ru

## ОПРЕДЕЛЕНИЕ
### №09АП-43744/2019-ГК

г.Москва                                                              Дело №А40-165165/18

12 сентября 2019 года

Резолютивная часть постановления объявлена 10 сентября 2019 года
Постановление изготовлено в полном объеме 12 сентября 2019 года
Девятый арбитражный апелляционный суд в составе:
Председательствующего судьи: Веклича Б.С.,
Судей: Гармаева Б.П., Левиной Т.Ю.,
при ведении протокола судебного заседания секретарем Козиным О.О.,
рассмотрев в открытом судебном заседании апелляционную жалобу Сабадаша А.В.
на решение Арбитражного суда г.Москвы от 14.09.2018 по делу №А40-165165/18, принятое
судьей Паршуковой О.Ю. (шифр судьи 140-4254)
по иску Индивидуального предпринимателя Гофман Е.Н.
к Простому товариществу «Иткин и Сабадаш»
о взыскании задолженности,
при участии в судебном заседании:
от истца: не явился, извещен;
от ответчика: Шадаев И.Н. по доверенности от 07.08.2018 б/н;
от заявителя: Тыхенова К.В. по доверенности от 03.07.2019 б/н,

## У С Т А Н О В И Л:

Вступившим в законную силу решением Арбитражного суда г.Москвы от 14.09.2018 с Простого товарищества «Иткин и Сабадаш» в пользу Индивидуального предпринимателя Гофман Е.Н. взыскано 826 000 руб. 46 коп. задолженности, неустойки.

Не согласившись с принятым по делу решением, Сабадаш А.В. в порядке ст.42 АПК обратился с апелляционной жалобой, в которой просит его отменить, ссылаясь на нарушение судом норм материального и процессуального права.

Ответчик возражает против доводов апелляционной жалобы, просит отказать в ее удовлетворении. Представил письменный отзыв на жалобу.

Жалоба рассмотрена судом в порядке ст.ст.123, 156 АПК РФ в отсутствие представителя истца, извещенного надлежащим образом о месте и времени судебного заседания.

По мнению заявителя, решение суда принято о его правах и обязанностях, поскольку Сабадашу А.В. приписывается участие в Простом товариществе «Иткин и Сабадаш», что не соответствует действительности.

Судебная коллегия считает, что данное обстоятельство не свидетельствует о принятии судом первой инстанции решения о правах и обязанностях Сабадаша А.В.

В резолютивной и мотивировочной частях решения отсутствуют указания на права и обязанности Сабадаша А.В.

Сабадаш А.В. не является участником правоотношений по рассматриваемому спору, а само по себе заключение договора простого товарищества не является основанием для наделения заявителя правом на обжалование оспариваемого решения.

2                                                                                        A40-165165/18

Наличие у Сабадаша А.В., не привлеченного к участию в деле, заинтересованности в исходе дела также не наделяет его правом на обжалование судебного акта. Для возникновения права на обжалование судебных актов у лиц, не привлеченных к участию в деле, необходимо, чтобы оспариваемые судебные акты не просто затрагивали права и обязанности этих лиц, а были приняты непосредственно об их правах и обязанностях.

Согласно п.1 ч.1 ст.264 АПК РФ арбитражный суд апелляционной инстанции возвращает апелляционную жалобу, если при рассмотрении вопроса о принятии апелляционной жалобы к производству установит, что жалоба подана лицом, не имеющим права на обжалование судебного акта в порядке апелляционного производства.

В соответствии с п.2 Постановления Пленума ВАС РФ от 28.05.2009 №36 «О применении Арбитражного процессуального кодекса Российской Федерации при рассмотрении дел в арбитражном суде апелляционной инстанции» если после принятия апелляционной жалобы будет установлено, что заявитель не имеет права на обжалование судебного акта, то применительно к п.1 ч.1 ст.150 АПК РФ производство по жалобе подлежит прекращению.

Учитывая изложенное, руководствуясь ст.ст.104, 150, 184, 185, 265 АПК РФ,

**ОПРЕДЕЛИЛ:**

прекратить производство по апелляционной жалобе Сабадаша А.В. на решение Арбитражного суда г.Москвы от 14.09.2018 по делу №А40-165165/18.

Определение Девятого арбитражного апелляционного суда вступает в законную силу со дня его принятия и может быть обжаловано в течение одного месяца со дня изготовления постановления в полном объеме в Арбитражный суд Московского округа.


Председательствующий судья:                                              Б.С. Веклич


Судьи:                                                                            Б.П. Гармаев


                                                                                 Т.Ю. Левина


Телефон справочной службы суда – 8 (495) 987-28-00

# Exhibit 18

**SUBP-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Manatt, Phelps & Phillips, LLP<br>Robert H. Platt (SBN 108533); Michael Zorkin (Bar No. 313308)<br>11355 W. Olympic Blvd.<br>Los Angeles, CA 90064<br>TELEPHONE NO.: (310) 312-4000      FAX NO.: (310) 312-4224<br>E-MAIL ADDRESS: rplatt@manatt.com; mzorkin@manatt.com<br>ATTORNEY FOR *(Name):* AFB Trading One, Inc., et al. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk

PLAINTIFF/PETITIONER: AFB Trading One, Inc., et al

DEFENDANT/RESPONDENT: Garry Y. Itkin, et al

| DEPOSITION SUBPOENA<br>FOR PRODUCTION OF BUSINESS RECORDS | CASE NUMBER:<br>BC647351 |
|---|---|

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known):*
East West Bank C/O Douglas P. Krause or Custodian of Records, 135 N Los Robles Avenue, 7th Floor, Pasadena, CA
1. YOU ARE ORDERED TO PRODUCE THE BUSINESS RECORDS described in item 3, as follows:

| To *(name of deposition officer):* Titan Legal Services | |
|---|---|
| On *(date):* June 10, 2019 | At *(time):* 10:00 AM |
| Location *(address):* 19700 Vermont Ave. Ste. 225, Torrance, CA 90502 | |

**Do not release the requested records to the deposition officer prior to the date and time stated above.**

a. ☒ by delivering a true, legible, and durable copy of the business records described in item 3, enclosed in a sealed inner wrapper with the title and number of the action, name of witness, and date of subpoena clearly written on it. The inner wrapper shall then be enclosed in an outer envelope or wrapper, sealed, and mailed to the deposition officer at the address in item 1.

b. ☐ by delivering a true, legible, and durable copy of the business records described in item 3 to the deposition officer at the witness's address, on receipt of payment in cash or by check of the reasonable costs of preparing the copy, as determined under Evidence Code section 1563(b).

c. ☐ by making the original business records described in item 3 available for inspection at your business address by the attorney's representative and permitting copying at your business address under reasonable conditions during normal business hours.

2. The records are to be produced by the date and time shown in item 1 (but not sooner than 20 days after the issuance of the deposition subpoena, or 15 days after service, whichever date is later). Reasonable costs of locating records, making them available or copying them, and postage, if any, are recoverable as set forth in Evidence Code section 1563(b). The records shall be accompanied by an affidavit of the custodian or other qualified witness pursuant to Evidence Code section 1561.

3. The records to be produced are described as follows *(if electronically stored information is demanded, the form or forms in which each type of information is to be produced may be specified):*
See Attachment 3.
☒ Continued on Attachment 3.

4. IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date Issued: May 9, 2019

Emily M. Speier
    *(TYPE OR PRINT NAME)*

▶ _____
    *(SIGNATURE OF PERSON ISSUING SUBPOENA)*
Attorney for Plaintiffs and Cross-Defendants

*(Proof of service on reverse)*

| | | Page 1 of 2 |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUBP-010 [Rev. January 1, 2012] | **DEPOSITION SUBPOENA FOR PRODUCTION<br>OF BUSINESS RECORDS** | Code of Civil Procedure, §§ 2020.410–2020.440;<br>Government Code, § 68097.1<br>www.courts.ca.gov |

**CONFIDENTIAL**

**49-1**

ATTACHMENT 3

DEFINITIONS

For purposes of the document requests set forth below, the following terms shall be defined as follows:

A.    "DOCUMENT" or "DOCUMENTS," unless otherwise indicated, is used in its customarily broad sense as described in Section 2031.010 of the California Code of Civil Procedure and shall refer to and mean all writings, as defined in Section 250 of the California Evidence Code, and other tangible things of any nature whatsoever, and shall include, but not be limited to, all records, files, reports, correspondence, writings, drawings, graphs, charts, photographs, phone records, billing and payment records, other data compilations or storage devices from which information can be obtained (even if such information must be translated into a reasonably usable form), magnetically recorded or stored information generated by a computer, contracts, agreements, communications, correspondence, telegrams, memoranda, records, reports, books, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, forecasts, statistical statements, work papers, drafts, accounts, analytical records, minutes or records of meetings or conferences, consultants' reports, appraisals, records, reports or summaries of negotiations, brochures, pamphlets, circulars, calendars, trade letters, press releases, notes, marginal notations, bills, invoices, checks, lists, journals, advertising, computer tapes and cards, and all other written, printed, recorded or photographic matter or sound reproductions, or tangible representations of things, however produced or reproduced, and all non-identical copies of the foregoing.

B.    "COMMUNICATION" or "COMMUNICATIONS" mean any contact between two or more persons or entities, including, without limitation, written contact by such means as letters, memoranda, reports, computer transmissions, electronic mail, instant messages, telegrams, telexes, fax messages, and oral contact by such means as meetings and telephone conversations.

C.    "CONCERN" or "CONCERNING" mean, in addition to their customary and usual meanings, addressing, discussing, pertaining to, reflecting, constituting, supporting,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

CONFIDENTIAL

1    evidencing, stating, showing, analyzing, evaluating, summarizing, recording, memorializing,

2    disputing, relating to, regarding, and/or referring to.

3            D.    "PERSON" shall mean, refer to, and include any natural Person and any

4    business entity or legal entity or subdivision thereof, include any corporation, firm, partnership,

5    association, organization, limited liability company, limited liability partnership, joint venture,

6    trust, public entity, government agency, or any other business or legal entity.

7            E.    "YOU" shall refer to East West Bank, and its agents, representatives,

8    attorneys, accountants, and all persons acting for it, at its direction, or on its behalf.

9            F.    Unless otherwise specified, the applicable time period for each of the

10    requests is 2000 through the present.

11    <u>**REQUESTS**</u>

12        1.    All DOCUMENTS CONCERNING any East West Bank checking account,

13    savings account, credit card account, loan account, investment account, or any other account

14    belonging (in whole or in part) to Garry Y. Itkin, including but not limited to the following

15    documents:

16          a.    All bank statements;

17          b.    All credit card statements;

18          c.    All financial statements;

19          d.    All account applications;

20          e.    All loan applications;

21

22          f.    All check images;

23        2.    All DOCUMENTS CONCERNING East West Bank account No. ███████,

24    including but not limited to the following documents:

25          a.    All bank statements;

26          b.    All credit card statements;

27          c.    All financial statements;

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

2

**CONFIDENTIAL**

d.   All account applications;

e.   All loan applications;

f.   All check images;

3.   All COMMUNICATIONS between YOU and Garry Y. Itkin.

4.   All COMMUNICATIONS between YOU and any PERSON CONCERNING Garry Y. Itkin.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

**CONFIDENTIAL**

49-4

SUBP-025

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Manatt, Phelps & Phillips, LLP<br>Robert H. Platt (SBN 108533); Michael Zorkin (Bar No. 313308)<br>11355 W. Olympic Blvd.<br>Los Angeles, CA 90064<br>TELEPHONE NO.: (310) 312-4000     FAX NO. *(Optional)*: (310) 312-4224<br>E-MAIL ADDRESS *(Optional)*: rplatt@manatt.com; mzorkin@manatt.com<br>ATTORNEY FOR *(Name)*: AFB Trading One, Inc., et al. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk

| PLAINTIFF/ PETITIONER: AFB Trading One, Inc., et al<br><br>DEFENDANT/ RESPONDENT: Garry Y. Itkin, et al | CASE NUMBER:<br>BC647351 |
|---|---|

| NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION<br>(Code Civ. Proc., §§ 1985.3,1985.6) | |
|---|---|

### NOTICE TO CONSUMER OR EMPLOYEE

TO *(name)*: Garry Y. Itkin and Anna Charno C/O Jon A. Atabek, Esq.

1. PLEASE TAKE NOTICE THAT REQUESTING PARTY *(name)*: AFB Trading One, Inc.
   SEEKS YOUR RECORDS FOR EXAMINATION by the parties to this action on *(specify date)*: June 10, 2019
   The records are described in the subpoena directed to witness *(specify name and address of person or entity from whom records are sought)*: East West Bank C/O Douglas P. Krause, 135 N Los Robles Avenue 7th Floor, Pasadena, CA 91101.

2. IF YOU OBJECT to the production of these records, YOU MUST DO ONE OF THE FOLLOWING BEFORE THE DATE SPECIFIED IN ITEM a. OR b. BELOW:
   a. If you are a party to the above-entitled action, you must file a motion pursuant to Code of Civil Procedure section 1987.1 to quash or modify the subpoena and give notice of that motion to the witness and the deposition officer named in the subpoena at least five days before the date set for production of the records.
   b. If you are not a party to this action, you must serve on the requesting party and on the witness, before the date set for production of the records, a written objection that states the specific grounds on which production of such records should be prohibited. You may use the form below to object and state the grounds for your objection. You must complete the Proof of Service on the reverse side indicating whether you personally served or mailed the objection. The objection should not be filed with the court. WARNING: IF YOUR OBJECTION IS NOT RECEIVED BEFORE THE DATE SPECIFIED IN ITEM 1, YOUR RECORDS MAY BE PRODUCED AND MAY BE AVAILABLE TO ALL PARTIES.

3. YOU OR YOUR ATTORNEY MAY CONTACT THE UNDERSIGNED to determine whether an agreement can be reached in writing to cancel or limit the scope of the subpoena. If no such agreement is reached, and if you are not otherwise represented by an attorney in this action, YOU SHOULD CONSULT AN ATTORNEY TO ADVISE YOU OF YOUR RIGHTS OF PRIVACY.

Date: May 9, 2019

Emily M. Speier
_____
(TYPE OR PRINT NAME)     ▶ _____  (SIGNATURE OF ☐ REQUESTING PARTY ☒ ATTORNEY)

### OBJECTION BY NON-PARTY TO PRODUCTION OF RECORDS

1. ☐  I object to the production of all of my records specified in the subpoena.
2. ☐  I object only to the production of the following specified records:

3. The specific grounds for my objection are as follows:

Date:

_____          ▶
(TYPE OR PRINT NAME)                              (SIGNATURE)

| | | |
|---|---|---|
| (Proof of service on reverse) | | Page 1 of 2 |
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUBP-025 [Rev. January 1, 2009] | **NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION** | Code of Civil Procedure,<br>§§ 1985.3, 1985.6,<br>2020.010–2020.510<br>www.courtinfo.ca.gov |
| | American LegalNet, Inc.<br>www.FormsWorkflow.com | |

**CONFIDENTIAL**

SUBP-025

| PLAINTIFF/PETITIONER: AFB Trading One, Inc., et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Gerry Y. Itkin, et al. | BC647351 |

## PROOF OF SERVICE OF NOTICE TO CONSUMER OR EMPLOYEE AND OBJECTION
### (Code Civ. Proc.,§§ 1985.3, 1985.6)
☐ Personal Service    [XX] Mail

1. At the time of service I was at least 18 years of age and not a party to this legal action.
2. I served a copy of the *Notice to Consumer or Employee and Objection* as follows (check either a or b):

   a. ☐ **Personal service.** I personally delivered the *Notice to Consumer or Employee and Objection* as follows:
   - (1) Name of person served:
   - (2) Address:
   - (3) Date served:
   - (4) Time served:

   b. [XX] **Mail.** I deposited the *Notice to Consumer or Employee and Objection* in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed as follows:
   - (1) Name of person served: Jon A. Atabek, Esq.
   - (2) Address: Atabek & Associates, P.C.,
     16330 Bake Parkway, Irvine, CA 92818
   - (3) Date of mailing: 05/09/2019
   - (4) Place of mailing: Torrance, CA
   - (5) I am a resident of or employed in the county where the *Notice to Consumer or Employee and Objection* was mailed.

   c. My residence or business address is *(specify):* 19700 Vermont Avenue, Torrance, CA 90502
   d. My phone number is *(specify):* (310) 464-8655

I declare under penalty of perjury under the laws of the laws of the State of California that the foregoing is true and correct.
Date: 05/09/2019

**Trixie Estanislao**
(TYPE OR PRINT NAME OF PERSON WHO SERVED)

▶ _(signature)_
(SIGNATURE OF PERSON WHO SERVED)

---

## PROOF OF SERVICE OF OBJECTION TO PRODUCTION OF RECORDS
### (Code of Civ. Proc.,§§ 1985.3, 1985.6)
☐ Personal Service    ☐ Mail

1. At the time of service I was at least 18 years of age and not a party to this legal action.
2. I served a copy of the *Objection to Production of Records* as follow (complete either a or b):

   a. ON THE REQUESTING PARTY
   - (1) ☐ **Personal service.** I personally delivered the *Objection to Production of Records* as follows:
     - (i) Name of person served:
     - (ii) Address where served:
     - (iii) Date served:
     - (iv) Time served:
   - (2) ☐ **Mail.** I deposited the *Objection to Production of Records* in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed as follows:
     - (i) Name of person served:
     - (ii) Address:
     - (iii) Date of mailing:
     - (iv) Place of mailing *(city and state:*
     - (v) I am resident of or employed in the county where the *Objection to Production of Records* was mailed.

   b. ON THE WITNESS:
   - (1) ☐ **Personal service.** I personally delivered the *Objection to Production of Records* as follows:
     - (i) Name of person served:
     - (ii) Address where served:
     - (iii) Date served:
     - (iv) Time served:
   - (2) ☐ **Mail.** I deposited the *Objection to Production of Records* in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed as follows:
     - (i) Name of person served:
     - (ii) Address:
     - (iii) Date of mailing:
     - (iv) Place of mailing *(city and state):*
     - (v) I am a resident of or employed in the county where the *Objection to Production of Records* was mailed.

3. My residence or business address is (specify):
4. My phone number is (specify):

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME OF PERSON WHO SERVED)

▶
(SIGNATURE OF PERSON WHO SERVED)

Page 2 of 2

**CONFIDENTIAL**

49-6

SUBP-010

| | |
|---|---|
| PLAINTIFF/PETITIONER: **AFB Trading One, Inc., et al.** | CASE NUMBER: |
| DEFENDANT/RESPONDENT: **Garry Y. Itkin, et al.** | **BC647351** |

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR
## PRODUCTION OF BUSINESS RECORDS

1. I served this *Deposition Subpoena for Production of Business Records* by personally delivering a copy to the person served as follows:

   a. Person served *(name)*: Mary W.

   b. Address where served: 135 N. Los Robles Ave. 7th Fl.
   Pasadena CA. 91101

   c. Date of delivery: 05-20-19

   d. Time of delivery: 12:31

   e. (1) ☐ Witness fees were paid.
           Amount: . . . . . . . . . . $ 0.00

      (2) ☐ Copying fees were paid.
           Amount: . . . . . . . . . . $ .00

   f. Fee for service: . . . . . . . . . . . . . . $ .00

2. I received this subpoena for service on *(date)*: 05-20-19

3. Person serving: Carlos Mejia
   a. ☐ Not a registered California process server.
   b. ☐ California sheriff, marshal, or constable.
   c. ☐ Registered California process server.
   d. ☐ Employee or independent contractor of a registered California process server.
   e. ☐ Exempt from registration under Bus. & Prof. Code section 22350(b).
   f. ☒ Registered professional photocopier.
   g. ☐ Exempt from registration under Bus. & Prof. Code section 22451.
   h. Name, address, and telephone number and, if applicable, county of registration and number:

       Titan Legal Services, Inc.
       19700 Vermont Avenue
       Suite: Suite 225
       Torrance, CA 90502
       (310) 464-8655
       Registration No.: 2014051805
       Exp. Date: 02/20/2020
       County: Los Angeles

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 05-20-19

▶ _____
       (SIGNATURE)

SUBP-010 [Rev. January 1, 2012]          **PROOF OF SERVICE**          **Page two**
**DEPOSITION SUBPOENA FOR PRODUCTION**      Order#: SU317124-01/CPROOF103
**OF BUSINESS RECORDS**          *www.Tristar3software.com*

**CONFIDENTIAL**

49-7



**EAST WEST BANK**

### DECLARATION CONCERNING BANK RECORDS
### UNDER SECTION 1561 OF THE EVIDENCE CODE

1.  The undersigned officer of East West Bank (the Bank), having been duly authorized to make this declaration, declares on behalf of the Bank:

2.  He/she is a duly authorized custodian of the Bank's records, as to which he/she is qualified to testify and authorized to certify;

3.  He/she has read the subpoena described on the envelope or wrapper with which this Declaration is enclosed, and has made and caused to be made a diligent search for all such records at the office of the Bank upon which the subpoena was served. After such diligent search for all described records:

    ☐ If this box is checked, copies of all of the records described in the subpoena are produced herewith;

    ☒ If this box is checked, the Bank only has part of the described records, copies of which are produced herewith; **Items not produced due to not being able to locate.**

    ☐ If this box is checked, the Bank has none of the described records for the time frame stated in the subpoena and thus, no records are produced herewith. See paragraph 5 below.

4.  The copies of records enclosed herewith and identified below, if any, are true copies of records described in the subpoena and found at the office of the Bank, the originals of which were prepared by the personnel of the office of the Bank in the ordinary course of business at or near the time of the act, condition or event so recorded.

5.  Identification of records produced herewith is as follows: EWB File Number: S-19-101-245

| ⇒ | Signature Cards, Statements, Canceled Checks, Deposits and Offsets, Withdrawals, Transfers, Wires, Cashier's Checks, Credit and Debit Memo |
|---|---|

6.  The mode of preparation of the records identified above was as follows:

| ⇒ | **From Microfilm, Image Library and/or Vision Archive Database:** Canceled Checks, Deposits and Offsets, Withdrawals, Transfers, Cashier's Checks, Credit and Debit Memo |
|---|---|
| ⇒ | **From FundTech Database:** Wires |
| ⇒ | **From EWB Computer Database (Synergy):** Statements |
| ⇒ | **From Original Documents:** Signature Cards |

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**
Executed July 2, 2019 at 9300 Flair Drive, 4th Floor, El Monte, CA 91731.

_____
Signature

Cory Pramono
Type Name

_____
Legal Process Specialist II
Type Title

(Rev. 6/09)

P.O. Box 927, Alhambra, CA 91802 • Nasdaq: EWBC

**CONFIDENTIAL**

EWB00315

**49-8**

00-29901154      PAGE

##XXH192SDPCSTM    ▓▓▓▓▓▓▓▓▓▓▓

```
                                          ACCOUNT STATEMENT
                                               Page 1 of 3
9300 Flair Drive Suite 106              STARTING DATE: July 01, 2018
El Monte CA 91731                        ENDING DATE: July 31, 2018
                                   Total days in statement period: 31
                                                         ( 2)

                                        Direct inquiries to:
                                            888 895-5650

        GARRY Y ITKIN
```

East West Premier Checking

```
Account number          ▓▓▓▓▓▓2
Enclosures                      0
Low balance             $0.00
Average balance         $5,374.81    Beginning bal              $10,906.13
Interest paid year to date           Total additions  ( 6)      19,486.35
                        $6.10        Total subtractions ( 31)   29,892.13
                                     Ending balance             $ 500.35
```

CREDITS

| Number | Date | Transaction Description | Additions | Control Number |
|--------|------|--------------------------|-----------|----------------|
| | 07-06 | Wire Trans-IN  GARRY ITKIN | 10,000.00 | 000000000002453 |
| | 07-12 | Swift IN Bk Cre EAST WEST BANK | 1,993.00 | 000000000003322 |
| | 07-17 | Wire Trans-IN  GARRY ITKIN | 5,000.00 | 000000000001940 |
| | 07-18 | Swift IN Bk Cre EAST WEST BANK | 1,993.00 | 000000000003011 |
| | 07-25 | Credit Memo     TLR 3202 BR 8032 | 500.00 | 072503202123102 |
| | 07-31 | Interest Credit | 0.35 | 000000000000000 |

DEBITS

| Date | Transaction Description | Subtractions | Control Number |
|------|--------------------------|--------------|----------------|
| 07-02 | POS Purchase    MERCHANT PURCHASE TERMINAL 443106 | | |
| | CRUNCH100A 212 993 0 NY XXXXXXXXXXXX6754 | | |
| | SEQ # 818222083953 | 81.50 | 000000839530000 |
| 07-02 | Preauth Debit  ADT SECURITY SER ADTPAPACH 180702 | 123.00 | 043301600060395 |
| 07-03 | Preauth Debit  ATT Payment 180703 | 147.30 | 031100201263119 |
| 07-05 | Intl Wire Xfer RIETUMU BANK | 7,000.00 | 000000000002789 |
| 07-05 | Service Charge INTL WIRE TRANSFER | 40.00 | 000000000000000 |
| 07-06 | Service Charge WIRE TRANS-IN | 10.00 | 000000000000000 |
| 07-06 | Intl Wire Xfer ELENA GOFMAN | 2,000.00 | 000000000002853 |
| 07-06 | Service Charge INTL WIRE TRANSFER | 40.00 | 000000000000000 |

**CONFIDENTIAL**

EWB01185

49-878

00-29901154        PAGE

##XXH1928DPCSTM

ACCOUNT STATEMENT
Page 2 of 3

9300 Flair Drive Suite 106                    STARTING DATE: July 01, 2018
El Monte CA 91731                             ENDING DATE: July 31, 2018
                                      Total days in statement period: 31

        GARRY Y ITKIN                                                ( 2)

| Date | Transaction Description | | Subtractions | Control Number |
|------|------------------------|--|--------------|----------------|
| 07-11 | Debit Memo | TLR 3202 BR 8032 | 4,000.00 | 071103202114112 |
| 07-12 | POS Purchase | POS PURCHASE TERMINAL 00000101 AMAZON.COM SEATTLE WA XXXXXXXXXXXX6754 SEQ # 2S0P37UV4ESF | 30.61 | 000000000020000 |
| 07-12 | POS Purchase | POS PURCHASE TERMINAL ARCO425 ARCO #42521 NORTH HOL CA XXXXXXXXXXXX1700 SEQ # 021001 | 58.44 | 000000210010000 |
| 07-12 | POS Purchase | MERCHANT PURCHASE TERMINAL 469216 DTV DIRECTV SERVIC E 800 347 3 CA XXXXXXXXXXXX6754 SEQ # 819227100246 | 617.91 | 000001002460000 |
| 07-13 | Intl Wire Xfer | ELENA GOFMAN | 2,000.00 | 000000000002193 |
| 07-13 | Service Charge | INTL WIRE TRANSFER | 40.00 | 000000000000000 |
| 07-13 | Debit Memo | TLR 3202 BR 8032 | 4,000.00 | 071303202111727 |
| 07-13 | POS Purchase | POS PURCHASE TERMINAL 00000101 AMAZON.COM SEATTLE WA XXXXXXXXXXXX6754 SEQ # 6PCGQV5D6TBF | 30.61 | 000000000060000 |
| 07-13 | POS Purchase | POS PURCHASE TERMINAL 00000101 AMAZON.COM SEATTLE WA XXXXXXXXXXXX6754 SEQ # ATUQ3YANHKKQ | 61.22 | 000000000000000 |
| 07-13 | POS Purchase | MERCHANT PURCEASE TERMINAL 475542 LA CITY PARKING ME TER LOS ANGEL CA XXXXXXXXXXXX1700 SEQ # 819421121947 | 2.00 | 000001219470000 |
| 07-13 | POS Purchase | MERCHANT PURCEASE TERMINAL 449215 SQ GOLDEN PAWS MO B NORTH HOL CA XXXXXXXXXXXX1700 SEQ # 819321740274 | 195.00 | 000007402740000 |
| 07-16 | POS Purchase | MERCHANT PURCEASE TERMINAL 434285 KazuNori Westwood Los Angel CA XXXXXXXXXXXX1700 SEQ # 819425018029 | 27.31 | 000000180290000 |
| 07-16 | POS Purchase | MERCHANT PURCEASE TERMINAL 469216 AMAZON MKTPLACE PM TS AMZN COM WA XXXXXXXXXXXX6754 SEQ # 819426100409 | 124.98 | 000001004090000 |
| 07-16 | Preauth Debit | TIME WARNER CABL TWC EFTPMT 180714 | 114.99 | 043000265036739 |
| 07-17 | Intl Wire Xfer | ELENA GOFMAN | 2,000.00 | 000000000003324 |
| 07-17 | Service Charge | WIRE TRANS-IN | 10.00 | 000000000000000 |
| 07-17 | Intl Wire Xfer | ELENA GOFMAN | 2,000.00 | 000000000003324 |
| 07-17 | Service Charge | INTL WIRE TRANSFER | 40.00 | 000000000000000 |
| 07-17 | POS Purchase | MERCHANT PURCEASE TERMINAL 434135 AEROFLOT PAO MOSCOW XX XXXXXXXXXXXX1700 SEQ # 819773010442 | 43.70 | 000000104420000 |
| 07-20 | Debit Memo | TLR 3202 BR 8032 | 3,200.00 | 072003202112943 |
| 07-20 | Preauth Debit | ReadyRefresh ECHECKPAY 180719 0013491014 | 133.44 | 111000023304191 |
| 07-23 | Preauth Debit | TIME WARNER CABL TWC EFTPMT 180723 | 115.00 | 043000261116859 |
| 07-24 | Legal Order | ORDER TO WITHHOLD, FRANCHISE TAX BOA RD | 3,515.12 | 427000724115206 |
| 07-24 | Legal Order Fee | ORDER TO WITHHOLD, FRANCHISE TAX BOA RD, LEGAL FEE | 90.00 | 427000724115207 |

**CONFIDENTIAL**

EWB01186

49-879

00-29901154      PAGE

##XXH1928DPCSTM

ACCOUNT STATEMENT
Page 2 of 3
9300 Flair Drive Suite 106                    STARTING DATE: August 01, 2018
El Monte CA 91731                             ENDING DATE: August 31, 2018
                                          Total days in statement period: 31
        GARRY Y ITKIN
                                                        ( 2)

| Date | Transaction | Description | Subtractions | Control Number |
|---|---|---|---|---|
| 08-06 | POS Purchase | MERCHANT PURCHASE TERMINAL 443106 GLENDALE PARKING E XCHANGGLENDALE CA XXXXXXXXXXXX1700 SEQ # 821629400249 | 1.00 | 000004002490000 |
| 08-08 | Preauth Debit | ADT SECURITY SER ADTPAPACH 180808 | 389.64 | 043301603886713 |
| 08-08 | Overdraft Fee | FOR OVERDRAFT PREAUTH DEBIT 043301603886713 | 30.00 | 118000809103843 |
| 08-09 | Service Charge | WIRE TRANS-IN | 10.00 | 000000000000000 |
| 08-13 | Service Charge | WIRE TRANS-IN | 10.00 | 000000000000000 |
| 08-13 | Intl Wire Xfer | RIETUMU BANK | 7,500.00 | 000000000002172 |
| 08-13 | Service Charge | INTL WIRE TRANSFER | 40.00 | 000000000000000 |
| 08-13 | POS Purchase | MERCHANT PURCHASE TERMINAL 449215 SQ GOLDEN PAWS MO B NORTH HOL CA XXXXXXXXXXXX1700 SEQ # 822522740220 | 225.00 | 000007402200000 |
| 08-14 | POS Purchase | POS PURCHASE TERMINAL 00000101 AMAZON.COM SEATTLE WA XXXXXXXXXXXX6754 SEQ # 5EBWK7502QR9 | 24.27 | 000000000050000 |
| 08-16 | POS Purchase | MERCHANT PURCHASE TERMINAL 426979 ENOVEX PHARMACY GLENDALE CA XXXXXXXXXXXX1700 SEQ # 822820001049 | 70.00 | 000000010490000 |
| 08-16 | POS Purchase | MERCHANT PURCHASE TERMINAL 449215 SQ GOLDEN PAWS MO B SAN FERNA CA XXXXXXXXXXXX1700 SEQ # 822729740278 | 210.00 | 000007402780000 |
| 08-20 | POS Purchase | MERCHANT PURCHASE TERMINAL 469216 BELLA LORA SPA BEVERLY H CA XXXXXXXXXXXX6754 SEQ # 823022100517 | 261.64 | 000001005170000 |
| 08-20 | Overdraft Fee | FOR OVERDRAFT CHECK # 2304 | 30.00 | 658000621111231 |
| 08-21 | Service Charge | WIRE TRANS-IN | 10.00 | 000000000000000 |
| 08-21 | Preauth Debit | ReadyRefresh ECHECKPAY 180820 0013491014 | 125.48 | 111000020680633 |
| 08-22 | Intl Wire Xfer | ELENA GOFMAN | 2,000.00 | 000000000002035 |
| 08-22 | Service Charge | INTL WIRE TRANSFER | 40.00 | 000000000000000 |
| 08-28 | Debit Memo | TLR 3202 BR 8032 | 5,000.00 | 082803202133413 |
| 08-28 | POS Purchase | MERCHANT PURCHASE TERMINAL 403601 eSKY pl S A Radom XX XXXXXXXXXXXX1700 SEQ # 823975082726 | 120.97 | 000000827260000 |
| 08-29 | POS Purchase | MERCHANT PURCHASE TERMINAL 471705 AIR FRANCE 057142 018807AIRFRANCE NY XXXXXXXXXXXX1700 SEQ # 824026872404 | 696.23 | 000008724040000 |
| 08-30 | POS Purchase | MERCHANT PURCHASE TERMINAL 449215 SQ GOLDEN PAWS MO B LOS ANGEL CA XXXXXXXXXXXX1700 SEQ # 824120740315 | 225.00 | 000007403150000 |
| 08-31 | POS Purchase | MERCHANT PURCHASE TERMINAL 405522 SALLY HERSHBERGER LOS ANGEL CA XXXXXXXXXXXX6754 SEQ # 824320200987 | 125.00 | 000002009870000 |

**CONFIDENTIAL**

EWB01189

49-882

00-29901154        PAGE

##XXH1928DPCSTM

ACCOUNT STATEMENT
Page 1 of 2
STARTING DATE: October 01, 2018
ENDING DATE: October 31, 2018
Total days in statement period: 31

9300 Flair Drive Suite 106
El Monte CA 91731

( 0)

Direct inquiries to:
888 895-5650

GARRY Y ITKIN

East West Premier Checking

Account number
Low balance            $350.25
Average balance        $493.86
Interest paid year to date                 Beginning bal                    $875.02
                       $6.19               Total additions    ( 3)        2,785.39
                                           Total subtractions ( 5)        3,320.14
                                           Ending balance               $ 340.27

CREDITS
Number      Date      Transaction Description          Additions      Control Number
            10-02     Deposit                           285.37        00000721655820
            10-09     Deposit         TLR 3205 BR 8032  2,500.00       100903205135301
            10-31     Interest Credit                    0.02         000000000000000

DEBITS
Date    Transaction Description                        Subtractions   Control Number
10-02   Preauth Debit  ADT SECURITY SER ADTPAPACH 181002   123.00     043301603890133
10-03   Preauth Debit  ATT Payment 161003                  147.14     031100201696149
10-09   Intl Wire Xfer ELENA GOFMAN                       3,000.00    000000000005570
10-09   Service Charge INTL WIRE TRANSFER                   40.00     000000000000000
10-31   Service Charge MAINTENANCE FEE                      10.00     000000000000000

DAILY BALANCES
Date      Amount        Date      Amount        Date      Amount
09-30      875.02       10-03      890.25       10-31      340.27
10-02    1,037.39       10-09      350.25

**CONFIDENTIAL**

EWB01193

49-886

00-29901154    PAGE

##XXH192SDPCSTM

ACCOUNT STATEMENT
Page 1 of 2
135 N. Los Robles Ave., 6TH FL.                    STARTING DATE: March 01, 2019
Pasadena, CA 91101                                 ENDING DATE: March 31, 2019
                                         Total days in statement period: 31
                                                         ( 0)

                                                   Direct inquiries to:
                                                       888 895-5650

        GARRY Y ITKIN

East West Premier Checking

Account number
Low balance                $51.33
Average balance           $175.81
Interest paid year to date          Beginning bal                $211.04
                          $0.02   Total additions    ( 2)    10,500.01
                                   Total subtractions ( 4)    10,209.71
                                   Ending balance              $ 501.34

CREDITS
Number    Date    Transaction Description              Additions    Control Number
          03-25   Credit Memo    TLR 3202 BR 8032      10,500.00    03250302154417
          03-31   Interest Credit                           0.01    000000000000000

DEBITS
Date    Transaction Description                       Subtractions   Control Number
03-05 Preauth Debit  ATT Payment 190303                    159.71   03110020S279527
03-25 Intl Wire Xfer ELENA GOFMAN                       10,000.00   000000000002833
03-25 Service Charge INTL WIRE TRANSFER                     40.00   000000000000000
03-31 Service Charge MAINTENANCE FEE                        10.00   000000000000000

DAILY BALANCES
Date      Amount      Date      Amount      Date      Amount
02-28      211.04     03-25      511.33
03-05       51.33     03-31      501.34

**CONFIDENTIAL**

EWB01203

49-896

# Exhibit 19

106690_1589515

# THE ARBITRATION COURT
# OF THE MOSCOW DISTRICT

Seleznevskaya St. 9, Moscow, GSP-4, 127994
official website: http://www.fasmo.arbitr.ru e-mail: info@fasmo.arbitr.ru

RULING

Moscow city

November 13, 2019                                        Case No. A40-165165/2018

The operative part of the ruling was announced on November 7, 2019.

The full text of the ruling was drawn up on November 13, 2019.

The Arbitration Court of the Moscow District

Composed of: the presiding judge V.V. Kobylyansky;

the judges: V.V. Petrova, S.N. Krekotnev,

with the participation in the hearing of:

on behalf of the claimant: Sole Proprietor E.N. Gofman - in person, with passport identification,

on behalf of the respondent: "Itkin and Sabadash" Simple Partnership, represented by the managing partner, G.Yu. Itkin. - I.N. Shadaev, by Power of Attorney of August 7, 2018

on behalf of A.V. Sabadash - A.I. Dobrovolsky, by power of attorney of July 3, 2019

having considered on November 7, 2019, in a court hearing, the cassation appeal of Alexander Vitalyevich Sabadash

regarding the ruling of September 12, 2019,

of the Ninth Arbitration Court of Appeal

on the Termination of Proceedings on the Appeal

in the Lawsuit of the Sole Proprietor E.N. Gofman

against "Itkin and Sabadash" Simple Partnership

for the recovery of monetary funds,

HAS FOUND: the Individual Entrepreneur Elena Nikolaevna Gofman (former surname Vasilyeva, hereinafter referred to as the claimant, the Sole Proprietor E.N. Gofman) filed a lawsuit with the Arbitration Court of the city of Moscow against "Itkin and Sabadash" Simple Partnership (90211, USA, State of California, Beverly Hills city, 8501 Wilshire Boulevard, of. 330) in the person of the managing partner Garry Yuriy Itkin for the recovery of debt, penalty, and fine totaling 826,000.46 rubles under the Paid Services Agreement of February 12, 2004.

By the decision of the Arbitration Court of Moscow city of September 14, 2018, the lawsuit was upheld.

The aforementioned decision was not appealed by the parties involved in the case and has entered into legal force.

Alexander Vitalyevich Sabadash, who did not participate in the case, filed an appeal against the said court decision with the Ninth Arbitration Court of Appeal, under Article 42 of the Arbitration Procedure Code of the Russian Federation.

By the ruling of the Ninth Arbitration Court of Appeal of September 12, 2019, the proceedings on the appeal of A.V. Sabadash were terminated.

Disagreeing with the issued ruling on the termination of the proceedings on the appeal, A.V. Sabadash filed a cassation appeal with the Arbitration Court of the Moscow District, requesting to reverse the said ruling of the court of appeal and to remand the case for a new hearing in the court of appeal, mentioning violations and incorrect application of the legal norms by the court of appeal, and the inconsistency of the court's findings with the actual circumstances of the case.

Justifying his arguments, the appellant states that the court's decision in this case directly affects the rights and obligations of A.V. Sabadash, who did not participate in the proceedings. Furthermore, the court of appeal failed to take into account the provisions of the Civil Code of the Russian Federation governing the simple partnership agreement, in

particular, it did not consider that a simple partnership is not a legal entity and, therefore, does not possess procedural legal capacity; consequently, it cannot act as a party (defendant) in a civil case.

The claimant and the respondent submitted responses with objections to the cassation appeal.

In her response to the cassation appeal, the claimant referred to the unfounded nature of the arguments of A.V. Sabadash and pointed out that the appellant missed the deadline for filing the appeal.

In the response to the cassation appeal, the respondent, represented by managing partner G.Yu. Itkin, stated that the cassation appeal submitted on behalf of A.V. Sabadash was signed by an attorney-in-fact whose power of attorney is void due to defects, in particular, corrections not certified by a notary, i.e. the cassation appeal was signed by an unauthorized person; the lawsuit in this case is brought against "Itkin and Sabadash" Simple Partnership under the Paid Services Agreement of February 12, 2004, concluded with the partnership; i.e. A.V. Sabadash, as an individual, is neither a party to the said agreement nor a party to the present case; the partners' share-based liability established by the simple partnership agreement does not relate to the subject matter of this dispute and cannot be the object of consideration within the framework of the submitted cassation appeal; the court decision in this case has been fully satisfied by the respondent; The existence of "Itkin and Sabadash" Simple Partnership is confirmed, including by the sentence of the Smolninsky District Court of St. Petersburg city of October 24, 2017, in the criminal case against A.V. Sabadash.

The representative of A.V. Sabadash, being present at the cassation court hearing, supported the arguments and claims of the cassation appeal; the claimant and the respondent's representative opposed the arguments of the appeal, mentioning the legality of the ruling issued by the court of appeal.

Having considered the arguments set forth in the cassation appeal, examined the

case materials, heard the explanations of the parties' representatives and the appellant, who were present at the court hearing, and verified, in accordance with Articles 284, 286, and 287 of the Arbitration Procedure Code of the Russian Federation, the correctness of the application of substantive and procedural law by the court of appeal, as well as the consistency of the findings contained in the contested judicial act with the established factual circumstances of the case and the available evidence, the cassation court finds no grounds to reverse the contested ruling for the following reasons.

Pursuant to Article 42 of the Arbitration Procedure Code of the Russian Federation, persons who did not participate in the case have the right to appeal a judicial act if it affects their rights and (or) obligations.

At the same time, a judicial act may be recognized as having been issued in respect of the rights and obligations of a person not involved in the case only if it establishes that person's rights in relation to the object of the dispute or imposes obligations upon them.

As follows from the case materials, there are no grounds to believe that the decision in this case was issued directly in respect of the rights of A.V. Sabadash or imposes any obligations on him personally.

At the same time, the existence of an interest in the outcome of the case on the part of a person not involved in the proceedings does not indicate a violation of that person's rights and legitimate interests by the judicial act rendered on the merits of the dispute.

Having found no grounds to classify the applicant as a person referred to in Article 42 of the Arbitration Procedure Code of the Russian Federation, the court of appeal terminated the proceedings on the appeal pursuant to point 1 of paragraph 1 of Article 150 of the said Code.

The arguments set forth in the cassation appeal regarding the right of A.V. Sabadash to file an appeal do not contradict the findings of the court of appeal. Moreover, as is clear from the text of the lawsuit, the lawsuit in this case was brought by the claimant against "Itkin and Sabadash" Simple Partnership, represented by the managing partner G.Yu. Itkin.

==Furthermore, as stated by the claimant and the respondent's representative at the cassation court hearing, the court decision in this case, which has entered into legal force, has been fully satisfied.==

Other arguments presented in the cassation appeal cannot be the object of consideration by the cassation court within the framework of this cassation appeal, as they do not pertain to the contested ruling but relate to the decision of the court of first instance.

No violations of procedural law by the court of appeal, constituting an unequivocal basis for reversing the contested ruling, have been established by the cassation panel.

Accordingly, the cassation court finds no grounds to reverse the issued ruling pursuant to Article 288 of the Arbitration Procedure Code of the Russian Federation.

Pursuant to Articles 176, 284-289 of the Arbitration Procedure Code of the Russian Federation, the court

HAS RULED:

To leave unchanged the ruling of the Ninth Arbitration Court of Appeal of September 12, 2019, in case No. A40-165165/2018; to dismiss the cassation appeal filed by Alexander Vitalyevich Sabadash.


The Presiding judge                                          V.V. Kobylyansky

The Judges:                                                      V.V. Petrova

                                                                       S.N. Krekotnev


UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman

106690_1589515





# АРБИТРАЖНЫЙ СУД
# МОСКОВСКОГО ОКРУГА

ул. Селезнёвская, д. 9, г. Москва, ГСП-4, 127994,
официальный сайт: http://www.fasmo.arbitr.ru e-mail: info@fasmo.arbitr.ru

ПОСТАНОВЛЕНИЕ

город Москва

13 ноября 2019 года                                          Дело № А40-165165/2018

Резолютивная часть постановления объявлена 07 ноября 2019 года

Полный текст постановления изготовлен 13 ноября 2019 года

Арбитражный суд Московского округа

в составе: председательствующего-судьи Кобылянского В.В.,

судей Петровой В.В., Крекотнева С.Н.,

при участии в заседании:

от истца: ИП Гофман Е.Н. – лично по паспорту,

от ответчика: простого товарищества «Иткин и Сабадаш» в лице управляющего

партнера Иткина Г.Ю. – Шадаев И.Н. по дов. от 07.08.2018,

от Сабадаша А.В. – Добровольский А.И. по дов. от 03.07.2019,

рассмотрев 07 ноября 2019 года в судебном заседании кассационную жалобу Са-

бадаша Александра Витальевича

на определение от 12.09.2019

Девятого арбитражного апелляционного суда

о прекращении производства по апелляционной жалобе

по иску ИП Гофман Е.Н.

к простому товариществу «Иткин и Сабадаш»

2

о взыскании денежных средств,

УСТАНОВИЛ: индивидуальный предприниматель Гофман Елена Никола-евна (прежняя фамилия Васильева, далее по тексту – истица, ИП Гофман Е.Н.) обратилась в Арбитражный суд города Москвы с иском к простому товарище-ству «Иткин и Сабадаш» (90211, США, штат Калифорния, город Беверли Хиллс, бульвар Вилшер, дом 8501, оф. 330) в лице управляющего партнера Иткина Гар-ри Юрий о взыскании задолженности, неустойки и штрафа в общем размере 826 000,46 руб. по договору возмездного оказания услуг от 12.02.2004.

Решением Арбитражного суда города Москвы от 14.09.2018 иск удовле-творен.

Названное решение в апелляционном порядке лицами, участвующими в деле, не обжаловалось и вступило в законную силу.

Не участвующий в данном деле Сабадаш Александр Витальевич, в поряд-ке статьи 42 Арбитражного процессуального кодекса Российской Федерации, обратился в Девятый арбитражный апелляционный суд с апелляционной жало-бой на указанное решение суда.

Определением Девятого арбитражного апелляционного суда от 12 сентяб-ря 2019 года производство по апелляционной жалобе Сабадаша А.В. прекраще-но.

Не согласившись с вынесенным определением о прекращении производ-ства по апелляционной жалобе, Сабадаш А.В. обратился в Арбитражный суд Московского округа с кассационной жалобой, в которой просит отменить данное определение суда апелляционной инстанции и направить дело на новое рассмот-рение в суд апелляционной инстанции, указывая на нарушение и неправильное применение апелляционным судом норм права и несоответствие выводов суда фактическим обстоятельствам дела.

В обоснование своих доводов, заявитель указывает, что решением суда по настоящему делу непосредственно затронуты права и обязанности не привле-ченного к участию в деле Сабадаша А.В., при этом апелляционным судом не учтены положения норм Гражданского кодекса Российской Федерации, регули-рующих договор простого товарищества, в частности, не принято во внимание,

что простое товарищество не является юридическим лицом, в связи с чем не обладает процессуальной правосубъектностью, следовательно, не может выступать стороной (ответчиком) по гражданскому делу.

Истицей и ответчиком представлены отзывы с возражениями на кассационную жалобу.

В отзыве на кассационную жалобу истица сослалась на несостоятельность доводов Сабадаша А.В. и указала на пропуск заявителем срока на апелляционное обжалование.

В отзыве на кассационную жалобу ответчик в лице управляющего партнера Иткина Г.Ю. указал, что кассационная жалоба от имени Сабадаша А.В. подписана представителем по доверенности, являющейся ничтожной в связи с наличием в ней пороков, в частности, неудостоверенных нотариусом исправлений, т.е. кассационная жалоба подписана неуполномоченным лицом; в настоящем деле предъявлен иск к простому товариществу «Иткин и Сабадаш» из договора возмездного оказания услуг от 12.02.2004, заключенного с товариществом, т.е. Сабадаш А.В., как физическое лицо, не является, ни стороной по указанному договору, ни стороной по настоящему делу; установленная договором о создании простого товарищества долевая ответственность товарищей не относятся к предмету данного спора и не может быть предметом рассмотрения в рамках заявленной кассационной жалобы; решение суда по настоящему делу полностью исполнено ответчиком; факт существования простого товарищества «Иткин и Сабадаш» подтвержден, в том числе приговором Смольнинского районного суда города Санкт-Петербурга от 24.10.2017 по уголовному делу в отношении Сабадаш А.В.

Явившиеся в судебное заседание суда кассационной инстанции представитель Сабадаша А.В. поддержал доводы и требования кассационной жалобы, истица и представитель ответчика возражали против доводов жалобы, указывая на законность вынесенного апелляционным судом определения.

Обсудив доводы кассационной жалобы, изучив материалы дела, заслушав объяснения явившихся в судебное заседание представителей сторон и заявителя апелляционной жалобы, проверив в порядке статей 284, 286, 287 Арбитражного

4

процессуального кодекса Российской Федерации правильность применения апелляционным судом норм материального и процессуального права, а также соответствие выводов, содержащихся в обжалуемом судебном акте, установленным по делу фактическим обстоятельствам и имеющимся в деле доказательствам, суд кассационной инстанции не находит оснований для отмены обжалуемого определения ввиду следующего.

Согласно статье 42 Арбитражного процессуального кодекса Российской Федерации лица, не участвовавшие в деле, вправе обжаловать судебный акт в случае, если он принят об их правах и (или) обязанностях.

При этом судебный акт может быть признан принятым о правах и обязанностях лица, не привлеченного к участию в деле, лишь в том случае, если им устанавливаются права этого лица относительно предмета спора, либо возлагаются обязанности на это лицо.

Как следует из материалов дела, оснований полагать, что решение по настоящему делу принято непосредственно о правах Сабадаша А.В. или возлагает на него лично какие-либо обязанности, не имеется.

При этом наличие заинтересованности в исходе дела лица, не привлеченного к участию в деле, не свидетельствует о нарушении его прав и законных интересов судебным актом, принятым по существу спора.

Установив отсутствие оснований для отнесения заявителя к лицам, указанным в статье 42 Арбитражного процессуального кодекса Российской Федерации, апелляционный суд прекратил производство по апелляционной жалобе применительно к пункту 1 части 1 статьи 150 названного Кодекса.

Доводы, изложенные в кассационной жалобе, относительно наличия у Сабадаша А.В. права на апелляционное обжалование выводы апелляционного суда не опровергают, к тому же, как следует из текста искового заявления, иск по настоящему делу предъявлен истицей к простому товариществу «Иткин и Сабадаш» в лице управляющего партнера Иткина Г.Ю., при этом, как заявили истица и представитель ответчика в судебном заседании суда кассационной инстанции, вступившее в законную силу решение суда по настоящему делу полностью исполнено.

Case 2:25-bk-11235-NB    Doc 90-1    Filed 07/01/25    Entered 07/01/25 20:45:17    Desc
Declaration of Michael Zorkin    Page 165 of 348

5

Иные приведенные в кассационной жалобе доводы не могут являться предметом рассмотрения суда кассационной инстанции в рамках настоящей кассационной жалобы, поскольку не относятся к обжалуемому определению, а касаются решения суда первой инстанции.

Нарушений апелляционным судом норм процессуального права, являющихся безусловным основанием для отмены обжалуемого определения, кассационной коллегией не установлено.

Таким образом, у суда кассационной инстанции отсутствуют основания для отмены внесенного определения, предусмотренные статьей 288 Арбитражного процессуального кодекса Российской Федерации.

Руководствуясь статьями 176, 284-289 Арбитражного процессуального кодекса Российской Федерации, суд

ПОСТАНОВИЛ:

определение Девятого арбитражного апелляционного суда от 12 сентября 2019 года по делу №А40-165165/2018 оставить без изменения, кассационную жалобу Сабадаша Александра Витальевича – без удовлетворения.


Председательствующий-судья                           В.В.    Кобылянский


Судьи:                                                                    В.В. Петрова


                                                                              С.Н. Крекотнев

UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman



**TRANSLATION SERVICES**

## CERTIFICATION OF TRANSLATION

**Project number: S-251172**

**Name of files: Translation Russian to English / Michael Zorkin**

**Job performed on: 30-06-2025**

**Translation from language: Russian**

**Translation into language: English**

**Translation performed by: Irina Turbal**

**Date of certification: June 30, 2025**

---

Universal Translation Services, a professional translation company, declares that the attached document(s) are stamped and signed by us and translated by qualified and professional translators, fluent in the above mentioned languages. In our best judgement, the translated text truly reflects the content, meaning and translation of the attached documents and / or copies that the client provide us with.

A validation procedure was performed by us, which confirms that the provided language translation is complete and accurate. The document hasn't been translated by a family member, friend or business associate.

By signing this Certification of Translation, Universal Translation Services declares that the translation is a true reflection of the source file(s). We do not guarantee that the original document is a genuine document or that the statements contained in the original document are true.

Universal Translation Services assumes no liability for the way the translation is used by the customer or any third party.

*A.H.J Huisman, Managing Director*
*Universal Translation Services*

Corporate ATA Member number 260038

**ata**
American Translators Association

• **Head Office USA:**  Phone: 1-844-wetranslate | Address: 20801 Biscayne Blvd, Suite 403, Aventura, Florida 33180
• **Office Spain:** Phone: +34-951-406-81 | Address: Calle Buenos Aires 3, 35002, Las Palmas
• **Office U.K.:** Phone: +44-20-3807-3275219 | Address: Kensington Street, Kensington W8 6bd, London
• **Other US Offices:** Commerce – San Francisco – Washington – Chicago – Boston – Las Vegas – Houston – Dallas – Seattle – Philadelphia



# Exhibit 20

```
1                    UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                              --oOo--

4    In Re:                      )
                                 ) Case No. 2:25-bk-11235-NB
5                                )
     ITKIN & SABADASH and        ) Chapter 7
6    ALEKSANDR VITALIEVICH       )
     SABADASH,                   )
7                                )
                     Debtor.     ) Los Angeles, California
8                                ) Tuesday, 11:00 A.M.
     ----------------------------X April 22, 2025
9

10                               HEARING RE: DEBTOR'S MOTION
                                 TO DISMISS INVOLUNTARY
11                               PETITION UNDER FRCP 12(b)(1)
                                 AND 12(b)(6) OR, IN THE
12                               ALTERNATIVE, MOTION FOR
                                 SUMMARY JUDGMENT
13
                                 STATUS CONFERENCE RE: CHAPTER
14                               7 INVOLUNTARY PETITION

15
                       TRANSCRIPT OF PROCEEDINGS
16              BEFORE THE HONORABLE NEIL BASON
                   UNITED STATES BANKRUPTCY JUDGE
17

18   APPEARANCES:

19   For the Five Joining       JOSEPH E. CACERES, ESQ.
     Creditors:                 Caceres & Shamash, LLP
20                              9701 Wilshire Boulevard
                                Suite #1000
21                              Beverly Hills, California 90212

22   For Himself:               JOSEPH ATABEK, Pro Se
                                250 Newport Center Drive
23                              Suite #306
                                Newport Beach, California 92660
24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.
```



```
 1   APPEARANCES (Continued):

 2   For Gary Y. Itkin:        DANIEL J. McCARTHY, ESQ.
                               Hill Farrer & Burrill, LLP
 3                             300 South Grand Avenue
                               37th Floor
 4                             Los Angeles, California 90071

 5   For Alexander Sabadash:   MICHAEL ZORKIN, ESQ.
                               The Zorkin Firm
 6                             6320 Canoga Avenue
                               15th Floor
 7                             Suite #1500
                               Woodland Hills, California 91367

 8
     Court Recorder:           Dawnette Francis
 9                             U.S. Bankruptcy Court
                               Central District of California
10                             Edward R. Roybal Federal Building
                                  and Courthouse
11                             255 East Temple Street, Room #1639
                               Los Angeles, California  90012
12                             (855) 460-9641

13   Court Transcriptionist:   Ruth Ann Hager, C.E.T.**D-641
                               Ben Hyatt Certified Deposition
14                                Reporters
                               17835 Ventura Boulevard
15                             Suite #310
                               Encino, California  91316

16

17

18

19

20

21

22

23

24

25
```

Page                                                                3

1          LOS ANGELES, CALIFORNIA, TUESDAY, APRIL 22, 2025

2                        11:03 A.M.

3                          --oOo--

4          THE CLERK:  Please come to order.  This court is

5    now in session, the Honorable Neil W. Bason presiding.

6          THE COURT:  All right.  Good morning, everyone.

7    I will do an abbreviated version of my usual announcements.

8    Please, just wait until I call upon you so that we're not

9    all talking at once.

10          All right.  I've had a priority request on

11   calendar #7.00 and #8.00, so let start with those matters.

12   And let me start by getting appearances in the courtroom.

13          MR. ZORKIN:  Good morning, Your Honor.  Michael

14   Zorkin for Alexander Sabadash.

15          THE COURT:  Thank you.  And Mr. Zorkin, for this

16   matter I'm going to ask you to stand at the lectern so that

17   people will -- on the video can see you and you can see

18   them -- or you'll be able to see them, regardless, but all

19   right.

20          Mr. McCarthy.

21          MR. MCCARTHY:  Good morning, Your Honor.  Dan

22   McCarthy for petitioning general partner Gary Itkin.

23          THE COURT:  Thank you.

24          Mr. Caceres.

25          MR. CACERAS:  Yes.  Good morning, Your Honor.

Page                                                                    4

1   Joseph Caceres, Caceres & Shamash, LLP, for the five

2   joining creditors.

3           THE COURT:  Thank you.

4           MR. CACERES:  Joined in the petition, not the

5   motion.

6           THE COURT:  I -- that was my assumption.  All

7   right.  Thank you.

8           Mr. Atabek.

9           MR. ATABEK:  Good morning, Your Honor.  John

10  Atabek on behalf of myself, a creditor.

11          THE COURT:  Thank you.

12          Anyone else who wishes to be heard on this

13  matter?

14          THE COURT:  Okay.  So let me start by saying you

15  all gave me a lot to read, including a lot of evidentiary

16  objections.  I think I have a fairly good grasp of the

17  issues, but I haven't finished working my way through all

18  of the matters.

19          I'm inclined to give you some oral tentative

20  rulings and then give you a brief period of time for

21  argument and then I'll probably continue this hearing and

22  we can figure out where we go from there.

23          So before I do that, I try always before I start

24  expressing views to make sure I'm not messing anything up

25  in case there's been any settlement or even if not a

Page                                                      5

1   settlement some other development that should mean I should

2   keep my mouth shut.

3           So let me go around the room, make sure any

4   objection to me proceeding with giving you an oral

5   tentative ruling.  Mr. Zorkin?

6           MR. ZORKIN:  No, Your Honor.

7           THE COURT:  Thank you.  Mr. McCarthy?

8           MR. McCARTHY:  No objection, Your Honor.

9           THE COURT:  Thank you.

10          Mr. Caceres?

11          MR. CACERES:  No, Your Honor.

12          THE COURT:  And Mr. Atabek?

13          MR. ATABEK:  No, Your Honor.

14          THE COURT:  Okay.  All right.  So I was not

15   actually familiar with the authority that facts can be

16   presented in support of a motion to dismiss on the

17   jurisdictional issue, but it does seem that that authority

18   says when those facts or factual issues are intertwined

19   with the merits, the motion has to be analyzed as a motion

20   for summary judgment.

21          So I'm inclined to think that I probably need to

22   analyze things from the perspective of the standards for a

23   motion for summary judgment.  Again, this is just the

24   tentative ruling, but that's my initial reaction.

25          As to the disputed factual issues, I think

Page                                                          6

1  they're possibly genuine and so probably I would have to

2  deny the motion as to dismissal.  As to abstention, it

3  seems to me -- I'm not sure there are any -- any of the

4  factual issues that are disputed, I'm not sure that they

5  would bear on or at least be determinative of the

6  abstention issue.  And it seems to me that it would be more

7  consistent with my previous rulings and with the

8  principles, as I understand them, of Chapter 15 and

9  principals of international comity and attempting to

10 prevent inconsistent judgments and so on for me to abstain

11 on at least the issue of whether a partnership exists,

12 because the matter -- those matters seem to be so

13 intertwined with the matters that I've already deferred on

14 to the Jersey court.  And, of course, if that court does

15 not wish to adjudicate that issue, then I'm happy to and we

16 could have a trial here on that issue.

17         Now, I have not fully worked out -- there may be

18 other matters on which it would be appropriate to defer to

19 the Jersey court and by "Jersey," of course, I mean, the

20 Isle of Jersey, the British jurisdiction, not New Jersey

21 here in the United States.

22         Obviously, I think I would not and could not

23 defer to that court on issues of bankruptcy law, U.S.

24 bankruptcy law.  So there may be issues under Section 303

25 of the Bankruptcy Code that I would not be deferring to or

Page                                                      7

1   asking the Jersey court to express any opinion on.  The

2   factual issue that I think is front and center is whether a

3   partnership exists.

4          There may be subsidiary issues, such as if it

5   does exist, what would be the terms of the partnership or

6   what would be the authority to file for bankruptcy and

7   things of that sort, but I think those are probably very

8   subsidiary and the real main issue is whether a partnership

9   exists or not.

10         So that's my oral tentative ruling.  And as you

11  can see, I've got a lot of matters on calendar.  You've

12  also commendably done a very thorough briefing on all of

13  these matters and so I'm just going to give you a

14  relatively short period of time in which to argue on those

15  issues or persuade me if I'm missing some issues and I

16  should focus on something else.

17         So Mr. Zorkin, why don't you take five minutes

18  and address what you think I need to focus on?

19         MR. ZORKIN:  Yes, thank you, Your Honor.

20         So the Court definitely has the authority to

21  convert this motion into a motion for summary judgment,

22  even in an involuntary proceeding.  We cited case law on

23  that.  But on a subject matter jurisdiction challenge there

24  is ample Ninth Circuit authority for a factual attack where

25  evidence is submitted and evidence considered.  And we

Page                                                                    8

1   actually cited two cases, one from the Bankruptcy Court

2   here in the Central District, one from the Bankruptcy Court

3   in Tennessee that heard a subject matter 12(b)(1) motion to

4   dismiss and voluntary proceedings specifically on the issue

5   of whether a debtor exists.  In *Micr Toner*, the Central

6   District case, the issue is whether an involuntary

7   proceeding could be commenced against a corporation that is

8   dissolved.  And *In Re: Taylor*, it was specifically this

9   issue here.

10          THE COURT:  That was by Judge Robles.  Yes.

11          MR. ZORKIN:  Yes.  So a 12(b)(1) subject matter

12  jurisdiction can be brought in a factual basis with

13  evidence without the need to convert the motion -- for a

14  motion for summary judgment, so I think that's an important

15  part of your tentative.

16          The second part is whether the motion for -- if

17  the Court is inclined to treat it as a motion for summary

18  judgment whether that motion should be denied.  So *In Re:*

19  *Long Partnership* case that we cite, also a Bankruptcy Court

20  decision that was affirmed in the Bankruptcy Appellate

21  Panel and in the Ninth Circuit, that case explains very

22  thoroughly what happens on -- in a summary judgment motion

23  where the issue is whether there is a *bona fide* dispute as

24  to either the existence of the entity or the validity of

25  the debt.

Page                                                                9

1          And the BAP actually explained that if there is a

2    genuine issue of fact, the motion actually has to be

3    granted because the petitioning creditors have the burden

4    to prove there is no dispute as to the validity of the debt

5    or the amount of the debt.

6          So in a case where the Court finds that there is

7    a factual dispute either as to -- and this is what they

8    said -- either as to the existence of the partnership

9    because that case was about the existence of the

10   partnership.  So if there is a dispute either as to the

11   existence of the partnership or as to the validity or the

12   amount of the debt, summary judgment motion has to be

13   granted, not denied.  It's a backwards analysis because the

14   creditor has the burden to prove there is no dispute.

15         So if the creditor submits evidence that actually

16   shows there is a dispute as is the case here, the motion

17   for summary judgment has to be granted.  So that's the

18   other thing that I think the Court should focus on.  And *In*

19   *Re: Long* goes through a pretty thorough analysis of what

20   happens in a summary judgment motion, specifically on these

21   facts, whether there's a partnership, whether there's a

22   *bona fide* dispute, so that's that.

23         On the abstention, I think the Court is correct.

24   Mr. Itkin is not getting the results he wants in Jersey.

25   He's asserted the existence of a partnership as a defense

Page                                                    10

1  there.  He has been fined 78,000 pounds by the Jersey

2  court.  He's been ordered to submit evidence.  He had a

3  deadline of a Monday and on Friday he filed this petition.

4  And so what he's trying to accomplish here is to stay the

5  previously filed Chapter 15 that's being administered in

6  Jersey in favor of this involuntary and I just -- there's

7  no support for -- to accomplish something like that.  I

8  think the Court is correct that it would be inconsistent

9  with your previous rulings to stop everything in Jersey to

10 adjudicate the partnership issue here, especially because

11 Mr. Itkin is asserting the partnership issue as a defense

12 in Jersey.

13         And I'm happy to discuss the merits.  The Court

14 did not go into the actual merits of the existence of the

15 partnership, so I'm happy to discuss that.  It will take

16 more than five minutes.  But I also want to -- I would like

17 to take questions from the Court as well.

18         THE COURT:  Okay.  I'm going to clarify something

19 that I had said before.  So one thing I didn't touch on was

20 the evidentiary disputes about the existence of the

21 partnership and the -- and whether there is a preclusive

22 effect from rulings of the courts in Russia.  I am

23 tentatively inclined to think based on the ruling of the

24 Ninth Arbitration Court of Appeals, the Russian court, and

25 this is at -- in the supplemental declaration of

Page                                                          11

1  Mr. Zorkin, docket 21.  And this is Exhibit -- it's part of

2  Exhibit 17 and it's at page 77 of 94 on my screen.  And

3  then reading the bottom of that page and on to the next

4  page, it seems to me that there is not a preclusive effect

5  from the Russian proceedings that there is no determination

6  that a partnership did exist.  So it seems to me it's back

7  to a factual issue and that it seems to me there are some

8  hotly contested issues about whether the partnership

9  exists.

10         So with that supplemental oral tentative ruling,

11  let me turn to Mr. McCarthy.

12         MR. McCARTHY:  Thank you, Your Honor.  I'm going

13  to make a brief statement about the evidence.  The exhibits

14  that we submitted in opposition to the motion, all were

15  exhibits to a motion for summary adjudication that was

16  filed in state court.  They were also trial exhibits.  They

17  should have been addressed in the motion.  They were not.

18  We brought them up in the opposition and we hear responses

19  for the very first time in the reply.  We were sandbagged

20  and I object to that.

21         The new evi -- and so the new arguments that are

22  now made in the reply, the new evidence that is submitted

23  should not be considered under the Local Rules, which

24  preclude new argument and new evidence in reply briefs,

25  including the document you just cited, Your Honor.

Page                                                    12

1           Mr. Zorkin's supplemental declaration submits

2  multiple exhibits, which I'd be happy to address one by one

3  because I think that a misleading presentation has been

4  given of the exhibits, but all those exhibits should be

5  stricken and not considered by the Court.

6           As to the one document Your Honor just referred

7  to, I respectfully disagree, Your Honor.  That document

8  refers to the partnership repeatedly.  You're talking about

9  Exhibit 17 to Mr. Zorkin's declaration.

10          What it said was the lower court did not

11  determine Mr. Sabadash's personal rights and obligations.

12  That's true, but it does not take away from the fact that

13  the lower court determined that there was a partnership.

14  It awarded Ms. Gofman a judgment against the partnership.

15  So that issue was resolved and there should be a preclusive

16  effect as that, as well as Mr. Gofman's judgment against

17  the partnership confirmed in the LA Superior Court, which

18  Mr. Sabadash opposed.  That also determined that there was

19  a partnership in entering a judgment against the

20  partnership based on the Russian judgment.

21          Your Honor, I won't go through all the

22  evidentiary objections.  I think there needs to be a ruling

23  on them before Your Honor goes any further.  Let me address

24  the issues that you and Mr. Zorkin addressed.

25          I agree with you that the summary judgment

Page                                                          13

1  standard applies to a determination of subject matter
2  jurisdiction and I disagree with Mr. Zorkin that the burden
3  of proof -- I'm sorry -- the burden of prevailing is
4  imposed upon the petitioning creditor.  If there's a
5  dispute as to whether you should grant an order for relief,
6  the proper procedure is to set an evidentiary hearing.
7  It's not to find that there hasn't been sufficient
8  evidence.
9        But beyond that, Your Honor, there's overwhelming
10 evidence that we submitted of the existence of the
11 partnership and notably, it's all documentary evidence.
12       Now, Mr. Zorkin's reply brief for the first time
13 hoped -- tries to poke holes in it by coming up with this
14 fantastic theory of forgery and conspiracy with Ms. Gofman,
15 a lawyer in Russia, and bribery.  Odd thing, Your Honor.
16 We've been in litigation with Mr. Sabadash now for eight
17 years.  Never did he make this argument in the LA Superior
18 Court.  He didn't make the argument to -- before Russian
19 courts.  He didn't make the argument in the Gofman
20 proceeding in LA Superior.  These are arguments made for
21 the first time without evidence in the reply brief and
22 they're fantastical.  It's like a Hollywood movie.
23       There clearly is evidence to support the
24 conclusion that there was a partnership and that the Court
25 had jurisdiction.  And if the Court doesn't make the ruling

Page                                                      14

1   on that today, there should be an evidentiary hearing in

2   that regard both on the issue of whether there's a

3   partnership and whether there are creditors whose claims

4   are not in *bona fide* dispute.

5           Notably, four of those claims were filed before

6   the motion and Mr. Zorkin didn't address any of those in

7   the motion.  We heard about them for the first time in the

8   reply brief.

9           There recently was submitted an objection to the

10  claims, which I don't think you should consider because it

11  violated the Local Rules in multiple respects that objected

12  to all the claims and which are not similarly situated, so

13  it violates the rules against omnibus objection.  It was

14  not set for hearing on 30 days' notice.  Copies of the

15  claims were not attached.  There's no evidence in the

16  objection.  Those claims are valid and at least should be

17  considered for evidentiary purposes for showing that there

18  are creditors who are owed money.

19          Let me address the issue of abstention, Your

20  Honor.  You have a history of it.  When you defer to the

21  Jersey court, this proceeding wasn't finished.  You

22  deferred to the Jersey court and you asked for instructions

23  from the Jersey court on whether the matter should proceed

24  here in California and the Jersey court responded, you

25  should do what you think you should do.  Didn't give you

Page                                                                    15

1   any instructions.  It left you freehand to act

2   appropriately to take on determination of issues here or to

3   permit relief from stay for the state court to determine

4   issues.

5           Now we have a different set of circumstances.

6   This proceeding concerning a California general partnership

7   that's on California property involves issues that should

8   be determined here.  The idea that you should defer to the

9   Jersey court to determine whether a partnership existed

10  under California law really is backwards.  That's an issue

11  that you should take on and that Jersey court should defer

12  to you.

13          In our opposition brief we analyzed the purposes

14  of Chapter 15 for five purposes, which were ignored in the

15  motion and ignored in the reply.  We cited the *RHTC*

16  *Liquidating Company* case regarding those five factors.  And

17  all of those factors point to the conclusion that the

18  Jersey court should defer to you, rather than the opposite.

19  I understand the idea that you want to be consistent in

20  your position, but now we have changed circumstances with

21  this involuntary position in front of you.

22          Culminating, as we pointed out in our reply

23  brief, is a two-way street and the Jersey could -- should

24  be deferential to you, a California partnership and a

25  California real property, as you were initially inclined to

Page                                                           16

1   be to the Jersey court before this involuntary case was

2   filed.  Mr. Zorkin questioned in his oral argument and in

3   his motion and in his reply brief the reason for the filing

4   of this involuntary.  He attributes it to Mr. Itkin trying

5   to avoid payment of an award that the Jersey court required

6   him to pay.

7           That argument is not serious, Your Honor.  We

8   only think what this involuntary petition did with respect

9   to the proceedings in Jersey was the seven-week

10  postponement of the hearing.  Surely a seven-week

11  postponement is not an argument in support of avoiding

12  payment of an award.  What this hearing -- what this

13  involuntary really is about is putting the issues before

14  the proper court to be determined; again, whether there's a

15  partnership under California law and whether that

16  partnership owns California real property.  Your Honor,

17  you're the one to make that determination or relief from

18  stay should be granted for it to be determined in state

19  court.

20          One final thing on that in terms of efficiency

21  and where this should be determined.  Keep in mind that the

22  issue of dissolution of the partnership was before the

23  state court.  Trial was started in March of 2020.

24  Mr. Zorkin was and is trial counsel in that case.

25  Mr. Atabek is trial counsel for Mr. Itkin.  These attorneys

Page                                                          17

1  and their clients all were prepared to go to trial and

2  actually did commence trial until this trial was declared

3  because of COVID in March of 2020.  The case was

4  rescheduled for trial and that was stayed when the *Golden*

5  *Sphynx* bankruptcy was filed.

6          So you have attorneys already for trial here to

7  determine that issue either in state court or it can be

8  litigated in front of you or you have a Jersey court where

9  it's in its infancy.  No trial date has been set, no

10 discovery deadlines, discovery hasn't been taken.  The idea

11 that you should let it proceed in Jersey where all the

12 attorneys there are just getting up to speed on claims that

13 have been asserted really has it backwards.  It should

14 proceed here and that's why abstention would be improper

15 and the Jersey court should defer to you.  Thank you, Your

16 Honor.

17          THE COURT:  Mr. Caceres.

18          MR. CACERES:  Your Honor, we would agree with --

19 obviously with Mr. McCarthy, which won't come -- won't come

20 as a surprise to the Court given that we -- my clients

21 joined in the petition.  I think he's correct as to the

22 objections to the claims.  That objection was totally

23 improper in almost every way under Local Bankruptcy Rule

24 3007-1.  No hearing, no notice, claims not attached,

25 omnibus objection differently situated claims.  And it

Page                                                          18

1    seems to me that those objections put the cart before the

2    horse because they're largely based on the main issue here

3    which is whether a partnership exists or not.

4              So if the Court decides that a partnership

5    exists, I think those objections largely fall away.  So I

6    think the Court does need to make that determination.  It's

7    the first thing -- and Your Honor mentioned that that was

8    the main issue, which I -- we agree with.  I think that

9    needs to be decided and it should be decided here.

10              THE COURT:  Thank you.

11              Mr. Atabek.

12              Oh, wait a minute.  I'll --

13              MR. ATABEK:  So you're --

14              THE COURT:  -- just add my usual caution when

15    somebody is representing themselves.  Bankruptcy

16    proceedings tend to be very tricky and I think you may be a

17    very experienced lawyer, for example, in some areas, maybe

18    even bankruptcy, but it's tricky to represent yourself and

19    it's easy to shoot yourself in the foot.

20              So usually less in more when somebody is speaking

21    without counsel -- bankruptcy counsel in a bankruptcy

22    proceeding, but I'll -- that said, I welcome your comments.

23              MR. ATABEK:  Sure.  And I'll keep it focused just

24    on the evidentiary issues -- or sorry, not the evidentiary

25    issues, the legal issue.

Page                                                              19

1          So the first one I was going to mention, Your

2    Honor, just from having been familiar with the proceedings

3    going on in Jersey, I would note that there may even be an

4    estoppel-type issue here, Your Honor.  From what I

5    understand, the joint liquidators are arguing in Jersey

6    that the existence of a partnership is completely

7    irrelevant to their position.  So to the extent that

8    they're asserting in Jersey that the partnership is

9    irrelevant but it's clearly relevant here, you know, in

10   terms of whether or not to grant abstention I think, you

11   know, the other side is talking a little bit out of both

12   sides -- on this issue, Your Honor.

13          And then just turning to the issue of the

14   evidentiary hearing, we would tend to agree.  Again, as

15   Mr. McCarthy said, both sides currently (phonetic) tried

16   this case and it's not going to try it for a very long time

17   in Jersey.  To the extent that the partnership issue is

18   relevant here, why not just have an evidentiary issue --

19   evidentiary hearing just on that issue here.  Could try it

20   very quickly.  The exhibit books were ready.  We got five

21   days.  We were almost through Mr. Sabadash's case on this.

22   It would not be a heavy lift to simply do an evidentiary

23   hearing here and figure the issue out.

24          THE COURT:  Thank you.

25          MR. ATABEK:  That's all I'll say.

Page                                                                20

1            THE COURT:  Okay.

2            MR. ZORKIN:  May I respond very briefly?

3            THE COURT:  Very, very briefly because I do have

4    a lot of people --

5            MR. ZORKIN:  Yes.  I'm sorry.  So obviously we

6    can respond and reply to evidence that's presented in

7    opposition and we had to do it because two of the exhibits

8    that were provided to this court by deposition were one was

9    a false translation and one was some sort of cockamamie

10   summary written by somebody instead of a Court of Appeal

11   decision.  So if the opposition was not playing games we

12   wouldn't have to do half of what we did.

13           All these arguments -- there was no sandbagging.

14   All these arguments were previously made.  Mr. Itkin knows

15   that he misspelled the partnership, a seal name.  He knows

16   that the minutes of the partnership are completely

17   illegible, not admissible anywhere in any proceeding.  All

18   of this he knows.  I don't understand why Mr. McCarthy said

19   this is a new argument, probably because he doesn't know it

20   himself.

21           Just two final things.  This court cannot hold an

22   evidentiary hearing if there's a *bona fide* dispute as to

23   the existence of the debtor or the validity of the debt.

24   There has to be a ruling first and as I think this court

25   understands at the very lease there is a dispute and if

Page                                                              21

1   there is a dispute, there is no involuntary.  And this
2   issue that we need to forget that there's a subject matter
3   jurisdiction challenge and jump straight to the evidentiary
4   hearing, that's not the law.  Nobody here will disagree
5   that there is a *bona fide* dispute as to the existence of
6   the partnership and the validity of these claims, which
7   were all created by Mr. Itkin and all the creditors are his
8   friends or his lawyers, so no one in this room was born
9   yesterday.
10          So there has to be a ruling on whether there's a
11  *bona fide* dispute.  Every single person here, including the
12  Court, recognizes there is a *bona fide* dispute.  The motion
13  has to be granted, either as -- either as a subject matter
14  jurisdiction challenge or it can be converted into summary
15  judgment and if there's a *bona fide* dispute, the
16  involuntary must be dismissed.  There's no way to object to
17  a hearing.
18          And what I would request is a supplemental brief
19  on the summary judgment standard in this type of proceeding
20  because the *In Re: Long Court*, which was affirmed by the
21  Ninth Circuit was very clear that it's a different standard
22  than a Rule 56 motion.
23          THE COURT:  Thank you.  So I'm going to note --
24  I'll just disregard any aspersions regarding Mr. McCarthy
25  or anything of that sort.

Page                                                        22

1              What I will do is continue this matter.  I'm not

2      going to give an opportunity for supplemental briefing yet.

3      I want to take some time, look at this with my law clerks

4      and figure out how to proceed on this matter.  That may

5      be -- maybe I'll decide if I can give you a ruling on the

6      existing record.  Maybe I'll decide that I need additional

7      proceedings, whether that's supplemental briefing or an

8      evidentiary hearing or maybe I'll just decide things on the

9      existing record.

10             So I think a continuance to June 3rd is

11     appropriate.  Any objection to June 3rd at 11:00.  I'll go

12     around the room.  Mr. Zorkin?

13             MR. ZORKIN:  At 11:00 a.m.?

14             THE COURT:  11:00 a.m.

15             MR. ZORKIN:  That -- oh, I'm sorry.  One second,

16     please.  I'm back in April for some reason.

17             THE COURT:  While you're looking at that,

18     Mr. McCarthy?  You're on mute, Mr. McCarthy.

19             MR. McCARTHY:  Thank you.  June 3rd at 11:00

20     works.  I note that we're going to be before you on

21     June 3rd at 2:00 in the *Golden Sphynx* case for a status

22     conference.

23             THE COURT:  Ah, that's a good point.  Why don't I

24     make it June 3rd at 2:00 and so parties don't have to show

25     up multiple times?  Mr. Zorkin?

Page                                                          23

1           MR. McCARTHY:  Thank you, Your Honor.

2           MR. ZORKIN:  That works.  I have kind of a

3    question that relates to the Jersey proceeding.  The Jersey

4    court has been involved by (indiscernible) attorneys that

5    there's an automatic stay in place on the Jersey

6    proceeding, which is itself a recognized Chapter 15.  So

7    they're waiting for some sort of an answer.  And I'm not

8    putting the Court on the spot to give an answer, but I

9    think it -- is that -- is that what's happening there, not

10   to do anything until there's a further ruling from the

11   Court, because that's what the Jersey court seems to think.

12          THE COURT:  I understand the question.  I don't

13   think it's appropriate for me to express any views on that.

14   There's no motion --

15          MR. ZORKIN:  Just floating as an issue that's out

16   there.  Thank you.

17          THE COURT:  Understood.  Okay.

18          Mr. McCarthy  --

19          MR. McCARTHY:  We do have a scheduling question,

20   Your Honor.  You know, we talked about the objection to

21   claim that was filed and my thinking was that it would

22   actually make sense to have the objection refiled properly

23   in compliance with the Local Rules, a hearing set on that

24   and the Court to determine those claims on a summary basis,

25   you know, in connection with the usual claims objection

Page                                                          24

1   procedure so we can get that out of the way before a ruling

2   is made on the other issues.

3          THE COURT:  So Mr. Zorkin, I didn't address this

4   before, but I think that there are some legitimate points

5   raised in connection with the objection.  Not only Local

6   Rules, but also the national rules, as I recall.  Omnibus

7   objections have to fall into very specific types of

8   categories and I'm not sure that this one does, but I

9   haven't analyzed the issue.  So there's that on top of the

10  Local Rule issues.

11         That said, my mentor always taught me that the --

12  a lot of the time the question is, was there any prejudice.

13  So I don't know that there's been any prejudice from not

14  attaching the claims.  It's much more convenient for the

15  Court and for parties if the claims are attached, but -- so

16  what I'd be inclined to do is to say, let's set that for

17  hearing for June 3rd.  And that gives you -- if you want to

18  go with a 30-day period under the Rules for filing and

19  serving claim objections, that gives you until May 3rd and

20  then I guess maybe you add three days for service by mail.

21  I've forgotten how the Local Rule is phrased.  So why not

22  direct you to do that?

23         MR. ZORKIN:  Your Honor, I -- there is a subject

24  matter jurisdiction challenge pending.

25         THE COURT:  Yes.

Page                                                              25

1              MR. ZORKIN:  And my understanding of the Federal

2    Rules is that there's nothing to be done while there's a

3    subject matter jurisdiction challenge pending.  I also --

4    and I will, of course, defer to you on the bankruptcy

5    procedure issues.  But I don't believe there's a need to

6    file objections to these claims until there's an order for

7    relief entered and we actually have a Chapter 7 proceeding

8    going.

9              So far, there's a challenge to this entire thing

10   and these claims, which were, you know, as the claims --

11   the filed claims indicate very clearly, Mr. Itkin created

12   those claims by writing letters and things like that.  So

13   they all go away if there is a -- if the Court finds there

14   is no subject matter jurisdiction.

15             THE COURT:  So -- but I think there is a bit of a

16   Catch-22 in that approach because it seems to me the

17   question under Section 303 is, are there the requisite

18   number of creditors petitioning and they have to be

19   creditors of the entity and is there an entity or not.

20             Well, these particular persons who have submitted

21   claims would have standing, I think, to appear and be heard

22   on the issues that Mr. McCarthy also has raised and with

23   filed claims they're normally deemed allowed and so that

24   would presuppose the existence of a partnership and so

25   don't we need to get to all of those issues anyway?  I --

Page                                                              26

1   now, maybe --

2          MR. ZORKIN:  I don't think so.

3          THE COURT:  Intellectually maybe you need to work

4   through things in a different fashion, but I would think

5   this needs to be part and parcel of the same proceeding or

6   at least scheduled and then if I decide on further review

7   that I can take the matters in a certain sequence, that's

8   fine, but I don't want to get to June 3rd and think, boy, I

9   wish I had this before me because that's really the nub of

10  the issue.

11         MR. ZORKIN:  So what I would -- so first, I think

12  *In Re: Long* has also addressed this issue and it really

13  essentially said these claims, we don't have to look at the

14  claims because we find there's a *bona fide* dispute as to

15  the existence of the entity.  So we don't have to worry

16  about the claims.

17         But I understand what Your Honor is saying.  I

18  think that it would make sense to set the hearing on the

19  claims objections for some time after there is a decision

20  on the motion to dismiss.

21         THE COURT:  Again, I'm worried about delay here

22  and the possibility that these things are all going to be

23  interrelated so that I have to decide them as well.  I have

24  not read *In Re: Long*.  I have read some of the other

25  authorities that have been cited in our papers, but that

Page                                                                27

1   was not one I had -- that I've actually gotten to.

2           So for the moment, I'm going to schedule the

3   claims objection for hearing on June 3rd with a deadline of

4   April 30th for you to file and serve an amended set of

5   claims objections.  And then the usual deadlines apply for

6   any responses.

7           MR. ZORKIN:  Understood.

8           THE COURT:  Okay.  Thank you, Mr. McCarthy, for

9   raising that issue.  Obviously, we'll see between now and

10  then.  Maybe I'll decide that we don't need to go forward

11  with that after all, but I think it's better to have it set

12  for hearing on that date and we can move forward if we need

13  to.

14          All right.  Mr. Caceres, any objection to

15  June 3rd at 2:00?

16          MR. CACERES:  No, Your Honor, that's fine.

17          THE COURT:  Thank you.

18          Mr. Atabek?

19          MR. ATABEK:  No objection, Your Honor.  Works for

20  us.

21          THE COURT:  Okay.  All right.  I think that's it

22  for today.

23          MR. McCARTHY:  Your Honor --

24          THE COURT:  Mr. McCarthy?

25          MR. McCARTHY:  Sorry to interrupt, Your Honor.

Page                                                                 28

1   Just one more thing.

2          You declined Mr. Zorkin's request for further

3   briefing.  I'm assuming you don't want any further briefing

4   unless you ask for it.

5          THE COURT:  Thank you for clarifying.  We've had

6   that issue come up in this case before.  Yes, no further

7   briefing unless I ask for it, which I may do either by

8   issuing an order between now and the next hearing or by

9   maybe at the next hearing I'll say, you know, I've gotten

10  to this point in my analysis, but I need more briefing on

11  this other point.  So we'll -- but thank you.

12         For now, no further briefing and no further

13  papers.  No evidentiary issues, no legal briefs.  Thank

14  you.

15         MR. McCARTHY:   Thank you, Your Honor.

16         THE COURT:  All right.

17         MR. ZORKIN:  Thank you.

18         THE COURT:  You're welcome.

19  (End at 11:41 a.m.)

20                  *  *  *  *  *  *  *

21

22

23

24

25

Page                                                              29

1            I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    *Ruth Ann Hager*

6    _____        Date:  6/23/2025

7    RUTH ANN HAGER, C.E.T.**D-641

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 21

1              UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                        --oOo--

4   In Re:                      )
                                ) Case No. 2:25-bk-11235-NB
5                               )
    ITKIN & SABADASH and        ) Chapter 7
6   ALEKSANDR VITALIEVICH       )
    SABADASH,                   )
7                               )
              Debtor.           ) Los Angeles, California
8                               ) Tuesday, 2:00 P.M.
    ----------------------------X June 3, 2025
9

10

11                          HEARING RE: PUTATIVE PARTNER
                            ALEXANDER SABADASH'S
12                          OBJECTION TO PROOF OF CLAIM
                            FILED BY PROGRESSIVE
13                          MANAGEMENT, INC. (CLAIM No.
                            1)

14                          HEARING RE: PUTATIVE PARTNER
                            ALEXANDER SABADASH'S
15                          OBJECTION TO PROOF OF CLAIM
                            FILED BY JEFFREY RATNER &
16                          ASSOCIATES, INC. (CLAIMS No.
                            2 AND 3)

17

18                          HEARING RE: PUTATIVE PARTNER
                            ALEXANDER SABADASH'S
19                          OBJECTION TO PROOF OF CLAIM
                            FILED BY ALEXEI KUROCHKIN
20                          (CLAIM No. 4)

21                          HEARING RE: PUTATIVE PARTNER
                            ALEXANDER SABADASH'S
22                          OBJECTION TO PROOF OF CLAIM
                            FILED BY EVGENIY AVILOV
                            (CLAIM No. 5)

23

24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.



1                          HEARING RE: PUTATIVE PARTNER
                              ALEXANDER SABADASH'S

2                          OBJECTION TO PROOF OF CLAIM
                          FILED BY ELENA GOFMAN (CLAIM

3                          No. 6)

4                          HEARING RE: PUTATIVE PARTNER
                          ALEXANDER SABADASH'S

5                          OBJECTION TO PROOF OF CLAIM
                          FILED BY MARIA HABAROVA

6                          (CLAIM No. 7)

7                          HEARING RE: PUTATIVE PARTNER
                          ALEXANDER SABADASH'S

8                          OBJECTION TO PROOF OF CLAIM
                          FILED BY ILDAR SHADAEV (CLAIM

9                          NO. 8)

10                        HEARING RE: PUTATIVE PARTNER
                         ALEXANDER SABADASH'S

11                      OBJECTION TO PROOF OF CLAIM
                     FILED BY MARIA SAMSONOVA

12                      (CLAIM No. 9)

13                      HEARING RE: PUTATIVE PARTNER
                       ALEXANDER SABADASH'S

14                      OBJECTION TO PROOF OF CLAIM
                     FILED BY ATABEK & COMPANY

15                      (CLAIM No. 10)

16                      CONTINUED HEARING RE: DEBTOR
                       MOTION TO DISMISS INVOLUNTARY

17                    PETITION UNDER FRCP 12(b)(10
                     AND 12(b)(6) OR, IN THE

18                    ALTERNATIVE, MOTION FOR
                     SUMMARY JUDGMENT

19

20                    CONTINUED STATUS CONFERENCE
                     RE: CHAPTER 7 INVOLUNTARY
                     PETITION

21

22

23               TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE NEIL BASON
              UNITED STATES BANKRUPTCY JUDGE

24

25


P 888.272.0022  F 818.343.7119                    www.benhyatt.com
BENHYATT
Certified Deposition Reporters

```
 1   APPEARANCES:

 2   For the Five Joining     JOSEPH E. CACERES, ESQ.
     Creditors:               Caceres & Shamash, LLP
 3                            9701 Wilshire Boulevard
                              Suite #1000
 4                            Beverly Hills, California 90212

 5   For Gary Y. Itkin:       DANIEL J. McCARTHY, ESQ.
                              Hill Farrer & Burrill, LLP
 6                            300 South Grand Avenue
                              37th Floor
 7                            Los Angeles, California 90071

 8   For Alexander Sabadash:  MICHAEL ZORKIN, ESQ.
                              The Zorkin Firm
 9                            6320 Canoga Avenue
                              15th Floor
10                            Suite #1500
                              Woodland Hills, California 91367
11
     For the Joint            KURT ERNEST RAMLO, ESQ.
12   Liquidators and Foreign  Levene Neale Bender Yoo &
     Representatives of           Golubchik, LLP
13   Golden Sphynx Limited:   2818 La Cienega Avenue
                              Los Angeles, California  90034
14
     Court Recorder:          Shemainee Carranza
15                            U.S. Bankruptcy Court
                              Central District of California
16                            Edward R. Roybal Federal Building
                                  and Courthouse
17                            255 East Temple Street, Room #1639
                              Los Angeles, California  90012
18                            (855) 460-9641

19   Court Transcriptionist:  Ruth Ann Hager, C.E.T.**D-641
                              Ben Hyatt Certified Deposition
20                                Reporters
                              17835 Ventura Boulevard
21                            Suite #310
                              Encino, California  91316

22

23

24

25
```

Page                                                                4

1            LOS ANGELES, CALIFORNIA, TUESDAY, JUNE 3, 2025

2                              2:29 P.M.

3                              --oOo--

4            THE COURT:  Now, for the 2:30 p.m. calendar we

5    actually don't have that matters on, but they're

6    potentially involved for the Itin & Sabadash matter.  I

7    have not issued a written decision.  My plan is to pull up

8    my draft here on the screen and talk to the parties about

9    what that says and then get the parties input from there

10   and then issue it either later tonight or tomorrow.

11           But I'm also planning to take the Glubian Totaro

12   (phonetic) matters out of order and then there's one other

13   matter on calendar that I -- it's to do with a Cherry Mann

14   (phonetic) case that I plan to take out of order and then

15   get to Itkin and Sabadash.  My hope would be that that

16   will -- I'll be able to get back to Itkin and Sabadash by

17   2:45 and I will promise you that I won't get to it before

18   that, so if you need to leave the courtroom, do other

19   things, you can do that.

20           (Recess from 2:30 p.m. to 2:46 p.m.)

21           THE COURT:  Okay.  I think that's everything on

22   the 2:00 p.m. calendar, except for the Itkin & Sabadash

23   matters.  Is there anyone I've missed who wishes to be

24   heard on any of the other matters?

25           (No response.)

Page                                                        5

1              Okay.  Hearing no response, that brings us to

2      Itkin & Sabadash.  So we start by getting -- and I should

3      say, related -- the related matters, there's no appearance

4      required in Golden Sphynx and the Sabadash individual

5      bankruptcy case.

6              So let me start by getting appearances.

7      Mr. Zorkin?

8              MR. ZORKIN:  Yes.  Michael Zorkin for putative

9      partner Alexander Sabadash.

10             THE COURT:  Thank you.

11             Mr. McCarthy?

12             MR. McCARTHY:  Good afternoon, Your Honor.  Dan

13     McCarthy for petitioning general partner, Gary Itkin.

14             THE COURT:  Thank you.

15             Mr. Caceres?

16             MR. CACERES:  Yes.  Good afternoon, Your Honor.

17     Joseph Caceres, Caceres and Shamash, LLP, for the various

18     claimants that were subject to the objections to claims.

19             THE COURT:  Thank you.

20             Mr. Ramlo.

21             MR. RAMLO:  Good morning -- good afternoon, Your

22     Honor.  Kurt Ramlo for the joint liquidators and foreign

23     representatives of Golden Sphynx Limited.

24             THE COURT:  Thank you.  And Mr. Ramlo, you're

25     coming through pretty faint, so just for future reference.

Page                                                          6

1          Anyone else who wishes to state an appearance in

2     this matter at this time?

3          (No response.)

4          Okay.  So I posted the tentative ruling, which

5     wasn't posted until 8:41 or 2 or something this morning.

6     Stated that I anticipated issuing a written tentative

7     ruling for dismissal of this matter before this hearing,

8     but I've had an inordinate matters today that have gone on

9     a little longer than typical.  A lot of *pro se* stuff, too.

10    So what I mentioned before -- before one of the breaks was

11    that I was expecting to read you the gist of the written

12    ruling that is drafted and not quite finalized.  So give me

13    a moment and I will do that, unless somebody tells me that

14    there's something that moots all of this and then I will

15    hear from the parties.  Okay.  Just a moment.

16                              (Pause)

17         Okay.  Let me see.  What I've got here is

18    currently 21 pages, so I don't want to spend the time to

19    read through all of those pages, so let me see if I can

20    summarize it and then if I'm skipping over anything that

21    any of you want to hear more about, let me know.

22         So Mr. Sabadash has asserted that the alleged

23    partnership, Itin & Sabadash, never existed and that,

24    therefore, this Court lacks jurisdiction because the

25    purported partnership isn't a "person" that can be a debtor

Page                                                                7

1   under the Bankruptcy Code.  In the alternative, he argues

2   that there's at least a *bona fide* dispute about the

3   existence of any partnership and hence, about the existence

4   of any purported debts on the part of the partnership.

5   And, therefore, he argues that the Court can't grant the

6   involuntary petition, because 363(h) requires that only

7   debts that -- that there's -- debts aren't being paid or

8   generally not being paid, but counting only debts that are

9   not subject to a modified dispute, and if they're all

10  subject to *bona fide* dispute then there's no way to make

11  that finding.

12          All right.  Mr. Itkin's counter-arguments are

13  principally that the existence of the alleged partnership

14  has been determined by courts in both Russia and California

15  and Mr. Sabadash presents not visible evidence to the

16  contrary and, alternatively, that the involuntary petition,

17  which has now been joined in and supported by several

18  alleged creditors, states at least a plausible claim for

19  relief or, alternatively, there's a genuine dispute of

20  material fact regarding the existence and so granting

21  summary judgment wouldn't be appropriate.

22          Mr. Sabadash counters this last argument

23  asserting that if there is a genuine dispute, that just

24  proves the point that then there is a *bona fide* dispute

25  about the issues and, therefore, that 363(h) -- 303(h) is

Page                                                                    8

1   not satisfied.

2          Okay.  So there are related procedural disputes

3   and so on.  My -- what I'm inclined to do is to -- because

4   the -- I think the issues under 303(h) and, for that

5   matter, whether the partnership is a person or not that

6   qualifies under the Bankruptcy Code, those issues are

7   intertwined with the jurisdictional issues and, therefore,

8   I don't think I can follow the case law under 12(b)(1) that

9   says that I can consider some factual matters without

10  converting it into a summary judgment motion.

11         So I think I have to analyze everything under the

12  summary judgment standard.  Procedurally, I'm not persuaded

13  that there's been any unfairness to Mr. Itkin.  In terms of

14  Rule 56 procedure as a practical matter Mr. Itkin has had

15  additional time.  He's submitted a supplemental brief.

16  That would be more time than he would have had anyway in

17  normal procedures in Rule 56.  The lack of proposed --

18  well, a statement of uncontroverted issues has not been

19  shown to have caused any prejudice and, in the interests of

20  justice and in the interests of handling this matter in a

21  timely fashion and because the parties are well represented

22  and I -- again, I don't see any prejudice, I have the

23  authority to waive any technical non-compliance with the

24  Local Rules, and I think it's appropriate to do so in terms

25  of the timing on the -- and procedures for the Rule 56

Page                                                              9

1    disposition.

2              In terms of evidentiary issues, I'm inclined to

3    sustain a number of the objections by Mr. Itkin to the

4    evidence if I were to take the evidence that's submitted

5    for the truth of the matters asserted, but it seems to me

6    that for the most part what I'm being asked to do is just

7    to recognize that positions have been taken in other

8    litigation that would show that the matter has not been

9    waived and that there is actually room for a *bona fide*

10   dispute as to the validity or amount of claims for purposes

11   of 303(h).

12             And so for those purposes, it seems to me that

13   the -- I can properly take account of a number of the

14   papers that were pointed to by Mr. Sabadash.  I don't think

15   that includes the -- how to describe it because I don't

16   have this right at my fingertips, but the chart that

17   shows -- the organizational chart that shows Mr. Sabadash

18   as 100 percent owner, my recollection is that that was a

19   color chart that was then presented in black and white to

20   somebody at a deposition and also presented through an

21   email from an attorney to another party, and it seems to me

22   it's too many steps removed.  It's not the sort of -- it

23   doesn't fall under the category of the other matters that I

24   was describing that are pleadings that are simply pointed

25   to, to show that there is a dispute and that the dispute is

Page                                                                10

1   *bona fide*.

2         So moving on, I won't recap the standards under

3   Rule 12(b)(1) and Rule 56, but I will note that in terms of

4   the standards applicable to dismissal of an involuntary

5   petition, the burden is on the petitioning creditors to

6   show that no *bona fide* dispute exists under binding Ninth

7   Circuit precedent and then there's a *bona fide* dispute of

8   an objective basis for either a factual or a legal dispute

9   exists as to the validity of the debt -- excuse me -- then

10  the BAP decision, the *Leong Partnership* decision affirmed

11  by the Ninth Circuit on different grounds, but the BAP's

12  decision I think is instructive and it describes the

13  slightly convoluted analysis here that the issue before me

14  is whether there is a genuine dispute that the claims

15  asserted against the alleged debtor are disputed, that

16  there's a -- no genuine dispute about a *bona fide* dispute.

17  And so with those preliminary remarks, let me get to the

18  main arguments.

19        I am not persuaded that preclusion applies, that

20  the -- either the decisions of the Russian court -- of

21  courts, plural, or of the California state court

22  established the existence of a partnership.  Here are my

23  reasons for that.

24        First of all, under 28 U.S.C. 1738 and the cases

25  interpreting it, I believe I need to apply California

Page                                                          11

1  preclusion law and so the issue needs to be identical to

2  that decided in the other proceeding.  It has to be

3  actually litigated, necessarily decided, final and on the

4  merits and the party has to be the same or in privity with

5  the party of a formal proceeding.  That's all from *Lucido*

6  *v. Superior Court*, 795 P.2d 1223 at 1225, (CA Supreme Court

7  1990).

8            And then even if all five of those elements are

9  satisfied, preclusion is only appropriate if the

10 application preclusion furthers the public policies

11 underlying the doctrine and those policies are preservation

12 of the integrity of the judicial system, promotion of

13 judicial economy and protection of litigants from

14 harassment by vexatious litigation.

15           Okay.  There's a bit of a gloss on some of those

16 things.  They actually litigated prong, for example, can be

17 a default judgment and -- but I won't get into the details

18 right now.  Those are the -- that's the outline.

19           I don't interpret the Russian court's decisions

20 as being preclusive for a number of reasons.  First of all,

21 on their own terms the Moscow arbitration court did rule in

22 favor of Ms. Elena Gofman and against a -- what it

23 described as a partnership of Itkin & Sabadash in the

24 amount of 800,000 rubles based on failure to pay Ms. Gofman

25 for consulting services she claimed to have performed for

Page                                                                    12

1    the partnership.  And the Moscow arbitration court's

2    judgment appears to support Mr. Itkin's arguments that a

3    partnership exists and that Mr. Sabadash, in fact, has

4    personal liability with Mr. Itkin for the partnership

5    debts.

6           The Court said in part that Ms. Gofman "may

7    request payment for services rendered from each of the

8    partners of simple partnership Itkin & Sabadash.  Once

9    personal financial liability is calculated, respective

10   shares in the partnership interest need to be taken into

11   consideration as per simple partnership agreement, namely

12   J. Y Itkin 33 percent, A.V. Sabadash 67 percent," and so

13   on.

14          So that's -- Mr. Sabadash appealed that judgment

15   arguing, among other things, that he'd been unable to

16   participate in the proceedings because he'd been

17   incarcerated, but in 2019 the Ninth Arbitration Court of

18   Appeal affirmed the judgment.  That court declined to

19   consider Mr. Sabadash's arguments in opposition to the

20   judgment.

21          But here's the important part for me; it's the

22   grounds on which it did so.  The Russian appellate court

23   ruled that the Moscow arbitration court had not, in fact,

24   made any decision as to the rights and obligation of

25   Mr. Sabadash, including whether he was deemed to be a

Page                                                                    13

1  member of the alleged partnership.  The appellate court

2  said Mr. Sabadash's position is that the Moscow arbitration

3  court made its decision as to his rights and obligations

4  "deeming him to be a member of the simple partnership Itkin

5  & Sabadash, which is factually incorrect."  And then it

6  went on to say the panel of judges believes that the

7  decision of the trial court "does not address

8  Mr. Sabadash's personal rights and obligations," and

9  there's no reference to his personal rights or obligations

10  in either of the "resolutive or the declarative parts of

11  the court decision."  Those parts.

12          So I read all of that to mean that the quoted

13  language from the Moscow arbitration court is dicta.  The

14  resolutive and declaratory part of the Court's decision

15  revealing with other things the dicta was about the

16  existence of the partnership and that language that I

17  quoted about personal financial liability of 67 percent of

18  the partnership's debts for Mr. Sabadash that that was

19  dicta.

20          That would explain why the appellate court says

21  there was no "decision" in the "resolutive or the

22  declaratory parts" of the judgment, either the existence of

23  the partnership or Mr. Sabadash's personal rights and

24  obligations.

25          So because of that, I interpret the Russian

Page                                                                14

1   courts looking at what was before them and saying that they

2   had a written contract that purported to be between Ms.

3   Gofman and the alleged partnership and they ruled the

4   contract was enforceable, leaving for another day disputes

5   between Mr. Itkin and Mr. Sabadash about their respective

6   liabilities, including whether or not the alleged

7   partnership is between them even existed or whether, as

8   Mr. Sabadash alleges, Mr. Itkin forged his signature on the

9   contract with Ms. Gofman.

10         So in any event, even if I'm wrong about that

11  interpretation of what was really going on there, I don't

12  think I can get beyond the Russian appellate court's

13  holding, which seems clear that any assertion that an

14  actual decision had been made about the existence of the

15  alleged partnership, Itkin & Sabadash, was "factually

16  incorrect."

17         Now, Mr. Itkin argues to the contrary citing a --

18  what's called an information summary issued by a single

19  deputy presiding judge of the Russian appellate court.  But

20  Mr. Itkin cites no authority that the information summary,

21  whatever that is, qualifies as a judgment or a decision

22  that would be entitled to preclusive effect, especially

23  when that summary doesn't explain any of the issues that

24  I've gotten into about why I read that what seems to be a

25  plain statement of the Russian appellate court that it's

Page                                                              15

1    factually incorrect to assert that any decision was made

2    about the existence of the partnership.  There's no

3    explanation squaring the summary with that holding, not

4    even an attempt to address that.

5              So alternatively, supposing for the sake of

6    argument the rulings of the Russian courts did, in fact,

7    affirm the existence of the alleged partnership of Itkin &

8    Sabadash which, again, I don't believe they did.  The --

9    I -- it seems to me that the existence of any partnership

10   at the time of Ms. Gofman's litigation is irrelevant to

11   whether any such partnership continues to exist today and

12   thus, whether the alleged partnership is currently a person

13   that's eligible to be a debtor in bankruptcy or whether it

14   existed at other times in connection with other purported

15   debts that are now attempted to be enforced.

16             And the Moscow arbitration court's judgment found

17   that Ms. Gofman's services were performed from February

18   2004 to December of 2006 and so that is consistent with the

19   partners, assuming for the sake of discussion if they ever

20   were partners, could have held themselves out as a

21   partnership only to Ms. Gofman and only during that time

22   period.

23             In fact, supporting all of this, Mr. Itkin has

24   testified in other litigation between him and the

25   Sabadash's related entities that the partnership ended in

Page                                                                16

1   2016, which illustrates the point that the partnership

2   doesn't necessarily exist today, doesn't -- didn't

3   necessarily exist as to any other persons or any other

4   debts.

5            And finally, assuming for the sake of

6   discussion -- this is yet another alternative -- that the

7   Russian court's rulings did, in fact, undermine the motion

8   to dismiss, which I'm not persuaded to do but that, that

9   would have been a basis for Ms. Gofman to have filed a

10  written opposition to the motion to dismiss on that basis,

11  but she didn't file any such opposition.  It's Mr. Itkin

12  who has filed an opposition and he hasn't cited authority

13  that he's in privity with Ms. Gofman for this purpose.  In

14  fact, to the contrary, his papers cite authority that the

15  offensive use of privity by one partner against another

16  partner based on determinations against the partnership is

17  not permitted.

18           And so it seems to me that the Russian court

19  decisions are not determinative of the issues before this

20  Bankruptcy Court nor would the state court, the Los Angeles

21  Superior Court's recognition of a foreign judgment that

22  involves Ms. Gofman be binding on this Bankruptcy Court for

23  the different issue, not of enforcement of that judgment

24  but for the issue of whether there's a *bona fide* dispute as

25  to the existence of the partnership and, hence, the

1  existence of the debts.

2          And layered on top of all of that is a public

3  policy concern that if all of this is a misinterpretation,

4  assuming for the sake of discussion that I'm somehow

5  misinterpreting the Russian appellate court and, for

6  example, that it wasn't saying that this is dicta and it

7  was simply on some other basis preventing Mr. Sabadash from

8  being able to argue his position, there isn't any

9  sufficient explanation to square with California public

10  policy.  It seems to me that the -- any rule of decision

11  that says you can't be heard because you're not really

12  involved in this, but you are involved in this and,

13  therefore, we're going to sock you with liability and that

14  liability can't later on be challenged because this is

15  preclusive, that that would not be consistent with

16  California law -- California principles of preclusion.

17          So that to me resolves the issue of preclusion

18  and then we've got the issue of, well, if there's not

19  preclusion is there evidence one way or the other.  And on

20  the evidence Mr. Itkin relies on a document entitled

21  "Minutes of the Meeting of Partners of Simple Partnership

22  Itkin & Sabadash" dated February 12, 2004 -- and this is

23  prepared by and at the behest of the same Ms. Gofman who

24  holds a claim against the partnership -- and supposedly,

25  Mr. Sabadash later signed the minutes, although he says

Page                                                    18

1  this was forged.  I note that there are a number of things

2  that call into question and, to me, raise at the very least

3  genuine issues of material fact about whether that document

4  and other documents are genuine and whether, in fact, a

5  partnership exists.

6           I start with the overall issue that is pointed

7  out by Mr. Sabadash in his papers, that it seems astounding

8  that a sophisticated businessman like Mr. Itkin would agree

9  to an arrangement involving very serious dollars or very

10 serious amounts of money in whatever currency without

11 having anything in writing.  There is some evidence that

12 the parties needed to keep some things secret either for

13 purposes of compliance with Russian law about who can serve

14 in the Duma or other reasons, but that particular issue

15 came up much later when Mr. Sabadash was elected to the

16 Duma.

17          Beyond that, there's some indication -- well,

18 there's no allegation, let alone evidence, of reasons why

19 this couldn't have been put into writing.  And even if

20 something shouldn't be publicized for various reasons,

21 legitimate or illicit, in other words, trying to evade laws

22 or for legitimate legal purposes, either way, it's one

23 thing to not want to have something published, but it's

24 another thing to not have an agreement, even as between the

25 two parties involved.

Page                                                        19

1        So for large dollar amounts to be involved and

2   yet no writing is surprising to begin with, beyond that

3   they -- Mr. Itkin asserts in his current declaration that,

4   in fact, large dollar amounts maybe were not involved.  He

5   doesn't make this quite as plain as this, but I'm picking

6   up on something that he said there, that when he was first

7   living in -- when he first moved to Moscow that he was

8   living in a squalid apartment and so on, but he testified

9   in other proceedings that he was getting $50,000 a month

10  from the start or very near the start.  Those things don't

11  mesh or at least not without a much better -- well, some

12  explanation and there's none, but any explanation would

13  have to be pretty good to explain how those things would

14  mesh.

15       So I come back to it certainly seems as if from

16  the very inception there were at least promises, according

17  to Mr. Itkin made of four million dollars a year, lots of

18  money, $50,000 a month being actually received, four

19  million dollars a year being supposedly promised and yet

20  none of this is in writing.  Okay.  So that's one major red

21  flag.

22       Another thing is that the minutes themselves,

23  they document that Mr. Itkin relies on, talks about how he

24  is being persuaded to enter into this supposed partnership

25  for purposes of effectively managing assets contributed to

Page                                                                        20

1    the partnership by Mr. Sabadash, so there's no question

2    that Mr. Sabadash is contributing the assets.

3            And then the minutes go on to say, Gary Itkin

4    made a commensurate contribution to the partnership by

5    virtue of his academic background.  Well, that's a heck of

6    a payoff for an academic background, four million dollars

7    minimum payment a year for an academic background.

8    Professional experience.  Again, you can hire a whole lot

9    of lawyers and really good accountants for four million

10   dollars a year.

11           Business reputation and connections.  Well, in

12   terms of connections and any sort of business

13   representation that could accomplish anything, again,

14   there's inconsistent testimony.  There's testimony that in

15   the latest declaration that Mr. Itkin was involved in

16   helping to expand the Russian operations so that they could

17   look to markets outside of Russia, for example.

18            I'm not sure that there's a whole lot more

19   detail than that, but there -- but in any event, he was

20   involved to some extent.  But then there's other testimony

21   that says he wasn't involved in the finances in Russia and

22   he didn't know where the money came from.

23           So whatever connections he had don't seem to have

24   been terribly connected to the primary source of revenues.

25   Now, he does seem to have managed assets through indirect

Page                                                         21

1   ownership that were held elsewhere, such as the mansion in

2   Beverly Hills that's been the subject of other proceedings

3   before this Court.  But that's not an asset that jumps out

4   right away as requiring lots of management or generating

5   revenue or anything that would warrant four million dollars

6   a year of minimum compensation.

7           And similarly, Mr. Itkin doesn't point to

8   anything else that would support this notion set forth in

9   the minutes that somehow he made a commensurate

10  contribution to that type of level of compensation, whether

11  it's through his business connections or anything else.

12          Mr. Sabadash points to a number of other problems

13  with various documents that are relied upon by Mr. Itkin or

14  the evidence that Mr. Itkin points to.  But without going

15  through each and every item, it seems to me that based on

16  the papers presented and the evidence that's been

17  presented, including just the evidence presented by

18  Mr. Itkin himself, so regardless of what the ruling might

19  be on any evidentiary objections -- and again, I'm inclined

20  to sustain a number of them, but not all -- but even if I

21  were to sustain all of the evidentiary objections, it seems

22  to me the evidence presented by Mr. Itkin himself is

23  sufficiently subject to challenge and suspect on its face

24  that there is at least a *bona fide* dispute about the

25  existence of any debts of the alleged partnership because

Page                                                                22

1   there's a *bona fide* dispute about the existence of any

2   partnership at all.

3            So for all of those reasons, I am prepared to

4   grant the motion, which I view is a motion for summary

5   judgment or for abstention, but it could also be

6   alternatively if it were viewed as a motion to dismiss,

7   would for the same reasons grant that as well.  And for the

8   same reasons, it seems to me it's appropriate to abstain

9   because if I am going to take the approach that I've

10  outlined, then I don't reach the -- whether I'm actually

11  denying the claim objections or not -- sustaining the claim

12  objections or not.  I am simply ruling that there is a *bona*

13  *fide* dispute and, therefore, as to any alleged claims

14  because there's a *bona fide* dispute about the existence of

15  the partnership and, therefore, that it's impossible to

16  make a finding that the debtor is not paying its debts that

17  are not subject to *bona fide* dispute that it's generally

18  not paying those debts.  And, therefore, I have to dismiss

19  the bankruptcy petition or, alternatively, it's appropriate

20  to abstain and let the -- principally the Jersey court, but

21  possibly other jurisdictions decide other disputes between

22  the parties.

23           So those are the matters addressed in the written

24  disposition that I have not finalized.  And let me hear now

25  from the parties as set forth in the tentative ruling.  I'm

Page                                                              23

1  not -- I think that we already had some argument about

2  these issues and so I'm not inviting re-argument on them.

3  Instead, I want to focus more on whether anyone thinks

4  that, for example, I've mixed up too parties or I've

5  decided something that's material that's incorrect or --

6  and also, any procedural issues that we should be dealing

7  with post-dismissal.

8            So let me start with Mr. Zorkin, actually, and

9  then turn to Mr. McCarthy and anybody else who wishes to be

10 heard, probably Mr. Caceres.

11           So Mr. Zorkin, go ahead.

12           MR. ZORKIN:  Thank you, Your Honor.  The only --

13 I only have one issue.  As far as the chart that Mr. Itkin

14 did to Mr. Sabadash, which is Exhibit 7 of the motion, it

15 is actually -- Exhibit 7 itself is actually an email from

16 Mr. Itkin to Mr. Sabadash's attorney attaching the chart,

17 so I would submit that this is an opposing party statement

18 and is not hearsay, so hearsay objection should be

19 overruled.

20           Other than that, I don't -- I didn't hear

21 anything factually inaccurate from what the Court just said

22 and that would -- just like to have a couple of minutes to

23 address anything the other party says.

24           THE COURT:  Thank you.

25           Mr. McCarthy.

Page                                                              24

1              MR. McCARTHY:  Thank you, Your Honor.  My

2    comments mostly have to do with procedural issues, what

3    Your Honor said substantively.  I do want to start out by

4    saying the *Leong Partnership* case, which Your Honor noted

5    and the other party has relied upon, presented

6    circumstances that were extremely different than what you

7    had before you.  The judge in the decision said that the

8    evidence was uncontradicted as to whether there was a *bona*

9    *fide* dispute.  And the issue of whether there was a

10   partnership in dicta, the Court said that the statements

11   that the partner creditor relied on were "equivocal at

12   best."

13              Well, Your Honor, in that case there was no

14   evidence to support the position taken and I think we have

15   something very different in this case.  And so the question

16   becomes drawing a line on where you have a *bona fide*

17   dispute or just a dispute.  And so as a matter of procedure

18   when there are disputes on the validity of an involuntary

19   petition, ordinarily they're set for a evidentiary hearing

20   if there's evidence to get by summary judgment.  And I

21   would, with due respect, suggest that there is enough

22   evidence to get by summary judgment, even under the

23   standard that *Leong* stated, which Your Honor described as

24   somewhat awkward in stating.  There has to be no genuine

25   dispute that there is a *bona fide* dispute, we think is the

Page                                                                25

1    way the Court said it.

2              So regarding the evidence, Your Honor, one of the

3    things that I expressed at the last hearing was my

4    frustration that all the evidence that we had presented in

5    our opposition, which Mr. Sabadash and Mr. Zorkin were

6    familiar with because they were trial exhibits in the state

7    court action and presented with cross-motions for summary

8    judgment weren't addressed until the reply brief.  And I

9    felt that that was unfair to my client.  My client had no

10   chance to respond in writing and I made that point to you

11   in my request for permission to file a supplemental brief

12   in which I stated there are a lot of issues that were

13   argued for the first time in the reply brief, but there was

14   one in particular that I thought was very important to

15   bring to your attention, which was the reason for the

16   information summary, which Mr. Zorkin discounted and

17   disparaged.

18             And, Your Honor, yourself mentioned it and you

19   weren't quite sure what it was from the judge, but it's

20   from a judge of the very same court that issued the prior

21   decision and it was in response to a request for

22   clarification of that decision.  Your criticism of the

23   information summary seems to be that the judge didn't go

24   far enough in trying to square what the judge was saying in

25   the information summary with the prior ruling, but it's

Page                                                               26

1    clear that it's a clarification of the prior ruling and it

2    was final.  The clarification wasn't further appeal, so I

3    just wanted to clarify that, what the procedure on that

4    was.

5              So anyway, I was frustrated with the lack of

6    opportunity to respond in writing to what Mr. Zorkin had

7    argued for the first time in his reply brief.  And I had a

8    lot to say about some of that evidence and his responses,

9    which we actually didn't get into at the last hearing.  We

10   had a very short hearing.

11             But I want to note something, Your Honor.  You

12   were critical of a lot of Mr. Itkin's evidence in what you

13   just stated, questioning, for example, the -- why would the

14   partnership agreement be worded the way it was, that Mr.

15   Itkin's statement that partnership had terminated.  These

16   are things that he explained in his declaration.

17             But here's what's important about that, Your

18   Honor.  Your criticisms of that evidence -- and I

19   understand them -- but they're different than what was

20   argued in the motion or in the reply.  So now it's a

21   situation where I didn't have a chance to respond to what

22   Mr. Zorkin said for the first time in the reply and I'm

23   being presented with your questioning of Mr. Itkin's

24   evidence and also some reliance on inadmissible evidence

25   submitted by -- by Mr. Zorkin, again without a chance to

Page                                                          27

1   respond in writing.

2          But I'll just give you on example of that, Your

3   Honor.  When the reply brief talked about the written

4   confirmation of the partnership from February 2004, which

5   Ms. Gofman drafted, the criticisms in the reply brief was

6   that it was forged, no evidence; that it was in the same

7   style and pen, so that was the suggestion that there might

8   be forgery, no evidence, no comparison; that there was a

9   conspiracy between Mr. Itkin and the Russian attorney Elena

10  Gofman, no evidence, just an accusation; and that the

11  Russian version was illegible, although it was translated.

12  So it was legible enough to be translated and I don't read

13  Russian, but it seemed like pretty clear Russian letters to

14  me but, in any event, it was translated into English and

15  that's what is required to be submitted to a court in the

16  U.S.  Those were the criticisms of that in the reply brief.

17         Your criticisms of it are a little bit different

18  and there's evidence that you didn't mention that Mr. Itkin

19  had presented as well, annual reports from Ms. Gofman to

20  the partnership, cash flow statements that Mr. Itkin had

21  prepared for the partnership for a five-and-a-half-year

22  period, and there was other evidence, too, especially the

23  detail in his declaration as to background.

24         So the issue procedurally, Your Honor, there was

25  plenty of evidence that was presented by Mr. Itkin, some of

Page                                                          28

1  which was criticized in the reply brief, some of which

2  you've criticized and we have not really had an opportunity

3  to explain to you why those criticisms are unfair.

4          Now, a few other things procedurally.  The

5  supplemental brief that I asked for leave to file, I would

6  ask that you at least grant that so it's part of the

7  record.  And also, I'd ask for evidentiary rulings.  You

8  know, for example, the suggestion is made that there was

9  forgery.  That's what Mr. Sabadash claimed.  Well, what

10  admissible evidence of that?  A declaration from a state

11  court action or declaration from his wife from a state

12  court action?

13          I'll give you another example of testimony that

14  was carefully cited in the reply brief.  There were Exhibit

15  13 to Mr. Zorkin's declaration attached to the reply brief

16  with a supplemental response to request for documents,

17  but -- and he selectively cited one request or one

18  response, I should say.

19          But if you go through the responses, they

20  repeatedly refer to the partnership with Mr. Sabadash.

21  Well, he didn't note those points about the supplemental

22  response.  Exhibit 14 was a supplemental response to

23  special interrogatories.  They also repeatedly refer to the

24  partnership with Mr. Sabadash.  And these are from 2019,

25  Your Honor.  And the interrogatory responses identified

1   witnesses with knowledge of the partnership.

2           Mr. Ratner's deposition was something else that

3   was attached for the first time to the reply brief.  And

4   again, there are selective citations to the deposition

5   transcript, but there are also portions of the part that

6   Mr. Zorkin submitted where Mr. Ratner testified that Itkin

7   informed him of a proposed partnership that would own

8   corporations.  Mr. Zorkin didn't point that out.  And when

9   Mr. Ratner filed his opposition to the objection to his

10  claim which, in part, was based on the existence of the

11  partnership, Mr. Ratner attached other relevant portions of

12  his deposition transcript that Mr. Zorkin didn't present to

13  you and that we didn't present to you because we didn't

14  have a chance to in response to the reply where Mr. Ratner

15  testified repeatedly to being aware that there was a

16  partnership and being told about that.  That's the problem

17  with, in violation of the Local Rules, presenting evidence

18  for the first time in reply brief and not giving the other

19  party a chance to respond to them.

20          So that's the procedural issue, Your Honor.  I

21  just -- I believe that we haven't had affidavit air due

22  process opportunity to respond to the new evidence and

23  arguments submitted with the reply and, in part, to some of

24  the ways that you've discounted the evidence that Mr. Itkin

25  has cited and also relied upon what I think is inadmissible

Page                                                              30

1    evidence that Mr. Zorkin presented.

2            One final thing, Your Honor.  On the abstention

3    issue, we did actually have a little bit of an opportunity

4    to argue about that at the last hearing and in your

5    statements that you just summarized you said alternatively

6    abstention could be a basis for my decision.  And I'm

7    wondering if your memorandum of decision intends to go into

8    any detail on abstention or that's just going to be another

9    one-liner at the end.

10            THE COURT:  Well, because it's at the end that's

11   the part that I haven't finished drafting, so I don't know.

12   Okay.

13            MR. McCARTHY:  Let me just make one point, Your

14   Honor, about that.  Under 305(a)(2) if you were to invoke

15   an abstention, you have the alternative remedies of

16   dismissal or suspending the case.  You're not required to

17   dismiss it and relief under 305(a)(2) is rarely granted.

18   One of the reasons for it is you can't appeal that to the

19   Court of Appeal.  Your only appellate remedy is to the

20   District Court or the BAP (phonetic) and so bankruptcy

21   courts are careful about issuing that remedy.

22            And here's what I think if you were to consider

23   that remedy, the proper remedy would be suspension and not

24   dismissal of the case.  And there were several reason for

25   that and perhaps you'd like to address that, you know, when

Page                                                              31

1   you finalize your memorandum.  There are creditors of the

2   partnership.  They've been objected -- their claims have

3   been objected to, but they hold millions of dollars of

4   claims that they believe are owed by the partnership.

5   You're not getting to those objections today because I --

6   because you, you know, view those as moot given the ruling.

7          But Mr. Caceres presented compelling opposition

8   to those objections presenting detailed evidence of why

9   there was no *bona fide* dispute as to many claims of

10  creditors who joined the petition and their claims alone

11  are additional evidence of the fact that there's a

12  partnership.

13         The fact that there are creditors of the

14  partnership is one reason that I think the better remedy

15  would be to suspend this proceeding, rather than dismiss

16  it.  Those creditors are not creditors of Golden Sphynx

17  Limited.  They're not protected in the Jersey litigation.

18  They only can be protected in a bankruptcy of Itkin &

19  Sabadash, the one that we filed.  And that -- you may get

20  to the point, depending on what happens in Jersey, where

21  this ends up coming back to you in connection with the

22  involuntary case where decisions need to be made.

23         Well, think, for example, the Jersey court held

24  that there was a partnership and that -- but that it can't

25  do anything to help the creditors of that partnership.

Page                                                          32

1           Well, if you had a suspended case you could then

2    look at those developments and say, yeah, I should consider

3    that in deciding how to proceed.  In other words, take a

4    wait-and-see approach as you had in connection with the

5    Golden Sphynx case, to see how things proceeded in Jersey

6    before deciding what to do in the United States.

7           Well, the same thing applies to the Itkin &

8    Sabadash partnership.  I think it's just a -- it's better

9    to wait to see what happens before dismissal, instead

10   suspended in the meantime.

11          And one final reason -- and we argued this

12   against abstention -- you have a partnership that's

13   governed by California law concerning California property

14   that was the subject of a California action where Mr. Itkin

15   was seeking dissolution.  The Jersey court may finally end

16   up telling you, you know what, although it didn't before

17   when you asked for assistance, the Jersey court may end up

18   telling you, you know what, we're not experts on California

19   law.  We need a California judge or a bankruptcy judge in

20   California to address these issues.

21          So I would suggest that you leave the issue open

22   how this case is going to be wound up by merely suspending

23   instead of dismissing if you're going to consider a remedy

24   under 305(a)(2).  And that's the last procedural point I

25   wanted to make.

Page                                                                    33

1              THE COURT:  Thank you.

2              Mr. Caceres.

3              MR. CACERES:  Yes, Your Honor.  First, I'd like

4    to join in Mr. McCarthy's arguments there.  I think, if

5    anything, the Court should set an evidentiary hearing.  I

6    understand that Mr. Zorkin would argue that there's a *bona*

7    *fide* dispute, but they can't be, that the mere fact that he

8    says there is one and he submits certain -- we think the

9    fact of evidence that there is a *bona fide* dispute can

10   carry the day without the Court first examining all the

11   facts and evidence and deciding whether these claims, for

12   example, the existence of a partnership doesn't really

13   exist.  Otherwise, we run into the danger of any claimant

14   or any objecting party to an involuntary being able to muck

15   up the proceedings simply by claiming there are *bona fide*

16   disputes as to creditors or as to whether a partnership

17   exists or so on, and throw out whatever they can to see

18   what sticks to the wall and, therefore, defeat any given

19   involuntary.

20             So I don't think that in itself should lead to

21   sort of a summary dismissal and this is a motion for

22   summary judgment for that is what essentially the Court

23   would be doing.

24             Now, the second and I think maybe even more

25   important point is that I'm looking at these decisions and

Page                                                              34

1    the Court cited these decisions are attached to a

2    declaration of Elena Gofman, so I can cite the Court to the

3    specific exhibit pages.  The declaration of Ms. Gofman

4    was -- that I filed as docket number 62, Exhibit C, I think

5    is the decision the Court is referring to the ruling of

6    the -- of the Ninth Arbitration Court of Appeals.

7              Then on pages -- Bates stamped pages 33 and 34 to

8    that declaration at docket 62, I think what the Court is

9    saying, if I understood you correctly and there's a lot

10   there to digest, is in reading the following language:

11             "The appellee's position is that the court made

12       its decision as to applicant's rights and obligations

13       deeming A.V. Sabadash to be a member of the simple

14       partnership Itkin & Sabadash, which is factually

15       incorrect."

16             When the court said that, I don't think that they

17   meant that the existence of Itkin & Sabadash was factually

18   incorrect.  I think what they meant was that the decision

19   by the lower court was not determining Mr. Sabadash's

20   individual rights as opposed to whether there was

21   partnership or not.  The lawsuit by Ms. Gofman was against

22   the partnership, not against Mr. Sabadash personally and I

23   think that's what the court was trying to get to.

24             The next line bolsters and it says:

25             "The panel of judges believes that the decision

Page                                                              35

1          of the trial court does not address Mr. Sabadash's

2          personal rights and obligations."

3              That's correct.  It didn't.  It only addressed

4    Itkin & Sabadash, the partnership's obligations.

5              The next sentence:

6              "There is no reference to Mr. Sabadash's personal

7          rights or obligations in either the relative or

8          declarative parts of the court's decision."

9              That's correct.  There wasn't.  It was

10   determining the -- her rights as against the partnership.

11   And I think that's what this court was getting to and it

12   makes sense because every one of these Russian court

13   decisions -- and it went through, I think, four layers; a

14   trial court and three appeals -- every single one of them

15   said, Itkin & Sabadash exists.

16             So this can't be a statement that, well, no,

17   that's wrong.  Mr. Sabadash doesn't exist because if it

18   didn't exist how could the court have sustained

19   Ms. Gofman's judgment against Itkin & Sabadash if it was

20   saying here, no, it's incorrect, that partnership doesn't

21   exist.  That doesn't make sense to me.

22             The only way to make this make sense is to say

23   that this court was simply saying what I said, what I just

24   stated, that it was telling Mr. Sabadash your personal

25   rights weren't determined here, so you can't appeal this.

Page                                                           36

1  The partnership's rights were established or were effective

2  and the partnership exists.

3        And then the next line in this court decision,

4  "Furthermore, having an interest in the outcome of the

5  case," yeah, he has an interest in the outcome of the case

6  if he's a partner, "does not vest Mr. Sabadash who is not a

7  party to the claim." Correct. He wasn't a party to the

8  claim; the partnership was. "... with the right to appeal

9  the judicial ruling. Individuals who are not party to a

10 court action may appeal judicial rulings only a variable to

11 demonstrate that said ruling not only impacted said

12 individuals' personal rights and obligations, but that it

13 directly addressed those rights and obligations."

14       So it may have impacted him indirectly by virtue

15 of the fact that he's a partner of the partnership but it

16 wasn't addressing his rights and obligations personally.

17       Now, the Supreme Court decision, which affirmed

18 all this is Exhibit D to docket 62, Ms. Gofman's

19 declarations. This, I believe -- let's see. It's at --

20 let me make sure I have this right. It may be Exhibit E.

21 Yes, Exhibit E of Ms. Gofman's declaration at docket 62 at

22 Bates stamped page 46. The Supreme Court said as follows:

23       "The court of appeal in terminating proceedings

24       on the appeal of Sabadash, A.V., was guided by the

25       provisions of Article 42, 15264 of the Arbitration

1          Procedure Code, Code of the Russian Federation, by the

2          explications set forth in paragraph 2 of Decision 36

3          of the plenum of the Supreme Arbitration Court of the

4          Russian Federation, dated May 2029 -- 2009 on

5          application of the Arbitration Procedure Code of the

6          Russian Federation of the proceedings, Arbitration

7          Court of Appeal noting that an individual lacks the

8          right to appeal the decision of the trial court since

9          the decision did not concern his rights and

10         responsibilities."

11              The court also noted the interests of a person in

12    the outcome of the case does not by itself vest such

13    individual with the right to appeal the court's decision.

14    And then the court goes on to affirm the lower decision.

15              So I think that's the correct reading of these

16    decisions, Your Honor, and I would urge the court before it

17    makes any decisions to perhaps go back and maybe review

18    these sections, these Exhibit C and D that I attached to

19    that declaration of Ms. Gofman, and further consider that

20    before it finalizes any decision in this matter, as well as

21    the comments that Mr. McCarthy made that if we get past --

22    I think there is preclusion, so we get past that, then, of

23    course, the evidentiary issues that Your Honor cited still

24    exists and then we need an evidentiary hearing to decide

25    both issues as to whether there's a partnership.  And then

Page                                                                    38

1    if there's a partnership, of course, a lot of -- you know,

2    probably 70, 80 percent of Mr. Zorkin's or Sabadash's

3    objections to my client's claim goes away because a lot of

4    it, if not most of it, is based on his allegation that

5    there's no partnership.  We think there is a partnership

6    and that would, you know, significantly reduce any issues

7    to be considered in connection with those objections as

8    well.  Thank you, Your Honor.

9            THE COURT:  Thank you.  Mr. Ramlo, did you wish

10   to be heard?

11           MR. ZORKIN:  You're on mute.

12           MR. RAMLO:  Can you hear me now, Your Honor?

13           THE COURT:  Yes.

14           MR. RAMLO:  Sorry, Your Honor.  Again, Kurt

15   Ramlo.  I have nothing to add to the argument, Your Honor.

16   Thank you.

17           THE COURT:  Thank you.  Anyone else before I

18   return to Mr. Zorkin?

19           (No response.)

20           MR. ZORKIN:  Okay.  Mr. Zorkin.

21           MR. ZORKIN:  Thank you.  Just briefly, to address

22   the last thing that Mr. McCarthy said request to keep the

23   case in abeyance or suspension, Section 305 does not trump

24   Section 303, so there is a *bona fide* dispute.  There's no

25   way to keep the case in abeyance.  The Ninth Circuit in *In*

Page                                                                    39

1   *Re: Vortex* said the petition shall be dismissed, so there's

2   no way to do that with the finding of a *bona fide* dispute.

3            Another thing that has been brought up several

4   times, the reply did not violate the Local Rules.  The

5   Local Rules specifically allow introduction of evidence on

6   reply to respond to evidence in opposition.  So the -- it's

7   the opposition that brought up Ms. Gofman.  It's the

8   opposition that brought up Mr. Ratner, so it's permissible

9   to reply.

10           Another concern that's being raised again

11  multiple times is that this has not been mentioned before.

12  So in the state court litigation I personally filed two

13  motions in limine addressing Ms. Gofman's evidence, which

14  is the 2004 minutes of the partnership and 2004 contract

15  for services where, you know, I'm not going to -- I don't

16  want to admit to anything, but this motion is essentially a

17  copy-and-paste of those motions.  And all those arguments

18  were raised in the state court litigation that signatures

19  are fake, there is a -- there is a partnership seal that

20  misspelled Mr. Sabadash's name.  Those documents never

21  appeared during discovery.  Only appeared after discovery

22  was closed and Mr. Itkin never mentioned Ms. Gofman at his

23  deposition or in the discovery responses as a person who

24  knows about the partnership.  All of these were raised.

25           And as far as unfairness, Ms. Gofman submitted a

Page                                                        40

1  declaration in support of all of the creditors' claims,
2  proof of claims a few weeks ago.  In that declaration she
3  does not deny that the signatures are forged.  She doesn't
4  explain the partnership seal that misspells Mr. Sabadash's
5  name.  She doesn't explain why Mr. Sabadash's signature is
6  the only one that appears electronically affixed, which in
7  2004 in Russia I'm confident that Adobe Acrobat was not
8  available, and she doesn't deny that Mr. Itkin paid her
9  $21,000 personally from his account to her account exactly
10 at the time that she filed the lawsuit against the
11 partnership.
12          So the -- Ms. Gofman had all the opportunity in
13 the world to explain herself and she didn't do that.
14 There's no fairness and the -- all the rules have been
15 followed.
16          This information summary, again, that was
17 submitted and cited in opposition as a decision of the
18 Russian court, no one has ever heard of this.  This was
19 not -- whatever this was, let's assume -- give Mr. Itkin
20 the benefit of the doubt that this was an actual request to
21 an actual officer of the court in Russia.  This was not
22 served on anybody.  There was no opportunity for
23 Mr. Sabadash to get clarification.  There was no --
24 frankly, I just don't know how it came about, so I'm going
25 to leave it at that, but it definitely was not a proceeding

Page                                                                    41

1  that was -- that had any semblance of due process.  This

2  document just appeared.  It appeared now.  It did not

3  appear in the state court litigation.

4         And I think everything else that was said by my

5  colleagues is really just disagreement with the law.  The

6  Ninth Circuit law is very clear.  If there is any

7  legitimate dispute the petition must be denied.  It's

8  simply not an involuntary proceeding.  Thank you.

9         THE COURT:  Okay.  Thank you.

10         MR. CACERES:  Your Honor, may I respond just

11  briefly to that?

12         THE COURT:  Yes, just very briefly.

13         MR. CACERES:  Okay.  All this stuff about Gofman

14  didn't deny forgery, she didn't deny this, she has a

15  judgment.  Okay.  And you know what?  Sometimes courts make

16  wrong judgments, but as a litigant you're still bound by

17  that judgment.  Your remedies are appeal it, go through the

18  normal channels if you think the decision was wrong, but

19  you can't just say, eh, I think it was wrong so, therefore,

20  I don't have to obey it, I'm not bound by it.

21         That's essentially what Mr. Zorkin is asking you

22  to accept.  The documents went through several layers of

23  appeals domesticated in Los Angeles.  It should have

24  brought this up earlier and let those courts that had the

25  cases before then determine if any of that stuff is true,

Page                                                                42

1   number one.

2           Number two, this is -- even if you could consider

3   that now and weren't bound by these judgment, it's --

4   there's no -- he has no evidence other than Sabadash's

5   opinion or the lawyer's opinion that he saw two signatures

6   and they looked different.  There's no proof, no

7   handwriting experts, nothing.  There's no evidence of any

8   of this, even if Ms. Gofman needed to refute it, which she

9   doesn't.  She has a judgment.  He's bound by it.  Should

10  have appealed it earlier and that's the whole point of the

11  preclusion doctrine.  Thank you.

12          THE COURT:  Okay.  Give me a moment to make a

13  note.

14          All right.  Well, what I'm going to do is take

15  this under submission, see about whether I'm going to

16  finalize the written disposition that I talked about or

17  whether I will make that a written tentative ruling that

18  then gives an opportunity for any further response.

19          I'm leaning against that.  I'm leaning against

20  just dismissing.  And in response to Mr. McCarthy's points

21  about issues not having been raised until the reply or, to

22  some extent, not raised until I gave you my oral rulings or

23  tentative rulings in this hearing, a couple of things on

24  that.

25          In terms of the reply, I do think that Mr. Zorkin

Page                                                                    43

1   is correct that when matters are raised in the opposition

2   there's an opportunity to address them in the reply.

3   There -- it is possible to ask for a surreply.  In this

4   instance there was a request for a supplemental brief that

5   was, in fact, filed.  So I don't see that there's any

6   either technical violation or any lasting harm from --

7   there's no -- there's no unfairness to Mr. Itkin from that.

8            In terms of me raising things, I want to take

9   that very seriously.  It's true that I have gone a little

10  beyond Mr. Sabadash's arguments when it comes to

11  interpretation of the Russian court rulings.  That said,

12  neither party, I felt, actually grappled with how to

13  reconcile the different Russian court statements.  You've

14  got statement by one -- or the information summary that

15  seems to say one thing and yet, what it's purporting to

16  summarize seems to me to say the opposite.  And so I

17  realize that it might be that Mr. Itkin didn't want to

18  acknowledge that there was that tension and, therefore,

19  didn't argue about a different interpretation which

20  Mr. Caceres has now argued for that, oh, no, the Russian

21  courts actually only meant that it was incorrect to say

22  that there was a finding as to the individual liability,

23  not as to the partnership.  Hey, I'm not sure that that's

24  persuasive, but maybe.  I mean, I'm going to take a further

25  look at that.

Page                                                              44

1          But the point is Mr. Itkin chose not to get into

2    that issue in his opposition papers and now to say, well,

3    Judge, you've kind of ambushed us by getting into that

4    issue, well, yeah, it was sitting out there.  Neither side

5    had reconciled these different positions.

6          So as I say, I will take a further look at the

7    Russian decisions and see if they're susceptible of the

8    interpretation or urged by the petitioning creditors.  I'm

9    still a little hung up on the Moscow Arbitration Court, the

10   trial court having specifically said about personal

11   liability of Mr. Sabadash as part and parcel of the --

12   there being a partnership.

13         And so I don't know how an appellate court could

14   say it's factually incorrect to say that there's anything

15   about personal liability in that context.  It seems to me

16   the Russian court was either saying -- the appellate court

17   was either saying it was dicta or it wasn't and if that was

18   dicta, then the bit about the partnership was dicta as

19   well.

20         I guess I come back to it's one thing to say in

21   effect, look, Mr. Itkin and Mr. Sabadash, who knows between

22   the two of you whether you were dealing with apparent

23   authority, actual authority, partnership or what have you,

24   but we've got before us this document that says it was

25   signed by a partnership, this person performed the

Page                                                          45

1  services, and now you're trying to stiff her by saying,

2  well, it ain't me, it's the other guy.  And don't play

3  those games; we, the Russian courts, are going to say the

4  partnership is liable and leave it to the two of you to

5  figure out what that means in terms of your own personal

6  individual liability.  That's very different to me from

7  saying that for all purposes, for all creditors that there

8  is such a thing as a partnership and that there are debts

9  owed by the partnership to all these other claims.  There's

10 also a statute of limitations issue.  There are a number of

11 issues that I want to look at a little further, but what I

12 think I need to do for today is to have a -- probably a

13 briefer continuance so as to keep my feet to the fire to

14 try to get this thing resolved.

15         And so looking at the calendar, I'm thinking

16 probably June 17 at 2:00.  So any objections to that date?

17         All right.  Hearing none, June 17th at 2:00.  And

18 between now and then, I hope to issue a written

19 disposition, but we'll see.

20         Now, Mr. Zorkin, you look as if you wanted to add

21 something.

22         MR. ZORKIN:  Yes, I think one thing has been lost

23 about the Russian proceeding is that Mr. Sabadash was not

24 served or appeared at the first trial level, so all they

25 had was a person saying, here's a contract, I haven't been

Page                                                                46

1   paid and no defense.  And so the court -- you know, there
2   was breach of contract, so it's perfectly understandable
3   that the -- Ms. Gofman won that case because there was no
4   defendant when -- what we're reading from is Mr. Sabadash
5   when he found out he attempted to appeal that decision and
6   the appellate court said, you don't have standing to
7   appeal.  You're not a party to this.  Your rights have not
8   been violated.  You claimed you were deemed a member of the
9   partnership.  That's not correct.  That's not what the
10  court did.  The court ruled on the breach of contract claim
11  and that's it.
12          There was no -- in terms of our issue preclusion
13  parlance, there was no -- the partnership issue was neither
14  litigated nor decided in that case.  It was simply a breach
15  of contract to which no one appeared to defend -- well, I
16  should say, Mr. Itkin sent a lawyer who admitted liability,
17  so someone did appear on behalf of the partnership, but not
18  Mr. Sabadash.  I think that's it.
19          THE COURT:  Thank you.
20          MR. ZORKIN:  Thank you.
21          THE COURT:  Okay.  Again, as usual, I want to
22  thank the parties.  This has been well briefed and argued
23  and I hope to get something out between now and the
24  June 17th.
25          MR. ZORKIN:  Thank you very much.

Page                                                                      47

1          THE COURT:  All right.

2          MR. McCARTHY:  Thank you, Your Honor.

3          THE COURT:  You're welcome.

4          MR. CACERES:  Thank you, Your Honor.

5          THE COURT:  Absolutely.

6  (End at 3:58 p.m.)

7                    *  *  *  *  *  *  *

8          I certify that the foregoing is a correct

9  transcript from the electronic sound recording of the

10  proceedings in the above-entitled matter.

11

12  *Ruth Ann Hager*

13  _____          Date:  6/24/2025

14  RUTH ANN HAGER, C.E.T.**D-641

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 22

The Arbitration Court within the Framework of the AD HOC Arbitration Procedure for Resolving a Specific Dispute

Sole arbitrator (judge), selected and agreed upon by the parties, Dmitry Valeryevich Knyazev

Address: 109012, Russian Federation, Moscow, 4 Ilyinka Street, of. 102- 103

Phone: +7926226184/ Email:ag99@list.ru

## RULLING

## On the Jurisdiction of the Court

August 25, 2021 The Arbitration Court within the Framework of the AD HOC Arbitration Procedure for Resolving a Specific Dispute (hereinafter also referred to as the "court"), in the person of the sole arbitrator (judge), selected and agreed upon by the parties, Dmitry Valeryevich Knyazev (hereinafter also referred to as the "judge" or "arbitrator"), having considered the lawsuit filed by Davilla Investing Limited (hereinafter also referred to as the "claimant") against Golden Spirits Limited (hereinafter also referred to as Respondent 1) and AFB Trading One, Inc. (hereinafter also referred to as Respondent 2), Golden Sphinx Limited (hereinafter also referred to as Respondent 3), Agragorn Holdings Limited (hereinafter also referred to as the Third Party) regarding the recovery of debt under the Loan Agreement, the Agreement on Modification and Deferral of Debt, and the Corporate Guarantees,

HAS FOUND

The claimant filed a lawsuit against Respondent 1, Respondent 2, Respondent 3, and the Third Party, sending on May 18, 2021, by registered mail to all parties to the case a notice of arbitration along with the lawsuit with the attachments, stating:

that the Claimant informs the parties about the submission of the claim for debt recovery under the Loan Agreement to arbitration proceedings;

that the dispute arose from the Loan Agreement of April 20, 2010, concluded between Agragorn Holdings Limited and Golden Spirits Limited; the Agreement on Modification and Deferral of Debt of August 23, 2012, concluded between Agragorn Holdings Limited and Golden Spirits Limited; and the Corporate Guarantee of August 23, 2012, concluded between Agragorn Holdings Limited and AFB Trading One, Inc.  The Corporate Guarantee of August 23, 2012, concluded between Agragorn Holdings Limited and Golden Sphinx Limited; and the Agreement on the Assignment of Rights under the Loan Agreement of September 7, 2020, concluded between Agragorn Holdings Limited and Davilla Investing Limited;

that on April 20, 2010 Agragorn Holdings Limited and Golden Spirits Limited concluded a loan agreement. In accordance with the terms of this agreement, the Third Party lent the borrower funds in the amount of 1022.000 (One million twenty-two thousand) US dollars. In accordance with clause 4.1 of the Loan Agreement, the Respondent 1 was required to repay the loan no later than two years from the date the loan was granted, and pursuant to clause 4.2 of the Loan agreement, to pay an annual interest rate of 1 % on the loan amount. On April 21, 2010 the Third Party transferred to the Respondent 1 funds in the amount of 1022000 (One million twenty-two thousand) US dollars and paid a transfer commission in the amount of 268.36 (Two hundred sixty-eight) US dollars. Thus, the Third Party has fully performed its obligations

under the Loan Agreement. The obligations of the Respondent 1 to repay the loan principal and the interest were not fully fulfilled. On August 23, 2012 the Third Party and the Respondent 1 concluded the Agreement on the Modification and Deferral of the Debt. In accordance with this agreement, the parties extended the deadline for the Respondent 1 to fulfill the obligation to repay the debt until January 1, 2020. At the same time, the interest rate specified in clause 4.2 of the Loan Agreement, in accordance with clause 4 of the Agreement on Modification and Deferral of the Debt, has been increased to 6.5% per annum, with monthly compounding interest, starting from the date of modification until full repayment. The parties also agreed upon the following guarantors: AFB Trading One, Inc., registered in the State of California, USA, with its registered offices located at: 8501 Wilshire Boulevard, Suite 330, Beverly Hills, California, USA ("Guarantor 1"), and Golden Sphinx Limited, a company registered in the State of California, USA, with its registered offices located at: 43 La Motte Street, Saint Helier, Jersey Island, JE4 8SD, Channel Islands ("Guarantor 2"). On August 23, 2012 the Third Party and AFB Trading One, Inc. concluded the Corporate Guarantee pursuant to which the Respondent 2 is liable to the Claimant for the performance of the obligations of the Respondent 1, including guaranteeing repayment of the debt within 10 days from the date the demand is made in the event of the failure of the Respondent 1 to fulfill its obligations. On August 23, 2012 the Third Party Golden Sphinx Limited concluded the Corporate Guarantee pursuant to which the Respondent 3 is liable to the Claimant for the performance of the obligations of the Respondent 1, including guaranteeing repayment of the debt within 10 days from the date the demand is made in the event of the failure of the Respondent 1 to fulfill its obligations. On August 23, 2012 the Third Party, the Respondent 1, the Respondent 2, and the Respondent 3 concluded the AGREEMENT ON THE SELECTION (OF THE IDENTITY) OF THE ARBITRATOR AND THE APPLICABLE RULES. On September 07, 2020 the Third Party and Davilla Investing Limited concluded the Agreement on the Assignment of Rights under the Loan Agreement, pursuant to which all the rights under the loan agreement of April 20, 2010, as amended on August 23, 2012, concluded between the Third Party and Respondent 1, were transferred to the Claimant, including the security in the form of Corporate Guarantees concluded by the Third Party with the Respondent 2 and the Respondent 3.  On December 21, 2020, the Claimant sent to the Respondent 2 a demand for payment of the debt owed by the Respondent 1. The Claimant sent to the Respondent 3 a demand for payment of the debt owed by the Respondent 1. To date, none of the respondents have made repayment of the outstanding debt under the existing obligations. Thus, the Respondents have a solidary debt amounting to 1804017.81 US dollars, out of which: 1022000 US dollars — the principal amount of the debt. 1874.53 US dollars — the amount of interest for the period from April 21, 2010, to April 21, 2012. 780143.28 US dollars — the amount for the period from April 21, 2012, to December 12, 2020;

that the Claimant requests to jointly and severally recover from the companies Golden Spirits Limited, AFB Trading One, Inc., and Golden Sphinx Limited, in favor of Davilla Investing Limited, of the principal amount in the amount of 1022000 (One million twenty-two thousand) US dollars, and the interest for the use of the funds in the amount of 782017.80 (Seven hundred eighty-two thousand seventeen dollars and eighty cents) US dollars. To jointly and severally recover the court costs from Golden Spirits Limited, AFB Trading One, Inc., and Golden Sphinx Limited, in favor of Davilla Investing Limited.

According to the certified copies of the above-mentioned agreements and contracts submitted to the court, namely: according to the Arbitration Agreement between the parties, which is included in the Agreement on Modification and Deferral of the Debt concluded between the Third Party and the Respondent 1 under clause 12.F; according to the Arbitration Agreement between the parties, which is included in the Corporate Guarantee concluded between the Claimant and the Respondent 2 under clause 5.7; according to the Arbitration Agreement between the parties, which is included in the Corporate

Guarantee concluded between the Claimant and the Respondent 3 under clause 5.7; according to the Agreement on Assignment of Rights under the Loan Agreement of September 7, 2020, concluded between the Claimant and the Third Party; according to the Agreement on the Selection (of the Identity) of the Arbitrator and the Applicable Rules of August 23, 2012, concluded between the Third Party, the Respondent 1, the Respondent 2, and Respondent 3, approved by the parties and currently governed by the UNCITRAL Arbitration Rules, the parties agreed that any disputes, disagreements, differences of opinion, or claims arising out of or in connection with the above-mentioned agreements and contracts, including but not limited to those relating to their validity, performance, amendment, breach, termination, or enforcement, shall be resolved and finally settled by means of AD HOC arbitration proceedings. Any dispute shall be resolved by the sole Arbitrator agreed upon by the parties. Thus, this specific dispute is referred to the jurisdiction of this constituted court, the sole arbitrator being the Doctor of Jurisprudence Dmitry Valeryevich Knyazev, a citizen of the Russian Federation, born on May 19, 1981.

The parties agreed that the dispute may be resolved solely on the basis of the written materials submitted by the parties, without the mandatory holding of an oral hearing and summoning of the parties, while allowing for the participation of the parties and the arbitrator in meetings via electronic video conference, such as Skype. The parties agreed that the proceedings shall be conducted in Moscow, the Russian Federation, in the Russian language, and in accordance with the laws of the Russian Federation. The parties agreed that the Arbitrator shall determine the existence and scope of the agreement subject to arbitration, and is authorized to render a decision, whether monetary or non-monetary, and to enforce the decision to the fullest extent possible.

On May 20, 2021 The Arbitration Court, within the framework of the AD HOC arbitration procedure for resolving the specific dispute, in the person of the sole arbitrator (judge) selected and agreed upon by the parties, Dmitry Valeryevich Knyazev, issued a Ruling on the Appointment of the Dispute for Hearing, by which this court was constituted within the AD HOC arbitration procedure for resolving the specific dispute, the sole arbitrator (judge) selected and agreed upon by the parties, Dmitry Valeryevich Knyazev, was approved, the above-mentioned lawsuit was accepted for consideration by this court, and a 25-day period was set for preparing the case for arbitral proceedings, with a request for the parties to submit all documents necessary for the consideration of the dispute, including responses to the lawsuit, by June 14, 2021.

In accordance with Article 11 of the Civil Code of the Russian Federation, "The protection of violated or disputed civil rights shall be carried out by a court, arbitration court, or arbitral tribunal (hereinafter referred to as the "court") in accordance with their competence."

In accordance with the Federal Law of the Russian Federation "On Arbitral Tribunals in the Russian Federation", Article 1, "1. This Federal Law regulates the procedure for the establishment and operation of arbitral tribunals located within the territory of the Russian Federation. 2. By agreement of the parties to the arbitral proceeding (hereinafter also referred to as the "parties"), any dispute arising from civil legal relations may be referred to an arbitral tribunal, unless otherwise provided by federal law. 3. The provisions of this Federal Law do not apply to international commercial arbitration. 4. If an international treaty of the Russian Federation establishes a different procedure for the establishment and operation of arbitral tribunals than that provided for by this Federal Law, the rules of the international treaty shall apply."

In accordance with the European Convention on International Commercial Arbitration, Article 4, "Conduct of the Arbitration Proceedings," of April 21, 1961 "1. The parties to an arbitration agreement shall be free to submit their disputes: (b) to an ad hoc arbitral procedure; in this case, they shall be free inter

alia: (i) to appoint arbitrators or to establish means for their appointment in the event of an actual dispute; (ii) to determine the place of arbitration; and (iii) to lay down the procedure to be followed by the arbitrators...".

On August 19, 2021 the Court received from AFB Trading One, Inc., Golden Sphinx Limited a motion in which the aforementioned Respondents raise the issue of the jurisdiction of this Court in connection with the liquidation on October 31, 2013 of the Respondent, Golden Spirits Limited, a party to this dispute and a signatory to the Agreement on the Selection (of the Identity) of the Arbitrator and the Applicable Rules of August 23, 2012.

In accordance with the Federal Law of the Russian Federation "On Arbitral Tribunals in the Russian Federation", Article 16,

In accordance with the UNCITRAL Arbitration Rules (the rules adopted by the United Nations Commission on International Trade Law in 1976 and recommended for use by the United Nations General Assembly on December 15, 1976, as amended).

HAS RULED

1. To grant the motion.
2. To recognize the lack of jurisdiction of the Arbitration Court within the framework of the AD HOC arbitration procedure for resolving the specific dispute, in the person of the sole arbitrator (judge) selected and agreed upon by the parties, Dmitry Valeryevich Knyazev, over the claim of Davilla Investing Limited against Golden Spirits Limited, AFB Trading One, Inc., Golden Sphinx Limited, and Agragorn Holdings Limited for recovery of debt under the Loan Agreement, the Agreement on Modification and Deferral of the Debt, and the Corporate Guarantees.
3. To terminate the proceedings on the claim of Davilla Investing Limited against Golden Spirits Limited, AFB Trading One, Inc., Golden Sphinx Limited, and Agragorn Holdings Limited for recovery of debt under the Loan Agreement, the Agreement on Modification and Deferral of the Debt, and the Corporate Guarantees.
4. To dissolve Arbitration Court within the framework of the AD HOC arbitration procedure for resolving the specific dispute, in the person of the sole arbitrator (judge) selected and agreed upon by the parties, Dmitry Valeryevich Knyazev, over the claim of Davilla Investing Limited against Golden Spirits Limited, AFB Trading One, Inc., Golden Sphinx Limited, and Agragorn Holdings Limited for recovery of debt under the Loan Agreement, the Agreement on Modification and Deferral of the Debt, and the Corporate Guarantees.

The Arbitration Court

within the Framework of the AD HOC Arbitration Procedure

UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman

for Resolving a Specific Dispute

the sole arbitrator (judge),

selected and agreed upon by the parties

Dmitry Valeryevich Knyazev                                    [signature]

UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman

**Stamp**:  [THE ARBITRATION COURT
WITHIN THE FRAMEWORK OF THE AD HOC ARBITRATION PROCEDURE
THE SOLE ARBITRATOR (JUDGE)
DMITRY VALERYEVICH KNYAZEV

UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman



**TRANSLATION SERVICES**

## CERTIFICATION OF TRANSLATION

**Project number: S-251172**

**Name of files: Translation Russian to English / Michael Zorkin**

**Job performed on: 30-06-2025**

**Translation from language: Russian**

**Translation into language: English**

**Translation performed by: Irina Turbal**

**Date of certification: June 30, 2025**

---

Universal Translation Services, a professional translation company, declares that the attached document(s) are stamped and signed by us and translated by qualified and professional translators, fluent in the above mentioned languages. In our best judgement, the translated text truly reflects the content, meaning and translation of the attached documents and / or copies that the client provide us with.

A validation procedure was performed by us, which confirms that the provided language translation is complete and accurate. The document hasn't been translated by a family member, friend or business associate.

By signing this Certification of Translation, Universal Translation Services declares that the translation is a true reflection of the source file(s). We do not guarantee that the original document is a genuine document or that the statements contained in the original document are true.

Universal Translation Services assumes no liability for the way the translation is used by the customer or any third party.

*A.H.J Huisman, Managing Director*
*Universal Translation Services*

Corporate ATA Member number 260038

**ata**
American Translators Association

- **Head Office USA:** Phone: 1-844-wetranslate | Address: 20801 Biscayne Blvd, Suite 403, Aventura, Florida 33180
- **Office Spain:** Phone: +34-951-406-81 | Address: Calle Buenos Aires 3, 35002, Las Palmas
- **Office U.K.:** Phone: +44-20-3807-3275219 | Address: Kensington Street, Kensington W8 6bd, London
- **Other US Offices:** Commerce – San Francisco – Washington – Chicago – Boston – Las Vegas – Houston – Dallas – Seattle – Philadelphia



Арбитражный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора

Единый арбитр (судья), выбранный  и согласованный сторонами, Князев Дмитрий Валерьевич

Адрес: 109012, РФ, город Москва, улица Ильинка, д.4, оф. 102-103/

Тел.:+7926226184/Электронная почта:ag99@list.ru

## ОПРЕДЕЛЕНИЕ

### О компетенции суда

25 августа 2021г. Арбитражный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора (далее также – суд), в лице единого арбитра (судьи), выбранного и согласованного сторонами  - Князева Дмитрия Валерьевича (далее также – судья или арбитр), рассмотрев исковое заявление Давилла Инвестинг  Лимитед (Davilla Investing Limited) (далее также – истец) к Голден Спиритс Лимитед (Golden Spirits Limited) (далее также – Ответчик 1), ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.) (далее также – Ответчик 2), Голден Сфинкс Лимитед (Golden Sphinx Limited) (далее также – Ответчик 3), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) (далее также – Третье лицо) о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям,

### УСТАНОВИЛ

Истец обратился в суд с иском к Ответчику 1, Ответчику 2, Ответчику 3, Третьему лицу, направив 18 мая 2021г. заказной почтой всем сторонам по делу уведомление об арбитраже с исковым заявлением с приложениями, указав:

что Истец информирует стороны о передаче требования по взысканию задолженности по Договору займа на арбитражное разбирательство;

что спор возник из Договора займа от 20 апреля 2010г. заключенного между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компанией Голден Спиритс Лимитед (Golden Spirits Limited), Соглашения об изменении и отсрочке долга от 23 августа 2012г. заключенного между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компанией Голден Спиритс Лимитед (Golden Spirits Limited), Корпоративной гарантии от 23 августа 2012г., заключенной между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и ЭйЭфБи Трейдинг Уан, Инк. (AFB Trading One. Inc.), Корпоративной гарантии от 23 августа 2012г., заключенной между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Голден Сфинкс Лимитед (Golden Sphinx Limited), Соглашения по передаче прав по Договору займа от 07 сентября 2020г., заключенного между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компанией Давилла Инвестинг  Лимитед (Davilla Investing Limited);

что 20 апреля 2010г. Компания Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компания Голден Спиритс Лимитед (Golden Spirits Limited) заключили  договор займа. В соответствии с условиями данного договора Третье лицо предоставило заемщику в долг денежные средства в размере 1022000 (Один миллион двадцать две тысячи) долларов США. В соответствии с п.4.1. договора займа Ответчик 1 должен был вернуть заем не позднее двух лет с момента предоставления займа и в соответствии с п.4.2. договора займа уплатить 1,1% годовых с суммы

займа. 21.04.2010г. Третье лицо перевело Ответчику 1 денежные средства в размере 1022000 (Один миллион двадцать две тысячи) долларов США и уплатил комиссию за перевод в размере 268,36 (Двести шестьдесят восемь) долларов США. Таким образом, в полном объеме выполнил обязательства по договору займа. Обязанности по возврату суммы займа и процентов по займу Ответчиком 1 выполнены не были в полном объеме. 23 августа 2012г. Третье лицо и Ответчик 1 заключили соглашение об изменении и отсрочке долга. В соответствии с данным соглашением стороны продлили срок исполнения обязательства по возврату долга Ответчиком 1 до «01» января 2020г. При этом процентная ставка, указанная в пункте 4.2 Договора займа, в соответствии с п.4 соглашения об изменении и отсрочке долга повышается до 6,5% годовых (в год), с ежемесячным начислением сложных процентов, начиная с даты изменения, до полной выплаты. А также стороны согласовали следующих гарантов: ЭйЭфБи Трейдинг Уан, Инк., зарегистрированная в Штате Калифорния, США, зарегистрированные офисы которой расположены по адресу: 8501 Вилшир Бульвар, Суит 330, Беверли-Хиллз, Калифорния, США («Гарант 1»), и Голден Сфинкс Лимитед, компания, зарегистрированной в Штате Калифорния, США, зарегистрированные офисы которой расположены по адресу: 43 Ла Мотт Стрит, Сент-Хелиер, остров Джерси, JE4 8SD, Нормандские Острова («Гарант 2»). 23 августа 2012г. Третье лицо и ЭйЭфБи Трейдинг Уан, Инк.(AFB One. Inc.) заключили корпоративную гарантию в соответствии с которой Ответчик 2 отвечает перед Истцом за исполнение обязательств Ответчиком 1 в том числе в случае неисполнения Ответчиком 1 своих обязательств гарантирует погашение задолженности в течение 10 дней с момента предъявления требования. 23 августа 2012г. Третье лицо и Голден Сфинкс Лимитед (Golden Sphinx Limited) заключили корпоративную гарантию в соответствии с которой Ответчик 3 отвечает перед Истцом за исполнение обязательств Ответчиком 1 в том числе в случае неисполнения Ответчиком1 своих обязательств гарантирует погашение задолженности в течение 10 дней с момента предъявления требования. 23 августа 2012г. Третье лицо, Ответчик 1, Ответчик 2, Ответчик 3 заключили ДОГОВОР О ВЫБОРЕ (ЛИЧНОСТИ) АРБИТРА И ПРИМЕНЯМЫХ ПРАВИЛАХ. 07 сентября 2020г. Третье лицо и компания Давилла Инвестинг Лимитед (Davilla Investing Limited), заключили соглашение по передаче прав по договору займа, в соответствии с которым, все права по договору займа от 20 апреля 2010г. с изменениями от 23 августа 2012г., заключенному между Третьим лицом и Ответчиком 1, перешли к Истцу, включая обеспечение в виде корпоративных гарантий, заключенных Третьим лицом с Ответчиком 2 и Ответчиком 3. 21 декабря 2020г. Истец направил Ответчику 2 требование об оплате задолженности Ответчика 1. 21 декабря 2020г. Истец направил Ответчику 3 требование об оплате задолженности Ответчика 1. До настоящего времени ни один из ответчиков не произвел погашение задолженности по существующим обязательствам. Таким образом, у Ответчиков есть солидарная задолженность на общую сумму 1804017,81 долл. США из которых: 1022000 долларов США – сумма основного долга. 1874,53 долл. США - сумма процентов за период с 21.04.2010г. по 21.04.2012г. 780143,28 долл. США за период с 21.04.2012г. по 12.12.2020г.;

что Истец просит солидарно взыскать с компаний Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк.(AFB One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) в пользу компании Давилла Инвестинг Лимитед (Davilla Investing Limited) сумму основного долга в размере 1022000 (Один миллион двадцать две тысячи) долларов США, проценты за пользование денежными средствами в размере 782017 (Семьсот восемьдесят две тысячи семнадцать) долларов США 80 центов. Солидарно взыскать с компаний Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк.(AFB One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) в пользу компании Давилла Инвестинг Лимитед (Davilla Investing Limited) судебные расходы.

Согласно представленным суду заверенным копиям перечисленных выше договоров и соглашений, а именно: на основании арбитражного соглашения сторон, которое включено в

соглашение об изменении и отсрочке долга, заключенного между Третьим лицом и Ответчиком 1 под пунктом 12.F;на основании арбитражного соглашения сторон, которое включено в Корпоративную гарантию, заключенную между Истцом и Ответчиком 2 под пунктом 5.7;на основании арбитражного соглашения сторон, которое включено в Корпоративную гарантию, заключенную между Истцом и Ответчиком 3 под пунктом 5.7;на основании соглашения о передаче прав по Договору займа от 07.09.2020, заключенного между истцом и третьим лицом;на основании Договора  о выборе (личности) Арбитра и применяемых правилах от «23» августа 2012г., заключенного между Третьим лицом, Ответчиком 1, Ответчиком 2, Ответчиком 3, утвержденного сторонами действующим в настоящее время Арбитражным регламентом ЮНСИТРАЛ стороны согласились о том, что любые споры, разногласия, расхождения во мнениях или претензии, которые могут возникнуть из или в связи с перечисленными выше соглашениями и договорами, включая, но, не ограничиваясь, теми, которые связаны с его вступлением в силу, исполнением, изменением, нарушением, прекращением или действительностью, подлежат разрешению и окончательному урегулированию посредством арбитражного разбирательства AD HOC. Любой спор будет рассмотрен единолично согласованным сторонами Арбитром. Таким образом, данный конкретный спор передается на рассмотрение данного сформированного суда, единым арбитром назначается доктор юриспруденции Дмитрий Валерьевич Князев, Гражданин Российской Федерации, 19.05.1981 года рождения.

Стороны согласились, что разрешение спора может происходить только на основе письменных материалов, предоставленных сторонами, без обязательного проведения устного слушания и вызова сторон, при этом допускается участие сторон и арбитра во встречах посредством электронной видеоконференции, например Skype. Стороны договорились, что разбирательство будет проводиться в Москве, Российская Федерация, на русском языке и в соответствии с законодательством Российской Федерации. Стороны договорились, что Арбитр определяет наличие и масштаб соглашения, подлежащего осуществлению арбитражного разбирательства, и уполномочен выносить решение, денежное или не денежное, приводить в исполнение решение, в максимально возможной степени.

20 мая 2021г. Арбитражный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора, в лице единого арбитра (судьи), выбранного  и согласованного сторонами - Князева Дмитрия Валерьевича вынес Определение о назначении спора к слушанию, которым был создан данный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора, утвержден единым арбитром (судьей), выбранного  и согласованного сторонами Князев Дмитрий Валерьевич, принято указанное выше исковое заявление к рассмотрению данным судом, назначен 25-дневный срок для подготовки дела к третейскому разбирательству с предложением сторонам представить все документы, необходимые для рассмотрения спора, включая отзывы на иск до 14 июня 2021г.

В соответствии со ст.11 Гражданского кодекса Российской Федерации «Защиту нарушенных или оспоренных гражданских прав осуществляет суд, арбитражный суд или третейский суд (далее - суд) в соответствии с их компетенцией».

В соответствии с Федеральным Законом Российской Федерации «О Третейских судах в Российской Федерации» ст.1 «1. Настоящий Федеральный закон регулирует порядок образования и деятельности третейских судов, находящихся на территории Российской Федерации. 2. В третейский суд может по соглашению сторон третейского разбирательства (далее также - стороны) передаваться любой спор, вытекающий из гражданских правоотношений, если иное не установлено федеральным законом. 3. Действие настоящего Федерального закона не распространяется на международный коммерческий арбитраж. 4. Если международным договором Российской Федерации установлен иной порядок образования и деятельности третейских судов,

чем предусмотренный настоящим Федеральным законом, то применяются правила международного договора».

В соответствии с Европейской конвенцией о внешнеторговом арбитраже от 21 апреля 1961 года ст.4 Осуществление арбитражного процесса «1. Стороны арбитражного соглашения могут по своему усмотрению: «…b) предусматривать передачу споров на разрешение арбитража по данному делу (арбитраж adhoc) и в этом случае, в частности: i) назначать арбитров или устанавливать в случае возникновения какого-либо спора методы их назначения; ii) устанавливать местонахождение арбитражного суда; iii) устанавливать правила процедуры, которых должны придерживаться арбитры…».

19 августа 2021г. Суд получил от ЭйЭфБи Трейдинг Уан, Инк (AFB One. Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) ходатайство, где указанные Ответчики ставят вопрос о компетенции данного Суда в связи с ликвидацией 31.10.2013г. Ответчика Компании Голден Спиритс Лимитед (Golden Spirits Limited), участника данного спора и подписанта Договора о выборе (личности) Арбитра и применяемых правилах от «23» августа 2012г.

В соответствии с Федеральным Законом Российской Федерации «О Третейских судах в Российской Федерации» ст.16.

В соответствии с Арбитражным регламентом ЮНСИТРАЛ (регламент, принятый Комиссией ООН по праву международной торговли в 1976 г. и рекомендованный к использованию Генеральной Ассамблеей ООН 15 декабря 1976 г. с изменениями).

ОПРЕДЕЛИЛ:

1. Удовлетворить заявленное ходатайство.
2. Признать отсутствие компетенции Арбитражного суда в рамках арбитражной процедуры AD HOC для разрешения конкретного спора в лице единого арбитра (судьи), выбранного и согласованного сторонами Князева Дмитрия Валерьевича по иску Давилла Инвестинг Лимитед (Davilla Investing Limited) к Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк (AFB One. Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited)о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям.
3. Прекратить производство по иску Давилла Инвестинг Лимитед (Davilla Investing Limited) к Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк (AFB One. Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям.
4. Распустить Арбитражный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора в лице единого арбитра (судьи), выбранного и согласованного сторонами Князева Дмитрия Валерьевича по иску Давилла Инвестинг Лимитед (Davilla Investing Limited) к Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк (AFB One. Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям.

Арбитражный суд

в рамках арбитражной процедуры AD HOC

UNIVERSAL TRANSLATION SERVICES
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman

для разрешения конкретного спора

единый арбитр (судья),

выбранный и согласованный сторонами

Князев Дмитрий Валерьевич

UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman

**АРБИТРАЖНЫЙ СУД**
В РАМКАХ АРБИТРАЖНОЙ ПРОЦЕДУРЫ
AD HOC

**ЕДИНЫЙ АРБИТР (СУДЬЯ)**

**КНЯЗЕВ**
ДМИТРИЙ ВАЛЕРЬЕВИЧ

UNIVERSAL TRANSLATION SERVICES
20801 Biscayne Blvd, Suite 403
Aventura FL 33180
www.universal-translation-services.com
info@universal-translation-services.com
Phone 844-938-7267

AHJ Huisman

# Exhibit 23

## Michael Zorkin

| | |
|---|---|
| **From:** | Дмитрий Князев <ag99@list.ru> |
| **Sent:** | Wednesday, August 25, 2021 2:12 AM |
| **To:** | Татьяна Падалко; l2020@hotmail.com; Michael Zorkin; itkin1; irina.seleznev@yandex.ru |
| **Subject:** | doc01214920210825090459.pdf, doc01215020210825090532.pdf, doc01215120210825090604.pdf и ещё 3 файла |
| **Attachments:** | doc01214920210825090459.pdf; doc01215020210825090532.pdf; doc01215120210825090604.pdf; doc01215220210825090628.pdf; doc01215320210825090655.pdf; doc01215420210825090725.pdf |

С уважением,
единый арбитр (судья)
выбранный и согласованный сторонами
Дмитрий Валерьевич Князев

# Exhibit 24

| Fill in this information to identify the case: |
| --- |

| Debtor 1 | Itkin & Sabadash |
| --- | --- |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| | (State) |
| Case number | 2:25-bk-11235 NB |

## Official Form 410

# Proof of Claim

12/24

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

### Part 1:  Identify the Claim

| 1. Who is the current creditor? | Aleksandr Grant |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| 2. Has this claim been acquired from someone else? | ☐ No |
| --- | --- |
| | ☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | c/o Caceres & Shamash, LLP | |
| | Name | Name |
| | 9701 Wilshire Boulevard, Suite 1000 | |
| | Number      Street | Number      Street |
| | Beverly Hills      CA      90212 | |
| | City      State      ZIP Code | City      State      ZIP Code |
| | Contact phone  (310) 205-3400 | Contact phone _____ |
| | Contact email _____ | Contact email _____ |

| 4. Does this claim amend one already filed? | ☑ No |
| --- | --- |
| | ☐ Yes. Claim number on court claims registry (if known) _____   Filed on ___ / ___ / ___ <br> MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| --- | --- |
| | ☐ Yes. Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 2,435,410.84  **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Arbitration Award _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priorit |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  05 / 31 / 2025
                   MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Aleksandr Grant | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Creditor | | |
| Company | c/o Caceres & Shamash, LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 9701 Wilshire Boulevard, Suite 1000 | | |
| | Number          Street | | |
| | Beverly Hills | CA | 90212 |
| | City | State | ZIP Code |
| Contact phone | (310) 205-3400 | Email | generalbox@locs.com |

Attachment to POC – Grant


- Initial Amount of Claim (principal) $1,022.000.00
- Prejudgment Interest $782,017.80
- Arbitration Costs $3,475.00.
- Total Owed – as of judgment (8/31/2021) $1,807,492.80
- Interest (10%) to filing date 2/19/2025 $627,918.04


Total due $2,435,410.84

«Согласовано»
Председатель МКАС при
Торгово-промышленной
палате РФ (Москва)
А.А.Костин
№ 1800-4/1301
« 06» сентября   2021г.

Арбитражный суд в рамках арбитражной процедуры AD HOC

для разрешения конкретного спора

Единый арбитр (судья), выбранный  и согласованный сторонами,

Князев Дмитрий Валерьевич

Адрес: 109012, РФ, город Москва, улица Ильинка, д.4, оф. 102-103/

**РЕШЕНИЕ**

31 августа 2021г. в г. Москва Арбитражный суд в рамках арбитражной процедуры AD HOC
для разрешения  конкретного  спора (далее также  –  суд), в лице единого арбитра (судьи),
выбранного  и согласованного сторонами  - Князева Дмитрия Валерьевича (далее также – судья
или арбитр), рассмотрев исковое заявление Давилла Инвестинг  Лимитед (Davilla Investing
Limited) (далее также – истец) к Голден Спиритс Лимитед (Golden Spirits Limited) (далее также –
Ответчик 1), ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.) (далее также – Ответчик 2),
Голден Сфинкс Лимитед (Golden Sphinx Limited) (далее также – Ответчик 3), Аграгорн Холдингс
Лимитед (Agragorn Holdings Limited) (далее также – Третье лицо) о взыскании задолженности по
договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям.

Третейское разбирательство проведено в соответствии с положениями Федерального закона
№ 382-ФЗ от 29.12.2015 г. «Об арбитраже (третейском разбирательстве) в Российской Федерации»
(далее-Закон об арбитраже, ФЗ-382), в присутствии сторон:

от истца: Давилла Инвестинг  Лимитед (Davilla Investing Limited) – адвокат Селезнева Ирина
Борисовна, в подтверждение полномочий к материалам дела приобщена копия доверенности
Davilla Investing Limited.

от ответчика 1: Голден Спиритс Лимитед (Golden Spirits Limited)

от  ответчика 2:  ЭйЭфБи  Трейдинг  Уан,  Инк  (AFB  Trading  One.Inc.) -  Татьяна  Падалко,
финансовый управляющий Сабадаша А.В., в подтверждение полномочий к материалам дела
приобщена  копия  Арбитражного  суда  Московской  области  по  делу  №А41-100887/19  от
10.11.2020г.

от ответчика 3: Голден Сфинкс Лимитед (Golden Sphinx Limited)

от третьего лица: Аграгорн Холдингс Лимитед (Agragorn Holdings Limited)

24 августа 2021г. Суд получил Отзыв на исковое заявление Давилла Инвестинг Лимитед (Davilla Investing Limited) от гр. Сабадаш Ларисы, как от директора ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), как от директора Голден Сфинкс Лимитед (Golden Sphinx Limited).

24 августа 2021г. Суд получил Отзыв на исковое заявление Давилла Инвестинг Лимитед (Davilla Investing Limited) от гр. Падалко Татьяны Алексеевны, как от финансового управляющего Сабадаша А.В., как от собственника ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.).

Реализуя полномочия, предоставленные ч. 1 ст. 16 Закона об арбитраже, Третейский судья, при установлении своей компетенции, дополнительно проверяет материалы дела на соответствие нормам статей 239 АПК РФ в целях исключения оснований компетентного суда для отказа в выдаче исполнительного листа на принудительное исполнение решения третейского суда.


Компетенция Третейского судьи:

В соответствии со ст. 2 Федерального закона № 382-ФЗ от 29.12.2015г. «Об арбитраже (третейском разбирательстве) в Российской Федерации» (далее-Закон об арбитраже, ФЗ-382):

2) арбитраж (третейское разбирательство) - процесс разрешения спора третейским судом и принятия решения третейским судом (арбитражного решения);

16) третейский суд - единоличный арбитр или коллегия арбитров

1) арбитр (третейский судья) - физическое лицо, избранное сторонами или избранное (назначенное) в согласованном сторонами или установленном федеральным законом порядке для разрешения спора третейским судом.

3) администрирование арбитража - выполнение функций по организационному обеспечению арбитража, в том числе по обеспечению процедур выбора, назначения или отвода арбитров, ведению делопроизводства, организации сбора и распределения арбитражных сборов, за исключением непосредственно функций третейского суда по разрешению спора;

Арбитражная оговорка, являющаяся частью договора, признается соглашением, не зависящим от других условий договора. Принятие арбитражного решения о том, что договор недействителен, само по себе не влечет недействительность арбитражного соглашения.

Заявление об отсутствии у третейского суда компетенции может быть сделано соответствующей стороной арбитража не позднее представления ею первого заявления по существу спора».


**До начала третейского разбирательства по существу настоящего спора, заявлений об отсутствии компетенции у Третейского судьи рассматривать данный спор, не поступило.**


Руководствуясь статьями 7, 19, 52 Закона об арбитраже, Третейский судья принял решение о наличии у него компетенции рассматривать переданный на его разрешение спор.

Реализуя полномочия, предоставленные ч. 1 ст. 16 Закона об арбитраже, Третейский судья, при установлении своей компетенции, дополнительно проверяет материалы дела на соответствие

нормам статьи 239 АПК РФ в целях исключения оснований компетентного суда для отказа в выдаче исполнительного листа на принудительное исполнение решения третейского суда:

I. В соответствии с ч. 3 ст. 239 АПК РФ:

П.1 «Компетентный суд может отказать в выдаче исполнительного листа только в случаях, если сторона третейского разбирательства, представит доказательство того, что: одна из сторон третейского соглашения, на основании которого спор был разрешен третейским судом, не обладала полной дееспособностью».

От сторон заявления по данному пункту не поступали.

П.2 «Компетентный суд может отказать в выдаче исполнительного листа только в случаях, если сторона третейского разбирательства, представит доказательство того, что: «Третейское соглашение, на основании которого спор был разрешен третейским судом, недействительно по праву, которому стороны его подчинили, а при отсутствии такого указания - по праву Российской Федерации».

В силу ст. 7 ФЗ-382, «арбитражное соглашение является соглашением сторон о передаче в арбитраж всех или определенных споров, которые возникли или могут возникнуть между ними в связи с каким-либо конкретным правоотношением, независимо от того, носило такое правоотношение договорный характер или нет. Арбитражное соглашение может быть заключено в виде арбитражной оговорки в договоре или в виде отдельного соглашения.

При толковании арбитражного соглашения любые сомнения должны толковаться в пользу его действительности и исполнимости».

**Стороны извещены надлежащим образом о формировании состава суда, дате, месте и времени судебного разбирательства.**

В силу статьи 3 Закона об арбитраже, стороны считаются извещенными надлежащим образом, по аналогии со ст. 123 АПК РФ.

Аналогичный вывод подтвержден позицией Судебной коллегии Верховного Суда Российской Федерации от 30 декабря 2015 года N 302-ЭС15-11092:

П.5) «Компетентный суд может отказать в выдаче исполнительного листа только в случаях, если сторона третейского разбирательства представит доказательство того, что: Состав третейского суда или процедура арбитража не соответствовали соглашению сторон или федеральному закону».

А) Состав третейского суда: В соответствии с ч. 2 ст. 11 ФЗ-382, Стороны арбитража могут согласовать по своему усмотрению процедуру избрания (назначения) арбитра или арбитров при условии соблюдения положений частей 4 - 11 настоящей статьи.

На основании соглашения о передаче прав по Договору займа от 07.09.2020, заключенного между истцом и третьим лицом;на основании Договора о выборе (личности) Арбитра и применяемых правилах от «23» августа 2012г., заключенного между Третьим лицом, Ответчиком 1, Ответчиком 2, Ответчиком 3, утвержденного сторонами действующим в настоящее время Арбитражным регламентом ЮНСИТРАЛ стороны согласились о том, что любые споры,

разногласия, расхождения во мнениях или претензии, которые могут возникнуть из или в связи с перечисленными выше соглашениями и договорами, включая, но, не ограничиваясь, теми, которые связаны с его вступлением в силу, исполнением, изменением, нарушением, прекращением или действительностью, подлежат разрешению и окончательному урегулированию посредством арбитражного разбирательства AD HOC. Любой спор будет рассмотрен единолично согласованным сторонами Арбитром. Таким образом, данный конкретный спор передается на рассмотрение данного сформированного суда, единым арбитром назначается магистр юриспруденции Дмитрий Валерьевич Князев, Гражданин Российской Федерации.

**Личность Арбитра установлена** на основании Паспорта гражданина Российской Федерации на имя Князева Дмитрия Валерьевича, подтверждается имеющейся копией в материалах третейского дела. Наличие у избранного Третейского судьи, Князева Дмитрия Валерьевича, высшего юридического образования, подтверждается Дипломом РФ г. Москва Специализированным институтом юриспруденции № АВС 0715029, имеющейся копией в материалах третейского дела.

Отсутствие судимости подтверждается Справкой ГУ МВД России по г. Москве от 11.07.2021 г. № 13/5-099/264646-Е, имеющейся в материалах третейского дела.

Согласно разъяснениям Минюста России от 02.09.2021 г. № 12-103924/2021, Положения Федерального закона № 382-ФЗ не предусматривают возможности предоставления третейскому суду, образованному сторонами для разрешения конкретного спора, права на осуществлении функций постоянно действующего арбитражного учреждения и выполнение им функций по администрированию арбитража. Таким образом, каких-либо дополнительных лицензий или разрешений для третейского судьи, действующим законодательством не предусмотрено.

**Таким образом, формирование состава Третейского суда произведено с соблюдением положений Закона об арбитраже.**

Б) Процедура арбитража: В соответствии с п.п. 1, 2 ст. 19 Закона об арбитраже: «При условии соблюдения положений настоящего Федерального закона стороны могут по своем усмотрению договориться о процедуре арбитража. При отсутствии договоренности третейский суд может с соблюдением положений настоящего Федерального закон осуществлять арбитраж таким образом, какой он посчитает надлежащим, в том числе отношении определения допустимости, относимости и значения любого доказательства».

В соответствии с ч. 2 ст. 2 Закона об арбитраже: «Администрирование арбитража - выполнение функций по организационному обеспечению арбитража, в том числе по обеспечению процедур выбора, назначения или отвода арбитров, ведению делопроизводства, организации сбора и распределения арбитражных сборов, за исключением непосредственно функций третейского суда по разрешению спора».

Во исполнение данной нормы, Единый Арбитр рассмотрел спор самолично, что подтверждается материалами третейского дела:

• лично избран сторонами в арбитражном соглашении,

• лично получил исковое заявление и принял к производству,

• лично выбрал и получил в пользование помещение для проведения судебного разбирательства,

• на личный банковский счет получил арбитражный сбор,

• лично оплатил расходы, связанные с рассмотрением спора (почтовые расходы, канцелярские принадлежности, оргтехника, помещение и т.п.),

• лично направил сторонам почтой судебные извещения и иные документы,

• лично назначил и провел судебное заседание,

• лично вынес постановления и арбитражное решение,

• Возражений о нарушении процедуры арбитража от сторон не поступало.

• Заявлений о самоотводах и об отводах, не поступило.

В соответствии с ч. 1 ст. 11 ГК РФ, защиту нарушенных или оспоренных гражданских прав осуществляет в соответствии с подведомственностью дел, установленной процессуальным законодательством, суд, арбитражный суд или третейский суд.

В соответствии с ч. 1 ст. 33 АПК РФ, споры, возникающие из гражданско-правовых отношений, а также индивидуальные трудовые споры спортсменов, тренеров в профессиональном спорте и спорте высших достижений могут быть переданы сторонами на рассмотрение третейского суда при наличии между сторонами спора действующего арбитражного соглашения, если иное не предусмотрено федеральным законом.

В соответствии с ч. 3 ст. 1 Закона об арбитраже, в арбитраж (третейское разбирательство) по соглашению сторон могут передаваться споры между сторонами гражданско-правовых отношений, если иное не предусмотрено федеральным законом.

Действующее законодательство не содержит запрета на передачу споров по договорам займа, цессии, заключенными между юридическими лицами, на рассмотрение в третейский суд.

Договоры займа, цессии, не являются контрактом, заключенным в сфере закупок для государственных и муниципальных нужд, а также не является договором, заключенным в порядке, предусмотренном Федеральным законом N 223-ФЗ.

**Каких-либо заявлений от Сторон о том, что рассматриваемый спор не может быть предметом третейского разбирательства, или о наличии противоречий публичному порядку Российской Федерации, не поступало, а Третейским судьей не установлено.**

Единолично Арбитр (третейский судья), при ведении протокола судебного заседания, рассмотрел исковое заявление, представленные сторонами доказательства

## УСТАНОВИЛ:

Истец обратился в суд с иском к Ответчику 1, Ответчику 2, Ответчику 3, Третьему лицу, направив 18 мая 2021г. заказной почтой всем сторонам по делу уведомление об арбитраже с исковым заявлением с приложениями, указав:

что Истец информирует стороны о передаче требования по взысканию задолженности по Договору займа на арбитражное разбирательство;

что спор возник из Договора займа от 20 апреля 2010г. заключенного между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компанией Голден Спиритс Лимитед (Golden Spirits Limited), Соглашения об изменении и отсрочке долга от 23 августа 2012г. заключенного между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компанией Голден Спиритс Лимитед (Golden Spirits Limited), Корпоративной гарантии от 23 августа 2012г., заключенной между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и ЭйЭфБи Трейдинг Уан, Инк. (AFB Trading One. Inc.), Корпоративной гарантии от 23 августа 2012г., заключенной между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Голден Сфинкс Лимитед (Golden Sphinx Limited), Соглашения по передаче прав по Договору займа от 07 сентября 2020г., заключенного между Компанией Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компанией Давилла Инвестинг Лимитед (Davilla Investing Limited);

что 20 апреля 2010г. Компания Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) и Компания Голден Спиритс Лимитед (Golden Spirits Limited) заключили договор займа. В соответствии с условиями данного договора Третье лицо предоставило заемщику в долг денежные средства в размере 1022000 (Один миллион двадцать две тысячи) долларов США. В соответствии с п.4.1. договора займа Ответчик 1 должен был вернуть заем не позднее двух лет с момента предоставления займа и в соответствии с п.4.2. договора займа уплатить 1,1% годовых с суммы займа. 21.04.2010г. Третье лицо перевело Ответчику 1 денежные средства в размере 1022000 (Один миллион двадцать две тысячи) долларов США и уплатил комиссию за перевод в размере 268,36 (Двести шестьдесят восемь) долларов США. Таким образом, в полном объеме выполнил обязательства по договору займа. Обязанности по возврату суммы займа и процентов по займу Ответчиком 1 выполнены не были в полном объеме. 23 августа 2012г. Третье лицо и Ответчик 1 заключили соглашение об изменении и отсрочке долга. В соответствии с данным соглашением стороны продлили срок исполнения обязательства по возврату долга Ответчиком 1 до «01» января 2020г. При этом процентная ставка, указанная в пункте 4.2 Договора займа, в соответствии с п.4 соглашения об изменении и отсрочке долга повышается до 6,5% годовых (в год), с ежемесячным начислением сложных процентов, начиная с даты изменения, до полной выплаты. А также

стороны согласовали следующих гарантов: ЭйЭфБи Трейдинг Уан, Инк., зарегистрированная в Штате Калифорния, США, зарегистрированные офисы которой расположены по адресу: 8501 Вилшир Бульвар, Суит 330, Беверли-Хиллз, Калифорния, США («Гарант 1»), и Голден Сфинкс Лимитед, компания, зарегистрированной в Штате Калифорния, США, зарегистрированные офисы которой расположены по адресу: 43 Ла Мотт Стрит, Сент-Хелиер, остров Джерси, JE4 8SD, Нормандские Острова («Гарант 2»). 23 августа 2012г. Третье лицо и ЭйЭфБи Трейдинг Уан, Инк.(AFB Trading One.Inc.) заключили корпоративную гарантию в соответствии с которой Ответчик 2 отвечает перед Истцом за исполнение обязательств Ответчиком 1 в том числе в случае неисполнения Ответчиком 1 своих обязательств гарантирует погашение задолженности в течение 10 дней с момента предъявления требования. 23 августа 2012г. Третье лицо и Голден Сфинкс Лимитед (Golden Sphinx Limited) заключили корпоративную гарантию в соответствии с которой Ответчик 3 отвечает перед Истцом за исполнение обязательств Ответчиком 1 в том числе в случае неисполнения Ответчиком1 своих обязательств гарантирует погашение задолженности в течение 10 дней с момента предъявления требования. 23 августа 2012г. Третье лицо, Ответчик 1, Ответчик 2, Ответчик 3 заключили ДОГОВОР О ВЫБОРЕ (ЛИЧНОСТИ) АРБИТРА И ПРИМЕНЯМЫХ ПРАВИЛАХ. 07 сентября 2020г. Третье лицо и компания Давилла Инвестинг  Лимитед (Davilla Investing Limited), заключили соглашение по передаче прав по договору займа, в соответствии с которым, все права по договору займа от 20 апреля 2010г. с изменениями от 23 августа 2012г., заключенному между Третьим лицом и Ответчиком 1, перешли к Истцу, включая обеспечение в виде корпоративных гарантий, заключенных Третьим лицом с Ответчиком 2 и Ответчиком 3. 21 декабря 2020г. Истец направил Ответчику 2 требование об оплате задолженности Ответчика 1. 21 декабря 2020г. Истец направил Ответчику 3 требование об оплате задолженности Ответчика 1. До настоящего времени ни один из ответчиков не произвел погашение задолженности по существующим обязательствам. Таким образом, у Ответчиков есть солидарная задолженность на общую сумму 1804017,81 долл. США из которых: 1022000 долларов США – сумма основного долга. 1874,53 долл. США - сумма процентов за период с 21.04.2010г. по 21.04.2012г. 780143,28 долл. США за период с 21.04.2012г. по 12.12.2020г.;

что Истец просит солидарно взыскать с компаний Голден Спиритс Лимитед  (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк.(AFB One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) в пользу компании Давилла Инвестинг  Лимитед (Davilla Investing Limited) сумму основного долга в размере 1022000 (Один миллион двадцать две тысячи) долларов США, проценты за пользование денежными средствами в размере 782017 (Семьсот восемьдесят две тысячи семнадцать) долларов США 80 центов. Солидарно взыскать с компаний Голден Спиритс Лимитед  (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк.(AFB One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) в пользу компании Давилла Инвестинг  Лимитед (Davilla Investing Limited) судебные расходы.

Согласно представленным суду заверенным копиям перечисленных выше договоров и соглашений, а именно: на основании арбитражного соглашения сторон, которое включено в

соглашение об изменении и отсрочке долга, заключенного между Третьим лицом и Ответчиком 1 под пунктом 12.F;на основании арбитражного соглашения сторон, которое включено в Корпоративную гарантию, заключенную между Истцом и Ответчиком 2 под пунктом 5.7;на основании арбитражного соглашения сторон, которое включено в Корпоративную гарантию, заключенную между Истцом и Ответчиком 3 под пунктом 5.7;на основании соглашения о передаче прав по Договору займа от 07.09.2020, заключенного между истцом и третьим лицом;на основании Договора  о выборе (личности) Арбитра и применяемых правилах от «23» августа 2012г., заключенного между Третьим лицом, Ответчиком 1, Ответчиком 2, Ответчиком 3, утвержденного сторонами действующим в настоящее время Арбитражным регламентом ЮНСИТРАЛ стороны согласились о том, что любые споры, разногласия, расхождения во мнениях или претензии, которые могут возникнуть из или в связи с перечисленными выше соглашениями и договорами, включая, но, не ограничиваясь, теми, которые связаны с его вступлением в силу, исполнением, изменением, нарушением, прекращением или действительностью, подлежат разрешению и окончательному урегулированию посредством арбитражного разбирательства AD HOC. Любой спор будет рассмотрен единолично согласованным сторонами Арбитром. Таким образом, данный конкретный спор передается на рассмотрение данного сформированного суда, единым арбитром назначается доктор юриспруденции Дмитрий Валерьевич Князев, Гражданин Российской Федерации.

Стороны согласились, что разрешение спора может происходить только на основе письменных материалов, предоставленных сторонами, без обязательного проведения устного слушания и вызова сторон, при этом допускается участие сторон и арбитра во встречах посредством электронной видеоконференции, например Skype. Стороны договорились, что разбирательство будет проводиться в Москве, Российская Федерация, на русском языке и в соответствии с законодательством Российской Федерации. Стороны договорились, что Арбитр определяет наличие и масштаб соглашения, подлежащего осуществлению арбитражного разбирательства, и уполномочен выносить решение, денежное или не денежное, приводить в исполнение решение, в максимально возможной степени.

20 мая 2021г. Арбитражный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора, в лице единого арбитра (судьи), выбранного  и согласованного сторонами  - Князева Дмитрия Валерьевича вынес Определение о назначении спора к слушанию, которым был создан данный суд в рамках арбитражной процедуры AD HOC для разрешения конкретного спора, утвержден единым арбитром (судьей), выбранного  и согласованного сторонами Князев Дмитрий Валерьевич, принято указанное выше исковое заявление к рассмотрению данным судом, назначен 25-дневный срок для подготовки дела к третейскому разбирательству с предложением сторонам представить все документы, необходимые для рассмотрения спора, включая отзывы на иск до 14 июня 2021г.

В соответствии со ст.11 Гражданского кодекса Российской Федерации «Защиту нарушенных или оспоренных гражданских прав осуществляет суд, арбитражный суд или третейский суд (далее - суд) в соответствии с их компетенцией».

В соответствии с Федеральным Законом Российской Федерации «О Третейских судах в Российской Федерации» ст.1 «1. Настоящий Федеральный закон регулирует порядок образования и деятельности третейских судов, находящихся на территории Российской Федерации. 2. В третейский суд может по соглашению сторон третейского разбирательства (далее также - стороны) передаваться любой спор, вытекающий из гражданских правоотношений, если иное не установлено федеральным законом. 3. Действие настоящего Федерального закона не распространяется на международный коммерческий арбитраж. 4. Если международным договором Российской Федерации установлен иной порядок образования и деятельности третейских судов, чем предусмотренный настоящим Федеральным законом, то применяются правила международного договора».

В соответствии с Европейской конвенцией о внешнеторговом арбитраже от 21 апреля 1961 года ст.4 Осуществление арбитражного процесса «1. Стороны арбитражного соглашения могут по своему усмотрению: «…b) предусматривать передачу споров на разрешение арбитража по данному делу (арбитраж adhoc) и в этом случае, в частности: i) назначать арбитров или устанавливать в случае возникновения какого-либо спора методы их назначения; ii) устанавливать местонахождение арбитражного суда; iii) устанавливать правила процедуры, которых должны придерживаться арбитры…».

Подготовка дела к рассмотрению проведена Арбитром надлежащим образом, а именно: Определением от  02 Августа 2021 года Арбитражный суд в рамках арбитражной процедуры AD НОС для разрешения конкретного спора, в лице единого арбитра (судьи), выбранного   и согласованного сторонами - Князева Дмитрия Валерьевича назначил третейское разбирательство по иску Давилла Инвестинг  Лимитед (Davilla Investing Limited) к Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк (AFB Tradig One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям к рассмотрению на 31 августа 2021г. в 12 часов 00 минут по г. Москве по адресу: 109012, РФ, город Москва, улица Ильинка, д.4, оф. 102-103; истцу предложено представить подлинные документы в обоснование заявленных требований; ответчикам и третьему лицу в срок до 25 августа 2021г.  предложено представить в суд отзывы на иск, подтвержденные документально, в судебное заседание подлинные документы в обоснование возражений. 05 августа 2021 года Арбитром направлен судебный запрос свидетелю по делу в лице Гарри Иткин (Garry Itkin).

Свидетель Гарри Иткин (Garry Itkin) на запрос суда представил надлежащим образом оформленные свидетельские показания, имеющие значения для правильного разрешения спора, а именно показал:

1.    Да, 20 апреля 2010-го года я являлся Директором компании Golden Spirits Limited

2.    Да, я подписывал договор займа между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 20 апреля 2010-го года на сумму USD 1,022,000

3.    Да, я подтверждаю мою подпись на договоре займа между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 20 апреля 2010-го года на сумму USD 1,022,000

4.    Да, я был уполномочен подписывать договор займа между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 20 апреля 2010-го года на сумму USD 1,022,000

5.    Да, сумма USD 1,022,000 была ли перечислена на счёт компании Golden Spirits Limited компанией Agragorn Holdings Limited 21 апреля 2010-го года в соответствии с договором займа от 20 апреля 2010-го года

6.    Да, сумма USD 1,022,000 была ли зачислена на счёт компании Golden Spirits Limited банком указанном в договоре займа от 20 апреля 2010-го года

7.    Нет, компания Golden Spirits Limited не возвратила компании Agragorn Holdings Limited долг в соответствии с договором займа от 20 апреля 2010-го года

8.    Да, 23 августа 2012-го года я являлся Директором компании Golden Spirits Limited?

9.    Да, я подписывал соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании Golden Spirits Limited

10.    Да, я подтверждаю мою подпись на соглашении об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании Golden Spirits Limited

11.    Да, я был уполномочен подписывать соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании Golden Spirits Limited

12.    Да, соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года безусловно отвечало интересам компании Golden Spirits Limited и было подписано в интересах компании Golden Spirits Limited

13.    Да, соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года было безусловно выгодным для компании Golden Spirits Limited

14.    Да, встречное удовлетворение в соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года было безусловно являлось достаточным для компании Golden Spirits Limited

15.    23 августа 2012-го года я являлся Директором компании Golden Sphinx Limited

16.      Да, я подписывал соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании Golden Sphinx Limited

17.      Да, я подтверждаю мою подпись на соглашении об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании Golden Sphinx Limited

18.      Да, я был уполномочен подписывать соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании Golden Sphinx Limited

19.      Да, компания Golden Sphinx Limited была материально заинтересована в финансовом успехе компании Golden Spirits Limited

20.      Да, соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года безусловно отвечало интересам компании Golden Sphinx Limited и было подписано в интересах компании Golden Sphinx Limited

21.      Да, соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года было безусловно выгодным для компании Golden Sphinx Limited

22.      Да, встречное удовлетворение в соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года было безусловно являлось достаточным для компании Golden Sphinx Limited

23.      23 августа 2012-го года я являлся Президентом, Финансовым и Исполнительным Директором и Казначеем, компании AFB Trading One Inc

24.      Да, я подписывал соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании AFB Trading One Inc

25.      Да, я подтверждаю мою подпись на соглашении об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании AFB Trading One Inc

26.      Да, я был уполномочен подписывать соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года от лица компании AFB Trading One Inc

27.      Да, компания AFB Trading One Inc была материально заинтересована в финансовом успехе компании Golden Spirits Limited

28.      Да, соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года безусловно отвечало интересам компании AFB Trading One Inc и было подписано в интересах компании AFB Trading One Inc

29.    Да, соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года было безусловно выгодным для компании AFB Trading One Inc

30.    Да, встречное удовлетворение в соглашение об изменении и отсрочке долга между компанией Agragorn Holdings Limited и компанией Golden Spirits Limited от 23 августа 2012-го года было безусловно являлось достаточным для компании AFB Trading One Inc

31.    Да, я подписывал корпоративную гарантию от лица компании Golden Sphinx Limited в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года, безотзывно и безоговорочно гарантируя компании Agragorn Holdings Limited своевременное и добросовестное исполнение, соблюдение и выполнение обязательств компанией Golden Spirits Limited

32.    Да, я подтверждаю мою подпись на корпоративной гарантии от лица компании Golden Sphinx Limited в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года

33.    Да, я был уполномочен подписывать корпоративную гарантию от лица компании Golden Sphinx Limited в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года

34.    Да, компания Golden Sphinx Limited была материально заинтересована в финансовом успехе компании Golden Spirits Limited

35.    Да, безотзывная и безоговорочная гарантия своевременного и добросовестного исполнения, соблюдения и выполнения обязательств компанией Golden Spirits Limited перед компанией Agragorn Holdings Limited от 23 августа 2012-го года безусловно отвечала интересам компании Golden Sphinx Limited и была подписана в интересах компании Golden Sphinx Limited

36.    Да, выпуск безотзывной и безоговорочной гарантии своевременного и добросовестного исполнения, соблюдения и выполнения обязательств компанией Golden Spirits Limited перед компанией Agragorn Holdings Limited от 23 августа 2012-го года был безусловно выгодным для компании Golden Sphinx Limited

37.    Да, встречное удовлетворение в корпоративной гарантии компании Golden Sphinx Limited в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года, гарантирующее компании Agragorn Holdings Limited своевременное и добросовестное исполнение, соблюдение и выполнение обязательств компанией Golden Spirits Limited, безусловно являлось достаточным для компании Golden Sphinx Limited

38.    Да, я подписывал корпоративную гарантию от лица компании AFB Trading One Inc в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года, безотзывно и безоговорочно гарантируя компании Agragorn Holdings Limited своевременное и добросовестное исполнение, соблюдение и выполнение обязательств компанией Golden Spirits Limited

39.    Да, я подтверждаю мою подпись на корпоративной гарантии от лица компании AFB Trading One Inc в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года

40.    Да, я был уполномочен подписывать корпоративную гарантию от лица компании AFB Trading One Inc в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года

41.    Да, компания AFB Trading One Inc была материально заинтересована в финансовом успехе компании Golden Spirits Limited

42.    Да, безотзывная и безоговорочная гарантия своевременного и добросовестного исполнения, соблюдения и выполнения обязательств компанией Golden Spirits Limited перед компанией Agragorn Holdings Limited от 23 августа 2012-го года безусловно отвечала интересам компании AFB Trading One Inc и была подписана в интересах компании AFB Trading One Inc

43.    Да, выпуск безотзывной и безоговорочной гарантии своевременного и добросовестного исполнения, соблюдения и выполнения обязательств компанией Golden Spirits Limited перед компании Agragorn Holdings Limited от 23 августа 2012-го года был безусловно выгодным для компании AFB Trading One Inc

44.    Да, встречное удовлетворение в корпоративной гарантии компании Golden Sphinx Limited в пользу компании Agragorn Holdings Limited от 23 августа 2012-го года, гарантирующее компании Agragorn Holdings Limited своевременное и добросовестное исполнение, соблюдение и выполнение обязательств компанией Golden Spirits Limited, безусловно являлось достаточным для компании AFB Trading One Inc

45.    Да, я подписывал соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании Golden Spirits Limited

46.    Да, я подтверждаю свою подпись на соглашении о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании Golden Spirits Limited

47.    Да, я был уполномочен подписывать соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании Golden Spirits Limited

48.    Да, соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года безусловно отвечало интересам компании Golden Spirits Limited и было подписано в интересах компании Golden Spirits Limited

49.    Да, соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года был безусловно выгодным для компании Golden Spirits Limited

50.    Да, встречное удовлетворение в соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года безусловно являлось достаточным для компании Golden Spirits Limited

51.    Да, я подписывал соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании Golden Sphinx Limited

52.    Да, я подтверждаю свою подпись на соглашении о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании Golden Sphinx Limited

53.    Да, я был уполномочен подписывать соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании Golden Sphinx Limited

54.    Да, соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года безусловно отвечало интересам компании Golden Sphinx Limited и было подписано в интересах компании Golden Sphinx Limited

55.     Да, соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года был безусловно выгодным для компании Golden Sphinx Limited

56.     Да, встречное удовлетворение в соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года безусловно являлось достаточным для компании Golden Sphinx Limited

57.     Да, я подписывал соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании AFB Trading One Inc

58.     Да, я подтверждаю свою подпись на соглашении о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании AFB Trading One Inc

59.     Да, я был уполномочен подписывать соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года от лица компании AFB Trading One Inc

60.     Да, соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года безусловно отвечало интересам компании AFB Trading One Inc и было подписано в интересах компании AFB Trading One Inc

61.     Да, соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года был безусловно выгодным для компании AFB Trading One Inc

62.     Да, встречное удовлетворение в соглашение о фигуре арбитра и применимом регламенте от 23 августа 2012-го года безусловно являлось достаточным для компании AFB Trading One Inc

19.07.2021 года в рамках рассмотрения настоящего дела от Татьяна Падалко, представившаяся финансовым управляющим Сабадаша А.В., в подтверждение полномочий к материалам дела приобщена копия Арбитражного суда Московской области по делу №А41-100887/19 от 10.11.2020г., позволяющих действовать от имени ответчиков, заявила в переписке, направленной суду: «Добрый день, я являюсь финансовым управляющим Сабадаша А.В. Организации – ответчики принадлежат Сабадашу А.В. Документы по данному спору были сфальсифицированы прошу представить ваши контактные данные для связи» (цитата из письма Татьяна Падалко <arbitrpadalko@gmail.com>). Данные заявления Татьяны Падалко оценены Арбитром в качестве доказательств наравне с иными доказательствами по делу.

19 августа 2021г. Суд получил от ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) ходатайство, где указанные Ответчики ставят вопрос о компетенции данного Суда в связи с ликвидацией 31.10.2013г. Ответчика Компании Голден Спиритс Лимитед (Golden Spirits Limited), участника данного спора и подписанта Договора о выборе (личности) Арбитра и применяемых правилах от «23» августа 2012г.

24 августа 2021г. Суд получил Отзыв на исковое заявление Давилла Инвестинг Лимитед (Davilla Investing Limited) подписанный  гр. Падалко Татьяны Алексеевны, как от финансового управляющего Сабадаша А.В., как от собственника ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), где не оспаривается соглашение о назначении арбитра в рамках арбитражной процедуры AD HOC, где также заявляется о прекращении деятельности в связи с ликвидацией 31.10.2013г.

Ответчика - Компании Голден Спиритс Лимитед (Golden Spirits Limited), поручителями по обязательствам которой являются Голден Сфинкс Лимитед (Golden Sphinx Limited), а также обязательства ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.). Представитель Ответчика просит отказать в удовлетворении иска в связи с утратой правоспособности заемщика Компании Голден Спиритс Лимитед (Golden Spirits Limited) с 01.10.2013г.

25 августа 2021г. Суд получил электронное сообщение от Managing Attorney Michael Zorkin: "Господин Князев, Прилагаю Отзыв На Исковое Заявление Ларисы Сабадаш от имени AFB Trading One, Inc. и Golden Sphinx Limited". Отзыв на исковое заявление Давилла Инвестинг Лимитед (Davilla Investing Limited) от гр. Сабадаш Ларисы (датированное 24.08.2021г., как от директора ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), как от директора Голден Сфинкс Лимитед (Golden Sphinx Limited), в которым подтверждает надлежащее уведомление о судебном рассмотрении 25 августа 2021г. в 12-00 по мск времени спора Арбитром, подтверждает заключение соглашения от 23.12.2012г. между сторонами и не оспаривает компетенцию Арбитра, указывает на то, что с 03.10.2016г. является директором ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), с 17.09.2019г. является директором Голден Сфинкс Лимитед (Golden Sphinx Limited), просит учесть, что Голден Спиритс Лимитед (Golden Spirits Limited) не существует с 31.10.2013г., заявляет, что поскольку основной заемщик Голден Спиритс Лимитед (Golden Spirits Limited)с 01.10.2013г. утратил правоспособность, соответственно полагает, что и обеспечивающие его обязательства по договорам поручительства следует считать прекратившимися, на основании чего просит отказать истцу в иске.

Суд рассмотрел отзыв гр. Сабадаш Ларисы и позицию ее представителя Михаила Зорькина, усмотрев признание и наличие долговых обязательств Голден Сфинкс Лимитед (Golden Sphinx Limited), а также обязательства ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.).

В соответствии со ст. 309 Гражданского кодекса Российской Федерации обязательства должны исполняться надлежащим образом в соответствии с условиями обязательства и требованиями закона.

Доводы представителей Ответчиков о пропуске срока исковой давности Арбитр усматривает несостоятельными постольку, поскольку гарантийные обязательства по займу Компании Голден Спиритс Лимитед (Golden Spirits Limited) были выданы до 01.10.2013г., а соответственно являются действующими.

Суд, рассмотрев в судебном заседании заявление финансового управляющего Сабадаша А.В., Падалко Т.А. о том, что организации – ответчики принадлежат Сабадашу А.В., с целью проверки указанных доводов по ходатайству истца изучил дело № А40-165165/18 по иску в Арбитражный суд г. Москвы Индивидуального предпринимателя Гофман Е. к Простому товариществу "Иткин и Сабадаш" с требованием об установлении факта заключения и действия договора. 10 октября 2019г. Решение Арбитражного суда города Москвы от 14.09.2018 г. по апелляционной жалобе гр. Сабадаша А.В., оспаривавшего факт создания Простого Товарищества «Иткин и Сабадаш» и принадлежность последнему имущества и активов, а именно: 1. ОАО

"Русский Дизель" (адрес: Ленинградская область, Всеволожский район, станция Кирпичный завод, промзона); взнос активов ОАО "Русский Дизель"в качестве уставного капитала в компанию "Дизель Лимитед" (Diesel Limited) находящуюся на острове Джерси, Великобритания; 2.ОАО "Выборгская целлюлоза" (адрес: Ленинградская область, Выборгский район, пос. Советский ул. Заводская д.2); взнос активов ОАО "Выборгская целлюлоза" в качестве уставного капитала в компанию "Выборг Лимитед" (Vyborg Limited) находящуюся на острове Джерси, Великобритания; 3.ЗАО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Синопская наб, д.56-58); 4.ООО "ЛИВИЗ" (адрес: г. Санкт-Петербург, Красное село, ул. Нагорная д.5); 5.Земельные паи в совхоз "Ленинский луч" (Московская область, Красногорский район) 987 га, совхоз "Петровский" (Московская область, Красногорский район) 197 га, совхоз "Ильинский" (Московская область, Красногорский район) 430 га, совхоз "Дмитровский" (Московская область, Красногорский район) 360 га; 6.Покупка недвижимого имущества находящегося по адресу: США, штат Калифорния, город Беверли Хиллс, улица Беверли Парк, д.58; 7. покупка самолета Гольфстрим G500; исключая имущество Заказчика: недвижимое имущество, расположенное по адресу: Франция, Кап Ферра́т, бульвар имени Генерала де Голя, д. 17; самолет Фалькон 200, бортовой номер HB VNG, в связи с нахождением имущества за пределами РФ., что было проверено и удостоверено Девятым Арбитражный Апелляционный Суд города Москвы в Определении от 12.09.2019 г., который рассмотрев в судебном заседании, дал оценку представленным доказательством и доводам господина Сабадаша, изложенных в его апелляционной жалобе, установил и подтвердил существование Простого Товарищества «Иткин и Сабадаш».

Таким образом изучив материалы дела № A40-165165/18, учитывая преюдициальность судебных актов, вступивших в законную силу и подлежащих обязательному исполнению, ответы сторон, третьих лиц и свидетелей на судебные запросы, Суд установил, что вопреки заявлению финансового управляющего Сабадаша А.В., гр. Падалко Т.А., организации – ответчики и активы, которыми они владеют, фактически принадлежат Простому Товариществу «Иткин и Сабадаш», хотя номинально зарегистрированы на имя Сабадаша А.В. и Амбер Траст (Amber Trust), управляемый Сабадашем А.В.


**Суд в ходе рассмотрения доказательств по данному делу установил следующее:**

- Ответчик 1, Голден Спиритс Лимитед (Golden Spirits Limited), находясь в номинальном владении Сабадаша А.В, фактически принадлежит Простому Товариществу «Иткин и Сабадаш»;

- Ответчик 2, ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), находясь в номинальном владении траста Амбер Траст (Amber Trust), управляемым Сабадашем А.В, фактически принадлежит Простому Товариществу «Иткин и Сабадаш»;

- Ответчик 3, Голден Сфинкс Лимитед (Golden Sphinx Limited), находясь в номинальном владении траста Амбер Траст (Amber Trust), управляемым Сабадашем А.В, фактически принадлежит Простому Товариществу «Иткин и Сабадаш»;

- ОАО "Русский Дизель" (адрес: Ленинградская область, Всеволожский район, станция Кирпичный завод, промзона), и компания "Дизель Лимитед" (Diesel Limited) находящаяся на острове Джерси, Великобритания, находясь в номинальном владении Ответчика 2, фактически принадлежат Простому Товариществу «Иткин и Сабадаш»;

- ОАО "Выборгская целлюлоза" (адрес: Ленинградская область, Выборгский район, пос. Советский ул. Заводская д.2) и компания "Выборг Лимитед" (Vyborg Limited), находящаяся на острове Джерси, Великобритания, находясь в номинальном владении Ответчика 2, фактически принадлежат Простому Товариществу «Иткин и Сабадаш»;

- Недвижимое имущество, находящееся по адресу: США, штат Калифорния, город Беверли Хиллс, улица Беверли Парк, д.58, фактически принадлежит Простому Товариществу «Иткин и Сабадаш»;

- Самолет Гольфстрим G500 фактически принадлежит Простому Товариществу «Иткин и Сабадаш»;

- Недвижимое имущество, расположенное по адресу: Франция, Кап Феррат, бульвар имени Генерала де Голя, д. 17 фактически принадлежит Простому Товариществу «Иткин и Сабадаш»;

Согласно представленным Арбитру доказательствам, 21.04.2010г. Третье лицо перевело Ответчику 1 денежные средства в размере 1022000 (Один миллион двадцать две тысячи) долларов США и уплатил комиссию за перевод в размере 268,36 (Двести шестьдесят восемь) долларов США. Таким образом, в полном объеме выполнил обязательства по договору займа. Обязанности по возврату суммы займа и процентов по займу Ответчиком 1 выполнены не были.

23 августа 2012г. Третье лицо и Ответчик 1 заключили соглашение об изменении и отсрочке долга. В соответствии с данным соглашением стороны продлили срок исполнения обязательства по возврату долга Ответчиком 1 до «01» января 2020г. При этом процентная ставка, указанная в пункте 4.2 Договора займа, в соответствии с п.4 соглашения об изменении и отсрочке долга повышается до 6,5% годовых (в год), с ежемесячным начислением сложных процентов, начиная с Даты изменения, до полной выплаты. А также стороны согласовали следующих гарантов: ЭйЭфБи Трейдинг Уан, Инк., зарегистрированная в Штате Калифорния, США, зарегистрированные офисы которой расположены по адресу: 8501 Вилшир Бульвар, Суит 330, Беверли-Хиллз, Калифорния, США («Гарант 1»), и Голден Сфинкс Лимитед, зарегистрированные офисы которой расположены по адресу: 43 Ла Мотт Стрит, Сент-Хелиер, остров Джерси, JE4 8SD, Нормандские Острова («Гарант 2»).

23 августа 2012г. Третье лицо и ЭйЭфБи Трейдинг Уан, Инк.(AFB Tradig One.Inc.) (далее – Ответчик 2) заключили корпоративную гарантию в соответствии с которой Ответчик 2 отвечает перед Истцов за исполнение обязательств Ответчиком 1 в том числе в случае неисполнения Ответчиком1 своих обязательств гарантирует погашение задолженности в течение 10 дней с момента предъявления требования.

23 августа 2012г. Третье лицо и Голден Сфинкс Лимитед (Golden Sphinx Limited) (далее – Ответчик 3) заключили корпоративную гарантию в соответствии с которой Ответчик 3 отвечает

перед Истцов за исполнение обязательств Ответчиком 1 в том числе в случае неисполнения Ответчиком1 своих обязательств гарантирует погашение задолженности в течение 10 дней с момента предъявления требования.

23 августа 2012г. Третье лицо, Ответчик 1, Ответчик 2, Ответчик 3 заключили ДОГОВОР О ВЫБОРЕ (ЛИЧНОСТИ) АРБИТРА И ПРИМЕНЯМЫХ ПРАВИЛАХ

07 сентября 2020г. Третье лицо и компания Давилла Инвестинг Лимитед (Davilla Investing Limited) (далее Истец), заключили соглашение по передаче прав по договору займа, в соответствии с которым, все права по договору займа от 20 апреля 2010г. с изменениями от 23 августа 2012г., заключенному между Третьим лицом и Ответчиком 1, перешли к Истцу, включая обеспечение в виде корпоративных гарантий, заключенных Третьим лицом с Ответчиком 2 и Ответчиком 3.

21 декабря 2020г. Истец направил Ответчику 2 требование об оплате задолженности Ответчика 1.

21 декабря 2020г. Истец направил Ответчику 3 требование об оплате задолженности Ответчика 1.

До настоящего времени ни один из ответчиков не произвел погашение задолженности по существующим обязательствам.

**Изложенные выше обстоятельства подтверждаются следующими доказательствами:**

1.      Договор займа от 20 апреля 2010г. между Третьим лицом и Ответчиком 1;

2.      Банковская выписка от 21 апреля 2010г. подтверждающая перевод 1022000 долларов США от Третьего лица Ответчику 1;

3.      Соглашение об изменении и отсрочке долга от 23 августа 2012г. между Третьим лицом и Ответчиком 1;

4.      Корпоративная гарантия от 23 августа 2012г. выданная Ответчиком 2 Третьему лицу;

5.      Корпоративная гарантия от 23 августа 2012г. выданная Ответчиком 3 Третьему лицу;

6.      Соглашение по передаче прав по договору займа от 07 сентября 2020г. между Третьим лицом и Истцом.

7.      Требованиями об оплате задолженности.


В соответствии со ст.810 ГК РФ «… Заемщик обязан возвратить займодавцу полученную сумму займа в срок и в порядке, которые предусмотрены договором займа».

В соответствии со ст.809 ГК РФ «1. Если иное не предусмотрено законом или договором займа, займодавец имеет право на получение с заемщика процентов за пользование займом в размерах и в порядке, определенных договором. При отсутствии в договоре условия о размере процентов за пользование займом их размер определяется ключевой ставкой Банка России, действовавшей в соответствующие периоды.

2. Размер процентов за пользование займом может быть установлен в договоре с применением ставки в процентах годовых в виде фиксированной величины, с применением ставки в процентах годовых, величина которой может изменяться в зависимости от предусмотренных договором условий, в том числе в зависимости от изменения переменной величины, либо иным путем, позволяющим определить надлежащий размер процентов на момент их уплаты.

3. При отсутствии иного соглашения проценты за пользование займом выплачиваются ежемесячно до дня возврата займа включительно…».

В соответствии со ст.363 ГК РФ «1. При неисполнении или ненадлежащем исполнении должником обеспеченного поручительством обязательства поручитель и должник отвечают перед кредитором солидарно, если законом или договором поручительства не предусмотрена субсидиарная ответственность поручителя.

2. Поручитель отвечает перед кредитором в том же объеме, как и должник, включая уплату процентов, возмещение судебных издержек по взысканию долга и других убытков кредитора, вызванных неисполнением или ненадлежащим исполнением обязательства должником, если иное не предусмотрено договором поручительства.

3. Лица, совместно давшие поручительство (сопоручители), отвечают перед кредитором солидарно, если иное не предусмотрено договором поручительства. Если из соглашения между сопоручителями и кредитором не следует иное, сопоручители, ограничившие свою ответственность перед кредитором, считаются обеспечившими основное обязательство каждый в своей части. Сопоручитель, исполнивший обязательство, имеет право потребовать от других лиц, предоставивших обеспечение основного обязательства совместно с ним, возмещения уплаченного пропорционально их участию в обеспечении основного обязательства…».

В соответствии со ст. 384 ГК РФ «Если иное не предусмотрено законом или договором, право первоначального кредитора переходит к новому кредитору в том объеме и на тех условиях, которые существовали к моменту перехода права. В частности, к новому кредитору переходят права, обеспечивающие исполнение обязательства, а также другие связанные с требованием права, в том числе право на проценты…».

Таким образом, у Ответчиков есть солидарная задолженность на общую сумму 1804017,81 долл. США из которых:

1022000 долларов США – сумма основного долга.

1874,53 долл. США - сумма процентов за период с 21.04.2010г. по 21.04.2012г.

780143,28 долл. США за период с 21.04.2012г. по 12.12.2020г.

В соответствии с Федеральным Законом Российской Федерации «О Третейских судах в Российской Федерации» ст.16.

В соответствии с Арбитражным регламентом ЮНСИТРАЛ (регламент, принятый Комиссией ООН по праву международной торговли в 1976 г. и рекомендованный к использованию Генеральной Ассамблеей ООН 15 декабря 1976 г. с изменениями).

31 августа 2021г. третейский суд, образованный сторонами для разрешения конкретного спора в составе единоличного третейского судьи, в лице единого арбитра (судьи), выбранного и согласованного сторонами - Князева Дмитрия Валерьевича, рассмотрев исковое заявление Давилла Инвестинг Лимитед (Davilla Investing Limited) ( истец) к Голден Спиритс Лимитед (Golden Spirits Limited) (Ответчик 1), ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.) (Ответчик 2), Голден Сфинкс Лимитед (Golden Sphinx Limited) (Ответчик 3), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям

## РЕШИЛ:

1.     Удовлетворить исковые требования по иску Давилла Инвестинг Лимитед (Davilla Investing Limited) к Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк (AFB Trading One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited), Аграгорн Холдингс Лимитед (Agragorn Holdings Limited) о взыскании задолженности по договору займа, соглашении об изменении и отсрочке долга, корпоративным гарантиям.

2.     Солидарно взыскать с компаний Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк.(AFB Trading One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) в пользу компании Давилла Инвестинг Лимитед (Davilla Investing Limited) сумму основного долга в размере 1022000 (Один миллион двадцать две тысячи) долларов США, проценты за пользование денежными средствами в размере 782017 (Семьсот восемьдесят две тысячи семнадцать) долларов США 80 центов.

3.     Солидарно взыскать с компаний Голден Спиритс Лимитед (Golden Spirits Limited), ЭйЭфБи Трейдинг Уан, Инк.(AFB Trading One.Inc.), Голден Сфинкс Лимитед (Golden Sphinx Limited) в пользу компании Давилла Инвестинг Лимитед (Davilla Investing Limited) судебные расходы в размере 278000 (Двести семьдесят восемь тысяч) рублей.

4.     В соответствии с арбитражным соглашением, решение третейского суда окончательно. Вступает в законную силу немедленно с даты принятия, подлежит немедленному исполнению. В соответствии с ч. 4 ст. 238 АПК РФ, обстоятельства, установленные третейским судом, не подлежат переоценке либо пересмотру, по существу.

Арбитражный суд
в рамках арбитражной процедуры AD HOC

для разрешения конкретного спора

единый арбитр (судья),

выбранный и согласованный сторонами

Князев Дмитрий Валерьевич

Case 2:25-cv-11238-SNB Doc 901 Filed 06/30/25 Page 1 of 36
Case 2:25-cv-11238-SNB Doc 901 Filed 06/30/25 USDC Colo pg 20:45 Page 285 of
Declaration of Michael Zorkin — Page 287 of 348

# MIKHAIL BOGOMOLNY
## TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

**Ad hoc tribunal for specific dispute resolution**
**Sole judge, selected and stipulated to by the parties: Knyazev Dmitry Valerievich**
**Address: 4 Ilinka Street, Office 102–103, Moscow, Russia 109012**

# ORDER

On August 31, 2021, in the city of Moscow, Ad hoc tribunal for specific dispute resolution (hereinafter also referred to as the "Tribunal"), composed of the sole judge, selected and stipulated to by the parties — Dmitry Valerievich Knyazev (hereinafter also referred to as the "Judge" or "Arbitrator"), reviewed the statement of claim filed by Davilla Investing Limited (hereinafter also referred to as the "Plaintiff") against Golden Spirits Limited (hereinafter "Defendant 1"), AFB Trading One, Inc. (hereinafter "Defendant 2"), Golden Sphinx Limited (hereinafter "Defendant 3"), and Agragorn Holdings Limited (hereinafter "Third Party") seeking the recovery of debt under a loan agreement, debt modification and deferral agreement, and corporate guarantees.

The arbitration was held in accordance with the Russian Federation Federal Arbitration Law No. 382-FZ of December 29, 2015" (hereinafter the "Arbitration Law," FZ-382), in the presence of the parties:

Irina Borisovna Selezneva, counsel for the plaintiff: Davilla Investing Limited. Copy of the power of attorney from Davilla Investing Limited submitted as part of the case file.

Defendant 1: Golden Spirits Limited

Defendant 2: AFB Trading One, Inc. — Tatyana Padalko, financial administrator for Sabadash A.V.; a copy of the decision of the Moscow Region Arbitration Court in case No. A41-100887/19 dated November 10, 2020, was submitted as evidence of authorization.

Defendant 3: Golden Sphinx Limited

Third Party: Agragorn Holdings Limited

On August 24, 2021, the Tribunal received a response to the claim filed by Davilla Investing Limited from Larisa Sabadash, in her capacity as Director of AFB Trading One, Inc. and as Director of Golden Sphinx Limited.
On the same date, the Tribunal received a separate response to the claim from Tatyana Alekseevna Padalko, in her capacity as Financial Administrator of Sabadash A.V., as owner of AFB Trading One, Inc.

Exercising the powers granted under Article 16.1 of the Arbitration Law, the Arbitrator, in determining jurisdiction, additionally reviews the case materials for compliance with Article 239 of the Commercial Procedure Code of the Russian Federation (RF CPC) to rule out any grounds that may cause a competent court to deny issuance of a writ of execution for the enforcement of the arbitral award.

Jurisdiction of the Arbitrator:
Pursuant to Article 2 of Russian Federation Federal Arbitration Law No. 382-FZ of December 29, 2015 (hereinafter the "Arbitration Law," FZ-382):

2. Arbitration (arbitral proceedings) — a process of dispute resolution by an arbitral tribunal and rendering of an arbitral award by the tribunal;

3. Arbitral tribunal — a sole arbitrator or a panel of arbitrators;

4. Arbitrator (arbitral judge) — a natural person selected by the parties or appointed in accordance with the procedure agreed upon by the parties or established by federal law for the purpose of resolving a dispute through arbitration;

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

**MIKHAIL BOGOMOLNY**
**TRANSLATION, NOTARY AND APOSTILLE SERVICES**

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

5. Administration of arbitration — carrying out organizational functions related to arbitration, including procedures for the selection, appointment, or challenge of arbitrators, maintenance of case files, and management of arbitration fees, excluding the functions of the tribunal related directly to dispute resolution.

An arbitration Paragraph that forms part of a contract is considered an agreement independent of the other terms of the contract. A ruling that the contract is invalid does not, by itself, render the arbitration agreement invalid.

A statement challenging the jurisdiction of the arbitral tribunal must be filed by the relevant party to the arbitration no later than the submission of its first statement on the merits of the dispute.


Prior to the commencement of the proceedings on the merits of the claim, no objections were raised pertaining to the Arbitral Judge's jurisdiction to adjudicate the matter at hand.

Pursuant to Articles 7, 19, and 52 of the Arbitration Law, the Arbitrator ruled that he has jurisdiction to consider the dispute submitted to him for resolution.

Exercising the powers granted under Article 16.1 of the Arbitration Law, the Arbitrator, in affirming his jurisdiction, additionally reviewed the case materials for compliance with the provisions of Article 239 of the Commercial Procedure Code of the Russian Federation (RF CPC) to eliminate grounds for a competent court to refuse the issuance of a writ of execution for the enforcement of the arbitral award:

I. In accordance with Article 239.3 of the RF CPC:

Paragraph 1: "A competent court may deny the issuance of a writ of execution only if a party to the arbitral proceedings provides evidence that one of the parties to the arbitration agreement under which the dispute was resolved lacked full legal capacity."
No such claims have been submitted by the parties.

Paragraph 2: "A competent court may deny the issuance of a writ of execution only if a party to the arbitral proceedings provides evidence that the arbitration agreement under which the dispute was resolved is invalid under the law to which the parties have subjected it, or in the absence of such indication, under the law of the Russian Federation."
Under Article 7 of Federal Law No. 382-FZ, "an arbitration agreement is an agreement between the parties to submit to arbitration all or certain disputes which have arisen or may arise between them in connection with a defined legal relationship, whether contractual or not. The arbitration agreement may be made in the form of an arbitration Paragraph in a contract or in the form of a separate agreement.
When interpreting an arbitration agreement, any doubt shall be interpreted in favor of its validity and enforceability."

The parties were duly notified of the formation of the tribunal, as well as the date, location, and time of the hearing. Pursuant to Article 3 of the Arbitration Law, the parties are deemed to have been properly notified, in accordance with the analogy to Article 123 of the RF CPC.

This conclusion is also supported by the position of the Judicial Panel of the Supreme Court of the Russian Federation dated December 30, 2015 No. 302-EC15-11092:

Paragraph 5: "A competent court may deny the issuance of a writ of execution only if a party to the arbitral proceedings provides evidence that the composition of the arbitral tribunal or the arbitration procedure was not in accordance with the agreement of the parties or with federal law."

A) Composition of the Arbitral Tribunal: Pursuant to Part 2 of Article 11 of Federal Law No. 382-FZ, the parties to arbitration may agree on the procedure for the selection (appointment) of an arbitrator or arbitrators, provided that the requirements of Parts 4–11 of this Article are observed.

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

On the basis of the assignment agreement under the Loan Agreement dated September 7, 2020, entered into between the Plaintiff and the Third Party, and on the basis of the Agreement on the Selection of the Arbitrator and Applicable Rules dated August 23, 2012, entered into between the Third Party, Defendant 1, Defendant 2, and Defendant 3, which is currently in force and has been approved by the parties pursuant to the UNCITRAL Arbitration Rules, the parties agreed that any disputes, disagreements, differences of opinion, or claims that may arise from or in connection with the aforementioned agreements and contracts—including but not limited to those related to their entry into force, performance, amendment, breach, termination, or validity—shall be resolved and finally settled through ad hoc arbitration.

Any such dispute shall be heard by a sole arbitrator agreed upon by the parties. Accordingly, this specific dispute was submitted for consideration by this duly constituted tribunal, with the sole arbitrator being Master of Laws Dmitry Valerievich Knyazev, a citizen of the Russian Federation.

The identity of the Arbitrator has been verified based on the Passport of a citizen of the Russian Federation issued in the name of Dmitry Valerievich Knyazev, as confirmed by a copy included in the arbitration case file. The possession of a higher legal education by the appointed Arbitrator, Dmitry Valerievich Knyazev, is confirmed by a diploma issued in the Russian Federation, Moscow, by the Specialized Institute of Jurisprudence, Diploma No. ABC 0715029, a copy of which is included in the case file.

The absence of a criminal record is confirmed by a Certificate issued by the Main Directorate of the Ministry of Internal Affairs of Russia for the city of Moscow dated July 11, 2021, No. 13/5-099/264646-E, also included in the arbitration case file.

According to the clarification provided by the Ministry of Justice of Russia dated September 2, 2021, No. 12-103924/2021, the provisions of Federal Law No. 382-FZ do not authorize an arbitral tribunal formed by the parties for the resolution of a specific dispute to perform the functions of a permanent arbitral institution or to engage in arbitration administration. Accordingly, the applicable legislation does not require the arbitrator to hold any additional licenses or permits.

Thus, the formation of the Arbitral Tribunal has been carried out in compliance with the provisions of the Arbitration Law.

B) Arbitration Procedure: Pursuant to paragraphs 1 and 2 of Article 19 of the Arbitration Law: "Subject to the provisions of this Federal Law, the parties may agree at their discretion on the procedure to be followed in the arbitration. In the absence of such agreement, the arbitral tribunal may, subject to the provisions of this Federal Law, conduct the arbitration in such manner as it considers appropriate, including the determination of the admissibility, relevance, and weight of any evidence."

According to Article 2.2 of the Arbitration Law: "Administration of arbitration means performing organizational functions related to the arbitration, including the selection, appointment, or challenge of arbitrators, case file maintenance, and the collection and allocation of arbitration fees, excluding the functions of the arbitral tribunal directly related to dispute resolution."

In accordance with this provision, the Sole Arbitrator adjudicated the dispute personally, as confirmed by the arbitration case materials:

• was personally selected by the parties in the arbitration agreement,
• personally received the statement of claim and accepted it for proceedings,
• personally selected and secured a venue for the hearing,

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

**MIKHAIL BOGOMOLNY**
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

Case 2:25-cv-01155-NBL Claim 901 Filed 06/30/25 Desc Main Document Page 29 of
Declaration of Michael Zorkin — Page 290 of 348

• received the arbitration fee into his personal bank account,
• personally paid expenses associated with the adjudication of the dispute (postal charges, office supplies, equipment, venue, etc.),
• personally mailed court notices and other documents to the parties,
• personally scheduled and conducted the hearing,
• personally issued procedural rulings and the arbitral award,
• no objections were raised by the parties regarding any violation of arbitration procedures,
• no motions for recusal or self-recusal were submitted.

Pursuant to Part 1 of Article 11 of the Civil Code of the Russian Federation, the protection of violated or disputed civil rights shall be carried out, in accordance with the jurisdiction established by procedural legislation, by a court, arbitration court, or arbitral tribunal.

According to Part 1 of Article 33 of the Commercial Procedure Code of the Russian Federation (RF CPC), disputes arising from civil law relations, as well as individual labor disputes involving professional athletes and coaches in elite sports, may be submitted by the parties to an arbitral tribunal, provided that a valid arbitration agreement exists between the parties and unless otherwise stipulated by federal law.

Under Part 3 of Article 1 of the Arbitration Law, disputes between parties to civil law relations may be submitted to arbitration by agreement of the parties, unless otherwise provided by federal law.

Current legislation does not prohibit referring disputes under loan agreements or assignments entered into between legal entities to arbitration.

Loan and assignment agreements are not contracts concluded within the framework of public procurement for state or municipal needs, nor are they contracts made under the procedure prescribed by Federal Law No. 223-FZ.

No submissions were made by the parties claiming that the present dispute is not arbitrable or that it contravenes the public policy of the Russian Federation, nor were any such issues identified by the Arbitrator.

The Sole Arbitrator, while maintaining the record of the hearing, reviewed the statement of claim and the evidence submitted by the parties, making the following

## FINDINGS:

The Plaintiff filed a claim against Defendant 1, Defendant 2, Defendant 3, and the Third Party, and on May 18, 2021, sent by registered mail to all parties a notice of arbitration with the statement of claim and annexes, stating:

that the Plaintiff was informing the parties about the referral of the claim for recovery of debt under the Loan Agreement to arbitration;

that the dispute arose from the Loan Agreement dated April 20, 2010, concluded between Agragorn Holdings Limited and Golden Spirits Limited; the Agreement on Modification and Deferral of Debt dated August 23, 2012, concluded between Agragorn Holdings Limited and Golden Spirits Limited; the Corporate Guarantee dated August 23, 2012, concluded between Agragorn Holdings Limited and AFB Trading One, Inc.; the Corporate Guarantee dated August 23, 2012, concluded between Agragorn Holdings Limited and Golden Sphinx Limited; and the Assignment Agreement dated September 7, 2020, concluded between Agragorn Holdings Limited and Davilla Investing Limited.

that on April 20, 2010, Agragorn Holdings Limited and Golden Spirits Limited entered into a loan agreement. Pursuant to this agreement, the Third Party extended a loan in the amount of 1,022,000 (one million twenty-two thousand) US dollars to the borrower. Under clause 4.1 of the loan agreement, Defendant 1 was to repay the loan no

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

MIKHAIL BOGOMOLNY
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG                                    CERTIFIED COURT INTERPRETER
P. 1.818.284.1884

later than two years from the date of disbursement, and under clause 4.2 of the loan agreement, to pay 1.1% annual interest on the loan amount. On April 21, 2010, the Third Party transferred 1,022,000 (one million twenty-two thousand) US dollars to Defendant 1 and paid a transfer fee of 268.36 (two hundred sixty-eight) US dollars. Thus, the Third Party fully performed its obligations under the loan agreement. Defendant 1 failed to fully perform its obligations to repay the loan principal and interest. On August 23, 2012, the Third Party and Defendant 1 entered into an agreement on modification and deferral of the debt. Under this agreement, the parties extended the deadline for repayment by Defendant 1 to January 1, 2020. The interest rate stipulated in clause 4.2 of the loan agreement was increased under clause 4 of the modification and deferral agreement to 6.5% per annum, with monthly compounding interest from the date of amendment until full repayment.

The parties also agreed to the following guarantors: AFB Trading One, Inc., registered in the State of California, USA, with registered offices at 8501 Wilshire Boulevard, Suite 330, Beverly Hills, California, USA ("Guarantor 1"), and Golden Sphinx Limited, a company registered in the State of California, USA, with registered offices at 43 La Motte Street, St. Helier, Jersey, JE4 8SD, Channel Islands ("Guarantor 2").

On August 23, 2012, the Third Party and AFB Trading One, Inc. entered into a corporate guarantee whereby Defendant 2 assumed responsibility before the Plaintiff for the performance of Defendant 1's obligations, and in case of default, guaranteed repayment of the debt within 10 days of a demand.

On August 23, 2012, the Third Party and Golden Sphinx Limited entered into a corporate guarantee whereby Defendant 3 assumed responsibility before the Plaintiff for the performance of Defendant 1's obligations, and in case of default, guaranteed repayment of the debt within 10 days of a demand.

On August 23, 2012, the Third Party, Defendant 1, Defendant 2, and Defendant 3 entered into an AGREEMENT ON THE SELECTION OF THE ARBITRATOR AND APPLICABLE RULES.

On September 7, 2020, the Third Party and Davilla Investing Limited entered into an agreement on the assignment of rights under the Loan Agreement, under which all rights under the loan agreement dated April 20, 2010, as amended on August 23, 2012, between the Third Party and Defendant 1, were transferred to the Plaintiff, including the security in the form of corporate guarantees concluded between the Third Party and Defendants 2 and 3.

On December 21, 2020, the Plaintiff sent a demand to Defendant 2 for payment of Defendant 1's debt. On December 21, 2020, the Plaintiff sent a demand to Defendant 3 for payment of Defendant 1's debt. As of this date, none of the Defendants has repaid the debt under the existing obligations.

Therefore, the Defendants have joint and several liability for a total amount of 1,804,017.81 US dollars, consisting of: 1,022,000 US dollars as the principal debt; 1,874.53 US dollars in interest for the period from April 21, 2010, to April 21, 2012; and 780,143.28 US dollars for the period from April 21, 2012, to December 12, 2020.

The Plaintiff seeks joint and several recovery from Golden Spirits Limited, AFB Trading One, Inc., and Golden Sphinx Limited in favor of Davilla Investing Limited in the amount of 1,022,000 (one million twenty-two thousand) US dollars as the principal debt, and 782,017.80 (seven hundred eighty-two thousand seventeen US dollars and eighty cents) as interest. The Plaintiff also seeks joint and several recovery of court costs from the same companies in favor of Davilla Investing Limited.

According to the certified copies of the above-mentioned agreements and contracts submitted to the Tribunal, and based on the arbitration agreements included therein, namely:

under the arbitration agreement of the parties incorporated in the Agreement on Modification and Deferral of Debt concluded between the Third Party and Defendant 1 under clause 12.F;

under the arbitration agreement of the parties incorporated in the Corporate Guarantee concluded between the

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

MIKHAIL BOGOMOLNY
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

CERTIFIED COURT INTERPRETER

Plaintiff and Defendant 2 under clause 5.7;

under the arbitration agreement of the parties incorporated in the Corporate Guarantee concluded between the Plaintiff and Defendant 3 under clause 5.7;

under the Assignment Agreement dated September 7, 2020, concluded between the Plaintiff and the Third Party;

under the Agreement on the Selection of the Arbitrator and Applicable Rules dated August 23, 2012, concluded between the Third Party, Defendant 1, Defendant 2, and Defendant 3, and approved by the parties pursuant to the currently applicable UNCITRAL Arbitration Rules,

the parties agreed that any disputes, disagreements, differences of opinion, or claims arising out of or in connection with the aforementioned agreements and contracts, including but not limited to those relating to their validity, performance, amendment, breach, termination, or enforceability, shall be resolved and finally settled through AD HOC arbitration. Any such dispute shall be adjudicated by a sole arbitrator agreed upon by the parties.

Accordingly, the present dispute was submitted to this duly formed tribunal, with Doctor of Law Dmitry Valerievich Knyazev, a citizen of the Russian Federation, appointed as the sole arbitrator.

The parties agreed that the dispute would be resolved solely based on the written materials submitted by the parties, without the mandatory holding of an oral hearing or summoning of the parties, while allowing participation of the parties and the arbitrator via electronic video conferencing, such as Skype. The parties further agreed that the arbitration would be conducted in Moscow, Russian Federation, in the Russian language and in accordance with the legislation of the Russian Federation. They also agreed that the Arbitrator would determine the existence and scope of the agreement to arbitrate and would be authorized to issue enforceable awards—monetary or otherwise—to the fullest extent possible.

On May 20, 2021, the Arbitral Tribunal, constituted under an AD HOC arbitration procedure for the resolution of a specific dispute and composed of the sole arbitrator selected and agreed upon by the parties, Dmitry Valerievich Knyazev, issued a Ruling to Schedule the Hearing. By this ruling, the Tribunal was established under the AD HOC arbitration procedure for resolution of a specific dispute, confirmed Dmitry Valerievich Knyazev as the sole arbitrator selected and agreed upon by the parties, admitted the above-mentioned claim for consideration by this Tribunal, and set a 25-day period to prepare the case for arbitration. The parties were invited to submit all documents required for adjudication of the dispute, including their responses to the claim, by June 14, 2021.

Pursuant to Article 11 of the Civil Code of the Russian Federation, "The protection of violated or disputed civil rights shall be carried out by a court, magistrate court, or arbitral tribunal (hereinafter referred to as the court) in accordance with their jurisdiction."

Pursuant to the Federal Law of the Russian Federation "On Arbitral Tribunals in the Russian Federation," Article 1 states: "1. This Federal Law regulates the procedure for the establishment and operation of arbitral tribunals located within the territory of the Russian Federation. 2. By agreement of the parties to arbitral proceedings (hereinafter also – the parties), any dispute arising from civil law relationships may be submitted to an arbitral tribunal unless otherwise provided by federal law. 3. The effect of this Federal Law does not extend to international commercial arbitration. 4. If an international treaty of the Russian Federation establishes a different procedure for the formation and operation of arbitral tribunals than that provided by this Federal Law, the rules of the international treaty shall apply."

According to Article 4 of the European Convention on International Commercial Arbitration dated April 21, 1961, "1. The parties to an arbitration agreement may, at their discretion: ... b) provide for the referral of disputes to arbitration in a particular case (ad hoc arbitration) and, in particular: i) appoint arbitrators or establish methods for

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

**MIKHAIL BOGOMOLNY**
**TRANSLATION, NOTARY AND APOSTILLE SERVICES**

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

their appointment in the event of a dispute; ii) determine the seat of the arbitral tribunal; iii) establish the rules of procedure to be followed by the arbitrators...*"*

The case was duly prepared for consideration by the Arbitrator. By Ruling dated August 2, 2021, the Arbitral Tribunal established under the AD HOC arbitration procedure for resolution of a specific dispute, acting through the sole arbitrator selected and agreed upon by the parties—Dmitry Valerievich Knyazev—scheduled the arbitral hearing in the case of Davilla Investing Limited vs. Golden Spirits Limited, AFB Trading One, Inc., Golden Sphinx Limited, and Agragorn Holdings Limited for recovery of debt under a loan agreement, agreement on modification and deferral of debt, and corporate guarantees for August 31, 2021, at 12:00 PM Moscow time, at: 4 Ilinka Street, Office 102–103, Moscow, Russia 109012.

The Plaintiff was requested to submit original documents supporting the claims; Defendants and the Third Party were given until August 25, 2021, to submit documented responses to the claim and to present originals substantiating their objections at the hearing.

On August 5, 2021, the Arbitrator sent a court request to witness Garry Itkin.

Witness Garry Itkin duly submitted sworn testimony significant for proper resolution of the dispute, in which he stated:

1. Yes, on April 20, 2010, I was the Director of Golden Spirits Limited.
2. Yes, I signed the loan agreement between Agragorn Holdings Limited and Golden Spirits Limited dated April 20, 2010, for the amount of USD 1,022,000.
3. Yes, I confirm my signature on the loan agreement dated April 20, 2010, for USD 1,022,000.
4. Yes, I was authorized to sign the loan agreement dated April 20, 2010, for USD 1,022,000.
5. Yes, the amount of USD 1,022,000 was transferred to the account of Golden Spirits Limited by Agragorn Holdings Limited on April 21, 2010, as per the loan agreement.
6. Yes, the amount of USD 1,022,000 was credited to the account of Golden Spirits Limited by the bank specified in the loan agreement dated April 20, 2010.
7. No, Golden Spirits Limited did not repay the debt to Agragorn Holdings Limited in accordance with the loan agreement dated April 20, 2010.
8. Yes, on August 23, 2012, I was the Director of Golden Spirits Limited.
9. Yes, I signed the agreement on modification and deferral of debt dated August 23, 2012, between Agragorn Holdings Limited and Golden Spirits Limited on behalf of Golden Spirits Limited.
10. Yes, I confirm my signature on the agreement on modification and deferral of debt dated August 23, 2012, on behalf of Golden Spirits Limited.
11. Yes, I was authorized to sign the agreement on modification and deferral of debt dated August 23, 2012, on behalf of Golden Spirits Limited.
12. Yes, the agreement on modification and deferral of debt dated August 23, 2012, was unequivocally in the interests of Golden Spirits Limited and was signed in its interest.
13. Yes, the agreement on modification and deferral of debt dated August 23, 2012, was unequivocally beneficial for Golden Spirits Limited.
14. Yes, the consideration in the agreement on modification and deferral of debt dated August 23, 2012, was undoubtedly sufficient for Golden Spirits Limited.
15. On August 23, 2012, I was also the Director of Golden Sphinx Limited.

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT(S) OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

MIKHAIL BOGOMOLNY
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

16. Yes, I signed the agreement on modification and deferral of debt dated August 23, 2012, between Agragorn Holdings Limited and Golden Spirits Limited on behalf of Golden Sphinx Limited.

17. Yes, I confirm my signature on the agreement on modification and deferral of debt between Agragorn Holdings Limited and Golden Spirits Limited dated August 23, 2012, on behalf of Golden Sphinx Limited.

18. Yes, I was authorized to sign the agreement on modification and deferral of debt between Agragorn Holdings Limited and Golden Spirits Limited dated August 23, 2012, on behalf of Golden Sphinx Limited.

19. Yes, Golden Sphinx Limited had a material interest in the financial success of Golden Spirits Limited.

20. Yes, the agreement on modification and deferral of debt dated August 23, 2012, between Agragorn Holdings Limited and Golden Spirits Limited was unequivocally in the interest of Golden Sphinx Limited and was signed in its interest.

21. Yes, the agreement on modification and deferral of debt dated August 23, 2012, was unequivocally beneficial for Golden Sphinx Limited.

22. Yes, the consideration in the agreement on modification and deferral of debt dated August 23, 2012, was undoubtedly sufficient for Golden Sphinx Limited.

23. On August 23, 2012, I was the President, Chief Financial and Executive Officer, and Treasurer of AFB Trading One Inc.

24. Yes, I signed the agreement on modification and deferral of debt between Agragorn Holdings Limited and Golden Spirits Limited dated August 23, 2012, on behalf of AFB Trading One Inc.

25. Yes, I confirm my signature on the agreement on modification and deferral of debt dated August 23, 2012, on behalf of AFB Trading One Inc.

26. Yes, I was authorized to sign the agreement on modification and deferral of debt dated August 23, 2012, on behalf of AFB Trading One Inc.

27. Yes, AFB Trading One Inc. had a material interest in the financial success of Golden Spirits Limited.

28. Yes, the agreement on modification and deferral of debt dated August 23, 2012, was unequivocally in the interest of AFB Trading One Inc. and was signed in its interest.

29. Yes, the agreement on modification and deferral of debt dated August 23, 2012, was unequivocally beneficial for AFB Trading One Inc.

30. Yes, the consideration in the agreement on modification and deferral of debt dated August 23, 2012, was undoubtedly sufficient for AFB Trading One Inc.

31. Yes, I signed the corporate guarantee on behalf of Golden Sphinx Limited in favor of Agragorn Holdings Limited dated August 23, 2012, irrevocably and unconditionally guaranteeing Agragorn Holdings Limited the timely and proper performance, observance, and fulfillment of obligations by Golden Spirits Limited.

32. Yes, I confirm my signature on the corporate guarantee on behalf of Golden Sphinx Limited in favor of Agragorn Holdings Limited dated August 23, 2012.

33. Yes, I was authorized to sign the corporate guarantee on behalf of Golden Sphinx Limited in favor of Agragorn Holdings Limited dated August 23, 2012.

34. Yes, Golden Sphinx Limited had a material interest in the financial success of Golden Spirits Limited.

35. Yes, the irrevocable and unconditional guarantee dated August 23, 2012, of the timely and proper performance, observance, and fulfillment of obligations by Golden Spirits Limited to Agragorn Holdings Limited was unequivocally in the interest of Golden Sphinx Limited and was signed in its interest.

36. Yes, the issuance of the irrevocable and unconditional guarantee dated August 23, 2012, was unequivocally beneficial for Golden Sphinx Limited.

37. Yes, the consideration in the corporate guarantee of Golden Sphinx Limited in favor of Agragorn Holdings Limited dated August 23, 2012, guaranteeing the timely and proper performance, observance, and

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

# MIKHAIL BOGOMOLNY
## TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

fulfillment of obligations by Golden Spirits Limited, was undoubtedly sufficient for Golden Sphinx Limited.

38. Yes, I signed the corporate guarantee on behalf of AFB Trading One Inc. in favor of Agragorn Holdings Limited dated August 23, 2012, irrevocably and unconditionally guaranteeing Agragorn Holdings Limited the timely and proper performance, observance, and fulfillment of obligations by Golden Spirits Limited.

39. Yes, I confirm my signature on the corporate guarantee on behalf of AFB Trading One Inc. in favor of Agragorn Holdings Limited dated August 23, 2012.

40. Yes, I was authorized to sign the corporate guarantee on behalf of AFB Trading One Inc. in favor of Agragorn Holdings Limited dated August 23, 2012.

41. Yes, AFB Trading One Inc. had a material interest in the financial success of Golden Spirits Limited.

42. Yes, the irrevocable and unconditional guarantee dated August 23, 2012, of the timely and proper performance, observance, and fulfillment of obligations by Golden Spirits Limited to Agragorn Holdings Limited was unequivocally in the interest of AFB Trading One Inc. and was signed in its interest.

43. Yes, the issuance of the irrevocable and unconditional guarantee dated August 23, 2012, was unequivocally beneficial for AFB Trading One Inc.

44. Yes, the consideration in the corporate guarantee of Golden Sphinx Limited in favor of Agragorn Holdings Limited dated August 23, 2012, guaranteeing timely and proper performance, observance, and fulfillment of obligations by Golden Spirits Limited, was undoubtedly sufficient for AFB Trading One Inc.

45. Yes, I signed the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of Golden Spirits Limited.

46. Yes, I confirm my signature on the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of Golden Spirits Limited.

47. Yes, I was authorized to sign the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of Golden Spirits Limited.

48. Yes, the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was unequivocally in the interest of Golden Spirits Limited and was signed in its interest.

49. Yes, the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was unequivocally beneficial for Golden Spirits Limited.

50. Yes, the consideration in the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was undoubtedly sufficient for Golden Spirits Limited.

51. Yes, I signed the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of Golden Sphinx Limited.

52. Yes, I confirm my signature on the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of Golden Sphinx Limited.

53. Yes, I was authorized to sign the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of Golden Sphinx Limited.

54. Yes, the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was unequivocally in the interest of Golden Sphinx Limited and was signed in its interest.

55. Yes, the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was unequivocally beneficial for Golden Sphinx Limited.

56. Yes, the consideration in the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was undoubtedly sufficient for Golden Sphinx Limited.

57. Yes, I signed the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of AFB Trading One Inc.

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

MIKHAIL BOGOMOLNY
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

CERTIFIED COURT INTERPRETER

Case 2:25-cv-11355-NB-Majn 901 Filed 06/27/25 Case Main DOC 06:20:45 Page 35 of
Declaration of Michael Zorkin — Page 296 of 348

58. Yes, I confirm my signature on the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of AFB Trading One Inc.

59. Yes, I was authorized to sign the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, on behalf of AFB Trading One Inc.

60. Yes, the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was unequivocally in the interest of AFB Trading One Inc. and was signed in its interest.

61. Yes, the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was unequivocally beneficial for AFB Trading One Inc.

62. Yes, the consideration in the agreement on the figure of the arbitrator and applicable rules dated August 23, 2012, was undoubtedly sufficient for AFB Trading One Inc.

On July 19, 2021, during the consideration of the present case, Tatiana Padalko, identifying herself as the financial administrator of Sabadash A.V., submitted a statement to the Tribunal, with a copy of the ruling by the Moscow Region Arbitration Court in case No. A41-100887/19 dated November 10, 2020, appended to the case file confirming her authority to act on behalf of the Defendants. In correspondence to the Tribunal, she stated: "Good afternoon, I am the financial administrator of Sabadash A.V.. The Defendant companies belong to Sabadash A.V.The documents in this dispute were falsified. Please provide your contact details for follow-up." (quoted from Tatiana Padalko's message arbitrpadalko@gmail.com). The Arbitrator evaluated this statement along with the other evidence in the case.

On August 19, 2021, the Tribunal received a petition from AFB Trading One, Inc. and Golden Sphinx Limited raising the issue of the Tribunal's jurisdiction in light of the liquidation of Golden Spirits Limited on October 31, 2013—one of the parties to the dispute and a signatory to the Agreement on the Selection of the Arbitrator and Applicable Rules dated August 23, 2012.

On August 24, 2021, the Tribunal received a response to the claim by Davilla Investing Limited signed by Tatiana Alekseevna Padalko in her capacity as the financial administrator of Sabadash A.V., as owner of AFB Trading One, Inc. The response does not contest the arbitration agreement under the AD HOC procedure, but states that the company ceased operations upon liquidation on October 31, 2013.

Golden Spirits Limited, whose obligations are guaranteed by Golden Sphinx Limited and AFB Trading One, Inc., was claimed by the representative to have lost legal capacity from October 1, 2013. Therefore, they requested the claim be dismissed.

On August 25, 2021, the Tribunal received an email from Managing Attorney Michael Zorkin: "Knyazev, Attached is the response to the claim by Larisa Sabadash on behalf of AFB Trading One, Inc. and Golden Sphinx Limited." In the response, dated August 24, 2021, submitted by Larisa Sabadash as Director of AFB Trading One, Inc. and Golden Sphinx Limited, she confirmed proper notice of the hearing scheduled for August 25, 2021, at 12:00 PM Moscow time, confirmed the conclusion of the agreement dated December 23, 2012, between the parties, did not dispute the Arbitrator's jurisdiction, stated she has been Director of AFB Trading One, Inc. since October 3, 2016, and Director of Golden Sphinx Limited since September 17, 2019, and asserted that since the primary borrower, Golden Spirits Limited, lost legal capacity on October 1, 2013, the associated guarantee obligations should be deemed terminated, requesting dismissal of the claim.

The Tribunal reviewed Larisa Sabadash' response and the position of her representative Michael Zorkin, finding an acknowledgment of the debt obligations of Golden Sphinx Limited and AFB Trading One, Inc.

According to Article 309 of the Russian Federation Civil Code, obligations must be performed properly in accordance with the terms of the obligation and legal requirements.

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

**MIKHAIL BOGOMOLNY**
**TRANSLATION, NOTARY AND APOSTILLE SERVICES**

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

The Arbitrator deemed the arguments of the Defendants regarding the expiration of the statute of limitations unsubstantiated, noting that the guarantee obligations under the loan issued by Golden Spirits Limited were undertaken before October 1, 2013, and thus remain valid.

The Tribunal reviewed the statement by financial administrator Tatiana Padalko that the Defendant companies belong to Sabadash A.V.. To verify these claims, the Tribunal examined case No. A40-165165/18 in the Moscow Arbitration Court regarding a claim by individual entrepreneur Gofman E. against the General Partnership "Itkin and Sabadash" seeking recognition of the existence and validity of an agreement. On October 10, 2019, the Moscow Arbitration Court issued a ruling in response to Sabadash A.V.'s appeal against the September 14, 2018, decision contesting the existence of the partnership and its ownership of specific assets, including:

1. Russian Diesel, OJSC (address: Leningrad Region, Vsevolozhsky District, Kirpichny Zavod station, industrial zone); contributed to the charter capital of Diesel Limited on Jersey Island, UK.

2. Vyborg Cellulose, OJSC (address: Leningrad Region, Vyborg District, Sovetsky village, Zavodskaya St. 2); contributed to the charter capital of Vyborg Limited on Jersey Island, UK.

3. LIVIZ, CJSC (address: 56–58 Sinopskaya Embankment, St. Petersburg,).

4. LIVIZ, CJSC (address: 5 Nagornaya Str., Krasnoye Selo, St. Petersburg,).

5. Agricultural land shares in Lenin's Ray state farm (Moscow Region, Krasnogorsky District) – 987 ha; Petrovsky – 197 ha; Ilyinsky – 430 ha; Dmitrovsky – 360 ha.

6. Real estate purchased in Beverly Hills, California, USA, Beverly Park Street, No. 58.

7. Purchase of Gulfstream G500 aircraft.

Excluding customer-owned assets located outside of the Russian Federation, including real estate in Cap Ferrat, France, General de Gaulle Blvd., No. 17, and a Falcon 200 aircraft, tail number NV VNG.

This was reviewed and confirmed by the Ninth Arbitration Appellate Court of Moscow in its ruling dated September 12, 2019, which, having considered the evidence and arguments in Sabadash' appeal, confirmed the existence of the General Partnership "Itkin and Sabadash."

Thus, after examining the materials in case No. A40-165165/18, and taking into account the preclusive effect of final judicial acts subject to mandatory enforcement, and the responses of parties, third parties, and witnesses to court inquiries, the Tribunal established that contrary to the statement by Sabadash A.V. via his financial administrator Tatiana Padalko, the Defendant companies and the assets they hold in fact belong to the General Partnership "Itkin and Sabadash," although they are nominally registered under the name of Sabadash A.V. and the Amber Trust, which is managed by Sabadash A.V.

In the course of reviewing the evidence in this case, the Tribunal established the following:

Defendant 1, Golden Spirits Limited, while nominally owned by Sabadash A.V., is in fact owned by the General Partnership "Itkin and Sabadash";

Defendant 2, AFB Trading One, Inc., while nominally owned by the Amber Trust, managed by Sabadash A.V., is in fact owned by the General Partnership "Itkin and Sabadash";

Defendant 3, Golden Sphinx Limited, while nominally owned by the Amber Trust, managed by Sabadash A.V., is in fact owned by the General Partnership "Itkin and Sabadash";

Russian Diesel, OJSC (address: Leningrad Region, Vsevolozhsky District, Kirpichny Zavod Station, industrial zone) and Diesel Limited on Jersey Island, United Kingdom, while nominally owned by Defendant 2, are in fact owned by the General Partnership "Itkin and Sabadash";

Vyborg Cellulose, OJSC (address: 2 Zavodskaya St, Sovetsky village, Vyborgsky District, Leningrad Region) and

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

MIKHAIL BOGOMOLNY
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

Vyborg Limited on Jersey Island, United Kingdom, while nominally owned by Defendant 2, are in fact owned by the General Partnership "Itkin and Sabadash";

Real estate located at 58 Beverly Park Street, Beverly Hills, California, USA, is in fact owned by the General Partnership "Itkin and Sabadash";

The Gulfstream G500 aircraft is in fact owned by the General Partnership "Itkin and Sabadash";

Real estate located at 17 General de Gaulle Boulevard, Cap Ferrat, France, is in fact owned by the General Partnership "Itkin and Sabadash".

According to the evidence submitted to the Arbitrator, on April 21, 2010, the Third Party transferred USD 1,022,000 to Defendant 1 and paid a transfer fee of USD 268.36. Thus, the Third Party fully fulfilled its obligations under the loan agreement. Defendant 1 failed to fulfill its obligations to repay the loan principal and interest.

On August 23, 2012, the Third Party and Defendant 1 entered into an agreement on modification and deferral of debt. Under this agreement, the parties extended the repayment deadline to January 1, 2020. The interest rate stipulated in Clause 4.2 of the loan agreement was increased to 6.5% per annum, with monthly compound interest starting from the date of amendment until full repayment.

The parties also agreed on the following guarantors: AFB Trading One, Inc., registered in the State of California, USA, with offices at 8501 Wilshire Boulevard, Suite 330, Beverly Hills, California, USA ("Guarantor 1"), and Golden Sphinx Limited, with offices at 43 La Motte Street, St. Helier, Jersey, JE4 8SD, Channel Islands ("Guarantor 2").

On August 23, 2012, the Third Party and AFB Trading One, Inc. (Defendant 2) entered into a corporate guarantee under which Defendant 2 is liable to the Plaintiff for the performance of Defendant 1's obligations, and in case of non-performance, guarantees repayment of the debt within 10 days of receiving a demand.

On August 23, 2012, the Third Party and Golden Sphinx Limited (Defendant 3) entered into a corporate guarantee under which Defendant 3 is liable to the Plaintiff for the performance of Defendant 1's obligations, and in case of non-performance, guarantees repayment of the debt within 10 days of receiving a demand.

On August 23, 2012, the Third Party, Defendant 1, Defendant 2, and Defendant 3 entered into the AGREEMENT ON THE SELECTION OF THE ARBITRATOR AND APPLICABLE RULES.

On September 7, 2020, the Third Party and Davilla Investing Limited (Plaintiff) entered into an agreement assigning all rights under the loan agreement dated April 20, 2010, as amended on August 23, 2012, from the Third Party to the Plaintiff, including the security in the form of corporate guarantees issued by Defendant 2 and Defendant 3.

On December 21, 2020, the Plaintiff sent a demand to Defendant 2 for payment of Defendant 1's debt. On December 21, 2020, the Plaintiff sent a demand to Defendant 3 for payment of Defendant 1's debt.

To date, none of the Defendants has repaid the debt under the existing obligations.

The above circumstances are confirmed by the following evidence:

1. Loan Agreement dated April 20, 2010, between the Third Party and Defendant 1;

2. Bank statement dated April 21, 2010, confirming the transfer of USD 1,022,000 from the Third Party to Defendant 1;

3. Agreement on Modification and Deferral of Debt dated August 23, 2012, between the Third Party and Defendant 1;

4. Corporate Guarantee dated August 23, 2012, issued by Defendant 2 to the Third Party;

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

MIKHAIL BOGOMOLNY
TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG            *CERTIFIED COURT INTERPRETER*
P. 1.818.284.1884

5.  Corporate Guarantee dated August 23, 2012, issued by Defendant 3 to the Third Party;

6.  Assignment Agreement of Loan Rights dated September 7, 2020, between the Third Party and the Plaintiff;

7.  Demands for payment of the debt.

According to Article 810 of the Civil Code of the Russian Federation:

"...The borrower is obligated to return to the lender the amount of the loan received within the time frame and in the manner stipulated by the loan agreement."

According to Article 809 of the Civil Code of the Russian Federation:

"1. Unless otherwise provided by law or the loan agreement, the lender has the right to receive interest from the borrower for use of the loan in the amount and manner defined in the agreement. If the agreement does not specify the interest rate, it is determined by the key rate of the Bank of Russia effective during the relevant periods.

2.  The interest rate for use of the loan may be set in the agreement as a fixed annual percentage, as a variable annual percentage dependent on conditions defined in the agreement, including changes in a variable value, or in another way that enables determination of the correct interest amount at the time of payment.

3.  Unless otherwise agreed, interest for use of the loan is paid monthly up to and including the date the loan is repaid..."

According to Article 363 of the Civil Code of the Russian Federation:

"1. In the event of non-performance or improper performance of an obligation secured by a guarantee, the guarantor and the debtor are jointly liable to the creditor, unless the law or the guarantee agreement provides for subsidiary liability.

2.  The guarantor is liable to the creditor to the same extent as the debtor, including the payment of interest, reimbursement of legal costs related to debt collection, and other creditor losses resulting from non-performance or improper performance by the debtor, unless otherwise stipulated in the guarantee agreement.

3.  Persons who jointly provide a guarantee (co-guarantors) are jointly liable to the creditor, unless the guarantee agreement provides otherwise. Unless agreed otherwise between the co-guarantors and the creditor, co-guarantors who have limited their liability are deemed to have secured the principal obligation each for their respective share. A co-guarantor who has fulfilled the obligation has the right to seek reimbursement from other co-guarantors proportional to their share in the security of the principal obligation..."

According to Article 384 of the Civil Code of the Russian Federation:

"Unless otherwise provided by law or agreement, the rights of the original creditor are transferred to the new creditor to the same extent and under the same conditions that existed at the time of the transfer. In particular, the new creditor acquires the rights securing the fulfillment of the obligation, as well as other rights associated with the claim, including the right to interest..."

Thus, the Defendants are jointly and severally liable for a total amount of USD 1,804,017.81, which includes:

USD 1,022,000 – principal loan amount;

USD 1,874.53 – interest for the period from April 21, 2010, to April 21, 2012;

USD 780,143.28 – interest for the period from April 21, 2012, to December 12, 2020.


Pursuant to Article 16 of the Russian Federation Federal Arbitration Law and in accordance with the UNCITRAL Arbitration Rules (as adopted by the United Nations Commission on International Trade Law in 1976 and recommended for use by the UN General Assembly on December 15, 1976, as amended),

On August 31, 2021, the tribunal, composed of the parties to the resolution of a specific dispute and presided over by

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

# MIKHAIL BOGOMOLNY
## TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E. MICHAEL@TRANSLATORPRO.ORG
P. 1.818.284.1884

*CERTIFIED COURT INTERPRETER*

the sole arbitrator mutually stipulated to by the parties — Dmitry Valerievich Knyazev — having reviewed the statement of claim submitted by Davilla Investing Limited (Plaintiff) against Golden Spirits Limited (Defendant 1), AFB Trading One, Inc. (Defendant 2), Golden Sphinx Limited (Defendant 3), and Agragorn Holdings Limited, seeking recovery of debt under a loan agreement, an agreement for modification and deferral of debt, and corporate guarantees,

### IT IS HEREBY ORDERED:

1. The claims brought by Davilla Investing Limited against Golden Spirits Limited, AFB Trading One, Inc., Golden Sphinx Limited, and Agragorn Holdings Limited for recovery of debt under the loan agreement, the agreement on modification and deferral of debt, and corporate guarantees are hereby GRANTED.

2. IT IS HEREBY ORDERED that Golden Spirits Limited, AFB Trading One, Inc., and Golden Sphinx Limited shall be jointly and severally liable to pay Davilla Investing Limited the principal debt in the amount of USD 1,022,000 (one million twenty-two thousand U.S. dollars), plus accrued interest in the amount of USD 782,017.80 (seven hundred eighty-two thousand seventeen U.S. dollars and eighty cents).

3. IT IS HEREBY ORDERED that Golden Spirits Limited, AFB Trading One, Inc., and Golden Sphinx Limited shall be jointly and severally liable to reimburse Davilla Investing Limited legal expenses in the amount of 278,000 (two hundred seventy-eight thousand) Russian rubles.

4. Pursuant to the arbitration agreement, the award of the arbitral tribunal is final, effective immediately upon issuance, and subject to immediate enforcement. In accordance with Article 238.4 of the Commercial Procedure Code of the Russian Federation, the findings of fact established by the arbitral tribunal shall not be subject to reassessment or substantive review.

Sole judge, Knyazev Dmitry Valerievich *[Signature]*
Ad hoc tribunal for specific dispute resolution
*Official round seal of the issuing authority*

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

# М И К Н А I L   B O G O M O L N Y

### TRANSLATION, NOTARY AND APOSTILLE SERVICES

W. WWW.TRANSLATORPRO.ORG
E.  MICHAEL@TRANSLATORPRO.ORG
P.  1.818.284.1884

*CERTIFIED COURT INTERPRETER*

# CERTIFICATE OF TRANSLATION

---

*Translation from Russian into English*

I, MIKHAIL BOGOMOLNY, A **CERTIFIED COURT INTERPRETER (ID: 313218)**, DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; THE TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

DOCUMENT DESCRIPTION

---

*ARBITRATION ORDER*

*IN RE: DAVILLA INVESTING LIMITED v. GOLDEN SPIRITS LIMITED,
AFB TRADING ONE, INC., GOLDEN SPHINX LIMITED,
AGRAGORN HOLDINGS LIMITED*

---





X _____

Mikhail Bogomolny
Translator

Interpreter information:
Address: 16001 Ventura Blvd., Ste. 120,
Encino, CA 91436
Ph. 818-284-1884

Email: michael@translatorpro.org

I, MIKHAIL BOGOMOLNY, A CERTIFIED COURT INTERPRETER (ID: 313218), DO SOLEMNLY DECLARE UNDER THE PENALTY OF PERJURY, THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ENGLISH TRANSLATION OF THE ATTACHED DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE IS TRUE, ACCURATE AND COMPLETE. I FURTHER DECLARE THAT I AM FLUENT IN ENGLISH AND RUSSIAN AND COMPETENT TO TRANSLATE TO AND FROM SAID LANGUAGES; BY ATTESTING TO THE ACCURACY OF THE ABOVE TRANSLATION I NEITHER VERIFY NOR DISPUTE THE ORIGIN OR FACTUAL CONTENT[S] OF THE SOURCE DOCUMENT; AND THAT THIS TRANSLATION FULLY CONFORMS TO THE SOURCE DOCUMENT EXECUTED IN THE RUSSIAN LANGUAGE ATTACHED HERETO.

# Exhibit 25

1   Brian S. Kabateck, SBN
    (bsk@kbklawyers.com)
2   Christopher B. Noyes, SBN
    (cbn@kbklawyers.com)
3   KABATECK, LLP
    633 W. 5th St., Ste. 3200
4   Los Angeles, CA 90071
5   T: 213.217.5000
    F: 213.217.5010
6
7
    Jon A. Atabek SBN 269497
8   (jatabek@atabeklaw.com)
9   ATABEK & ASSOCIATES, P.C.
    16330 Bake Parkway
10  Irvine, CA 92618
11  Tel: (213) 394-5943
    Fax: (213) 402-3413
12
13  Attorneys for Defendants and Cross-Complainants
    GARRY Y. ITKIN and NEW ALBION PROPERTY LTD.
14
15              **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
16            **COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE**
17

| | |
|---|---|
| AFB TRADING ONE, INC., a California corporation; M-BJEP LIMITED, an Isle of Man corporation; M-NICE LIMITED, an Isle of Man corporation; GOLDEN SPHINX LIMITED, a Jersey corporation; NEW ALBION PROPERTY LIMITED, an England corporation; <br><br> Plaintiffs, <br><br> v. <br><br> GARRY Y. ITKIN, an individual; THE LIGHTHOUSE PARTNERSHIP LIMITED, an England corporation, and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. BC647351 <br><br> [Assigned: Hon. Michael L. Stern, Dept. 62] <br><br> **DEFENDANT AND CROSS-COMPLAINANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> [Filed concurrently herewith: (1) Statement of Undisputed Facts; (2) Appendix of Evidence] <br><br> Hearing Date:  January 23, 2020 <br> Hearing Time:  8:30 a.m. <br> Dept:  62 |
| And Related Actions and Cross Actions | Trial Date: March 9, 2020 <br><br> Reservation ID No.: 225156202487 |

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

ITKIN'S MOTION FOR SUMMARY ADJUDICATION
REGARDING PARTNERSHIP/DUTY
LASC Case No. BC647351

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2        **PLEASE TAKE NOTICE** that on January 23, 2020, at 8:30 a.m., or as soon thereafter as

3  this matter may be heard in Department 62 of the Los Angeles County Superior Court, located at

4  111 North Hill Street, Los Angeles, California 90012, Defendant and Cross-Complainant GARRY

5  Y. ITKIN ("Itkin" or "Cross-Complainant") will, and hereby does, move this Court for an order

6  granting summary adjudication of Itkin's Second Amended Cross-Complaint pursuant to California

7  Code of Civil Procedure section 437c(f) on the following grounds:

8        **Summary Adjudication of Cross-Defendants' Fourteenth Affirmative Defense and**

9        **the Duty Element of Cross-Complainant's Breach of Fiduciary Duties Claim**

10       **Issue No. 1**:  There was a legal relationship, specifically a partnership, between Cross-

11  Defendant Alexander Sabadash ("Sabadash") and Itkin upon which fiduciary duties were owed

12  from Sabadash to Itkin.

13       **Issue No. 2**:  Sabadash owed fiduciary duties to Itkin as a matter of law, as a result of the

14  partnership between Sabadash and Itkin.

15        This Motion is based upon this Notice of Motion, the supporting Memorandum of Points

16  and Authorities, the Appendix of Evidence, the Separate Statement of Undisputed Material Facts,

17  the pleadings and papers on file in this action, and such other argument and evidence as may be

18  presented at the hearing on this Motion.

19

20  Dated:  November 8, 2019                    ATABEK & ASSOCIATES, P.C.

21

22                                             By: _____

23                                             JON A. ATABEK
                                               Attorneys for Defendant and
24                                             Cross-Complainants
                                               GARRY Y. ITKIN,
25                                             NEW ALBION PROPERTY LIMITED

26

27

28

29

30

31

32

33

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     PROCEDURAL BACKGROUND .......................................................................2

III.    LEGAL STANDARD .........................................................................................3

IV.     ARGUMENT .......................................................................................................3

        A.      Sabadash is Collaterally Estopped From Denying the Partnership Exists. .....3

                1.      *Two Courts Enter Judgments Against the Partnership.* ............................4

                2.      *The Elements for Collateral Estoppel are Met Twice.* ...............................5

        B.      In the Alternative, There is No Genuine Issue of Material Fact on the
                Existence of the Partnership. ........................................................................6

                1.      *Itkin Meets His Initial Burden to Show the Existence of the
                        Partnership.* .......................................................................................7

                2.      *Sabadash Cannot Meet His Burden to Controvert the Existence of
                        the Partnership.* ...............................................................................12

        C.      A Fiduciary Duty Exists Between Itkin and Sabadash as a Matter of Law. ...17

V.      CONCLUSION .................................................................................................18

**TABLE OF AUTHORITIES**

**Cases**

*Agam v. Gavra* (2015) 236 Cal. App. 4th 91 ..................................................................... 17

Aguilar v. Atlantic Richfield Co. (2001) 25 Cal. 4th 826 ........................................... 7, 12

*Ayon v. Esquire Deposition Sols., LLC* (2018) 27 Cal. App. 5th 487 ................................ 13

*Bank of Montreal v. Kough* (9th Cir. 1980) 612 F.2d 467 ................................................ 5

*Beroiz v. Wahl* (2000) 84 Cal. App. 4th 485 ..................................................................... 5

*Broffman v. Newman* (1989) 213 Cal. App. 3d 252 ......................................................... 16

*Castaneda v. Ensign Grp., Inc.* (2014) 229 Cal. App. 4th 1015 ..................................... 16

*Enea v. Superior Court* (2005) 132 Cal.App.4th 1559 .................................................... 17

*Eng v. Brown* (2018) 21 Cal. App. 5th 675 ..................................................................... 15

*Fed. Deposit Ins. Corp. v. Superior Court* (1997) 54 Cal. App. 4th 337 .......................... 3

*GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.* (2000) 83 Cal. App. 4th 409 ... 17, 18

Green v. Ralee Engineering Co. (1998) 19 Cal. 4th 66 .................................................... 12

*Greene v. Brooks* (1965) 235 Cal. App. 2d 161 ...................................................... 7, 8, 15

*Holmes v. Lerner* (1999) 74 Cal. App. 4th 442 ....................................................... 14, 15

*Jacobs v. Fire Ins. Exch.* (1995) 36 Cal. App. 4th 1258 ................................................. 14

*Kloke v. Pongratz* (1940) 38 Cal. App. 2d 395 .............................................................. 14

*Kojababian v. Genuine Home Loans, Inc.* (2009) 174 Cal. App. 4th 408 ........................ 13

*Linden Partners v. Wilshire Linden Assocs.* (1998) 62 Cal. App. 4th 508 ....................... 3

*Lucido v. Superior Court* (1990) 51 Cal. 3d 335 ......................................................... 5, 6

*Manco Contracting Co. (W.L.L.) v. Bezdikian* (2008) 45 Cal. 4th 192 .............................. 5

*Marzec v. California Pub. Employees Ret. Sys.* (2015) 236 Cal. App. 4th 889 ................. 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* (1986) 475 U.S. 574, 586 .................. 12

*Parigian v. Phillips* (1934) 138 Cal. App. 702 .............................................................. 16

*Parsons v. Crown Disposal Co.* (1997) 15 Cal. 4th 456 .................................................... 3

*Patterson v. Sacramento City Unified Sch. Dist.* (2007) 155 Cal. App. 4th 821 ............. 18

*Peck v. Hagen* (1989) 215 Cal. App. 3d 602 ................................................................. 16

People v. Sims (1982) 32 Cal. 3d 468 ............................................................................... 6

*Persson v. Smart Inventions, Inc.* (2005) 125 Cal. App. 4th 1141 .................................... 7

*Pittelman v. Pearce* (1992) 6 Cal. App. 4th 1436 ......................................................... 17

*Reeves v. Hanlon* (2004) 33 Cal. 4th 1140 .................................................................... 17

*Regents of Univ. of California v. Pub. Employment Relations Bd.* (1986) 41 Cal. 3d 601 .............. 16

1   S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co. (2010) 186 Cal. App. 4th 383 .............................. 18

2   *Sangster v. Paetkau* (1998) 68 Cal. App. 4th 151 ........................................................................ 12, 17

3   *Santa Ana Unified Sch. Dist. v. Orange Cty. Dev. Agency* (2001) 90 Cal. App. 4th 404 .................. 17

4   *Stanley v. Richmond* (1995) 35 Cal. App. 4th 1070 .......................................................................... 18

5   *United States v. Geophysical Corp. of Alaska* (9th Cir. 1984) 731 F.2d 693 ...................................... 6

6   *Vandenberg v. Superior Court* (1999) 21 Cal. 4th 815 ........................................................................ 5

7   *Villa v. McFerren* (1995) 35 Cal. App. 4th 733 .................................................................................. 13

8   *Weber v. Langholz* (1995) 39 Cal. App. 4th 1578 ............................................................................ 7, 8

9   *Weiner v. Fleischman* (1991) 54 Cal. 3d 476 ...................................................................................... 7

10  *Ziller Elecs. Lab GmbH v. Superior Court* (1988) 206 Cal. App. 3d 1222 ....................................... 16

11  **Statutes**

12  Cal. Code Civ. Proc.§ 437c(f)(1) ...................................................................................................... 3, 13

13  Cal. Corp. Code § 16202(a) ................................................................................................................... 7

14  Cal. Rules of Court, Rule 3.1110(g) .................................................................................................... 15

15  Code Civ. Proc. § 437c(b)(1) ............................................................................................................... 13

16  Code Civ. Proc. § 437c(e) .................................................................................................................... 13

17  Code Civ. Proc. § 437c(p) .................................................................................................................... 12

18  **Treatises**

19  7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 299, p. 846 ........................................................ 5

20  Weil & Brown, Cal. Prac. Guide Civ. Pro. Before Trial (The Rutter Group) § 10:317 ................... 13

21

22

23

24

25

26

27

28

29

30

31

32

33

## MEMORANDUM OF POINTS AND AUTHORITIES

I.     **INTRODUCTION**

Through his Second Amended Cross-Complaint ("SACC"), Garry Y. Itkin ("Itkin") seeks to wind up the business of his partnership with Cross-Defendant Alexander Sabadash ("Sabadash"), and resolve disputes relating to control of the partnership's assets. This action also seeks damages against Sabadash for causing harm to Itkin and the partnership through wrongful acts which constituted breaches of Sabadash's fiduciary duties. In an effort to streamline the issues for trial, this motion seeks summary adjudication on the existence of a partnership between Itkin and Sabadash, and, in turn, the existence of fiduciary duties between Itkin and Sabadash as a legal consequence of their partnership.

Prior to partnering with Itkin, Sabadash was an ill-educated vodka distributor for Seagram's in Russia. Over time, Sabadash acquired a distillery and started making his own vodka with some success. Sabadash wanted to expand, but he recognized his own limitations. Rather than educating himself, Sabadash tapped his best friend at the time, Itkin, to help him expand his business. Itkin was an American-educated accountant with a Master's degree in Business Administration. Sabadash offered Itkin a minority partnership, whereby Itkin would control operations, hoping to expand the business. The business did expand, burgeoning into three distilleries, one of Russia's biggest cellulose plants, commercial/industrial real property holdings, and real estate speculation, once having a value of over a billion dollars.

Then, Sabadash doomed the partnership by committing a massive and very public fraud in Russia, landing Sabadash in Russian prison. In an attempt to deny Itkin his share of the partnership assets and avoid any consequences for breaches of his fiduciary duties, Sabadash now denies the existence of the partnership, asserting Itkin was a mere employee of his businesses.

However, the existence of the partnership can be established as a matter of law. First, Sabadash is collaterally estopped from denying the partnership, because its existence has been conclusively established through two judgments, one in Russia and one in California. Moreover, the evidence of the partnership is overwhelming. Itkin has consistently testified that he and Sabadash formed an oral partnership around 1998, *while Sabadash has never submitted a single declaration to contradict Itkin's testimony*. At least five other witnesses also testified that Itkin and Sabadash were partners. The partnership is confirmed in myriad written documentation, including a 2004 document signed by both parties confirming their partnership, a 2004 legal services contract entered into by the partnership and signed by both partners, 2004-2006 service delivery reports to the partnership, partnership expense statements and capital accounts, and meeting minutes of a 2014

1    meeting between Sabadash and Itkin that again confirmed the partnership. Further, the parties here

2    *actually did* carry on as partners for over a decade, with Itkin moving to Russia to manage the

3    partnership's businesses and drawing his share of the partnership proceeds for years. A number of

4    witnesses also testified as to Itkin's critical operational role with the partnership's businesses in

5    Russia, including Conrad Stampfli, the long-time attorney for the Sabadash family.

6        Sabadash, on the other hand, has failed to produce any admissible evidence showing a

7    triable issue of fact exists on the existence of the partnership. Most importantly, in the Russian

8    proceedings, Sabadash did not produce any declaration to contradict Itkin's sworn testimony that

9    the parties had a partnership—and here, the Court has ordered Sabadash's declarations stricken due

10    to his inability to be cross-examined. Nor has Sabadash produced any other admissible evidence

11    controverting Itkin's evidence. Sabadash has instead relied on a number of legal arguments, all of

12    which fail. For instance, Sabadash previously moved for summary judgment on the ground that any

13    partnership terminated because the parties incorporated the partnership. This Court denied that

14    motion, finding as a matter of law that the partnership was not terminated through incorporation.

15    That order is binding on the parties.

16        Finally, fiduciary duties are imposed by law upon partners and codified by statute. Thus, if

17    this Court finds that there is no genuine issue of material fact on the issue of whether Itkin and

18    Sabadash formed a partnership, then as a matter of law fiduciary duties existed between them.

19    **II.    PROCEDURAL BACKGROUND**

20        Itkin previously dismissed the following parties and causes of actions as to his SACC: (1)

21    Piotr Szymaski; (2) Conrad Stampfli; (3) Second Cause of Action for Declaratory Relief; (4) Fifth

22    Cause of Action for Unfair Business Practices; (5) Sixth Cause of Action Breach of Lease Contract;

23    and (6) Seventh Cause of Action for Conversion.

24        Sabadash and other Cross-Defendants previously moved for summary judgment and/or

25    summary adjudication of the SACC. (Cross-Defs.' MSJ (April 5, 2019).) Sabadash argued that any

26    partnership between Sabadash and Itkin terminated as a matter of law because the parties

27    incorporated the partnership. (Cross-Defs.' MSJ (April 5, 2019), at 7-11.) Sabadash further argued

28    that, if the partnership terminated, Sabadash did not owe Itkin a fiduciary obligation. (*Id.* at 11-12.)

29        The Court granted Cross-Defendants' motion only as to the fourth cause of action in the

30    SACC, for aiding and abetting breach of fiduciary duty against Larissa Sabadash and Thomas

31    Reynolds. (Notice of Ruling (June 24, 2019).) However, the Court denied the motion as to the first

32    and third causes of action for dissolution of partnership and breach of fiduciary duty as against

33    Sabadash. (*Id.*) The Court found that there was more than adequate facts to establish a genuine

1   issue of fact for trial regarding the existence of the partnership. (*See id.*; Itkin's Statement of

2   Undisputed Facts ("SUF") 61.)  The Court further found that Sabadash failed to establish as a

3   matter of law that incorporation terminated the partnership, because the corporations were

4   incorporated before the partnership was allegedly formed. (*Id.*)

5   **III.    LEGAL STANDARD**

6         "A party may move for summary adjudication as to one or more causes of action within an

7   action, one or more affirmative defenses, one or more claims for damages, or one or more issues of

8   duty . . . ." Cal. Code Civ. Proc.§ 437c(f)(1).  "Summary adjudication is properly granted when the

9   evidence in support of the moving party establishes that there is no issue of fact to be tried as to a

10   particular cause of action, affirmative defense, claim for damages or issue of duty." *Fed. Deposit*

11   *Ins. Corp. v. Superior Court* (1997) 54 Cal. App. 4th 337, 344.  The Court of Appeal has held that,

12   "on a motion for summary adjudication, the court may rule whether a defendant owes or does not

13   owe a duty to plaintiff without regard for the dispositive effect of such ruling on other issues in the

14   litigation, except that the ruling must completely dispose of the issue of duty." *Linden Partners v.*

15   *Wilshire Linden Assocs.* (1998) 62 Cal. App. 4th 508, 522.  "Duty, being a question of law, is

16   particularly amenable to resolution by summary judgment." *Parsons v. Crown Disposal Co.* (1997)

17   15 Cal. 4th 456, 465.

18         Summary adjudication is therefore appropriate here to determine that there is no issue of

19   fact to be tried as to: (1) Cross-Defendants' Fourteenth Affirmative Defense that states, "There is no

20   legal or other relationship upon which any duty or obligation could be owed by Cross-Defendants to

21   Cross-Complainants" (Cross-Defs.' Answer to SACC (May 30, 2018)); and (2) The duty element of

22   Cross-Complainant's Third Cause of Action for Breach of Fiduciary Duty set forth in the Second

23   Amended Cross-Complaint.

24   **IV.    ARGUMENT**

25      **A.    Sabadash is Collaterally Estopped From Denying the Partnership Exists.**

26         As a matter of law, the existence of the partnership is res judicata in this proceeding, and thus

27   cannot be in dispute.  In 2018, after being sued for breach of contract, a Moscow court entered

28   judgment against the "Simple Partnership 'Itkin and Sabadash.'"  The plaintiff then sued in Los

29   Angeles Superior Court to have the foreign judgment recognized here, and in 2019 that court also

30   entered judgment against the partnership.  Based on these judgments, Sabadash is now collaterally

31   estopped from denying the existence of the partnership between himself and Itkin.  The elements of

32   collateral estoppel are all met, not only once, but twice—first in the Moscow court and then in

33   California.

###### *1.    Two Courts Enter Judgments Against the Partnership.*

In 2004 in Russia, Itkin and Sabadash entered into an "Information Services Agreement" with a Russian attorney named Elena Vasilieva explicitly as "Partners." (SUF 1.) The contract provided that "Simple Partnership 'Itkin and Sabadash' . . . represented by its partners G.Y. Itkin and A.V. Sabadash" agreed to certain terms for consulting and legal work to be provided by Ms. Vasilieva. (*Id.*) Both Itkin and Sabadash initialed each page of the contract, and signed on the last page. (*Id.*) At the end of years 2004, 2005, and 2006, a "Services Delivery Report" was entered into between "Simple Partnership 'Itkin and Sabadash' . . . represented by Managing Partner G.Y. Itkin, acting pursuant to the Simple Partnership Agreement." (SUF 2.)

In 2018, Ms. Vasilieva (now Ms. Gofman)[1] filed a lawsuit in Moscow Arbitration Court against the Itkin and Sabadash Partnership for failure to pay. (SUF 3.) Sabadash was served at two different addresses. (SUF 4.) After a trial in which both sides appeared, the Moscow court found that the "Simple Partnership 'Itkin and Sabadash'" contracted with Gofman, that Gofman rendered services for the "Simple Partnership 'Itkin and Sabadash,'" and that the "Simple Partnership 'Itkin and Sabadash'" failed to pay Gofman pursuant to the contract. (SUF 5.) It further found, "respective shares in partnership interest are to be taken into consideration, as per Simple Partnership Agreement, namely: G.Y. Itkin – 33%, A.V. Sabadash: - 67%." (*Id.*) The Moscow court entered judgment in favor of Ms. Gofman. (*Id.*)

Sabadash has filed two unsuccessful appeals of the Moscow court's judgment.[2] (SUF 6.) Sabadash explicitly acknowledged that, as to the first appeal, it "challeng[ed] the existence of the partnership" and that he was litigating "the issue of whether a partnership exists between Mr. Sabadash and Mr. Itkin." (SUF 7.) Sabadash argued it was "factually incorrect" that he was a member of the "Simple Partnership 'Itkin and Sabadash.'" (SUF 8.) Yet Sabadash did not file any sworn declarations denying that it is his signature on the 2004 contract with Gofman, or on the 2004 meeting minutes evidencing the partnership in any of the Russian proceedings, including both of his appeals. (SUF 9.) Similarly, Sabadash has never filed a sworn declaration in either appeal denying that the Partnership contracted for and received the 2004-2006 service delivery reports from Gofman. (*Id.*)

---

[1] The Court noted that Elena Vasilieva had changed her name to Elena Gofman. (SUF 3.)

[2] Civil and penal judicial proceedings in Russia are conducted by a three-stage system. Gofman's case that was originally heard and adjudicated by the Moscow Court was then appealed to the 9th Appellate Arbitration Court, and then to the Moscow District Arbitration Court (Cassation). (SUF 6.)

1    In 2019, Ms. Gofman then sued Itkin and Sabadash as "a general partnership" in Los

2  Angeles Superior Court to have the Moscow court's judgment recognized and fulfilled here

3  pursuant to California's Uniform Foreign-Country Money Judgments Recognition Act.  (SUF 10.)

4  In that complaint, Ms. Gofman again alleged that Itkin and Sabadash had a "general partnership,"

5  and that the Moscow court granted judgment against the partnership.  (SUF 11.)  Sabadash had

6  notice of the complaint and tried to stay the case pending resolution of the Russian appeal and this

7  case.  (SUF 12.)  On November 7, 2019, the Superior Court for the County of Los Angeles entered a

8  judgment against Itkin and Sabadash, as a partnership.  (SUF 13.)  That same day, a higher appellate

9  court denied Sabadash's second, further appeal of Goffman's judgment. (SUF 6.)

10               *2.*       ***The Elements for Collateral Estoppel are Met Twice.***

11    Based on these judgments, Sabadash is now collaterally estopped from denying the existence

12  of the partnership.  The California Supreme Court has explained that "res judicata does not merely

13  bar relitigation of identical claims or causes of action."  *Vandenberg v. Superior Court* (1999) 21

14  Cal. 4th 815, 828.  In addition, "in its collateral estoppel aspect, the doctrine may also preclude a

15  party to prior litigation from redisputing *issues* therein decided against him, even when those issues

16  bear on different claims raised in a later case."  *Id.* (emphasis original).  Res judicata and collateral

17  estoppel are applicable to judgments in foreign courts.  *Beroiz v. Wahl* (2000) 84 Cal. App. 4th 485,

18  494 ("Generally, '[a] foreign judgment will be res judicata in an American court if it has that effect

19  in its country of rendition, and if it meets the American standard of fair trial before a court of

20  competent jurisdiction.'") (quoting 7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 299, p.

21  846); *Bank of Montreal v. Kough* (9th Cir. 1980) 612 F.2d 467, 473.  Res judicata and collateral

22  estoppel principles also apply in actions to enforce foreign money judgments.  *Manco Contracting*

23  *Co. (W.L.L.) v. Bezdikian* (2008) 45 Cal. 4th 192, 205–06.

24    Collateral estoppel applies when the following elements are met: (1) the issue sought to be

25  precluded from relitigation is identical to that decided in a former proceeding; (2) the issue was

26  actually litigated in the former proceeding; (3) the issue was necessarily decided in the former

27  proceeding; (4) the decision was final and on the merits; and (5) the party against whom preclusion

28  is sought must be the same as, or in privity with, the party to the former proceeding.  *Lucido v.*

29  *Superior Court* (1990) 51 Cal. 3d 335, 341.

30    The elements are met with respect to the Moscow court's judgment.  First, the issues are

31  identical because both proceedings address allegations that a partnership exists.  *See id.* at 342 ("The

32  'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two

33  proceedings, not whether the ultimate issues or dispositions are the same.").  Indeed, Sabadash

1 admitted that he specifically appealed the Moscow court's judgment on the ground that a partnership

2 did not exist. Thus, the issue of the partnership was "actually litigated," because it was raised by the

3 pleadings and submitted to the court for determination. *People v. Sims* (1982) 32 Cal. 3d 468, 484

4 ("An issue is actually litigated when it is *properly raised*, by the pleadings or otherwise, and is

5 submitted for determination, and is *determined*. . . .") (internal quotation omitted; superseded by

6 statute on other grounds as noted in *Gikas v. Zolin* (1993) 6 Cal. 4th 841, 851).

7        The Moscow court necessarily determined the partnership did exist when it found that the

8 "Simple Partnership 'Itkin and Sabadash'" contracted with Gofman, that Gofman rendered services

9 for the "Simple Partnership 'Itkin and Sabadash,'" and that the "Simple Partnership 'Itkin and

10 Sabadash'" failed to pay Gofman pursuant to the contract. The Moscow court necessarily had to

11 conclude that the partnership existed to conclude that the partnership contracted with Gofman,

12 breached the contract with her, and owed her money. *Lucido*, *supra*, 51 Cal. 3d at 342 (courts

13 require "only that the issue not have been 'entirely unnecessary' to the judgment in the initial

14 proceeding). The Russian appellate courts then explicitly denied Sabadash's challenge to the

15 existence of the partnership. Thus, the Moscow court's judgment is final and on the merits. Finally,

16 Sabadash was a party to those proceedings, having had notice and having participated.

17        Similarly, the elements are met again with respect to the Los Angeles judgment. Both

18 complaints allege that Itkin and Sabadash had a partnership, fulfilling the "identical issue"

19 requirement. The issue was "actually litigated" already in Los Angeles because plaintiff raised it in

20 the pleadings and submitted it to the court for a determination. That court necessarily decided that a

21 partnership existed, entering judgment against the partnership in favor of Ms. Gofman. The Los

22 Angeles court's decision was final and on the merits. Finally, the decision was adjudicated against

23 the partnership, which is in privity with both partners. *See*, *e.g.*, *United States v. Geophysical Corp.*

24 *of Alaska* (9th Cir. 1984) 731 F.2d 693, 697 (partners were collaterally estopped by the judgment in

25 a prior action in which their partnership participated).

26        Accordingly, the existence of the partnership has been conclusively established in two prior

27 proceedings. Sabadash is thus collaterally estopped from denying the existence of the partnership

28 in this dispute.

29        **B.    In the Alternative, There is No Genuine Issue of Material Fact on the Existence**

30              **of the Partnership.**

31        Even if the existence of the partnership was not res judicata in this case, the Court should

32 still grant summary adjudication on its existence, because there is no genuine issue of material fact

33 in dispute on the existence of the partnership.

1      First, as shown below, and as this Court effectively noted when denying Sabadash's motion

2 for summary judgment, Itkin meets his burden to make a *prima facie* case regarding the existence of

3 the partnership. *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal. 4th 826, 850. Itkin's uncontro-

4 verted testimony is that Sabadash offered him a partnership, and Itkin accepted. Sabadash and Itkin

5 then did in fact operate as partners in Russia for a decade, and Itkin drew his share from the part-

6 nership proceeds for years. The partnership is confirmed by the testimony of Ratner, Sosinsky,

7 Isakova, and the Russian trial witnesses. Various written documentation, including the 2004

8 document signed by both parties confirming their partnership, 2004 legal services contract, the

9 2004-2006 service delivery reports, the partnership expense statements, the 2014 meeting minutes,

10 the Moscow court's judgment, and the Los Angeles court's judgment, also evidence the partnership.

11      The burden then shifts to Sabadash to produce *admissible evidence* showing that a triable

12 issue of fact exists. However, this Court struck Sabadash's declarations in this action due to

13 Sabadash's unavailability to be cross-examined. And Sabadash has not produced any other

14 admissible evidence contradicting Itkin's evidence. Sabadash has instead relied exclusively on a

15 number of legal arguments and innuendo, all of which fail to present a genuine issue of material

16 fact for trial, as explained below. Thus, Sabadash cannot meet his burden to show a genuine issue

17 of material fact on the existence of the partnership.

18      Although the existence of a partnership is a question of fact, "a question of fact can become

19 one of law . . . when only one reasonable conclusion can be drawn from the undisputed

20 foundational facts." *Weber v. Langholz* (1995) 39 Cal. App. 4th 1578, 1583. Here, only one

21 reasonable conclusion can be drawn from the facts: that Itkin and Sabadash had a partnership, and

22 that partnership was not terminated.

23          *1.    Itkin Meets His Initial Burden to Show the Existence of the Partnership.*

24      Itkin, as the moving party, bears the initial burden of production to make a *prima facie*

25 showing that the parties had a partnership. *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at

26 850. In order to make a finding of duty stemming from that partnership, the Court need not

27 determine the precise terms of the partnership, only that one existed.

28      "A partnership is defined by statute, as it was at common law, as an association of two or

29 more persons to carry on as co-owners a business for profit." *Persson v. Smart Inventions, Inc.*

30 (2005) 125 Cal. App. 4th 1141, 1157 (citing Cal. Corp. Code § 16202(a)). A partnership "need not

31 be evidenced in writing." *Greene v. Brooks* (1965) 235 Cal. App. 2d 161, 166; *Weiner v.*

32 *Fleischman* (1991) 54 Cal. 3d 476, 482 ("A joint venture or partnership may be formed orally."). In

33 fact, "[i]t is immaterial that the parties do not designate the relationship as a partnership or realize

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

7

ITKIN'S MOTION FOR SUMMARY ADJUDICATION
REGARDING PARTNERSHIP/DUTY
LASC Case No. BC647351

1   that they are partners, for the intent may be implied from their acts." *Greene, supra*, 235 Cal. App.

2   2d at 166. "The ultimate test of the existence of a partnership is the intention of the parties to carry

3   on a definite business as coowners." *Id.* at 165-66. Such intention may be determined from the

4   terms of the parties' agreement or from the surrounding circumstances. *Id.* The existence of a

5   partnership can become a matter of law "when only one reasonable conclusion can be drawn from

6   the undisputed foundational facts." *Weber, supra*, 39 Cal. App. 4th at 1583.

7         The evidence demonstrates that Itkin and Sabadash formed a partnership and intended to,

8   and did, carry on as co-owners:

9                    a.    Itkin Testified as to the Existence of and Terms of the Partnership.

10        Itkin met Sabadash in or around 1993 when Sabadash became Itkin's client in his accounting

11  practice. (SUF 14.) Over time, they became close friends, as did their wives. (SUF 15.) During

12  this time, Sabadash continually proposed that Itkin move to Russia and work full time with Sabadash

13  for a 33% share of his businesses, which included a vodka plant. (SUF 16.) Sabadash did not

14  complete college, and recognized the benefit of a partnership with Itkin, who was a successful tax

15  accountant with an M.B.A. (SUF 17.) Itkin, who was already making almost half-a-million dollars

16  per year, was concerned about risking his practice and leaving his family if the business was not

17  going to be profitable; as he put it, "one third partner of nothing is nothing." (SUF 17, 18.)

18  Sabadash told Itkin he was making about a million a month, and that within six months to one year

19  after Itkin moved to Russia, Itkin would be able to draw one-third of a million a month. (SUF 19.)

20  In the meantime, Sabadash told Itkin he could draw $50,000 a month. (*Id.*)

21        Thus, in 1998, Itkin agreed to become partners with Sabadash. They agreed that Itkin was

22  "coming in as partner to an existing structure." (SUF 20.) Itkin would help manage the enterprise,

23  including legal and accounting work. (SUF 21.) In exchange, Itkin would become a one-third

24  minority partner, receiving a 33% share in the business. (SUF 22.) Thus, Itkin explained, it was a

25  "silent sweat equity partnership." (SUF 20.) They were good friends at the time, and Itkin trusted

26  Sabadash, and so they shook hands on it. (SUF 23.)

27                    b.    Jeff Ratner Confirmed the Existence of and Terms of the Partnership.

28        Itkin told Jeff Ratner, his accountant colleague in Los Angeles, about the partnership with

29  Sabadash. (SUF 24.) Specifically, Ratner testified that "Sabadash offered [Itkin] a partnership."

30  (*Id.*) After Itkin and Sabadash agreed to the terms of the partnership, Itkin asked Ratner if Ratner

31  wanted to split his share in the partnership in exchange for coming to Russia with him to help

32  manage the businesses. (SUF 25.) Ratner declined the offer. (*Id.*)

33  / / /

       c.      Michael Sosinsky and the IUE Documents Confirmed the Partnership.

Michael Sosinsky, a business colleague in Russia, testified that he met Itkin and Sabadash in Moscow in late 1998 or early 1999. (SUF 26.) Sosinsky testified that "Alexander brought a new partner from the United States." (SUF 27.) When asked whether "partner" was the exact word Sabadash used, Sosinsky testified, "Yes, of course. It was a partnership. I can guaranty that. . . . It was a partnership, Sabadash and Itkin. . . . It was completely, absolutely partnership." (*Id.*) He further testified that Sabadash brought Itkin from the United States "as a partner with him because he needs more Americanized person in the company." (SUF 28.)

Sosinsky helped Itkin and Sabadash obtain membership into the prestigious International Union of Economists ("IUE"). (SUF 29.) Sosinsky helped them fill out the application, and they applied in the name of "Sabadash Itkin Partnership." (*Id.*) He testified that Sabadash paid the larger share of the membership fee, 70% vs. 30%, because he was the bigger partner. (SUF 30.) Itkin and Sabadash did obtain IUE membership, and Sosinsky authenticated their membership documents. (SUF 31.)

       d.      In 2004, Itkin and Sabadash Confirmed their Partnership in Writing.

As discussed in Section A, *supra*, Itkin and Sabadash entered into an agreement with a Russian attorney, Ms. Gofman (then Ms. Vasilieva) for legal and consulting services. (SUF 1.) Ms. Gofman was reluctant to enter into a contract for the partnership in the absence of a written partnership agreement. (SUF 32.) Thus, Itkin and Sabadash drafted and signed "Minutes of the Meeting of Partners of Simple Partnership 'Itkin & Sabadash'" dated February 12, 2004 for the benefit of Ms. Gofman.[3] (SUF 33.)

In the document, Itkin and Sabadash memorialized that they formed a partnership in 1998, dividing assets and revenues as follows: Sabadash, 67%, and Itkin, 33%. (SUF 35.) Among other terms, they assert that the partnership was intended to exist indefinitely. (SUF 36.) They also agree that Itkin was responsible for general day-to-day operations of the partnership. (SUF 37.)

       e.      In 2004, the "Partnership" Entered into an Information Services Agreement.

In 2004, Itkin and Sabadash then entered into a contract explicitly as partners, as the "Simple Partnership 'Itkin and Sabadash' . . . represented by its partners G.Y. Itkin and A.V. Sabadash." (SUF 1.) Itkin and Sabadash both initialed each page of the contract, and signed on the last page.

---

[3] Itkin only recently obtained a copy of this document when Ms. Gofman included it in connection with the Moscow appeal. (SUF 34.)

1   (*Id.*)  In the "Dispute Resolution section," the contract states that liability shall take into account

2   "respective shares in partnership interest. . . per Simple Partnership Agreement, namely: G.Y. Itkin:

3   33%, A. V. Sabadash: 67%."  (SUF 38.)  At the end of years 2004, 2005, and 2006, a "Services

4   Delivery Report" was entered into between "Simple Partnership 'Itkin and Sabadash' . . .

5   represented by Managing Partner G.Y. Itkin, acting pursuant to the Simple Partnership Agreement."

6   (SUF 2.)

7          Two courts then entered judgment against the "Partnership" for breaching its contract with

8   Ms. Gofman.  In 2018, the Moscow court found that the "Simple Partnership 'Itkin and Sabadash'"

9   had failed to fully render payment according to contract.  (SUF 5.)  It further found, "respective

10  shares in partnership interest are to be taken into consideration, as per Simple Partnership

11  Agreement, namely: G.Y. Itkin – 33%, A.V. Sabadash: - 67%."  (*Id.*)  In 2019, the Los Angeles

12  Superior Court recognized the Moscow court's judgment by again entering judgment here against

13  the "Partnership."  (SUF 13.)  In none of proceedings, including both of Sabadash's appeals, has

14  Sabadash filed any sworn declarations denying that it is his signature on the 2004 contract or

15  minutes with Gofman.  (SUF 9.)  Similarly, Sabadash has never filed a sworn declaration in either

16  appeal denying that the Partnership contracted for and received the 2004-2006 service delivery

17  reports from Gofman.  (*Id.*)

18                 f.      Itkin and Sabadash Confirmed the Partnership in a 2014 Meeting.

19         On May 5, 2014, Itkin and Sabadash met in St. Petersburg.  (SUF 39.)  Larisa Isakova was

20  hired as an independent third-party attorney to take minutes of the meeting.  (SUF 40.)  She

21  confirmed that the meeting participants were Itkin and Sabadash by looking at their passports.  (SUF

22  41.)  Isakova took notes as the parties were speaking, and gave them the opportunity to read and

23  confirm that what she was writing was accurate.  (SUF 42.)  Sabadash never disagreed with the

24  contents of Isakova's notes.  (*Id.*)  At this meeting, Itkin and Sabadash agreed that,

> In 1998, Mr. Itkin accepted Mr. Sabadash's offer to for the Partnership for purposes
> of managing Mr. Sabadash's business in the Russian Federation; the Partnership
> was, in fact, formed in June of 1998 (hereinafter referred to as "Partnership").
> Although no written agreement was entered into between the partners, the intention
> and consequent actions of the Partners indicated the existence of said agreement to
> form a silent partnership, namely [conducting] joint activities on terms and
> conditions stated below.  At the time that this record was made, the Partnership was
> in effect.

31  (SUF 43.)

32         They further confirmed that "Mr. Itkin's share in the Partnership comprises 33% of all

33  tangible and intangible assets of the Companies, as well as 33% of all revenues of the Companies

1  received in cash or otherwise." (SUF 44.)  When Itkin asserted that the partnership owed him $56

2  million, Sabadash "declined to comment." (SUF 45.)

3       In her deposition testimony about this meeting, Ms. Isakova recalled that the parties

4  confirmed the partnership, stating, "At the moment of that meeting, partnership—the partnership

5  was still active, in existence, active." (SUF 46.)  Further, Sabadash's pilot, Herb McCormick,

6  confirmed that he flew Sabadash to St. Petersburg on May 4, 2014, the day before the meeting.

7  (SUF 47.)  The pilot then flew Sabadash from St. Petersburg to Moscow the afternoon of May 5,

8  where Sabadash was later arrested.  (SUF 48.)[4]

9       g.    Russian Witnesses Testified That Itkin Was Sabadash's "Partner."

10       In or around 2016, Sabadash was tried, convicted, and sentenced to six years in prison in

11  Russia for fraud.  During his sentencing, the court heard the testimony of various witnesses,

12  including S.V. Grekova, who testified she knew Sabadash since 1998 and testified that Itkin was the

13  "business partner" of Sabadash. (SUF 49).  Various other witnesses confirmed that Itkin was

14  involved with overseeing the Liviz operations as Sabadash's "partner" or "companion."[5]  (SUF 50,

15  51.)

16       h.    Operational Role Confirms the Partnership.

17       Itkin was in fact in charge of operations in Russia.  He moved to Russia and lived there from

18  1999 to 2015.  (SUF 52.)  He testified he managed the affairs of the businesses there, securing the

19  companies through legal efforts.  (SUF 53.)  For instance, Itkin litigated in Russia to retain

20  ownership of the partnership's cellulose plant.  (*Id.*)  Itkin opened bank accounts for the companies

21  on behalf of the partnership.  (SUF 54.)  Itkin and Sabadash even met monthly to go over separate

22  partnership accounting and expense statements.  (SUF 55.)

23       Conrad Stampfli testified that Itkin managed the affairs of Liviz, the vodka production

24  company.  (SUF 56.)  Stampfli also drafted and signed a letter verifying that since 1999, Itkin had

25  been serving as "Attorney in Fact" for "several" of Stampfli's clients.  (SUF 57.)

26       The judge who sentenced Sabadash incorporated the statements of various witnesses, who

27  confirmed Itkin's operational role in Russia.  For instance, N.V. Aleksandrov stated that Itkin was

28  the "actual manager of Liviz CJSC" who authorized contracts; P.L Basisty stated that the "owners

29

---

30      [4] The testimony of the pilot only became necessary because Sabadash had asserted, in

31  verified responses to written discovery, that he was not in St. Petersburg, Russian on the date of the
meeting with Ms. Isakova. Sabadash subsequently purported to "amend" his responses to reflect that

32  he was in fact in St. Petersburg, but only after he had been caught lying under oath.

33      [5] "Companion" is a synonym for partner in Russian.

ATABEK & ASSOCIATES, P.C.          11       ITKIN'S MOTION FOR SUMMARY ADJUDICATION
Attorneys at Law                   REGARDING PARTNERSHIP/DUTY
10171.3                         LASC Case No. BC647351

1   and actual managers" of the Liviz plant were "A.V. Sabadash and his companion H. Iu. Itkin"[6]; and

2   T.S. Lobanova stated, "Legal support of lending to the controlled companies by "Tavrichesty' Bank

3   was assigned by A.V. Sabadash to H. Iu. Itkin, his longtime friend and companion." (SUF 51.)

4        The 2014 Meeting Minutes also confirm that Itkin "manages the legal departments of all the

5   companies owned by Mr. Sabadash in order to protect their joint business interests from external

6   threats. (SUF 58.) The minutes state that Itkin was acting as the manager of the cellulose company

7   as well as the Liviz vodka companies. (*Id.*) Ms. Gofman's annual reports to the partnership further

8   support that Itkin was managing and overseeing the accounting, tax planning, and tax strategy risk

9   assessment in relation to these plants, in addition to various real estate holdings. (SUF 59.)

10       This evidence overwhelmingly demonstrates that Itkin and Sabadash intended to, and did,

11  form a partnership, which they carried on for at least a decade.

12                    **2.      *Sabadash Cannot Meet His Burden to Controvert the Existence of the***

13                           ***Partnership.***

14       Once the moving party has met its initial burden, the burden shifts to the opposing party to

15  produce admissible evidence showing that a triable issue of fact exists. *See* Code Civ. Proc. §

16  437c(p)(1); *Green v. Ralee Engineering Co.* (1998) 19 Cal. 4th 66, 72.[7] The non-moving party

17  "shall *not* rely upon the allegations or denials of its pleadings to show that a triable issue of material

18  fact exists but, instead, shall set forth the *specific facts* showing that a triable issue of material fact

19  exists as to the cause of action or a defense thereto." Code Civ. Proc. § 437c(p) (emphasis added);

20  *see Aguilar, supra,* 25 Cal. 4th at 843 ("The purpose of the law of summary judgment is to provide

21  courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite

22  their allegations, trial is in fact necessary to resolve their dispute.").

23       To meet its burden, the non-moving party "must do more than simply show that there is

24  some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

25  *Corp.* (1986) 475 U.S. 574, 586. Evidence that is merely speculatory is insufficient to establish a

26  triable issue of material fact. *Sangster v. Paetkau* (1998) 68 Cal. App. 4th 151, 166 (On summary

27  judgment, "responsive evidence that gives rise to no more than mere speculation cannot be regarded

28

29       [6] The "H. Iu." in the judgment refers to Itkin, and resulted due to phonetic translation. The
30  phonetic spelling of Itkin's first and middle name could be interpreted as Garry or Harry, and either
    Yuri, or Iuri.

31       [7] The burden-shifting analysis is the same for both a motion for summary adjudication and a
32  motion for summary judgment. *See* Code Civ. Proc. §§ 437c(p); 437c(f)(2).

33

1  as substantial, and is insufficient to establish a triable issue of material fact."). Merely attacking the

2  moving party's credibility is also insufficient to defeat the motion. Code Civ. Proc. § 437c(e); *Ayon*

3  *v. Esquire Deposition Sols., LLC* (2018) 27 Cal. App. 5th 487, 490 (affirming trial court's order

4  granting summary judgment when non-moving party merely attacked the credibility of the evidence

5  rather than setting forth its own evidence).

6              a.    Sabadash Has Failed to Produce Any Specific Facts Denying the

7                    Existence of the Partnership.

8          Sabadash has failed to produce any evidence in this litigation setting forth specific facts that

9  would create a genuine issue of dispute regarding the existence of the partnership. Sabadash has, to

10  date, raised only a couple of challenges to Itkin's evidence, all of which fail.

11                    i.    Itkin's testimony is uncontroverted and must be accepted

12                          as true.

13          Sabadash previously attacked Itkin's testimony on the ground that it was "self-serving."

14  This is a meaningless argument, as the same can be said for every party's own testimony. Further,

15  the Code of Civil Procedure explicitly rejects this argument, permitting a motion for summary

16  judgment to be supported by "declarations, admissions, answers to interrogatories, depositions, and

17  matters of which judicial notice shall or may be taken." Code Civ. Proc. § 437c(b)(1); *Villa v.*

18  *McFerren* (1995) 35 Cal. App. 4th 733, 749 (deposition transcripts are admissible and a court may

19  use them to shift the burden of proof and grant a summary judgment motion).

20          More importantly, this argument is a red herring, meant to distract the Court from the

21  crucial fact that *Sabadash has failed to rebut Itkin's own testimony with his own*. Where the non-

22  moving party fails to rebut the moving party's declarations, the trial court may accept the

23  declarations as true for purposes of the summary judgment motion. *Kojababian v. Genuine Home*

24  *Loans, Inc.* (2009) 174 Cal. App. 4th 408, 417 (affirming trial court's order granting summary

25  judgment based solely on declarations); Weil & Brown, Cal. Prac. Guide Civ. Pro. Before Trial

26  (The Rutter Group) § 10:317 ("If the moving party's declarations are not controverted, the court

27  must accept them as true for summary judgment purposes. The judge has no discretion to deny the

28  motion and send the case to trial simply to allow the opposing party to cross-examine the

29  declarants, or otherwise challenge their credibility.") (*citing* Code Civ. Proc. § 437c(e)).

30  Accordingly, this Court must accept Itkin's testimony as true for purposes of this summary

31  judgment motion.[8]

32  _____

33        [8] Theoretically, a court may disregard a declaration prepared for purposes of a summary
judgment motion when it conflicts with that declarant's deposition testimony. *Jacobs v. Fire Ins.*

1    Sabadash may rely again on *Kloke v. Pongratz* (1940) 38 Cal. App. 2d 395, 401–02 for the

2    proposition that a partnership is not proven merely by the existence of one document in which

3    parties refer to themselves as partners.  (Cross-Defs.' Reply to MSJ (June 14, 2019), at 6.)  *Kloke* is

4    easily distinguishable.  Itkin is not relying on only one document, or only his testimony, to prove

5    the existence of the partnership.  Rather, Itkin has presented evidence of the existence of the

6    partnership through, *inter alia*: Itkin's testimony; the testimony of Ratner, Sosinsky, Isakova, and

7    the Russian trial witnesses; various written documentation, including the 2004 legal services

8    contract and partnership meeting minutes, the 2004-2006 service delivery reports, the 2005 letter

9    identifying Itkin as the attorney in fact for the partnerships businesses, the partnership expense

10   statements and capital accounting, and the 2014 meeting minutes; and the conduct of Itkin and

11   Sabadash for over a decade.  This evidence is far more than simply referring to himself as a partner.

12   Rather, it shows conduct in which both Sabadash and Itkin together formed a partnership, acted on

13   behalf of that partnership, and continued to do so for more than a decade.

14                          ii.    A partnership agreement need not be evidenced in writing.

15   Sabadash also previously argued that there was a lack of formal partnership documents, such

16   as a bank account or bylaws.  Yet this is factually incorrect, as Itkin did in fact keep partnership

17   expense records based on monthly meetings he had with Sabadash.  (SUF 55.)  Further, in

18   connection with the Russian appeal, Ms. Gofman provided a written memorialization of the

19   existence and terms of the partnership.  (SUF 33.)

20   In any event, Sabadash has pointed to no legal support that any particular documents are

21   necessary to establish a partnership, nor can he find such support.  Rather, case law is clear that a

22   partnership agreement may be oral or implied in fact, and it need not be evidenced in writing.

23   For instance, in *Holmes v. Lerner* (1999) 74 Cal. App. 4th 442, 446, the parties had a "kitchen table

24   conversation" about starting a nail polish business together.  They did not formalize an agreement in

25   writing, never discussed division of profits, and Holmes did not invest her own money into the

26   venture.  *Id.* at 453, 448.  But Holmes worked on the project, making sales presentations and

27   attending meetings.  *Id.* at 451.  After Lerner ousted Holmes, Holmes sued.  The Court of Appeal

28   upheld the finding that the parties formed a partnership: "that Holmes birthed an idea which was

29   incubated jointly by Lerner and Holmes, from which they intended to profit once it was fully

30

31   *Exch.* (1995) 36 Cal. App. 4th 1258, 1270.  That is not the case here, however.  Itkin has consistently

32   stated in his declarations and deposition testimony that he and Sabadash formed and maintained a

33   partnership.

1  matured in their company." *Id.* at 457.  It did not matter that the parties did not have a written

2  partnership agreement or even that they had not worked out a formal share of profits.  Once they

3  "agree[d] to associate as co-owners with the intent to carry on a business for profit, [they] have

4  established a partnership." *Id.*  "Other provisions of the [Uniform Partnership Act] and the conduct

5  of the parties supply the details of the agreement." *Id.*

6      Similarly, in *Greene*, *supra*, 235 Cal. App. 2d at 166, the appellate court affirmed the trial

7  court's finding that a partnership existed despite formal partnership documents.  It held, "The trial

8  court properly concluded from the parties' conduct and oral understandings that although a written

9  partnership agreement never materialized, they were nevertheless associated as partners." *Id.*  The

10  court relied on evidence such as the parties' joint search for business premises, combined efforts in

11  remodeling and managing the premises, the sharing of profits, and both their names on bank

12  accounts and permits as facts "indicating the parties' intention to carry on" as co-owners. *Id.*

13      Thus, no formal partnership documents such as tax returns or bank records are necessary to

14  form a partnership.  Indeed, a written partnership agreement is not even necessary.  An initial oral

15  partnership agreement between Itkin and Sabadash, formed with a handshake, and their intention to

16  carry on as partners, is sufficient to constitute a partnership.  But the Court need not rely only on that

17  handshake, because the partnership was then subsequently proved through various written

18  documentation, including the 2004 memorialization of the partnership, the 2004 legal services

19  contract, the 2004-2006 service delivery reports, the 2005 letter confirming Itkin's status as attorney

20  in fact, the partnership expense statements and capital accounting, and the 2014 meeting minutes, as

21  well as testimony from numerous witnesses and the parties' own conduct for a decade.

22                              iii.    Itkin has provided certified translations of Russian documents.

23      Finally, Sabadash previously objected that the English translation of the 2014 meeting

24  minutes drafted by Larisa Isakova was not a certified translation.  Itkin has since obtained a certified

25  translation of those 2014 meeting minutes, as well as certified translations of the other Russian-

26  language documents. *See* Cal. Rules of Court, Rule 3.1110(g).

27                      b.    This Court Found that the Partnership Was Not Terminated by

28                            Incorporation.

29      Once a partnership is shown to exist, it is presumed to continue, and the burden is on the

30  party denying its existence to show it was terminated. *Eng v. Brown* (2018) 21 Cal. App. 5th 675,

31  695. A partnership may terminate if it is incorporated or reorganized into another type of entity. *Id.*

32  Sabadash previously moved for summary judgment on the ground that any alleged partnership

33  terminated as a matter of law because the parties incorporated the partnership. (Cross-Defs.' MSJ

1  (April 5, 2019), at 7-11.) This Court denied that motion, finding that Sabadash failed to establish as a

2  matter of law that incorporation terminated the partnership, because the corporations were incor-

3  porated before the partnership was formed. (Notice of Ruling (June 24, 2019); Atabek Decl. ¶ 2.)

4      The Court's previous order is binding on the parties. "Parties to an action are bound by the

5  trial court's interim rulings unless the rulings are reversed upon trial court reconsideration or

6  appellate review." *Ziller Elecs. Lab GmbH v. Superior Court* (1988) 206 Cal. App. 3d 1222, 1228;

7  *Peck v. Hagen* (1989) 215 Cal. App. 3d 602, 609. Put another way, Sabadash is barred from re-

8  arguing that the partnership terminated by incorporation, because this Court has already concluded

9  that it was not. *See Id.* at 608 (final order has the effect of res judicata if the merits are determined in

10  action between parties).

11          c.      Sabadash Has Failed to Produce Any Evidence That Itkin Was an

12                  Employee.

13      Finally, Sabadash's arguments that Itkin was not a partner begs the question, then what was

14  he? Sabadash has suggested that Itkin was an employee. But, in this litigation, Sabadash has failed

15  to produce a single piece of evidence of an employer-employee relationship. For instance, Sabadash

16  has not produced any payroll checks, evidence of income tax withholding, an employment

17  agreement, personnel forms, an employee handbook, employee benefits, or any internal company

18  documents referring to Itkin as an employee. *See, e.g., Regents of Univ. of California v. Pub.*

19  *Employment Relations Bd.* (1986) 41 Cal. 3d 601, 619–20 (discussing indicia of employment status);

20  *Castaneda v. Ensign Grp., Inc.* (2014) 229 Cal. App. 4th 1015, 1021-1023 (same).

21      Sabadash has suggested that Itkin's monthly guaranteed draw on the partnership account

22  was akin to a salary, meaning the partnership did not exist. This is incorrect. Partners may be paid a

23  salary from the partnership, as long as they agree to that arrangement. A partner may be compen-

24  sated in this way via a written agreement "or by a course of conduct demonstrating such agree-

25  ment." *Broffman v. Newman* (1989) 213 Cal. App. 3d 252, 259. An arrangement for a partner to be

26  paid a salary may also be evidenced through an oral agreement. *Parigian v. Phillips* (1934) 138

27  Cal. App. 702, 705. Itkin and Sabadash did have an agreement that Itkin would be paid a guaran-

28  teed amount of money each month. Sabadash made this promise to Itkin to entice him to leave his

29  accounting practice in Los Angeles and move to Russia to work with him. (SUF 18, 19.) This

30  agreement was confirmed by the parties during their 2014 meeting in St. Petersburg. (SUF 60.)

31      Perhaps more importantly, Sabadash has not produced any evidence that Itkin's monthly

32  draw was an *employee's* salary. He has produced no evidence of employment whatsoever, relying

33  instead on vague speculation or accusations of fabrication. But in opposing this motion, Sabadash

1    can no longer rely on theories or conjecture.  He must produce "admissible evidence showing a

2    triable issue of fact."  *Santa Ana Unified Sch. Dist. v. Orange Cty. Dev. Agency* (2001) 90 Cal. App.

3    4th 404, 411.  A trial court may properly grant summary judgment in favor of the moving party if

4    the non-moving party fails to do so.  *Sangster, supra*, 68 Cal. App. 4th at 166 (bare assertion that

5    moving party "fabricated" evidence was not "substantial" and was insufficient to avoid summary

6    judgment).

7    **C.    A Fiduciary Duty Exists Between Itkin and Sabadash as a Matter of Law.**

8        As shown above, Sabadash is collaterally estopped from denying the existence of the

9    partnership between him and Itkin.  In the alternative, the evidence shows that there is no genuine

10    issue of material fact on the issue of the partnership.  If no triable issue of fact exists, "and the sole

11    remaining issue is one of law, it is the duty of the trial court to determine it."  *Pittelman v. Pearce*

12    (1992) 6 Cal. App. 4th 1436, 1441.  Because Itkin and Sabadash formed a partnership, a fiduciary

13    duty existed between them as a matter of law.

14        Fiduciary duties are imposed by law upon partners and codified by statute.  Pursuant to

15    Corporations Code section 16404, "the fiduciary duties a partner owes to the partnership and the

16    other partners are the duty of loyalty and the duty of care."  *See GAB Bus. Servs., Inc. v. Lindsey &*

17    *Newsom Claim Servs., Inc.* (2000) 83 Cal. App. 4th 409, 416 (disapproved of on other grounds in

18    *Reeves v. Hanlon* (2004) 33 Cal. 4th 1140) ("Fiduciary duties are imposed by law in certain

19    technical, legal relationships such as those between partners or joint venturers.")  "The defining

20    characteristic of a partnership is the combination of two or more persons to jointly conduct

21    business.  It is hornbook law that in forming such an arrangement, the partners obligate themselves

22    to share risks and benefits and to carry out the enterprise with . . . the loyalty and care of a

23    fiduciary."  *Agam v. Gavra* (2015) 236 Cal. App. 4th 91, 112–13 (citing *Enea v. Superior Court*

24    (2005) 132 Cal.App.4th 1559, 1564).  "Partnership is a fiduciary relationship, and partners are held

25    to the standards and duties of a trustee in their dealings with each other. . . .  [I]n all proceedings

26    connected with the conduct of the partnership every partner is bound to act in the highest good faith

27    to his copartner and may not obtain any advantage over him in the partnership affairs by the

28    slightest misrepresentation, concealment, threat or adverse pressure of any kind."  *Enea, supra*, 132

29    Cal. App. 4th at 1564.

30        Thus, "[w]hether a fiduciary duty exists is generally a question of law."  *Marzec v.*

31    *California Pub. Employees Ret. Sys.* (2015) 236 Cal. App. 4th 889, 915.  The Court of Appeal has

32    held that once the factual prerequisite to a fiduciary relationship is establishes, "the law imposes a

33    fiduciary duty."  *GAB Bus. Servs., Inc., supra*, 83 Cal. App. 4th at 421.  The court further held that

1  the trial court committed prejudicial error when it instructed the jury to find whether a fiduciary

2  duty existed, where the conclusion was inescapable that it existed as a matter of law. *Id.* at 423.

3  Other courts have similarly granted summary adjudication on the issue of whether a duty exists as a

4  matter of law. *See S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co.* (2010) 186 Cal. App. 4th 383,

5  388 (affirming trial court's order granting summary adjudication on whether insurer owed a duty of

6  care to insured); *Patterson v. Sacramento City Unified Sch. Dist.* (2007) 155 Cal. App. 4th 821, 832

7  (affirming trial court's determination that duty was owed as a matter of law by school district);

8  *Stanley v. Richmond* (1995) 35 Cal. App. 4th 1070, 1086 (scope of an attorney's fiduciary duty may

9  be determined as a matter of law).

10       Thus, fiduciary duties exist as a matter of law between partners. If this Court finds that

11  there is no genuine issue of material fact on the issue of whether Itkin and Sabadash had a

12  partnership, then as a matter of law a fiduciary duty existed between them, and summary

13  adjudication on that issue of duty must be granted.

14  **V.    CONCLUSION**

15       For the reasons described above, Itkin respectfully requests that this Court grant summary

16  adjudication on Cross-Defendants' Fourteenth Affirmative Defense and the issue of duty,

17  specifically, that as a matter of law Itkin and Sabadash maintained a legal relationship (a

18  partnership) upon which fiduciary duties were owed between them.

19

20  Dated:  November 8, 2019                 ATABEK & ASSOCIATES, P.C.

21

22                                          By:
                                            JON A. ATABEK
23                                          Attorneys for Defendant and
                                            Cross-Complainants
24                                          GARRY Y. ITKIN,
                                            NEW ALBION PROPERTY LIMITED
25

26

27

28

29

30

31

32

33

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) and not a party to the within action. My business address is 16330 Bake Parkway, Irvine, CA 92618.

On November 8, 2019, I served the foregoing document described as:

**(1) ITKIN'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**

**(2) DEFENDANT AND CROSSCOMPLAINANT GARRY Y. ITKIN'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION; and**

**(3) DEFENDANT AND CROSSCOMPLAINANT GARRY Y. ITKIN'S APPENDIX OF EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

on the interested parties in this action by placing ( ) the original **(X)** true copies thereof enclosed in sealed envelopes addressed as follows:

| ( )　　**BY MAIL** | ( )　　**BY FACSIMILE TRANSMISSION** |
|---|---|
| I caused such envelope to be deposited in the mail at Irvine, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. | I caused said document(s) to be transmitted by facsimile transmission to the name(s) and facsimile telephone number(s) of the person(s) set forth on the attached service list. The facsimile machine telephone number of the sending facsimile machine was (213) 402-3413. A transmission report was issued by the sending facsimile machine confirming that the transmission was completed without error. A true and correct copy of said transmission report is attached hereto. |
| ( )　　**BY OVERNIGHT DELIVERY** | ( X )　　**BY PERSONAL DELIVERY** |
| Said document was placed in an envelope designated by the express service center and placed for collection in a box regularly maintained by said carrier with whom we have a direct billing account, to be delivered to the office of the addressee listed above on the next business day. | I caused personal service of the above-referenced document by requesting that an appropriate agent deliver the above referenced documents to the office of the recipient named below, either by handing the document(s) to the recipient to by leaving the document(s) with the receptionist or other person apparently in charge of the recipient's office. |
| ( X )　　**BY ELECTRONIC SERVICE** | |
| By transmitting the document(s) listed above from my email to the e-mail address(es) of the person(s) set forth on the attached service list. The transmission was reported as complete and without error. *See* California Rules of Court, rule 2060. | |

**(X)**　　**STATE**　　I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**(X)**　　**EXECUTED** on November 8, 2019 at Irvine, California.

_Jon Atabek_

1

**SERVICE LIST**

2

3

Robert H. Platt, Esq.
Reid P. Davis, Esq.
Michael Zorkin, Esq.

4

MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard

5

Los Angeles, California 90064

6

rplatt@manatt.com
redavis@manatt.com

7

mzorkin@manatt.com

8

*Counsel for ALEXANDER SABADASH,
CONRAD STAMPFLI, LARISSA SABADASH,*

9

*THOMAS REYNOLDS, PIOTR SZYMANSKI,
AFB TRADING ONE, INC., M-BJEP*

10

*LIMITED, M-NICE LIMITED, GOLDEN*

11

*SPHINX LIMITED*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

20

ITKIN'S MOTION FOR SUMMARY ADJUDICATION
REGARDING PARTNERSHIP/DUTY
LASC Case No. BC647351

# Exhibit 26

Electronically Received 02/07/2020 03:44 PM

1   MANATT, PHELPS & PHILLIPS, LLP
2   ROBERT H. PLATT (Bar No. CA 108533)
    REID P. DAVIS (Bar No. CA 275164)
3   MICHAEL ZORKIN (Bar No. CA 313308)
    11355 West Olympic Blvd.
4   Los Angeles, CA 90064
    Tel: (310)312-4000
5   Fax: (310)312-4224

6   *Attorneys for Plaintiffs and Cross-Defendant*
7   Alexander Sabadash, AFB Trading One, Inc., M-BJEP Limited, M-
    NICE Limited, Golden Sphinx Limited, and New Albion Property
    Limited

8

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10              FOR THE COUNTY OF LOS ANGELES

11

12  AFB TRADING ONE, INC., a California        Case No. BC647351
    corporation; M-BJEP LIMITED, an Isle of
13  Man corporation; M-NICE LIMITED, an        Assigned to Hon. Michael L. Stern
    Isle of Man corporation, GOLDEN            Dept. 62
14  SPHINX LIMITED, a Jersey corporation;
    NEW ALBION PROPERTY LIMITED, an            [PROPOSED] ORDER RE: CROSS-
15  England corporation;                       COMPLAINANT GARRY Y. ITKIN'S
                                               MOTION FOR SUMMARY
16          Plaintiff Companies,               ADJUDICATION

17      vs.                                    Hearing Date:    January 29, 2020
                                               Hearing Time:    8:30 a.m.
18  GARRY Y. ITKIN, an individual; THE         Dept:            62
    LIGHTHOUSE PARTNERSHIP
19  LIMITED, an England corporation; and
    DOES 1 through 100, inclusive,
20
            Defendants.
21

22  And Related Cross-Complaint

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FILED
Superior Court of California
County of Los Angeles

FEB 27 2020

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
      M. Alaniz

02/28/2020

1

## ORDER

2       On January 29, 2020 at 8:30 a.m., in Department 62 of the Superior Court for the County

3  of Los Angeles, located at 111 North Hill Street, Los Angeles, California 90012, the Honorable

4  Michael L. Stern presiding, the Court called for regular hearing Cross-Complainant Garry Y.

5  Itkin's ("Itkin") Motion for Summary Adjudication.  Reid P. Davis appeared on behalf of

6  Plaintiffs AFB Trading One, Inc., M-BJEP Limited, M-NICE Limited, Golden Sphinx Limited,

7  and New Albion Property Limited, as well as on behalf of Cross-Defendant Alexander Sabadash.

8  Stephanie Charlin appeared on behalf of Itkin.

9       The Court, having considered the briefing submitted and argument of counsel, and good

10 cause appearing therefore, hereby orders that Itkin's Motion for Summary Adjudication is

11 **DENIED**, on the grounds that:

12      1.  Collateral estoppel ~~cannot be established on the basis~~ *issues are in dispute regarding* of the prior actions filed by

13          Elena Gofman (previously Elena Vasilieva) in Russia or in California; and

14      2.  There remain disputed issues of material fact concerning the existence of the

15          "secret" partnership between Garry Itkin and Alexander Sabadash.

16

17 **IT IS SO ORDERED.**

18 DATED: _Feby 24_ , 2020          _____

19                                                Hon. Michael L. Stern

20

21 325764616.2

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

02/28/2020

## PROOF OF SERVICE

I, Erica L. Nash, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California 90064-1614. On **February 7, 2020**, I served the within:

**[PROPOSED] ORDER RE: CROSS-COMPLAINANT GARRY Y. ITKIN'S MOTION FOR SUMMARY ADJUDICATION**

on the interested parties in this action addressed as follows: **SEE ATTACHED SERVICE LIST**

☐ **(BY MAIL)** By placing such document(s) in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of correspondence for mailing with the United States Postal Service, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

☐ **(BY OVERNIGHT MAIL)** By placing such document(s) in a sealed envelope, for collection and overnight mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of overnight service mailing, said practice being that in the ordinary course of business, correspondence is deposited with the overnight messenger service, **FEDEX**, for delivery as addressed.

☐ **(BY PERSONAL SERVICE)** By causing such document(s) to be delivered by hand, as addressed by delivering same to **First Legal** with instructions that it be personally served.

☒ **(BY ELECTRONIC SERVICE )** By causing such document(s) to be submitted via the Superior Court of California, County of Los Angeles's electronic filing provider, **First Legal**, and served upon all counsel of record registered to receive electronic service.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on **February 7, 2020**, at Los Angeles, California.

_/s/ Erica Nash_
Erica Nash

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

319445481.1                                    3

PROOF OF SERVICE

1

## SERVICE LIST

2

3    Jon A. Atabek. Esq.                          *Attorneys for Defendant,*
     Shella Albabes, Esq.                         Garry Y. Itkin
4    **ATABEK & ASSOCIATES, P.C.**
     16330 Bake Parkway
5    Irvine, CA 92618
     Phone: (213) 394-5943
6    Fax:    (213) 402-3413
     Email: jatabek@atabeklaw.com
7    Email: salcabes@atabeklaw.com

8    Christian S. Molnar, Esq.                    *Attorneys for Defendant,*
     **ARENDSEN CANE MOLNAR LLP**                 The Lighthouse Partnersip Limited
9    315 S. Beverly Drive, Suite 320
     Beverly Hills, CA  90212
10   Phone: (310) 299-8630
     Fax:    (310) 820-9926
11   Email: cmolnar@arendsenlaw.com

12

13   Brian S. Kabateck, Esq.                      *Attorneys for Defendants and Cross-*
     Christopher B. Noyes, Esq.                   *Complainants,* Garry Y. Itkin and
14   Stephanie Charlin, Esq.                      New Albion Property Ltd.

15   **KABATECK, LLP**
     633 W. 5th Street, Suite 3200
16   Los Angeles, CA  90071
     Phone: (213) 217-5000
17   Fax:    (213) 217-5010
18   Email: bsk@kbklawyers.com
     Email: cbn@kbklawyers.com

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

319445481.1                              4

PROOF OF SERVICE

# Exhibit 27



# INVOICE

Invoice # 592
Date: 03/05/2025
Due On: 03/25/2025

6320 Canoga Ave., 15th Floor
Woodland Hills, CA 91367
Phone: (323) 493-8075
Email: mz@thezorkinfirm.com

Alexander Sabadash

## 10001-007

## Chapter 7 Bankruptcy

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 02/25/2025 | Review email from J. Garrood re: Jersey Court order. | 0.20 | $550.00 | $110.00 |
| Service | 02/25/2025 | Call with client re: ██████ | 0.20 | $550.00 | $110.00 |
| Service | 02/25/2025 | Research and analyze standing to object to Chapter 7 petition. | 0.80 | $550.00 | $440.00 |
| Service | 02/25/2025 | Research and analyze procedure to contest Chapter 7 petition. | 0.90 | $550.00 | $495.00 |
| Service | 02/25/2025 | Research and analyze availability of an evidentiary hearing in a Chapter 7 petition. | 0.40 | $550.00 | $220.00 |
| Service | 02/26/2025 | Call with clien ██████████ | 0.40 | $550.00 | $220.00 |
| Service | 02/27/2025 | Analyze strategy for obtaining dismissal/ruling on partnership. | 0.80 | $550.00 | $440.00 |

**Total** **$2,035.00**

Invoice # 592 - 03/05/2025



## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 592 | 03/25/2025 | $2,035.00 | $2,035.00 | $0.00 |

| | | |
|---|---|---|
| **Outstanding Balance** | **$29,594.61** |
| **Total Amount Outstanding** | **$29,594.61** |

Please make checks payable to The Zorkin Firm, Law Corporation.

Wire Instructions:



# INVOICE

Invoice # 631
Date: 04/06/2025
Due On: 04/25/2025

6320 Canoga Ave., 15th Floor
Woodland Hills, CA 91367
Phone: (323) 493-8075
Email: mz@thezorkinfirm.com

Alexander Sabadash

## 10001-007

## Chapter 7 Bankruptcy

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 03/02/2025 | Research when service by mail of summons is deemed effective. | 0.40 | $550.00 | $220.00 |
| Service | 03/02/2025 | Further research procedures to contest chapter 7 petition. | 0.40 | $550.00 | $220.00 |
| Service | 03/05/2025 | Analyze strategy for motion for summary judgment. | 1.70 | $550.00 | $935.00 |
| Service | 03/06/2025 | Research bankruptcy court specific rules for motions for summary judgment. | 0.40 | $550.00 | $220.00 |
| Service | 03/06/2025 | Research and analyze involuntary chapter 7 cases involving partnerships. | 0.90 | $550.00 | $495.00 |
| Service | 03/07/2025 | Draft motion to dismiss. | 3.40 | $550.00 | $1,870.00 |
| Service | 03/09/2025 | Further draft motion to dismiss the bankruptcy petition. | 1.70 | $550.00 | $935.00 |
| Service | 03/11/2025 | Further research and analyze requirements for motion to dismiss and summary judgment in the alternative. | 0.40 | $550.00 | $220.00 |
| Service | 03/12/2025 | Further revise motion to dismiss. | 1.80 | $550.00 | $990.00 |
| Service | 03/12/2025 | Further research case law dismissing involuntary claims against a partnership. | 1.70 | $550.00 | $935.00 |
| Service | 03/13/2025 | Further revise motion to dismiss. | 1.70 | $550.00 | $935.00 |
| Service | 03/13/2025 | Research and analyze case law on suing dissolved entities. | 1.80 | $550.00 | $990.00 |
| Service | 03/14/2025 | CIP call with liquidators, Togut re: ▮▮▮▮▮▮ | 0.80 | $550.00 | $440.00 |

Invoice # 631 - 04/06/2025

| Service | 03/14/2025 | Call with client re: ██████████ | 0.40 | $550.00 | $220.00 |
|---|---|---|---|---|---|
| Service | 03/14/2025 | Further revise motion to dismiss based on lack of subject matter jurisdiction. | 2.40 | $550.00 | $1,320.00 |
| Service | 03/17/2025 | Draft liquidator's declaration re: status of Jersey proceedings and abstention. | 0.90 | $550.00 | $495.00 |
| Service | 03/17/2025 | Research and analyze dismissal of involuntary petition due to abstention. | 1.60 | $550.00 | $880.00 |
| Service | 03/17/2025 | Further draft motion to dismiss based on bona fide dispute. | 2.10 | $550.00 | $1,155.00 |
| Service | 03/17/2025 | Further draft motion to dismiss based on lack of subject matter jurisdiction. | 2.20 | $550.00 | $1,210.00 |
| Service | 03/19/2025 | Communicate with GSL foreign representative and revise Wood declaration. | 0.80 | $550.00 | $440.00 |
| Service | 03/19/2025 | Further revise subject matter jurisdiction section of motion to dismiss. | 2.10 | $550.00 | $1,155.00 |
| Service | 03/19/2025 | Further revise bona fide dispute section of motion to dismiss. | 1.10 | $550.00 | $605.00 |
| Service | 03/19/2025 | Further revise factual background section of motion to dismiss. | 1.30 | $550.00 | $715.00 |
| Service | 03/20/2025 | Revise and finalize motion to dismiss. | 1.20 | $550.00 | $660.00 |
| Service | 03/20/2025 | Revise abstention section of motion to dismiss. | 0.90 | $550.00 | $495.00 |
| Service | 03/20/2025 | Identify and assemble exhibits iso motion to dismiss. | 2.70 | $550.00 | $1,485.00 |
| Service | 03/20/2025 | Draft request for judicial notice. | 0.70 | $550.00 | $385.00 |
| Service | 03/20/2025 | Draft declaration of Michael Zorkin iso motion to dismiss. | 1.60 | $550.00 | $880.00 |
| Service | 03/21/2025 | Communicate with J. Garrod re: ██████████ | 0.20 | $550.00 | $110.00 |
| Service | 03/28/2025 | Review and analyze new filings by creditors in the Ch. 7 case. | 0.70 | $550.00 | $385.00 |
| Service | 03/31/2025 | Call with D. Trubina re: ██████████ | 0.40 | $550.00 | $220.00 |
| Service | 03/31/2025 | Review and analyze proofs of claim filed by other creditors. | 0.60 | $550.00 | $330.00 |

**Total**    **$22,550.00**

Invoice # 631 - 04/06/2025



Please make checks payable to The Zorkin Firm, Law Corporation.

Wire Instructions:





# INVOICE

Invoice # 650
Date: 05/06/2025
Due On: 06/05/2025

6320 Canoga Ave., 15th Floor
Woodland Hills, CA 91367
Phone: (323) 493-8075
Email: mz@thezorkinfirm.com

Alexander Sabadash

## 10001-007

## Chapter 7 Bankruptcy

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 04/11/2025 | Review and analyze opposition to motion to dismiss. | 0.90 | $550.00 | $495.00 |
| Service | 04/11/2025 | Analyze strategy for reply iso motion to dismiss. | 0.60 | $550.00 | $330.00 |
| Service | 04/13/2025 | Further analyze strategy for reply iso motion to dismiss. | 0.60 | $550.00 | $330.00 |
| Service | 04/13/2025 | Draft reply iso motion to dismiss. | 2.10 | $550.00 | $1,155.00 |
| Service | 04/14/2025 | Further draft reply iso motion to dismiss. | 2.90 | $550.00 | $1,595.00 |
| Service | 04/14/2025 | Review and analyze Itkin's exhibits in opposition to motion to dismiss. | 1.40 | $550.00 | $770.00 |
| Service | 04/14/2025 | Review and analyze Itkin's declaration in opposition to motion to dismiss. | 1.20 | $550.00 | $660.00 |
| Service | 04/14/2025 | Research whether Itkin's cases support the propositions they are cited for. | 1.40 | $550.00 | $770.00 |
| Service | 04/14/2025 | Review and analyze deposition transcript of Ratner to reply to Itkin's arguments. | 1.90 | $550.00 | $1,045.00 |
| Service | 04/15/2025 | Further revise reply iso motion to dismiss. | 2.10 | $550.00 | $1,155.00 |
| Service | 04/15/2025 | Further revise and finalize reply iso motion to dismiss. | 1.90 | $550.00 | $1,045.00 |
| Service | 04/15/2025 | Further review Itkin's evidence in opposition to motion to dismiss. | 0.70 | $550.00 | $385.00 |
| Service | 04/15/2025 | Draft supp Zorkin declaration. | 1.10 | $550.00 | $605.00 |
| Service | 04/15/2025 | Identify and assemble reply exhibits. | 1.90 | $550.00 | $1,045.00 |
| Service | 04/15/2025 | Draft objections to Itkin's declaration. | 0.70 | $550.00 | $385.00 |

| | | | | | |
|---|---|---|---|---|---|
| Service | 04/15/2025 | Draft omnibus objection to proof of claim | 1.40 | $550.00 | $770.00 |
| Service | 04/16/2025 | Further revise objections to proof of claim. | 0.60 | $550.00 | $330.00 |
| Service | 04/21/2025 | Prepare for oral argument on motion to dismiss. | 1.90 | $550.00 | $1,045.00 |
| Service | 04/22/2025 | Prepare for and attend argument on motion to dismiss. | 1.10 | $550.00 | $605.00 |
| Service | 04/27/2025 | Research and analyze necessity for objections to proofs of claim in an involuntary proceeding. | 1.80 | $550.00 | $990.00 |
| Service | 04/29/2025 | Call with client re: ████████ | 0.30 | $550.00 | $165.00 |
| Service | 04/29/2025 | Communicate with J. Garrood re: ████████ | 0.30 | $550.00 | $165.00 |
| Service | 04/29/2025 | Research and analyze case law discussing proof of claim in the context of an involuntary proceeding. | 0.90 | $550.00 | $495.00 |
| Service | 04/29/2025 | Draft amended objections to proofs of claim for creditor Ratner. | 0.90 | $550.00 | $495.00 |
| Service | 04/29/2025 | Draft amended objections to proofs of claim for creditor Progressive Management. | 0.80 | $550.00 | $440.00 |
| Service | 04/29/2025 | Draft amended objections to proofs of claim for creditor Gofman. | 1.20 | $550.00 | $660.00 |
| Service | 04/30/2025 | Draft objections to proof of claim for creditor Kurochkin. | 0.80 | $550.00 | $440.00 |
| Service | 04/30/2025 | Draft objections to proof of claim for creditor Habarova. | 0.60 | $550.00 | $330.00 |
| Service | 04/30/2025 | Draft objections to proof of claim for creditor Samsonova. | 0.60 | $550.00 | $330.00 |
| Service | 04/30/2025 | Draft objections to proof of claim for creditor Avilov. | 0.60 | $550.00 | $330.00 |
| Service | 04/30/2025 | Draft objections to proof of claim for creditor Atabek. | 0.60 | $550.00 | $330.00 |
| Service | 04/30/2025 | Assemble and organize exhibits for filing amended objections to proof of claim. | 0.80 | $550.00 | $440.00 |

**Total**  **$20,130.00**

Invoice # 650 - 05/06/2025



Please make checks payable to The Zorkin Firm, Law Corporation.

Wire Instructions:
U.S. Bank



# INVOICE

Invoice # 669
Date: 06/15/2025
Due On: 06/30/2025

6320 Canoga Ave., 15th Floor
Woodland Hills, CA 91367
Phone: (323) 493-8075
Email: mz@thezorkinfirm.com

Alexander Sabadash

## 10001-007

## Chapter 7 Bankruptcy

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 05/01/2025 | Review and analyze Itkin's request to file a supplemental brief. | 0.40 | $550.00 | $220.00 |
| Service | 05/07/2025 | Call with client re: ████████ | 0.30 | $550.00 | $165.00 |
| Service | 05/07/2025 | Communicate with Golden Sphinx re: ████████ ██ | 0.20 | $550.00 | $110.00 |
| Service | 05/14/2025 | Communicate with JLs re: ████████ ████████ | 0.20 | $550.00 | $110.00 |
| Service | 05/27/2025 | Review and analyze creditor's oppositions to objections to proofs of claim. | 1.30 | $550.00 | $715.00 |
| Service | 05/27/2025 | Draft reply iso objections to proof of claims. | 2.30 | $550.00 | $1,265.00 |
| Service | 05/28/2025 | Call with K. Owens re: bankruptcy fraud investigation. | 0.60 | $550.00 | $330.00 |

| | | | | **Total** | **$2,915.00** |
|--|--|--|--|-----------|-------------|



Invoice # 669 - 06/15/2025

Please make checks payable to The Zorkin Firm, Law Corporation.

Wire Instructions:



# INVOICE

Invoice # 671
Date: 07/01/2025
Due On: 07/31/2025

6320 Canoga Ave., 15th Floor
Woodland Hills, CA 91367
Phone: (323) 493-8075
Email: mz@thezorkinfirm.com

Alexander Sabadash

## 10001-007

## Chapter 7 Bankruptcy

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 06/02/2025 | Review and analyze new creditor claim related to Davilla arbitration. | 0.70 | $550.00 | $385.00 |
| Service | 06/02/2025 | Review previous communications related to Davilla arbitration. | 0.20 | $550.00 | $110.00 |
| Service | 06/02/2025 | Prepare for hearing on motion to dismiss. | 1.10 | $550.00 | $605.00 |
| Service | 06/03/2025 | Attend hearing on motion to dismiss. | 2.50 | $550.00 | $1,375.00 |
| Service | 06/03/2025 | Further prepare for hearing on motion to dismiss. | 1.40 | $550.00 | $770.00 |
| Service | 06/13/2025 | Communicate with client re: case strategy and next steps. | 0.40 | $550.00 | $220.00 |
| Service | 06/16/2025 | Review and analyze Order dismissing the petition. | 0.60 | $550.00 | $330.00 |
| Service | 06/16/2025 | Communicate with client re: ███████ ████ | 0.40 | $550.00 | $220.00 |
| Service | 06/16/2025 | Research timelines for motion for fees under 303(i). | 0.40 | $550.00 | $220.00 |
| Service | 06/16/2025 | Research types of damages available under 303(i). | 0.40 | $550.00 | $220.00 |
| Service | 06/16/2025 | Communicate with liquidators re: ████ | 0.20 | $550.00 | $110.00 |
| Service | 06/17/2025 | Review final order dismissing the case. | 0.20 | $550.00 | $110.00 |
| Service | 06/17/2025 | Analyze strategy for motion for fees and sanctions. | 1.70 | $550.00 | $935.00 |
| Service | 06/19/2025 | Call with client re: ██████████ | 0.40 | $550.00 | $220.00 |
| Service | 06/19/2025 | Draft motion for fees. | 1.60 | $550.00 | $880.00 |

| Service | 06/19/2025 | Further draft and revise motion for fees. | 1.70 | $550.00 | $935.00 |
| Service | 06/20/2025 | Research and analyze bankruptcy court precedent on examples of bad faith filings. | 1.70 | $550.00 | $935.00 |
| Service | 06/20/2025 | Research and analyze FRBP 9011 sanctions in conjunction with a motion under 303(i). | 1.40 | $550.00 | $770.00 |
| Service | 06/20/2025 | Further revise motion for fees. | 1.90 | $550.00 | $1,045.00 |
| Service | 06/22/2025 | Further revise motion for fees. | 1.30 | $550.00 | $715.00 |
| Service | 06/23/2025 | Further revise motion for fees. | 1.80 | $550.00 | $990.00 |
| Service | 06/23/2025 | Draft request for sanctions under FRBP 9011. | 1.10 | $550.00 | $605.00 |
| Service | 06/23/2025 | Review and analyze case materials from the Davilla v. Golden Spirits arbitration to prepare for request for sanctions. | 0.90 | $550.00 | $495.00 |
| Service | 06/23/2025 | Communicate with liquidators re: motion for fees. | 0.30 | $550.00 | $165.00 |
| Service | 06/23/2025 | Review and analyze docket of the Russian Gofman case. | 0.90 | $550.00 | $495.00 |
| Service | 06/24/2025 | Call with court reporter re: transcript request. | 0.30 | $550.00 | $165.00 |
| Service | 06/24/2025 | Further revise motion for sanctions. | 2.20 | $550.00 | $1,210.00 |
| Service | 06/25/2025 | Further revise motion for sanctions. | 0.40 | $550.00 | $220.00 |
| Expense | 06/25/2025 | Reimbursable expenses: Fee for transcripts of the hearings on motion to dismiss. | 1.00 | $114.61 | $114.61 |
| Service | 06/25/2025 | Review and analyze transcripts of hearing on motion to dismiss. | 0.80 | $550.00 | $440.00 |
| Expense | 06/25/2025 | Reimbursable expenses: Translation of Russian Documents into English. | 1.00 | $220.00 | $220.00 |
| Service | 06/25/2025 | Further revise motion for fees and sanctions. | 2.10 | $550.00 | $1,155.00 |
| Service | 06/25/2025 | Further revise motion for fees and sanctions. | 2.20 | $550.00 | $1,210.00 |
| Service | 06/26/2025 | Draft A. Sabadash declaration iso motion for fees. | 1.10 | $550.00 | $605.00 |
| Service | 06/26/2025 | Further revise motion for fees. | 1.90 | $550.00 | $1,045.00 |
| Service | 06/27/2025 | Further revise motion for fees. | 3.70 | $550.00 | $2,035.00 |
| Service | 06/29/2025 | Further revise motion for sanctions. | 0.90 | $550.00 | $495.00 |
| Service | 06/30/2025 | Review translations for accuracy. | 0.50 | $550.00 | $275.00 |
| Service | 06/30/2025 | Further revise motion for sanctions. | 3.10 | $550.00 | $1,705.00 |
| Service | 06/30/2025 | Further revise motion for fees. | 2.90 | $550.00 | $1,595.00 |
| Service | 06/30/2025 | Conduct additional research into requirement that | 0.60 | $550.00 | $330.00 |

Invoice # 671 - 07/01/2025

motions under Rule 9011 be separately filed.

**Total    $26,679.61**

Please make checks payable to The Zorkin Firm, Law Corporation.

Wire Instructions:



# INVOICE

Invoice # 672
Date: 07/01/2025
Due On: 07/31/2025

## The Zorkin Firm

6320 Canoga Ave., 15th Floor
Woodland Hills, CA 91367

Alexander Sabadash

## 10001-007

## Chapter 7 Bankruptcy

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 07/01/2025 | Draft Zorkin declaration iso motion for fees/ sanctions. | 1.60 | $550.00 | $880.00 |
| Service | 07/01/2025 | Further revise and finalize motion for sanctions. | 2.10 | $550.00 | $1,155.00 |
| Service | 07/01/2025 | Further revise and finalize motion for fees. | 1.90 | $550.00 | $1,045.00 |
| Service | 07/01/2025 | Assemble and organize exhibits iso motion for sanctions. | 2.60 | $550.00 | $1,430.00 |

|  | **Total** | **$4,510.00** |
|--|-----------|---------------|



Invoice # 672 - 07/01/2025

Please make all amounts payable to: The Zorkin Firm