1  MICHAEL ZORKIN (Bar No. CA 313308)
   Email: mz@thezorkinfirm.com
2  THE ZORKIN FIRM
   6320 Canoga Ave., 15th Floor
3  Woodland Hills, California 91367
   Telephone:   323.493.8075
4

5  Attorneys for Putative Partner of Alleged Debtor
   Alexander Sabadash
6

7

8                UNITED STATES BANKRUPTCY COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11 In re:                          No. 2:25-bk-11235-NB

12 Itkin & Sabadash,               Hon. Neil W. Bason

13            Debtor,              **PUTATIVE PARTNER
                                   ALEXANDER SABADASH'S
14                                 MOTION FOR FEES AND
                                   DAMAGES, UNDER 11 U.S.C. §
15                                 303(I) AND SANCTIONS UNDER
                                   FRBP 9011 AND THE COURT'S
16                                 INHERENT POWER**

17                                  Hearing Date: August 5, 2025
                                    Hearing Time: 11:00 a.m.
18

19                                  Filed concurrently with:
                                    1.  Declaration of Michael Zorkin;
20                                  2.  Declaration of Alexander
                                        Sabadash;
21                                  3.  Declaration of Andy Wood;
                                    4.  Request for Judicial Notice.
22

23

24

25

26

27

28

                                    1

THE ZORKIN FIRM

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 5, 2025 at 11:00 a.m. in Courtroom 1545 of the above captioned court, located at 255 E. Temple Street, Los Angeles, CA 90012, Putative Partner of Alleged Debtor Alexander Sabadash will move for sanctions under Fed. R. Bank. P. 9011 and the Court's inherent authority.

This motion is made because the involuntary petition and each joinder to the involuntary petition was signed and presented to the court for an improper purpose. FRBP 9011(b)(1).

The claims, defenses, and other contentions were not warranted by existing law or by nonfrivolous argument to extend, modify, or reverse existing law. FRBP 9011(b)(2). The allegations and factual contentions did not have evidentiary support. FRBP 9011(b)(3).

Putative Partner seeks sanctions from Garry Itkin, Daniel McCarthy, and Joseph Caseres jointly and severally.

Mr. Sabadash seeks $78,485 in fees and asks the Court to award any additional amount to deter future conduct.

LBR 9013-1(f) requires a written response to be filed and served at least 14 days before the hearing.

The motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities and declarations, the request for judicial notice, any evidence or argument presented at the hearing, and any papers on file with the Court.

Dated:      July 1, 2025                    THE ZORKIN FIRM


By: /s/ Michael Zorkin
      Michael Zorkin
      Attorneys for Putative Partner
      Alexander Sabadash

THE ZORKIN FIRM

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................. 1

ARGUMENT ........................................................................................................ 5

I.     MR. MCCARTHY AND MR. CASERES SHOULD BE SANCTIONED UNDER RULE 9011 FOR FAILURE TO INVESTIGATE AND REPRESENTING TO THE COURT THAT THE PETITION AND JOINDERS HAD MERITS. ..................... 5

    A.    Mr. McCarthy and Mr. Caseres presented the involuntary petition and joinders for an improper purpose. ..................................................... 6

    B.    Mr. McCarthy and Mr. Caseres knew that the debts were in bona fide dispute. ............................................................................................. 9

    C.    Mr. McCarthy and Mr. Caceres did not conduct a reasonable inquiry into creditors' claims before filing the petition and joinders......................... 12

       1.   Gofman (Claim no. 6.) ................................................ 12

       2.   Aleksandr Grant (Claim No. 11). ................................. 14

       3.   Russian Lawyers (Habarova (claim 7), Shadaev (claim 8), Samsonova (claim 9).) ................................................................... 15

       4.   Ratner and Progressive Management (Claims 1 and 2). ............. 16

II.    MR. ITKIN, MR. MCCARTHY, AND MR. CASERES SHOULD BE JOINTLY AND SEVERALLY LIABLE FOR ANY AWARD. ......................................... 17

III.    THE COURT SHOULD AWARD ATTORNEYS' FEES AND ANY ADDITIONAL AMOUNT TO DETER FUTURE CONDUCT. ........................................ 17

CONCLUSION .................................................................................................. 18

## **INTRODUCTION**

Alexander Sabadash seeks sanctions because this involuntary bankruptcy petition was a misuse of the court system—filed not for a proper bankruptcy purpose, but to dodge unfavorable rulings from the Jersey Court.  Mr. Itkin and his attorneys knew that no partnership existed and that the alleged debts were hotly contested.  Yet, they filed anyway, banking on deception to halt ongoing litigation abroad.

Sanctions under Rule 9011 are equally justified against Mr. McCarthy and Mr. Caseres.  The petition was undeniably filed in bad faith, intended to stall Jersey court proceedings, evade payment of court-ordered fines, and engage in blatant forum-shopping.  Both attorneys neglected their fundamental duty to conduct a proper investigation into the legitimacy of the claims.  Instead, they recklessly advanced claims rooted in fraud and forgery, accepting dubious evidence without scrutiny.

