1  HILL, FARRER & BURRILL LLP
   Daniel J. McCarthy (SBN 101081)
2  dmccarthy@hillfarrer.com
   515 South Flower Street, 7th Fl.
3  Los Angeles, CA 90071-3147
   Telephone: (213) 621-0802
4  Fax: (213)624-4840

5  Attorneys for Petitioning General Partner
   Garry Y. Itkin and Daniel J. McCarthy, in pro per
6
7  CACERES & SHAMASH, LLP
   Charles Shamash (SBN 178110)
   cs@locs.com
8  Joseph E. Caceres (SBN 169164)
   jec@locs.com
9  9701 Wilshire Boulevard, Suite 1000
   Beverly Hills, California 90212
10 Tel: (310) 205-3400
   Fax: (310) 878-8308
11
   Attorneys for Creditors and Joseph E. Caceres, in pro
12 per

13            UNITED STATES BANKRUPTCY COURT

14     CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

15

16

17 | In re | Case No. 2:25-bk-11235-NB
   |
18 | ITKIN & SABADASH, | Chapter 15

19 |            Involuntary Debtor. | **JOINT OPPOSITION TO PUTATIVE PARTNER ALEXANDER SABADASH'S**
20 | | **MOTION FOR FEES AND DAMAGES, UNDER 11 U.S.C. § 303(I) (DOCKET**
21 | | **NO. 90); DECLARATIONS OF GARRY Y. ITKIN, DANIEL J. McCARTHY,**
22 | | **JOSEPH E. CACERES AND CHARLES SHAMASH**
23 |
24 | | Date:    August 19, 2025
   | | Time:    2:00 p.m.
25 | | Place:   Courtroom 1545

26

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1

2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................................. 1

   A.    The Court's Dismissal of the Involuntary Petition and Mr. Itkin's Motion for
Reconsideration ............................................................................................................ 1

   B.    Mr. Sabadash's Pending Motions ................................................................................ 1

   C.    Summary of Argument on the Fee Motion .................................................................. 2

II.    THE FEE MOTION SHOULD BE DENIED ..................................................................... 3

   A.    The Fee Motion is Premature ....................................................................................... 3

   B.    Applicable Standard Under 11 U.S.C. § 303(i) ........................................................... 3

   C.    Mr. Sabadash is Not Entitled to An Award as a Putative Partner Who Opposed
the Petition ................................................................................................................... 5

   D.    Mr. Sabadash Is Not Entitled to Fees Under Section 303(i)(A) or Punitive Damages
Under Section 303(i)(B)(2) ........................................................................................ 10

      1.    Mr. Itkin, as Well as His Counsel, Both Have and Had a Good Faith Objective and
Subjective Belief That The Existence of the Partnership and the Claims of
Partnership Creditors Are Not in Bona Fide Dispute, Which is to Say That the
Involuntary Petition was not filed Bad Faith ................................................... 10

      2.    The Doubt Expressed by the Court In Its Memorandum of Decision Regarding
Mr. Itkin's Evidence is Not Grounds to Find that the Petition Was Filed in Bad
Faith or for the Court to Exercise Its Discretion to Award Fees to Mr. Sabadash ......... 15

      3.    Mr. Sabadash Incorrectly Speculates About Mr. Itkin's Motives for Filing the
Involuntary Petition and the Reasons Why the Involuntary Petition was Filed .............. 23

   E.    Mr. Sabadash's Self-Interested Declaration Is Not Persuasive ..................................... 24

      1.    Mr. Sabadash's Declaration Should Not Be Considered ................................................ 24

      2.    Mr. and Mrs. Sabadash Are Not Credible ...................................................................... 25

   F.    Mr. Sabadash's Brief Declaration is Clearly and Convincingly Contradicted by the
Declarations of Mr. Itkin and Elena Gofman ............................................................ 27

   G.    Mr. Itkin Did Not Pay Ms. Gofman $21,000 to Sue the Partnership ......................... 29

**HILL, FARRER & BURRILL LLP**
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# TABLE OF CONTENTS

Page

H.    Mr. Itkin Did Not Rely On Forged Documents ................................................. 30

I.    The Gofman Judgment Has Not Been Paid ....................................................... 31

J.    The Reasonableness of Fees Cannot Be Determined Due to the Failure to Allocate Them, and Certain Fees Are Not Compensable .................................................. 32

K.    Section 303(i) Does Not Authorized An Award of Fees Against Counsel for Mr. Itkin and Counsel for the Creditors .................................................. 33

III.    THE COURT SHOULD NOT CONSIDER NEW ARGUMENTS AND EVIDENCE PRESENTED BY MR. SABADASH FOR THE FIRST TIME WITH HIS REPLY BRIEFS .................................................. 35

IV.    CONCLUSION .................................................. 35

DECLARATION OF GARRY Y. ITKIN .................................................. 36

DECLARATION OF DANIEL J. McCARTHY .................................................. 41

DECLARATION OF JOSEPH E. CACERES .................................................. 45

DECLARATION OF CHARLES SHAMASH .................................................. 51

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Franklin v. Four Media Co. (In re Mike Hammer Prods., Inc.)*,
294 B.R. 752 (9th Cir. B.A.P. 2003) ................................................................ 6, 8

*Hancock as Tr. of Hillman Mather Adams Norberg Tr. v. Blair House Assocs. Ltd.
P'ship*, No. 2:22-CV-00099-JDL, 2023 WL 2743641 (D. Me. Mar. 31, 2023) ................. 7, 8

*Havens v. Leong P'ship*,
586 B.R. 760 (N.D. Cal. 2018), aff'd, 788 F. App'x 526 (9th Cir. 2019) ....................... 5, 6, 7

*Havens v. Leong P'ship*,
788 F. App'x 526 (9th Cir. 2019) ......................................................................... 6

*Headwaters Inc. v. U.S. Forest Serv.*,
399 F.3d 1047 (9th Cir. 2005) .......................................................................... 13

*Higgins v. Vortex Fishing Sys., Inc.*,
379 F.3d 701 (9th Cir. 2004) ............................................................................. 3

*In re Cadena*,
634 B.R. 1038 (Bankr. C.D. Cal. 2022) .............................................................. 33

*In re Fox Island Square P'ship*,
106 B.R. 962 (Bankr. N.D. Ill. 1989) .............................................................. 7, 33

*In re Leong Partnership*,
2018 WL 1463852 (9th Cir. BAP Mar. 23, 2018),
*aff'd,* 788 F. App'x 539 (9th Cir. 2019) ......................................................... 4, 5, 13

*In re Marciano*,
708 F.3d 1123 (9th Cir. 2013) ..................................................................... 10, 31

*In re RHTC Liquidating Co.*,
424 B.R. 714 (Bankr. W.D. Pa. 2010) ................................................................ 24

*Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.*,
933 F.2d 724 (9th Cir. 1991) ............................................................................ 13

*Lamie v. United States Tr.*, 540 U.S. 526, 534; 124 S. Ct. 1023, 1030; 157 L. Ed. 2d
1024, 1033 (2004) ......................................................................................... 10

*Miles v. Okun (In re Miles)*,
430 F.3d 1083 (9th Cir. 2005) ........................................................................ 6, 8

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

**TABLE OF AUTHORITIES**
**CONTINUED**

Page(s)

*McGee v. Estelle*,
    722 F.2d 1206 (5th Cir.1984)......................................................................... 24

*PNY Techs., Inc. v. Miller, Kaplan, Arase & Co., LLP*,
    2017 WL 2876736 (N.D. Cal. July 6, 2017) ................................................... 13

*S.E.C. v. Koracorp Indus., Inc.*,
    575 F.2d 692 (9th Cir. 1978)......................................................................... 21

*United States v. Ron Pair Enters.*,
    489 U.S. 235, 242; 109 S. Ct. 1026, 1031; 103 L. Ed. 2d 290, 299 (1989 .............. 9

*United States v. Wilson*,
    556 F.2d 1177 (4th Cir. 1977)....................................................................... 14

*Vibe Micro, Inc. v. SIG Capital, LLC (In re 8Speed8, Inc.)*,
    921 F.3d 1193 (9th Cir. 2019) ...................................................... 3, 5, 6, 7, 8, 11

**Federal Statutes**

11 U.S.C.
    § 101(13) ........................................................................................... 6, 8
    § 303(i) .................................................. 1, 2, 3, 5, 6, 7, 8, 9, 32, 33, 34

California Corporations Code
    § 15901.02 ............................................................................................. 17
    § 16101 ................................................................................................. 16

California Penal Code
    § 159.4 .................................................................................................. 14
    § 160.4 .................................................................................................. 14

**Rules**

Federal Rules of Bankruptcy Procedure, Rule 1011 ..................................................... 6

Federal Rules of Bankruptcy Procedure, Rule 1004 ..................................................... 9

Federal Rules of Bankruptcy Procedure, Rule 1011(a)................................................... 9

Federal Rules of Bankruptcy Procedure, Rule 9001(5) .................................................. 9

Federal Rules of Bankruptcy Procedure, Rule 9001(5)(B) ........................................ 6, 8, 9

Federal Rules of Evidence, Rule 601(a)(1)(A) ......................................................... 14

**HILL, FARRER & BURRILL LLP**
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

Federal Rules of Evidence, Rule 613(b) ........................................................................ 21

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7th FLOOR
LOS ANGELES, CALIFORNIA 90071

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

### A. The Court's Dismissal of the Involuntary Petition and Mr. Itkin's Motion for Reconsideration

On June 16, 2025, the Court entered a 23-page Memorandum of Decision Dismissing Involuntary Petition. ("Memorandum," docket no. 75.)  On June 17, 2025, it also entered an Order Dismissing Involuntary Petition (the "Dismissal Order, docket no. 76.)  A notice of dismissal was entered on the same day.  (Docket no. 77.)  The Court did not close the case.  Instead, it retained jurisdiction under Local Bankruptcy Rule ("LBR") 1017-1(f).

On July 1, 2025, petitioning creditor Garry Y. Itkin ("Mr. Itkin") filed a Motion for Reconsideration of the Dismissal Order and Memorandum.  (Docket no. 89.)  As of the date of this Opposition, the Court has not scheduled the Motion for Reconsideration for hearing, and it has not denied the Motion.  (McCarthy Decl., ¶ 11.)

### B. Mr. Sabadash's Pending Motions

Later on July 1, 2025, Alexander Sabadash ("Mr. Sabadash") filed two motions.  The first was entitled "Putative Partner Alexander Sabadash's Motion for Fees and Damages, Under 11 U.S.C. § 303(i)" (the "Fee Motion," docket no. 90.)   The second was entitled "Putative Partner Alexander Sabadash's Motion for Fees and Damages under 11 U.S.C. § 303(i) and Motion for Sanctions under FRBP  9011" (the "Sanctions Motion," docket no. 91.)

It is unclear why separate Motions were filed.  They clearly overlap.[1]  Regarding the amount of $78,485, Mr. Zorkin's declarations explains that it is based upon (1) "93.9 hours on research and analysis, factual investigation, drafting the motion to dismiss, reviewing Itkin's opposition, drafting reply, and declarations, addressing proofs of claim, hearing attendance, and exhibit review"; (2) "48.8 hours on research and analysis, factual investigation, drafting the motion, and declarations"; (3) $334.91 in costs, and he states that he anticipates "pending

---

[1] With their Joint Oppositions to the two Motions, Mr. Itkin, Mr. McCarthy and Mr. Caceres are filing Omnibus Joint Objections to the three declarations and Joint Objections to Mr. Sabadash's Request for Judicial Notice.

1   additional time on reply and hearing attendance."  (Zorkin Decl., ¶¶ 34-36.)

2                   **C.      Summary of Argument on the Fee Motion**

3       The Fee Motion should be denied for multiple reasons.   These reasons are substantially

4   similar to the grounds for denial of the Sanctions Motion.

5       First, until Mr. Itkin's Motion for Reconsideration is decided, the Fee Motion is premature.

6   If that Motion is granted, Mr. Sabadash's Motions are moot.

7       Second, section 303(i) is discretionary.  Under the circumstances of this case, the Court

8   should exercise its discretion to deny an award of fees and costs.

9       Third, under the language of section 303(i), a putative general partner who opposes an

10  involuntary petition is not entitled to an award of fees and costs.

11      Fourth, fees should be denied because Mr. Sabadash's Motions fail to (1) allocate the fees

12  between the 19-page Fee Motion under section 303(i) and the 18-page Sanctions Motion under

13  Federal Rule of Bankruptcy Procedure ("FRBP") 9011; and (2) fees incurred in objecting to the

14  creditors' claims (including the original defective objection), which are not compensable.

15      Fifth, there is no justification for awarding punitive damages on grounds that the

16  Involuntary Petition was filed in bad faith.  While the Court ultimately held that there was a bona

17  fide dispute as to the existence of Itkin & Sabadash as a partnership -- based in part upon

18  inadmissible evidence -- there was ample admissible evidence and legal authority to support the

19  conclusion that the Partnership existed.  Ten creditors filed claims totaling more than $4.6 million,

20  which themselves evidenced the existence of the Partnership.  The involuntary petition was filed

21  to benefit them by having the petition granted and a trustee appointed to aggregate assets and pay

22  those creditors.  A key asset is the Beverly Hills property.  It makes more sense for this Court to

23  determine the existence of the Partnership under California law, to determine ownership of that

24  Property under California law, and to determine the validity of claims under California law, rather

25  than the Jersey Court doing so in the liquidation proceeding of Golden Sphinx Limited, where the

26  claims of those creditors cannot be addressed, if Mr. Itkin were to prevail there.

27      Sixth, Section 303(i) does not support an award of fees and costs against Mr. McCarthy

28  and Mr. Caceres.  Mr. Sabadash's remedy against them only exists under FRBP 9011.  As

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

1  explained in the concurrently-filed Joint Opposition to the Sanctions Motion, there are many

2  reasons to deny an award against them under FRBP 9011.

3      **II.**    **THE FEE MOTION SHOULD BE DENIED**

4          **A.**    **The Fee Motion is Premature**

5      If Mr. Itkin's Motion for Reconsideration is granted, it moots the Fee Motion and the

6  Sanctions Motion.  Those Motions should be denied without prejudice.  Alternatively, the hearing

7  on the Fee and Sanctions Motions should be continued.

8          **B.**    **Applicable Standard Under 11 U.S.C. § 303(i)**

9      11 U.S.C. § 303(i) states:

10  If the court dismisses a petition under this section other than on consent of all
petitioners and the debtor, and if the debtor does not waive the right to judgment
11  under this subsection, <u>the court may grant judgment</u>—

12  (1) against the petitioners and <u>in favor of the debtor</u> for—

13  (A) costs; or

14  (B) a reasonable attorney's fee; or

15  (2) against any petitioner that filed the petition in bad faith, for—

16  (A) any damages proximately caused by such filing; or

17  (B) punitive damages.

18  (Emphasis added.)

19      The plain language of section 303(i) <u>only</u> authorizes an award against the <u>petitioner</u>.  It

20  does not authorize an award against the petitioner's counsel as requested by the Fee Motion.

21      Further, section 303(i) does not <u>mandate</u> an award of fees or costs.  Instead, it is

22  discretionary in stating "the court may grant judgment." See *Vibe Micro, Inc. v. SIG Capital, LLC*

23  *(In re 8Speed8, Inc.),* 921 F.3d 1193, 1196 (9th Cir. 2019) ("Indeed, 'the plain language of the

24  statute clearly contemplates that fees and costs will not be awarded in all cases….' (Citation)."

25      The Fee Motion cites the "totality of circumstances" test explained in  *Higgins v. Vortex*

26  *Fishing Sys., Inc.,* 379 F.3d 701, 707 (9th Cir. 2004), which requires the Court to consider: (1) the

27  merits of the involuntary petition, (2) the role of any improper conduct on the part of the alleged

28  debtor, (3) the reasonableness of the actions taken by the petitioning creditors, and (4) the

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1    motivation and objectives behind filing the petition.  The Court went on to state:

2        1 Collier ¶ 303.15 ("In determining whether to grant an award, courts should
        consider the reasonableness of the petitioner's actions, the petitioner's motives and
3        objectives (which calls for both a subjective and objective assessment) and the
        merits of the petitioner's view that a filing was appropriate and sustainable.")
4        (Citation). Although definitive in most cases, this list is not exhaustive, and a
        bankruptcy court may, in its discretion, choose to consider other material factors it
5        deems relevant."

6        *Id.* at 707–708.

7        These factors are discussed below.  First, the Involuntary Petition clearly had merit.

8    Significant evidence supports that conclusion.  Second, Mr. Sabadash's improper conduct

9    included a failure to discuss evidence in his Motion to Dismiss even though he was aware of it,

10   instead "saving" his evidence and arguments for his Reply.  Third, the actions of Mr. Itkin in filing

11   and defending the Involuntary Petition were meritorious given the evidence supporting the

12   existence of the Partnership, his legitimate reasons for filing the Petition, the joinders in the

13   Petition filed by multiple creditors and the claims filed by ten creditors totaling in excess of $4.6

14   million.  Fourth, as described below, Mr. Itkin had three motives and objectives, all of which were

15   legitimate.  Interfering with the Jersey proceeding was not a reason for the filing.  Fifth, as also

16   described below, Mr. Caceres' actions in assisting the joining creditors were meritorious given the

17   evidence supporting the existence of the Partnership and validity of the claims, with the sole

18   motive being to help them get their claims paid.

19       The facts before this Court contrast starkly with those before the Court in *In re Leong*

20   *Partnership*, 2018 WL 1463852 (9th Cir. BAP Mar. 23, 2018), *aff'd*, 788 F. App'x 539 (9th Cir.

21   2019), where the issue was whether the claims of petitioning creditors were in bona fide dispute.

22   After the opposing alleged partner's motion to dismiss was denied, he brought a motion for

23   summary judgment.  The Bankruptcy Appellate Panel noted that in granting summary judgment

24   "the bankruptcy court gave a detailed recitation of the <u>uncontroverted facts</u> in the record and

25   carefully analyzed why, in light of those facts, Leong was entitled to summary judgment." *Id.* at

26   *4, emphasis added.  In contrast, Mr. Sabadash lacked admissible evidence and Mr. Itkin offered

27   plenty of evidence not only to demonstrate the existence of the Partnership, but also to

28   demonstrate that it is not in bona fide dispute.  In *dicta,* the Court went on to address the

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1  statements that the partner/creditor relied upon to prove the existence of the partnership, which the

2  Court held were "equivocal at best." *Id.* at *8. Mr. Itkin's evidence is not "equivocal at best,"

3  especially when viewed in the light most favorable to him.

4      In the extreme circumstances of that case, the *Leong Partnership* Court noted that the

5  bankruptcy court had granted Leong's motion for fees as against two petitioning creditors, but that

6  the appeal from that order was not before the Court. *Id.* at *5, no. 7. In *Havens v. Leong P'ship,*

7  586 B.R. 760, 769 (N.D. Cal. 2018), aff'd, 788 F. App'x 526 (9th Cir. 2019), the Court affirmed

8  the bankruptcy court's 20% reduction of requested fees.

9      Mr. Itkin and his counsel recognize that a losing petitioner typically must pay the fees of a

10  debtor who obtains dismissal and that it is the petitioner's burden to demonstrate that the "totality

11  of circumstances" supports the disallowance of fees. That burden is met by this Opposition.

12      **C.    Mr. Sabadash is Not Entitled to An Award as a Putative Partner Who**

13          **Opposed the Petition**

14      Oddly, the Fee Motion does not even discuss the obvious threshold issued of a putative

15  general partner's entitlement to fees under 11 U.S.C. § 303(i). It will be too late to do so for the

16  first time in a reply brief. The Fee Motion should be denied for that reason.

17      Mr. Itkin does not dispute Mr. Sabadash's standing to seek dismissal of the Involuntary

18  Petition, but he does dispute Mr. Sabadash's right to an award of fees and costs under section

19  303(i). The plain language of section 303(i)(1) *only* authorizes an award "in favor of the debtor."

20  It does not authorize an award in favor of a putative general partner such as Mr. Sabadash. As

21  stated, below, that plain language should be followed.

22      One commentor explained: "An interesting question arises over whether sanctions may be

23  recovered by parties other than the debtor. Because section 303(i) does not, on its face, cover such

24  a situation, most courts restrict recovery to the debtor." 2 *Collier on Bankruptcy* (16th ed.) , ¶

25  303.33. It cited the Ninth Circuit decision in *Vibe Micro, Inc. v. SIG Capital, LLC (In re 8Speed8,*

26  *Inc.)*, 921 F.3d 1193 (9th Cir. 2019), cert. denied 140 S. Ct. 48, 205 L. Ed.2d 132 (2019) (50%

27  shareholder of involuntary debtor not entitled to recover under section 303(i)). The Ninth Circuit

28  explained three reasons for its conclusion.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7th FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

1      "First, the relevant House and Senate Reports suggest that only the debtor has standing to

2  seek § 303(i) damages." *Id.* at 1195.

