1    RAMLO LAW
     Kurt Ramlo (SBN 166856)
2    15021 Ventura Blvd. #544
     Los Angeles, CA 91403
3    Telephone: (310) 880-9208
     RamloLegal@gmail.com
4

5    HERBERT SMITH FREEHILLS KRAMER (US) LLP
     Kyle J. Ortiz (NY 4818571) (admitted *pro hac vice*)
6    Kyle.Ortiz@hsfkramer.com
     1177 Avenue of the Americas
     New York, New York 10036
7    Telephone: (212) 715-9100

8    Attorneys to the Foreign Representatives
     of Golden Sphinx Limited
9

10            **UNITED STATES BANKRUPTCY COURT**

11    **FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

| | |
|---|---|
| In | Case No. 2:25-bk-11235-NB |
| ITKIN & SABADASH, | Hon. Neil W. Bason |
|        Alleged Debtor. | **Statement Regarding Motion for Reconsideration of Order Dismissing Involuntary Case** |
| | Hearing Date: To be set<br>Hearing Time: To be set<br>Courtroom: To be set |

       Andrew Wood and Alexander Adam, in their capacities as the joint liquidators and authorized foreign representatives (in such capacity, the "**Foreign Representatives**") of Golden Sphinx Limited, a corporation organized and existing under the laws of Jersey ("**Golden Sphinx**"), by and through their undersigned counsel, respectfully submit this statement (the "**Statement**") to Garry Y. Itkin's *Motion for Reconsideration of Order Dismissing Involuntary Case [Docket No. 76]* [Dkt. No. 89] (the "**Reconsideration Motion**").[1]

///

///

///

---

[1]   Unless stated otherwise, references to docket entry numbers refer to filings in the above-captioned case.

1

2                                            **STATEMENT**

3          In June 2025, this Court properly dismissed the involuntary petition.  *See* Dkt. Nos. 75, 76.

4    Simply put, Mr. Itkin's Reconsideration Motion fails to establish a basis for this Court to

5    reconsider its memorandum and order dismissing the involuntary petition.

6          Given certain representations contained in recent filings by Garry Y. Itkin ("**Mr. Itkin**"),

7    which appear to challenge the propriety of the Jersey Court (defined herein) proceedings – which

8    this Court has already recognized as proper – the Foreign Representatives file this Statement to

9    provide the Court with an update on the status of matters concerning Mr. Itkin and Golden Sphinx

10   pending before the Royal Court of Jersey (the "**Jersey Court**").

11         This Court has already recognized Golden Sphinx's Jersey liquidation proceedings (the

12   "**Jersey Liquidation**") as the foreign main proceeding and the liquidation is proceeding in the

13   Jersey Court.  *See* Order Granting Foreign Representatives' Motion for (I) Recognition of the

14   Jersey Liquidation as a Foreign Main Proceeding and (II) Certain Related Relief, *In re Golden*

15   *Sphinx Limited* (Case No. 22-13420, ECF No. 42) (the "**Recognition Order**"); *see also* Order

16   Denying Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362, *In re Golden Sphinx*

17   *Limited* (Case No. 22-13420, ECF No. 154).

18         Despite this Court's Recognition Order, Mr. Itkin has repeatedly tried to stall the Jersey

19   Liquidation.

20         The Recognition Order was entered on September 9, 2022.  On October 11, 2022, Mr. Itkin

21   filed an application in the Jersey Court seeking to remove the Foreign Representatives as Joint

22   Liquidators of Golden Sphinx.  That application was ultimately unsuccessful, with the Jersey

23   Court issuing its final decision on June 23, 2023.  *See* June 23, 2023 Judgment, attached hereto as

24   **Exhibit 1**.  Until that application had been determined, the Foreign Representatives did not

25   consider it appropriate to progress the Jersey Liquidation.

26         In October 2023, Golden Sphinx applied to amend its claims in the Jersey Liquidation,

27   which Mr. Itkin opposed.  A hearing took place on February 7, 2024, in respect of the application

28   to amend, at which Mr. Itkin ultimately consented to the application and the Jersey Court

1    progressing the Jersey Liquidation.  Following that hearing, both parties filed their amended

2    pleadings.

3    　　　In his Amended Answer, Mr. Itkin claims that an alleged partnership existed between him

4    and Mr. Sabadash and that the alleged partnership owns Golden Sphinx and all its assets.  Golden

5    Sphinx made requests for further information and clarification from Mr. Itkin (the "**Requests**"),

6    largely in relation to this alleged partnership.  Mr. Itkin refused to answer most of the Requests and

7    Golden Sphinx had to apply to the Jersey Court for an order that he do so.  At a hearing on

8    December 2 and 3, 2024, the Jersey Court ordered Mr. Itkin to provide answers to the majority of

9    the Requests by January 17, 2025.  In doing so, the Jersey Court accepted jurisdiction in respect of

10    the alleged partnership issue and is seized of it.  The Jersey Court also ordered Mr. Itkin to pay

11    Golden Sphinx £78,432 on account of its costs awarded following the hearing on February 7,

12    2024.  *See* February 25, 2025 Judgment, attached hereto as **Exhibit 2**.

13    　　　On January 10 and 23, 2025, Mr. Itkin sought further time to respond to the Requests, on

14    the basis that the wildfires in California prevented him from consulting with his U.S. and Jersey

15    counsel.  The Foreign Representatives agreed to extend his time to respond to the Requests to

16    January 31, 2025.  *See* Foreign Representatives' Status Report at 2, *In re Golden Sphinx Limited*

17    (Case No. 22-13420, ECF No. 163).  Mr. Itkin then applied to the Jersey Court for a stay of the

18    Jersey Liquidation to February 28, 2025, and to vacate a "directions hearing" scheduled for

19    February 25, 2025.  His grounds for seeking a stay was that both he and his US counsel were

20    unable to deal with matters due to the wildfires in California.  *Id.*  The Jersey Court dismissed the

21    request for a stay and ordered Mr. Itkin to provide responses to the Requests and payment of the

22    costs award by February 24, 2025.  *Id.* at 2-3.  He failed to do so.  *Id.* at 3.

23    　　　On February 19, 2025, Mr. Itkin filed this involuntary petition as a means to collaterally

24    attack the Jersey Court's dismissal of his stay request and this Court's Recognition Order.  *See*

25    Dkt. No. 1.  At the hearing on February 25, 2025, the Jersey Court adjourned matters pending

26    determination of this involuntary petition on the basis that the automatic stay prevented any

27    progress in Jersey.  *See* Exhibit 2.