Given this egregious and calculated misconduct, the Court should award sanctions against Mr. Itkin, Mr. McCarthy, and Mr. Caseres jointly and severally.

Any lesser sanction risks emboldening similar misuse, degrading public confidence in the judicial system, and transforming legitimate legal remedies into tools for gamesmanship and delay.[1]

## **FACTUAL AND PROCEDURAL BACKGROUND**

### **A. Meeting and hiring Mr. Itkin.**

The Sabadash family met Mr. Itkin, a Los Angeles tax preparer, in the 1990's.  Mr. Itkin began doing taxes for the Sabadashes and the families became friends.  Around 2000, Mr. Sabadash asked Mr. Itkin to move to Russia and work for his companies performing various tasks centered on accounting and tax services.

---

[1] Mr. Sabadash recognizes that the arguments in this motion and the concurrently filed motion for fees overlap in some, but not all, respects.  This motion is brought separately because Rule 9011(c)(2)(A) requires this motion to be "made separately from any other motion or request."

THE ZORKIN FIRM

1    (Sabadash Decl., ¶ 2.)  Mr. Sabadash offered Mr. Itkin a generous salary and Mr.

2    Itkin began receiving $50,000 per month as soon as he began working for Mr.

3    Sabadash.  (Sabadash Decl., ¶ 3; Zorkin Decl., Ex. 1, Itkin Dep. Tr., 148:15-149:1.)

4         When Mr. Itkin was hired in May 2000, Mr. and Mrs. Sabadash issued Mr.

5    Itkin a power of attorney.  (Zorkin Decl., Ex. 6; Sabadash Decl. ¶ 1.)  This document

6    specified that Mr. Itkin was to "manage [the Sabadash's] property arising out of [the

7    Sabadash's] interests in said companies" in exchange for "fees to [Mr. Itkin]."

8         From 2000 to 2016, Mr. Itkin worked for Mr. Sabadash as an accountant and

9    financial manager.  To enable Mr. Itkin to perform his duties, Mr. Sabadash

10   appointed Mr. Itkin as a director of various corporations which required Mr. Itkin's

11   services.  (Sabadash Decl. ¶ 1-3, RJN Ex. 3.)

12        **B. Mr. Itkin's removal from his corporate positions.**

13        In around 2014, Mr. Itkin hatched a scheme to take over nearly all of the

14   Sabadash family assets by exploiting his positions of trust as director of various

15   Sabadash companies.  For instance, between 2014 and 2016, he stole money from

16   bank accounts, transferred corporate shares to himself, mortgaged Mr. Sabadash's

17   assets, and created various contracts and promissory notes that effectively locked

18   down all of Mr. Sabadash's assets.  (Sabadash Decl. ¶ 8-10.)  Mr. Itkin believed that

19   in Mr. Sabadash's absence he could do this in secret and that Mrs. Sabadash would

20   be unable to defend the family.  And he almost got away with it.

21        Mr. Itkin's plan is striking because he did much more than just lay claim to

22   Mr. Sabadash's business assets.  He took control (on paper) of the Sabadash family

23   home where Mrs. Sabadash lives with her two children.  This has caused

24   unimaginable strain on Mrs. Sabadash whose life has been put on hold by Mr.

25   Itkin's betrayal and who continues to pay the substantial mortgage, property taxes,

26   and all expenses for this home.

27        After Mr. Itkin's abuses of trust and misappropriation of assets surfaced, he

28

1  was officially voted out from his positions as director of all companies by Mr.

2  Sabadash. (Sabadash Decl. ¶ 8-10.) Mr. Itkin disputed the shareholder vote was

3  legitimate but never mentioned a partnership. (*Id.* ¶ 11.)

4  **C. Mr. Itkin invents a partnership as a defense.**

5  The first time anyone heard about a partnership, was Mr. Itkin's 2017 cross-

6  complaint against Mr. Sabadash. (Sabadash Decl. ¶ 12.) Mr. Itkin came up with a

7  defense—that back in 1998 he and Mr. Sabadash formed an oral partnership. Mr.

8  Itkin, a tax preparer at the time, claims he was promised a one-third interest in the

9  Sabadash business empire worth hundreds of millions of dollars. Per Mr. Itkin, this

10  alleged 20-year-old promise allowed him to take whatever Sabadash assets he

11  wanted, including money and corporate shares, purportedly as payment for his

12  services, all without consequence. And Mr. Itkin did not document this deal of a

13  lifetime in any way.

14  After extensive discovery and a three-day deposition, Mr. Itkin's partnership

15  theory fell apart. For example, Mr. Itkin never agreed to share in the losses of the

16  partnership. (Zorkin Decl., Ex. 1, Itkin Dep. Tr., 629:10-17; 156:22-157:11; 160:3-

17  11.) To the contrary, his draw was supposedly guaranteed, meaning that even if the

18  partnership lost money, Mr. Itkin would get his share, and Mr. Sabadash, a two-

19  thirds partner, would get nothing. Unsurprisingly, Mr. Itkin admitted that he never

20  received this promised "partnership" share. (*Id.*, 159:3-8; 527:22-25.)