3      "Second, appellate courts in this circuit have twice considered whether a non-debtor can

4  seek damages under § 303(i), and twice those courts have decided it cannot. See *In re Miles*, 430

5  F.3d at 1093–94; *In re Hammer,* 294 B.R. at 753–54." *Id.* at 1195.

6      "Third, reading § 303(i) to permit only the debtor to seek damages is consistent with its

7  purpose and the policy interests underlying it. Section 303(i) is intended to alleviate the

8  consequences that involuntary proceedings impose on the debtor." *Id.* at 1196.

9      In affirming the bankruptcy court's order awarding the contesting general partner fees

10  under section 303(i), however, the Court in *Havens v. Leong P'ship,* 586 B.R. 760, 767 (N.D. Cal.

11  2018), aff'd, 788 F. App'x 526 (9th Cir. 2019), explained (without any analysis or supporting case

12  law) as follows:

13              The Bankruptcy Court recognized Leong as "the debtor" by
              examining the definitions of the term "debtor" in Bankruptcy Code
14              § 101(13) (the person upon whom the bankruptcy case has been
              brought) and Federal Rule of Bankruptcy Procedure 9001 (if the
15              named debtor is a partnership the court can designate a person in
              control of the partnership to perform any act required by the debtor).
16              (Footnote 10.) Fee Order at 4. The Bankruptcy Court was within its
              powers to do so and, subsequently, award fees under § 303(i).
17              (Footnote 11.)

18      In footnote 11, the Court noted: "Leong points out that Bankruptcy Rule 1011 also

19  provides a route by which he could be recognized as 'the debtor' for purposes of § 303(i), as

20  Havens himself alleged that Leong was a general partner of the Leong Partnership."  The Court

21  did not rely upon that argument.

22      The Ninth Circuit affirmed that ruling (without any analysis) in an unpublished decision

23  based upon the definition of a "debtor" under section 101(13) and Rule 9001(5)(B).  *Havens v.*

24  *Leong P'ship*, 788 F. App'x 526, 527 (9th Cir. 2019).  That statute and rule are discussed below.

25  The Court did not rely upon Rule 1011.

26      It is notable that the decision in *Havens v. Leong P'ship*, 788 F. App'x 526, 527 (9th Cir.

27  2019), was issued on December 19, 2019, and the decision in *Vibe Micro, Inc. v. SIG Capital,*

28  *LLC (In re 8Speed8, Inc.)*, 921 F.3d 1193 (9th Cir 2019), was issued on April 29, 2019.  The Ninth

1    Circuit in *Havens v. Leong P'ship* mentions *In re 8Speed8, Inc.*, 788 App'x at 527, for the

2    applicable standard of review, but then completely <u>ignores</u> its earlier reasoning in *In re 8Speed8,*

3    *Inc.*

4           The decision of the Court in *In re Fox Island Square P'ship,* 106 B.R. 962 (Bankr. N.D.

5    Ill. 1989), was well known to the Ninth Circuit majority in *In re 8Speed8, Inc.,* because it was

6    discussed at length in the dissent, yet the majority was not persuaded.  In *Fox Island,* five partners

7    who held a 75% interest in a general partnership filed an involuntary petition against a partnership.

8    *Id.* at 965.  Another partner (Frey) did not challenge the existence of the partnership.  After a three

9    day trial, the court dismissed the involuntary petition on grounds that "the Partnership was

10   generally paying its debts" and that a certain debt "was not the Partnership's debt, and even if it

11   was, it was disputed."  *Id.* at 966.  The Court held that the challenging partner (Frey) had

12   attempted to save the partnership from bankruptcy, so he "represented the Partnership":

13           In response, the Petitioners argue that Frey is not the Debtor and, thus, is not
             entitled to reasonable costs and fees pursuant to Section 303 of the Bankruptcy
14           Code, and the Petitioners argue that the Involuntary Petition was filed to reorganize
             the Partnership not delay the state foreclosure proceeding. As a preliminary matter,
15           the Court finds that for <u>all intents and purposes, Frey, as the non-petitioning partner</u>
             <u>who attempted to save the Partnership from bankruptcy, represented the Partnership</u>
16           <u>and thus may seek an award under Section 303</u>.

17           *Id.* at 967, emphasis added.

18           The *Fox Island* decision has been cited for the proposition that a partner, who <u>acts on</u>

19   <u>behalf of the partnership</u> in challenging an involuntary petition on grounds that the partnership is

20   paying its debts that are not subject to bona fide as they become due, is entitled to fees.  In

21   *Hancock as Tr. of Hillman Mather Adams Norberg Tr. v. Blair House Assocs. Ltd. P'ship,* No.

22   2:22-CV-00099-JDL, 2023 WL 2743641, at *5 (D. Me. Mar. 31, 2023), the bankruptcy court

23   agreed with the challenging general partner in holding: "the existence of a bona fide dispute

24   precluded Hancock from bringing an involuntary bankruptcy petition and then issued an order

25   dismissing the petition."  In those circumstances it held that the challenging general partner was

26   entitled to fees: "To give this provision practical effect, a defending general partner <u>acting on</u>

27   <u>behalf of a partnership debtor</u> must be entitled to the same relief under section 303(i) as the debtor

28   itself because, in those circumstances, <u>a partnership is acting through its general partner</u>. This

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

1   construction of sections 303(d) and 303(i) is supported by case law." *Id.* at \*12, emphasis added.

2       In this case, Mr. Sabadash did not act "on behalf of the Partnership" to "save it from

3   bankruptcy." To the contrary, he had his own personal reasons for arguing that the Partnership did

4   not exist. He was more like the type of non-debtor party that the Court in *In re 8Speed8, Inc.,* 921

5   F.3d at 1195, held is not entitled to fees. That Court stated: "appellate courts in this circuit have

6   twice considered whether a non-debtor can seek damages under § 303(i), and twice those courts

7   have decided it cannot." *Id.* It cited two supporting decisions: *Miles v. Okun (In re Miles)*, 430

8   F.3d 1083 (9th Cir. 2005), and *Franklin v. Four Media Co. (In re Mike Hammer Prods., Inc.)*, 294

9   B.R. 752 (9th Cir. B.A.P. 2003). *Id.* In *Miles*, the Court held that an involuntary debtor's wife

10  and children, as non-debtor third parties, did not have standing to pursue award of damages

11  against petitioning creditors under section 303(i), even though they alleged damages due to the

12  petition. *Miles v. Okun (In re Miles)*, 430 F.3d at 1094. In *Franklin v. Four Media Co. (In re*

13  *Mike Hammer Prods., Inc.)*, 294 B.R. 752 (9th Cir. B.A.P. 2003), the court reversed an award of

14  fees in favor of two non-petitioning creditors. The *Mike Hammer* Court observed parties acting on

15  behalf of the debtor could be eligible for fees:

16          Franklin's reading is also more natural, and is consistent with the rather sparse
            authority to address this issue. See *In re Ed Jansen's Patio, Inc.*, 183 B.R. 643, 644
17          (Bankr.M.D.Fla.1995) ("the relief set forth in § 303(i) is available only to the
            debtor" (emphasis added), but because assignee for benefit of creditors was
18          <u>representative of debtor's estate</u> he was eligible to recover "damages incurred as a
            result of the filing of the involuntary petition"). See also *In re Fox Island Sq.*
19          *P'ship*, 106 B.R. 962, 968 (Bankr.N.D.Ill.1989) (non-petitioning general partner
            "<u>represented the Partnership</u> and thus may seek an award under Section 303").
20          (Citations.)

21          *Id.* at 755, emphasis added.

22       Because Mr. Sabadash did not purport to act on behalf of the Partnership, because

23  (according to his own label) he was a "putative partner," and he actually denied the existence of

24  the Partnership, he is not entitled to fees under section 303(i) according to applicable case law.

25       Section 101(13) and Rule 9001(5)(B) also do not support an award of fees to Mr.

26  Sabadash. Section 101(13) states: "The term 'debtor' means person or municipality concerning

27  which a case under this title has been commenced." Mr. Sabadash was not a "person…concerning

28  which a case under this title has been commenced." The Partnership was the person concerning

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

which the case was commenced.

Rule 9001(5) defines the term "Debtor":

"Debtor," when the debtor is not a natural person and <u>either is required by these rules to perform an act or must appear for examination, includes</u>:…

(B) <u>if the debtor is a partnership</u>:

• <u>any or all of its general partners</u>; or

• if the court so designates, any other person in control.

(Emphasis added.)

Rule 9001(5)(B) only defines a general partner as a debtor <u>for purposes of performing an act for a partnership or appearing for examination</u>.  It does not define a putative general partner as a debtor for purposes of section 303(i), so fees may not be awarded to a prevailing putative general partner under that statute.  One commentator explained the difference:

Rule 9001(b)(5) does not so much define the term "debtor" (it is already defined in section 101(13) of the Code) as give it content in certain discrete instances. Section 101 (13) of the Bankruptcy Code defines "debtor" as the "person or municipality concerning which a case under this title has been commenced." Rather than repeating the definition, which would be redundant, <u>Rule 9001(b)(5) tells us who this "debtor" is whenever the Bankruptcy Rules require the "debtor" to do something and the debtor is not a natural person</u>.

10A *Collier on Bankruptcy* (16th ed. 2025), ¶ 9001.06 (emphasis added).

 Rule 1011(a) also is not a basis for a general partner's right to fees under section 303(i).  It states: "Who May Contest a Petition…..In a partnership case under Rule 1004, a nonpetitioning general partner-or a person who is alleged to be a general partner but denies the allegation-may contest the petition."   Rule 1011(a) permits a general partner to challenge an involuntary petition under section 303(b)(3)(A), yet section 303(i) does not refer to a "general partner," much less a self-described "putative" general partner.  It states that the Court may "grant judgment—(1) against the petitioners and in favor of the debtor."  The plain language should govern, rather than a strained "judicial gloss" in an effort to reach a desired result.  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' (Citation)."  *United States v. Ron Pair Enters.*, 489 U.S. 235, 242; 109 S. Ct. 1026, 1031; 103 L. Ed. 2d 290, 299 (1989).

1    Accord, *Lamie v. United States Tr.*, 540 U.S. 526, 534; 124 S. Ct. 1023, 1030; 157 L. Ed. 2d 1024,

2    1033 (2004) ("'It is well established that "when the statute's language is plain, the sole function of

3    the courts--at least where the disposition required by the text is not absurd--is to enforce it

4    according to its terms.' (Citation)."

**D.    Mr. Sabadash Is Not Entitled to Fees Under Section 303(i)(A) or**

**Punitive Damages Under Section 303(i)(B)(2)**

**1.    Mr. Itkin, as Well as His Counsel, Both Have and Had a**

**Good Faith Objective and Subjective Belief That The Existence**

**of the Partnership and the Claims of Partnership Creditors**

**Are Not in Bona Fide Dispute, Which is to Say That the**

**Involuntary Petition was not filed Bad Faith**

12    The Court held that the existence of the Partnership was in bona fide dispute.  The Court's

13    Memorandum correctly identified the applicable test in stating:

> A "bona fide dispute" exists if "there is an objective basis for either a factual or a
> legal dispute as to the validity of the debt." *In re Vortex Fishing Sys., Inc.*, 277 F.3d
> 1057, 1064 (9th Cir. 2002). "[T]he *burden is on the petitioning creditors* to show
> that no bona fide dispute exists…. [I]f there is either a genuine issue of material
> fact that bears upon the debtor's liability, or a meritorious contention as to the
> application of law to undisputed facts, then the petition must be dismissed." *Id.*
> (citation omitted; emphasis added).

18    (Docket no. 75, at 8:13-19.)

19    In the context of determining whether a creditor's claim based upon a non-default

20    judgment was in bona fide dispute, the 2-1 majority of the Court in *In re Marciano,* 708 F.3d

21    1123, 1127 (9th Cir. 2013), held that a judgment cannot be viewed as being in bona fide dispute,

22    even when the judgment is on appeal:

> But where, as here, the amount and validity of the claims of the Petitioning
> Creditors have been established by non-default state judgments and the debtor's
> immediate liability cannot be disputed under governing state law, there can be no
> such concerns. Indeed, it is difficult to imagine a more "objective" measure of the
> validity of a claim than an unstayed judgment entered by a court of competent
> jurisdiction.

26    In this case, Ms. Gofman holds final non-default judgment against the Partnership from

27    Courts in Russia and Los Angeles.  Her claim clearly is not in bona fide dispute.  While this Court

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   determined that those judgments were not entitled to collateral estoppel effect against Mr.

2   Sabadash, those judgments necessarily determined the existence of the Partnership in awarding

3   Ms. Gofman judgment against the Partnership.  That means that the existence of the Partnership

4   also was not in bona fide dispute.

5        In *In re 8Speed8, Inc.*, 921 F.3d at 1196, the Ninth Circuit explained that punitive damages

6   may be awarded after an unsuccessful involuntary petition due to the serious consequences that

7   can flow from the initiation of involuntary bankruptcy proceedings:

8        Section 303(i) is intended to alleviate the consequences that involuntary
         proceedings impose on the debtor. Those consequences include "loss of credit
9        standing, inability to transfer assets and carry on business affairs, and public
         embarrassment." (quoting *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985))).

10       Mr. Sabadash fails to explain any adverse consequences that he personally suffered due to

11  the involuntary petition.

12       There is no justification for awarding punitive damages on grounds that the Involuntary

13  Petition was filed in bad faith.  The Court ultimately held that there was a bona fide dispute as to

14  the existence of Itkin & Sabadash as a partnership, based in part upon inadmissible evidence.

15  However, there was ample admissible evidence and legal authority to support the conclusion that

16  the Partnership existed, including the following evidence:

17       • Mr. Itkin's 24-page declaration that was filed with the Opposition to the Motion to

18  Dismiss and the exhibits thereto.

19       • The Minutes of Meeting of the Itkin & Sabadash partnership dated February 12, 2004,

20  which were prepared by Elena Gofman, f/k/a Elena Nikolayevna Vasilieva, who has been a tax

21  attorney in Russia since 2001.  (Docket  no. 16, Itkin Decl., Exh. A.)  Those Minutes clearly

22  confirm the existence of the Partnership.  Mr. Itkin's declaration that was attached to the

23  Opposition to the Motion to Dismiss explained that the meeting between himself and Mr.

24  Sabadash occurred and the Minutes were prepared on the recommendation of Ms. Gofman, who

25  Mr. Sabadash and Mr. Itkin had hired on behalf of the Partnership; that Ms. Gofman attended the

26  meeting; and that he witnessed Mr. Sabadash signing the Minutes.  When Mr. Sabadash's Reply in

27  support of his Motion to Dismiss contended (for the first time) that his signature on the Minutes

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   was  forged (Itkin Decl., ¶¶ 9-11), Mr. Itkin had no opportunity to respond in writing.  The

2   declaration of Ms. Gofman that is attached to Mr. Itkin's Motion for Reconsideration confirms

3   that the meeting occurred and the Minutes were prepared by her on her recommendation of Ms.

4   Gofman; that she was present at the meeting; that Mr. Sabadash and Mr. Itkin had hired her on

5   behalf of the Partnership; and that she also witnessed Mr. Sabadash signing the Minutes.  (Docket

6   no. 89, Gofman Decl.,¶ 10, Exh. A.)

7        • The Information Services Agreement dated February 12, 2004, under which Mr.

8   Sabadash and Mr. Itkin hired Ms. Gofman on behalf of the Partnership.  (Docket  no. 16, Itkin

9   Decl., Exh. B.) Mr. Itkin's declaration that was attached to the Opposition to the Motion to

10  Dismiss authenticated that document and stated that he saw Mr. Sabadash sign it.  (*Id.,* ¶¶ 33 and

11  34.)  When Mr. Sabadash's Reply in support of his Motion to Dismiss contended (for the first

12  time) that his signature on the Information Services Agreement the Minutes was forged, Mr. Itkin

13  had no opportunity to respond in writing.  The declaration of Ms. Gofman that is attached to Mr.

14  Itkin's Motion for Reconsideration confirms that she prepared the Information Services

15  Agreement and that she saw Mr. Sabadash and Mr. Itkin sign it.  (Docket no. 89, Gofman Decl.,¶

16  10, Exh. B.)

17       • The Minutes and the Information Services Agreement were presented by Mr. Itkin in the

18  Superior Court action and were marked as trial exhibits.  (Itkin Decl., ¶ 9.)  Mr. Sabadash did not

19  assert in the State Civil action his signatures on the Minutes and the Information Service

20  Agreement were forged.  (Itkin Decl., ¶¶ 9-11.)  Mr. Sabadash also did not assert that before the

21  Russian courts or in Ms. Gofman's lawsuit in the Los Angeles Superior Court.  (Docket no. 62

22  (Gofman Decl. in opposition to objections to claims), ¶ 10.)

23       • The annual Service Delivery Reports prepared by Ms. Gofman for the Partnership for

24  2004, 2005 and 2006.  (Docket  no. 16, Itkin Decl., Exh. B.)  The first paragraph of each Report

25  confirmed the existence of the Partnership:

26       Simple Partnership "Itkin and Sabadash", hereinafter referred to as "Client",
         represented by Managing Partner G. Y. Itkin, acting pursuant to the Simple
27       Partnership Agreement, on the one hand, and E. N. Vasilieva on the other, jointly
         referred to as "Parties", have hereby issued this report as follows:

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1    Mr. Itkin's declaration that was attached to the Opposition to the Motion to Dismiss

2    submitted those reports.  (Docket no. 16, Exh. B.)  The declaration of Ms. Gofman that is attached

3    to Mr. Itkin's Motion for Reconsideration confirms that she prepared those reports for the

4    Partnership.  (Docket no. 89, Gofman Decl., Exh. B.)

5    • Multiple decisions of Russian courts that held that the Partnership existed in awarding

6    judgment to Ms. Gofman for fees owed to her by the Partnership.  The Court's Memorandum of

7    Decision ruled that these decisions did not have collateral estoppel effect against Mr. Sabadash.

8    Mr. Itkin respectfully disagrees for the reasons stated in his Motion for Reconsideration.  The

9    Court relied upon the standards for issue preclusion under California law.  (Memorandum, at 10:1-

10    21.)  The standards are met: (1) The issue of the existence of the Partnership identical.  That is the

11    issue before this Court, and it was an issue before the Russian Courts, as confirmed by Professor

12    Childress' declaration that is attached to the Motion for Reconsideration.  (2)  The issue was

13    actually litigated, which is why the September 14, 2018 judgment of the Moscow Arbitration

14    Court determined that the Partnership existed and the September 12, 2019 Ruling and the August

15    6, 2020 Information Summary from the Ninth Arbitration Court of Appeals later confirmed that.

16    (3) The issue was necessarily decided in four decisions of the Russian courts.  Ms. Gofman could

17    not obtain a judgment against the Partnership and have that judgment affirmed in appeals filed by

18    Mr. Sabadash unless the Partnership existed.  (4) The decisions of the Moscow Arbitration Court

19    and the Ninth Arbitration Court of Appeals were appealed up the Russian Supreme Court.  Mr.

20    Sabadash presented his arguments and evidence, which were rejected.  The judgment is final.  (5)

21    The party against whom preclusion is sought (Mr. Sabadash) was in privity with the Partnership,

22    which was a party to the proceedings in the Russian Courts.  Mr. Sabadash may not be in privity

23    with Mr. Itkin, as a general partners, but he is in privity with the Partnership under applicable law

24    for purposes of issue preclusion.  *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052–53

25    (9th Cir. 2005); *Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.,* 933 F.2d

26    724, 728 (9th Cir. 1991); *PNY Techs., Inc. v. Miller, Kaplan, Arase & Co., LLP,* 2017 WL

27    2876736, at *4 (N.D. Cal. July 6, 2017).  As such, he is bound by the judgments of the Russian

28    courts regarding the finding that the Partnership existed.  However, regardless of whether the

1  decisions are entitled to collateral estoppel effect, they certainly formed the basis of a good faith

2  belief that the existence of the Partnership was not in bona fide dispute.

3      • The judgment of the Los Angeles Superior Court in favor of Ms. Gofman and against

4  the Partnership that recognized her the judgment of the Russian court in her favor.  Because Mr.

5  Sabadash is in privity with the Partnership, he similarly is precluded by that Judgment from

6  questioning the existence of the Partnership.

7      • The Court acknowledged Mr. Itkin's professional background, which he explained in his

8  declaration as follows:

9      I have a Master of Business Administration degree, majoring in taxation, from
       Pepperdine University. I was admitted as an Enrolled Agent before the IRS and
10     practiced taxation from 1986 to 1998 after which I accepted Alexander Sabadash's
       below-described offer, gave up my accounting practice, and started working in
11     Russia.

12     (Docket no. 16, Itkin Decl., ¶ 1.)