28    　　　Ultimately, a "directions hearing" was held before the Jersey Court on July 23, 2025.  *See*

Foreign Representatives' Status Report, *In re Golden Sphinx Limited* (Case No. 22-14320, Dkt. No. 176) (the "**August 1 Status Report**").   Following the hearing, the Jersey Court issued an order (the "**July 23 Order**"), which gave Mr. Itkin until July 31, 2025 to (1) pay amounts to Golden Sphinx as ordered by the Jersey Court pursuant to the Act of Court dated February 7, 2024, and (2) answer Golden Sphinx's Requests. *See id.* (a copy of the July 23 Order is attached to the August 1 Status Report).   The July 23 Order provides that if Mr. Itkin failed to do so, his Amended Answer in the Jersey Court "shall be struck out and he shall be debarred from defending the proceedings." *Id.*

At the date of this Statement, Mr. Itkin has failed to comply with the July 23 Order: he has not paid the ordered amount to Golden Sphinx, nor did he answer its Requests by July 31, 2025.[2] The July 23 Order therefore provides that Mr. Itkin's Amended Answer shall be struck out and he be debarred from defending the proceedings before the Jersey Court. *Id.*  A hearing was set for August 14, 2025, in the Jersey Court related to a summons for judgment against Mr. Itkin based on his breach of the July 23 Order (the "**Hearing**").

On August 12 2025, Mr. Itkin filed an affidavit dated August 11 2025, with the Jersey Court in which he accepted  that he had breached the July 23 Order but stated the following: that until January 2025 his litigation costs had been funded by a third party but that arrangement was terminated in January 2025; that this, together with the Californian wildfires, had hampered his ability to comply with the July 23 Order; that he is in the process of obtaining financing and should be in funds by "the end of the month"; and should be in a position to pay the outstanding costs by September 2025. On August 14, 2025, shortly prior to the Hearing, Mr. Itkin's Jersey Advocate advised the Jersey Court that he was "unclear as to whether or not [he] is instructed to appear" at the Hearing.  *See* August 14, 2025 Judgment, attached hereto as **Exhibit 3**.

In light of the above, the Jersey Court adjourned the Hearing to September 22, 2025 on the basis that it requires further information from Mr. Itkin as to his financial position, and why the issues raised in his affidavit had not been raised previously.

---

[2] Mr. Itkin did provide a belated response to the requests for information on August 4, 2025; such responses are defective in several respects including failure to answer numerous of the requests.

The July 23 Order also requires Mr. Itkin to pay certain costs incurred by Golden Sphinx, including costs of and incidental to Mr. Itkin's application for a stay of proceedings, and costs of and incidental to Golden Sphinx's February 3, 2025 summons.  July 23 Order ¶ 6.

In the July 23 Order, the Jersey Court had also, provisionally, set additional dates for hearings in the Jersey Court should they be necessary: September 22, 2025, if required, in relation to discovery protocols (although this will now be utilized for a hearing on Golden Sphinx's summons for breach of the July 23 Order), and December 3, 2025, if required, in relation to any applications following discovery.  *See* August 1 Status Report at 2.

The July 23 Order also contained a timetable for trial, including:

1. Discovery to be completed by October 31, 2025;

2. Witness statements of fact to be filed by January 30, 2026;[3] and

3. The case to be set down for trial, with parties to attend to fix trial dates by December 5, 2025.[3]

The Jersey Liquidation is now at an advanced stage, contrary to what Mr. Itkin claims. However, any further hearing or procedural steps in the Jersey Court will only take place if Mr. Itkin is allowed to continue with his defense.  That will be determined by the Jersey Court on September 22, 2025.

The Reconsideration Motion is a further attempt by Mr. Itkin to stall Golden Sphinx's liquidation process.  Mr. Itkin fails to satisfy the stringent standard that courts apply to a motion for reconsideration and it is a blatant attempt to continue his campaign of delay and disruption.

**WHEREFORE**, the Foreign Representatives respectfully request that this Court deny the Reconsideration Motion.

Dated: August 26, 2025

HERBERT SMITH FREEHILLS KRAMER (US) LLP

By:  ___/s/ Kyle J. Ortiz_____
       Kyle J. Ortiz

Attorney to the Foreign Representatives of
GOLDEN SPHINX LIMITED

---

[3] In the event that parties confirm there are no applications arising in relation to discovery.

1    Dated:  August 26, 2025                    RAMLO LAW

2

3                                              By:   /s/ Kurt Ramlo
                                                    Kurt Ramlo

4                                              Local Counsel to the Foreign
                                               Representatives of
5                                              GOLDEN SPHINX LIMITED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# Exhibit 1

Companies.

# [2023]JRC106

**ROYAL COURT**
**(Samedi)**

**23 June 2023**

**Before    :    Sir William Bailhache, Commissioner, and Jurats**
**Hughes and Ramsden**

| | | |
|---|---|---|
| **Between** | **Garry Yuri Itkin** | **Representor** |
| **And** | **Andrew Wood** | |
| **And** | **Alexander Adam** | **Respondents** |

**(In their capacity as Joint Liquidators of**
**Golden Sphinx Limited)**

**Advocate I. C. Jones for the Representor.**

**Advocates M. St. J. O'Connell and S. A. Hurry for the Respondents.**

**JUDGMENT**

**THE COMMISSIONER:**

1.    On 23 May 2023, judgment was handed down in respect of the application by the Representor for orders preventing Golden Sphinx Limited ("the Company") from instructing Advocate Jeremy Garrood and removing the Respondents from their appointment as Joint Liquidators.   In its judgment, the Court expressed concern about a number of features of the liquidation.   In essence there were three:

  (i)    There was uncertainty about whether proper notice was given to the Representor, as a creditor of the Company, of the proposed appointment of the Respondents as liquidators.

  (ii)    There was concern about the approach which had been taken by Advocate Garrood, who had been instructed by the Company before it resolved to go into liquidation and who was initially instructed by the Respondents thereafter.   In referring to that concern, we reiterate

what was said at paragraphs 9 and 10 of the Court's judgment of 23 May – Advocate Garrood did not appear before the Court at the hearing of the Representation and we accordingly did not hear directly from him. Thus, for the avoidance of doubt, we made and make no findings or criticism as to the propriety of his conduct to date, albeit we did conclude that it would be inappropriate for the Respondents to instruct him as counsel to assist them as liquidators in the liquidation of the Company.

(iii)    There was concern as to whether the funding of the Respondents by Mrs Sabadash would have an impact on their ability to perform their functions as liquidators.

2.    As we said at paragraph 47 of the judgment, we are satisfied that the Respondents are professionals who seek to do their job as liquidators notwithstanding the concerns which we have expressed earlier. However, in the circumstance that at its heart the litigation in the different jurisdictions seems to us to be an argument between two individuals, Mrs Sabadash on the one hand and the Representor on the other, we think it is important that the Respondents, who have a special status as liquidators which is recognised in Courts outside the island, have the legitimacy of that status endorsed in relation to the actions which they propose to take. They have asserted firmly to this Court that, notwithstanding that they are funded by Mrs Sabadash, they are able to apply an independent approach to the functions which they have as liquidators. We are satisfied that they intend to do so and, as we think we made plain in our judgment of 23 May, we do not express any personal or professional criticism of them beyond the comment that it was in our view an error of judgment in the particular circumstances of this case not to confirm until put under pressure in Court the identity of the party funding the liquidation and thus the conduct of the litigation.