21  And though Mr. Itkin will claim that he took part in managing the Sabadash

22  businesses, his sworn testimony tells a different story. Mr. Itkin admitted that he

23  only worked with Mr. Sabadash's non-Russian entities. Mr. Itkin testified that he

24  didn't manage any business in Russia, was not a signatory to any Russian bank

25  accounts, and "had no clue" how money in Russia was made. (*Id.*, 93:20-95:9;

26  180:12-15; 485:19-486:1.)

27  In fact, all Mr. Itkin knew about Mr. Sabadash's businesses is how much

28

1    money was deposited into the European bank accounts, which Mr. Itkin used mainly

2    to pay Mr. Sabadash's bills.  (*Id.*)

3         Mr. Itkin also admitted that the partnership did not formally exist.  The

4    partnership never owned a single asset.  The partnership never filed a tax return (as

5    all partnerships are required to do).  (*Id.*, 50:9-21; 505:15-19.)  The partnership

6    never had a bank account and Mr. Sabadash was always listed as the owner of

7    corporate accounts, even on accounts opened by Mr. Itkin.  And Mr. Itkin, without

8    fail, referred to Mr. Sabadash as the beneficial owner of each company.  (*Id.*, 78:13-

9    79:9; 171:9-19; 505:5-14.)

10         Every corporate document Mr. Itkin ever created confirmed that he had no

11    ownership interest.  Whether they were employment agreements or various

12    guarantees and corporate resolutions, Mr. Itkin always listed Mr. Sabadash as the

13    owner.  Indeed, when Mrs. Sabadash asked Mr. Itkin to meet with her lawyer and

14    accountant and disclose the extent of Mr. Sabadash's holdings, he identified Mr.

15    Sabadash – not himself or any alleged partnership – as the 100% owner.  (Zorkin

16    Decl., Ex. 7.)

17         **D. The Golden Sphinx bankruptcy**.

18         The facts surrounding Golden Sphinx's bankruptcy are known to the parties

19    and this court.  As a quick refresher, Golden Sphinx, and in turn New Albion, were

20    both assets of the Amber Trust—a trust formed by Mrs. Sabadash in 1996 to protect

21    the family's assets (years before Mr. Itkin began working for Mr. Sabadash).  Mr.

22    Sabadash has never been a shareholder; the trustees of the trust hold the shares of

23    Golden Sphinx.  (Itkin Dep. Tr., 322:16-25.)

24         Mr. Itkin was removed from the board of Golden Sphinx by the trustees of the

25    Amber Trust (and shareholders of Golden Sphinx) in 2017.

26         This Court has recognized the Golden Sphinx Jersey liquidation as the foreign

27    main proceeding and the liquidation is proceeding in the Jersey Court.  Mr. Itkin's

28

THE ZORKIN FIRM ⑦

1   repeated attempts to stall the Jersey proceeding have been rejected by the Jersey

2   Court.  Mr. Itkin was ordered to pay £78,432 in costs by February 24, 2025 and also

3   provide evidence for his baseless defenses.  (Wood Declaration, Ex. AW2.)  In a

4   transparent attempt to flout the court's order, Mr. Itkin filed this petition instead.

5   **E.  Involuntary Chapter 7 bankruptcy.**

6   Dissatisfied with this Court's orders recognizing the Golden Sphinx

7   bankruptcy and with the Jersey Court's multiple orders against him including

8   sanctions, Mr. Itkin tried to reverse those orders by filing an involuntary petition

9   against the non-existent partnership.  This Court dismissed the involuntary petition

10  in a memorandum decision and order.  (Dkts. 75 and 76.)

11  **ARGUMENT**
**I.  MR. MCCARTHY AND MR. CASERES SHOULD BE SANCTIONED
12     UNDER RULE 9011 FOR FAILURE TO INVESTIGATE AND
       REPRESENTING TO THE COURT THAT THE PETITION AND
13     JOINDERS HAD MERITS.**

14  "Our legal system depends on officers of the court not to lie or act with wanton

15  and reckless disregard for the truth."  *In re GL Master Inc.*, No. 2:18-BK-24302-NB,

16  2022 WL 34686, at *15 (Bankr. C.D. Cal. 2022) (Bason, J.).  To protect "the integrity

17  of the bankruptcy system" courts can award sanctions under FRBP 9011.  *Id.* at *1.

18  "The purpose of Rule 9011 is to encourage counsel to avoid a groundless filing

19  or pleadings filed for improper purposes, primarily through the imposition of

20  sanctions."  *In re Cadena*, 634 B.R. 1038, 1053–55 (Bankr. C.D. Cal. 2022).