13     Ms. Gofman has been an attorney in Russia since 2001.  They clearly have credibility that

14  is far superior to that of Mr. Sabadash, who has been incarcerated in Russia since May 2014 for

15  attempted embezzlement of value added tax, fraud and bank fraud.  (Docket no. 16, Itkin Decl., ¶

16  4, 71, 72.)  Mr. Sabadash's fourth trial in Russia has already started.  He is officially charged with

17  violations of (a) Russian Penal Code section 159.4 for "fraud in especially large scale";

18  and  (b) Russian Penal Code section 160.4 for  "misappropriation or embezzlement committed on

19  an especially large scale by organized group."  (Itkin Decl., ¶ 17, Exh. B.)

20     Mr. Sabadash fails to provide any evidence of his education, background or character.

21  Federal Rule of Evidence 601(a)(1)(A) states:

22     The following rules apply to attacking a witness's character for truthfulness by
       evidence of a criminal conviction:
23
       (1) for a crime that, in the convicting jurisdiction, was punishable by death or by
24     imprisonment for more than one year, the evidence:

25     (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in
       which the witness is not a defendant….
26
       If they are to be considered in connection with the pending Motions, the declarations of
27
28  Mr. Sabadash and his wife lack credibility. *United States v. Wilson*, 556 F.2d 1177, 1178 (4th Cir.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1  1977) (admission of conviction in Germany, even though it was without a jury trial.")

2  • Ten (10) creditors filed claims against the Partnership totaling more than $4,649,576.11,

3  which themselves evidenced the existence of the Partnership. Proof of claims nos. 1 to 10 had

4  been filed by nine creditors at the time Mr. Itkin filed his Opposition to Mr. Sabadash's Motion to

5  Dismiss.[2] Their claims totaled $2,214,165.27. Proof of Claim no. 11 (filed by Aleksandr Grant)

6  on June 2, 2025, in the amount of $2,435,410.84 was not objected to by Mr. Sabadash, although it

7  is addressed for the first time in his Fee Motion and Sanctions Motion.

8          **2.      The Doubt Expressed by the Court In Its Memorandum of**

9                  **Decision Regarding Mr. Itkin's Evidence is Not Grounds to Find**

10                 **that the Petition Was Filed in Bad Faith or for the Court to**

11                 **Exercise Its Discretion to Award Fees to Mr. Sabadash**

12         In declining to view Mr. Itkin's evidence of the existence of the Partnership in the light

13  most favorable to Mr. Itkin – as required under applicable law[3] – the Court's Memorandum of

14  Decision explained that the existence of the Partnership did not align with certain facts.

15         *First*, the Court questions the existence of the Partnership based upon the lack of a written

16  agreement when the Partnership was formed, given the promise of $4 million per year and Mr.

17  Itkin's reluctance to move to Russia, especially given that Mr. Itkin is an accountant. (Docket no.

18  75, at 19:22-20:15.) In not considering the evidence in a light most favorable to Mr. Itkin, the

19  Court overlooks the facts that:

20         • Between 1990 and 1998, Mr. Sabadash and Mr. Itkin and their spouses) "became good

21  friends." (Docket 16, at 34:12-17).

22         • Contrary to the Court's statement, Mr. Sabadash did not "guarantee[] Mr. Itkin a

23  *minimum income of $4 million per year*" (docket no. 75, at 2:6-7, emphasis in original), but

24  instead Mr. Itkin stated: "A. Sabadash stated he was so confident we would succeed that he

25  _____

26  [2] Proof of Claims Nos. 2 and 3 by Jeff Ratner and Associates, Inc., were duplicative.

27  [3] Citing Supreme Court authority, the Court's Memorandum acknowledged: "The evidence and
   inferences therefrom must be viewed in the light most favorable to the non-moving party."

28  (Docket no. 75, at 6:21-23.)

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1  promised me a minimum income of $4,000,000 per year, which I could either draw upon, or

2  reinvest into the partnership as I saw fit."  (Docket no. 16, at 35:11-13.)   A "promise" is not a

3  "guarantee."

4       • That income did not materialize at first; instead "[a]t its earliest stages, the Partnership

5  generated barely any revenue, and little in the way of comfort" and "when I first moved to St.

6  Petersburg, A. Sabadash and I lived together in a run-down, one-bedroom apartment that A.

7  Sabadash informed me was owned by his mother-in-law" and "when I did rent my own apartment,

8  that apartment was even more squalid.  (*Id.* at 35:26-36:6);

9       • Mr. Itkin and Mr. Sabadash acted like partners in the manner agreed to by them, with

10  Mr. Itkin forming the companies, Mr. Itkin being appointed as a director and officer, and the

11  Partnership assets being held in this manner.  (*Id.* at 36:11-16);

12       • In late 1999, Mr. Sabadash and Mr. Itkin joined the International Union of Economists,

13  as partners and splitting the $15,000 registration fee with Mr. Sabadash paying $10,000 and Mr.

14  Itkin paying $5,000 per their agreed upon partnership share shares of 2/3 and 1/3.  (*Id.* at 36:19-

15  28.)

16       • Both of them drew on Partnership accounts.  (*Id.* at 37:1-4.)

17       • Both of them held "ourselves out as partners to employees, business associates,

18  governmental officials, and others."  (*Id.* at 37:5-7.)

19       In other words, this Partnership between friends was entered into without a written

20  agreement and worked well from approximately 1999 to 2003 without a written agreement.  Only

21  when they met Russian attorney Elena Gofman, f/k/a Elena Nikolayevna Vasilieva, in early 2004

22  did they act on her recommendation in conducting a meeting on February 12, 2004, that resulted

23  in the Partnership Minutes, which Mr. Itkin and Ms. Gofman saw Mr. Sabadash sign.  (Docket no.

24  16, at 37:21-38:6; Docket no. 89, Gofman Decl., ¶ 10; Suppl. Itkin Decl., ¶ 6.)

25       Interpreting this evidence in the "light most favorable" to Mr. Itkin, it is credible that the

26  Partnership between friends was entered into without a written agreement.[4]  (Docket no. 89, Itkin

27

28  [4]  California Corporations Code § 16101 explicitly defines a "partnership agreement" as an

Decl., ¶ 12.)  They trusted each other at the time.  (*Id.*)  Significantly, neither Mr. Sabadash nor the Court dispute that a partnership agreement may be verbal and need not be in writing.  In light of no contrary admissible evidence, Mr. Itkin established that there is not a bona fide dispute as to the existence of the Partnership.

*Second*, in further questioning Mr. Itkin's declaration, the Court doubts that Mr. Itkin's "academic background" and his "professional experience, business reputation and connection" justified "obtain[ing] this $4 million per year, and a 30% or so interest in assets that turned out to be worth hundreds of millions of dollars." (Docket no. 75, at 20:16-27.)[5]  The Court was referring to the language in the Partnership Minutes.  However, the Court ignores the evidence that Mr. Itkin's contributions went far beyond his background.  He presented evidence that:

- Paragraph 1 of the Partnership Minutes also stated that Mr. Itkin and Mr. Sabadash agreed in 1998 to "combine their assets, monetary funds, other financial resources, as well as the value of their education, professional experience, business reputation and business connections to jointly conduct business activities without forming a legal entity." (Docket no. 16, Ex. A, emphasis added.)  They agreed to contribute the same types of consideration.

- Paragraph 2 of the Partnership Minutes stated: "Each Partner shall be personally liable to the second Partner for non-performance or partial performance of his obligations hereunder.  Moreover, Partners shall serve as each other's fiduciaries. Each Party shall act in good faith towards his Partner and abstain from engaging in acts of gross negligence or recklessness, intentional unlawful acts or deliberate violations of the law." (Docket no. 16, Ex. A.)  Thus, Mr. Itkin and Mr. Sabadash agreed to be liable to the other one; they each promised to act as fiduciaries; and they each agreed to abstain from improper conduct.

- Paragraph 5 of the Partnership Minutes stated: "In consideration of the obligations of each Party to keep all the information received by the Partners hereunder confidential, Partners

agreement "whether written, oral, or implied" among the partners concerning the partnership. Similarly,  California Corporations Code § 15901.02 also recognizes that a partnership agreement may be "oral, implied, in a record, or in any combination."

[5] Mr. Sabadash did not make this argument in his Motion to Dismiss or supporting Reply.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵀᴴ FLOOR
LOS ANGELES, CALIFORNIA 90071

1   agree not to disclose the existence of the Simple Partnership to third parties (Silent Partnership)."

2   (Docket no. 16, Ex. A.)  Thus, Mr. Itkin and Mr. Sabadash each promised confidentiality.

3      But the evidence of Mr. Itkin's consideration for his 33% Partnership interest goes well

4   beyond the recitations in the Partnership Minutes  Mr. Itkin's declaration further explains:

5      • He moved to Russia and for a time lived in squalid conditions to pursue the Partnership.

6      • In 2004, Mr. Itkin and Mr. Sabadash hired Elena Nikolayevna Vasilieva "on behalf of

7   the Partnership to provide tax-related legal services to Itkin & Sabadash and the companies owned

8   by it that were held in the name of Mr. Sabadash."  (Docket 16, at 37:21-23; 38:7-10.)

9      • Mr. Itkin did not receive $4 million per year.  Instead, he "drew my share as a fairly

10  steady draw, opting to leave most of my interests invested in the Partnership. I drew between

11  approximately $300,000 and $800,000 per year, as needed, for a total of approximately

12  $8,000,000 over the course of approximately sixteen years."  (*Id.* at 40:23-25.)  He significantly

13  reinvested in the Partnership, thereby meeting his promise that was stated in paragraph 1of the

14  Partnership Minutes to "combine [his] assets, monetary funds, other financial resources."

15     • Mr. Itkin also kept track of Partnership income and expenses.  He explained: "I kept

16  track of the Partnership's revenues and expenses and provided monthly expense statements to A.

17  Sabadash so each of us could keep track of Partnership revenues and expenses and how much each

18  of us had withdrawn from the Partnership. Attached hereto as **Exhibit H** are true and correct

19  copies of examples those cash flow statements in chronological order from the period February

20  2005 to August 2010."  (*Id.* at 54:22-26.)

21     Thus, interpreting the evidence the "light most favorable" to Mr. Itkin, he clearly

22  contributed significant time and money to the Partnership as consideration that went well beyond

23  his background, experience and connections, which themselves constituted consideration.  It must

24  be kept in mind that while the Partnership eventually had assets worth hundreds of millions of

25  dollars, that future success could not have been predicted.  It is unfair to Mr. Itkin to discount his

26  multiple contributions to the Partnership in light of future developments and then apply the benefit

27  of hindsight.  Thus, when considering the evidence of Mr. Itkin's contributions to the Partnership

28  in the light most favorable to him, it supports the existence of the Partnership and establishes an

1   absence of bona fide dispute in that regard, especially when considering that Mr. Sabadash failed

2   to present any admissible evidence to the contrary.

3       *Third*, the Court sees contradictions in Mr. Itkin's statements in his declaration that he

4   moved to Russia to take over Mr. Sabadash's existing ventures and to pursue new ventures and

5   looked into marketing our products abroad for export from Russia, on the one hand, and his

6   deposition testimony that he did not manage cash flow generated by Russian operations and "I

7   have no clue where" the "Russian flow of funds" originated, on the other hand.  (Docket 75, at

8   21:1-13.)

9       As an initial matter, footnote 5 in the Memorandum asserts that this testimony is

10  admissible because "[i]t is offered not to establish the truth of the matters to which he testifies, but

11  instead to demonstrate the existence of a bona fide dispute as to the existence of the Itkin &

12  Sabadash partnership. *See* n. 3."  That presumably was a reference to footnote 4.  There is no

13  exception to the hearsay rule that hearsay is admissible to demonstrate a dispute without it being

14  accepted for the truth of the matters stated.

15      More importantly, while the Court acknowledges that it "can conceive of possible ways to

16  try to reconcile these statements," it concludes "at the very least they would only establish that Mr.

17  Sabadash's dispute is bona fide."  (Docket 75, at 21:11-13.)  There is a very simple way to

18  reconcile these statements, especially if Mr. Itkin's declaration and deposition testimony are read

19  in a "light most favorable" to him.

20      Mr. Itkin's declaration does <u>not</u> state that he agreed to take over Russian business

21  operations.  Instead, he states that Mr. Sabadash initially proposed the venture as follows:  "In

22  1998, <u>A. Sabadash asked me</u> to move to Russia with A. Sabadash, to become 'business partners'

23  with him and <u>to take over the operation and growth</u> of all of A. Sabadash's existing business

24  ventures, as well as pursuing new business ventures."  (Docket 16, at 34:15-17, emphasis added.)

25  Mr. Itkin's declaration and deposition testimony do <u>not</u> state that he actually took over "the

26  operation and growth of all of A. Sabadash's existing business ventures" in Russia, but he does

27  state that he assisted Mr. Sabadash in "pursuing new business ventures," including (as noted by

28  the Court) looking into marketing the Partnership's products abroad for export from Russia (*id.* at

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

36:17-18); he "was appointed as a director and officer of the majority of the corporate entities

falling under the Partnership or of the parent company for each such business, controlling the

boards of directors of the subsidiary companies" (*id.* at 36:11-16); he also "took steps to

modernize/westernize the Partnership's business interests" (*id.*); and after Mr. Sabadash was

elected to the Russian Senate in 2003, Mr. Itkin took "on the role of sole director and officer for

the bulk of the corporate entities falling within the Partnership" (*id.* at 37:16-17).  He was very

active in the Partnership's business.

So, how can Mr. Itkin reconcile his deposition testimony in which he stated that he did not

"manage cash flow" generated by Russian operations and "I have no clue where" the "Russian

flow of funds" originated?  (Zorkin Decl. (dkt. 8-1), Ex. 1, at 93:25-94:4.)  In Mr. Itkin's

deposition testimony that Mr. Sabadash submitted with his Motion, Mr. Itkin explained a very

sensible reason why, which is that those details were handled by someone else:

> Q And you were managing the entire partnership; is that correct?
>
> No.  I was not managing Russian flow. I mentioned that before, number one.
> Number two, I --  the monies that were coming in, to me, they were monies that
> were coming from profits and -- from the profits of the partnership. I have no clue
> where they're coming from. It was a completely separate person that was dealing
> with that, with the Russian flow of funds.
>
> Q And who was that?
>
> A Kirill Arsentiev.
> (*Id.* at 93:93:22-94:4, emphasis added.)

In follow up questions from Mr. Zorkin, Mr. Itkin explained what he meant:

> Q What do you mean by "money flows in Russia"?  I'm sorry.
>
> A Well, there were a number of partnership entities in Russia, and there were --
> there were incoming funds and there were expenditures and et cetera's. All that was
> done by Kirill Arsentiev.  What I saw is the end, the monies on Golden Sphinx,
> Golden Spirits; in other words, accounts that were over the border.
>
> Q Okay.
>
> A How they were generated and received there, I didn't know.
>
> (*Id.* at 93:24-94:9, emphasis added.)

Mr. Itkin further testified that he was "notified when the money came in" and that Mr.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7th FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

1    Arsentiev "would always tell me this amount of money is being sent….(*Id.* at 182:3-15.)

2         Thus, while Mr. Itkin held a position as officer and director of multiple companies with

3    assets worth hundreds of millions of dollars, he cannot be expected to know the details of "money

4    flows."  After Kirill Arsentiev was hired in 2007-2008, he handled the cash flow of net profits

5    from the Partnership's Russian operations.  He was the equivalent of a Chief Financial Officer for

6    the Partnership's Russian operations.  (Docket no. 89, Suppl. Itkin Decl., ¶ 13.)

7         In short, reading Mr. Itkin's declaration and his actual deposition testimony in a light most

8    favorable to him leads to the conclusion that they are consistent and that they do not  show that

9    there was a bona fide dispute as to the existence of the Partnership.  In fact, even if the testimony

10   could be viewed as inconsistent, whether or not Mr. Itkin managed funds or personally followed

11   cash flows does not contradict the conclusion that the Partnership existed.

12        *Fourth*, the Court sees a contradiction between Mr. Itkin's declaration regarding living in a

13   run-down apartment belonging to Mr. Sabadash's mother-in-law and later living in a squalid

14   apartment, on the one hand, and his deposition testimony that he began receiving $50,000 per

15   month from the Partnership "practically right away" after moving to Russia, on the other hand.

16   The Court states that Mr. Itkin does not explain this apparent inconsistency.  (Docket no. 75, at

17   21:14-25.)  Again, as stated above, that deposition testimony is inadmissible.  Further, there is no

18   evidence that Mr. Itkin was even asked to explain this apparent inconsistency that the Court

19   identified, so it is unclear why the Court criticizes Mr. Itkin for not explaining it, unless the Court

20   is seeking to impeach Mr. Itkin's credibility without him even being asked to explain the supposed

21   inconsistency.[6]  It is well-settled that the credibility of a  testimony of a witness  in opposition to a

22   summary judgment motion cannot be determined  by the Court in choosing to disbelieve his or her

23   testimony.  *S.E.C. v. Koracorp Indus., Inc.,* 575 F.2d 692, 698 (9th Cir. 1978) ("It is not the

24

25   _____

[6] Federal Rule of Evidence 613(b) states that a witness must be given an opportunity to explain
26   prior inconsistent statements: "Unless the court orders otherwise, extrinsic evidence of a witness's
     prior inconsistent statement may not be admitted until after the witness is given an opportunity to
27   explain or deny the statement and an adverse party is given an opportunity to examine the witness
     about it."  The Court's questioning of Mr. Itkin's credibility on this issue in its Memorandum did
28   not afford Mr. Itkin that opportunity.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   function of the trial court at the summary judgment hearing to resolve any genuine factual issue,

2   including credibility; and for the purpose of ruling on the motion all factual inferences are to be

3   taken against the moving party and in favor of the opposing party, and the appellate court will do

4   likewise in reviewing the trial court's grant of summary judgment.")  There is a very simple

5   explanation.  When Mr. Itkin moved to Russia, his family stayed in California.  The bulk of the

6   $50,000 each month was sent to Mr. Itkin's wife so his family would have funds to pay for their

7   expenses.  Mr. Itkin kept a small amount for himself to pay his expenses in Russia, while he often

8   worked more than 15 hours per day on Partnership business.  (Docket no. 89, Suppl. Itkin Decl., ¶

9   14.)  Mr. Itkin's evidence was supposed to be interpreted in the light most favorable to him.

10      *Fifth*, the Court also suggests that Ms. Gofman's judgment against the Partnership for

11   $13,130.83 was a "ploy to preclude Mr. Sabadash from contesting the existence against the

12   Partnership" because she has not chosen to enforce it, which the Court concludes "casts doubt

13   about both the existence of the partnership and the validity of Ms. Gofman's claim against it."

14   (Docket no. 75, at 22:1-7.)  Of course, there is no evidence regarding Ms. Gofman's reasons for

15   not seeking enforcement.  The Court speculated in that regard.  Ms. Gofman's declaration that is

16   attached to Mr. Itkin's Motion for Reconsideration explains why she has not pursued collecting on

17   her $13,130.83 Recognition Judgment.  First, the fees and costs that would be incurred by her in

18   seeking to enforce the Recognition Judgment would be disproportionate to the $13,130.83

19   judgment amount.  Second, she has been unaware of any assets directly owned by the Partnership

20   in California that could be the subject of an inexpensive effort to enforce the Recognition

21   Judgment.  (Docket no. 89, Gofman Decl., ¶ 3.)  Further, Mr. Itkin periodically spoke with her,

22   calming her down and promising to pay her judgment as soon as his lawsuit in the Los Angeles

23   Superior Court to dissolve Partnership was done and Partnership assets are sold.  (Itkin Decl., ¶

24   18.)  These reasons are obvious.  Rather than viewing Ms. Gofman's lack of collection efforts in

25   the light <u>most</u> favorable to Mr. Itkin, the Court questions it in a light <u>least</u> favorable to Mr. Itkin.

26   More importantly, even if the Court chooses to discount the impact of Ms. Gofman's lack of

27   collection efforts on her small judgment, it still does not contradict Mr. Itkin's testimony, the

28   Partnership Minutes, the contract between Ms. Gofman and the Partnership, and the rulings of the

1    Russian Courts.

2              **3.      Mr. Sabadash Incorrectly Speculates About Mr. Itkin's**

3              **Motives for Filing the Involuntary Petition and the Reasons**

4              **Why the Involuntary Petition was Filed**

5              There were several important reasons for filing the Involuntary Petition, all of which were

6    legitimate.  Mr. Itkin and his counsel agreed on those reasons, as set forth in the attached

7    declarations.

8              First, the Involuntary Petition was filed to benefit the Partnership Creditors by having the

9    petition granted and a trustee appointed to aggregate assets and pay those creditors.  (Ikin Decl., ¶

10    5; McCarthy Decl., ¶ 7.)