3.    In our judgment of 23 May, we indicated at paragraph 48 that the Respondents should return to Court with details of the progress they had made on the proposed alternative funding arrangements for the liquidation and the conduct of the litigation. We had such a hearing on the date on which the judgment was handed down.

**The submissions then made**

4.    Advocate O'Connell submitted that we should sit in private to hear details of the funding arrangements which the Respondents had made. He said that these were privileged and it was likely that the Court would see materials which would include a range of options from the possibility of external funding through to the continuation of funding by Mrs Sabadash. Any funding provided externally would inevitably be linked to the question of the likely success of the litigation, which was why the submission should be heard in private.

5.    Advocate O'Connell went on to submit that the Respondents would have no difficulty in scrutinising the activities of Mrs Sabadash.  He said that if she metaphorically turned off the funding tap, then the Respondents could come back to Court and at that stage seek alternative funding.  Furthermore, the Respondents were not only comfortable with that but also with the proposition that they would update the Court from time to time, but they must be able to do so in private.  In that context he relied upon Craig v Humberclyde Industrial Finance Group Limited and Others [1999] 1 WLR 129.  In that case, a company was wound up by order of the Court (as opposed to going into liquidation at the instance of the shareholders, as in this case) but the official receiver was unable to pursue litigation in the interests of the company for shortage of funds.  The liquidator sought directions from the Court and the judge directed him to assign the actions to the former directors.  On appeal by the putative defendants of such actions, the Court of Appeal held that the liquidators' power to sell the property (which included the causes of action) was subject to the control of the Court and in exercising that control the Court's function was essentially administrative, to ensure as far as practicable the proper exercise of fiduciary powers or obligations.  In the circumstances, the judge had been entitled to exclude the representatives of the putative defendants from that part of the hearing dealing with evidence and submissions as to the merits of the company's actions against those members of the group; and the judge had given counsel for those putative defendants an adequate opportunity to be heard.  Accordingly, there was nothing unfair in the course of the proceedings taken.

6.    The decision in Craig v Humberclyde was in our judgment one of general principle, albeit that there was reference to the particular provisions of the Insolvency Act 1986 and the Insolvency Rules made thereunder, which are missing from our legislation.  In our judgment, Advocate Jones rightly agreed that Craig v Humberclyde was relevant and applied in the instant case, and accordingly we heard from Advocate O'Connell with Advocate Jones present, and briefly from Advocate Jones who then retired.  We then heard from Advocate O'Connell in private and Advocate Jones returned to make some final submissions.  This judgment is available to the Representor because it represents the conclusion of his application for the dismissal of the Respondents as liquidators of the Company, but we have sought to protect the confidence of what was said to us in private albeit, as is clear, we are taking that into account.

7.    As to the merits of their position, Advocate O'Connell noted in open hearing that the Court had been rightly concerned with Advocate Garrood's involvement at the outset, and also that the Court was able to look at the reality of the position overall.  He submitted that at one time the Company had assets of over £75 million.  It is now before the Court in an insolvent state and the reason he contended for that position was that the Representor had removed the assets or a substantial part of them.  Indeed, Advocate O'Connell submitted that the Representor admits that he did so, as part of an exercise to 'lock down' the assets.  On his own case, it was said that the Representor had indulged in self-help security.

8.  As to the position in relation to different funding possibilities, Advocate O'Connell described the process by which litigation funders might consider a proposal.  At step one, a confidentiality agreement would be prepared in respect of the transmission of information about the litigation to prospective funders.  With that confidentiality agreement would generally be provided an opinion from counsel on the merits, sufficient to justify interest on the part of the litigation funders.

9.  Step two would represent that stage where there was active due diligence and closer discussion. A term sheet would identify the matters to be negotiated.

10.  Step three would involve the investment of funds in the litigation and the execution of the deal in respect of which such funding would be provided.

11.  Step four would involve ongoing monitoring of the litigation in respect of its progress and potential returns.  That was an onerous stage in the proceedings because the funders would set up a credit committee or investment committee to consider the extent to which they would continue to put their own funds at risk.

12.  The cost of all this was enormous.  The external funder generally took a substantial uplift which could be up to 50% on all the actual outlay, depending on the extent of the risk.  The result was that there was less money available to creditors at the end of the litigation, if it were successful.

13.  It was furthermore said that there was no current complaint of what Mrs Sabadash had done as director (other than in her convening of the creditors' meeting) so any investigation of her conduct was theoretical rather than real at this stage.

14.  That was the extent of the submissions made in Advocate Jones' presence insofar as external funding was a possibility.  It was said to us that the materials which the Respondents wished to put forward would disclose their independence as liquidators, but it might be against the interests of the Company to do so in the presence of Advocate Jones.

15.  Advocate Jones submitted that, as far as one could tell, we were not at the process point at the moment.  He had no objection in principle to third party funding, but it is difficult for the liquidators if they are funded by Mrs Sabadash, and their conduct since August 2022 shows that to be so. As director, she refused payment of a substantial judgment debt due by the Company to his client, the Representor.  The Company under her direction opposed his application to have the Company wound up and issued its own claims in respect of the substance of the judgment debt which it owed.  The bottom line is that the Representor criticises Mrs Sabadash at every point,

and it is entirely accurate to describe the litigation as, in effect, litigation between his client and Mrs Sabadash.

16.    In response, Advocate O'Connell submitted that Advocate Hurry had written to Advocate Jones on 21 February 2023 seeking details of what the precise concerns were, and yet there had been no reply.  Advocate Jones confirmed that was correct.  He said he had set out the problems already.

17.    At that point, Advocate Jones left Court and Advocate O'Connell addressed us in confidence. However, it is not necessary or relevant to our decision to refer to anything said to us in private for the purposes of this judgment.

18.    We were presented with a draft affidavit called the second affidavit of Andrew Wood.  It was unsworn, but as Mr Wood was present in Court, he swore it before us as being true to the best of his knowledge, information and belief.  In his affidavit, Mr Wood explains how the Respondents' consistent view has been that before they cause the Company to continue or commence Court proceedings to recover the Company's assets, they need to have clarity on the funding arrangements for any such proceedings, including any adverse costs award.

19.    Apart from being registered as an approved liquidator in Jersey, Mr Wood is managing director of Teneo Financial Advisory Limited and, as mentioned, joint liquidator of the Company.  He put before us a copy of an agreement (the "Teneo Agreement") entered into with Mrs Sabadash on 4 July 2022.  In that agreement, Mrs Sabadash undertook to pay the Respondents in respect of their remuneration and all the liquidation costs, expenses and disbursements.  There was no uplift or other high percentage recovery for Mrs Sabadash in the event of recoveries being made by the Company.  That distinguished the Teneo Agreement from what was common in funding agreements with commercial funders.  As a result, the Teneo Agreement was advantageous to the Company's stakeholders.