21  "In determining whether sanctions are warranted under Rule 9011(b),

22  bankruptcy courts must consider both frivolousness *and* improper purpose on a

23  sliding scale, where the more compelling the showing as to one element, the less

24  decisive need be the showing as to the other.  A claim is frivolous if it is both

25  baseless and made without a reasonable and competent inquiry.  The inquiry is an

26  objective one that considers whether the attorney acted in a manner that a

27  reasonably competent attorney admitted to practice before the court would."  *In re*

28

THE ZORKIN FIRM

1    *GL Master Inc.*, 2022 WL 34686, at *14 (emphasis original, cleaned up).  A petition

2    need not be "wholly frivolous" to be sanctionable.  *In re Marsch*, 36 F.3d 825, 830

3    (9th Cir. 1994).

4          As Judge Tighe recently explained, "Any attorney who practices in

5    bankruptcy should be aware of the threshold requirement needed by creditors to file

6    a proper involuntary bankruptcy petition.  Similarly, bankruptcy attorneys should

7    be aware that the consequences for filing an improper involuntary bankruptcy

8    petition can be severe." *In re Cadena*, 634 B.R. at 1053–55.

9          Here, the record shows that neither Mr. McCarthy nor Mr. Caseres made a

10    reasonable inquiry into the facts or law before filing the petition, joinders to the

11    petition, and proofs of claim.  And sanctions are warranted even if, as expected, the

12    attorneys argue that they relied on Mr. Itkin's representations.  "Blind reliance" on

13    client's representations is not a reasonable inquiry.  *Hendrix v. Naphtal*, 971 F.2d

14    398, 400 (9th Cir. 1992); *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018,

15    1026 (5th Cir. 1994).

16          Although Rule 9011 imposes a safe harbor requirement, it has an exception

17    for petitions.  "A party seeking sanctions based on the filing of a petition need not

18    comply with the safe harbor requirement by first giving the other party an

19    opportunity to withdraw the offending document." *In re Meltzer*, 516 B.R. 504, 520

20    (Bankr. N.D. Ill. 2014).[2]

21          **A.  Mr. McCarthy and Mr. Caseres presented the involuntary petition**

22          **and joinders for an improper purpose.**

23          Courts routinely sanction attorneys for filing involuntary petitions for an

24    improper purpose.  *Keiter v. Stracka*, 192 B.R. 150, 155 (S.D. Tex. 1996)

25

26    _____

27    [2] Analysis of bad faith under § 303(i) and improper purpose under Rule 9011(b)(1)
overlap.  *In re Meltzer*, 516 B.R. 504, 520 (Bankr. N.D. Ill. 2014).  Therefore, Mr.
Sabadash incorporates all arguments made in his motion for fees to support his

28    request for sanctions.

("involuntary petition was filed for an improper purpose which could be punished by sanctions under Rule 9011."); In re Cadena, 634 B.R. at 1053–55.

Mr. Itkin filed this petition to escape the jurisdiction of the Jersey court after the Jersey court ordered Mr. Itkin to substantiate his defenses and to pay Golden Sphinx £78,432. (Wood Decl., ¶ 3-9.)  Mr. Itkin delayed responding to basic requests for information since October 2024 forcing Golden Sphinx to move to compel compliance. (Wood Decl., ¶ 10-14.)  In response, the Jersey court ordered Mr. Itkin to respond and pay sanctions. (*Id.*, Ex. AW2.)  Mr. Itkin again asked for another continuance claiming that he had no opportunity to speak with or take advice from his Jersey and U.S. counsel on account of the Palisades fires. (*Id.*)  The Jersey court granted another continuance ordering Mr. Itkin to respond and pay by February 24, 2025.

But as is now apparent, contrary to Mr. Itkin's representations that he was unable to confer with his counsel, he was scheming behind the scenes with his Russian cronies to stall the Jersey case with this petition, which he filed two days after the Jersey Court's order.  Mr. Itkin's counsel concurrently represented to the Jersey Court that there is a bankruptcy stay preventing the Jersey Court from moving forward. (Wood Decl., ¶ 18.)

Subsequently, the Jersey Court realized it was misled stating, "Notwithstanding Mr Itkin's apparent inability to consult with his US lawyers, within 2 days of my orders, he managed to engage with US lawyers and to file a bankruptcy petition in relation to the alleged partnership." (Wood Decl., Ex. AW3.)

The forum-shopping is readily apparent from Mr. Itkin's counsel's arguments at the hearing.  Mr. McCarthy argued that the Golden Sphinx Chapter 15

proceeding was wrongly being considered in Jersey and that Mr. Itkin's defense of

trying to create a partnership should be heard in in California:[3]

> This proceeding concerning a California general partnership that's on California property involves issues that should be determined here. The idea that you should defer to the Jersey court to determine whether a partnership existed under California law really is backwards. That's an issue that you should take on and that Jersey court should defer to you.

(Zorkin Decl., Ex. 20, April 22, 2025, Hr. Tr. 15:6-12.)

Mr. McCarthy all but admitted this involuntary was filed for an improper

purpose:

> [W]hat this involuntary really is about is putting the issues before the proper court to be determined; again, whether there's a partnership under California law and whether that partnership owns California real property. Your Honor, you're the one to make that determination or relief from stay should be granted for it to be determined in state court.

(April 22, 2025, Hr. Tr. 16:12-19.)