11              Second, a key asset is the Beverly Hills property.  It makes more sense for this Court to

12    determine the existence of the Partnership under California law, to determine ownership of that

13    Property under California law, and to determine the validity of claims under California law, rather

14    than the Jersey Court doing so in the liquidation proceeding of Golden Sphinx Limited, where the

15    claims of those creditors cannot be addressed, if Mr. Itkin were to prevail there.  (Ikin Decl., ¶ 6;

16    McCarthy Decl., ¶ 8.)

17              Third, Mr. Itkin expected that the Jersey Court would recognize the Partnership's Chapter

18    7 case, so this Court would not abstain from hearing this case.  Indeed, Mr. Itkin and his counsel

19    expected the Jersey Court to defer to this Court in the Partnership's Chapter 7 case on matters

20    bearing upon the Partnership because (1) as stated above, issues under California law predominate

21    the existence of the Partnership, the ownership of the Beverly Hills property, and the allowance of

22    claims; (2) Golden Sphinx Limited and Mr. Sabadash (represented by Michael Zorkin) and Mr.

23    Itkin all are parties to the stayed Superior Court action in which the dissolution of the Partnership

24    was presented by Mr. Itkin's first cause of action in his Second Amended Cross-Complaint; (3)

25    the Superior Court action was fully prepared by all parties for trial and the jury trial actually

26    commenced in March 2020, until a mistrial was declared due to Covid-19, so it makes sense for

27    the Partnership-related issues to be tried in a court in Los Angeles, whether it is this Court or the

28    Superior Court; (4) the dispute in the Jersey Court regarding these issues is at a very early stage;

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   (5) when this Court asked the Jersey Court for instructions by its letter dated April 10, 2024, the

2   Jersey Court expressed indifference as to how this Court should rule; and (6) the Jersey Court

3   cannot address the concerns of the Partnership's creditors, if Mr. Itkin succeeds in showing that

4   the Partnership existed and that it owns the Beverly Hills property, given that they are not

5   creditors of Golden Sphinx Limited and are not parties to the liquidation proceeding in Jersey.

6   (Ikin Decl., ¶ 7; McCarthy Decl., ¶ 9.)  "[C]omity is not just a one-way street. Just as this Court

7   will defer to a foreign court if the circumstances require it, so too should a foreign court defer to

8   this Court when appropriate." *In re RHTC Liquidating Co.*, 424 B.R. 714, 725 (Bankr. W.D. Pa.

9   2010). Accord, *McGee v. Estelle,* 722 F.2d 1206, 1214 (5th Cir.1984) (en banc) (quoting

10  *Thompson v. Wainwright*, 714 F.2d 1495, 1509 (11th Cir.1983)).

11       Mr. Sabadash also has argued that the Jersey Court adjourned a February 25, 2025 hearing

12  due to the Involuntary Petition, which in part concerned an order that Mr. Itkin pay costs of

13  £78,432 and that he respond to requests for information.  (Docket nos. 90-3 and 91-3, Wood Decl.,

14  ¶¶ 15-18.)  The short adjournment was the consequence of the Involuntary Petition, but that hardly

15  was prejudicial to Mr. Sabadash (i.e., the moving party), who remains incarcerated in Russia, or

16  even the Joint Liquidators.  Mr. Wood's declaration fails to explain any prejudice to the Joint

17  Liquidators, who are not even parties to this Involuntary Chapter 7 case.

18       While the temporary adjournment of the Jersey proceeding was a consequence of the

19  automatic stay, Mr. Itkin has not sought to escape the orders of the Jersey Court.  That was not his

20  motivation in filing the Involuntary Petition.  In fact, the Involuntary Petition was never going to

21  cure Mr. Itkin's alleged breaches of orders of the Jersey Court regarding the payment of fees and

22  providing responses to requests for information, the latter of which have been provided.  (Ikin

23  Decl., ¶ 8; McCarthy Decl., ¶ 10.)

24       Mr. Itkin appreciates that this Court may grant relief from the automatic stay to permit the

25  Jersey liquidation proceeding to go forward on issues bearing upon the Partnership, if such relief

26  were requested by the Joint Liquidators, although he would oppose any such relief.

27       **E.    Mr. Sabadash's Self-Interested Declaration Is Not Persuasive**

28            **1.    Mr. Sabadash's Declaration Should Not Be Considered**

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1  The Fee Motion and the Sanctions Motion are based in part upon a new declaration from

2 Mr. Sabadash that for the first time attempts to contradict the declaration of Mr. Itkin that was

3 attached to his Opposition to the Motion to Dismiss.  (Docket no. 16.)  Mr. Sabadash's new

4 declaration was not a basis of dismissal of the Involuntary Petition.  It should not be considered as

5 a basis of the Fee Motion and the Sanction Motion.

6    **2.  Mr. and Mrs. Sabadash Are Not Credible**

7  Mr. Sabadash's declaration is not credible, it is incomplete and it is misleading. It is not

8 credible because Mr. Sabadash is a convicted felon, who has been incarcerated in Russia since

9 2014.  Moreover, he readily admits that his wife and two children reside in the $50 million

10 Beverly Hills residence.  It is apparent that he will say whatever is necessary from a prison in

11 Russia to delay the determination of whether the Partnership exists and whether it owns the

12 Beverly Hills property so his wife and children can remain in that residence.  That delayed

13 determination was accomplished by the filing of Golden Sphinx Limited's liquidation proceeding

14 in August 2022 and this Court's recognition of that proceeding in September 2022, which stayed

15 the State Court action that was scheduled for trial in December 2022.

16  It is not coincidental that Mr. Sabadash's wife (Larisa) arranged for the appointment of the

17 joint liquidators in Jersey and the filing of the liquidation proceeding.  A resolution to liquidate

18 Golden Sphinx Limited as attached as Exhibit H to the declaration of Andrew Wood that was filed

19 by the joint liquidators in support of the Recognition Motion in the Golden Sphinx Limited

20 ("GSL") Chapter 15 case.  (GSL docket no. 10.)  The resolution was dated "5-7-22," which Mr.

21 Wood stated was July 5, 2022.  (*Id.*, ¶ 26.)  That resolution was signed by Larisa Sabadash as the

22 alleged sole director of GSL.  (*Id.*, Exh. H.)  Mr. Wood further explained:

23   On July 6, 2022, the Debtor's Jersey domiciled registered shareholders executed a
    unanimous written resolution resolving to wind up the Debtor and to nominate
24   Alexander Adam and I as Joint Liquidators for the purposes of such winding up.
    *See* Exhibits I and J (shareholder resolutions for winding up of Debtor and
25   nomination of the Joint Liquidators).

26   (*Id.*, ¶ 27.)

27  The Minutes of two meetings dated July 6, 2022 stated: "This forms part of the wider

28 process to retain control of the underlying property held within New Albion <u>and distribute this to</u>

1    <u>Larissa Sabadash, who currently resides in the property</u> (the '**Resolution'**)." (*Id.*, Exhs. I and J,

2    emphasis added.)  Thus, it was evident that the point of the GSL liquidation proceeding was so

3    Larisa Sabadash could keep the Beverly Hills property.

4         Mr. Wood further explained:

5         At the Creditors Meeting on July 6, 2022, which was called in accordance with the
          provisions of Art. 160(1) of the Law following fourteen-day notice to all creditors,

6         Alexander Adam and I were appointed Joint Liquidators in accordance with Article
          161 of the Law. *See* Exhibit K (minutes from meeting of creditors approving

7         resolution appointing Joint Liquidators to wind up the Debtor).

8         (*Id.*, ¶ 28.)

9         Exhibit K was a copy of Minutes of a July 7, 2022 creditors meeting at which Larisa

10   Sabadash attended as GSL's sole director and creditor.  (*Id.*, Exh. K.)  The Minutes recite that she

11   chaired the meeting and that Andrew Wood and Alexander Adam were appointed as the joint

12   liquidators to wind up the affairs of GSL.  (*Id.*)  No other creditors attended.  (*Id.*)

13        Larisa Sabadash's actions went beyond causing the commencement of the GSL liquidation

14   proceeding and the appointment of the Joint Liquidators.  The Joint Liquidators were reluctant to

15   disclose who was paying their fees.  Their counsel (Mr. Hurry) finally disclosed that it was Larisa

16   Sabadash, as explained in paragraph 41 of the May 23, 2023 Judgment of the Jersey Court:

17        In the course of the hearing, we asked Advocate Hurry who was funding the
          liquidation. His response was that the Respondents would of course provide that

18        information to the Court if so directed, but they considered that it was private
          information to which the Represantor was not entitled as he was in hostile litigation

19        with the Company. <u>The Court considered that in the light of the circumstances
          surrounding the appointment of the Respondents it would be appropriate to disclose</u>

20        <u>the identity of the funders of the liquidation</u>. <u>We were told by Advocate Hurry that
          the funder was Mrs Sabadash</u>. In his closing argument, he said that funding of the

21        liquidation was an issue and third party funding was being considered. The
          Respondents would not bring proceedings unless they could take them through to

22        completion. We have no further information than that.

23        (Itkin Decl., ¶ 5, Exh. A hereto, emphasis added.)

24        Larisa Sabadash also is paying for the joint liquidators' counsel's fees in GSL's Chapter 15

25   case (Itkin Decl., Exh. B, ¶ 41) and probably for Mr. Sabadash's fees in this Chapter 7 case.

26        In short, Mr. Sabadash is supporting the efforts of his wife to have a foreign court in the

27   GSL liquidation proceeding determine California-related issues for her stated purpose of getting

28   the Beverly Hills property distributed to her.  He and his wife engaged in forum-shopping in

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   attempting to transfer resolution of these disputes to Jersey.  His declaration is not credible.  In

2   contrast, Mr. Itkin wants the Partnership's assets (including the Beverly Hills property) to be

3   liquidated after a determination that the Partnership owns it, the Partnership's creditors to be paid

4   and remaining monies to be allocated between Mr. Sabadash and Mr. Itkin under California

5   partnership dissolution law.

6   **F.    Mr. Sabadash's Brief Declaration is Clearly and Convincingly**

7   **Contradicted by the Declarations of Mr. Itkin and Elena Gofman**

8       Mr. Sabadash disputes Mr. Itkin's declaration regarding their agreement to enter into a

9   partnership agreement in 1998.  He claims that he hired Mr. Itkin "in or around the year 2000" as

10  "an accountant and financial manager for my U.S. and European based companies" and that before

11  that Mr. Itkin only had prepared Mr. Sabadash's family tax returns.  (Sabadash Decl., ¶ 1.)  He

12  asserts that he hired Mr. Itkin as an employee, paid him a salary, and gave him the official roles of

13  "officer and director" of several corporations owned by Mr. Sabadash  (*Id.*, ¶¶ 2-4.)

14      The falsity of the statement that Mr. Itkin was hired as an employee is shown by the fact

15  that he was not treated as an employee.  He was not paid the same amounts (weekly or monthly) as

16  any employee would have been paid; he was not provided with any kind of payroll statements;

17  taxes were not withheld; and he was not provided with W-2s.  (Itkin Decl., ¶ 14.)

18      Mr. Itkin's very detailed version of the facts in his 24-page declaration attached to his

19  Opposition to the Motion to Dismiss differs greatly, and it is considerably more credible.  He

20  began provide accounting services to Mr. Sabadash well before 2000.  His declaration explains:

21      10.    During the 1990s, I worked as a tax accountant in Beverly Hills, California.
        A. Sabadash was a client of mine.

22
23      11.    Over the years, A. Sabadash and I (and our spouses) became good friends.

        12.    In 1998, A. Sabadash asked me to move to Russia with A. Sabadash, to
24      become "business partners" with him and to take over the operation and growth of
        all of A. Sabadash's existing business ventures, as well as pursuing new business
25      ventures.

26      (Docket no. 16, Itkin Decl.)

27      His attached declaration estimates that he began providing tax accounting services to Mr.

28  Sabadash in 1993-1994.  (Itkin Decl., ¶ 13.)  By 1995, Mr. Sabadash and his wife became friends

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1    with Mr. Itkin and his wife, and their children also became friends. (*Id.*) This background is

2    important. Mr. Itkin and Mr. Sabadash built a relationship over many years, which is why they

3    trusted each other and entered into the partnership based upon an oral agreement.

4         Mr. Sabadash formed a partnership with Mr. Itkin in 1998, i.e., well before 2000. (Docket

5    no. 16, Itkin Decl., ¶¶ 10-20.) They then engaged in Partnership business for many years. (*Id.*, ¶¶

6    21-30, 43-72.) With the assistance of a tax attorney in Russia named Elena Gofman (then known

7    as Elena Nikolayevna Vasilieva), Mr. Sabadash and Mr. Itkin conducted an in-person Partnership

8    meeting on February 12, 2004, and executed minutes of that meeting (the "Partnership Minutes"),

9    which confirmed the Partnership they had entered into in 1998. (*Id.*, ¶31-33, Ex. A.) The

10   Partnership then hired that lawyer pursuant to an Information Services Agreement to provide tax-

11   related legal services to the companies owned by the Partnership. Mr. Sabadash and Mr. Itkin

12   signed that agreement. (*Id.*, ¶¶ 34, 36, Ex. B.)

13        Ms. Gofman advised the Partnership on tax matters and prepared annual year-end "Service

14   Delivery Reports" dated December 31, 2004, December 31, 2005, and December 31, 2006, that

15   described the work she did for the Partnership during each year, analyzed and advised on tax

16   circumstances of each substantial Partnership asset and listed the Partnership's assets her work

17   was focused on. (Docket no. 16, Itkin Decl., ¶¶ 35-36, Ex. B.) For example, in accordance with

18   her Information Services Agreement and her Service Delivery Reports dated December 31, 2004,

19   Ms. Vasilieva was to provide services specifically in relation to tax compliance of the Partnership

20   regarding multiple Partnership assets, including the residential real estate property located at 58

21   Beverly Park, Beverly Hills, CA, USA (purchased by Partnership in June 2004). (*Id.*)

22        Given the clear written evidence of the Partnership's existence, Mr. Sabadash now denies

23   that he ever met Elena Gofman, that the February 12, 2004 meeting occurred, that he signed the

24   February 12, 2004 Minutes, and that he signed the Information Services Agreement. (Sabadash

25   Decl., ¶¶ 5-7.) So, he would have the Court believe that Mr. Itkin (a credentialed accountant) and

26   Ms. Gofman (an attorney since 2001) are lying to the Court.[7] Had Mr. Sabadash's declaration

27

28   _____

     [7] Ms. Gofman's detailed declaration explains: "I am licensed to practice law in Russia. I would

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1  been filed with his Motion to Dismiss – as it should have been -- it would have been insufficient to

2  create a "bona fide dispute" as to the existence of the Partnership.  It is similarly insufficient to

3  form a basis for an award of fees and punitive damages.  He would not face any consequences of

4  lying to the Court.  He already is incarcerated.  There would not be an effective way for Mr.

5  Sabadash to be convicted and punished in the United States for lying under oath.

6  **G.    Mr. Itkin Did Not Pay Ms. Gofman $21,000 to Sue the Partnership**

7  Through counsel, Mr. Sabadash again speculates that Mr. Itkin  paid Ms. Gofman $21,000

8  to sue the Partnership.  This was an accusation made for the first time in Mr. Sabadash's Reply in

9  support of his Motion to Dismiss.  Mr. Itkin's Motion for Reconsideration was his first

10  opportunity to address it.  Ms. Gofman's declaration explains the falsity of that accusation:

11  5.    I acknowledge receipt of $21,000 from Mr. Itkin by wire transfers between
July 2018 and March 2019.  The payments were not "bribes."  A payment of
12  $2,000 was wired to me by Mr. Itkin on July 6, 2018.  That was the equivalent to
124,000 Russian rubles ("RUB").  Page 3 of the English translation of the Russian
13  Judgment that is attached hereto as Exhibit C states: "Defendant, represented by
Managing Partner G. U. Itkin, has voluntarily partially satisfied [Plaintiff's]
14  Demand for Payment by remitting 2,000 (two thousand) US dollars (an amount
equal to 124,000 (one hundred twenty four thousand) RUB)."  Thus, that payment
15  was accounted for in reaching the amount awarded in the Russian Judgment, which
was the equivalent to $23,130.83.  Thus, the Partnership was credited for the first
16  payment of $2,000 when I obtained the Recognition Judgment for the balance
owing to me by the Partnership.

17
6.    Attached hereto as **Exhibit E** is a true and correct copy of the motion for
18  judgment on the pleadings that was filed on my behalf in the Superior Court Action
on August 7, 2019.  As set forth in that motion, the Partnership was further credited
19  an additional $10,000 in payments that Mr. Itkin had wired me between July 2018
and March 2019, which is why the motion requested and I was awarded the balance
20  of $13,130.83 in the Recognition Judgment.  The sums of $2,000 and $10,000
account for $12,000 of the total amount of $21,000 that Mr. Itkin wired to me
21  between July 2018 and March 2019.  The balance of $9,000 was applied to the
equivalent of $5,000 in legal fees incurred by me in obtaining the Russian
22  Judgment and the equivalent of $4,126.72 in legal fees incurred by me in obtaining
recognition of the Russian Judgment in the United Kingdom.

23
*    *    *    *
24
13.    I filed the lawsuit against the Partnership in Russia in July 2018.  Mr. Itkin
25  did not pay me $21,000 or any other monies to file that lawsuit.  I filed it for the
purpose of collecting on the balance of the Partnership's debt to me, which is set

26

27  never jeopardize my license by engaging in the bribery and conspiracy that Mr. Sabadash has
28  falsely accused me of engaging in."  (Docket no. 89, Gofman Decl., ¶ 22.)

1  forth in the Russian Judgment.

2  (Docket no. 89, Gofman Decl., emphasis added.)

3  **H.    Mr. Itkin Did Not Rely On Forged Documents**

4  As explained above, Mr. Itkin and Ms. Gofman both have stated under oath that they saw

5  Mr. Sabadash signed the February 12, 2004 Minutes of the Partnership Meeting and the

6  Information Services Agreement with Ms. Gofman under which she prepared annual Reports for

7  the Partnership in 2004, 2005 and 2006.

8  Moreover, as explained above, prior to filing his Reply in support of his Motion to

9  Dismiss, Mr. Sabadash had not previously argued that his signatures on the Minutes and the

10  Information Services Agreement were forged.  He did not make that argument in the State Court

11  action, where those documents had been marked as trial exhibits.   (Itkin Decl., ¶¶ 9-11.)  He also

12  did not raise that argument before the Russian courts or in Ms. Gofman's action in the Los

13  Angeles Superior Court in which he filed an ex parte application for leave to file an amended

14  answer to Ms. Gofman's complaint.   (Docket no. 62, ¶ 10.)  That contention was made by Mr.

15  Sabadash's counsel for the first time in the Reply that was filed on April 15, 2025, in support of

16  Mr. Sabadash's Motion to Dismiss, when Mr. Itkin had no opportunity to respond in writing.

17  Mr. Sabadash also makes the colorful argument that his name was misspelled:

18  The alleged partnership seal in the lower left corner of the contract misspells Mr.
19  Sabadash's last name (the seal says Sadabash). (Zorkin Decl., Ex. 16.) This is not a
    mark of a successful business but of a back-alley counterfeiter. Mr. Itkin knows
    about the misspelling, yet he gave this Court a false translation which correctly
20  spells Mr. Sabadash's name. (*Cf.* Dkt. 16-1, Itkin Decl., Ex. B.).

21  (Docket no. 90, Fee Motion, at 14:3-8.)

22  It is ironic that a person incarcerated in Russia since 2014 on multiple counts of fraud has

23  the temerity to call Mr. Itkin a "back-alley counterfeiter."  He is projecting his own criminal

24  mindset on Mr. Itkin and Ms. Gofman.  Mr. Sabadash speculates that Mr. Itkin ordered the

25  misspelled seal.  Mr. Sabadash is incorrect.  Ms. Gofman's declaration explains:

26  Mr. Itkin did not order that stamp.  I ordered the Partnership stamp because
    according to Russian custom at that time every organization needed an official
27  stamp.  Since the Partnership did not have a stamp, I ordered it on an urgent basis
    and apparently a misspelling of Mr. Sabadash's name occurred.  I did not realize
28  that at the time.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7™ FLOOR
LOS ANGELES, CALIFORNIA 90071

1    (Docket no. 89, Gofman Decl., ¶ 17.)

2    Perhaps more importantly, Mr. Sabadash fails to explain why the misspelling is relevant,

3    except as purely speculative circumstantial evidence that the Minutes were fabricated and forged.

4    Mr. Sabadash again argues that the Russia version of the Minutes that were attached as

5    Exhibit A to the Opposition to the Motion to Dismiss are illegible – as if that is evidence that they

6    are fabricated.  He again is incorrect.  They were legible enough for the English translation to be

7    prepared.  (Docket no. 16, Exh. A; Docket no. 89, Exh. A.)  A more legible version is attached as

8    Exhibit D to the Motion for Reconsideration.  (Docket no. 89.)  Ms. Gofman's declaration

9    explains what happened to the original:

10   > I understand that Mr. Sabadash complained in his Reply that the February 12, 2024 [sic,
     > 2004] Partnership Minutes are illegible. The original of those Minutes were submitted to
11   > the Moscow Arbitration Court in my action to obtain the Russian Judgment, and it was not
     > returned to me. A more legible copy of the Partnership Minutes in Russian is attached as
12   > **Exhibit D**.