20.    However, that agreement did not provide a sophisticated framework for handling the litigation which might be necessary.  A draft of a litigation funding agreement (the "DFA") was first provided to Mrs Sabadash for comment on 14 December 2022.  It remained unsigned by both parties at the date of the hearing, albeit that both the Respondents and Mrs Sabadash appear to have acted so far as if it had been signed.  Mrs Sabadash has approved the costs budget and the additional commitment (as defined by the DFA) thereby paving the way for the Respondents to attempt to recover assets of the Company with potentially considerable value.  The DFA has in fact been amended from time to time, albeit still remaining unsigned, given the lapse of time since

it was first drafted, and the developments which have taken place. The Court was shown the amendments.

21. What is particularly important, according to Mr Wood, is that one notices from the revised version of the DFA, that Clause 9, which relates to the control and conduct of each action, has not changed. It provides as follows:

> *"9.1    The joint liquidators [the Respondents] (on behalf of the Company) shall have overall and day to day control and conduct of, and responsibility for, each Agreed Action.*
>
> *9.2.    The funder shall have no control or conduct of any Agreed Action."*

22. *"Agreed Action"* is defined in the DFA as action or additional action as agreed between the funder and the Company in accordance with Clause 4.3. Although it may subsequently have changed, at the date of the hearing, that clause was in these terms:

> *"Upon receipt of the Initial Advice the Company will procure that a copy of the Initial Advice is delivered to the funder. The funder and the Company will negotiate in good faith to agree to investigate, commence and / or pursue one or more agreed actions."*

23. Mrs Sabadash is the funder. The Initial Advice is defined as a written advice on the merits of the actions comprising the litigation between the Company and, among others, the Representor, and any other additional action provided by legal counsel.

24. Advocate O'Connell emphasised that nothing in the Teneo Agreement or in the DFA gave Mrs Sabadash any right to require the Respondents to take particular steps. As a result it could fairly be said that the Respondents were entirely independent of the funder and it was proper for them to proceed on that basis.

25. As to external funding, the Respondents had made some enquiries. Their enquiries with Harbour Litigation Funding were more advanced than enquiries with others – counsel's advice had been provided and Harbour had indicated a potential interest. Detailed negotiations had not however taken place, although it was indicated by Harbour that they would want a return of between 1.35 and 3 times their investment. The discussions with two other funders had barely started.

26.   In Advocate O'Connell's submission, if the Court were satisfied that the Respondents could properly fulfil their functions, funded as they were by Mrs Sabadash, then there was no reason to spend additional monies through an external funding agreement of the kind described.  He said that we should be so satisfied – if the Respondents found themselves in difficulties, then they could make a Beddoe application and seek approval for external funding.  He agreed that Advocate Jones could be informed of this.  He also agreed that Advocate Jones could be informed that Mrs Sabadash has promised only to pay for the agreed actions.  When Advocate Jones was informed of this on his return, he submitted that the possibility of a Beddoe application did not address the difficulties which have been identified, other than that the Court will be able to supervise the performance of the Respondents' functions.

27.   We make the following observations about the DFA as it was shown to us at the hearing:

(i)   It remained unsigned.  In our judgment it should be executed as soon as convenient.  It may be that Mrs Sabadash has so far acted in accordance with its terms, but this is not the type of contract in our judgment which could successfully lead to a conclusion that its part performance revealed its binding nature.

(ii)   The funding obligation on Mrs Sabadash was to pay the amount of a funding request within five business days of receipt.  Amounts paid are then treated as an expense of the liquidation of the Company.  The funding request must be accompanied by such information as Mrs Sabadash may at any time reasonably require.  It follows that if the Respondents were to come across circumstances which they considered should be investigated but which were potentially adverse to the interests of Mrs Sabadash, they would, on the face of it, be obliged to inform her that this is what the funding was required for.

(iii)   The DFA only provides for Mrs Sabadash and the Company to negotiate on the basis of the initial advice for the investigation, commencement or pursuit of one of more Agreed Actions – that is to say, actions agreed between Mrs Sabadash and the Company.  There is indeed an additional provision headed *'Additional Commitment'* – this refers to the need for agreement between Mrs Sabadash and the Company of a costs budget for any agreed actions.

(iv)   When we said in our earlier judgment that in litigation he who pays the piper calls the tune, it seems to us that this was entirely apposite to the present case, not in Mrs Sabadash having the ability to tell the Respondents what they must do, but rather as a mechanism for curtailing what they were able to do simply by reason of her control of the purse strings.

(v)    The DFA provides that Mrs Sabadash may at any time discontinue the making of advances in respect of a commitment at her absolute discretion save that she would remain liable for discontinuation costs and any adverse costs order.

**Conclusion**

28.    It was said to us by Advocate O'Connell that, if the Respondents found themselves in difficulties with the performance of their obligations, then they would be able to return to Court and apply for directions, seeking approval for external funding.  That submission was made in Advocate Jones' presence and arose in the context of an acceptance that Mrs Sabadash had promised only to pay for the Agreed Actions.  In his submission in response, Advocate Jones said that the possibility of a Beddoe application did not address the difficulties which previously had been identified, other than to show that the Court could supervise the performance of the Respondents' functions.

29.    Nothing that we have seen has caused us to change our view that Mrs Sabadash in essence retains practical control over what the Respondents are able to do because, if she does not approve of their intended actions, she is not obliged to provide the funds for them.  For as long as the Respondents take steps in the liquidation which are acceptable to her, she will continue to pay for them.  Nothing that we have seen or heard suggests that any of the preliminary concerns which we expressed in our judgment of 23 May have dissipated, although we do accept, as we indicated at the hearing, that the Respondents have every intention of acting professionally as liquidators of the Company and taking steps which are in the best interests of its stakeholders.

30.    The far more difficult question has been the next steps from here.  The Company has resolved to go into liquidation.  It is not a resolution to go into voluntary liquidation, so far as one can tell, because the Company does not seem to be able to procure that a statement of solvency is provided: Mrs Sabadash would have to accept an obligation to come up with payment of the substantial judgment debt in favour of the Representor for that to take place.

31.    Accordingly, if we were make to an order relieving the Respondents of their functions, the question we must address would be what further order would be right or proper.

32.    Under Article 175 of the Companies (Jersey) Law 1991, as amended (the "Law"):

*"**175.  Appointment or removal of liquidator by the court***

> *(1)       The court may appoint a liquidator if for any reason there is no liquidator acting in a creditors' winding up.*
>
> *(2)       The court may, on reason being given, remove a liquidator in a creditors' winding up and may appoint another.*
>
> *(3)       The appointment or removal of a liquidator under this Article may be made on request by the company, a director of the company, a creditor, the Viscount, the Commission, the Minister or any other person."*

33.  Although it is slightly unclear, we think that this is a creditors' winding up and therefore the Court has the power under Article 175(2) to remove the Respondents.  However, the liquidation would continue.  Article 185A of the Law allows for a termination of the creditors' winding up, but by paragraph (2) of that Article, any application, whether by the liquidator of the Company or, by the members sanctioned by special resolution by the Company, is to be refused unless the Court is satisfied that the Company is then able to discharge its liabilities as they fall due.  There is no basis at present for thinking that the Company would be able to do so.