Thus, according to Mr. McCarthy, Mr. Itkin was unhappy with this Court's

order recognizing the Golden Sphinx Chapter 15 bankruptcy and this Court's order

denying Mr. Itkin relief from stay in the Golden Sphinx bankruptcy. Rather than

appeal the Golden Sphinx orders, he filed an involuntary proceeding for a made-up

entity specifically to get out of Jersey.

This petition is not only an improper forum-shopping attempt but is also a

misguided collateral attack on this Court's orders recognizing the Golden Sphinx

Chapter 15 proceeding and denying Mr. Itkin's motion to lift stay. Mr. Itkin knew

that *this* Court already ruled that the Beverly Hills residence is part of Golden

Sphinx's estate that will be administered in Jersey. (Related Case No. 2:22-bk-

---

[3] Mr. Atabek, one of four of Mr. Itkin's lawyers who acted as a creditor in this matter, also argued that the proper forum is here, claiming it would not be a "heavy lift" to hold a trial in this court. (April 22, 2025, Hr. Tr. 19:13-23.)

1   14320-NB, Dkt. 42.)  This did not stop him from alleging that the Beverly Hills

2   residence is the Alleged Debtor's principal asset.[4]  There was thus no legitimate

3   reason to file this petition when the only asset of the Alleged Debtor is administered

4   in Jersey under this Court's order.  This Court may make a reasonable inference

5   that Mr. Itkin filed this petition to circumvent this Court's order recognizing the

6   Golden Sphinx Chapter 15 proceeding.

7       The Ninth Circuit has imposed sanctions for this type of conduct, and so

8   should this Court.  *In re Grantham Bros.*, 922 F.2d 1438, 1442 (9th Cir. 1991)

9   (imposing sanctions for filing an adversary proceeding which was an impermissible

10  collateral attack on a previous bankruptcy court order).  As the Ninth Circuit

11  explained, the proper action when dissatisfied with a bankruptcy court's order is "to

12  seek any review, reconsideration, or stay."  *In re Grantham Bros.*, 922 F.2d at 1442.

13  Mr. Itkin did none of those things and cannot achieve the same result through an

14  involuntary petition.

15      **B.  Mr. McCarthy and Mr. Caseres knew that the debts were in bona**

16          **fide dispute.**

17      Courts routinely sanction attorneys for filing involuntary petitions that are in

18  bona fide dispute.  *In re Meltzer*, 516 B.R. at 520 (sanctions awarded where "the

19  petition's main purpose was to delay the eviction action."); *In re Fox Island Square*

20  *P'ship*, 106 B.R. 962, 969–70 (Bankr. N.D. Ill. 1989) (sanctions awarded where a

21  reasonable inquiry would have shown that the debts were disputed).

22      Mr. Itkin knew that the very existence of a partnership and thus any debts of

23  the partnership were in dispute.  (Sabadash Decl., ¶2.)  Mr. Itkin was removed from

24  his director and officer positions in Mr. Sabadash's corporations in 2016.  (Sabadash

25  Decl., ¶ 8-9.)  Mr. Sabadash then sued Mr. Itkin for fraud and breaches of fiduciary

26

---

27  [4] This residence is the Sabadash's family home where Mrs. Sabadash has lived with
    her children since its purchase in 2004.  Mr. Itkin did not include his own home as a
28  "partnership" asset.

1    duties and Mr. Itkin countersued for breach of duty and judicial dissolution of

2    partnership. (*Id.*, 12.)  The litigation was hotly contested: Mr. Itkin's motion for

3    summary judgment to establish a partnership was denied and case went to a jury

4    trial that was interrupted by the Covid pandemic. (*Id.*, 12.)  There is thus no

5    credible argument that the existence of the partnership was not in bona fide dispute.

6        Mr. Itkin's main argument for the existence of the partnership was claim

7    preclusion based on lawsuits filed in Russia and California by Elena Gofman.  Mr.

8    Itkin argued Mr. Sabadash is precluded from arguing that no partnership exists.

9    But Mr. Itkin already made an identical argument in state court in his motion for

10    summary adjudication. (Zorkin Decl., Ex. 25, RJN.).  The court denied Mr. Itkin's

11    motion because "collateral estoppel issues are in dispute regarding the prior actions

12    filed by Elena Gofman." (*Id.*, Ex. 26, RJN.)  This shows that there was a bona fide

13    dispute even for the effect of Gofman's lawsuits on the existence of the partnership.

14    Yet Mr. Itkin stubbornly insists that the Gofman lawsuits are dispositive even

15    though he cannot meet any elements of claim preclusion.

16        And Mr. Itkin's efforts to establish the elements of the doctrine were half-

17    hearted at best.  The only element of res judicata Mr. Itkin addressed in his

18    opposition was privity. (Dkt. 16, Itkin Opp., at 14-16.)  Mr. Itkin did not address

19    either the requirement that there be an identical cause of action (for claim

20    preclusion) or that an identical issue was litigated and necessarily decided (for issue

21    preclusion). (*Id.*)  Nor did Mr. Itkin mention the public policy behind claim

22    preclusion as articulated by the California Supreme Court.  This shows that Mr.