13   (Docket no. 89, Gofman Decl., ¶ 12.)

14   **I.    The Gofman Judgment Has Not Been Paid**

15   Mr. Sabadash newly argues that the Cassation Court noted that Mr. Itkin admitted that Ms.

16   Gofman's judgment "has been fully satisfied," yet she obtained a judgment in the Los Angeles

17   Superior Court and filed a proof of claim based upon the assertion that she was still owed

18   $13,130.82.  (Docket no. 90, Fee Motion, at 15-16.)  Her Superior Court judgment conclusively

19   holds otherwise.  Ninth Circuit precludes Mr. Sabadash from questioning that.  *In re Marciano,*

20   708 F.3d at 1128 ("If the creditor is entitled to have the judgment treated as valid in the state

21   courts, we see no reason why a bankruptcy court should be allowed to question the judgment.")

22   Mr. Sabadash could have sought leave to intervene in Ms. Gofman's Superior Court action

23   to raise this argument, but he chose not to do so.

24   The apparent inconsistencies between Mr. Itkin's statement to the Cassation Court and the

25   judgment by Ms. Gofman in Los Angeles Superior Court is easily explained.  As previously

26   explained, Ms. Gofman's April 2019 complaint that was filed in Superior Court stated that she

27   was awarded $23,130.83 by a Russian Court on October 18, 2018 (docket no. 16-1, Exh. E, at

28   4:18-19) and a copy of that judgment was attached as Exhibit 2 to her Complaint.  (*Id.*)  When she

1    filed her motion for judgment on the pleadings in her Superior Court action on August 7, 2019,

2    she acknowledged that she had been paid $10,000.00, which left a balance due of $13,130.83.

3    (Docket no. 89-1, Exh. E, at 7:6-8.)  The Superior Court's November 7, 2019 judgment awarded

4    her that amount.  (Docket no. 16-1, Exh. F.)

5        Regarding Mr. Itkin's statement to the Russian Cassation Court, he in fact paid Ms.

6    Gofman a total of $21,000 up to March 2019.  He understood it had been applied by her under the

7    Russian judgment and he considered the judgment as having been satisfied, which is what the

8    Cassation Court was told, whereas he later learned that from Ms. Gofman that she applied

9    $2,000.00 as a credit before receiving the Russian judgment for $23,130.83, she has applied

10   $10,000.00 against the judgement before being awarded $13,130.83 by the Los Angeles Superior

11   Court, and she had applied $9,000.00 to fees she had incurred in Russia and the United Kingdom

12   in connection with her dispute with the Partnership rather than applying it to the principal amount

13   of the debt, so she actually was owed net amount of $13,130,83.  (Itkin Decl., ¶ 16.)

14       **J.        The Reasonableness of Fees Cannot Be Determined Due to the Failure**

15       **to Allocate Them, and Certain Fees Are Not Compensable**

16       Mr. Sabadash's Motions fail to allocate the fees between the 19-page Fee Motion under

17   section 303(i) and the 18-page Sanctions Motion under FRBP 9011.  Instead, he requests the same

18   amount of $26,840 for "48.8 hours on research and analysis, factual investigation, drafting the

19   motion, and declarations" for both Motions.  He attaches a "detailed billing summary" as Exhibit

20   27 to his declaration, leaving the Court and Mr. Itkin to guess how to allocate fees.  There are

21   multiple entries for the motion for fees and the motion for sanctions.   The entries mentioning

22   "sanctions" or "FRBP 9011" appear to total 22.3 hours, i.e., **$12,265**.  (Zorkin Decl., pp. 344-347

23   of 348.)  That means that $14,575 was incurred in connection with the Fee Motion.

24       Similarly, Mr. Sabadash's Motions fail to allocate fees incurred in objecting to the

25   creditors' claims, including the original defective objection.  Mr. Sabadash fails to cite any

26   authority for the proposition that fees incurred in objecting to claims are compensable as fees

27   incurred on obtaining dismissal of an involuntary petition.

28       Indeed, the Court did not sustain Mr. Sabadash's objection to claims 1 to 10, so he cannot

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7th FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7th FLOOR
LOS ANGELES, CALIFORNIA 90071

1   establish that he prevailed on those objections in obtaining dismissal of the involuntary petition.

2   There is no basis for awarding him fees incurred in objecting to the claims, especially under the

3   defective initial omnibus objection to claims 1 to 10.  Pages 339, 340 and 342 of 348 of Exhibit 27

4   to Mr. Zorkin's declaration contain entries on April 15 and 16, 2025, for 2.0 hours (**$1,100**) for the

5   defective omnibus objection, which should not be compensable.  Then there are entries between

6   April 29 and 30, 2025 for 7.8 hours and on May 27, 2025 for 3.6 hours, for a total of 14.4 hours at

7   $550 per hour, equaling **$6,270**.

8           **K.      Section 303(i) Does Not Authorize An Award of Fees Against Counsel**

9                   **for Mr. Itkin and Counsel for the Creditors**

10          The Fee Motion fails to cite any case law that supports the proposition that section 303(i)

11  authorizes a Court to award a debtor (or a prevailing general partner) fees and costs against

12  counsel for the petitioning general partner or counsel for joining creditors.  The Fee Motion states:

13              Mr. McCarthy and Mr. Caseres [sic] should be jointly and severally
                liable with Mr. Itkin for their role in the bad faith conduct as
14              described above. *See In re Cadena*, 634 B.R. at 1056–57 (ordering
                counsel jointly and severally liable with petitioner for fees, damages,
15              and sanctions.); *In re Fox Island Square P'ship*, 106 B.R. at 971
                (same).

16          Mr. Sabadash's citation to those cases is knowingly misleading.  Those cases clearly do

17  <u>not</u> stand for the proposition that section 303(i) is a basis for awarding fees and costs against

18  counsel.  In fact, in *In re Cadena*, 634 B.R. 1038, 1050 (Bankr. C.D. Cal. 2022), the Honorable

19  Maureen Tighe expressly held that fees could <u>not</u> be awarded against the petitioner's counsel

20  under section 303(i).  In that case, fees only were awarded against the petitioner's counsel under

21  FRBP 9011.  *Id.* at 1053-1054.  The impropriety of awarding fees against counsel is addressed in

22  the concurrently-filed Opposition to the Sanctions Motion.

23          *In re Fox Island Square P'ship*, 106 B.R. 962, 970 (Bankr. N.D. Ill. 1989), sanctions were

24  awarded against counsel under FRBP 9011.  The Court held that section 303(i) "does <u>not</u> provide

25  for an award against the petitioners' attorney." *Id.* at 970 (emphasis added).

26          Thus, the two cases cited by Mr. Sabadash as supporting an award of fees against counsel

27  expressly <u>contradict</u> the proposition for which Mr. Sabadash cites them.  Mr. Itkin questions how

28

1   Mr. Zorkin believes he satisfied the requirements of FRBP 9011 in seeking an award of fees

2   against counsel <u>under section 303(i)</u> by the Fee Motion.  FRBP 9011(b)(2) ("By presenting to the

3   court a…written motion…an attorney…certifies that, to the best of the person's knowledge,

4   information, and belief formed after an inquiry reasonable under the circumstances:…(2) the

5   claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous

6   argument to extend, modify, or reverse existing law, or to establish new law….")

7          As more fully explained in the opposition to the Sanctions Motion, an award of fees

8   against Mr. McCarthy is unwarranted.  As explained in paragraphs 4 to 10 of his attached

9   declaration, Mr. McCarthy  diligently investigated facts supports the existence of the Partnership

10  and claims of creditors that were not in bona fide dispute in the two weeks prior to the filing of the

11  Involuntary Petition; he collected supporting documents in that regard that eventually were

12  presented to the Court in opposition to Mr. Itkin's Motion to Dismiss; and he concluded that there

13  were at least three legitimate reasons for filing the petition, which are explained above.  They are

14  the same reasons that Mr. Itkin filed the petition.

15         As also explained in the opposition to the Sanctions Motion and in Mr. Caceres' attached

16  declaration, an award of fees against Mr. Caceres is unwarranted.  Only after the claims discussed

17  by Mr. Sabadash (claim nos. 1, 2, 6, 7, 8, 9, and 11), which were verified under oath and

18  supported with explanations, were filed, did Charles Shamash (not Mr. Caceres) sign and file

19  joinders for those seven creditors (docket nos. 10-11, 13-14, 49-50,  and 64), so Mr. Caceres

20  cannot be subject to sanctions for that.  Moreover, Mr. Caceres did <u>not</u> sign the above seven filed

21  claims, or any filed claims (nor did Mr. Shamash), so he cannot be subject to sanctions for that.

22  Mr. Caceres only signed and filed oppositions to objections to nine creditor's claims with a

23  supporting declaration from Ms. Gofman, as well as supporting declarations from each of the

24  claimants, along with supporting documents.  (Docket nos. 52-59 and 61-62.)  Finally, contrary to

25  Mr. Sabadash's speculation, Mr. Caceres did not blindly rely on Mr. Itkin for information

26  regarding the joining creditors.  Instead, he and Mr. Shamash adequately investigated facts in

27  support of the claims.  *See* Caceres Decl., ¶¶ 4-7; Shamash Decl., ¶¶ 3-7.

28  / /

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

**III.    THE COURT SHOULD NOT CONSIDER NEW ARGUMENTS AND EVIDENCE PRESENTED BY MR. SABADASH FOR THE FIRST TIME WITH HIS REPLY BRIEFS**

LBR 9013-1(c)(3) requires that a motion be accompanied by: "A written statement of all reasons in support thereof, together with a memorandum of the points and authorities upon which the moving party will rely." LBR 9013-1(g)(4) states: "New arguments or matters raised for the first time in reply documents will not be considered."

Mr. Sabadash previously "saved" significant evidence and arguments for his reply in support of his Motion to Dismiss -- spinning a story of bribery and forgery -- knowing that Mr. Itkin would have no opportunity to respond in writing. Mr. Itkin and his counsel wish to avoid a similar denial of due process in connection with Mr. Sabadash's pending Fee Motion and Sanctions Motion. Thus, they respectfully request that the Court decline to consider new arguments and evidence raised by Mr. Sabadash in his Reply briefs filed in support of his Fee Motion and Sanctions Motion.

**IV.    CONCLUSION**

Based upon the foregoing, Mr. Itkin, Mr. McCarthy, and Mr. Caceres  respectfully request that the Court deny the Fee Motion in its entirety.

DATED: August 5, 2025

HILL, FARRER & BURRILL LLP                    CACERES & SHAMASH, LLP

By:  _/s/ Daniel J. McCarthy_                    By: _____
    Daniel J. McCarthy                              Charles Shamash
Attorneys for Petitioning General Partner        Attorneys for Creditors and Joseph E. Caceres, in
GARRY Y. ITKIN, and Daniel J. McCarthy,          pro per
in pro per

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF GARRY Y. ITKIN

I, Garry Y. Itkin, declare:

1.     I respectfully submit this declaration in opposition to "Putative Partner Alexander Sabadash's Motion for Fees and Damages, Under 11 U.S.C. § 303(i)" (the "Fee Motion," docket no. 90), and "Putative Partner Alexander Sabadash's Motion for Fees and Damages under 11 U.S.C. § 303(i) and Motion for Sanctions under FRBP 9011" (the "Sanctions Motion," docket no. 91) that were filed by Alexander Sabadash on July 1, 2025.

2.     This declaration supplements my 24-page declaration that was filed on April 8, 2025 (docket no. 16) in opposition to the "Putative Partner Alexander Sabadash's Motion to Dismiss Involuntary Petition under FRCP 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Summary Judgment" (the "Motion to Dismiss") and my 5-page declaration that was filed on July 1, 2025, with my "Motion for Reconsideration of Order Dismissing Involuntary Case [Docket No. 76] and Memorandum of Decision [Docket No. 75]" (docket no. 89) ("my Prior Declarations").

3.     Before the filing of the involuntary petition against Itkin & Sabadash on February 19, 2025, I consulted with bankruptcy attorney Daniel J. McCarthy and with Jon Atabek, who is one of my attorneys in Los Angeles Superior Court case no. BC647351 entitled *AFB P-Trading One, Inc., et al v. Garry Y. Itkin, et al.* (the "Superior Court Action"}.

4.     For all the reasons stated in my Prior Declarations, I know that I entered into a verbal partnership agreement with Alexander Sabadash in 1998; that we confirmed that verbal agreement by the written Minutes of a partnership meeting between us on February 12, 2004; and that the Partnership has not been dissolved.  In fact, I sued for dissolution of the partnership by my first cause of action in the Superior Court action, which has remain stayed since the Chapter 15 case of Golden Sphinx Limited was filed on August 9, 2022.

5.     I understand that my motives for filing the involuntary petition against Itkin & Sabadash have been questioned.  After consulting with Mr. McCarthy and Mr. Atabek, I concluded that there were several very good reasons to file the petition.  First, I was aware and still am aware that the Partnership has multiple creditors, who are owed in excess of $4.6 million.  The Involuntary Petition was filed to benefit the Partnership Creditors by having the petition granted

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   and a trustee appointed to aggregate assets and pay those creditors.

2       6.      Second, a key asset is the Beverly Hills property, which is owned by the

3   Partnership.  I believe it makes more sense for this Court to determine the existence of the

4   Partnership under California law, to determine ownership of that Property under California law,

5   and to determine the validity of claims under California law, rather than the Jersey Court doing so

6   in the liquidation proceeding of Golden Sphinx Limited, where the claims of those creditors

7   cannot be addressed, if I were to prevail there.

8       7.      Third, I expected that the Jersey Court would recognize the Partnership's Chapter 7

9   case.  Indeed, I expected the Jersey Court to defer to this Court in the Partnership's Chapter 7 case

10  on matters bearing upon the Partnership because (1) as stated above, issues under California law

11  predominate the existence of the Partnership and the ownership of the Beverly Hills property; (2)

12  Golden Sphinx Limited and Mr. Sabadash (represented by Michael Zorkin) and I all are parties to

13  the stayed Superior Court action in which the dissolution of the Partnership was presented by my

14  first cause of action in my Second Amended Cross-Complaint; (3) the Superior Court action was

15  fully prepared by all parties for trial and the jury trial actually commenced in March 2020, until a

16  mistrial was declared due to Covid-19, so it makes sense for the Partnership-related issues to be

17  tried in a court in Los Angeles, whether it is the Bankruptcy Court or the Superior Court; (4) the

18  dispute in the Jersey Court regarding these issues is at a very early stage; (5) when this Court

19  asked the Jersey Court for instructions by its letter dated April 10, 2024, the Jersey Court

20  expressed indifference as to how this Court should rule; and (6) the Jersey Court cannot address

21  the concerns of the Partnership's creditors, if I succeed in showing that the Partnership existed and

22  that it owns the Beverly Hills property, given that they are not creditors of Golden Sphinx Limited

23  and are not parties to the liquidation proceeding in Jersey.

24      8.      I understand that Mr. Sabadash has argued that the Jersey Court adjourned a

25  February 25, 2025 hearing due to the Involuntary Petition, which in part concerned an order that I

26  pay costs of £78,432 and that he respond to requests for information.   I understand that the short

27  adjournment was the consequence of the Involuntary Petition, but I am unaware of any prejudice

28  to Mr. Sabadash, who remains incarcerated in Russia, or the Joint Liquidators.  While the

1    temporary adjournment of the Jersey proceeding was the consequence of the automatic stay in

2    effect in the Partnership's involuntary Chapter 7 case, I have not sought to escape the orders of the

3    Jersey Court.  That was not my motivation in filing the Involuntary Petition.  It was and remains

4    my understanding that the filing of the Involuntary Petition was never going to cure my alleged

5    breaches of orders of the Jersey Court regarding the payment of fees and providing responses to

6    requests for information.  In fact, those responses were filed and served by my counsel in Jersey

7    on August 4, 2025.

8         9.    In the Superior Court action, the Minutes of the February 12, 2004 Partnership

9    Meeting and the Information Services Agreement with Elena Gofman, f/k/a Elena Nikolayevna

10   Vasilieva that also was dated February 12, 2004 (Exhibits A and B to my declaration that was

11   filed on April 8, 2025) were trial exhibits.  Exhibits C, E, F and H that to that declaration also

12   were trial exhibits in the Superior Court Action. Exhibit C to that declaration was Judgment dated

13   September 14, 2018, in Ms. Gofman's favor against the Partnership.  Exhibit E was the Complaint

14   filed on April 19, 2019, by Ms. Gofman in the Los Angeles Superior Court commencing case no.

15   19STCP01412 to domesticate her Russian judgment against the Partnership. Exhibit F was the

16   Judgment entered in Ms. Gofman's favor against the Partnership in that action on November 7,

17   2019.  Exhibit H was a copy of cash flow statements that I prepared for the Partnership from the

18   period February 2005 to August 2010.

19        10.   Thus, Mr. Sabadash and his counsel were well aware of those documents.

20        11.   At no time did Mr. Sabadash or his counsel in the Superior Court action contend

21   that Mr. Sabadash's signatures on the Minutes of the February 12, 2004 Partnership Meeting and

22   the Information Services Agreement were forged  That contention was made by Mr. Sabadash's

23   counsel for the first time in the Reply that was filed on April 15, 2025, in support of Mr.

24   Sabadash's Motion to Dismiss.

25        12.   As I have stated in my Prior Declarations, I saw Mr. Sabadash sign the Minutes and

26   the Information Services Agreement on February 12, 2004.

27        13.   Alexander Sabadash and his wife Larisa became my clients in approximately 1993-

28   1994. Starting at the time and continuing through the late 1990s, did tax work for their family, as

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

-38-

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

well as bookkeeping and tax work for business AFB Trading One, Inc. and few other businesses. Starting in approximately 1995, Mr. Sabadash and I became very close friends, our wives also became very close friends, and our children also became very close friends. I have many photos of us from that period of time.

14. Mr. Sabadash contends that he hired me in approximately 2000, and that I was not his partner. The falsity of that statement is shown by the facts that I was not treated as an employee. I was not paid the same amounts (weekly or monthly) as any employee would have been paid, I was not provided with any kind of payroll statements, taxes were not withheld, and I was not provided with W-2s.

15. Attached hereto as **Exhibit A** is a true and correct copy of the Judgment of the Royal Court of Jersey dated May 23, 2023, in the liquidation proceeding of Golden Sphinx Limited.

16. I understand that Mr. Sabadash has argued that the Cassation Court noted that I admitted that Ms. Gofman's judgment "has been fully satisfied," yet she obtained a judgment in the Los Angeles Superior Court and filed a proof of claim based upon the assertion that she was still owed $13,130.82. This was due to a misunderstanding on my part regarding how payments that I had made to Ms. Gofman on behalf of the Partnership had been applied by her. I in fact had paid Ms. Gofman a total of $21,000 up to March 2019. I understood the payments had been applied by her to her Russian judgment and I considered the judgment as having been satisfied, which is what the Cassation Court was told, whereas I later learned that from Ms. Gofman that she applied $2,000.00 as a credit before receiving the Russian judgment for $23,130.83, she has applied $10,000.00 against the judgement before being awarded $13,130.83 by the Los Angeles Superior Court, and she had applied $9,000.00 to fees she had incurred in Russia and the United Kingdom in connection with her dispute with the Partnership rather than applying it to the principal amount of the debt, so she actually was owed net amount of $13,130,83.

17. I am informed that Mr. Sabadash's fourth trial in Russia has already started. He is officially charged with violations of (a) Russian Penal Code section 159.4 for "fraud in especially large scale"; and (b) Russian Penal Code section 160.4 for "misappropriation or embezzlement

1   committed on an especially large scale by organized group."  Attached hereto as **Exhibit B** is a

2   true and correct copy of a screenshot from the Russian court's website at

3   https://mos-gorsud.ru/rs/golovinskij/services/cases/criminal/details/f401b600-66d7-11f0-9010-

4   a34a20711200?participant=%D0%A1%D0%B0%D0%B1%D0%B0%D0%B4%D0%B0%D1%88

5   +%D0%90.%D0%92.  It describes the charges against Mr. Sabadash in that pending trial.  The

6   information can be translated from Russian to English on that website.

7       18.    I periodically spoke with Ms. Gofman, calming her down and promising to pay her

8   judgment as soon as my lawsuit in the Los Angeles Superior Court to dissolve Partnership was

9   done and Partnership assets are sold.

10      19.    In the Superior Court action, Judge Stern ruled that all Declarations of Alexander

11  Sabadash would not be allowed into evidence because Mr. Sabadash could not be cross examined

12  on them as he was unavailable for deposition.

13      The foregoing is within my personal knowledge and if called as a witness in this matter I

14  could and would competently testify thereto.