34.  Replacing the present Respondents with any other professional liquidators funded by Mrs Sabadash would essentially raise the same concerns as have been raised in connection with the Respondents.

35.  It would seem to follow that if we were to adopt this course, it would be to drive the appointment of external funders, a much more expensive solution which these Respondents have indicated they will follow in any event if it becomes necessary for them to do so to fulfil their obligations as liquidators.

36.  None of these options appears necessarily attractive.  In our judgment, the least worst option is that the Respondents should continue in their appointment and accordingly we have reached the conclusion that the Representation, insofar as it seeks the removal of the Respondents, should be dismissed.  Having received from the Respondents their undertaking that Advocate Garrood will not be reinstructed by them in the course of this liquidation, it is unnecessary to make the further orders in that connection which the Representor had sought.

37.  It will clearly be necessary, if Mrs Sabadash gets to the point she does not wish to fund the liquidation any further, for the Respondents to make a Beddoe style application to the Court for approval to seek third party funding.  On the basis, however, that the liquidation will continue to

be funded by Mrs Sabadash, we think it right to add to our decision just given that it would be appropriate for the Respondents to apply at this stage for a direction pursuant to Article 186A of the Law, to seek approval of the steps which the Respondents intend to take in litigation in Jersey or in other jurisdictions.  In our view, it would be inappropriate to convene the Representor to any such application insofar as the application concerns litigation hostile to his position.  Inevitably, it would be necessary for the Respondents to set out in any such application the merits and demerits of the proposed action, as they are advised at that time.  The purpose of the application, as we currently see it, is not to advise the Respondents as to what action they should or should not take; but rather to ensure that, given the special status which liquidators have in most other advanced jurisdictions, this Court can be satisfied that, in the circumstances of this case, which as we have said we regard as essentially litigation between two warring creditors of the Company, no unfair advantage is obtained by one of those creditors through her appointment and payment of these liquidators.  It goes without saying that approval of any such action, whether in Jersey or other jurisdictions, would not amount to an endorsement of the merits of the action in question of itself – and given the possibility that much of the litigation may yet occur in Jersey, it is also necessary that a different Court be constituted to deal with that litigation than with any application under Article 186A.

38.   Finally, we are available to be addressed on costs of the Representation if either party wishes to make an application in that connection, and they should apply to the Bailiff's Judicial Secretary to fix a date in the usual way in that event.   It may, however, be helpful to give a preliminary indication of our current views.   It will be apparent that, although the Representation has been dismissed, it has been partially successful in the sense that an undertaking has been given not to reinstruct Advocate Garrood, and because the Court has been satisfied that there are circumstances unconnected with the integrity or professionalism of the Respondents which cause concern in relation to their appointment; and yet on the other side, the Representation has been dismissed and that prayer for relief has not been granted.   Our preliminary view is that the equity in these circumstances is that each side should bear their own costs – that has the effect of neutrality as between the two warring creditors on this particular issue, which, provisionally, as indicated, if not heard by the parties, might seem at this stage to be the equitable result.

**Authorities**

Companies (Jersey) Law 1991.

Insolvency Act 1986.

Craig v Humberclyde Industrial Finance Group Limited and Others  [1999] 1 WLR 129.

# Exhibit 2

# Exhibit 2

# In the Royal Court of Jersey

---

**Samedi Division**                                                        **2021/149**

---

**In the year two thousand and twenty-five, the twenty-fifth day of February.**

Before Advocate David Michael Cadin, Master of the Royal Court.

BETWEEN                          Golden Sphinx Limited
                                 (In Creditors' Winding Up)                    PLAINTIFF

AND                              Garry Itkin                      DEFENDANT

UPON hearing Counsel for the Parties;

AND for the reasons set out in a File and Parties' judgment of even date;

THE COURT ORDERED THAT:

1.   the parties may disclose the said File and Parties' judgment to the US Court;

2.   the proceedings shall be adjourned for 6 weeks, and a date shall be fixed for the said
     adjourned hearing, TE ½ day, by close of business on 28 February 2025.

Master of the Royal Court

CC (JB) & AC (MO'C)
BJ (IJ)

**2021/149**

# File and Parties Only

**ROYAL COURT**
**(Samedi Division)**

**25th February 2025**

Before    :    **Advocate David Michael Cadin, Master of the Royal Court.**

Between    **Golden Sphinx Limited**    **Plaintiff**

**(In Creditors'' Winding Up)**

And    **Garry Itkin**    **Defendant**

**Advocate J Barham/Advocate M O'Connell for the Plaintiff.**

**Advocate I Jones for the Defendant.**

**JUDGMENT**

**Introduction**

1.    This judgment is provided to explain my reasons for granting a short adjournment of the proceedings for 6 weeks on 25 February 2025.

**Background**

2.    GSL issued proceedings against Mr Itkin in April 2022.  In July 2022, proceedings were stayed following GSL having entered into a creditors' winding up.  That stay was lifted on 6 February 2024 and permission was given to GSL to file an Amended Order of Justice and for consequential amended pleadings.  Thereafter the proceedings were stayed for ADR.

3.    The matter came back before me in December 2024, when for the reasons set out in a judgment, reported at [2024] JRC 279, I ordered that Mr Itkin pay GSL the sum of £78,432 on account of costs, and that he answers a number of Requests for Further Information by 17 January 2024.  A

hearing to determine the costs of the applications and to give further directions was originally scheduled for 14 January 2025 but this was subsequently moved, by consent, to 25 February 2025.

4.    By an email dated 10 January 2025, Advocate Jones, for Mr Itkin, notified Advocate Barham, for GSL, that Mr Itkin had been the subject of an evacuation order relating to the Californian wildfires, and that the principal lawyer in his US legal team had been similarly impacted.  Advocate Jones proposed an extension of 7 days *"in the first instance"* to the deadline for the provision of the further information.  Advocate Jones wrote again on 23 January 2025, indicating that matters had not changed, and he requested a further extension to 31 January 2025.  Advocate Barham replied, agreeing to *"a final extension to 31 January 2025 on condition that the interim payment on account of costs (the Costs) is also paid by that date."*  On 31 January 2025, Advocate Jones notified Advocate Barham that matters had not improved in California and he was therefore instructed to seek a stay.

5.    Advocate Barham's response, dated 31 January 2025, is relevant in that he noted that:

> *"…we have had access to publicly available information which shows that your client's home is not in an evacuation zone but is in a zone marked as "safe", Accordingly, if your client would like the JLs to consider agreeing a further extension (a general stay clearly being inappropriate in the circumstances), please provide detailed evidence to support the assertion that your client and his legal team have been displaced. We would expect this to include copies of the evacuation orders/notices, detail their current circumstances, explain what systems and documents they require access to in order to respond to the RFIs and why they are unable to access them from their present locations and provide you with instructions, if that is the issue.*
>
> *Further, we note that you have not addressed the payment of outstanding Costs. Please could you confirm, by return, that they will now be paid or provide an explanation as to why they cannot be paid."*

6.    Mr Itkin issued an application on 3 February 2025 to stay the proceedings and to vacate the hearing listed for 25 February 2025.  The Plaintiff also issued an application on the same day for unless orders.