23    Itkin (and his counsel) did not sincerely believe in the application of claim

24    preclusion.

25        What is more, Mr. Itkin argued in the Russian court that "Sabadash, as an

26    individual, is neither a party to the said agreement nor a party to the present case,"

27    making his privity argument to this Court frivolous. (Zorkin Decl., Ex. 19.)

28

THE ZORKIN FIRM

1    And Mr. Itkin's reliance on the Information Summary in lieu of the actual

2    opinion of the Russian court provides more evidence of bad faith.  Mr. Itkin tried to

3    steer the Court away from the actual court of appeal ruling by citing the Information

4    Summary as if it were the Court's ruling.  Indeed, the Opposition did not even

5    submit the Court's ruling as an exhibit.  That aside, asking this Court to rely on a

6    summary of a legal opinion – that inexplicably includes facts and legal analysis not

7    found in the actual opinion – is frivolous on its face.

8    And this is the likely reason Mr. Itkin tried to hoodwink this Court into ruling

9    based on a summary—to avoid harmful language from the actual opinion.  As this

10   Court recognized:

11   > You've got statement by one - or the information summary
>    that seems to say one thing and yet, what it's purporting to

12   > summarize seems to me to say the opposite.

13   (Zorkin Decl., Ex. 21, June 3, 2025 Hr. Tr., 43:13-16.)

14    Mr. Itkin continued to misrepresent the facts in his supplemental brief,

15   repeatedly referring to the Information Summary's recitation of the facts as holdings

16   of a court.  (Dkt. 45, Supp. Brief, 5:2-6:9.)  The Information Summary cannot "hold"

17   anything and the "holdings" identified by Mr. Itkin were simply general facts of the

18   case as alleged by Gofman.  No reasonable lawyer could mistake these background

19   facts for a holding.

20    Not to mention that even if this Summary were real, and Mr. Sabadash has

21   no basis to believe that it is, Mr. Itkin gave no notice that he asked for the Summary

22   and did not allow Mr. Sabadash to participate in the process.[5]  He then tried to use

23   the summary for preclusive effect.  This is frivolous.

24

25

26

27   _____

28   [5] The Information Summary does not appear on the docket of the Gofman case
casting doubt on its authenticity.  (*See* Zorkin Decl. ¶ 18-19.)

THE ZORKIN FIRM

MOTION FOR FEES

**C. Mr. McCarthy and Mr. Caceres did not conduct a reasonable inquiry into creditors' claims before filing the petition and joinders.**

Rule 11 imposes a mandatory prefiling investigation requirement. "The reasonable inquiry test is meant to assist courts in discovering whether an attorney, after conducting an objectively reasonable inquiry into the facts and law, would have found the complaint to be well-founded." *Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005).

Courts routinely sanction attorneys who file petitions without a reasonable inquiry. *In re Cadena*, 634 B.R. at 1054 (sanctions awarded for filing an involuntary petition without a proper inquiry); *Keiter v. Stracka*, 192 B.R. at 155 (sanctions awarded where attorney "failed to adequately investigate and research the basis for filing the involuntary petition.")

1. Gofman (Claim no. 6.)

The facts show that a reasonable lawyer upon a reasonable inquiry would not have relied on Ms. Gofman's claims and would not have signed a joinder to the petition on Gofman's behalf as a creditor.

Mr. McCarthy did not conduct a proper investigation, otherwise he would have known Mr. Itkin paid Gofman to file the Russian lawsuit. Rather than conduct a proper investigation consistent with Rule 9011, Mr. McCarthy tried to cast the blame on Mr. Sabadash, claiming Mr. Itkin was blindsided. But the evidence of payment has always been in Mr. Itkin's possession—Mr. Itkin made the payments. Neither did Mr. McCarthy's investigation reveal that Mr. Itkin told the Russian cassation court that the Gofman judgment has been satisfied. (Zorkin Decl., Ex.

MOTION FOR FEES

THE ZORKIN FIRM

19.)[6]  Mr. McCarthy cannot blindly carry out his client's demands with no investigation.  *Hendrix v. Naphtal*, 971 F.2d 398, 400 (9th Cir. 1992).

Mr. Caseres' investigation was no better.  Mr. Caceres' investigation did not reveal that Gofman was paid by Mr. Itkin to initiate the lawsuit and that the signatures on the Gofman documents were forged, which Gofman did not deny in her declaration.  (Dkt. 62, Gofman Decl.)  Neither did he learn that Gofman represented to the cassation court that the judgment was satisfied.  (Zorkin Decl., Ex. 19.)[7]

In reciting the "partnership's" contentions on appeal, the Cassation Court stated:

> "In the response to the cassation appeal, the respondent, represented by managing partner G.Yu. Itkin, stated that . . . the court decision in this case *has been fully satisfied* by the respondent."

Later, in the holding, the Cassation Court explained:

> "Furthermore, as stated by the claimant [Gofman] and the respondent's representative [Itkin] at the cassation court hearing, the court decision in this case, which has entered into legal force, *has been fully satisfied*."