15      I declare under penalty of perjury of the laws of the United States of America that the

16  foregoing is true and correct and that this declaration was executed on August 4th, 2025, at

17  Beverly Hills, California.

18  _____
    *Garry Itkin*
19  Garry Y. Itkin

20

21

22

23

24

25

26

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

### DECLARATION OF DANIEL J. McCARTHY

I, Daniel J. McCarthy, declare:

1.    I am attorney and am duly qualified to practice before all State and Federal Courts in California.  I was licensed to practice law in California in 1981, and I have been in good standing since then.  I have never been the subject of any disciplinary proceedings before the State Bar or any court.  Through my professional corporation, I am a partner at the law firm of Hill, Farrer & Burrill, LLP, in Los Angeles, California.

2.    I am solely responsible for representing Garry Y. Itkin as the petitioning general partners in the involuntary chapter 7 bankruptcy case of Itkin & Sabadash bearing case no. 2:25-bk-11235-NB.

3.    Throughout my 44-year career in law, I have specialized in matters in bankruptcy court.  I am familiar with the requirements for filing an involuntary petition on behalf of creditors and general partners.

4.    Because I am familiar with the potential consequences under 11 U.S.C. § 303(i) of the dismissal of an involuntary petition, I spent two weeks between February 5 and 18, 2025, reviewing the grounds for an involuntary filing against Itkin & Sabadash with Mr. Itkin.  In particular, I focused on the evidence of the existence of the Partnership and creditors  that were owed liquidated sums, whose claims were not in bona fide dispute.  In that regard,  Mr. Itkin provided me a list of creditors, the basis of their claims against the Partnership and multiple documents, including the Minutes of a partnership meeting between Alexander Sabadash and Mr. Itkin dated February 12, 2004, that were signed by both of them (the "Partnership Minutes"); an Information Services Agreement between them (on behalf of Itkin and Sabadash partnership) and a Russian lawyer named Elena Nikolayevna Vasilieva that also was signed by both of them, an Information Summary from the Ninth Arbitration Court of Appeal in Russia dated August 6, 2020; and the judgment entered on November 7, 2019, in favor of  Elena Gofman  and against the Partnership in Los Angeles Superior Court case no. 19STCP01412.  Copies of these documents were attached as exhibits to the Opposition to "Putative Partner Alexander Sabadash's Motion to Dismiss Involuntary Petition under FRCP 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1 Summary Judgment" (the "Motion to Dismiss") that I filed on behalf of Mr. Itkin on April 8,

2 2025.  (Docket no. 16.)

3      5.    I also had some familiarity with the disputes and pleadings filed in Los Angeles

4 Superior Court case no. BC647351 entitled *AFB P-Trading One, Inc., et al v. Garry Y. Itkin, et al.*

5 because I had sought relief from the automatic stay in the Chapter 15 case of Golden Sphinx

6 Limited to permit that case to proceed to trial.  In particular, I was very familiar with the Second

7 Amended Cross-Complaint of Mr. Itkin in that case, which was the basis of his declaration that

8 was filed with this Court on April 8, 2025, in opposition to Mr. Sabadash's Motion to Dismiss.   I

9 knew that trial had commenced in that action in March 2020 and that after approximately six days

10 a mistrial had been declared due to Covid-19.

11      6.    I also had some familiarity with the liquidation proceeding of Golden Sphinx

12 Limited in Jersey.  I understood that the dispute between the joint liquidators and Mr. Itkin was at

13 very early stage, in contrast with the Superior Court action in which the parties and their counsel

14 had prepared for and commenced trial.  I also understood that the Partnership's multiple creditors

15 were not creditors in or parties to the liquidation proceeding of Golden Sphinx Limited in Jersey.

16      7.    After consulting with Mr. Itkin and state court counsel for Mr. Itkin, I concluded

17 that there were several very good reasons to file the petition, that the filing would be in good faith

18 and that it would not be subject to dismissal.  First, based upon the fact that the Partnership has

19 multiple creditors, the Involuntary Petition would benefit the Partnership Creditors by having the

20 petition granted and a trustee appointed to aggregate assets and pay those creditors.

21      8.    Second, there is a dispute as to the ownership of the Beverly Hills property, which

22 Mr. Sabadash contends is owned by the Partnership.  I believe it makes more sense for this Court

23 to determine the existence of the Partnership under California law, to determine ownership of that

24 Property under California law, and to determine the validity of claims under California law, rather

25 than the Jersey Court doing so in the liquidation proceeding of Golden Sphinx Limited, where the

26 claims of those creditors cannot be addressed, if Mr. Itkin were to prevail there.

27      9.    Third, I expected that the Jersey Court would recognize the Partnership's Chapter 7

28 case.  Indeed, I expected the Jersey Court to defer to this Court in the Partnership's Chapter 7 case

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1    on matters bearing upon the Partnership because (1) as stated above, issues under California law

2    predominate the existence of the Partnership and the ownership of the Beverly Hills property; (2)

3    Golden Sphinx Limited and Mr. Sabadash (represented by Michael Zorkin) and Mr. Itkin all are

4    parties to the stayed Superior Court action in which the dissolution of the Partnership was

5    presented by Mr. Itkin's first cause of action in his Second Amended Cross-Complaint; (3) the

6    Superior Court action was fully prepared by all parties for trial and the jury trial actually

7    commenced in March 2020, until a mistrial was declared due to Covid-19, so it makes sense for

8    the Partnership-related issues to be tried in a court in Los Angeles, whether it is the Bankruptcy

9    Court or the Superior Court; (4) I am informed that the dispute in the Jersey Court regarding these

10   issues is at a very early stage; (5) when this Court asked the Jersey Court for instructions by its

11   letter dated April 10, 2024, the Jersey Court expressed indifference as to how this Court should

12   rule; and (6) the Jersey Court cannot address the concerns of the Partnership's creditors, if Mr.

13   Itkin succeeds in showing that the Partnership existed and that it owns the Beverly Hills property,

14   given that they are not creditors of Golden Sphinx Limited and are not parties to the liquidation

15   proceeding in Jersey.

16          10.    I understand that Mr. Sabadash has argued that the Jersey Court adjourned a

17   February 25, 2025 hearing due to the Involuntary Petition, which in part concerned an order that

18   Mr. Itkin pay costs of £78,432 and that he respond to requests for information.   The Involuntary

19   Petition was not filed for the purpose of obtaining that adjournment.  I am unaware of any

20   prejudice to Mr. Sabadash, who remains incarcerated in Russia, or the Joint Liquidators.  While

21   the temporary adjournment of the Jersey proceeding was the apparent consequence of the

22   automatic stay in effect in the Partnership's involuntary Chapter 7 case, it was not a reason for

23   filing the Involuntary Petition.  It was and remains my understanding that the filing of the

24   Involuntary Petition was never going to cure Mr. Itkin's alleged breaches of orders of the Jersey

25   Court regarding the payment of fees and providing responses to requests for information.  I am

26   informed that those responses were filed and served by Mr. Itkin's counsel in Jersey on August 4,

27   2025.

28          11.    On July 1, 2025, I filed a Motion for Reconsideration of the Dismissal Order and

1   Memorandum on behalf of Mr. Itkin.  (Docket no. 89.)  Pursuant to this Court's procedures, it was

2   not set for hearing.  Instead, the next day, I called chambers and left a message informing the

3   Court of the Motion and asking whether a courtesy copy needed to be delivered.  I received a

4   prompt call back from a gentlemen who informed me that my message had been received and that

5   a courtesy copy was not required.  As of the date of this Opposition, the Court has not scheduled

6   the Motion for Reconsideration for hearing and it has not denied the Motion.

7        12.    I have never been served by anyone with a motion under Federal Rule of

8   Bankruptcy Procedure 9011 relating to the involuntary Chapter 7 case of Itkin & Sabadash, except

9   for the pending Fee and Sanctions Motions.  In fact, in my 44 years of practicing law, I have never

10  been served with a motion seeking sanctions against me or any client pursuant to Federal Rule of

11  Bankruptcy Procedure 9011 or Federal Rule of Civil Procedure 11.

12       The foregoing is within my personal knowledge and if called as a witness in this matter I

13  could and would competently testify thereto.

14       I declare under penalty of perjury of the laws of the United States of America that the

15  foregoing is true and correct and that this declaration was executed on August 5, 2025, at Los

16  Angeles, California.

17                          /s/ Daniel J. McCarthy
                            Daniel J. McCarthy
18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF JOSEPH E. CACERES**

I, Joseph E. Caceres, declare:

1.     I am attorney and am duly qualified to practice before the Courts of the State of California and the Federal District Court for the Central District of California.  I was licensed to practice law in California in 1993, and I have been in good standing since then.  Through my professional corporation, I am a partner at the law firm of Caceres & Shamash, LLP ("C&S, LLP"), in Beverly Hills, California.

2.     C&S, LLP represented several creditors in filing joinders (which my partner Charles Shamash filed) to the involuntary petition herein, and in preparing oppositions to objections to claims filed by Mr. Sabadash in the case (which I filed).

3.     Throughout my 32-year career in law, I have focused on matters in bankruptcy court.  Similarly, my partner Charles Shamash was admitted to practice law in California in 1995, and we have been partners in C&S, LLP through our professional corporations since 2003.  Hence, we are both familiar with the requirements for filing documents and pleadings on behalf of debtors, creditors, and other parties in interest.  I would also add that neither of us has ever been the subject of any disciplinary proceedings before the State Bar or any court; neither of us has ever been sanctioned by any court or even served with a Rule 11 motion; and we have never been sued for malpractice.

4.     In seeking to have me sanctioned, Mr. Sabadash asserts in his motion that I did not conduct a reasonable inquiry into creditors' claims before filing the claims and joinders he discusses in his motion (claim  nos. 1, 2, 6, 7, 8, 9, and 11).  As a threshold matter, he fails to note the following:

• Although my firm filed 5 of the above 7 claims as a courtesy to the claimants, (along with one other claim not mentioned by Mr. Sabadash, for a total of 6 claims) (claims 1 and 2 were filed by the claimants directly, as were three others not mentioned), I did not sign any proofs of claim (nor did Mr. Shamash); all 11 filed claims were signed by the claimants themselves.

• I did not sign the joinders.  Regardless, only after he was comfortable with the

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵀᴴ FLOOR
LOS ANGELES, CALIFORNIA 90071

1  bona fides of the above claims, which were verified under oath by the claimants, did Mr. Shamash

2  sign and file joinders for those seven creditors, as well as three others (docket nos. 10-11, 13-14,

3  49-50, 60, and 64).

4  • I did sign and file oppositions to Mr. Sabadash's objections to nine creditors'

5  claims, with a supporting declaration from Ms. Gofman, as well as supporting declarations from

6  each of the claimants, along with supporting documents from all of them, including translations of

7  Russian documents from a certified court translator who Yakov Fridman (Mr. Fridman is

8  identified in paragraph 5 below) engaged and communicated with, and who also emailed and

9  spoke directly with Mr. Shamash (Docket nos. 52-59, and 61-62).[8]

10  • At no time did Mr. Sabadash's counsel provide me or my firm with a proposed

11  9011 motion or safe harbor letter, regarding any of the foregoing.

12      5.      Regardless, contrary to Mr. Sabadash's speculation, my firm did not blindly rely on

13  Mr. Itkin or Mr. McCarthy for information regarding the joining creditors, and did adequately

14  investigate facts in support of the claims (this applies to Mr. Shamash also although the motion

15  was not filed against him).  This included reviewing documents and information provided by the

16  creditors themselves, some directly and several through their Russian lawyer named Yakov

17  Fridman (who was actually in Russia and was the point of contact for Elena Gofman, Ildar

18  Shadaev, Maria Samsonova, Maria Habarova, Evgeniy Avilov, and Aleksandr Grant, six of the

19  joining creditors, the first five for whom I filed oppositions to Mr. Sabadash's objections to

20  claims).  This included both Mr. Shamash and myself emailing back and forth with Mr. Fridman at

21  different times going back to March 3, 2024 (when he first contacted Mr. Shamash to discuss the

22  matter), at all hours of the day given the time differential, requesting information and documents

23  regarding the claims.

24      6.      Our efforts also included Mr. Shamash and I discussing by phone and/or emailing

25  back and forth regarding the matter with the other claimants who were not represented by Mr.

26

27  [8] Shamash informed me that he actually interviewed the interpreter and reviewed his website (and
that the interpreter speaks both Russian and Hebrew, the latter of which Shamash understands and

28  spoke to him in).  Shamash also paid him directly for his services.

1    Fridman, in order to obtain information and documents (such as Jeff Ratner of Ratner &

2    Associates, Victoria Lerman of Progressive Management, Inc., Alexei Kurochkin, and Jon

3    Atabek).  For the sake of transparency and candor to the Court, we did indeed discuss the case or

4    request certain information from Mr. McCarthy or Mr. Itkin at times, but they were not the

5    primary source of information or documents regarding the claims, much less the "sole source" or a

6    "puppetmaster" as Mr. Sabadash speculates.

7           7.       With respect to the oppositions to the objections to claims that I filed, those

8    documents speak for themselves (Docket nos. 52-59, and 61-62), so I will not repeat the

9    arguments made in those oppositions here.  I note the following, however with regard to the

10   claims that Mr. Sabadash specifically mentions in his motion:

11         • With regard to the Gofman claim (POC 6) (and all others), Mr. Sabadash's

12   objections to the claims were largely based on the premise that the Itkin & Sabadash Partnership

13   did not exist.  For the reasons stated in this opposition brief and in the attached Itkin Declaration,

14   as well as in the Opposition to the Objection to the Gofman claim [Docket no. 56], I had a

15   reasonable, good faith belief that the partnership existed, thereby removing the main pillar of

16   Sabadash's assertions that Gofman's (and others' claims) were not valid.

17         • With regard to the Aleksandr Grant claim (POC 11), this claim was never

18   objected to by Mr. Sabadash, and only raised for the first time in his Sanctions Motion.  Hence,

19   even if the claim were in fact frivolous, it could not have caused Mr. Sabadash to incur any

20   damages or costs, even if he was otherwise entitled to collect such damages and costs as a self-

21   described "putative partner."  I also note that I did not sign this proof of claim.  Regardless, my

22   office did not conspire to falsify a claim with Mr. Itkin regarding this matter, as Mr. Sabadash

23   would have this Court believe.  Rather, my office received information and documents through

24   Yakov Fridman.  In short, we reasonably believed the claim to be valid based on the documents

25   we examined, and the fact that the entities against which Mr. Grant had obtained an arbitration

26   decision were owned by the Itkin & Sabadash Partnership.[9]

27

28   [9]Indeed, the award attached to the Grant claim contained a recitation that the arbitrator examined

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7ᵗʰ FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1

2      A copy of the arbitration award and an English translation of that award is attached to Mr.

3  Grant's proof of claim no. 11.  It is dated August 31, 2021.  Mr. Zorkin contends it is "fake"

4  because the arbitrator supposedly emailed an order dated August 25, 2021, that is attached as

5  Exhibit 22 to Mr. Zorkin's declaration, and it stated that the arbitrator lacked jurisdiction.  At no

6  point did I receive any information indicating that this arbitration award was falsified, or have any

7  reason to believe it was.  Further, if the Court compares Exhibit 22 to Mr. Zorkin's declaration

8  (the alleged August 25, 2021 order) to the order attached to Mr. Grant's proof of claim, which is

9  Exhibit 24 to Mr. Zorkin's declarations, it is notable that the Russian version of the alleged August

10  25, 2021 order attached to Mr. Zorkin's declarations does <u>not</u> have the arbitrator's official round

11  stamp (docket no. 90-1 and 91-1, at 257 of 348), which means it is <u>not</u> authenticated as a filing in

12  that arbitration.  However, the August 31, 2021 order that is attached to Mr. Grant's proof of claim

13  contains that round stamp on the first page and the last page.  (Docket no. 90-1 and 91-1, at 266

14  and 286 of 348.)  The signature block in the translated version of the August 31, 2021 order states:

15      Sole judge, Knyazev Dmitry Valerievich [Signature]

16      Ad hoc tribunal for specific dispute resolution

17      Official round seal of the issuing authority

18      The fact that it contains the official round seal suggests that the August 31, 2021 order is

19  legitimate and that the August 25, 2021 order is in fact a fake order.  In short, there was no reason

20  for Mr. Shamash or I  to suspect that the August 31, 2021 order was fake.

21      Moreover, I note that Mr. Zorkin fails to explain in the Fee Motion and the Sanctions

22  Motion why he has not taken any steps with the arbitrator to vacate the August 31, 2021 order, if

23

24  Ms. Gofman's case, and that pursuant to Gofman's judgment, the partnership of Itkin & Sabadash
25  exists.  Then, the court went on to hold that "the Defendant companies and the assets they hold in
   fact belong to the General Partnership 'Itkin and Sabadash,' although they are nominally
26  registered under the name of Sabadash A.V. and the Amber Trust, which is managed by Sabadash
   A.V."  The named defendant companies against which Mr. Grant's assignor (Davilla Investing
27  Limited) obtained the award were Golden Spirits Limited, AFB Trading One, Inc., and Golden
28  Sphinx Limited.

1    he truly believes it was fabricated.

2    • With regard to the "Russian Lawyers" Habarova (POC 7), Shadaev (POC 8), and

3    Samsonova (POC 9), for the reasons stated in the Opposition to the Objection to these creditors'

4    claims [Docket nos. 57-59], I had a reasonable, good faith belief that the claims were valid.  First,

5    for the reasons stated above, I reasonably believed that the Itkin & Sabadash Partnership existed.

6    Second, these are all lawyers who defended the Itkin & Sabadash Partnership against the lawsuit

7    filed by Gofman, and I had no reason to believe there was anything amiss; for example, I had no

8    reason to believe that Mr. Itkin paid Ms. Gofman $21,000 to sue the Partnership, as Mr. Sabadash

9    speculates (this assertion is disputed elsewhere in this brief).  These lawyers provided

10    documentation through Mr. Fridman to substantiate their claims and signed declarations.[10]

11    • With regard to Progressive Management (POC 1) and Ratner (POC 2), for the

12    reasons stated in the Opposition to the Objection to these creditors' claims [Docket nos. 52-53], I

13    had a reasonable, good faith belief that the claims were valid.  First, for the reasons stated above, I

14    reasonably believed that the Itkin & Sabadash Partnership existed.  Second, both claimants stated

15    in their declarations attached to the oppositions to the claim objections that they were sucked into

16    a partnership dispute and deposed in a state trial that involved entities belonging to the

17    partnership, incurred costs for both preparation and conduct of the deposition, and received a

18    promise in writing to be reimbursed for those costs by Mr. Itkin, who confirmed this.  Again, these

19    claimants contacted my firm on their own and provided documentation and information

20    themselves to substantiate their claims and signed declarations for the oppositions.  I also spoke to

21    Mr. Itkin to confirm the agreement to reimburse, which he did.

22    8.    Finally, I had no nefarious motive in assisting the joining creditors in this case.  My

23    sole motive was to help them get their claims paid.

24    The foregoing is within my personal knowledge, except where stated to be on information

25

---

26    [10] I also note that while Mr. Sabadash complains about the total amount claimed by these three
    lawyers of $113,594, arguing that the fees are excessive, he fails to note that the total consists of

27    three components – fees, which totaled $65,718, interest, which totaled $33,628, and an exchange

28    rate differential claimed by Samsonova of $14,248.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   and belief, in which case I believe it to be true, and if called as a witness in this matter I could and

2   would competently testify thereto.

3       I declare under penalty of perjury under the laws of the United States of America that the

4   foregoing is true and correct and that this declaration was executed on August 4, 2025, at

5   Beverly Hills, California.

6

7   Joseph E. Caderes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# DECLARATION OF CHARLES SHAMASH

I, Charles Shamash, declare:

1.      I am attorney and am duly qualified to practice before the Courts of the State of California and the Federal District Court for the Central District of California.  I was licensed to practice law in California in 1995, and I have been in good standing since then.  Through my professional corporation, I am a partner at the law firm of Caceres & Shamash, LLP ("C&S, LLP"), in Beverly Hills, California.

2.      C&S, LLP represented several creditors in filing joinders to the involuntary petition herein, and in preparing oppositions to objections to claims filed by Mr. Sabadash in the case.

3.      Throughout my 30-year career in law, I have focused on matters in bankruptcy court.  Similarly, my partner Joseph E. Caceres was admitted to practice law in California in 1993, and we have been partners in C&S, LLP through our professional corporations since 2003. Hence, we are both familiar with the requirements for filing documents and pleadings on behalf of debtors, creditors, and other parties in interest.  I would also add that neither of us has ever been the subject of any disciplinary proceedings before the State Bar or any court; neither of us has ever been sanctioned by any court or even served with a Rule 11 motion; and we have never been sued for malpractice.

4.      In seeking to have Mr. Caceres sanctioned, Mr. Sabadash asserts in his motion that Mr. Caceres did not conduct a reasonable inquiry into creditors' claims before filing the claims and joinders he discusses in his motion (claim nos. 1, 2, 6, 7, 8, 9, and 11).  As a threshold matter, he fails to note the following:

• Although my firm filed 5 of the above 7 claims as a courtesy to the claimants, (along with one other claim not mentioned by Mr. Sabadash, for a total of 6 claims) (claims 1 and 2 were filed by the claimants directly, as were three others not mentioned), Mr. Caceres did not sign any proofs of claim (nor did I); all 11 filed claims were signed by the claimants themselves.