7.    Those applications were heard by me on 17 February 2025, when for the reasons given in an *ex tempore* judgment, I refused Mr Itkin's application for a stay and varied my previous order of 13

December 2024, so as to require Mr Itkin to pay the monies on account of costs and to answer the various requests for further information, by noon on 24 February 2024.

8.  By email dated 21 February 2025, Advocate Jones for Mr Itkin, notified the Court that Mr Itkin had filed a bankruptcy petition in relation to the "Itkin-Sabadash Partnership" and that that petition prevented both him and the Plaintiff from taking any further action in the proceedings before the Royal Court on the basis that:

> "As the Joint Liquidators will doubtless be advised, the filing by Mr Itkin of the Involuntary Petition operates as an automatic stay under '11 U.S.C. section 362(a)'. The stay applies to all and any actions which concern any property claimed to be directly and indirectly owned by the Itkin-Sabadash partnership. As your clients will be aware, the Itkin-Sabadash partnership asserts claims ownership of the real property at 58 Beverley Park in Beverly Hills; '11 U.S.C. section 362(a)' as of yesterday, operates so as to prevent your clients taking any further action in GSL -v- Itkin - 2021/149."

**The Hearing**

9.  Having recently sat, and delivered an *ex tempore* judgment, matters relating to this case, and in particular, the evidence filed, were fresh in my mind.

10. Mr Itkin swore an affidavit on 11 February 2025 setting out the basis for his application for a stay. That affidavit recorded his address as 8501 Wilshire Blvd., Suite 330 Beverly Hills, California, USA and noted that:

> "3… The reason I seek an adjournment and / or a stay is because of the recent devastating events in the Los Angeles area; specifically, the Wildfires. Since 7th January this year I have not been able to engage meaningfully with this litigation. I have not had the time or proper opportunity to speak with Advocate Jones, certainly not substantively, nor have I been able to take any advice from my US legal team who have been similarly impacted by the Wildfires…
>
> 5… Many homes suffered extensive smoke damage to their homes - mine was one of these homes - in particular to their HVAC systems. My own system is yet to be repaired and / or replaced and until it is, living at home with my family and my nearly 87 year old mother is extremely difficult owing to the various respiratory problems that it causes. Naturally a lot of my time and focus has had to be on the well-being and safety of my family - not to mention myself…

*9. While I feel very fortunate to have been left with my own home largely intact - notwithstanding the extensive smoke damage to the HVAC system; and while I am fortunate to not have been directly impacted by the Wildfires in the way that others have, I have nevertheless been living in close proximity to the impacted areas, at this point on a long term basis - I and my legal team, continue to face a range of long-term challenges such as our mental and physical health, economic stability, and overall sense of security….*

*16. Unfortunately, the reality of the situation, as I have tried to detail above, is that I remain unable to consult with my US legal team and as a consequence I am unable to give Advocate Jones full instructions. I will therefore not be able to comply with the requirements of the current orders of the Court; nor would I be able to meet or otherwise satisfy the proposed 'unless order'. As matters stand that is simply not possible."*

11. Mr Wood, one of the Joint Liquidators of GSL, swore an affidavit on 12 February 2025.  In that affidavit, he noted that:

(i)   in all of the affidavits sworn by Mr Itkin in these proceedings, Mr Itkin had given his address as 8501 Wilshire Blvd., Suite 330 Beverly Hills, California;

(ii)  Mr Itkin's US lawyer, Mr Atabek, made a solemn declaration under pain of perjury on 17 March 2022 in support of an application by Mr Itkin to set aside a default judgment in which he stated that:

*"Mr. Itkin further advised me that he obtained the CMC Statement from the offices of his accountant located at 8501 Wilshire Blvd., Suite 330, Beverly Hills, California (the "Wilshire Address"). Mr. Itkin stated to me that he used to work out of the Wilshire Address, but ceased doing so in the year 2015."*

(iii) in other Californian proceedings, Mr Itkin appears to be associated with a property at 13355 Mulholland 20 Drive, Beverly Hills, CA 90210;

(iv)  Mr Itkin is represented by ACTS Law and by Atabek & Co. with addresses at 16001 Ventura Boulevard and New Beach respectively;

(v)   according to the publicly available information, neither of Mr Itkin's addresses, nor those of his lawyers, fall within the area affected by the wildfires.

12.    Notwithstanding Mr Itkin's apparent inability to consult with his US lawyers, within 2 days of my orders, he managed to engage with US lawyers and to file a bankruptcy petition in relation to the alleged partnership.  He did not however pay the monies on account of costs or file any responses to the Requests for Further Information.

13.    Moreover, in issuing the bankruptcy petition, he recorded both his mailing address and that of the alleged partnership, as 8501 Wilshire Blvd., Suite 330 when according to his lawyer's 2022 declaration, this was neither his residential address nor his business address.

14.    At the hearing, Counsel for the joint liquidators was at pains to stress that the joint liquidators did not want to breach, wilfully or at all, any orders of the US Court and that it was a matter for me as to how I progressed the litigation, if indeed, I did so.  Counsel for Mr Itkin submitted that having issued the petition, it was now for the joint liquidators to get guidance from the Royal Court, in the form of a separately constituted bankruptcy court, as to what they should do.

15.    From the Court's perspective, this was not a very satisfactory position.  Having chosen to issue a petition rather than to comply with my orders, and to have done so this close to the hearing in Jersey, it was incumbent on Mr Itkin to provide both the Court and the joint liquidators with proper evidence as to what he alleged the consequences of his actions to be.  Bald assertions in correspondence were not sufficient.

16.    However, out of an abundance of caution and with proper deference to the US Courts, it appears to me that I should not, at this stage, take any substantive steps in the Jersey proceedings until all parties have had an opportunity to take advice, to consider their respective positions and to bring such applications, if any, as they think fit.

17.    Accordingly, I adjourn the proceedings for 6 weeks and direct that a date be fixed for the said adjourned hearing by close of business on 28 February 2025.

# Exhibit 3

# Exhibit 3

# In the Royal Court of Jersey

**Samedi Division**                                                            2021/149

In the year two thousand and twenty-five, the twenty-first day of August.

Before Advocate David Michael Cadin, Master of the Royal Court.