In other words, Mr. Itkin affirmatively represented to the Russian court that the judgment has been paid.  Yet here both Mr. Itkin and Gofman submitted sworn declarations contending Gofman is a creditor of the "partnership."[8]

The fact that Mr. McCarthy and Mr. Caseres allowed Gofman to be a creditor in this matter all but mandates imposing sanctions.

---

[6] The other possibility is that Mr. McCarthy knew the facts and chose to conceal them from this Court.

[7] The other possibility is that Mr. Caseres knew the facts and chose to conceal them from this Court.

[8] The cassation court opinion is in both Mr. Itkin's and Gofman's possession as they were both parties to the case and appeared at the hearing.  They chose not to present it to this Court.

2. <u>Aleksandr Grant (Claim No. 11)</u>.

Claim No. 11 is a special case and is more egregious than even the Gofman fraud. Mr. Caseres submitted to this court a proof of claim for a debt purportedly based on a Russian arbitration decision issued in 2021 titled *Davilla Investing Limited v. Golden Spirits Limited, AFB Trading One, Inc., and Golden Sphinx Limited* ("Davilla Arbitration"). The decision appears to resolve a dispute between several corporations who are not parties to this proceeding.[9]

This "decision" is a sham. This case was *dismissed* in 2021—there was no hearing and judgment. Mr. Sabadash's counsel, Mr. Zorkin, took part in representing the Defendants in the Davilla Arbitration. (Zorkin Decl. ¶ 22-25.) Mr. Zorkin received a letter from the arbitrator, Mr. Knyazev, stating that a private arbitration hearing[10] was set for August 25, 2021. (*Id.*) Mr. Zorkin, on behalf of the Defendants, sent Mr. Knyazev three formal objections. (*Id.*) The first contested the jurisdiction of the arbitrator to hear the dispute because defendants were not parties to any arbitration agreement. The second objected on the ground that defendants have not received any documents substantiating Plaintiff's claims and questioned the validity of any such documents. The third raised a defense based on the statute of limitations as the alleged debts arose in 2010. (*Id.*)

Mr. Zorkin was on the phone with Russian attorneys at 2 a.m. ready to log on to Skype to attend this supposed arbitration. (*Id.*) Defendants' Russian attorneys went to the address listed by the arbitrator while in contact with Mr. Zorkin by phone. The attorneys knocked on the door of the office designated by the arbitrator, but no one answered the door. (*Id.*)

---

[9] The proof of claim does not explain who creditor Aleksandr Grant is or how this judgment was connected to a partnership.

[10] This is in contrast to Russian business courts which are called "arbitrazh" courts and are frequently translated into English as "arbitration."

THE ZORKIN FIRM

1    Then, about ten minutes after the hearing was scheduled to start, the

2  arbitrator emailed Mr. Zorkin attaching a decision dismissing the case based on

3  Defendants' objections.  The arbitrator found that he lacks jurisdiction to hear the

4  case based on objections submitted by defendants.  (*Id.*, Ex. 22.)  Worse yet—the

5  arbitrator copied Mr. Itkin on the email attaching the order of dismissal.  (*Id.*, Ex.

6  23.)

7    This case was dismissed on August 25, 2021.  But Mr. Caseres, no doubt in

8  coordination with Mr. Itkin, submitted to this Court a decision purporting to be from

9  the same arbitrator.  (Zorkin Decl. Ex. 24, Claim 11.)  He then signed a joinder based

10  on this fake decision.  (Dkt. 64.)

11    This fake decision states that defendants appeared at a hearing on August 31,

12  2021.  (Zorkin Decl. Ex. 24.)  This never happened.

13    Although the case had nothing to do with either Mr. Itkin, Mr. Sabadash, or

14  the partnership, the fake decision made several peculiar factual findings that appear

15  to support Mr. Itkin's position in this case, including incorporating allegations from

16  the Gofman case.  (*Id.*)

17    Submitting a fake decision to this Court in support of an involuntary petition

18  is plainly sanctionable.

19    At the very least, Mr. Caseres must explain what he did to verify this claim.

20  When was he retained by Grant?  What investigation did he conduct?  What

21  documents did he receive proving he was a creditor?  What communications did he

22  have with Grant?  Or did he receive everything from Mr. Itkin?

23    3.  <u>Russian Lawyers (Habarova (claim 7), Shadaev (claim 8),</u>

24    <u>Samsonova (claim 9).)</u>

25    Upon proper inquiry, Mr. Caseres would have realized that three attorneys

26  could not have billed $113,594 to "defend" the partnership in a single Russian case.[11]

27

28  [11] Habarova $26,416 (Claim 7), Shadaev $44,435 (Claim 8), Samsonova $42,743 (Claim 9).

THE ZORKIN FIRM

1  A reasonable inquiry of court records available to Mr. Caseres would have revealed

2  that the three lawyers did nothing except help Mr. Itkin admit allegations and file a

3  few motions *opposing* dismissal.  In fact, only Shadaev appeared on behalf of the

4  "partnership."  (Zorkin Decl., Ex. 17, 19; Dkt. 16-1, Itkin Decl., Ex. A.)