• Mr. Caceres did not sign the joinders.  Regardless, only after I was comfortable with the bona fides of the above claims, which were verified under oath by the claimants, did I prepare for their signature and file the joinders, which were also verified under oath by the above

1   seven claimants, on our pleadings, as well as three others (docket nos. 10-11, 13-14, 49-50, 60,

2   and 64).

3               • Mr. Caceres did sign and file oppositions to Mr. Sabadash's objections to nine

4   creditors' claims, with a supporting declaration from Ms. Gofman, as well as supporting

5   declarations from each of the claimants, along with supporting documents from all of them,

6   including translations of Russian documents from a certified court translator who Yakov Fridman

7   (Mr. Fridman is identified in paragraph 5 below) engaged and communicated with, and who also

8   emailed and spoke directly with me (Docket nos. 52-59, and 61-62).[11]  Mr. Caceres discusses the

9   oppositions to the objections to the claims that Mr. Sabadash specifically mentions in his motion

10  in paragraph 7 of his attached declaration, and I agree with his recitations of the facts therein.

11              • At no time did Mr. Sabadash's counsel provide me or my firm with a proposed

12  9011 motion or safe harbor letter, regarding any of the foregoing.

13      5.      Regardless, contrary to Mr. Sabadash's speculation, my firm did not blindly rely on

14  Mr. Itkin or Mr. McCarthy for information regarding the joining creditors, and did adequately

15  investigate facts in support of the claims.  This included reviewing documents and information

16  provided by the creditors themselves, some directly and several through their Russian lawyer

17  named Yakov Fridman (who was actually in Russia and was the point of contact for Elena

18  Gofman, Ildar Shadaev, Maria Samsonova, Maria Habarova, Evgeniy Avilov, and Aleksandr

19  Grant, six of the joining creditors, the first five for whom Mr. Caceres filed oppositions to Mr.

20  Sabadash's objections to claims).  This included both Mr. Caceres and myself emailing back and

21  forth with Mr. Fridman at different times going back to March 3, 2024 (when he first contacted me

22  to discuss the matter), at all hours of the day given the time differential, requesting information

23  and documents regarding the claims.

24      6.      Our efforts also included Mr. Caceres and I discussing by phone and/or emailing

25  back and forth regarding the matter with the other claimants who were not represented by Mr.

26

27  [11] I actually interviewed the interpreter and reviewed his website (the interpreter speaks both
    Russian and Hebrew, the latter of which I understand and spoke to him in).  I also paid him

28  directly for his services.

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1 | Fridman, in order to obtain information and documents (such as Jeff Ratner of Ratner &

2 | Associates, Victoria Lerman of Progressive Management, Inc., Alexei Kurochkin, and Jon

3 | Atabek).  For the sake of transparency and candor to the Court, we did indeed discuss the case or

4 | request certain information from Mr. McCarthy or Mr. Itkin at times, but they were not the

5 | primary source of information or documents regarding the claims, much less the "sole source" or a

6 | "puppetmaster" as Mr. Sabadash speculates.

7 |       7.     Finally, I had no nefarious motive in assisting the joining creditors in this case.  My

8 | sole motive was to help them get their claims paid.

9 |      The foregoing is within my personal knowledge, except where stated to be on information

10 | and belief, in which case I believe it to be true, and if called as a witness in this matter I could and

11 | would competently testify thereto.

12 |      I declare under penalty of perjury under the laws of the United States of America that the

13 | foregoing is true and correct and that this declaration was executed on August 4, 2025, at

14 | Beverly Hills, California.

15

16 | Charles Shamash

17

18

19

20

21

22

23

24

25

26

27

28

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# EXHIBIT A

Companies

# [2023]JRC089

**ROYAL COURT**
**(Samedi)**

**23 May 2023**

**Before    :    Sir William Bailhache, Commissioner, and Jurats**
**Ramsden and Hughes**

**Between**                        **Gary Yuri Itkin**                        **Representor**

**And**                        **Andrew Wood**                        **First Respondent**

                        **Alexander Adam**                        **Second**

                                                **Respondent**

**(In their capacity as Joint Liquidators of**
**Golden Sphinx Limited)**

**Advocate I. C. Jones for the Representor.**

**Advocate S. A. Hurry for the Respondents.**

**JUDGMENT**

**THE COMMISSIONER:**

1.    The Representor claims to be a creditor of Golden Sphinx Limited (the "Company"), incorporated in Jersey on 31 August 2000 and now subject to a creditors' winding up.   In that capacity he seeks orders preventing the Company from instructing Advocate Jeremy Garrood and removing the Respondents from their appointment as joint liquidators.

2.    The evidence before the Court is that the Company's registered shareholders have at all times been JTC Services Limited and JTC Nominees Limited, each as a nominee for JTC Trust Company Limited in its capacity as Trustee of the Amber Trust, or possibly a successor trust. The current sole director of the Company is Mrs Larissa Sabadash ("Mrs Sabadash"), the wife of Mr Alexander Sabadash ("Mr Sabadash").   It is said by the Respondents that the Amber Trust and the Company were created as passive investment holding vehicles, and these were operated

for the ultimate benefit of Mr and Mrs Sabadash and their children, albeit it is said that Mr Sabadash no longer has any interest in the Trust or the Company.

3.     The Representor was appointed as a director of the Company in approximately 2009 and was removed or resigned on 28 February 2017.  A Mr Piotr Szymanski was appointed on 28 February 2017 and removed on 25 October 2019.  Mrs Sabadash was appointed on the latter date.

4.     The Representor asserts that the circumstances of his removal as director of the Company on 28 February 2017 remain in dispute.  However, it is a matter of judicial record that judgment was entered in his favour against the Company on 2 December 2016 for the sum of £505,000 in relation to unpaid director's fees, along with interest and costs (the "Judgment").  An application by the Company to have the Judgment set aside was considered by the Court in 2021, and on 20 April of that year the Court determined that the Judgment should not be aside, and the application therefore failed.  There was no appeal against that decision.

5.     In the affidavit evidence put before the Court by the First Respondent, he indicates that he has been informed by JTC Law (the firm of advocates then acting for the Company with which Advocate Garrood is associated), that notice of a creditors' meeting was provided to the Company's creditors on 21 and 22 June 2022.  Copies of the notice to creditors were put before the Court.  We note that the letters were sent by mail to a lawyer in Switzerland, to Mrs Sabadash in Beverley Hills, California, to the Representor, also in Beverley Hills, but also to Revenue Jersey and Messrs Carey Olsen in Jersey.  JTC Law addressed one of the letters to themselves, and that was delivered by hand.  A total of six letters were thus sent out to creditors.

6.     Mrs Sabadash approved a members' unanimous Special Resolution on 5 July 2022 to wind up the Company and nominated the Respondents as liquidators.  The following day the Company, by its registered shareholders, resolved to wind up and nominated the Respondents as liquidators, and on that same day there was a meeting of creditors of the Company and the written resolution appointing the Respondents as liquidators was approved.  Mrs Sabadash and JTC Law were, as we understand it, the only creditors present or represented.  The Respondents had been contacted by JTC Law about potentially being appointed as liquidators on 30 June 2022 and indicated on 4 July 2022 that they would consent to act in that capacity.

**The parties' respective positions**

7.     There is now no dispute as to any ongoing participation by Advocate Garrood in the liquidation of the Company.  He is no longer acting for the Respondents and, as they put it in their Skeleton

Argument, the relief sought in that respect falls away.  We will consider later in this judgment whether Advocate Garrood's earlier participation so taints the position of the Respondents that they should not continue in office.

8.  Indeed, the connection between Advocate Garrood and the Respondents is one of the grounds upon which the Representor contends that their appointment as liquidators should be set aside.

9.  We note that Advocate Garrood was convened to the Representation.  He did not appear before the Court at the hearing of the Representation, no doubt because he was no longer instructed by the Respondents, and accordingly we have not heard directly from him.

10.  For the avoidance of doubt, in the circumstances of this case, and without making any findings or criticism as to the propriety of Advocate Garrood's conduct to date, we do not consider that it would be appropriate for the Respondents to instruct him as counsel to assist them as liquidators in the liquidation of the Company.

11.  It is clear from the documentation we have seen that there are a number of complex issues to be considered in relation to the liquidation of the Company.  There is currently litigation involving the Company and the Representor which continues in a number of jurisdictions.  There are three sets of proceedings in Jersey, quite apart from this present application, those other proceedings being stayed as a result of the winding up.  There are three sets of proceedings in California, some in the State court, some in the Federal court and some in the Bankruptcy court, the Respondents having filed a motion for recognition of their title there.  There are proceedings before the Business and Property Courts in Manchester concerning the ownership of the shares in New Albion Property Limited ("New Albion"), which owns a property in California, to which we note the letter to Mrs Sabadash giving notice of the creditors' meeting of the Company was addressed. The Company has filed a claim in certain bankruptcy proceedings in the Isle of Man involving two companies connected with Mr and/or Mrs Sabadash, one of which is bankrupt.

12.  It appears that much of the litigation has at its core a dispute over an alleged partnership between the Representor and Mr Sabadash who, it is said, was arrested in Moscow in 2014, allegedly as a result of political differences with government representatives and has been incarcerated since. The Representor asserts that the breaches of the alleged partnership agreement led him to take protective action over the assets in which Mr Sabadash allegedly had an interest. We do note that there are serious allegations of fraud made against the Representor, and serious allegations in some of the US proceedings made against Mrs Sabadash.  We obviously make no findings in relation to either set of claims.  It is quite impossible for us at this stage to do anything other than note the series of complex proceedings  It is quite impossible for us at this stage to do other than

note the series of complex proceedings which exist in the different jurisdictions, but we can immediately acknowledge that it is unsurprising that it was necessary for the Respondents to establish their status to act for the Company in the various pieces of litigation to which it is a party.

13. The First Respondent is registered as an approved liquidator in Jersey.  In his affidavit, he says that he is a chartered accountant with nearly twenty years' experience working with stressed and distressed businesses.  He estimates that he has held over ninety appointments as liquidator, administration manager or receiver.  In addition to being on the register of approved liquidators in Jersey, he is also a UK qualified insolvency practitioner and a fellow of the Institute of Chartered Accountants in England and Wales.

14. The First Respondent asserts on affidavit that his colleague, the Second Respondent, is also a chartered accountant and an experienced insolvency practitioner, a senior managing director with a Guernsey firm, having over eighteen years financial services experience.  He is registered as a non-Jersey approved liquidator and also a UK qualified insolvency practitioner and fellow of the Institute of Chartered Accountants in England and Wales.

**The Representor's complaints against the Respondents**

15. The Representor asserts that the Respondents are not impartial in their approach for the following reasons:

   (i)   He has an unassailable Judgment debt in the sum of £505,000 which the liquidators have seemingly valued at £0 in their Statement of Affairs.

   (ii)  For much longer than should have been the position, the Respondents took advice from Advocate Garrood who the Representor considered to be in a hopelessly conflicted position.

   (iii) The liquidation of the Company was not instituted or pursued in good faith, or in the interests of the creditors as a whole – and in reality, the Representor claims to be the only true creditor of the Company in the sense that all the other debts owed to the Company have been incurred in opposing his taking of judgment and in the application to have that Judgment set aside.

(iv)   The Representor raised the issues and concerns in a letter to the Respondents dated 6 August 2022, and has not received any substantive response.  In particular, he has enquired how the Company can afford to pay its legal fees and who or what is underwriting those fees and the costs of the liquidation, in circumstances where Mrs Sabadash has sworn on oath that the Company has no funds.  The fact that the Respondents refuse to engage with that question is said to demonstrate their lack of impartiality.

(v)   There is a cause of action in negligence against Messrs Carey Olsen and / or Advocate Garrood with which the Respondents do not seem prepared to engage.  That cause of action is said to have a value but has never been listed or identified as an asset of the Company.

**The law**

16.   Article 175 of the <u>Companies (Jersey) Law 1991</u> (the "Law") is in these terms:

> ***"Appointment or removal of liquidator by the Court***
>
> ***(1)   The Court may appoint a liquidator if for any reason there is no liquidator acting in a creditors' winding up;***
>
> ***(2)   The Court may, on reason being given, remove a liquidator in a creditors' winding up and may appoint another;***
>
> ***(3)   The appointment or removal of a liquidator under this Article may be made on request by the company, a director of the company, a creditor, the Viscount, the Commission, the Minister or any other person."***

17.   Local case law on this Article is limited but the most detailed is a decision in <u>Bisson and Others v 3B Holdings Limited (In Liquidation) and Others In the Matter of 3B Holdings Limited</u> [2012] JRC 021.  That case concerned an application by the representors to remove the second and third respondents as joint liquidators, that company not being subject to a creditors' winding up but to a just and equitable winding up under Article 155 of the law.  The Court held that although Article 175 applied to the removal of a liquidator on a creditors' winding up and that case concerned a winding up on just and equitable grounds, the same criteria would apply to the removal of a liquidator in both cases.

18.  Clyde-Smith, Commissioner, noted the cases of <u>Hotel Beau Rivage Company Limited v Careves</u>
     <u>Investments Limited</u> [1985-86] JLR 70, confirming the authority of <u>Re Matthews (Stephen) Limited</u>
     Royal Court 1980 267 Ex 443, that if there were grounds for suspecting that a liquidator was
     acting improperly or was neglecting his duty then the Court may interfere.  Reference was also
     made to the case of <u>Re Inter Estate RC</u> 1998/35A where the Court had no difficulty in removing
     one of two joint liquidators for manifest breaches of his duties as a joint liquidator – in that case,
     the removed liquidator did not advise the bank of the change in his co-liquidator until three years
     later and even then did not change the bank mandate details to remove the retired co-liquidator
     and add his replacement.  Instead, he sought to operate the account in an improper manner
     under his sole signature.

19.  Turning to English case law on the equivalent power in that jurisdiction, Clyde-Smith,
     Commissioner, referred to the case of <u>ANP Ordinary Type Music Box Enterprises Limited v</u>
     <u>Hoffman</u> [2003] 1 BCLC 319, citing from the judgment of Neuberger J (as he then was) laying
     down what the judge described as anodyne but still useful propositions in relation to the powers of
     the English Court to remove a liquidator for good cause:

> ***"As a matter of ordinary principle and statutory interpretation, that
> seems to me to suggest as follows: (a) the Court has a discretion whether or
> not to remove and replace the liquidator, (b) it will do so on good grounds, (c)
> it is up to the person seeking the order to establish those grounds, (d) whether
> good grounds are established will depend on the particular facts of a particular
> case, (e) in general it is inappropriate to lay down what facts will and what facts
> will not constitute sufficient grounds."***

20.  Neuberger J went on to make the following observations which the Court described as helpful:

> ***"In an application such as this, the Court may have to carry out a
> difficult balancing exercise.  On the one hand the Court expects any liquidator,
> whether in a compulsory winding up or a voluntary winding up, to be efficient
> and vigorous and unbiased in his conduct of the liquidation, and it should have
> no hesitation in removing a liquidator if satisfied that he has failed to live up
> those standards at least unless it can be reasonably confident that he will live
> up to those requirements in the future.***
>
> ***Support for this approach is not only to be found in Keypak, but also in
> some cases where the Court has compulsorily wound up the company and
> appointed a new liquidator in circumstances where there is already a
> voluntarily liquidator in place – see for instance, <u>Re Zirceran Limited</u> [2000] 1***

*BCLC 751, especially at paragraph 25(5).  Also where the liquidator could not be seen as independent – see, for instance, Re Lowestoft Traffic Services Limited [1986] 1 BCLC 84 (where the liquidator concerned seems to have been the same liquidator as in Keypak).*

*It may also be right to remove a liquidator where the circumstances are such that, through no fault of his own, he is perceived to be – even though he may not be – biased in favour of, say, one or more of the creditors – see per Robert Walker J in Re Gordon and You Breach Science Publishers Limited [1995] BCC 261, another case concerned with a compulsory winding up order in circumstances where there was already a voluntary liquidator in place.*

*While the removal of the liquidator is not necessarily based on any fault on his part, most such cases will involve a degree of criticism.  Although in Keypak Mr Justice Millett emphasised there was no criticism of the general ability, experience and professionalism of the liquidator, and that, even in relation to the particular case, there was no evidence of his being biased or dishonest, it is nonetheless clear that he was removed because the judge took a dim view of the way in which he had conducted the particular liquidation.  As the judge said, the fact that this may to some extent resound to the discredit to some extent of the liquidator, does not mean that the Court should shy away from making the order.  On the contrary, in an appropriate case it is the duty of the Court to make such an order, not merely on the merits of the particular case, but also because it sends out a clear message to liquidators that they have an important function which they should conduct in a vigorous, effective and independent manner.*

*On the other hand, if a liquidator has been generally effective and honest, the Court must think carefully before deciding to remove him and replace him.  It should not be seen to be easy to remove a liquidator merely because it can be shown that in one, or possibly more than one, respect his conduct has fallen short of ideal.  So to hold would encourage applications under Section 108(2) by creditors who have not had their preferred liquidator appointed, or who are for some other reason disgruntled.  Once a liquidation has been conducted for a time, no doubt there can almost always be criticism of the conduct, in the sense that one can identify things that could have been done better, or things that could have been done earlier.  It is all too easy for an insolvency practitioner, who has not been involved in a particular liquidation, to say, with the benefit of the wisdom of hindsight, how he could have done better.  It would plainly be undesirable to /encourage an application to remove a liquidator on such grounds.  It would mean that any liquidator who was appointed, in circumstances where there was support for another possible*

*liquidator, would spend much of his time looking over his shoulder, and there would be a risk of the Court being flooded with applications of this sort. Further, the Court has to bear in mind that in almost any case where it orders a liquidator to stand down, and replaces him with another liquidator, there will be undesirable consequences in terms of costs and in terms of delay."*

21.   It is also useful to note in <u>Re Keypak Home Care Limited</u> [1987] BCLC 409, where Millett J (as he then was) said this:

*"It was submitted to me that the rule laid down in [<u>Re Adam Eyton</u>], that in order to effect the removal of the liquidator the Court needs only to be satisfied that it is for the general advantage of those interested in the assets of the company that the liquidator to be removed, must be read in the context of the facts of the case and that very special circumstances must exist before the power can be exercised in a case in which no personal misconduct or unfitness can be shown on the part of the liquidator.*

*There were special circumstances in that case, but I do not read the general principle laid down by the Court of Appeal as being limited to cases in which special circumstances can be shown.  On the contrary, the words of the statute are very wide and it would be dangerous and wrong for a Court to seek to limit or define the kind of cause which is required.  Circumstances vary widely, and it may be appropriate to remove a liquidator even though nothing can be said against him, either personally or in his conduct of the particular liquidation."*

22.   In <u>Re 3B Holdings Limited</u>, the Court adopted the principles set out in the English cases cited above.  Clyde-Smith, Commissioner, said at paragraph 65:

*"The underlying test is that the Court may remove a liquidator (whether appointed by the Court or in a creditors' winding up) where it is satisfied that it is for the general advantage of those interested in the assets of the company to do so.  Due causal action is to be measured by reference to the real, substantial and honest interests of the liquidation and to the purpose for which the liquidator is appointed.  As made clear in <u>Re Adam Eyton</u>, we are concerned with the substantial or real interests of the liquidation by which is meant all those who are interested in the company being liquidated.  However the Court will not lightly remove its own officer and will take into account the impact on his or her professional standing and reputation and the undesirable consequences in terms of cost and delay."*

**Discussion**

23.   We deal first with the complaints in relation to Advocate Garrood, whose participation in the events leading up to Judgment being taken by the Representor against the Company, and in relation to the set aside application, are set out at paragraphs 13 to 24 of the Judgment Itkin v Golden Sphinx Limited [2021] JRC 117.  It is clear that the Court has already expressed itself satisfied from the evidence which it has seen previously that Advocate Garrood was on the side of those hostile to the Representor – in other words, Mr and / or Mrs Sabadash.

24.   It is also clear that, regardless of the compliance with the Company's Articles or the Law (on which we make no findings) of the notice to creditors given by JTC Law on 21 June 2022 of the meeting which was to be held at 4.30pm on 6 July, as a matter of practicality, because that letter was sent by mail, it seems highly likely that the notice did not arrive with the Representor in good enough time for any action to be taken prior to that creditors' meeting.  In his second affidavit in these proceedings, the Representor says that he did not receive notice of the meeting until 19 July. This is relevant, not because the resolution to go into liquidation would not have been passed, but because, as a creditors' winding up, the creditors would have an interest in determining the identity of the prospective liquidators.  The difficulty in the present case lies, from the Representor's perspective, in the fact that the Respondents were not only advised in the first instance by the same legal team who was acting for his opponents in the litigation against him, but, as he indicates in his second affidavit, it was more likely than not that it was Advocate Garrood who suggested and / or advised Mrs Sabadash that the Respondents should be appointed as liquidators.  Mr Itkin is careful to indicate that he does not assert that simply because Advocate Garrood was the route through which the Respondents were appointed as liquidators, it follows that they are biased or would do anything untoward, but he does assert that that fact provides a prism through which one should consider and evaluate their decisions and actions.