BETWEEN                              Golden Sphinx Limited
                                     (In Creditors' Winding Up)                    PLAINTIFF

AND                                       Garry Itkin                          DEFENDANT

UPON reading the emails from the Advocates for the Plaintiff and the Defendant

BY CONSENT IT IS HEREBY ORDERED THAT:

1.  the parties may disclose the File and Parties judgment, and Act of Court dated 14
    August 2025 (the Act), and, unless ordered otherwise, any further File and Parties
    judgments of Acts of Court in these proceedings, to any courts in the United States of
    America or elsewhere involving the same or related parties or subject matter;

2.  the time for complying with paragraph 2 of the Act is extended to 4pm on 3 September
    2024;

3.  the time for complying with paragraph 3 of the Act is extended to 4pm on 12 September
    2024;

4.  the time for complying with paragraph 4 of the Act is extended to 4pm on 15 September
    2024;

5.  liberty to apply; and

6.  costs in the cause.

Master of the Royal Court

CC (JB)
BJ (IJ)
Bailiff's Judicial Secretary (by email for information)

**2021/149**

# File & Parties Only

**ROYAL COURT**
**(Samedi Division)**

**14th August 2025**

Before    :    **Advocate David Michael Cadin, Master of the Royal**
                       **Court.**

**Between**                      **Golden Sphinx Limited**                      **Plaintiff**

                                          **(In Creditors'' Winding Up)**

**And**                                    **Garry Itkin**                                    **Defendant**

**Advocate J Barham for the Plaintiff.**

**Advocate I Jones for the Defendant.**

**JUDGMENT**

**Introduction**

1.    This is my judgment setting out the reasons for adjourning the Plaintiff's application for judgment
       against the Defendant following the Defendant's failure to comply with the terms of an unless order.

**Background**

2.    On 23 July 2025, for the reasons set out in a File and Parties' Judgment of the same date, I ordered
       that:

              *"1. unless the Defendant:*

                     *a. pays the Plaintiff the sum of £78,432 on account of the costs ordered*
              *pursuant to the Act of Court dated 7 February 2024; such sum to be received in*

1

*cleared funds by the Plaintiff by 12 noon local time in Jersey (British Summer Time) on 31 July 2025; and*

*b. answers Requests 2 (ii) to (viii); 5, 6, 10, 13, 14, 15, 19, 20, 22, 23, 24, 25, 26, 41, 43, 44, 45, 49, 50, 51, 52, 54, 57, 58, 59, 60, 61, 62, 63, 64, 69, 77, 79, 80, 87, and 92 of the Plaintiff's Requests for Further Information by 12 noon local time in Jersey (British Summer Time) on 31 July 2025*

*the Defendant's Amended Answer shall be struck out and he shall be debarred from defending the proceedings…"*

3.    The Defendant failed to comply with both deadlines.

4.    On 4 August 2025, Advocate Jones for Mr Itkin filed a document entitled *"Defendant's Response to Plaintiff's Request for Further Information and Clarification dated 26th April 2024"* which purports to answer all of the Requests ordered by the 23 July 2025 Act of Court.  In its Skeleton Argument, the Plaintiff criticises the response on the grounds that, not only is it late, but:

*"The Responses do not respond to all of the Requests adequately or at all (22 of the 37 requests remain unanswered and 6 are only partial answers or raise additional issues)."*

5.    On 11 August 2025, Mr Itkin swore an affidavit in response to the Plaintiff's application.  In it, Mr Itkin deposed that:

(i)    he had breached the unless orders;

(ii)    until January 2025, his litigation costs had been funded by a third party but in January 2025, that arrangement was terminated;

(iii)    that that termination, together with the Californian wildfires, hampered his ability to comply with the terms of the orders;

(iv)    he is in the process of obtaining financing and he should be in funds by "the end of the month" and should be in a position to pay the outstanding costs by September 2025.

6.   No formal application has been made by Mr Itkin for any extension of time or for any relief from sanction, contrary to the provisions of Practice Direction RC 17/05 and the procedure adopted in Newman v de Lima [2018] JRC 155. Instead, he seeks to rely upon the fact that he has filed responses to the outstanding Requests for Further Information and that he has provided an explanation as to why he has not paid the costs as grounds for asserting that the unless orders should not be triggered as his failures apparently *"do not come anywhere close to rendering it impossible for there to be a fair trial of this action."* He does not however assert that he is impecunious.

7.   In response to that affidavit, on the day of the hearing, the Plaintiff uploaded to Case Centre two documents from proceedings instituted in the Superior Court of California for the County of Los Angeles by Paul Hendifar against Mr Itkin's former lawyer, Mr Atabek, Mr Itkin and others. The first document is the First Amended Complaint which alleges that Mr Hendifar provided litigation funding in the sum of USD300,000 to Mr Itkin on the basis of what he asserts, was concealment by the Defendants and/or fraudulent inducements which also amounted to a breach of contract. The second document is a Notice of Motion by Mr Hendifar alleging that Mr Itkin has failed to respond to requests for production of documents.

8.   By an email dated 14 August 2025, sent at 11:51, Advocate Jones indicated that he was *"unclear"* as to whether he was instructed to appear at the hearing listed for today at 4pm and requested that the in-person hearing be changed to facilitate Mr Itkin's attendance by video link.

**Discussion and Decision**

9.   In Halabi v Farrow [2024] JRC 243, Commissioner Thompson explored the position in relation to the enforcement of unless orders in Jersey. His starting point was the decision of Birt, DB (as he then was) in Leeds v Admatch [2008] JRC 086 where he set out the principles cited by Master Wheeler:

> *"17…The Master reminded himself of the principles as set out in the Supreme Court Practice (White Book) at paras 3/5/2 - 3/5/4, 3/5/9 and 3/5/10. He quoted a number of extracts but we would refer to the following extract from 3/5/10:-*
>
> *"The court observed that each case had to be considered on its own facts but the underlying approach might be encapsulated by the following:*

*1. An unless order was an order of last resort, not made unless there was a history of failure to comply with other orders. It was the party's last chance to put its case in order.*

*2. Because it was the last chance, a failure to comply would ordinarily result in the sanction being imposed.*

*3. The sanction was a necessary forensic weapon which broader interests of the administration of justice required to be deployed unless the most compelling arguments were advanced to exonerate the failure.*

*4. It seemed axiomatic that if a party intentionally flouted the order he could expect no mercy.*

*5. A sufficient exoneration would almost invariably require that he satisfied the court that something beyond his control had caused the failure.*

*6. The judge would exercise his judicial discretion whether to excuse the failure in the circumstances of each case on its own merits, at the core of which was service to justice.*

*7. The interests of justice required that justice should be shown to the injured party for procedural inefficiencies causing the twin scourges of delay and wasted costs. The public administration of justice to contain those blights also weighted heavily. Any injustice to the defaulting party, though never to be ignored came a long away behind the other two (Hytec Information Systems Limited v Coventry City Council [1997] 1 WLR 1666, CA)."*

10.   Commissioner Thompson noted paragraphs 33 and 34 of that judgment, where Birt, DB, held that:

*"33. The applicable principles in relation to 'unless' Orders are correctly stated in the passage from the White Book quoted at para 17 above. In particular, an 'unless' Order is a party's last chance to put its case in order and failure to comply with such an order will ordinarily result in the sanction referred to in the Order being imposed.*