5      And as discussed, it is undisputed that Mr. Itkin paid Gofman $21,000 at the

6  exact time she sued the alleged partnership.  With this in mind, no reasonable

7  lawyer would have believed that Mr. Itkin could incur $113,594 to "defend" a case

8  that he paid for.

9      A reasonable inference arises that Mr. Caseres was acting on Mr. Itkin's

10  behalf and may never have even spoken to the five Russian nationals he purports to

11  represent as creditors.  Mr. Caseres should explain how he was retained by them.

12  What did he do to verify their claims?  What investigation did he conduct?  What

13  communications did he even have with them?  Or did he receive everything from

14  Itkin?

15          4.  <u>Ratner and Progressive Management (Claims 1 and 2).</u>

16      A reasonable inquiry would have revealed that Ratner and Progressive

17  Management are not entitled to compensation and their attorneys' fees for

18  complying with a deposition subpoena and thus are not creditors of the alleged

19  partnership.  Under California law, fact witnesses are entitled to statutory witness

20  fees, not their hourly rates and attorneys' fees.  Cal. Civ. Proc. Code § 2020.230.

21  There was no agreement to pay hourly rates and attorneys' fees.  (Zorkin Decl., ¶

22  29.)  And in any case, the subpoenaing party was not the alleged partnership but a

23  corporation AFB Trading One, Inc. (plaintiff in the action in which the subpoenas

24  were served.)  (*Id*.)

25      The creditor claims are based solely on Mr. Itkin's 2022 letter obligating the

26  "partnership" to pay Ratner and Progressive for no legal reason (and assigning a

27

28

THE ZORKIN FIRM  7

MOTION FOR FEES

usurious interest rate of 12%).  Any reasonable lawyer would have recognized that

Mr. Itkin cannot create debt by letter years after the fact.

## II.    MR. ITKIN, MR. MCCARTHY, AND MR. CASERES SHOULD BE JOINTLY AND SEVERALLY LIABLE FOR ANY AWARD.

Mr. McCarthy and Mr. Caseres should be jointly and severally liable with Mr.

Itkin for their conduct as described above.  *See In re Cadena*, 634 B.R. at 1056–57

(ordering counsel jointly and severally liable with petitioner for fees, damages, and

sanctions.); *In re Fox Island Square P'ship*, 106 B.R. at 971 (same).

Without repeating the above, a reasonable lawyer would have, on proper

inquiry, advised her client that the debt is subject to dispute and there are no

grounds for an involuntary petition.  Not to mention, as discussed, the creditors'

claims were highly questionable.  Finally, counsel admitted in court that the purpose

behind this petition was forum-shopping.

It is also highly likely that Mr. Caseres was acting on Mr. Itkin's behalf in

this case.  Mr. Caseres should explain how ten creditors, six of whom live in Russia,

and are connected only through Mr. Itkin, retained his services.  Mr. Sabadash

believes that Mr. Itkin, and not the creditors, provided all information to Mr.

Caceres.

In short, Mr. McCarthy and Mr. Caseres shirked their duties and should be

held jointly and severally liable with Mr. Itkin.

## III.    THE COURT SHOULD AWARD ATTORNEYS' FEES AND ANY ADDITIONAL AMOUNT TO DETER FUTURE CONDUCT.

Mr. Sabadash incurred $79,365 in fees for legal work to obtain a dismissal of the

petition and prosecuting this motion.  (Zorkin Decl., ¶ 34-36.)  This included

research and analysis, factual investigation, drafting the motion to dismiss,

reviewing Itkin's opposition, drafting reply, and declarations, addressing proofs of

claim, hearing attendance, and exhibit review.  This is calculated as $550 hourly for

144.3 hours of work.  The rates and hours are reasonable for this complex dispute

1  and the Los Angeles market.  *See Zurich Am. Ins. Co. of Illinois*, 2020 WL 8610839,

2  at *6 (finding $550 per hour reasonable for the Los Angeles legal market); *Perfect 10,*

3  *Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484, at *15 (C.D.

4  Cal. Mar. 24, 2015), *aff'd,* 847 F.3d 657 (9th Cir. 2017) (approving up to $690 per

5  hour for associates and $930 per hour for partners in 2014.)

6      Mr. Sabadash will also incur fees for analyzing the opposition, drafting the

7  reply, and attending the hearing.  He will submit a declaration for those future fees

8  at the appropriate time.

9      Mr. Sabadash also asks the Court to award any other amount it deems

10  appropriate to deter future similar conduct.

11                    **<u>CONCLUSION</u>**

12      This involuntary petition was an egregious attempt at manipulating the court

13  for an improper purpose.  Sanctions are warranted.

14

15  Dated:       July 1, 2025              THE ZORKIN FIRM

16

17                                By: /s/ Michael Zorkin

18                                    Michael Zorkin
                                     Attorneys for Putative Partner
19                                    Alexander Sabadash

20

21

22

23

24

25

26

27

28

THE ZORKIN FIRM