25.   It would be unsurprising if Mrs Sabadash asked for advice from Advocate Garrood, as to the best method of dealing with the various litigations which engaged the Company in which she claims an interest.  We proceed on the assumption that the decision to put the Company into liquidation was a decision arrived at on advice from Advocate Garrood; and we think it is more likely than not that it was Advocate Garrood who made the enquiry of the Respondents as to whether they would be prepared to act.

26.   We now consider the action which the Respondents have taken since appointment and the criticisms which the Representor makes of them.

27. The Representor notes the statement of the Respondents that they understand Mr Sabadash no longer has any discretionary beneficial interest in the Amber Trust and, consequently, the Company. He notes that no explanation is given as to why that should be so. Given that the Representor allegedly has claims against Mr Sabadash arising out of a partnership which the two of them had, the issue as to whether Mr Sabadash has any interest in the Amber Trust or the Company could conceivably be very relevant. One can understand therefore why the Representor should be suspicious of an apparent change in the beneficial interest in the Company in the circumstances where the Trust was apparently set up in the first place for the benefit of the Sabadash family.

28. Since their appointment, the Respondents say they have been active in their efforts to protect and conserve the Company's position and its assets for the benefit of all creditors. They confirm that the Company has no cash or other significant liquid assets. They say that the Company is plainly insolvent and a Statement of Affairs as at 5 July 2022 indeed shows that to be true. The major assets are shares in New Albion, which is said to be the sole beneficial owner of a property in Beverley Hills, California, which is the same address to which JTC Law wrote when communicating with Mrs Sabadash as to the date of the creditors' meeting. The Statement of Affairs also shows the main creditor to be Mrs Sabadash – other creditors of the Company are various lawyers in Jersey and Switzerland in relatively small sums; and the Representor is shown as having a Judgment debt of £505,000 plus costs and interest, but the debt is "*subject to a set off of £35 million arising from his unlawful misappropriation of the two shares in New Albion Property Limited*".

29. The Statement of Affairs is a document that was signed by Mrs Sabadash. The way in which the certain debt of the Company due to the Representor as against the uncertain value of the claims which the Company might have against the Representor in respect of the shares in New Albion is presented is, therefore, not a matter to be laid at the door of the Respondents. Understandably the Respondents say that they have taken significant time and effort since their appointment to consider the various pieces of litigation in which the Company is involved. In his affidavit, the First Respondent makes it plain that the Statement of Affairs, which lists the Company's liability to the Representor as £0, is not an indication of any view which the Respondents have formed on the claims against the Representor. We find that the Respondents have acted properly in that respect, and we have noted a letter from their advocates, Messrs Collas Crill, dated 7 November 2022, that the value of the Jersey Judgment is "*not contested by the liquidators*".

30. The Representor claims he is the only true creditor of the Company and some of his criticisms of the Respondents seem to flow from his assessment that they should have rejected any other approach. The First Respondent says in his affidavit that the Statement of Affairs makes it clear that the Representor is not the Company's sole creditor. Just as it would be improper to assume

at the present stage that the value of the debt to the Representor is £0, so it would also be improper at this stage for the Respondents to have ignored the other creditors of the Company listed in the Statement of Affairs. Assessing who is a creditor of the Company and how much is due is all part of the liquidation process. There is no criticism to be made of the Respondents in that respect.

31. The Representor claims that the liquidation of the Company is being deployed to frustrate his efforts at recovering what is owed to him, whether those steps are taken in Jersey, the USA, or England. He says in his affidavit that he set out the issues and concerns in particular in a letter of 6 August 2022 sent by Preston Legal to the Respondents (the "6 August Letter").

32. The Representor's lawyers opened by saying that the 6 August Letter had four distinct purposes – to notify the Respondents of the Representor's claims in the winding up of the Company, to make various requests for information, to raise various concerns in relation to the running and representation of the Company and to provide responses to the Respondents' letter of 27 July. The claims are for $55 million plus £505,000 plus interest and costs.

33. In March 2022, at the instance of Mrs Sabadash, the Company had issued an Order of Justice against the Representor in respect of material which the Representor considered was covered by the Judgment and strike out application, and was thus *res judicata*. The 6 August Letter sought confirmation from the Respondents as to how they proposed to deal with this litigation.

34. Because the Representor was not at the creditors' meeting on 6 July 2022, the request in the 6 August Letter was for all information which was provided to that meeting; and if there was objection to providing the information, there was a request for the nature of the objection. The next question was as to who was funding the Company to enable it to engage with litigation in three separate jurisdictions, given the fact of the Company's insolvency. The next request related to the giving of notice of the creditors' meeting, it being asserted that the Company had committed an offence by proceeding with the creditors' meeting without giving proper notice to the Representor. The Respondents were asked for the results of their enquiries into this matter. The 6 August Letter then went on to express concerns about the conflict of interest in Advocate Garrood acting for the Company as well as being a creditor of the Company and in the context of Advocate Garrood's alleged conflict of interest from having acted for the Representor since at least 2016.

35. Finally, concerns were then expressed in the 6 August letter about various requests for information which had been made on behalf of the Respondents by JTC Law, the Respondents' then legal advisers. The point was made that these very same legal advisers had, until recently,

been retained to act directly against the Representor in hostile litigation, and the fact that the same law firm was then making requests and demands on behalf of the Respondents made the Respondents' position untenable.

36.   Given the complaint that the Respondents are not impartial, it is relevant to consider the reply which was sent on 18 August 2022 (the "the 18 August Letter").

37.   The first thing to note is that the reply was sent by Advocate Garrood on behalf of the Respondents, and indeed it opens with the request that Preston Law should deal with him directly and not by writing to the Respondents themselves.   It might be thought that response was tactless, to say the least in the circumstances. The 18 August Letter asks for proof of the Representor's claims against the Company in the usual way.   Insofar as the Order of Justice commenced by the Company was concerned, the 18 August Letter noted that that action had been stayed by the Royal Court of its own volition and the response was that the Respondents were considering the future conduct of that case.

38.   As to the request for information, the 18 August Letter attached a copy of the Statement of Affairs that was presented at the creditors' meeting; it indicated that the Respondents would not provide the information requested as to the funding of the Company because that was a matter which related to the Company's internal management and the Representor was not entitled to the information.   Advocate Garrood also said in the 18 August Letter that the Respondents were satisfied that the notice of the creditors' meeting was sent to the Representor on 21 June in accordance with Article 160 of the Law and the complaints made by the Representor were misconceived.   The 18 August Letter then went on to say – clearly not on behalf of the Respondents – that "*We [i.e. JTC Law] do not consider we are conflicted*".   The letter concludes with various comments in relation to the shares in New Albion where the Respondents' position was reserved, as indeed it was generally.

39.   In the hearing before us, Advocate Hurry submitted that, despite the objections which had been put forward, the Respondents were not lined up against the Representor.   They were office holders with an intention to follow up on their statutory functions and fulfil them in the interests of the creditors.   He submitted that an enormous amount of work had been done to establish the landscape and an assessment would be made later.   There had been liaison with counsel in different jurisdictions and the Respondents were keen to progress matters.

40.   As at the date of the hearing, the Respondents' position was that it would be preferable if all the outstanding litigation were to be heard in Jersey and, in the meantime, the Representor should

return to the Company its various assets said to be in the Representor's possession, including the two shares in New Albion.

41.    In the course of the hearing, we asked Advocate Hurry who was funding the liquidation.  His response was that the Respondents would of course provide that information to the Court if so directed, but they considered that it was private information to which the Representor was not entitled as he was in hostile litigation with the Company.  The Court considered that in the light of the circumstances surrounding the appointment of the Respondents it would be appropriate to disclose the identity of the funders of the liquidation.  We were told by Advocate Hurry that the funder was Mrs Sabadash.  In his closing argument, he said that funding of the liquidation was an issue and third party funding was being considered.  The Respondents would not bring proceedings unless they could take them through to completion. We have no further information than that.

42.    It is not uncommon that there should be serious litigation between liquidators of a company and one or more of the company's creditors.  In those cases, the liquidators have a duty to the creditors as a whole to ensure that the assets available to the company are utilised in the best interests of the creditors.  The free passage of information to creditors is not always easy when one of those creditors is in hostile litigation with the company because it might well be inappropriate to provide privileged information to such a creditor.

43.    Nonetheless, the old adage that he who pays the piper calls the tune is never more relevant than in litigation.  It was – or should have been – obvious to the Respondents from the outset of their appointment that the maintenance of an impartial position on their part would be almost impossible if they and the lawyers instructed by them were paid by a party with whom one of the major creditors of the company was in direct dispute. The position is aggravated by the arrangements surrounding the appointment of the Respondents by the Company, which do not seem to us to be obviously beyond reproach.

44.    All the different pieces of litigation have at their heart the dispute between the Representor on the one hand and Mr and/or Mrs Sabadash on the other. It follows that the Respondents' complaint that the Representor is merely seeking his own preferred liquidators is a complaint that can just as easily be laid against Mrs Sabadash.

45.    The position of the Respondents in the present case has been exacerbated by the early communications on their behalf by Advocate Garrood who, although we have not heard from him, must also have been aware of the position we have just described. The Respondents' position has also been exacerbated by their refusal to confirm, until put under pressure in Court, the

identity of the party funding the liquidation and the conduct of the litigation, when it must have been obvious to them and those advising them that it would be almost impossible for a liquidator, relying on such funding, to take an impartial and independent position on behalf of the Company in a battle between two warring creditors.

46. We are unsurprised at the complaints which the Representor has made.  The Company is apparently clearly insolvent and has been so for some time, but that does not seem to have inhibited its involvement and participation in numbers of pieces of litigation.  All that suggests is that the liquidation was a device for litigation advantage.

47. We are quite satisfied that the Respondents are professionals who now seek to do their job as liquidators.  At the same time, the funding of what they do is so fundamental to their ability to satisfy the creditors as a whole (thus including the Representor) and we do not think they can continue in this role until the funding is clarified.  They have made no quasi Beddoe application to the Court which might have addressed the Court's concerns, and indeed those of the Representor as to what steps they should take in the very difficult circumstances facing them given the conflict between their obligations to the Company and its creditors as a whole and their reliance on Mrs Sabadash for funding.

48. The liquidation is a continuing process.  We invite the Respondents, in the light of this judgment, to return to Court with details of such progress as they have made on the proposed alternative funding arrangements for the liquidation and the conduct of the litigation.  If these are not found by the Court to be adequate, then in our judgment the Court will be obliged to invite further submissions as to whether the Respondents should be removed and others appointed, how such liquidators should be remunerated and/or whether some other step should be taken in relation to the liquidation.

49. Counsel for the parties are directed to attend on the Bailiff's Judicial Secretary to fix a date convenient to the Court and the parties as to when this might take place, ideally within the next six weeks.

**Postscript**

50. The foregoing provisions of this judgment – with some minor corrections which have been made subsequently – were sent to the parties on 3 May 2023 with the customary invitation to the parties to submit their comments with details of obvious factual and typographical errors before the judgment was finalised. No comments were received from Advocate Jones. Advocate Hurry

submitted a number of comments to address typographical errors and stylistic changes all of which have been taken into account. However, in a second letter dated 5 May 2023, he made a number of further submissions, inviting in effect the Court to amend its conclusions. The fact that he did so in a most respectful manner does not detract from the substance of what he was trying to achieve. The submissions were made with the expressed view that they were made "*in the belief that it is their duty, and that it is in the interests of justice to do so.*"

51. Although we have accepted some of the points made and amended the draft judgment accordingly, we have not accepted the substance of the criticisms and it will be for the Respondents to take the matter up with the Court of Appeal if so advised in the usual way. Given that possibility, it is perhaps appropriate that we make these comments in relation to the criticisms made.

52. As our summary of the objections taken by the Respondents the key points were:

(i) It is wrong for the Court to have regard to the fact that Mrs Sabadash is funding the Respondents in the liquidation. If the funding of the liquidators by a creditor with an interest in the proceedings were an objection to those liquidators remaining in office, there could be serious consequences for liquidators in many liquidations of Jersey companies.

(ii) It is wrong for the Court to have concluded that Mrs Sabadash and the Representor were "warring creditors" or otherwise in direct dispute. Even if true, that would be irrelevant to what we had to consider.

(iii) The Amber Trust was and is the owner of the shares in the Company and it is wrong to refer to there being any change in beneficial ownership. In any event, the ownership of the Company has no bearing on the issues in the litigation, which from the Respondents' perspective is really about recovering the Company's assets from the Representor.

(iv) The alleged partnership dispute between Mr Sabadash and the Representor is similarly irrelevant to the issues arising on the liquidation of the Company.

(v) The Representor's cross claim against Mrs Sabadash in the United States has been dismissed.

53. As we have described at [16] to [22] above, the Court has a discretion to exercise in dealing with applications such as that brought by the Representor.  That discretion is exercised on the particular circumstances of each case and cases are frequently very different from each other.  We recognise that the Respondents make a superficially valid point that liquidators of companies are frequently funded by one or more creditors in circumstances where the company in question could not otherwise afford the cost of liquidation.  In the present case, the Company does not appear to be insolvent on the balance sheet test, if indeed it is entitled to the shares in New Albion Property Limited which it claims.  These are valued at £2 in the statement of affairs prepared by Mrs Sabadash but that is their nominal value only and as owner of the property in Beverley Hills, California in which Mrs Sabadash appears to be living, it would seem the true value is well in excess of that, and indeed well in excess of the debts.  It does appear to be insolvent on the basis that it is unable to pay its debts as they fall due. But what are those debts?  In practice they seem to be largely if not exclusively debts incurred in relation to litigation against various entities and the Representor.  Those pieces of litigation have been continuing since approximately 2017 and must have cost a great deal of money.  If Mrs Sabadash is currently funding the Respondents as they confirm she is, we have proceeded on the basis that she has before their appointment been funding the Company and although there is no evidence specifically on this, there seems a high degree of probability that the loan account in the books of the Company in her favour represents at least for the most part the costs of the litigation and the maintenance of the Company in good standing.  Without the litigation, there would appear to be no more insolvency now than there has been at any time before 2017.

54. The Respondents have wide responsibilities as liquidators, not just in terms of collecting in the assets of the Company and settling its debts but also in considering and if necessary reporting on the Company's administration prior to their appointment.  The former of those responsibilities involves them in a dispute with the Representor, the same dispute that Mrs Sabadash must have been funding over the last few years.  The latter responsibilities may lead them to consider not only the administration of the Company when the Representor was the sole director but also more latterly since 2019 when Mrs Sabadash has been the sole director.

55. This prompts consideration of whether a) the litigation will address only the matters for which Mrs Sabadash is willing to pay and b) the Respondents would in practice to fulfil their reporting duties in respect of any breaches or maladministration by Mrs Sabadash.  In our view, common sense suggests that neither would be realistically possible for as long as Mrs Sabadash is funding them, unless there are in place financial arrangements of which we are currently unaware.  This is why at [47] to [48] above, the Court wanted to receive further submissions.  It may be that some of those submissions should not be made in the presence of the Representor.  That is a matter on which the Representor and the Respondents will reflect and indeed, the Court may itself have to adjudicate.  We do not currently anticipate – although this may not turn out to be correct -  that an

analysis of the merits of the Company's litigation in the different jurisdictions will be central to our consideration at this stage. Without any conclusions, we have assumed that the Company's claims may have merit.

56.   One might take the view that the liquidators of a company will merely act in the overall interests of the company and its creditors and thus there is no damage done in this case by the Respondents having the conduct of the litigation. In our view, that does not give sufficient weight to the nature of the appointment. As we understand it, the fact of their appointment has already had an impact on the litigation because courts in different jurisdictions make the starting assumption that claims against the Company should be put back until they are dealt with by the liquidators in the ordinary course of the liquidation. That occurred immediately the Respondents had their title as liquidators recognised in the various courts. There is an informal presumption of regularity on which professional liquidators are entitled to rely, which recasts the balance of litigation.

57.   When we ask ourselves the question – what has changed between 2017 and July 2022? – it is not obvious that anything has. The Company was litigating against the Representor and still is. More likely than not, Mrs Sabadash was funding the Company and she still is. In other words, the probability at this stage is that the resolution to place the Company in liquidation, which clearly would not have happened without Mrs Sabadash' approval, was a device intended to confer on the Company a benefit in the litigation in which it was involved. This appears to us to be a factor which goes into the mix in relation to points (i) and (ii) at [52] above.

58.   The assertion that the partnership dispute between Mr Sabadash and the Representor is irrelevant to the issues surrounding the liquidation of the Company may be correct. We recognise that there may be an argument that the court should not attempt to pierce the corporate or fiduciary veil. We do not ourselves attempt to do so at present. But equally we do not consider that at this stage it would be right to assume that it cannot be a relevant consideration. This is perhaps a good example of a different approach that is taken by liquidators funded by an interested party and a court, which will step back until the facts are ascertained.

59.   Finally, it is said in correspondence that the claim against Mrs Sabadash has been dismissed. That was not apparent to us on the evidence produced at the hearing and we do not comment on it.

60.   For these reasons, the judgment is now handed down.

**Authorities**

Companies (Jersey) Law 1991.

Bisson and Others v 3B Holdings Limited (In Liquidation) and Others In the Matter of 3B Holdings Limited [2012] JRC 021

Hotel Beau Rivage Company Limited v Careves Investments Limited [1985-86] JLR 70.

Re Matthews (Stephen) Limited Royal Court 1980 267 Ex 443.

Re Inter Estate RC 1998/35A.

ANP Ordinary Type Music Box Enterprises Limited v Hoffman [2003] 1 BCLC 319.

Re Keypak Home Care Limited [1987] BCLC 409.

Itkin v Golden Sphinx Limited [2021] JRC 117.

**EXHIBIT B**



**OFFICIAL PORTAL**
**COURTS OF GENERAL JURISDICTION**
**CITIES OF MOSCOW**

| Courts of general jurisdiction | SEARCH BY COURT | COURT | TERRITORIAL | ST |
| Golovinsky District Court | CASES | HEARINGS | JURISDICTION | CA |

Home › Golovinsky District Court › Services › Information on court cases › Information on criminal cases of first instance › Information on the case № 01-0423/2025

## INFORMATION ON THE CASE № 01-0423/2025

Printing version

| | |
|---|---|
| Unique case identifier | 77RS0005-02-2025-010063-18 |
| Case number ~ material | 01-0423/2025 |
| Date of receipt | 21.07.2025 |
| Defendant | A.V. Morozova (St. 159, H. 4), Padalko T.A. (St. 160, P. 4; Art. 159, H. 4), Sabadash A.V. (St. 160, P. 4; Art. 159, H. 4) |
| Judge | Astakhova E.S. |
| Current state | The court hearing is scheduled for 04.08.2025 14:00 |



| The movement of the case | Court hearings | Documents |

### History of states

| Date | State | Document-base |
|---|---|---|
| 21.07.2025 | Registered | |
| 25.07.2025 | Consideration | Resolution on the appointment of a court session |

### Location history

| Date | Location | Comment |
|---|---|---|
| 21.07.2025 | In the office | |

‹ Back To List

Subscribe to updates

Regulations

Lists of information systems and data banks under the jurisdiction of courts

Bodies of the judicial community

Notifications of the time and place of consideration of administrative cases in accordance with Chapter 27.1 of the CAS of the Russian Federation, 27.2 of the CAS of the Russian Federation

Portal of open data of courts of general jurisdiction of the city of Moscow

Protection of intellectual rights

mos-gorsud.ru

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 515 South Flower Street, 7th Floor, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*):**JOINT OPPOSITION TO PUTATIVE PARTNER ALEXANDER SABADASH'S MOTION FOR FEES AND DAMAGES, UNDER 11 U.S.C. § 303(I) (DOCKET NO. 90); DECLARATIONS OF GARRY Y. ITKIN, DANIEL J. McCARTHY, JOSEPH E. CACERES AND CHARLES SHAMASH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 5, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Joseph E Caceres jec@locs.com,  generalbox@locs.com
Daniel J McCarthy  dmccarthy@hillfarrer.com,  spadilla@hillfarrer.com;dflowers@hfbllp.com
Kurt  Ramlo Adam RamloLegal@gmail.com,  kr@ecf.courtdrive.com,ramlo@recap.email
Charles  Shamash cs@locs.com,  generalbox@locs.com
Oleg Stolyar  astolyar@loeb.com
United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov
Michael  Zorkin  mz@thezorkinfirm.com

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) August 5, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

United States Trustee
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 5, 2025 | Daniel J. McCarthy | /s/ Daniel J. McCarthy |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

HILL, FARRER & BURRILL LLP
A LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
CITY NATIONAL PLAZA
515 S. FLOWER STREET, 7TH FLOOR
LOS ANGELES, CALIFORNIA 90071