*34. However, there is a discretion to extend time retrospectively which, however rarely, may in the particular circumstances of the case be exercised*

*where the Court is satisfied that the failure to comply with the 'unless' Order was not intentional and contumelious."*

11.    Commissioner Thompson then held as follows:

> *"36. In my judgment, the starting point for breach of an unless Order is still Leeds v Admatch and the approach set out at paragraphs 17, 33 and 34. I consider that the remarks of Sir Michael Birt apply with equal force today and have not been qualified by Newman v De Lima. Newman concerns what sanctions to impose where an order has been breached. While the extracts I have quoted recognise the significance of a party being deprived of its day in court, I consider that Sir Michael was well aware of that principle. He recognised that a party facing an unless order had already been given a final chance to put its house in order. Even then he recognised the power to grant relief from sanction where a breach of an unless order was not intentional or contumelious. While that could be a breach due to the acts of a third party, paragraph 34 is wider than that as is the Supreme court extract. As the latter observes a "failure to comply with such an order will ordinarily result in the sanction referred to in the Order being imposed (emphasis added).*
>
> *37. In Powell v Chambers, which was approved in Sheyko, the relief from sanction was granted because notwithstanding that an unless order had been made, on the particular facts of that case, I concluded that it was a disproportionate sanction for the breaches that had occurred at that stage. The Court's discretion may therefore go beyond unintentional breaches but may also extend to breaches where to give effect to an unless order would clearly be unfair and it would be wrong to deprive a party in breach of an unless order of a trial. I wish to stress however that such a case would be exceedingly rare and that deliberate failures or breaches where there is no justification are highly likely to lead to the unless order taking effect. This conclusion does not detract from the approach in Newman. By the time a court is reviewing a breach of an unless order, the party in default has already been given at least one, if not more than one, opportunity to comply. That party's right to a trial has therefore already been recognised and respected. Something more is therefore required to avoid the effects of an unless order taking effect."*

12.    I have set out the relevant approach of the Courts in relation to the enforcement of unless orders as in my judgment, this matter is not necessarily clear cut:

(i) the Plaintiff submits, through its Skeleton Argument, that the Defendant has failed to comply with the terms of the unless orders, and his purported compliance with the answers to the Requests is inadequate. I anticipate, given the additional material uploaded, that it will also submit that:

    (a) any failure to pay the costs is intentional and/or contumelious given the allegations that the litigation funding was obtained by fraud; and/or

    (b) he has failed to provide any evidence as to his alleged impecuniosity and/or the funding that he now asserts will be obtained.

(ii) the Defendant submits, through his affidavit, that he has filed responses and will pay the costs, and that any failure to pay was not through any fault of his.

13. The potential consequences of the Plaintiff's application are significant in that judgment will be entered against the Defendant immediately in the context of proceedings involving significant sums of money.

14. Against that background, I think that it is wholly unsatisfactory for Advocate Jones to be unaware of whether he is instructed to appear and/or for the Court to be asked at the eleventh hour to make arrangements to enable Mr Itkin to appear personally by video link, if so minded.

15. I have reminded myself of the principles set out in <u>Dick Stock v G.B. Trustees Limited</u> [2019] (1) JLR Note 6 where Le Cocq, DB (as he then was) held that:

> *"On an application to adjourn hearing dates, the following matters should be considered: the importance of the proceedings and the likely adverse consequences to the party seeking an adjournment; the risk that that party might be prejudiced in the conduct of the proceedings if an adjournment were refused; the risk of prejudice or other disadvantage to the other party if it were granted; the convenience of the court; the interests of justice generally in the efficient dispatch of court business; the desirability of not delaying future litigants by adjourning early and thus leaving the court empty; and the extent to which the party seeking an adjournment had been responsible for creating the difficulty which led to the application (Cummins v. Howlands (Furniture) Ltd., 2014 (2) JLR N [18], applied). The power to adjourn should be exercised with great care and only when there was a real risk of serious prejudice which might lead to*

> *injustice; in practice this test was difficult to satisfy (States Greffier v. Les Pas*
> *Holdings Ltd., 1998 JLR N–3, applied)"*

16.    I have also reminded myself that these proceedings are already listed for a half day hearing on 22 September 2025 by video link, whereas the Court only has an hour available today to deal with the Plaintiff's application.

17.    In my judgment, the Court will require longer than an hour to deal with the issues that are apparent on the face of the papers, particularly if Mr Itkin is acting in person.   It will also require further evidence from Mr Itkin to explain:

(i)      his financial position;

(ii)     why the points now relied upon were not raised previously and in particular:

(a)      in February 2025, noting that the matter was then before the Court and Mr Itkin swore an affidavit dated 11 February 2025 stating that "Since 7th January this year I have not been able to engage meaningfully with this litigation" allegedly on the basis of the Californian wildfires, not because his funding had been withdrawn; and

(b)      in July 2025 when the matter came back before the Court and Advocate Jones appeared for Mr Itkin.

18.    Accordingly, of my own motion, I adjourn the Plaintiff's application to 22 September 2025 and direct that:

(i)      the Defendant file a further affidavit addressing the points listed above, such affidavit to be filed by 4pm on 22 August 2025;

(ii)     the Plaintiff have permission to file any affidavit in response by 5 September 2025;

(iii)    insofar as the Plaintiff submits that the Defendants responses to the Requests for Further Information represent non-compliance with the terms of the unless order as opposed to late compliance, they shall set out such submissions as they think fit in a further Skeleton Argument to be filed by 12 September 2025;

(iv)    the freeze date for the hearing on 22 September 2025 shall be 4pm on 15 September 2025.

19.    I would also channel Commissioner Thompson's words in <u>Halabi v Farrow</u>, in that having had unless orders made against him, Mr Itkin is very much under last orders in the last chance saloon, and he may well think it in his interests to ensure that the costs due under the Unless Order have been satisfied by the next hearing.

### Authorities

Halabi v Farrow [2024] JRC 243

Leeds v Admatch [2008] JRC 086

Dick Stock v G.B. Trustees Limited [2019] (1) JLR Note 6



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 15021 Ventura Blvd. #544, Sherman Oaks, CA  90034.

A true and correct copy of the foregoing document entitled

## Statement Regarding Motion for Reconsideration of Order Dismissing Involuntary Case

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **August 28, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Joseph E Caceres     jec@locs.com, generalbox@locs.com
- Daniel J McCarthy     dmccarthy@hillfarrer.com, spadilla@hillfarrer.com;dflowers@hfbllp.com
- Charles Shamash     cs@locs.com, generalbox@locs.com
- Oleg Stolyar     astolyar@loeb.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Michael Zorkin     mz@thezorkinfirm.com

**2.  SERVED BY UNITED STATES MAIL**: On **August 28, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**None**.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 28, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**None**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| August 28, 2025 | Kurt Ramlo | /s/ Kurt Ramlo |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**